```
                                                    ┌─────────────────────────┐
                                                    │        FILED            │
                                                    │                         │
    IN THE UNITED STATES DISTRICT COURT             │      JAN 3 1 2006        │
  FOR THE WESTERN DISTRICT OF NORTH CAROLINA        │                         │
          Civil Action No. 3:05CV256-H              │   U.S. DISTRICT COURT   │
                                                    │  DISTRICT OF DELAWARE   │
                                                    └─────────────────────────┘
```

| | |
|---|---|
| A. ARENSON HOLDINGS, LTD., D.A. ) <br> GARDENS, LTD., J12ALH ) <br> ASSOCIATES, SELK, LLC and LAUREL ) <br> EQUITY GROUP, LLC, ) | |

0 6 -     6 2

Plaintiffs, )

v. )     **DECLARATION OF**
)     **PAMELA JARVIS**
)     **IN SUPPORT OF MOTION TO**
SHAMROCK HOLDINGS OF )     **DISMISS OR TRANSFER**
CALIFORNIA, INC., SHAMROCK )
CAPITAL ADVISORS, INC., EUGENE I. )
KRIEGER, GEORGE J. BUCHLER and )
BRUCE J. STEIN, )
)
Defendants. )

**PAMELA JARVIS** declares pursuant to 28 U.S.C. § 1746 that:

1.      I am a partner in the law firm of GREGORY P. JOSEPH LAW OFFICES LLC, counsel

for Defendants in the above-captioned action. I submit this declaration on behalf of Defendants

Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"),

Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein"), in

support of their motion to dismiss the Complaint in the above-captioned action or, alternatively,

to transfer this action to the United States District Court for the District of Delaware.* Unless

otherwise indicated, I have personal knowledge of the matters set forth in this Declaration, and

as to such other matters, I believe that the statements herein are true.

---

* This Declaration is submitted in support of Defendants' motion to dismiss for failure to state a claim
under Fed. R. Civ. P. Rule 12(b)(6) only to the extent that it attaches documents referred to in the
Complaint but not attached thereto.

2.      Annexed as Exhibit A hereto is a true and correct copy of the June 2, 2005 Complaint filed by Plaintiffs herein ("Complaint").

3.      Annexed as Exhibit B hereto is a true and correct copy of the April 22, 2005 First Amended Complaint filed by Defendants in the United States District Court for the District of Delaware ("DE Complaint").

4.      Annexed as Exhibit C hereto is a true and correct copy of the September 13, 2004 complaint originally filed by Defendants herein in the Court of Chancery of the State of Delaware.

5.      Annexed as Exhibit D hereto is a true and correct copy of the Operating Agreement of ALH Holdings, LLC ("ALH") dated June 12, 1998 and a true and correct copy of the March 15, 1999 Amendment to the Operating Agreement.

6.      Annexed as Exhibit E hereto is a true and correct copy of the November 5, 2004 Declaration of George J. Buchler in Support of Motion for Remand (without exhibits), filed in Defendants' action against Plaintiffs in the United States District Court for the District of Delaware (the "DE Action").

7.      Annexed as Exhibit F hereto is a true and correct copy of a July 1, 2001 Agreement between ALH and Lion ALH Capital LLC ("Lion LLC") (the "Lion LLC Settlement Agreement").

8.      Annexed as Exhibit G hereto are true and correct copies of the Affidavits of Confession and Judgment of Shalom Lamm ("Lamm"), Jonathan Zich, and John D. Hourihan, dated August 27, 2001.

2

9.    Annexed as Exhibit H hereto is a true and correct copy of an agreement dated July 1, 2001 between Lion LLC and ALH, as attached to the Lion LLC Settlement Agreement.

10.    Annexed as Exhibit I hereto is a true and correct copy of a Written Consent of the Class D Members of ALH, dated August 16, 2001.

11.    Annexed as Exhibit J hereto is a true and correct copy of a July 1, 2001 agreement between SCA and ALH (the "Consulting Agreement").

12.    Annexed as Exhibit K hereto is a true and correct copy of a July 1, 2001 Unanimous Written Consent of the Supervisory Board of ALH, approving the Lion LLC Settlement Agreement and certain matters in connection therewith.

13.    Annexed as Exhibit L hereto is a true and correct copy of a Unanimous Written Consent of the Supervisory Board of ALH, dated July 1, 2001, in connection with the Lion LLC Settlement Agreement, initialed and executed by Avie Arenson ("Arenson").

14.    Annexed as Exhibit M hereto is a true and correct copy of a December 18, 2002 e-mail from Arenson to Krieger, Buchler, Michael G. Jesselson (" M. Jesselson"), Michel Konig ("Konig"), and Isaac M. Neuberger ("Neuberger").

15.    Annexed as Exhibit N hereto is a true and correct copy of an e-mail exchange dated December 18-27, 2002 among Krieger, Neuberger, M. Jesselson, Konig, Arenson and Buchler.

16.    Annexed as Exhibit O hereto is a true and correct copy of an e-mail exchange dated August 6, 2002 among Krieger, Neuberger, Buchler, Arenson, M. Jesselson, Konig and Mark Frankel ("M. Frankel").

3

17.     Annexed as Exhibit P hereto is a true and correct copy of the Partnership Agreement of J12ALH Associates, dated June 2, 1998.

18.     Annexed as Exhibit Q hereto is a true and correct certified copy of the January 9, 1998 Certificate of Formation of Jays Twelve LLC in the State of Delaware.

19.     Annexed as Exhibit R hereto is a true and correct certified copy of the June 3, 1998 Delaware Certificate of Formation of ALH.

20.     Annexed as Exhibit S hereto is a true and correct copy of a Guarantee Agreement between ALH and SELK, dated March 15, 1999.

21.     Annexed as Exhibit T hereto is a true and correct copy of a Settlement Agreement and Mutual Release between, *inter alia,* ALH and Lamm, dated December 17, 2004. Included in Exhibit H are copies of a cover letter from S. Mark Hurd, Esq. ("Hurd") to Sean J. Bellew, Esq. and Thomas M. Wood, IV, Esq. ("Wood"), dated January 14, 2005, and a letter from Wood to Hurd., dated January 19, 2005.

22.     Annexed as Exhibit U hereto is a true and correct copy of the Certificate of Incorporation of ALH II, Inc ("ALH II") in the State of Delaware, dated December 9, 1998.

23.     Annexed as Exhibit V hereto is a true and correct copy of the Loan Agreement between ALH II (as Borrower) and Shamrock, A. Arenson Holdings, Inc. and Lion & Lamm Capital, LLC (as Lenders), dated April 6, 2000.

24.     Annexed as Exhibit W hereto is a true and correct copy of the March 20, 2002 engagement agreement between ALH and Jolson Merchant Partners ("JMP").

25.     Annexed as Exhibit X hereto is a true and correct copy of the ALH II Loan Agreement dated May 7, 2002.

4

26.    Annexed as Exhibit Y hereto is a true and correct copy of an e-mail exchange
dated August 8-9, 2004 among Neuberger, Pamela Jarvis ("Jarvis"), Wood, Arenson, Benjamin
Jesselson ("B. Jesselson"), M. Jesselson, Konig, Yeheskel Frankel ("Y. Frankel") and M.
Frankel.

27.    Annexed as Exhibit Z hereto is a true and correct copy of an e-mail exchange
dated December 14-16, 2004 among Buchler, Arenson, Neuberger, Bridget McCarthy, Krieger,
Stein and Lamm.

28.    Annexed as Exhibit AA hereto is a true and correct copy of an e-mail exchange
dated August 2-3, 2004 among Jarvis, Neuberger and Wood.

29.    Annexed as Exhibit BB hereto is a true and correct copy of an e-mail exchange
dated April 1, 2004 between Buchler and Arenson.

30.    Annexed as Exhibit CC hereto is a true and correct copy of an e-mail exchange
dated August 3-5, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson,
Konig, Y. Frankel and M. Frankel.

31.    Annexed as Exhibit DD hereto is a true and correct copy of an e-mail exchange
dated August 3-5, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson,
Konig, Y. Frankel and M. Frankel.

32.    Annexed as Exhibit EE hereto is a true and correct copy of an e-mail exchange
dated August 6, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson,
Konig, Y. Frankel and M. Frankel.

5

33.     Annexed as Exhibit FF hereto is a true and correct copy of an e-mail exchange

dated August 6, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson,

Konig, Y. Frankel and M. Frankel.

34.     Annexed as Exhibit GG hereto is a true and correct copy of an e-mail exchange

dated August 8-11, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson,

Konig, Y. Frankel and M. Frankel.

35.     Annexed as Exhibit HH hereto is a true and correct copy of an e-mail exchange

dated August 22-23, 2004 among Jarvis, Neuberger, Arenson, B. Jesselson, Krieger, Buchler,

Konig, M. Jesselson, Y. Frankel, M. Frankel, Wood, William R. Lanius ("Lanius") and Gregory

P. Joseph ("Joseph").

36.     Annexed as Exhibit II hereto is a true and correct copy of an e-mail exchange

dated August 22-23, 2004 among Neuberger, Jarvis, Arenson, M. Jesselson, Krieger, Buchler,

Konig, B. Jesselson, Y. Frankel, M. Frankel, Wood, Lanius and Joseph.

37.     Annexed as Exhibit JJ hereto is a true and correct copy of an e-mail exchange

dated September 2-5, 2004 among Neuberger, Jarvis, Wood, Buchler, Krieger, Stein, Arenson

and Lamm.

38.     Annexed as Exhibit KK hereto is a true and correct copy of an e-mail exchange

dated August 27 - September 2, 2004 among Jarvis, Neuberger and Wood.

39.     Annexed as Exhibit LL hereto is a true and correct copy of an e-mail exchange

dated September 2-9, 2004 among Jarvis, Neuberger, Wood, Buchler, Krieger, Stein, Arenson

and Lamm.

6

40.    Annexed as Exhibit MM hereto is a true and correct copy of an e-mail exchange dated April 18, 2002 among Krieger, Buchler, Lamm and Arenson.

41.    Annexed as Exhibit NN hereto is a true and correct copy of the December 20, 2004 Declaration of Pamela Jarvis in Support of Motion for Remand (without exhibits), filed in the DE Action.

42.    Annexed as Exhibit OO hereto is a true and correct copy of an e-mail exchange dated August 27, 2004 among Jarvis, Neuberger and Wood.

43.    Annexed as Exhibit PP hereto is a true and correct copy of a September 13, 2004 letter from Hurd to Neuberger enclosing a copy of the complaint filed by Defendants herein in the Court of Chancery of the State of Delaware.

44.    Annexed as Exhibit QQ hereto is a true and correct copy of a July 12, 2004 letter from Neuberger to Stanley P. Gold, Krieger and Buchler.

45.    Annexed as Exhibit RR hereto is a true and correct copy of a December 17, 2001 letter from David Robbins, Esq., of Fried, Frank, Harris, Shriver & Jacobson to ALH and Shamrock.

46.    Annexed as Exhibit SS hereto is a true and correct copy of a January 28, 2002 conflict of interest waiver letter from David Robbins, Esq., of Fried, Frank, Harris, Shriver & Jacobson, to ALH and Shamrock.

47.    Annexed as Exhibit TT hereto is a true and correct copy of the May 14, 2003 Minutes of the Meeting of the Supervisory Board of ALH.

48.    Annexed as Exhibit UU hereto is a true and correct copy of the June 26, 2003 Minutes of the Meeting of the Supervisory Board of ALH.

7

49.     Annexed as Exhibit VV hereto is a true and correct copy of the March 24, 2004 Minutes of the Meeting of the Supervisory Board of ALH.

50.     Annexed as Exhibit WW hereto is a true and correct copy of the April 13, 2004 Minutes of the Meeting of the Supervisory Board of ALH.

51.     Annexed as Exhibit XX hereto is a true and correct copy of a Unanimous Written Consent of the Supervisory Board of ALH dated August, 2003.

52.     Annexed as Exhibit YY hereto is a true and correct copy of an e-mail exchange dated July 11, 2003 among Arenson, Buchler, Lamm and Krieger.

53.     Annexed as Exhibit ZZ hereto is a true and correct copy of a July 30, 2002 e-mail from Arenson to Buchler, Krieger and Neuberger.

54.     Annexed as Exhibit AAA hereto is a true and correct copy of an e-mail exchange dated October 31 - November 8, 2002 among Krieger, Arenson, Lamm and Buchler.

55.     Annexed as Exhibit BBB hereto is a true and correct copy of an e-mail exchange dated August 14 - September 6, 2002 among Krieger, Arenson and Buchler.

56.     Beginning in approximately mid-July 2004, as counsel to Defendants in this matter, I communicated directly with Plaintiffs' counsel, Neuberger, concerning the possibility of discussions between the parties.

57.     From approximately mid-July 2004 through August 2004, Neuberger and I engaged in a nearly daily exchange of correspondence, mostly by email, concerning the possibility of a meeting at which the parties might discuss and attempt to resolve their differences. It proved to be impossible to get the parties to agree on a place and time for face-to-face meeting, and even arranging a date and time for a conference call was difficult.

8

58.    In the course of my communications with Neuberger, strong disagreement was expressed on behalf of the parties concerning what might be discussed during the possible conference call. Neuberger advised me that Plaintiffs sought to discuss the compensation they wanted from Defendants, based on Plaintiffs' claims that Defendants had acted wrongfully with respect to ALH. I advised Neuberger of Defendants' position that Plaintiffs had no right to any such compensation, but that Defendants were willing to discuss the possibility of a mutually agreeable business transaction that would address the future of ALH.

59.    At no time after the parties' August 26, 2004 conference call did either party solicit or attempt to schedule any further discussions with the other.

60.    Between August 27, 2004 and September 13, 2004, Plaintiffs did not sue Defendants and did not communicate to Defendants any threat to sue. In addition, during the eight months after Defendants commenced the DE Action, Plaintiffs did not sue Defendants and did not communicate any threat to sue Defendants.

61.    In an email to me dated September 5, 2004, Neuberger stated that before agreeing to a mediation in Delaware, Plaintiffs "will require that Shamrock . . . agree to the same level of discovery that we think we could achieve if we were to file a lawsuit. I have asked Sam Wood [a partner in Plaintiffs' counsel's law firm] to scope that out and to provide you with the outline [of] a lawsuit that would be the basis of the mediation." Wood never provided me with the "outline of a lawsuit," whether as a basis for mediation or for any other purpose. Nor did he provide any other information regarding the discovery that Plaintiffs stated they wanted as a condition of agreeing to mediation.

9

62.     My next communication with Plaintiffs was on September 8, 2004. At that time, Neuberger sent me an email asking about "the extent of the discovery that [Shamrock] would consider if [Plaintiffs] were agree to the Mediation." Later that day, I responded by asking for the information from Mr. Wood that was promised on September 5, 2004. Plaintiffs provided nothing in response to my request.

63.     As of September 13, 2004, Plaintiffs had not explicitly refused to participate in a mediation in the Court of Chancery of the State of Delaware, but neither had they agreed to it. Since September 13, 2004, Plaintiffs have not communicated to Defendants any interest in pursuing mediation or settlement discussions.

64.     On October 6, 2004, the original defendants in the DE Action (SELK, LLC ("SELK"), Laurel Equity Group, LLC ("Laurel"), and Arenson, referred to herein as the "Original Defendants") removed the original complaint in the DE Action (Ex. C, *supra*) to federal court. On October 14, 2004, the Original Defendants filed various motions to dismiss the original complaint in the DE Action, but they did not move to dismiss on grounds of improper venue and they did not move to transfer the action to North Carolina

65.     On November 5, 2004, the Defendants herein moved to remand the DE Action to the Court of Chancery of the State of Delaware, on the grounds that the Original Defendants had failed to carry their burden of establishing diversity jurisdiction. Thereafter, in connection with the remand proceedings, through discovery and otherwise, the Original Defendants provided information concerning the ownership, controlling persons and business activities of the Plaintiffs herein, by means of, *inter alia*, sworn declarations and verified interrogatory responses.

10

In addition, the Original Defendants made supplemental factual submissions to the court concerning these matters. The motion to remand was denied on March 22, 2005.

66.     On June 3, 2005, following the April 22, 2005 filing of the amended complaint in the DE Action, Plaintiffs filed various motions to dismiss the DE Complaint (Ex. B, *supra*), but they did not move to dismiss on grounds of improper venue and they did not move to transfer the action to North Carolina

67.     According to sworn declarations submitted by Arenson in the DE Action, Arenson controls and is the record and/or beneficial owner of A. Arenson Holdings, Ltd. and D.A. Gardens, Ltd.

68.     As lead counsel for Defendants, I am familiar with the pleadings and proceedings in the DE Action over the past year, and I have reviewed extensive documentation concerning ALH and the matters at issue between Plaintiffs and Defendants. On this basis, I believe that the primary witnesses in this litigation will be the parties themselves, including but not limited to their owners, principals, members and controlling persons. As noted in ¶ 65 above, during the course of the remand proceedings in the DE Action, information about the locations of Plaintiffs and their owners, principals, members and controlling persons was provided.

69.     In addition, I expect at least the following to be third party-witnesses: (a) JMP, which was ALH's investment banker and financial advisor in connection with the sale of ALH's operations, and which is located in San Francisco, California (*see, e.g.,* Ex. W, *supra*), (b) Jonathan Zich, who was intimately involved in the affairs of Lion LLC and ALH, including but not limited to the Lion LLC Settlement Agreement, and who, according to his Confession of Judgment (Ex. G, *supra*) resides in New York City (*see, e.g.,* Exs. F-I, *supra*), (c) Neuberger,

11

who, *inter alia*, identified himself to me as a probable witness during our first telephone conversation in July 2004, and who is based in Baltimore, Maryland, (d) Fried, Frank, Harris, Shriver & Jacobson, which has been accused by Plaintiffs of conflicts of interest in connection with ALH and with facilitating alleged wrongdoing by Defendants, and which is based in New York (its California office having recently closed), and (e) Lanius and John Laguardia ("Laguardia"), who were senior officers of ALH and who reside in Florida.

70.   I have done on-line research concerning the distances between (a) the places where the foregoing potential witnesses are located, and (b) Wilmington, Delaware (where the Delaware federal court is located) and Charlotte, North Carolina, respectively. In addition, a paralegal at my law firm, acting under my supervision, did on-line research concerning the availability of non-stop flights between these places, using a sample travel date of September 19, 2005. Although airline routes and schedules are naturally subject to change, I believe the information we obtained is a fair representation of what is generally likely to be available during the litigation of this case. Having practiced in the Delaware courts on numerous occasions during my twenty-five plus years of legal practice, I am personally familiar with the transportation between the New York City area and Wilmington, Delaware.

71,   Arenson Holdings is an Israeli corporation with its principal place of business in Israel and D.A. Gardens is a Panamanian corporation with its principal place of business in Panama. Complaint ¶¶ 14-15. Both are owned and controlled by Arenson, who is an Israeli citizen and a particularly significant witness because of his role as Class B Representative on ALH's Supervisory Board. It appears that there are no non-stop flights between Tel Aviv, Israel and either Charlotte or Wilmington, but Wilmington is within approximately 100 miles of the

12

New York City airports, which have five non-stop flights per day, and Wilmington is within easy reach of New York City by car or train.

72.    J12 ALH Associates is a New York general partnership with two partners: an individual who is a New York citizen and a Delaware LLC, the members of which are twelve New York trusts that have New York trustees. *Id.* ¶ 16. Two of Laurel's three members are individual citizens of New York and New Jersey. *Id.* ¶ 18. One of SELK's two members is also an individual New York citizen. *Id.* ¶ 17. Wilmington is obviously more accessible than Charlotte for these witnesses as well as the others from New York and New Jersey.

73.    Laurel's third member is a Bahamian corporation that has its principal place of business in Geneva, Switzerland, "where all corporate business decisions are made." *Id.* ¶ 18. SELK's other member a British Virgin Islands ("BVI") corporation that apparently "does not have one principal place of business," but its "day to day activities, including investment decisions, as well as corporate decisions, are made in Europe, Israel and occasionally in New York." *Id.* ¶ 17. Geneva, like Tel Aviv, has non-stop air service to and from the New York City airports. It is reasonable to assume that the unidentified places in Europe where SELK makes its decisions have more nonstop flight to/from the New York City airports than Charlotte.

74.    The individual Defendants all reside in the Los Angeles, California area, and the corporate Defendants have their headquarters there. There are several non-stop flights per day between Los Angeles and Charlotte, but nearly ten times as many between Los Angeles and the New York City airports, and nearly five times as many to the Philadelphia and Washington, D.C, airports.

13

75.    With regard to Lanius and Laguardia, I have not discerned an appreciable difference between Wilmington, Delaware and Charlotte, North Carolina in terms of the availability of convenient travel arrangements to/from Florida.

76.    Based on all the information we have gathered, I believe that, for all of the parties and for most of the other witnesses, Delaware would be a considerably more accessible forum that North Carolina.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 2, 2005.

PAMELA JARVIS

/574691

14

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing has been served by United States mail, first-class, postage prepaid, to the following counsel of record:

    Russ A. Brinson
    Cozen O'Connor
    One Wachovia Center, Suite 2100
    301 South College Street
    Charlotte, North Carolina 28302

    Thomas M. Wood, IV
    Neuberger, Quinn, Gielen, Rubin & Gibber
    One South Street, 27th Floor
    Baltimore, Maryland 21202-3282

    This the 2nd day of September, 2005.

                  /s/ _____
                  J. Donald Cowan, Jr.
                  N.C. State Bar No. 0968

OF COUNSEL:
SMITH MOORE LLP
Post Office Box 21927
300 N. Greene Street, Suite 1400
Greensboro, North Carolina 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400

OF COUNSEL:
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200
Facsimile: (212) 407-1299

*Attorneys for Defendants Shamrock*
*Holdings of California, Inc., Shamrock*
*Capital Advisors, Inc., Eugene I. Krieger,*
*George J. Buchler, and Bruce J. Stein*

15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
No. 3:05-CV-256-H

| | | |
|---|---|---|
| A. ARENSON HOLDINGS, LTD., D.A.<br>GARDENS, LTD., J12ALH ASSOCIATES,<br>SELK, LLC and LAUREL EQUITY GROUP,<br>LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) ) | **INDEX OF EXHIBITS TO<br>DECLARATION OF<br>PAMELA JARVIS<br>IN SUPPORT OF MOTION<br>TO DISMISS OR TRANSFER** |
| SHAMROCK HOLDINGS OF<br>CALIFORNIA, INC., SHAMROCK<br>CAPITAL ADVISORS, INC., EUGENE I.<br>KRIEGER, GEORGE J. BUCHLER and<br>BRUCE J. STEIN, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Due to the volume of exhibits, the exhibits to the Declaration of Pamela Jarvis in Support

of Motion to Dismiss or Transfer, as listed below, are being submitted to the Court in PDF

format on CD.

1.     Exhibit A—June 2, 2005 Complaint filed by Plaintiffs in the United States

District Court for the Western District of North Carolina.

2.     Exhibit B—April 22, 2005 First Amended Complaint filed by Defendants in the

United States District Court for the District of Delaware.

3.     Exhibit C—September 13, 2004 Complaint originally filed by Defendants in the

Court of Chancery of the State of Delaware.

4.     Exhibit D—Operating Agreement of ALH Holdings, LLC ("ALH") dated June

12, 1998 and the March 15, 1999 Amendment to the Operating Agreement.

Case 3:05-cv-00256   Document 1342   Filed 09/02/2005   Page 2 of 99

5.      Exhibit E—November 5, 2004 Declaration of George J. Buchler in Support of Motion for Remand (without exhibits), filed in Defendants' action against Plaintiffs in the United States District Court for the District of Delaware.

6.      Exhibit F—July 1, 2001 Agreement between ALH and Lion ALH Capital LLC ("Lion LLC").

7.      Exhibit G—Affidavits of Confession and Judgment of Shalom Lamm ("Lamm"), Jonatthan Zich, and John D. Hourihan, dated August 27, 2001 ("Lion LLC Settlement Agreement").

8.      Exhibit H—an agreement dated July 1, 2001 between Lion LLC and ALH, as attached to the Lion LLC Settlement Agreement.

9.      Exhibit I—Written Consent of the Class D Members of ALH, dated August 16, 2001.

10.     Exhibit J—July 1, 2001 agreement between SCA and ALH (the Consulting Agreement").

11.     Exhibit K—July 1, 2001 Unanimous Written Consent of the Supervisory Board of ALH, approving the Lion LLC Settlement Agreement and certain matters in connection therewith ("Consulting Agreement").

12.     Exhibit L—Unanimous Written Consent of the Supervisory Board of ALH, dated July 1, 2001, in connection with the Lion LLC Settlement Agreement, initialed and executed by Avie Arenson ("Arenson").

13.     Exhibit M—December 18, 2002 e-mail from Arenson to Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler"), Michael G. Jesselson (M. Jesselson"), Michel Konig ("Konig"), and Isaac M. Neuberger ("Neuberger").

2

Case 3:05-cv-00256   Document 42   Filed 09/02/2005   Page 33 of 99

14.     Exhibit N—e-mail exchange dated December 18-27, 2002 among Krieger, Neuberger, M. Jesselson, Konig, Arenson and Buchler.

15.     Exhibit O—e-mail exchange dated August 6, 2002 among Krieger, Neuberger, Buchler, Arenson, M. Jesselson, Konig and Mark Frankel ("M. Frankel").

16.     Exhibit P—Partnership Agreement of J12ALH Associates, dated June 2, 1998.

17.     Exhibit Q—January 9, 1998 Certificate of Formation of Jays Twelve LLC in the State of Delaware.

18.     Exhibit R—June 3, 1998 Delaware Certificate of Formation of ALH.

19.     Exhibit S—Guarantee Agreement between ALH and SELK, dated March 15, 1999.

20.     Exhibit T—Settlement Agreement and Mutual Release between, *inter alia,* ALH and Lamm, dated December 17, 2004. Included in Exhibit H are copies of a cover letter from S. Mark Hurd, Esq. ("Hurd") to Sean J. Bellew, Esq. and Thomas M. Wood, IV, Esq. ("Wood"), dated January 14, 2005, and a letter from Wood to Hurd., dated January 19, 2005.

21.     Exhibit U—Certificate of Incorporation of ALH II, Inc ("ALH II") in the State of Delaware, dated December 9, 1998.

22.     Exhibit V—Loan Agreement between ALH II (as Borrower) and Shamrock, A. Arenson Holdings, Inc. and Lion & Lamm Capital, LLC (as Lenders), dated April 6, 2000.

23.     Exhibit W—March 20, 2002 engagement agreement between ALH and Jolson Merchant Partners ("JMP").

24.     Exhibit X—ALH II Loan Agreement dated May 7, 2002.

3

Case 3:05-cv-00256    Document 1-42    Filed 09/02/2005    Page 44 of 99

25. Exhibit Y—e-mail exchange dated August 8-9, 2004 among Neuberger, Pamela Jarvis ("Jarvis"), Wood, Arenson, Benjamin Jesselson ("B. Jesselson"), M. Jesselson, Konig, Yeheskel Frankel ("Y. Frankel") and M. Frankel.

26. Exhibit Z—e-mail exchange dated December 14-16, 2004 among Buchler, Arenson, Neuberger, Bridget McCarthy, Krieger, Stein and Lamm.

27. Exhibit AA—e-mail exchange dated August 2-3, 2004 among Jarvis, Neuberger and Wood.

28. Exhibit BB—e-mail exchange dated April 1, 2004 between Buchler and Arenson.

29. Exhibit CC—e-mail exchange dated August 3-5, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson, Konig, Y. Frankel and M. Frankel.

30. Exhibit DD—e-mail exchange dated August 3-5, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson, Konig, Y. Frankel and M. Frankel.

31. Exhibit EE—e-mail exchange dated August 6, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson, Konig, Y. Frankel and M. Frankel.

32. Exhibit FF—e-mail exchange dated August 6, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson, Konig, Y. Frankel and M. Frankel.

33. Exhibit GG—e-mail exchange dated August 8-11, 2004 among Jarvis, Neuberger, Wood, Arenson, B. Jesselson, M. Jesselson, Konig, Y. Frankel and M. Frankel.

34. Exhibit HH—e-mail exchange dated August 22-23, 2004 among Jarvis, Neuberger, Arenson, B. Jesselson, Krieger, Buchler, Konig, M. Jesselson, Y. Frankel, M. Frankel, Wood, William R. Lanius ("Lanius") and Gregory P. Joseph ("Joseph").

4

35.     Exhibit II—e-mail exchange dated August 22-23, 2004 among Neuberger, Jarvis, Arenson, M. Jesselson, Krieger, Buchler, Konig, B. Jesselson, Y. Frankel, M. Frankel, Wood, Lanius and Joseph.

36.     Exhibit JJ—e-mail exchange dated September 2-5, 2004 among Neuberger, Jarvis, Wood, Buchler, Krieger, Stein, Arenson and Lamm.

37.     Exhibit KK—e-mail exchange dated August 27-September 2, 2004 among Jarvis, Neuberger and Wood.

38.     Exhibit LL—e-mail exchange dated September 2-9, 2004 among Jarvis, Neuberger, Wood, Buchler, Krieger, Stein, Arenson and Lamm.

39.     Exhibit MM—e-mail exchange dated April 18, 2002 among Krieger, Buchler, Lamm and Arenson.

40.     Exhibit NN—December 20, 2004 Declaration of Pamela Jarvis in Support of Motion for Remand (without exhibits), filed in the United States District Court for the District of Delaware.

41.     Exhibit OO—e-mail exchange dated August 27, 2004 among Jarvis, Neuberger and Wood.

42.     Exhibit PP—September 13, 2004 letter from Hurd to Neuberger enclosing a copy of the complaint filed by Defendants herein in the Court of Chancery of the State of Delaware.

43.     Exhibit QQ—July 12, 2004 letter from Neuberger to Stanley P. Gold, Krieger and Buchler.

44.     Exhibit RR—December 17, 2001 letter from David Robbins, Esq., of Fried, Frank, Harris, Shriver & Jacobson to ALH and Shamrock.

45.     Exhibit SS—January 28, 2002 conflict of interest waiver letter from David Robbins, Esq., of Fried, Frank, Harris, Shriver & Jacobson, to ALH and Shamrock.

46.     Exhibit TT—May 14, 2003 Minutes of the Meeting of the Supervisory Board of ALH.

47.     Exhibit UU—June 26, 2003 Minutes of the Meeting of the Supervisory Board of ALH.

48.     Exhibit VV—March 24, 2004 Minutes of the Meeting of the Supervisory Board of ALH.

49.     Exhibit WW—April 13, 2004 Minutes of the Meeting of the Supervisory Board of ALH.

50.     Exhibit XX—Unanimous Written Consent of the Supervisory Board of ALH dated August, 2003.

51.     Exhibit YY—e-mail exchange dated July 11, 2003 among Arenson, Buchler, Lamm and Krieger.

52.     Exhibit ZZ—July 30, 2002 e-mail from Arenson to Buchler, Krieger and Neuberger.

53.     Exhibit AAA—e-mail exchange dated October 31-November 8, 2002 among Krieger, Arenson, Lamm and Buchler.

54.     Exhibit BBB—e-mail exchange dated August 14-September 6, 2002 among Krieger, Arenson and Buchler.

This the 2nd day of September, 2005.

/s/
J. Donald Cowan, Jr.
N.C. State Bar No. 0968

6

OF COUNSEL:
SMITH MOORE LLP
Post Office Box 21927
300 N. Greene Street, Suite 1400
Greensboro, North Carolina 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400

OF COUNSEL:
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200
Facsimile: (212) 407-1299

*Attorneys for Defendants Shamrock*
*Holdings of California, Inc., Shamrock*
*Capital Advisors, Inc., Eugene I. Krieger,*
*George J. Buchler, and Bruce J. Stein*

8

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served by United States mail, first-class, postage prepaid, to the following counsel of record:

Russ A. Brinson
Cozen O'Connor
One Wachovia Center, Suite 2100
301 South College Street
Charlotte, North Carolina 28302

Thomas M. Wood, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, Maryland 21202-3282

This the 2nd day of September, 2005.

/s/
J. Donald Cowan, Jr.

9

# EXHIBIT A

FILED
CHARLOTTE, N. C.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NIN 2 2006

U. S. DISTRICT COURT
W. DIST. OF N. C.

A. ARENSON HOLDINGS, LTD.             )
5 Hashita Street                      )
Caesera, Israel,                      )
                                      )
D.A. GARDENS, LTD.                    )       Civil Action No.
31st Street 1-109                     )
P.O.B. 6831                           )       3:05 CV 256-H
Panama 5, Panama,                     )
                                      )
J12ALH ASSOCIATES                     )
1301 Avenue of the Americas           )
Suite 4101                            )
New York, New York  10019,            )
                                      )
SELK, LLC                             )
One South Street, 27th Floor          )
Baltimore, Maryland 21202,            )
                                      )
and                                   )
                                      )
LAUREL EQUITY GROUP, LLC              )
4583 Route 9 North                    )
Howell, New Jersey  07731             )
                                      )
          Plaintiffs                  )
                                      )
     v.                               )
                                      )
SHAMROCK HOLDINGS OF                  )
  CALIFORNIA, INC.                    )
4444 Lakeside Drive                   )
Burbank, California  91505,           )
                                      )
SHAMROCK CAPITAL                      )
  ADVISORS, INC.                      )
4444 Lakeside Drive                   )
Burbank, California  91505,           )
                                      )
EUGENE I. KRIEGER                     )
4444 Lakeside Drive                   )
Burbank, California  91505,           )

**GEORGE J. BUCHLER**          )
**4444 Lakeside Drive**        )
**Burbank, California 91505,** )

**and**                        )
                               )
**BRUCE J. STEIN**             )
**4444 Lakeside Drive**        )
**Burbank, California 91505**  )
                               )
        **Defendants.**   )

---

## COMPLAINT
### (JURY TRIAL DEMANDED)

Plaintiffs, A. Arenson Holdings, Ltd., D.A. Gardens, Ltd., J12ALH Associates, SELK, LLC, and Laurel Equity Group, LLC, by and through undersigned counsel, sue Defendants, Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler, and Bruce J. Stein and allege as follows:

### BACKGROUND

Plaintiffs are the Class B Members of ALH Holdings, ("ALH"), a Delaware limited liability company. Although ALH was registered in Delaware, none of its daily business activities have ever been conducted in Delaware. ALH was in the home-building business and had until recently its only operating business in the Charlotte, Greensboro and Winston-Salem, North Carolina areas. As a result of Defendants' improper conduct as set forth herein, the value of Plaintiffs' interests in ALH are worthless, their investments have been lost, and ALH is now insolvent.

2.    ALH II, Inc. ("ALH II") is a Delaware corporation and is a wholly-owned subsidiary of ALH. It is the operating subsidiary of ALH that has conducted business in Florida, Tennessee and North Carolina. ALH II has never conducted any of its daily business in Delaware.

3.    Defendant, Shamrock Holdings of California, Inc., ("Shamrock"), is a Class A Member of ALH and holds approximately 62% of the Class A membership interests in ALH.

4.    Defendant, Shamrock Capital Advisors, Inc. ("SCA"), has no membership interest in ALH. SCA is controlled by Shamrock. In July 2001, at Shamrock's insistence, without any change to the ALH Operating Agreement and without any consent of the Class B members, SCA entered into a consulting agreement with ALH to provide consulting services to ALH in connection with the sale of ALH's operating units and/or assets.

5.    Defendants, Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler"), and Bruce J. Stein ("Stein"), are employees of Shamrock and of SCA, and were nominated and elected by Shamrock in their individual capacities to serve as representatives on ALH's Supervisory Board. All three have served together as Supervisory Board Representatives of the Class A Members since at least July 2001. All three simultaneously owe conflicting loyalties to ALH on the one hand and Shamrock and SCA on the other.

6.    In early 2001, Defendants first expressed a desire to exit their investment and management of ALH. Over the next year, Defendants attempted to use their majority position to force a sale under any circumstances.

7. In March 2002, Defendants attempted to sell ALH as a going concern but the sale was mishandled from the start because Defendants insisted on selling ALH's balance sheet which contained an enormous amount of goodwill rather than sell ALH as a multiple of cash flow and land option inventory.

8. After the sale of ALH as a going concern was unsuccessful, Defendants concluded that ALH required too much of Shamrock's time, and embarked on their scheme to rid themselves of their management responsibilities and duties, by trying to sell off the operating units of ALH in a piecemeal fashion which they knew would result in depressed values for each of the units.

9. At the time Defendants announced that the management of ALH was too time consuming and began to sell off the company piecemeal, the loans that the Class A members had made to ALH through ALH II were still outstanding. Before Defendants completely walked away, they decided to get their loans repaid.

10. In order for the repayment of the loans not to be treated as preferences, since by this time ALH was insolvent, Shamrock realized that it had to keep ALH viable until the preference period elapsed.

11. In order to accomplish these goals of relieving themselves of their management responsibilities and safeguarding the repayment of the loans, Defendants began to sell off pieces of ALH at "fire sale" prices in order to use the proceeds to repay the loans.

12. The sale of ALH's operations in piecemeal fashion resulted in a depressed value of ALH and destroyed all member equity. That Defendants wiped out all member equity was reflected in the price obtained for its last asset, Mulvaney Homes,

Inc. ("MHI"). The sales also advanced Defendants towards their stated goal of ridding themselves of their responsibilities to ALH and its members.

13.    The schemes, as detailed above, perpetrated by Defendants have not been in the best interests of the Class B members and ALH and amount to intentional breaches of fiduciary duties owed to Plaintiffs, gross negligence, bad faith, and self-dealing.

## PARTIES

14.    Plaintiff, A. Arenson Holdings, Ltd. ("Arenson Holdings") is an Israeli Corporation. Arenson Holdings is a Class B member of ALH and owns approximately 8% of the Class B membership interest in ALH. Its principal place of business is in Israel. Arenson Holdings has not conducted any business in Delaware.

15.    Plaintiff, D.A. Gardens, Ltd. ("D.A. Gardens"), is a Panamanian Corporation. D.A. Gardens is a Class B member of ALH and owns approximately 8.77% of the Class B membership interest in ALH. Its principal place of business is in Panama. D.A. Gardens has not conducted any business in Delaware.

16.    Plaintiff, J12ALH Associates ("J12"), is a New York general partnership. The partners are Erica Jesselson and Jays Twelve, LLC, a Delaware LLC. Erica Jesselson is a citizen of New York. The members of Jays Twelve are twelve New York trusts. The trustees are all New York citizens. J12 is a Class B member of ALH and owns approximately 16.7% of the Class B membership interest in ALH. J12 ALH has not conducted any business in Delaware.

17.     Plaintiff, SELK, LLC ("SELK"), is a limited liability company registered in the state of Delaware. SELK's members are Shalom Lamm and NACA Holding Inc. Shalom Lamm is a citizen of New York and NACA Holding Inc. ("NACA") was incorporated in the British Virgin Islands. It does not have one principal place of business. It engages in business activities throughout Europe and Israel and occasionally the United States. All day to day activities, including investment decisions, as well as corporate decisions, are made in Europe, Israel and occasionally in New York by the Trust that owns NACA. No business is conducted in Delaware. SELK is a Class B member of ALH and owns approximately 33.3% of the Class B membership interests in ALH.

18.     Plaintiff, Laurel Equity Group, LLC ("Laurel Equity"), is a limited liability company registered in the state of Delaware. Laurel Equity's members are Mark Frankel, Chesky Frankel and Sallervale Company. Mark Frank and Chesky Frankel are New Jersey and New York citizens, respectively. Sallervale Company is a Bahamian corporation. Sallervale's principal place of business is in Geneva, Switzerland, where all corporate business decisions are made. No business is conducted in Delaware. Laurel Equity is a Class B member of ALH and owns approximately 33.3% of the Class B membership interests in ALH.

19.     Defendant, Shamrock, is a California corporation engaged in business as a diversified investment company wholly-owned by the Roy E. Disney Family with its principal place of business at 4444 Lakeside Drive, Burbank, California.

20.     Defendant, SCA, is a Delaware closed corporation engaged in business as a merchant bank with its principal place of business located at 4444 Lakeside Drive, Burbank, California. SCA is also the investment adviser affiliate of Shamrock

21     Defendant, Krieger is Vice-Chairman and Chief Operating Officer of Shamrock. Krieger also performs substantial services for SCA. Krieger also serves as a representative on ALH's Supervisory Board. Krieger is a citizen of the state of California. Krieger has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Krieger was a director of MHI.

22.     Defendant, Buchler is President and Chief Executive of the Shamrock Real Estate Division and was also Vice President and Chief Financial Officer of Shamrock. Buchler performs substantial services for SCA. Buchler also serves as a representative on ALH's Supervisory Board. Buchler is a citizen of the state of California. Buchler has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Buchler was a director of MHI.

23     Defendant, Stein, is the Director of Real Estate for Shamrock. Stein performs substantial services for SCA. Stein also serves as a representative on ALH's Supervisory Board. Stein is a citizen of the state of California. Stein has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Stein was a director of MHI.

### JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states and

citizens of different states and foreign countries. This Court has personal jurisdiction over the defendants pursuant to N.C. Gen. Stat. § 1-75.4, N.C. Gen. Stat. § -75.6 and N.C. Rules Civ. Proc. § 1A-1, Rule 4 and principles of common law.

25.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants conducted substantial business within this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### THE BUSINESS OF ALH

26.    ALH primarily built entry-level homes in the Southeastern United States. For example, in the Charlotte, North Carolina area, ALH, through one of its subsidiary operating units, MHI, closed 675 house sales in the year 2000 alone.

27.    In 1998, ALH acquired home-building operations in Jacksonville, Florida, that operated under the name Atlantic Builders, Inc. ("ABI"). This acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants.

28.    In 1999, ALH acquired home-building operations in Memphis, Tennessee that operated under the name Bowden Building Corporation ("BBC"). acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants.

29.    In 2000, ALH acquired home-building operations in Charlotte, North Carolina, that operated under the name MHI. This acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants. expanded into western North Carolina and operated in the Charlotte, Greensboro and

Winston-Salem metropolitan areas.    MHI was sold to Mattamy Homes Corporation ("Mattamy") in December, 2004.

### ALH'S SUPERVISORY BOARD

30.    When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by ALH's Class A members, one designated by ALH's Class B members and two designated by ALH's Class D members. ALH's Board has always consisted of five members, but the Class B members have consistently been limited to one Representative.    Major decisions require the unanimous consent of the Class A Representatives on the Board.    All other decisions and actions by ALH are effective by majority vote of the Board.

31.    From the outset, Buchler was one of two Class A Representatives and Arenson was the Class B Representative. The Representatives of the Class D members were Shalom E. Lamm ("Lamm") and Jonathan Zich ("Zich").

32.    In or around late 1999/early 2000, Krieger became a Class A Representative, replacing another Shamrock employee who previously held that position.

33.    In a move designed to further entrench the power of Shamrock, ALH entered into a management agreement in the summer of 2001 (the "Management Agreement"). The Management Agreement stripped one of the two seats from the Class D members on the Board and gave the Class A Members the right to designate the person to fill the Class D seat on the Board.

34.    Zich was removed as the Class D member of the Supervisory Board, and Shamrock added Stein to the Supervisory Board.

35.     Ever since the creation of the Management Agreement, three of the five members of the Supervisory Board (a majority) have been Shamrock employees.

## HIRING DECISIONS BY ALH

36.     Defendants have continually made hiring decisions not in the best interests of the Class B members or ALH as a whole. At Shamrock's insistence, ALH hired a Shamrock-subsidiary, SCA, as a "consultant" when Shamrock embarked on its course to dismantle ALH. Shamrock also hired its own attorneys as the attorneys for ALH in connection with the sales of its assets and operating units. Shamrock used its consultant to justify the sales of operating units and its own clearly conflicted law firm to represent ALH in the sales.

### Hiring a Subsidiary to be a Consultant

37.     In July 2001, ALH entered into an agreement with SCA (the "SCA Agreement") to provide consulting services to ALH for $100,000 per year. The SCA Agreement: (1) does not require SCA to provide any minimum amount of time in order to receive its yearly payoff; (2) allows SCA to determine how much time, if any, it will allocate to its duties; (3) allows SCA to terminate the agreement at will; (4) includes indemnification clauses to protect SCA from its mistakes; and (5) attempts to shield SCA from all liability to ALH for the mistakes it makes. SCA assisted, aided and abetted Shamrock in its goal to sell off ALH at a loss.

38.     Krieger, Buchler, and Stein, the Class A Representatives on the Supervisory Board, have all done substantial work for SCA. The three Representatives are

highly placed officers in Shamrock, which wholly-owns SCA. The three representatives owe fiduciary duties to Plaintiffs, Defendants, ALH, and the companies hired by ALH.

### Shamrock hires conflicted counsel

39.    The law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank") represents Shamrock (largest Class A member) and SCA (the consultant hired by Shamrock for ALH). Fried Frank was hired by Shamrock to represent ALH in the sale of its various operating units and assets. Despite protests raised with Fried Frank, Shamrock, ALH and the Supervisory Board regarding this clear conflict of interest and likely detriment to the Class B members of ALH, Fried Frank continued to represent ALH in the sales even though its duty of loyalty was to its longtime client Shamrock. Fried Frank's recognition of its conflict is evidenced by a conflict letter it insisted that ALH sign despite the fact that the conflict could not be waived. Fried Frank has assisted in the destruction of the Class B members' equity and the dismantling of ALH.

40.    Fried Frank continued to attend the Supervisory Board meetings on behalf of ALH and Shamrock and continued throughout the sale of ABI, BBC and MHI, to represent both ALH and Shamrock despite the unwaivable conflict. Any attempt by the Class B members to bring counsel to Supervisory Board meetings has been blocked by Shamrock without explanation.

### THE LOANS

41.    Pursuant to a loan agreement, dated April 6, 2000, various ALH members made loans to ALH II. The loans were guaranteed by various ALH II subsidiaries. Arenson Holdings loaned over $150,000 to ALH II and Shamrock loaned over $1,500,000.

42.     Pursuant to another loan agreement, dated May 7, 2002, various ALH members made loans to ALH II.  D.A. Gardens loaned over $300,000, J12ALH loaned over $300,000, SELK loaned over $600,000, and Shamrock loaned almost $2,000,000.

43.     These loans were eventually repaid from the proceeds of the sale of the assets of ALH's operating entity, ABL

44.     At the time the loans were repaid, ALH was insolvent.  If ALH had declared bankruptcy at any time within one year from the date of the repayment of the loans, the repayments would have to be disgorged as preferential.  Therefore, rather than declare bankruptcy, Defendants continued to sell off ALH's assets so that ALH could continue to operate.  This scheme ultimately stripped ALH of any value and wiped out Plaintiffs' equity.

### The Charlotte Meeting

45.     In February, 2003 some of Plaintiffs and their counsel met with Shamrock (Messrs. Krieger and Buchler) in Charlotte.  The purpose of the meeting was to discuss the problems then-currently facing ALH and the future problems that could arise if a change of course was not effected.  Defendants' reply to Plaintiffs' counsel was that ALH was consuming too much management time and that Defendants wanted to rid themselves of the hassle of dealing with ALH.

46.     At this meeting, Plaintiffs warned Defendants that a piecemeal sale of the operating units would be disastrous.  The Class B members even proposed buying out the Shamrock position in ALH.  All of the concerns and proposals raised by the Class B members were ignored and continued to be ignored, and because of Defendants' gross

negligence and self-dealing, ALH is in the dire straits that was predicted at the Charlotte meeting.

### THE DISMEMBERING OF ALH

47.    At the meeting of ALH's Supervisory Board on May 14, 2003, the failure to sell ALH in its entirety as a going concern and the subsequent efforts to sell ALH piece-by-piece, starting with ABI, were discussed.

### *Shamrock sells off ABI*

48.    At a subsequent June 26, 2003, Supervisory Board meeting, an overview was presented regarding ALH's efforts to find purchasers for its various operating units and assets. Fried Frank (counsel to ALH, Shamrock, and SCA) then presented the terms of a proposed sale of ABI to the Supervisory Board.  During the discussion that followed, Arenson recommended that existing members finance another infusion of capital to assist ALH compete more effectively in the home buying market as had been done in 2000 and 2002, rather than sell off the assets piecemeal.

49.    Buchler argued in bad faith, despite Arenson's previous proposal, that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of pending litigation (that involved the initial purchase of BBC) to be concluded, and (3) no other proposals for funding or acquiring ABI had been made.

50.    After further review and discussion, and with Shamrock firmly in control of the Supervisory Board, it voted in favor of the sale of ABI. Arenson voted against the sale. The proceeds of the sale were used, in part, to pay off the loans.

### Shamrock sells off BBC

51.    Less than a year later, at a Supervisory Board meeting on March 24, 2004, ALH considered the proposed sale of 100% of the stock of BBC. Buchler gave an overview of the economic terms of the transaction and Fried Frank (counsel to ALH, Shamrock, and SCA) made a presentation regarding the terms of the proposed purchase agreement.

52.    The Board then discussed the merits of the proposed BBC sale. Arenson stated that he opposed the sale of BBC for the same reasons he had expressed in connection with the sale of ABI. Arenson expressed a concern that the sale was not in the best interests of all of ALH's members and that better value might be obtained by continuing to operate BBC.

53.    Arenson expressed concern that there was a conflict of interest on the part of Fried Frank in the BBC transaction because Fried Frank also represented Shamrock (and SCA). Fried Frank explained that it was representing ALH and the Supervisory Board in the transaction and not ALH's members separately. Fried Frank also took the position that, regardless of whether there was a potential conflict, ALH had waived any potential conflict of interest. These conflicts, however, could not be waived.

54.    After further discussion, and with Shamrock in control of the Supervisory Board, it voted in favor of the proposed sale of BBC over the protests of Arenson and another member of the Board.

55.    Again, the proceeds of the BBC sale were used to infuse cash into ALH so that it could continue to operate until such time as the repayment of the loans would not be considered preferential.

### *Shamrock sells off MHI*

56.    After the sales of ABI and BBC, ALH was left with only one operating home building unit, MHI.

57.    In furtherance of their scheme to rid themselves of any further management responsibilities with respect to ALH and, at the same time, tread water until the preference period expired, Defendants attempted to sell MHI at a depressed value.

58.    At the time of the sale of ABI in 2003, William Lanius ("Lanius") was the CFO for ALH. After the sale of ABI, Lanius became the President of ABI's acquirer, Mattamy. Despite his new position, he was hired by Defendants as a consultant to advise Defendants on the management and financial aspects of ALH and assist in the further sales of ALH's operating units BBC and MHI.

59.    In his capacity as consultant for ALH, Lanius was responsible for negotiating with potential buyers and negotiating with ALH's lenders, Wachovia and Swiss Re, in connection with the sales of BBC and MHI.

60.    In the summer of 2004, ALH and Levitt Homes ("Levitt") entered into a letter of intent for the sale of MHI. At that time, the President of Levitt was John LaGuardia ("LaGuardia"), the former President of ALH. LaGuardia had previously used

knowledge gained about the mismanagement by Defendants of ALH, in his former position with ALH to his advantage and to the disadvantage of ALH in the BBC sale. Despite the manner in which LaGuardia used Defendants' mismanagement of ALH (the lack of commitment and weakness of the management team) to leverage the purchase of BBC to the advantage of BBC and to the disadvantage of ALH, Defendants, nevertheless, attempted to sell MHI to Levitt.

       61.    In connection with the sale of MHI to Levitt, Lanius, as the consultant for ALH, evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH shareholders would receive a payment of $1 million if the Levitt transaction closed. A copy of a memo from Defendant, Buchler, attached as Exhibit A, demonstrates Lanius' intimate role in the Levitt transaction.

       62.    The $1 million payment negotiated by Lanius on behalf of the ALH shareholders was too little too late. Plaintiffs had invested over $8.5 million in ALH and a payment of $1 million was woefully inadequate, although not surprising, considering Defendants' mismanagement.

       63.    On October 6, 2004, Levitt informed ALH that it no longer was interested in purchasing MHI. The reasons for Levitt's sudden lack of interest are unclear. Attached as Exhibit B is a copy of Defendant Buchler's e-mail regarding Levitt's refusal to go forward with its purchase of MHI.

       64.    Although Buchler's e-mail conveyed Levitt's intent to withdraw, coincidentally, it indicated that Lanius, as President of Mattamy, was interested in

purchasing MHI. Buchler's e-mail makes crystal clear that as of October 6, 2004, Lanius was representing both ALH as a consultant and Mattamy as its President.

65.    On October 22, 2004 Mattamy submitted a proposal through Lanius, offering to purchase MHI on even less favorable terms than the Levitt deal. A copy of the Mattamy proposal is attached as Exhibit C.

66.    Between October 6 and October 22, 2004, Defendants made no efforts to solicit other buyers to purchase MHI. During this time, Defendants made no efforts to shop MHI on the open market but instead, entered into discussions with its own consultant, Lanius, who was intimately familiar with the financial weaknesses of ALH.

67.    Mattamy's depressed offer was not surprising. In his capacity as consultant, Lanius negotiated on behalf of ALH with the various lenders and was intimately familiar with the financial condition of ALH as well as Defendants' conduct which resulted in the severely depressed financial condition of ALH and MHI.

68.    The Mattamy offer was put together by Lanius and he undoubtedly used the insider information he gained while CFO and consultant to ALH to make such a depressed offer. ALH found itself in a position of having received this depressed offer from Mattamy as a result of the decisions and breaches of fiduciary duty made by Defendants in order to rid themselves of their management responsibilities and to recoup their loans to ALH without any preference issues.

69.    In December, 2004, Mattamy and ALH II entered into a Stock Purchase Agreement to sell MHI to Mattamy. This new offer still only gave One Million Dollars ($1,000,000) to Plaintiffs who had invested over $8.5 million in ALH.

70.     Because of Defendants' past conduct in dismantling ALH, ALH now found itself in a position of having only one buyer who was intimately familiar with all of its weaknesses, was familiar with Defendants' desire to rid themselves of their investment and was able to exploit these weaknesses to the disadvantage of ALH, Plaintiffs, and to the advantage of Mattamy.

71     It is apparent that Defendants, for their own purposes, wrote off the equity in ALH.  By selling divisions of ALH in piecemeal fashion, they allowed ALH to avoid bankruptcy and have their loans paid back in a manner that would prevent the payments from being treated as "preferential" payments to "insiders" under 1  U.S.C. § 547 of the Bankruptcy Code.

## COUNT ONE - BREACH OF FIDUCIARY DUTY

72.     Plaintiffs reallege the previous paragraphs as if fully set forth herein.

73.     Rather than continue to spend the time required to properly manage ALH, Defendants schemed to relieve themselves of their fiduciary duties to run the company, but at the same time, have their loans repaid without running the risk of having to disgorge the payments as preferences.

74.     First, in attempting to sell ALH as a whole, Defendants owed a fiduciary duty to the Class B members to obtain the best possible price for Plaintiffs and to maximize value for the Class B members

75.     Defendants' failure to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory, was a breach of their fiduciary duties to Plaintiffs.

76.     Second, Defendants' failure to actively solicit offers for ALH and their failure to work with Class B members was a breach of their fiduciary duties to Plaintiffs.

77.     Third, when Defendants embarked on their plan to sell the operating units piecemeal, Defendants breached their fiduciary duties by stifling competitive bids by selling the assets at "fire sale" prices. Defendants' actions were knowing, intentional, willful, grossly negligent, and in bad faith.

78.     Defendants owe fiduciary duties to Plaintiffs and the Class B members. Defendants breached such duties by, *inter alia*, insuring that the sale of ALH would fail, scheming to sell operating units so that the proceeds could be used to prop up the liquidity of ALH so that ALH would not have to declare bankruptcy and the repayment of the loans would not be preferences, and hiring Fried Frank as counsel for ALH.

79.     As a result of Defendants' knowing and willful failure to comply with their fiduciary duties, Plaintiffs have lost the value of their investment and their equity is virtually worthless.

80.     Thus, as a result of Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.


### COUNT TWO - BREACH OF OPERATING AGREEMENT

81.     Plaintiffs reallege the previous paragraphs as if fully set forth herein.

82      Defendants' breaches of fiduciary duties as alleged above are in violation of the ALH operating agreement.

83.    Section 6.2(f) of the ALH operating agreement states:

> the Manager, Representatives, and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence. Nothing in this Section 6.2(f) shall be deemed to make the Manager or any Representative or any Deputy Representative liable, responsible or accountable to any Person other than the Company or the Members.

84.    Defendants' actions, as described above, were done in bad faith and in a grossly negligent manner and constitute a violation of the operating agreement.

85.    Defendants' actions, as described above further violate Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

> (c)    To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted ·or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.
>
> (e)    A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

86.    By engaging in the acts described above, Defendants have also violated the implied contractual covenant of good faith and fair dealing.

87.    As a result of Defendants' breaches, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

209213.9/1060.5                    - 20 -

## COUNT THREE – BREACH OF CONSULTING AGREEMENT

88.    Plaintiffs reallege the previous paragraphs as if fully set forth herein.

89.    SCA's breaches of fiduciary duties as alleged above are in violation

of the consulting agreement between SCA and ALH.

90.    Schedule A of the consulting agreement [emphasis added] states:

the Company [ALH] shall not be responsible for any
claims, liabilities, expenses, losses, and damages to the extent
that it is finally judicially determined that they result
primarily from actions taken or omitted to be taken by
SCA in bad faith or due to SCA's gross negligence or
willful misconduct.

91.    SCA's actions, as described above, were done in bad faith, in a

grossly negligent manner, and with willful misconduct and constitute a violation of the

consulting agreement.

92.    SCA's actions, as described above further violate Delaware's

Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

(c)    To the extent that, at law or in equity, a member or manager or other
person has duties (including fiduciary duties) to a limited liability company
or to another member or manager or another person that is a party to or is
otherwise bound by a limited liability company agreement, the member's or
manager's or other person's duties may be expanded or restricted or
eliminated by provisions in the limited liability company agreement;
provided, that the limited liability company agreement may not eliminate
the implied contractual covenant of good faith and fair dealing.

(e)    A limited liability company agreement may provide for the limitation
or elimination of any and all liabilities for breach of contract and breach of
duties (including fiduciary duties) of a member, manager or other person to a
limited liability company or to another member or manager or to another
person that is a party to or is otherwise bound by a limited liability company
agreement; provided, that a limited liability company agreement may not
limit or eliminate liability for any act or omission that constitutes a bad
faith violation of the implied contractual covenant of good faith and fair
dealing.

93. By engaging in the acts described above, SCA has also violated the implied contractual covenant of good faith and fair dealing.

94. As a result of SCA's breaches, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

### COUNT FOUR - GROSS NEGLIGENCE

95. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

96. Defendants' conduct as alleged above and its actions relating to the sale of ALH and the subsequent sale of its operating units amounts to gross negligence. Further its hiring and directions to both Fried Frank and SCA were grossly negligent.

97. Defendants scheme to sell ALH in a piecemeal fashion was for the sole benefit of the Class A members.

98. Defendants hiring of Fried Frank and forcing ALH to waive any conflicts was grossly negligent and was in bad faith and was for the sole benefit of the Class A members.

99. Defendants owed a duty to Plaintiffs to act in their best interests and to protect the value of their interests in ALH.

Defendants further owed a duty to Plaintiffs to refrain from breaching the operating agreement.

101. Defendants have breached their duties as alleged above.

As a result of Defendants' grossly negligent actions, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

209213.9/1060.5                    - 22 -

## COUNT FIVE - SELF-DEALING

Plaintiffs reallege the previous paragraphs as if fully set forth herein.

104.    Defendants schemed to sell ALH in a piecemeal fashion.  This plan of action was for the sole benefit of the Class A members.

Defendants, through their control of the Supervisory Board, directed that ABI, BBC, and MHI be sold as separate operating units.

Each time a vote was held to sell an operating entity of ALH, the bare minimum required (three votes) to approve the sale was achieved.  Each time, the three votes were from insiders—all three were employees of Class A member Shamrock and worked for SCA.

The controlled votes allowed ALH to sell off ABI, BBC, and MHI for the sole benefit of the Class A members and to the detriment of the Class B members.

108.    The actions approved by the Shamrock portion of the Board are *ultra vires* in nature and, as a result of Defendants' self-dealing, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT SIX - CIVIL CONSPIRACY

109.    Plaintiffs reallege the previous paragraphs as if fully set forth herein.

110.    Defendants have conspired with each other to strip ALH of its value, to breach their fiduciary duties to Plaintiffs, to hire consultants and lawyers who did not protect the interests of Plaintiffs, and other acts as alleged herein so that Defendants would no longer have to manage ALH and so that their loans would be repaid.

209213.9/1060.5                               - 23 -

111.    In furtherance of their conspiracy, Defendants committed the breaches of fiduciary duty described herein and have conspired with each other for the sole benefit of themselves and the other Class A members.

112.    Defendants conspired against the Class B members with actual malice, ill will, and in bad faith and with an intent to financially injure them. Defendants' plan to sell off ALH in a piecemeal fashion has financially injured all Plaintiffs by reducing the value of their interests in ALH to virtually nothing.

WHEREFORE, Plaintiffs demand judgment against Defendants in excess of $8,000,000, the exact amount to be determined at trial.

PLAINTIFFS DEMAND A JURY TRIAL.

Respectfully submitted this the 2nd day of June, 2005.

RUSS A. BRINSON, NC Bar No. 26070
Cozen O'Connor
One Wachovia Center, Suite 2100
301 South College Street
Charlotte, North Carolina 28202
(704) 376-3400
Fax: 704-334-3351
RBrinson@cozen.com


Of Counsel:

THOMAS M. WOOD, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, MD 21202-3282
(410) 332-8523
tmw@nqgrg.com

Attorneys for Plaintiffs


209213.9/1060.5                        - 24 -

Page 1 of 1

**Subject: FW: Wachovia Forbearance Agreement - Draft**



---- Original Message ----
**From:** George Buchler
**To:** 'Shalom Lamm' ; Avie Arenson (avie@arenson.co.il) ; Gene Krieger ; Bruce Stein
**Sent:** Tuesday, August 24, 2004 2:17 AM
**Subject:** FW: Wachovia Forbearance Agreement - Draft

Please note the following information supplied by Bill Lanius regarding Wachovia's MHI loan.

----Original Message----
**From:** William R. Lanius [mailto:wrlanius@bellsouth.net]
**Sent:** Sunday, August 22, 2004 11:27 AM
**To:** 'George J. Buchler'
**Subject:** Wachovia Forbearance Agreement - Draft

George..... FYI, I have attached a copy of Wachovia's proposed forbearance agreement which provides for the continuity of construction financing thru the end of the year. However, Wachovia has also inserted some considerable hurdles, costs, restrictions and other legal provisions. I have summarized some of them below:

1. Forbearance Timetable
   a. 9/15/04 - Executed LOI w/ Levitt (done? If so, can I please have an executed copy?)
   b. 10/29/04 - Executed SPA/APA w/ Levitt
   c. 12/29/04 - Close MHI sale w/ Levitt
2. Non-refundable forbearance fee of $100k payable immediately
3. Interest rate increase of 50 bps to Prime + 1%
4. New financial covenants:

   a. Minimum liquid assets of $2.9 million
   b. Spec ratio of 35%
4. Cross-default w/ all other loans/lenders
5. Releases Wachovia completely with covenant not to sue

I have forwarded this document to counsel in NC for legal review but would also like to discuss the foregoing provisions w/ you. FYI, for the most part, I will be in meetings, etc. thru this Wednesday and may not be immediately reachable. Thx....... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556

Page  of 2

Subject: FW: Wachovia Forbearance Agreement - Draft

---- Original Message ----
From: George Buchler
To: Gene Krieger ; Bruce Stein ; Avie Arenson (avie@arenson.co.il) ; 'Shalom Lamm'
Sent: Tuesday, August 24, 2004 2:20 AM
Subject: FW: Wachovia Forbearance Agreement - Draft

Further update from Bill Lanius.

-----Original Message-----
From: William R. Lanius [mailto:wrlanius@bellsouth.net]
Sent: Monday, August 23, 2004 7:52 AM
To: 'George J. Buchler'
Subject: RE: Wachovia Forbearance Agreement - Draft

George .... I neglected to mention one other significant item below: the substitution collateral provision. Thx.... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556

-----Original Message-----
From: William R. Lanius [mailto:wrlanius@bellsouth.net]
Sent: Sunday, August 22, 2004 2:27 PM
To: 'George J. Buchler (gbuchler@shamrock.com)'
Subject: Wachovia Forbearance Agreement - Draft

George..... FYI, I have attached a copy of Wachovia's proposed forbearance agreement which provides for the continuity of construction financing thru the end of the year. However, Wachovia has also inserted some considerable hurdles, costs, restrictions and other legal provisions. I have summarized some of them below:

1. Forbearance Timetable
   a.  9/15/04 - Executed LOI w/ Levitt (done? If so, can I please have an executed copy?)
   b.  10/29/04 - Executed SPA/APA w/ Levitt
   c.  12/29/04 - Close MHI sale w/ Levitt
2. Non-refundable forbearance fee of $100k payable immediately
3. Interest rate increase of 50 bps to Prime + 1%
4. New financial covenants:
   a.  Minimum liquid assets of $2.9 million
   b.  Spec ratio of 35%
5. Cross-default w/ all other loans/lenders
6. Releases Wachovia completely with covenant not to sue

I have forwarded this document to counsel in NC for legal review but would also like to discuss

Page 2 of 2

the foregoing provisions w/ you. FYI, for the most part, I will be in meetings, etc. thru this Wednesday and may not be immediately reachable. Thx...... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556



**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Sunday, October 10, 2004 2:19 AM
**To:** Isaac M. Neuberger; Michael G. Jesselson (E-mail); benjamin Jesselson; Michel Konig (E-mail); Hesky
**Subject:** Fw: Mulvaney Homes (MHI)

—— Original Message ——
**From:** George Buchler
**To:** Avie Arenson (avie@arenson.co.il) ; Shalom Lamm (slamm@lionlamm.com) ; Gene Krieger ; Bruce Stein
**Cc:** 'Francis W. Costello (fcostell@hklaw.com)'
**Sent:** Wednesday, October 06, 2004 7:21 PM
**Subject:** Mulvaney Homes (MHI)

I have just been notified by Levitt that they will not proceed with their acquisition of MHI. Their stated reason for not moving forward is that they feel that MHI would need to reposition itself into the "move-up" home market and Levitt is uncertain whether this strategy would be a success. The starter home market is apparently overcrowded with many national firms in this category.

Mattamy, the purchaser of Atlantic Builders, has now surfaced as a potential buyer of the company. As you know, Bill Lanius, who has continued to assist ALH in a variety of ways, works for Mattamy. Bill has quickly reviewed the MHI potential acquisition with his boss, and there is sufficient interest to proceed. Bill will go to Charlotte early next week with the idea of doing enough due diligence to demonstrate the potential of acquiring MHI. If indications are then positive, depending on what Mattamy will pay for MHI, consent would then be needed from Swiss Re and the lenders to consummate the transaction. Undoubtedly, Swiss Re, as was the case with the aborted Levitt transaction, will need to in some way provide funding under their surety instrument. Swiss Re wants to be done with ALH and take their loss as required.

The MHI situation continues to be very fragile. We have been told of several employees leaving MHI for what they perceive as better employment opportunities elsewhere. Time is of the essence to complete a transaction.

If I can answer anything further regarding the situation, please let me know.

# Mattamy U.S. Group

7800 Belfort Parkway, Suite 200
Jacksonville, FL 32256

Phone: (904) 219-8460
Fax: (904) 279-9556



October 22, 2004.

ALH II, Inc.
4444 Lakeside Drive
Second Floor
Burbank, California 91505
Attn:   George J. Buchler
        Director

Dear George:

The purpose of this letter is to confirm the interest of Mattamy Homes Corporation, or an affiliate thereof ("Mattamy") in acquiring all of the equity interests of Mulvaney Homes, Inc. and its subsidiaries (collectively, the "Company"). The proposed transaction, which is described below, will hereinafter be referred to as the "Acquisition." Mattamy and any affiliate or affiliates through which the Acquisition may be effected may hereinafter be referred to as the "Purchaser." The beneficial holder of all the equity interests in the Company is assumed to be ALH II, Inc. and will hereinafter be referred to as the "Interest Holder."

## NON-BINDING ACQUISITION PROPOSAL

1.      Acquisition. Based on the information currently known to Mattamy, it is proposed that the terms of the Acquisition would include the following:

(a)     Purchase of Stock. At the closing for the Acquisition (the "Closing"), Purchaser would purchase from the Interest Holder all of the issued and outstanding shares of stock of the Company (the "Stock"). At the Closing, the assets of the Company would include those assets reflected on the September 30, 2004 balance sheet of the Company previously delivered to Mattamy, as the same may have changed only in the usual and ordinary course of the Company's business (the "Assets"). The Assets would include all assets currently used in the Company's homebuilding, land development and related businesses and necessary to continue the Company's business as a going concern.

(b)     Purchase Price. The purchase price for the Stock (the "Purchase Price") would be $6,500,000, payable entirely in cash. The Purchase Price assumes that any debt of the Company or other amounts owed by the Company to related parties, including, but not limited to the Interest Holder, would be converted to equity in the Company prior to the Closing and that from September 30, 2004 through the Closing, no distributions would be made from the Company to the Interest Holder or any other related party.

■ MMP/Chase Homes (Minneapolis, MN)                    ■ MJP/Atlantic Builders (Jacksonville, FL)

(c)    Non-Compete/Non-Solicitation.    The Interest Holder would enter into non-compete/non-solicitation agreements with Purchaser prohibiting them and their affiliates from: (i) engaging, either directly or indirectly, in the construction, sale and/or leasing of single-family or multi-family homes, the development of real property for use as lots for residential or commercial construction, the provision of mortgage financing or title insurance/settlement services anywhere within 100 miles of any county in which the Purchaser operates, for a period of five (5) years after the Closing, and (ii) soliciting to employ or employing any employee of Purchaser, or an affiliate of Purchaser while such individual is employed by Purchaser or such affiliate, in each case for such five (5) year period.

(d)    Employment Arrangements.    Purchaser would obtain mutually satisfactory employment arrangements with key personnel of the Company, as identified by Mattamy.

(e)    Material Adverse Change.    From September 30, 2004 through the Closing, there would not have been any material adverse change, or occurrence of an event likely to result in any material adverse change, in the assets, liabilities, business, financial condition, results of operations, personnel or prospects of the Company.

2.    Definitive Agreement.    Mattamy would promptly prepare for consideration and negotiation by the parties, a draft of an agreement with the Interest Holders that would contain and describe with greater specificity the terms and conditions set forth herein and other usual and customary representations, warranties, indemnities, covenants and conditions for a transaction of the type contemplated herein.  In this regard, the Interest Holder's representations and warranties would relate to such matters as accuracy of financial statements, absence of unrecorded liabilities, payment of taxes, state of title to the Assets, compliance with applicable laws and absence of current or expected adverse events. As a condition of closing, the Interest Holder also would obtain any material consents of third parties required to permit the transfer of the Stock to Purchaser.  The Closing would occur by December 31, 2004.  The indemnification obligations of the Interest Holder would be funded solely out of the funds currently being held pursuant to that certain Escrow Agreement dated July 10, 2003 by and between Mattamy (Jacksonville) Partnership, Atlantic Builders, Inc. (an affiliate of the Interest Holder) and RBC Centura Bank, the terms of which would be amended accordingly and extended for a period of two years after the Closing.

The obligations of Purchaser and Interest Holder to consummate the Acquisition would be subject to the negotiation and execution of the definitive form of such agreement, containing mutually acceptable provisions, (the "Definitive Agreement") and to the following additional conditions, which are not intended to be exhaustive:

(a)    The results of Mattamy's diligence investigation are satisfactory to Mattamy in its sole discretion; and

(b)  On or before Closing, all regulatory and material third party consents, approvals and clearances are received, on terms satisfactory to Mattany in its sole discretion.

(c)  On or before Closing, the "Term Loan" from Wachovia Bank to Interest Holder will be satisfied in full and no liens or encumbrances upon the capital stock of the Company will exist as of the Closing date. We understand that the current principal balance of the Term Loan is approximately $22 million and that Swiss Reinsurance America Corporation is a surety for such loan.

### BINDING PROVISIONS

3.  Diligence Investigation.  Immediately upon the execution of this letter, the Company shall provide Mattany's authorized employees, agents, consultants, legal counsel, accountants and other representatives with full access, upon reasonable prior notice, to the Company, its assets, properties, contracts, books and records and all other information and data concerning the Company, including without limitation working papers of the Company's public accountants. The Company and its officers and employees shall cooperate fully with, and the Company shall request its public accountants and outside legal counsel to cooperate fully with, those individuals engaged in Mattany's investigation, and to make a full and complete disclosure to Mattany of all material facts regarding the assets, liabilities, business, results of operations, financial condition, tax position and prospects of the Company. The examination shall include such environmental reviews as Mattany may deem appropriate.

4.  Expenses.  Purchaser and Interest Holder shall each bear their own accounting and legal fees and other costs and expenses with respect to the negotiation and preparation of the Definitive Agreement and the consummation of the Acquisition. The Interest Holder shall pay its share of such costs and expenses, including any broker fees for the Acquisition, from the Purchase Price and not the Assets of the Company.

5.  Confidentiality; Publicity.  Without the prior written consent of the other parties hereto, no party shall, and each party shall cause its respective Representatives not to, make any release to the press or other disclosure with respect to either the fact that discussions or negotiations are taking place concerning Purchaser's possible acquisition of the Stock or the existence or contents of this letter, except for (a) such public disclosure as a party hereto reasonably believes may, after due consultation with counsel for such party, be necessary, in order for such party not to be in violation of or default under any applicable law, regulation, governmental order or rule of any securities market and (b) such other disclosure, on a confidential basis, as may be reasonably required to seek or obtain any consents of third parties to permit the transfer of the Stock to Purchaser. For purposes hereof, "Representatives" means officers, directors, managers, partners, members, employees, agents, counsel, accountants, financial advisors, consultants and other representatives.

6. <u>Exclusivity.</u> For the period (the "Exclusivity Period") from the date of the Interest Holder's execution hereof until the earliest of (the "Termination Date") (a) December 31, 2004, or (b) the execution and delivery of the Definitive Agreement, Interest Holder shall not, and shall not permit any of its Representatives to, and shall direct its respective Representatives not to, directly or indirectly, enter into any discussions, negotiations or agreements with, or provide information to, any person, entity or group other than Mattamy relating to any proposal or offer for or inquiry about any merger or other business combination involving the Company, any acquisition of any equity ownership in the Company or any acquisition of a substantial portion of the Assets, whether directly or indirectly (a "Business Combination"). In addition, on the date of the Interest Holder's execution hereof, the Interest Holder and its Representatives shall cease any discussions, negotiations and the provision of information to any person, entity or group other than Mattamy with which it or its Representatives have had contact prior to such date regarding a Business Combination.

7. <u>Conduct of Business.</u> From the date hereof through the date of Closing, the Company shall conduct its business in the ordinary course consistent with past practice.

8. <u>Letter of Intent Not Binding; Survival.</u> This letter is intended to be a confirmation of Mattamy's interest with respect to the Acquisition and it is expressly understood that (a) this letter is not intended to, and does not, constitute an agreement to consummate the Acquisition or to enter into a definitive acquisition agreement and (b) the parties hereto will have no rights or obligations of any kind whatsoever relating to the Acquisition by virtue of this letter or any other written or oral expression by their respective Representatives or any past or future action, inaction or course of conduct or dealing unless and until a Definitive Agreement is executed and delivered; provided that the respective obligations of the Interest Holder and Mattamy contained in Sections 3, 4, 5, 6, 7 and this Section 8 (the "Binding Provisions") will constitute the binding agreements of the Interest Holder and Mattamy, as the case may be, when the Interest Holder has signed and returned a copy of this letter to Mattamy in the manner provided below, and will survive the Termination Date. The Binding Provisions, together with the Confidentiality Agreement, constitute the entire agreement among the parties and supersede all prior oral or written agreements, understandings, representations or other statements with respect to the subject matter hereof. The Binding Provisions shall be governed by and construed under the laws of the State of North Carolina without regard to conflicts of laws principles that would apply any other law.

Please indicate your acceptance of the foregoing by countersigning this letter and returning it to the undersigned at the address set forth on the first page hereof. Mattamy's proposal shall expire if a fully executed original (or facsimile copy followed by hard copy) has not been received by Mattamy by 5:00 p.m. Eastern Time on October 27, 2004.

Very truly yours,



MATTAMY HOMES CORPORATION

By: _____
William R. Quinn, President

AGREED AND ACCEPTED THIS
DAY OF OCTOBER _____, 2004

ALH II, INC., in its capacity as sole shareholder of MULVANEY HOMES, INC.

By: _____

Name: _____

Title: _____

# EXHIBIT AA

## Pamela Jarvis

**From:** Pamela Jarvis

**Sent:** Tuesday, August 03, 2004 12:35 PM

**To:** 'Isaac M. Neuberger'

**Cc:** Thomas M. Wood

**Subject:** RE: ALH

You seem to be intent on mischaracterizing the situation as one in which Shamrock is unwilling to meet with the Class B investors. As my letters have plainly stated, Shamrock is indeed willing to meet. This is why I asked you (see August 2, 2004 letter at 4) to let me know when Mr. Arenson will be in the United States. If, as you assert, your clients want to meet with Shamrock, I trust that you will provide this information at your earliest convenience.

I do not comprehend your statement that "MHI is a Shamrock creation." It is my understanding that (1) Shalom Lamm introduced MHI to ALH, (2) ALH acquired MHI in January 2000, at a time when the Class A investors had only two of ALH's five board seats, and (3) ALH's acquisition of MHI was unanimously approved by the board, including by Mr. Arenson.

Your assertion that only a "little information [has been] occasionally dribbled out by Shamrock" is demonstrably untrue. Shamrock and others have routinely kept Mr. Arenson, as Class B representative, up-to-date on material developments concerning ALH. Mr. Arenson has received weekly reports, periodic financial statements and other materials. He has had unrestricted access to the company's management. In addition to board meetings, there have been numerous teleconferences and email exchanges between Shamrock and Mr. Arenson, and Shamrock has consistently made itself available to Mr. Arenson. (See, e.g., June 1, 2004 email to Mr. Arenson, arranging teleconference with George Buchler and Eugene Krieger to update Mr. Arenson concerning, *inter alia*, MHI and "[a]nything else that you would like to know about.") Moreover, your clients have always had full access to information from Shalom Lamm, under Section 9.2 of the Operating Agreement. I am unaware of any instance in which your clients requested information but did not receive it. Whatever they wanted to know has been theirs for the asking -- if they did not ask, that is their responsibility, not Shamrock's.

In particular, with regard to MHI, the current information concerning the Levitt offer is set forth in Mr. Buchler's July 1, 2004 email to Mr. Arenson and the letter of intent that was faxed to Mr. Arenson at that time. MHI's "dire straits" are described in the July 1 email, and have been discussed at length with Mr. Arenson, as reflected in, *inter alia*, paragraph 3 of the email. Your attempt to suggest that your clients do not grasp the "critical" nature of the MHI situation is disingenuous. I am confident that Mr. Arenson, as one of Israel's largest general contractors, fully understands the ramifications of MHI present dependence on short-term extensions of its construction lines of credit, in the absence of which MHI "would have had to shut down operations" (July 1 email paragraph 2). Indeed, Mr. Arenson must be especially sensitive to the inability of MHI's management to function without appropriate capital resources.

The question Shamrock has repeatedly put to the Class B investors with respect to MHI is whether they are interested in making an alternative proposal. The answer to this can only come from the Class B investors -- it cannot come from Shamrock. As discussed above, if the Class B investors wanted any additional information concerning MHI in order to answer this question, they could seek it from Shamrock or other sources, but they have not done so.

I have already addressed your unfounded accusations regarding breach of fiduciary duty, so I will not repeat that discussion here.

I look forward to hearing from you concerning Mr. Arenson's availability to meet.

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Monday, August 02, 2004 1:28 PM
**To:** Pamela Jarvis

**Cc:** Thomas M. Wood
**Subject:** ALH

Your letter of today is acknowledged,it unfortunately is another edition of your prior epistle and seeks to avoid the simple fact that MHI is a Shamrock creation,it is a core issue,it can not be separated in some convenient box.

If after 10 pages of the same redundant dodge, Shamrock is unwilling to meet with the Class B investors, then simply say so. Do not purport to seek a resolution and suggest that we divorce MHI and that we wait 6 weeks to meet. If MHI is as critical as you have suggested, then maybe Shamrock had better inform the Class Bs directly,meet with them and see if a solution to the overall issue can be found. The Class Bs know only what little information is occasionally dribbled out by Shamrock.

You continue to belittle what Shamrock did. They took control of ALH and then proceeded to liquidate it, against the advice and the desires of the Class Bs, all in the name that Shamrock grew tired of the management time that ALH consumed. That, succinctly stated, is a breach of fiduciary duty to the other shareholders of ALH.

I happen to be in Spain today and will be in Paris tomorrow. Intermittently(between meetings) I do see e-mails, though there is a 6 hour time difference to NYC and 9 hours to LA. I can be reached on my GSM- 1-443-570-5135 or 011-972-54-340-118.

Please let us not waste each others time and try and contain our written words to one page. We are going to meet or we are not....it will not even need a full page.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT AAA

Page 1 of 2

## Gene Krieger

| | |
|---|---|
| **From:** | Gene Krieger |
| **Sent:** | Friday, November 08, 2002 3:17 PM |
| **To:** | 'Avie Arenson (avie@arenson.co.il)' |
| **Subject:** | The silence is deafening . . . |

Dear Avie:

It has been a week since I wrote you regarding your request for access to John and Bill in connection with a possible buyout by the Bs. Your lack of responsiveness is further eroding any sense of seriousness on the part of the Bs and your own personal credibility.

We received the draft purchase agreement from Walter earlier this week, and we are actively engaged in trying to move this forward. There are many open issues in this deal, and we are not certain that we will get it done. Nevertheless, we are working hard to make something happen for ALH, and we thought you would be a bit more involved. On October 8th, you wrote us that you would "get us an answer in a day or two". George responded to you and Shalom, yet we never heard anything further from you on this important transaction.

Regards.

Gene

> -----Original Message-----
> **From:** Gene Krieger
> **Sent:** Friday, November 01, 2002 4:51 PM
> **To:** 'Arenson Avie'
> **Cc:** Shalom Lamm; George Buchler
> **Subject:** RE: alh

Dear Avie:

As we have said on several occasions, we would be happy to receive an offer from the Bs to buy us out. However, there has been such a long delay in this process, we are not sure these expressions of interest are really credible. The beginning of this process was in late July with an indication that any offer would occur within a matter of days or possibly weeks. It is now more than three months since that time, and we have received no meaningful indication of the price or the timing of a possible transaction. Nevertheless, we are still open to this idea, so we will make John and Bill available, subject to the following:

1. We need to know exactly who is in your group. There has been some uncertainty about which B investors are involved, and their actual identity. This is especially true of the SELK interest.

2. There is no problem as far as I am concerned with the B investors getting additional financial information; however, there is a need for confidentiality. We are involved in a sale process and we are working regularly with investment bankers and potential buyers, so the information you require is sensitive and requires confidential treatment.

3. We expect to get a draft purchase agreement from Walter Industries early next week on the acquisition of Bowden for a net price of $6 million. We will be trying to move this along quickly, so if your group would like to see Bowden retained as part of ALH, they will need to respond very, very quickly.

11/1/2004

4. **The involvement of John and Bill must be subject to their ongoing management duties. As you know, they have their hands full with day-to-day operations, especially since they have taken over the leadership roles at Mulvaney.**

With respect to Swiss Re, George has made arrangements with Shalom to get Zich's continued assistance in getting the extension. The process is getting started, and George will be directly involved in all aspects of the discussions. We need to move this forward quickly, but based on prior experience, dealings with Swiss Re are likely to take a while. Therefore, if your group's buyout proposal will be contingent on an extension by Swiss Re, this may end up being a slower process. Also, if you approach the deal this way, and we do get the Swiss Re extension, much of the current risk to ALH is diminished, and the buyout price will need to take that important factor into consideration.

Best regards.

Gene

-----Original Message-----
From: Arenson Avie [mailto:avie@arenson.co.il]
Sent: Thursday, October 31, 2002 8:21 AM
To: George Buchler; Gene Krieger
Cc: Shalom Lamm
Subject: alh

Hello

Some of the B investors (including myself) are interested in making Shamrock an offer to buy out the A's. In order to do so we would like ALH management (John and Bill) to prepare some estimates as to cash flow and other things. We would like to meet them to have them discuss with us these estimates and thus let my colleagues have a first-hand impression of them. I would like your agreement to this before approaching John and Bill. What is happening on the Swiss RE front?

Avie

11/1/2004

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHAMROCK HOLDINGS OF           )
CALIFORNIA, INC., SHAMROCK      )
CAPITAL ADVISORS, INC., EUGENE I. )
KRIEGER, GEORGE J. BUCHLER and  )
BRUCE J. STEIN,                 )
                                )   Civ. No. 04- 1339-SLR
            Plaintiffs,          )
                                )
    v.                          )
                                )
AVIE ARENSON, SELK, LLC, LAUREL )
EQUITY GROUP, LLC, J12ALH       )
ASSOCIATES, A. ARENSON          )
HOLDINGS, LTD. AND D.A.         )
GARDENS, LTD.,                  )

            Defendants.

### FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs Shamrock Holdings of California, Inc. ("Shamrock"), its

affiliate, Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"),

George J. Buchler ("Buchler") and Bruce J. Stein ("Stein"), by and through their

attorneys, allege upon knowledge with respect to themselves and their own actions and

upon information and belief with respect to other matters as follows:

### NATURE OF THE ACTION

1.    This action seeks declaratory relief, pursuant to 10 Del. C. §§ 6501

et seq. and 28 U.S.C. §§ 2201-02, with respect to certain rights and obligations of the

parties hereto.

1

2.    Defendants, directly and indirectly, invested in the equity of ALH
Holdings, LLC. ("ALH"), a limited liability company organized under Delaware law in
June 1998 to engage in the home-building business. Shamrock invested millions of
dollars more in the equity of ALH than did any of the defendants. Due to no wrongdoing
by plaintiffs, ALH was ultimately unsuccessful, with the result that both Shamrock and
defendants have lost most of what they invested in ALH. Defendants are now
threatening to sue Shamrock, Krieger, Buchler and Stein, even though there is no basis
for holding these plaintiffs liable for ALH's disappointing performance.

3.    The plaintiffs' and defendants' financial interests in ALH have at
all times been fully aligned. Under the agreement creating ALH, the economic rights of
the Class A and Class B investors are *pari passu*. The Class A investors have no
financial priority or preference over the Class B investors. The only difference is that
Shamrock's share of ALH's losses is necessarily larger than that of defendants, because
Shamrock's investment in ALH is larger. No setback experienced by ALH could hurt
defendants without hurting Shamrock more. As the single largest investor in ALH,
Shamrock always sought to maximize value for all investors. All of plaintiffs' actions in
connection with ALH were taken in good faith, in the reasonable exercise of plaintiffs'
business judgment.

4.    At most, defendants are claiming that they would have made
certain business decisions differently than plaintiffs. In particular, defendants assert that
they were opposed to the sale of ALH's operations and that the sale process should have
been handled differently. Defendants object vehemently to ALH's separate sales of its
regional operations, even though months of searching yielded no buyer for the company

2

as a whole, and the company could not meet its liquidity and capital needs without selling at least some of its operations. In fact, through their Representative on ALH's Supervisory Board, defendants consented to the sale of ALH and approved the selection, retention and compensation of the financial and investment banking professionals who conducted the auction of ALH's operations.

     5.     Defendants seem to believe, in hindsight, that they should have taken some other approach to ALH, e.g., by asserting themselves more strongly in the management of ALH or by presenting concrete alternative plans for meeting ALH's financial obligations and needs, as plaintiffs repeatedly invited defendants to do. Such a hindsight belief cannot support any legal claim against plaintiffs — let alone a claim for bad faith or gross negligence that would override the exculpation clause in § 6.2(f) of ALH's Operating Agreement.

     6.     This action presents a case or controversy suitable for declaratory judgment because, among other things, defendants persist in asserting that plaintiffs breached their fiduciary duties, acted in self-interest and engaged in other wrongful conduct. Defendants have repeatedly stated their intention to sue plaintiffs for millions of dollars, insisting that plaintiffs must "make them whole" by paying them the entire amount they claim to have invested in the equity of ALH, plus additional damages. Thus, plaintiffs face a real and substantial probability of being sued by defendants, and are entitled to judicial relief from the injury caused by these spurious accusations.

## THE PARTIES AND THEIR CONNECTIONS WITH DELAWARE

*The Plaintiffs*

7.    Plaintiff Shamrock has invested more than $9.1 million in the equity of ALH, constituting approximately 38% of ALH's total equity. Shamrock is a Class A Member of ALH, holding approximately 62% of the Class A Membership Interest in ALH. Shamrock and the other Class A Members of ALH invested a total of approximately $ 14.5 million in ALH (approximately 62% of ALH's total equity).

8.    Plaintiffs Krieger, Buchler and Stein are employees of Shamrock who serve as Representatives on ALH's Supervisory Board. Krieger, Buchler and Stein all perform substantial services for plaintiff SCA.

*Arenson and the Arenson Entities*

9.    Defendant Avie Arenson ("Arenson") is the founder and controlling shareholder of Israel's largest private real estate contractor. Over more than four decades, Arenson's companies, which have approximately 1200 employees, have successfully completed numerous major construction projects in Israel and other countries.    Arenson has substantial expertise in the real estate, contracting and construction businesses.

10.    Since the inception of ALH in 1998, Arenson has served on ALH's Supervisory Board as the Representative of ALH's Class B Members (the "Class B Representative").

11.    Since the inception of ALH in 1998, Arenson has owned, controlled and acted as agent for A. Arenson Holdings, Ltd. ("Arenson Holdings") and D.A. Gardens, Ltd. ("D.A. Gardens") (collectively the "Arenson Entities"). The Arenson

4

Entities claim to have invested $1.4 million in the equity of ALH, which would constitute approximately 6% of ALH's total equity. Each of the Arenson Entities is a Class B Member of ALH; together they claim to hold approximately 17% of the Class B Membership Interest in ALH.

12.    In acting as Class B Representative, Arenson has represented all of ALH's Class B Members, including the Arenson Entities.

13.    As Class B Representative, Arenson has acted in what he perceived and/or claimed to be the best interests of both the Arenson Entities and the other Class B Members.

14.    In all matters relating to the Arenson Entities' initial investment in and subsequent dealings with ALH, Arenson was the controlling person of, and sole agent, spokesperson and signatory for, the Arenson Entities.

15.    Since the inception of ALH in 1998, Arenson has participated materially in the management of ALH. Among other things, Arenson has participated in decisions and actions concerning (a) the corporate structure and governance of ALH and its subsidiaries, (b) the funding of ALH's operations, including assessment of financial needs, arrangements for debt and equity financing and obtaining extensions and waivers in connection with debt financing arrangements, (c) the engagement and payment of consultants and financial/investment banking advisors, (d) the acquisition and disposition of operations, (e) the restructuring of ALH's relationship with affiliates providing management services, (f) the handling and resolution of litigation, and (g) the appointment, compensation and termination of officers of ALH and its subsidiaries.

5

16.    From time to time, Arenson visited ALH's home-building operations in Florida, Tennessee and North Carolina, talked to local management and made suggestions for improving the operations.

17.    Beginning in or around July 2001, Arenson was one of the three members of ALH's Audit Committee.

18.    Arenson has expressly acknowledged his material participation in the management of ALH, e.g., his statement in April 2002 that he and Shamrock had been allowed by the other Members of ALH to "do what we thought best in the company."

*The June 1998 ALH Transaction*

19.    In and around June 1998, the investors in ALH, including the Arenson Entities and the other Class B Members, negotiated the terms of their investment in a limited liability company to be organized under Delaware law for the purpose of engaging in the home-building business. That limited liability company, ALH, was formed on June 3, 1998 by the filing of a Certificate of Limited Liability Company with the Office of the Secretary of State of the State of Delaware.

20.    On or around June 12, 1998, the Class B Members, including the Arenson Entities, funded their investments in ALH. At that time, ALH's operations began.

21.    As a result of the June 1998 closing of the transaction that formed and funded ALH (the "ALH Transaction"), ALH became the sole direct or indirect stockholder of American Landmark Homes Corporation ("ALH Corp.") and Atlantic Builders, Inc. ("ABI"), Delaware corporations with home-building operations in Florida.

6

The stock of ALH Corp. was contributed to ALH by (a) Landmark Equity Investors LLC, a Delaware limited liability company which thereby became the Class C Member of ALH, and (b) Lion ALH Capital LLC ("Lion LLC"), a Delaware limited liability company which thereby became the Class D Member of ALH.

*The ALH Operating Agreement*

22.     ALH's Operating Agreement was initially signed by ALH's Members as of June 12, 1998 and was amended as of March 15, 1999. (Except as otherwise indicated, the term "Operating Agreement" as used herein refers to ALH's June 12, 1998 Operating Agreement as amended.)

23.     The Operating Agreement provides that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

24.     Arenson caused the Arenson Entities to enter into the ALH Transaction and signed ALH's original June 12, 1998 Operating Agreement on behalf of the Arenson Entities.

*The Creation of ALH II*

25.     On or around December 9, 1998, the members of ALH's Supervisory Board (the "Class Representatives"), including Arenson, decided that it would be in ALH's best interests to form a Delaware corporate subsidiary which would be the parent company of all of ALH's operating subsidiaries. That corporate subsidiary, ALH II, Inc. ("ALH II"), was organized on December 9, 1998 by the filing of a

7

Certificate of Incorporation with the Office of the Secretary of State of Delaware. All
Class Representatives, including Arenson, approved the creation of ALH II.

26.    ALH II was created in part for tax planning purposes, in order to,
*inter alia*, capture the consolidated tax liability of ALH, while taxable income would
flow directly to ALH's Members. ALH II was used as the vehicle for obtaining debt
financing for ALH's operations and acquisitions. The financial statements of ALH II
were presented to lenders in connection with the initial arrangement and subsequent
modification of such loans. As of June 30, 2001, ALH II was the borrower or guarantor
on over $40 million in loans for the benefit of ALH and its operations.

27.    Both ALH and ALH II were exposed to potential liability for the
debts of ALH II and its subsidiaries. For example, in or around January 2000, ALH II
obtained a $27.5 million loan from Wachovia Bank, N.A. ("Wachovia"). The Wachovia
loan was secured by surety bonds from Swiss Reinsurance America Corporation ("Swiss
Re") and Amwest Surety Insurance Corporation ("Amwest") (subsequently, Swiss Re
assumed the Amwest surety bond). The proceeds of this loan were used for, *inter alia*,
the acquisition of home-building operations in Charlotte, North Carolina that operated
under the name Mulvaney Homes, Inc. ("MHI").

28.    In connection with the Wachovia loan, ALH II pledged its interest
in a $500,000 Certificate of Deposit and ALH pledged all of its stock in ALH II. In
addition, ALH agreed that, if ALH II defaulted on the loan, Wachovia could require ALH
to purchase ALH II's loan obligation to Wachovia for a price equal to ALH's obligation
to Wachovia. Thus, in effect, ALH became the guarantor of ALH II's obligations to

8

Wachovia. All Class Representatives, including Arenson, approved the acquisition of MHI, the Wachovia loan and the related arrangements.

*The March 1999 Operating Agreement Amendment and Related Capital Contributions*

29.    Arenson caused the Arenson Entities to enter into the March 15, 1999 Amendment to ALH's Operating Agreement and signed the Amendment on their behalf. In connection with the March 15, 1999 Amendment to the Operating Agreement, Arenson caused the Arenson Entities to make a capital contribution of approximately $469,000 to ALH. The March 19, 1999 Amendment to the Operating Agreement shows this amount as having been contributed jointly by the Arenson Entities; it does not differentiate between Arenson Holdings and D.A. Gardens.

30.    The purpose of the capital contributions made by ALH's Class A and Class B Members in connection with the March 15, 1999 Amendment of the Operating Agreement was to provide funds for ALH Tennessee Acquisition, Inc. ("ALH Tennessee"), a Delaware corporation and direct wholly-owned subsidiary of ALH II, to acquire Bowden Building Corporation ("BBC"), a home-building company based in Memphis, Tennessee.

31.    In connection with the March 15, 1999 Amendment to the Operating Agreement, defendants SELK, LLC ("SELK") guaranteed to ALH that Shalom Lamm ("Lamm"), as Class E Member of ALH, would fulfill his outstanding obligation to contribute capital to ALH (the "Class E Capital Contribution") in the amount of approximately $4.7 million, by paying cash or satisfying certain indebtedness of ALH Corporation (the "SELK Guarantee"). The March 15, 1999 Amendment to the Operating Agreement provides that, if Lamm fails to make the full Class E Capital

9

Contribution, SELK must make up the shortfall by performing under the SELK Guarantee, and to the extent SELK fails to do so, its equity interest in ALH shall be reduced dollar-for-dollar by the amount of the shortfall.

*The 2000 Loans*

32.     Pursuant to a loan agreement dated April 6, 2000 (the "2000 Loan Agreement"), certain ALH investors loaned $2 million to ALH II to "finance certain operations" of ALH II. Approximately $1.63 million of this amount was loaned by Shamrock. According to the 2000 Loan Agreement, $166,666 was loaned by an "A. Arenson Holdings, Inc." The 2000 Loan Agreement does not state what the relationship is between "A. Arenson Holdings, Inc.," on the one hand, and Arenson and the Arenson Entities, on the other hand.

33.     ALH II's obligations under the 2000 Loan Agreement were guaranteed by various ALH II subsidiaries, including three Delaware corporations: Atlantic Builders, Inc. ("ABI"), ALH Acquisition Corp. (the parent company of ABI) and ALH-Tennessee (the parent company of BBC).

34.     All Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2000 Loan Agreement. Arenson caused "A. Arenson Holdings, Inc." to enter into the 2000 Loan Agreement and agreed to it on behalf of "A. Arenson Holdings, Inc."

35.     By the end of 2000, ALH II was in default under the 2000 Loan Agreement and under agreements with its third-party lenders. The auditor's report on ALH II's financial statements for fiscal year 2000 stated that ALH II's defaults on certain

10

loan covenants raised substantial doubt about the ability of ALH II and its subsidiaries to continue as a going concern.

*The Lion LLC Settlement*

      36.     Pursuant to § 6.1(a) of the Operating Agreement, Lion LLC was appointed the Initial Manager of ALH. Lion LLC was controlled by Lamm.

      37.     By early 2001, the Class A and Class B Members of ALH were extremely dissatisfied with Lion LLC's performance as Manager of ALH. The Class A and Class B Members of ALH believed that Lion LLC, Lamm and certain of their associates owed ALH millions of dollars in misappropriated and/or misused funds and unauthorized expenditures.

      38.     In or around July 2001, ALH reached a settlement with Lion LLC, Lamm and certain of their associates (the "Lion LLC Settlement"). Pursuant to the Lion LLC Settlement, Lion LLC, Lamm and certain of their associates agreed to pay approximately $2 million dollars to ALH.

      39.     The Lion LLC Settlement substantially decreased the influence of Lion LLC, Lamm and their associates over ALH by, *inter alia*: (a) allowing the Class A Members to designate one of the two Class D Representatives on the Supervisory Board, (b) providing that SCA would render consulting services to ALH, (c) making Buchler a member of the board of directors of each ALH II subsidiary, and (d) establishing an Audit Committee, the members of which would be the two Class A Representatives (Krieger and Buchler) and the Class B Representative (Arenson).

40.    As part of the Lion LLC Settlement, the subsidiaries of ALH II which guaranteed the 2000 Loan Agreement reaffirmed their guarantees to Shamrock and "A. Arenson Holdings, Inc."

41.    All Class Representatives, including Arenson, approved the Lion LLC Settlement.

*The Possible Sale of ALH*

42.    Because of, *inter alia*, ALH's ongoing financial problems and disappointing performance, the Class Representatives, including Arenson, decided during the course of 2001 that it would be in ALH's best interests to consider selling ALH's operations.

43.    In or around December 2001, Isaac M. Neuberger ("Neuberger"), who then represented some or all of the Class B Members in connection with ALH, was involved in identifying a possible buyer for ALH, for which he sought a substantial finder's fee. Because the transaction was not consummated, Neuberger did not receive this payment.

44.    In March 2002, ALH and ALH II engaged Jolson Merchant Partners ("JMP") to provide financial advisory and investment banking services in connection with the possible sale of some or all of ALH's operations. All Class Representatives, including Arenson, approved this engagement of JMP.

*The 2002 Loans*

45.    Regardless of whether there would or would not be a sale of some or all of ALH's operations, the Class Representatives, including Arenson, decided that ALH needed additional funding. After considering and exploring various alternatives,

12

the Class Representatives, including Arenson, concluded that it would not be feasible to raise additional equity from ALH's existing Members or obtain additional equity or loans from outside parties.

46.    Pursuant to a loan agreement dated May 7, 2002 (the "2002 Loan Agreement"), certain ALH investors loaned approximately $4.4 million to ALH II. The purpose of the 2002 Loan Agreement was to "provide working capital" to ALH II and its subsidiaries. All Class Representatives, including Arenson, approved the borrowings by ALH II pursuant to the 2002 Loan Agreement.

47.    Pursuant to the 2002 Loan Agreement, D.A. Gardens loaned $312,500 to ALH II. Arenson caused D.A. Gardens to enter into the 2002 Loan Agreement and signed the Agreement on behalf of D.A. Gardens. Shamrock loaned approximately $1,964,000 to ALH II pursuant to the 2002 Loan Agreement, and other ALH Members (except Laurel) also made loans to ALH II.

48.    At the June 26, 2003 meeting of ALH'S Supervisory Board, Arenson suggested that the loans to ALH II pursuant to the 2000 Loan Agreement and 2002 Loan Agreement — including the loans made by the Arenson Entities, the other Class B Members and Shamrock — should be repaid from the proceeds of the sale of ABI. All Class Representatives, including Arenson, consented to these loan repayments.

*The Class B Members' Efforts to Acquire the Class A Membership Interest*

49.    Beginning in or around July 2002, ALH's Class B Members embarked on a plan to acquire the Class A Membership Interest in ALH.

50.    At that time, ALH was in the midst of an effort to sell BBC, to raise cash that was essential to ALH's survival. Through Arenson and Neuberger, the

13

Class B Members contended that the sale of BBC — or any sale of less than all of ALH's operations — was imprudent and would serve only Shamrock's interests. Yet the Class B Members knew that an acceptable buyer for all of ALH could not be found, both because of JMP's unsuccessful efforts and because of the Class B Members' own fruitless efforts to find a partner to join them in a buy-out offer.

51.    At the same time, the Class B Members refused to provide any additional funding for ALH. Despite repeated invitations by Shamrock, the Class B Members never once made a written proposal to acquire the Class A Membership Interest. Apparently, the Class B Members hoped that the ALH situation would deteriorate to the point where Shamrock would succumb to their threats and pressure tactics and sell out on the cheap.

*SELK*

52.    Defendant SELK claims to have invested approximately $2.9 million in the equity of ALH, which would constitute approximately 12% of ALH's total equity. SELK is a Class B Member of ALH, claiming to hold approximately 33% of the Class B Membership Interest in ALH. SELK is a limited liability company organized under Delaware law.

53.    Pursuant to a Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR"), Lamm, on behalf of himself and, *inter alia*, his affiliates (collectively the "Lamm Affiliates"), has released ALH, ALH II, MHI and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors and assigns (collectively the "ALH Affiliates"), from "any and all claims, demands, debts, duties, bonds, damages, liabilities,

14

actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises" (collectively "Claims") of Lamm or the Lamm Affiliates that "relate[] to or aris[e] out of [any] past transactions between or amongst them."

54.    In the course of opposing plaintiffs' motion to remand this action, SELK filed a declaration in which Lamm attests that he (1) is "the managing member" of SELK, (2) holds a 30% membership interest in SELK, and (3) on behalf of SELK, authorized the removal of this action, Consequently, it appears that SELK is a Lamm Affiliate which has released any Claims it may have against the ALH Affiliates, including but not limited to the threatened claims which are referenced in this action.

55.    SELK has denied that it is a Lamm Affiliate under the SAMR and that any claim it may have against the ALH Affiliates was released by the SAMR. If that were correct, then SELK was not released by the ALH Affiliates pursuant to the SAMR. Therefore, SELK would have continuing exposure under the SELK Guarantee and the March 15, 1999 Amendment to the Operating Agreement.

56.    Lamm has not made the Class E Capital Contribution in full and SELK has not paid ALH the amount of the shortfall in the Class E Capital Contribution. Plaintiffs do not know the precise amount of the shortfall, but they believe that it reduces or eliminates SELK's equity interest in ALH and, therefore, any amount recoverable by SELK under its threatened litigation against plaintiffs.

*Laurel*

57.    Defendant Laurel Equity Group ("Laurel") claims to have invested approximately $2.9 in the equity of ALH, which would constitute approximately 12% of ALH's total equity. Laurel supposedly made $1.75 million of its capital contribution to

ALH by releasing a promissory note, issued by ALH Corp. and signed by Lamm, in favor of one of the members of Laurel.  Laurel is a Class B Member of ALH, claiming to hold approximately 33% of the Class B Membership Interest in ALH.  Laurel is a limited liability company organized under Delaware law.

*J12*

58.     J12ALH Associates ("J12") claims to have invested approximately $1.47 million in the equity of ALH, which would constitute approximately 6% of ALH's total equity.  J12 is a Class B Member of ALH, claiming to hold approximately 17% of the Class B Membership Interest in ALH.

59.     J12 is a general partnership organized under the laws of New York State.  On or around June 2, 1998, J12 was formed for the purpose of acquiring, owning, managing, investing in or disposing of an interest in ALH.

60.     One of J12's three general partners, Jays Twelve LLC ("Jays LLC"), is a Delaware limited liability company.  Jays LLC was formed on January 12, 1998 by the filing of a Certificate of Formation with the Office of the Secretary of State of the State of Delaware.  According to its Certificate of Formation, Jays LLC has a registered office and a registered agent for the service of process in Wilmington, Delaware.

61.     Under the J12 partnership agreement, Jays LLC was required to contribute $100,000 of the partnership's total $1 million capital.  For tax reasons, although Jays LLC was required to contribute only 10% of J12's capital, the partnership agreement entitled Jays LLC to 90% of the partnership's cash flow from the ALH investment, after return of the $888,889 capital contributed by the partnership's Class A

16

partner. The Class A partner, who is a citizen of New York State, had only a 10% interest in such cash flow, despite the much larger percentage of her capital contribution to the partnership.

62.    Together, Arenson Holdings, D.A. Gardens, SELK, Laurel and J12 claim to hold 100% of the Class B Membership Interest in ALH.

## JURISDICTION

63.    This action was originally commenced in the Court of Chancery of the State of Delaware. The action was removed to this Court on grounds of diversity jurisdiction under 28 U.S.C. § 1332, and plaintiffs' motion for remand was denied.

64.    This Court has personal jurisdiction over the defendants pursuant to 6 Del. C. § 18-105, 6 Del. C. § 18-109, 10 Del. C. § 3104(c)(1), § 310(a) of the New York State Civil Practice Law and Rules ("NY CPLR"), and principles of common law.

65.    J12, a New York general partnership, is subject to personal jurisdiction in Delaware through service of process of Jays LLC, one of its general partners. Jay LLC, a Delaware limited liability company, is subject to service of process in Delaware. J12 is also subject to personal jurisdiction in Delaware because it transacted business in Delaware from which the present causes of action arise and intentionally availed itself of the benefits and protections of Delaware law.

66.    On or around October 5, 2004, defendants Arenson, SELK and Laurel entered a general appearance in the Chancery Court, without any reservation of rights with respect to personal jurisdiction. Thus, Arenson, SELK and Laurel have waived any objection based on lack of personal jurisdiction.

17

67. Arenson is subject to personal jurisdiction in Delaware under 6 Del. C. § 18-109, which provides in pertinent part that (a) a manager of a limited liability company may be served with process in all civil actions "involving or relating to the business of the limited liability company, and (b) the term "manager" refers to any person who, although not formally named as a manager in the limited liability company agreement or similar instrument, "participates materially in the management of the limited liability company."

68. Arenson and the Arenson Entities are subject to personal jurisdiction in Delaware under 10 Del. C. § 3104(c)(1), in that they transacted business in Delaware from which the present causes of action arise and intentionally availed themselves of the benefits and protections of Delaware law, including Delaware's advanced body of law on alternative entities such as limited liability companies. Among other things, the Arenson Entities and Arenson himself (as Class B Representative and as agent for the Arenson Entities):

(a) Entered into the ALH Transaction, i.e., agreed to form and fund the Delaware limited liability company that became ALH, from which all of their claims against plaintiffs arise — claims as to which plaintiffs now seek declaratory relief.

(b) Entered into the Operating Agreement, which created the ALH governance structure that they now attack as the vehicle for plaintiffs' alleged breaches of fiduciary duty.

(c) Agreed that their rights and obligations in connection with ALH should be governed by Delaware law, as expressly provided in the Operating Agreement,

18