# EXHIBIT DD

## Pamela Jarvis

| | |
|---|---|
| **From:** | Pamela Jarvis |
| **Sent:** | Thursday, August 05, 2004 7:26 PM |
| **To:** | 'Isaac M. Neuberger' |
| **Cc:** | Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com |

**Subject:** RE: ALH

Dear Isaac:

Thank you for your prompt response. Shamrock is not available for a conference call on Monday August 9, but can do a call tomorrow (Friday August 6) at 10 am LA time/1 pm NY time/8 pm Israel time. After the conference call, we can all consider whether a meeting in NY on August 26 makes sense (I'm afraid the 19th is not feasible).

The first part of your proposed agenda for tomorrow's conference call, which concerns ALH's current business and financial status and Shamrock's assessment of the possible scenarios, is acceptable. These are matters that would be normally be discussed at a board meeting without the presence of legal counsel for any constituency, but on this occasion Shamrock is willing accommodate your request. However, with all due respect, I think the second part of your proposed agenda -- a "review" of "why the Bs have issues with Shamrock" -- is both unnecessary and counterproductive. Our exchange of correspondence over the past couple of weeks has already reviewed the issues comprehensively. It is obvious that our clients see and interpret past events quite differently. We have heard your views and you have heard ours. A rehash of these differences is far more likely to engender further discord than it is to lead to the "amicable resolution" referred to in your first email to me. Accordingly, I propose instead that the second part of the agenda be focused on the future rather than the past, i.e., whether there is a viable alternative to the Levitt proposal for MHI, and if so, how it can be achieved. If you and I cannot agree on the second part of the agenda, Shamrock would still be willing to proceed tomorrow with a conference call regarding just the first part.

If you and your clients will _not_ be calling in from more than four different phone numbers, we can use my firm's conference line. Just call 212-407-1233 at the appointed time; no password will be needed. If you and your clients will be calling in from more than four different numbers, please let me know immediately, as I will have to arrange an outside conference line and get back to you with instructions.

Sincerely,

Pamela Jarvis

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Thursday, August 05, 2004 4:08 PM
**To:** Pamela Jarvis
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:** RE: ALH

### _PLEASE SEE RESPONSES IN CONTEXT_

8/8/2005

**From:** Pamela Jarvis [mailto:pjarvis@josephnyc.com]
**Sent:** Thursday, August 05, 2004 12:16 PM
**To:** Isaac M. Neuberger
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:** RE: ALH

Dear Isaac:

In response to your inquiries regarding a meeting, you are correct in assuming that New York should be the location. Unfortunately, Monday and Tuesday of next week are not possible. With regard to meeting in Europe, we know of no reason why Mr. Arenson would only be able to meet there, and in any event Shamrock will not undertake to meet there.

*IMN- I HAVE SPOKEN TO MR. ARENSON- HE IS WILLING TO COME HERE IN THE THIRD WEEK OF AUGUST, POSSIBLY ON THE 19th or 26th. If in Europe,it could possibly be earlier.*

In order to expedite communication without the burden of travel for anyone, we propose an initial conference call during the week of August 23. This would give us all an opportunity to gauge whether a face-to-face meeting in New York would be worthwhile. If you would like to have a conference call sooner than that, Shamrock is available tomorrow from 10:00-11:30 am and 1:30-4:30 pm Los Angeles time.

*IMN- WHAT TIME ON MONDAY COMING, AUGUST 9, WOULD SHAMROCK BE AVAILABLE FOR A CONFERENCE CALL?*

Regarding participants in conference calls or meetings, George Buchler and perhaps other Class A Representatives would attend. We assume that Mr. Arenson, as the sole Class B Representative, would also attend. Would other Class B Members attend?

*IMN- WE WOULD ATTEND TO INVITE ALL OF THE Bs TO PARTICIPATE. I EXPECT THAT IN ADDITION TO MR. ARENSON, THAT MR. M. JESSELSON WOULD PARTICIPATE.*

It would be most helpful if you would provide us with a proposed agenda, so that we can be as fully prepared as possible.

*IMN- THE AGENDA IS FOR US TO DISCUSS WHERE WE ARE TODAY VIS A VIS WACHOVIA,OHIO AND SWISS RE; THE CAPITAL POSITION AND WHAT SHAMROCK'S INTENTIONS ARE. THEN WE CAN REVIEW WHY THE Bs HAVE ISSUES WITH SHAMROCK AND ITS MANAGERS.*

If you would like to have a conference call tomorrow, please get back to me right away so that I can make the necessary arrangements.

*IMN- PLEASE UNDERSTAND THAT THERE ARE SIGNIFICANT TIME DIFFERENCES INVOLVED. 10 AM Los Angeles time is 10 hours different than Israel or 8 PM in the evening. That is the absolute latest time that we can start.*

8/8/2005

Sincerely,

Pamela Jarvis

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Wednesday, August 04, 2004 5:02 PM
**To:** Pamela Jarvis
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net;
konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:** RE: ALH

## PLEASE SEE MY RESPONSES IN CONTEXT

**From:** Pamela Jarvis [mailto:pjarvis@josephnyc.com]
**Sent:** Tuesday, August 03, 2004 12:35 PM
**To:** Isaac M. Neuberger
**Cc:** Thomas M. Wood
**Subject:** RE: ALH

You seem to be intent on mischaracterizing the situation as one in which Shamrock is unwilling to meet with the Class B investors. As my letters have plainly stated, Shamrock is indeed willing to meet. This is why I asked you (*see* August 2, 2004 letter at 4) to let me know when Mr. Arenson will be in the United States. If, as you assert, your clients want to meet with Shamrock, I trust that you will provide this information at your earliest convenience.

*IMN- BY COPY OF THIS E-MAIL, I AM INQUIRING IF MR. ARENSON CAN MEET IN THE USA. I ASSUME THAT WE WILL MEET IN NYC. IS ATHAT CORRECT? WHO, FROM SHAMROCK,WILL ATTEND. IF MR. ARENSON IS ABLE, IS NEXT MONDAY OR TUESDAY POSSIBLE? IF MR. ARENSON CAN ONLY MEET IN EUROPE, IS SHAMROCK WILLING TO DO SO AND IF YES, WHEN?*

I do not comprehend your statement that "MHI is a Shamrock creation." It is my understanding that (1) Shalom Lamm introduced MHI to ALH, (2) ALH acquired MHI in January 2000, at a time when the Class A investors had only two of ALH's five board seats, and (3) ALH's acquisition of MHI was unanimously approved by the board, including by Mr. Arenson.

*IMN- THE DILEMMA OF MHI, AS A STAND ALONE IS THE RESULT OF SHAMROCK'S HAVING SOLD BOTH MEMPHIS AND JACKSONVILLE,IN A PIECE MEAL FASHION, OF HAVING DESTROYED THE MANAGEMENT STRUCTURE BY LETTING IT BE KNOWN THAT ALH WAS BEING LIQUIDATED,PIECE BY PIECE AND THEREBY ALLOWING ALH TO BE DISMEMBERED AS IT WAS.THE ORIGINAL ACQUISITION OF MHI IS IRRELEVANT AND THE INTRODUCTION OF SHALOM LAMM IS BUT ANOTHER RED HERRING.*

Your assertion that only a "little information [has been] occasionally dribbled out by Shamrock" is demonstrably untrue. Shamrock and others have routinely kept Mr. Arenson, as Class B representative, up-to-date on material developments concerning ALH. Mr. Arenson has received weekly reports, periodic financial statements and other materials. He has had unrestricted access to the company's management. In addition to board meetings, there have been numerous teleconferences and email exchanges between Shamrock and Mr. Arenson, and Shamrock has consistently made itself available to Mr. Arenson. (*See, e.g.*, June 1, 2004 email to Mr. Arenson, arranging teleconference with George Buchler and Eugene Krieger to update Mr. Arenson concerning, *inter alia*, MHI and "[a]nything else that you would like to know about.") Moreover, your clients have always had full access to information from Shalom Lamm, under Section 9.2 of the Operating Agreement. I am unaware of any instance in which your clients requested information but did not receive it. Whatever they wanted to know has been theirs for the asking -- if they did not ask, that is their responsibility, not Shamrock's.

*IMN- AS I TOLD YOU WHEN WE SPOKE, WHILE SHAMROCK ALLOWED ITS COUNSEL TO ATTEND BOARD MEETINGS AT WILL MESSRS KRIEGER ET. AL REFUSED TO ALLOW MR. ARENSON TO BRING ME TO A BOARD MEETING CHARLOTTE. IN ADDITION, AS TO THE ISSUES AT HAND, THE WRONGFUL AND IMPROPER LIQUIDATION OF ALH TO SATISFY A SHAMROCK OBJECTIVE, WAS DONE OVER THE OBJECTION AND PROTEST OF MR. ARENSON AND THE Bs.*

In particular, with regard to MHI, the current information concerning the Levitt offer is set forth in Mr. Buchler's July 1, 2004 email to Mr. Arenson and the letter of intent that was faxed to Mr. Arenson at that time. MHI's "dire straits" are described in the July 1 email, and have been discussed at length with Mr. Arenson, as reflected in, *inter alia*, paragraph 3 of the email. Your attempt to suggest that your clients do not grasp the "critical" nature of the MHI situation is disingenuous. I am confident that Mr. Arenson, as one of Israel's largest general contractors, fully understands the ramifications of MHI present dependence on short-term extensions of its construction lines of credit, in the absence of which MHI "would have had to shut down operations" (July 1 email paragraph 2). Indeed, Mr. Arenson must be especially sensitive to the inability of MHI's management to function without appropriate capital resources.

*IMN- MHI'S LACK OF CREDIBLE MANAGEMENT IS THE CORE ISSUE. SHAMROCK ALLOWED THAT CONDITION TO OCCUR, AS IT WAS PART OF THEIR CAMPAIGN TO "CLOSE" ALH AND RID THEMSELVES OF THEIR FIDUCIARY OBLIGATIONS, AT ANY COST. THEY HAD WRITTEN OFF THE EQUITY LONG AGO AND ONLY SOUGHT TO BE REPAID THEIR LOANS.*

The question Shamrock has repeatedly put to the Class B investors with respect to MHI is whether they are interested in making an alternative proposal. The answer to this can only come from the Class B investors – it cannot come from Shamrock. As discussed above, if the Class B investors wanted any additional information concerning MHI in order to answer this question, they could seek it from Shamrock or other sources, but they have not done so.

*IMN- AS PART OF AN OVERALL RESOLUTION OF THIS "MESS" I AM SURE THAT MHI'S CURRENT POSITION CAN BE ADDRESSED, AS WELL. THE SOONER WE MEET, THE BETTER.WE ARE UNABLE TO REALLY CONSIDER ANY OTHER ALTERNATIVE OR APPROVE THE SHAMROCK SPONSORED DEAL WITH LEVITT UNTIL WE HAVE RESOLVED THE CURRENT SITUATION WITH SHAMROCK.*

I have already addressed your unfounded accusations regarding breach of fiduciary duty, so I will not repeat that discussion here.

I look forward to hearing from you concerning Mr. Arenson's availability to meet.

************************************

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
************************************

************************************

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin &
Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended
recipient and may constitute a communication protected by the attorney-client privilege. If you are
not the intended recipient or a person responsible for delivering it to the intended recipient, you
are hereby notified that any use, distribution, or copying of this communication or its contents is
strictly prohibited. If you have received this communication in error, please notify us immediately
by telephone at (410) 332-8550.
**********************************

# EXHIBIT E

CLOCKED COPY



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHAMROCK HOLDINGS OF                    )
CALIFORNIA, INC., SHAMROCK              )
CAPITAL ADVISORS, INC., EUGENE I.       )
KRIEGER, GEORGE J. BUCHLER and          )
BRUCE J. STEIN,                         )
                                        )    Civil Action No.: 04-1339-SLR
                                        )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )
                                        )
                                        )
AVID ARENSON, SELK, LLC and             )
LAUREL EQUITY GROUP, LLC,

            Defendants.

**DECLARATION OF GEORGE J. BUCHLER**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND**

**GEORGE J. BUCHLER** declares pursuant to 28 U.S.C. § 1764 that:

1.      I am one of the plaintiffs in the above-captioned action. I submit this

declaration in support of the Motion of Plaintiffs Shamrock Holdings of California, Inc.

("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"),

Bruce J. Stein ("Stein") and myself for an order pursuant to 28 U.S.C. § 1447(c): (1)

remanding this action to the Court of Chancery of the State of Delaware (the "Chancery

Court"), and (2) awarding the just costs and actual expenses, including attorneys fees,

incurred by Plaintiffs as the result of the defective and unwarranted removal of this action by

Defendants Avie Arenson ("Arenson"), SELK, LLC ("SELK") and Laurel Equity Group,

LLC ("Laurel"). Unless otherwise indicated, I have personal knowledge of the matters set

1

forth in this Declaration, and as to such other matters, I believe that the statements herein are true

2.      Annexed as Ex. A hereto is a true and accurate copy of the Complaint in this action.

3.      Annexed as Ex. B hereto is a true and accurate copy of the June 12, 1998 Operating Agreement of ALH Holdings, LLC ("ALH").

4.      Annexed as Ex. C hereto is a true and accurate copy of Defendants' October 6, 2004 notice of removal of this action.

5.      Annexed as Ex. D hereto is a true and accurate copy of the October 14, 2004 motion of SELK and Laurel to dismiss this action.

6.      Annexed as Ex. E hereto is a true and accurate copy of Plaintiffs' October 15, 2004 interrogatories relating to their motion to remand (the "Interrogatories").

7.      Annexed as Ex. F hereto is a true and accurate copy of Arenson's responses to the Interrogatories.

8.      Annexed as Ex. G hereto is a true and accurate copy of SELK's responses to the Interrogatories.

9.      Annexed as Ex. H hereto is a true and accurate copy of Laurel's responses to the Interrogatories.

10.     Annexed as Ex. I hereto is a true and accurate copy of the August 16, 2001 written consent of ALH's Class D Member.

11.     Annexed as Ex. J hereto is a true and accurate copy of a September 20, 2001 notification letter from Lion ALH Capital, LLC.

2

12.    Annexed as Ex. K hereto is true and accurate copy of: (1) a December 22, 2002 email to Krieger and me from Isaac Neuberger ("Neuberger"), the senior partner of Neuberger, Quinn, Gielen, Rubin & Gibber, counsel to all the Class B Members of ALH and lead counsel for Defendants in this action; and (2) a December 27, 2002 email from Krieger in response to Neuberger's December 22, 2002 email.

13.    I am the President of Shamrock's Real Estate Division.    Shamrock is a corporation organized under California law with its principal place of business in California. SCA, which is an affiliate of Shamrock, is a corporation organized under Delaware law with its principal place of business in California.    Krieger, Stein and I, who are employees of Shamrock, also perform substantial services for SCA.

14.    As individuals, Krieger, Stein and I reside in and are citizens of California. Pursuant to § 6.2(b)(i) of ALH's Operating Agreement (Ex. B hereto), Krieger and I serve on ALH's Supervisory Board as representatives of the Class A Members of ALH.

15.    On information and belief, the Class A Members are individuals, except that a few are trusts and one is a limited partnership. The individuals reside in and are citizens of California.    The trustees of the trusts are individuals who reside in and are citizens of California, except that: (1) the trustee of one trust is an individual who resides in and is a citizen of Arizona; (2) the trustee of one trust is an individual who resides in and is a citizen of Colorado; and (3) the trustee of one trust is a citizen of the United Kingdom who is a resident alien of the United States domiciled in Nevada.    The partners of the limited partnership are individuals who reside in and are citizens of California.

16.    ALH's Class D Member is Lion ALH Capital LLC ("Lion Capital"), a Delaware LLC. See Ex. B hereto at 1, 4.    According to Lion Capital's June 12, 1998

3

operating agreement, which was among the documents received by Shamrock in connection
with the closing of its June 1998 equity investment in ALH, the members of Lion Capital are
Lion & Lamm Capital LLC ("L&L"), a New York limited liability company ("LLC"), and
ALH-EBC Corporation, a Delaware corporation. According to L&L's September 1, 1997
operating agreement, Lamm is a member of L&L. On information and belief, Lamm resides
in and is a citizen of New York, and continues to be a member of L&L, which continues to
be a member of Lion Capital.

17.     One of the Class B Members of ALH is an entity identified in the transaction
documents as "J12ALH, Associates LLC" ("J12"). Before commencing this action,
Plaintiffs' counsel tried but was unable to determine J12's state of organization. Since at
least 2002, all of the Class B Members, including J12 and Defendants, have been jointly
represented by Neuberger and his law firm in connection with ALH. J12 was part of the
Class B Member group that sought, in late 2002, to acquire Shamrock's interest in ALH at a
lowball price. Thereafter, J12 continued to be part of the Class B Member group that was
represented by Neuberger in connection with ALH. J12 is one of the Class B Members who,
along with Defendants, have been threatening to sue Plaintiffs since July 2004.

18.     Pursuant to loan agreements dated April 6, 2000 and May 7, 2002, various
Members of ALH made loans to ALH II, Inc., a direct wholly-owned subsidiary of ALH.
The lenders included Shamrock and other Class A Members, SELK, the two Class B
Members controlled by Arenson (Arenson Holdings, Ltd. and D.A. Gardens) and J12, which
made its loan through the Erica Jesselson 1994 CLAT. At the June 26, 2003 meeting of
ALH'S Supervisory Board, Arenson suggested that all of the foregoing loans be repaid from

4

the proceeds of the sale of ALH's operations in Jacksonville, Florida. All members of ALH's Supervisory Board, including Arenson, consented to these loan repayments.

19.    In late 2002, as reflected in an email from Neuberger to Krieger and me, the Class B Members (including Defendants) "suggest[ed]" acquiring all of the Class A Membership Interest in ALH — including both the equity and the outstanding loans owed to the Class A Members — for $3 million. *See* Ex. K hereto. At that time, the principal and interest due on the Class A Members' above-described loans to ALH exceeded $5 million. Consequently, the "suggest[ed]" $3 million price valued all of the Class A equity in ALH at approximately negative $2 million.

20.    Under § 4.1(b) of the Operating Agreement (Ex. B hereto), the Class A equity and the Class B equity are treated *pari passu*, i.e., each is entitled to an equal proportion of any distribution by ALH. Because neither has any priority over the other, value of the Class B equity is the same as the value of the Class equity. Consequently, when Defendants and the other Class B Members suggested a price that valued Class A equity at less than zero, they were necessarily valuing their own Class B equity at less than zero.

21.    Since the Class A Members have a majority interest in ALH, it could be argued that their equity is worth more than the Class B equity, because it carries with it a control premium. But because of the *pari passu* treatment of the two classes, it could not be argued that the Class A equity was worth less than the Class B equity. Therefore, even a price for the Class A Membership Interest that exceeded ALH's total outstanding indebtedness to the Class A Members would not necessarily imply a positive value for the Class B equity.

5

22.    On information and belief, in late 2001, Neuberger was involved in identifying a possible buyer for ALH, for which he sought a substantial finder's fee. However, no transaction with this possible buyer was consummated, so Neuberger did not receive this fee.

23.    In late 2002 and early 2003, Neuberger acted as counsel to Defendants and the other Class B Members in connection with the possible acquisition of the Class A Membership Interest in ALH.  During 2003 and 2004, Neuberger acted as counsel to Defendants and the other Class B Members in connection with other matters relating to ALH, such as ALH's sale of its Florida and Tennessee operations.  In the summer of 2004, through Neuberger, Defendants and the other Class B Members repeatedly threatened to sue Plaintiffs. Plaintiffs' counsel had extensive communications with Neuberger, refuting each and every one of the accusations in detail.  Finally, in the hope of obtaining a prompt resolution of the parties' dispute, Plaintiffs commenced this action in the Chancery Court.

6

I declare under penalty of perjury that the foregoing is true and correct. Executed in Los Angeles, California, this 4th day of November, 2004.

GEORGE J. BUCHLER

which ALH has the power and authority) (the "ALH Releasors"), shall have and shall hereby be deemed to have, fully, finally and forever released, relinquished, and discharged all "ALH Released Claims" (as defined below) (but expressly excluding any other Claim (as defined below)) against the "Released Management Persons" (as defined below) (but expressly excluding any Claims or ALH Released Claims against any other Person).

(a) "ALH Released Claims" collectively means all claims, demands, rights, liabilities, and causes of action (each of the foregoing, a "Claim"), known or unknown, accrued or unaccrued, fixed or contingent, direct or derivative, individual or representative, of every nature and description whatsoever, from the beginning of time down to the date of this Agreement arising out of or relating to any action or inaction of the Management Persons to the extent (but only to the extent) that the same is expressly acknowledged in Section 2 above (including, but not limited to, any violation of the Operating Agreement or any other agreement between any Management Person and any ALH Person), but shall not include any Claim (i) arising out of or relating to any action or inaction of the Management Persons that is not expressly acknowledged in Section 2 above (including, but not limited to, any violation of the Operating Agreement or any other agreement between any Management Person and any ALH Person that has not been expressly acknowledged in Section 2 above), (ii) arising under the Operating Agreement or any other agreement between any Management Person and any ALH Person from and after the date hereof, (iii) arising out of or relating to those rights and obligations expressly created by or presented by the terms of this Agreement and the other agreements executed in connection herewith or (iv) arising directly or indirectly in connection with the obligation of SELK, LLC pursuant to the Guarantee Agreement, dated March 15, 1999, between ALH and SELK, LLC (the "SELK Guarantee").

(b) "Released Management Persons" means each Management Person and, as applicable, each of its respective past or present directors; officers; employees; partners; principals; agents; underwriters; issuers; insurers; co-insurers; reinsurers; shareholders; attorneys (including, without limitation, Zukerman Gore & Brandeis, LLP; any present or former partners, associates or employees of the foregoing firm); accountants (solely with respect to work performed for such Management Person in connection with any ALH Person); advisors (solely with respect to work performed for such Management Person in connection with any ALH Person); personal representatives; predecessors; successors; parents; subsidiaries; divisions; assigns; spouses; heirs; associates; affiliates, any members of their immediate families; any person, firm, trust, corporation, officer, director, or other individual or entity in which any Management Person has a controlling interest or which is related to or affiliated with any Management Person or any trust of which any Management Person is the settlor or which is for the benefit of any Management Person or member of his or her family (but only to the extent that each of the foregoing releases the Released ALH Persons pursuant to Section 5.2 below).

5.2 Release by Management Persons. Subject to the satisfaction of the Closing Conditions, each Management Person, on behalf of itself and for each and all of its respective predecessors, members, parents, partners, subsidiaries, affiliates (including, without limitation, each Management Person Affiliate), associates, successors, assigns, agents and others claiming through or under it (for which it has power and authority) (the "Management Person Releasors")), shall have and shall hereby be deemed to have, fully, finally, and forever released,

relinquished, and discharged all "Management Person Released Claims" (as defined below) against the "Released ALH Persons" (as defined below) (but expressly excluding any Claims or Management Person Released Claims against any other Person).

(a) "Management Person Released Claims" collectively means all Claims known or unknown, accrued or unaccrued, fixed or contingent, direct or derivative, individual or representative, of every nature and description whatsoever, from the beginning of time down to the date of this Agreement arising out of or relating to any Management Person Releasor's direct or indirect investment in any ALH Person, the rights of, or duties owing by any ALH Person to, any Management Person, any Management Person Affiliate or any other Management Person Releasor, whether as a result of Manager acting as "Manager" under and as defined in the Operating Agreement or of any actions taken, services performed, or offices or directorships held by such Management Person, any Management Person Affiliate or any other Management Person Releasor on behalf of any ALH Person or otherwise, or arising out of any business relationship or contract between any ALH Person and any Management Person, any Management Person Affiliate or any other Management Releasor (including, without limitation, any claims against ALH, BBC or any other Subsidiary under the Rolling Option Agreement, whether for the failure of any ALH Person to make any payment thereunder when due or otherwise, at any time prior to entering into the Amended Rolling Option Agreement), excepting therefrom only those rights and obligations of ALH to such Management Person Releasor expressly created by or presented by the terms of this Agreement and the other agreements executed in connection herewith.

(b) "Released ALH Persons" means each ALH Person and its respective past or present directors, officers, Class A Representatives, the Class B Representative, Members (but expressly excluding any Management Person Affiliate (as defined below)), employees, partners, principals, agents, underwriters, issuers, insurers, co-insurers, reinsurer, shareholders, attorneys (including, without limitation Fried, Frank, Harris, Shriver & Jacobson, and any present or former partners, associates or employees of the foregoing firm), accountants (solely with respect to work performed for such ALH Person), investment bankers (solely with respect to work performed for such ALH Person), advisors (solely with respect to work performed for such ALH Person), brokerage firms (solely with respect to work performed for such ALH Person), predecessors, successors, parents, subsidiaries, divisions, assigns, associates and affiliates but shall expressly exclude any Management Person or any Management Person Affiliate. For purposes of this Agreement, "Management Person Affiliate" shall mean any Person directly or indirectly controlling or controlled by or under the direct or indirect common control with any Management Person; provided, however, that each of ALH and any of its direct or indirect Subsidiaries or any Person in which ALH holds directly or indirectly an equity interest shall not constitute a Management Person Affiliate for purposes of this Agreement.

## 6.0 Closing.

6.1 Closing Conditions. The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent (the "Closing Conditions") on or prior to the execution hereof (the "Closing"):

14

(a) Execution and Delivery. Each of the Parties shall have duly executed and delivered this Agreement, and ALH shall have received a duly executed counterpart of this Agreement from each Management Person.

(b) Acknowledgements. Each of the acknowledgements set forth in Section 2 shall be true, accurate and complete.

(c) Representations and Warranties. The representations and warranties of each Management Person contained in this Agreement shall be true and correct on and as of the date of the Closing and each of Manager and Lion Capital shall have delivered to ALH a certificate of its President and Chief Financial Officer, dated as of the Closing, to that effect.

(d) Amended Rolling Option Agreement. The Parties shall cause Arlington and BBC to amend the Rolling Option Agreement on terms satisfactory to the parties thereto and on a payment schedule consistent with the calculations previously presented to ALH (the "Amended Rolling Option Agreement").

(e) Performance. Each Management Person and each Management Person Affiliate, as applicable, shall have performed and complied with all agreements, covenants, obligations, and conditions contained in this Agreement, the Management Persons' Deliveries and all other agreements executed by such Management Person or Management Person Affiliate in connection herewith or therewith that are required to be performed or complied with by it on or before the Closing, including but not limited to the delivery of certificates evidencing Cousy, LLC's ownership of equity interests in QACC, LLC, together with all requisite stock powers with respect thereto duly endorsed in blank by Cousy, LLC, and each of Manager and Lion Capital shall have delivered to ALH a certificate of its President and Chief Financial Officer, dated as of the date of the Closing, to that effect.

(f) No Violation. No Management Person or Management Person Affiliate shall have caused or permitted to exist any violation of the Operating Agreement or any other agreement between such Management Person and/or Management Person Affiliate and any ALH Person that is not expressly acknowledged by the Management Persons in Section 2.

(g) Documents. ALH shall have received each of the following documents, agreements or instruments, in form and substance satisfactory to ALH in its sole discretion, duly executed and delivered by the appropriate parties:

(i)    A consulting agreement, between ALH and Shamrock Capital Advisors, Inc. ("SCA") providing for annual compensation of not more than $100,000, plus reimbursement of fees, costs and expenses incurred in the ordinary course of business.

(ii)    Each of the Management Persons' Deliveries.

(iii)    A legal opinion (the "Legal Opinion") of Zukerman Gore & Brandeis, counsel to the Management Persons, dated the date of the Closing, with respect to such matters as ALH or its counsel may reasonably request.

15

        (iv)    Evidence that a payment in the amount of $23,400 shall have been made to ALH or ALH II by the Management Persons.

        (v)    Evidence that ALH shall have received such Payment.

        (vi)    Such certificates, resolutions and other documents of the Management Persons as ALH may in its sole discretion request duly certified by their respective officers and directors, if any, or by such Management Person.

        (vii)    The Zich Resignation Letter.

        (viii)    The Class D Member Resolutions.

        (h) No Injunction.  At the time of the Closing there shall be no effective injunction, writ, or preliminary restraining order or any order of any nature issued by a court or governmental agency of competent jurisdiction to the effect that the transactions contemplated herein may not be consummated as herein provided; no proceeding or lawsuit shall have been commenced by any person or entity (including, without limitation, any Member) for the purpose of obtaining any such injunction, writ, or preliminary restraining order; and no written notice shall have been received from any such person or entity indicating an intent to restrain, prevent, materially delay, or restructure the transactions contemplated by this Agreement.  There shall be no lawsuit filed or threatened that challenges this Agreement, the Note or any agreement or documents executed in connection herewith or therewith or any of the transactions contemplated hereby or thereby.

        6.2 Location.  The Closing shall take place at Fried, Frank, Harris, Shriver & Jacobson, 350 South Grand Avenue, Los Angeles, California 90071 at 9:00 a.m. on the dates provided herein or at such other place or time as the parties shall mutually agree.

## 7.0 Indemnification.

        7.1 Indemnification by Management Persons.  Each of the Management Persons, jointly and severally, agrees to indemnify and hold harmless ALH and the other ALH Persons and each of their respective affiliates, directors, officers, employees, agents, successors and assigns, and other persons, if any, who control or are otherwise affiliated (within the meaning of the Securities Act of 1933, as amended) with ALH and the other ALH Persons (but expressly excluding those Persons that are Management Persons or Management Person Affiliates) (the "ALH Indemnified Parties") from and against any cost, damage, disbursement, expense, liability, judgment, loss, deficiency, obligation, penalty, or settlement of any kind or nature, whether foreseeable or unforeseeable, including, but not limited to, interest or other carrying costs, penalties, reasonable legal, accounting and other professional, expert witness and consultant fees and reasonable expenses incurred in the investigation, collection, prosecution, and defense of claims and amounts paid in settlement (collectively, "Losses") that may be imposed on, incurred, or suffered by the ALH Indemnified Parties as a result of any of the following matters:

        (a) The inaccuracy or breach of any of the acknowledgements, releases, agreements, representations, warranties, covenants, or obligations of or any other provision with

respect to any of the Management Persons or Management Person Affiliates contained herein or in any other document delivered by or on behalf of any of the Management Persons or any Management Person Affiliate to the ALH Indemnified Parties, including without limitation, the Note and the other Management Persons' Deliveries, pursuant to the terms and provisions hereof or thereof, or in connection with the consummation of the transactions contemplated hereby or thereby; or

(b) Any untrue statement or alleged untrue statement of a material fact contained in any report or other documentation delivered by any Management Person(s) with respect to this Agreement or the release hereunder, or in any amendment or supplement thereto, or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

In addition to any other amounts to which the ALH Indemnified Parties are entitled pursuant to this Section 7.1, if the Management Persons shall fail to pay in full in cash all amounts owing under the Note and the other Management Persons' Deliveries when and as due thereunder (including, without limitation, payment of the Aggregate Claim) or if the ALH II Release shall be invalid or ineffective for any reason whatsoever, each of the Management Persons, jointly and severally, agrees to indemnify the ALH Indemnified Parties for any Losses related to the matters set forth in Section 2 of this Agreement. If ALH brings any action to enforce this Agreement, any of the documents or agreements executed in connection herewith or any of the terms hereof or thereof, each Management Person, jointly and severally, agrees to pay all fees, costs and expenses (including the reasonable attorneys' fees) of ALH incurred in connection therewith.

7.2 No limitation On Other Rights of Recovery. The indemnification set forth in this Section 7 shall be in addition to any other obligations or liabilities of indemnifying persons to the ALH Indemnified Parties hereunder at common law or otherwise and shall remain operative and in full force and effect regardless of any investigation made or omitted by or on behalf of any ALH Indemnified Party. The provisions of this Section 7 shall not eliminate or otherwise limit the right of any indemnified party hereunder or any other person to seek or recover contribution damages or otherwise enforce (including through specific performance) its rights without regard to the provisions of this Section 7.

**8.0 Miscellaneous Provisions.**

8.1 Cooperation and Intent. The Parties agree (a) that it is their intent to consummate all of the transactions contemplated by this Agreement; and (b) to cooperate in good faith to the extent necessary to effectuate and implement all terms and conditions of this Agreement and to exercise their best efforts to promptly accomplish the terms and conditions of this Agreement.

8.2 Third-party Beneficiaries. Except as expressly set forth in this Agreement, nothing herein expressed or implied is intended, or shall be construed, to give any Person, other than the ALH Persons, any rights or remedies under or by reason of this Agreement.

8.3 Complete Resolution; Good Faith; Benefit of Counsel. Each of the Parties

17

intend the Agreement and the Management Persons' Deliveries, to be final and complete resolution of all disputes asserted which could be asserted by such Party against the Released Management Persons or the Released ALH Persons, as applicable, with respect to the ALH Released Claims or the Management Person Released Claims, as applicable. The Parties agree that the amount paid and the other terms of the Agreement were negotiated at arms' length in good faith by the Parties and reflect a settlement that was reached voluntarily after consultation with experienced counsel for each of the Parties.

8.4 Entire Agreement. This Agreement, the Operating Agreement, the Management Persons' Deliveries, the SELK Guarantee, and the agreements contemplated herein and therein constitute the entire agreement among the Parties with respect to the subject matter hereof, and no representations, warranties, or inducements have been made to any Parties concerning the foregoing other than those contained and memorialized in such agreements.

8.5 Counterparts. This Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument.

8.6 Successor and Assigns. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns; provided, that no Management Person may assign all or any portion of this Agreement or any rights hereunder or delegate any obligations hereunder without the prior written consent of ALH and that ALH may assign any portion of this Agreement or any rights hereunder without the prior written consent of any of the Management Persons.

8.7 Governing Law. This Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of New York, and the rights and obligations of the Parties to this Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of New York without giving effect to that state's choice of law or conflicts of law principles that could cause the law of any state other than the state of New York to apply. WITH RESPECT TO ANY CLAIM ARISING OUT OF THIS AGREEMENT, OR ANY OF THE MANAGEMENT PERSONS' DELIVERIES OR ANY OTHER DOCUMENT OR AGREEMENT ENTERED INTO IN CONNECTION HEREWITH OR THEREWITH, THE MANAGEMENT PERSONS IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK, NEW YORK AND WAIVE ANY OBJECTION WHICH ANY OF THEM MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT, OR ANY OF THE MANAGEMENT PERSONS' DELIVERIES OR ANY OTHER DOCUMENT OR AGREEMENT ENTERED INTO IN CONNECTION HEREWITH OR THEREWITH, BROUGHT IN ANY SUCH COURT, IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER IRREVOCABLY WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY; PROVIDED, HOWEVER, THAT NOTHING IN THIS SECTION 8.7 SHALL BE DEEMED TO PRECLUDE ANY ALH PERSON FROM BRINGING AN ACTION OR PROCEEDING IN RESPECT OF THIS AGREEMENT, OR

18

ANY OF THE MANAGEMENT PERSONS' DELIVERIES OR ANY OTHER DOCUMENT
OR AGREEMENT ENTERED INTO IN CONNECTION HEREWITH OR THEREWITH, IN
ANY OTHER JURISDICTION. EACH MANAGEMENT PERSON AGREES THAT
SERVICE OF PROCESS UPON IT IN ANY SUIT, ACTION OR PROCEEDING BROUGHT
BY ANY ALH PERSON IN ANY JURISDICTION SHALL BE DEEMED IN EVERY
RESPECT EFFECTIVE SERVICE OF PROCESS UPON IT IF GIVEN IN THE MANNER SET
FORTH IN SECTION 8.13. EACH PARTY HERETO AGREES THAT IN ANY SUIT,
ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT,
OR ANY OF THE MANAGEMENT PERSONS' DELIVERIES OR ANY OTHER
DOCUMENT OR AGREEMENT ENTERED INTO IN CONNECTION HEREWITH OR
THEREWITH, ALH WILL BE ENTITLED, IN THE EVENT THAT IT IS THE PREVAILING
PARTY, TO RECOVER FROM THE MANAGEMENT PERSONS ALL COSTS AND
EXPENSES, INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS, INCURRED
BY ALH IN CONNECTION WITH SUCH SUIT, ACTION OR PROCEEDING.

8.8 Waiver of Jury Trial. EACH MANAGEMENT PERSON WAIVES ALL
RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO
RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR
OTHERWISE CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THIS
AGREEMENT OR THE RELATIONSHIP ESTABLISHED BETWEEN ANY ALH PERSON
AND ANY MANAGEMENT PERSON IN CONNECTION WITH THIS AGREEMENT OR
ANY OF THE DOCUMENTS EXECUTED IN CONNECTION HEREWITH. ALH RETAINS,
IN ITS SOLE AND ABSOLUTE DISCRETION, THE RIGHT TO DEMAND A TRIAL BY
JURY.

8.9 Amendments; Waivers. This Agreement may be modified only by a written
instrument signed by all the Parties hereto. No delay on the part of any Party to this Agreement
in the exercise of any power or right under this Agreement shall operate as a waiver thereof, nor
shall waiver or single or partial exercise of any power or right constitute a waiver of or preclude
further exercise thereof or the exercise of any other power or right.

8.10 Expenses. Except as otherwise provided herein, each of the Parties will
bear their own expenses with respect to the negotiation, execution, and delivery of the Agreement
and the performance of their obligations hereunder; provided, however, ALH shall pay the
reasonable legal and accounting expenses and other documented out-of-pocket costs and
expenses of SHOC, SCA, the Class A Representatives and the Class B Representative including,
without limitation, the expenses of Fried, Frank, Harris, Shriver & Jacobson, in connection with
the negotiation, preparation, execution and delivery of this Agreement.

8.11 Severability. Whenever possible, each provision of this Agreement will be
interpreted in such manner as to be effective and valid under applicable law, but if any provision
of this Agreement is held to be prohibited by or invalid under applicable law, such provision will
be ineffective only to the extent of such prohibition or invalidity, without invalidating the
remainder of this Agreement. It is hereby stipulated and declared to be the intention of the
Parties that they would have executed the remaining terms, provisions, covenants and restrictions
without including any of such which may be hereafter declared invalid, void or unenforceable.

19

8.12    Injunctive Relief.  Each Management Person acknowledges that remedies at law, including monetary damage awards, for any breach by any Management Person of this Agreement, the Management Persons' Deliveries and/or the agreements contemplated herein would be inadequate and that the ALH shall be entitled to seek injunctive relief against the Management Persons in the event of any such breach.  ALH shall be entitled to exercise such remedies cumulatively or in conjunction with all other rights and remedies provided herein, by law or otherwise.

8.13    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties at the following address (or at such other address for a Party as shall be specified by like notice):

If to:  ALH

ALH Holdings LLC
489 Fifth Avenue
New York, NY 10017
Attention: Jonathan Zich
Facsimile:  (212) 867-6303

with copies, simultaneously by like means (but which shall not constitute notice) to:

| | |
|---|---|
| Fried, Frank, Harris, Shriver & Jacobson<br>350 South Grand Avenue, Suite 3200<br>Los Angeles, CA 90071-3405<br>Attention: David Robbins, Esq.<br>Facsimile:  (213) 473-2222 | Shamrock Capital Advisors, Inc.<br>4444 Lakeside Drive<br>Burbank, CA 91505<br>Attention:  George J. Buchler<br>Facsimile: (818) 556-6995 |
| If to any Management Person,<br>addressed to such Management Person<br>at the following address: | with a copy , simultaneously by like<br>means (but which shall not constitute<br>notice) to: |
| c/o Lion & Lamm Capital, LLC<br>489 Fifth Avenue<br>New York, NY 10017<br>Facsimile: (212) 867-6303 | Zukerman Gore & Brandeis, LLP<br>900 Third Avenue<br>New York, NY  10022-4728<br>Attention:  Clifford A. Brandeis<br>Facsimile:  (212) 223-6433 |

Any Party may change any address to which notice is given to it by giving notice as provided above of such change of address.

8.14    Headings and Construction.  The headings in this Agreement are for convenience only and are not intended to supplement or change the terms of this Agreement.

20

Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and references to the singular include the plural.

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement effective as of the date first set forth above.

ALH:

ALH HOLDINGS LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

MANAGEMENT PERSONS:

LION & LAMM CAPITAL, LLC, a New York
limited liability company

By: _____
Name: _____
Title: _____

LION ALH CAPITAL, LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

SHALOM E. LAMM, an individual

_____
Shalom E. Lamm

73000

AUG-29-2001  15:03    ZUKERMAN GORE & BRANDEIS    212 223 6433    P.11/12

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement effective as of the date first set forth above.

ALH:

ALH HOLDINGS LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

MANAGEMENT PERSONS:

LION & LAMM CAPITAL, LLC, a New York limited liability company

By: _____

Name: Simon E. Lamm

Title: President

LION ALH CAPITAL, LLC, a Delaware limited liability company

By: _____

Name: Shalom E. Lamm

Title: President

SHALOM E. LAMM, an individual

_____

Shalom E. Lamm

**JONATHAN ZICH, an individual**

Jonathan Zich

**JOHN D. HOURIHAN, an individual**

John D. Hourihan

33

# EXHIBIT F

## AGREEMENT

This Agreement (the "Agreement"), dated as of July 1, 2001, is made and entered into by and among ALH Holdings LLC, a Delaware limited liability company ("ALH"), Lion ALH Capital LLC, a Delaware limited liability company (the "Manager"), and certain affiliates of Manager, specifically, Lion & Lamm Capital, LLC, a New York limited liability company ("Lion Capital"), Shalom E. Lamm ("Lamm"), Jonathan Zich ("Zich") and John D. Hourihan ("Hourihan") (the Manager, Lion Capital, Lamm, Zich and Hourihan being referred to herein as the "Management Persons"). ALH and the Management Persons are sometimes referred to hereinafter collectively as the "Parties," and each of them individually as a "Party." All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Operating Agreement of ALH, dated as of June 12, 1998, among the Manager and the Members party thereto as amended as of March 15, 1999 by the Amendment to Operating Agreement (as amended, the "Operating Agreement").

## INTRODUCTION

**WHEREAS,** the Manager, in its capacity as "Manager" under the Operating Agreement, has certain duties and obligations to ALH, its Subsidiaries and the Members as set forth in the Operating Agreement;

**WHEREAS,** Manager and ALH wish to clarify the duties and obligations of the Manager in its capacity as "Manager" under the Operating Agreement.

**NOW, THEREFORE, IT IS HEREBY AGREED** by and among the Parties as follows:

## AGREEMENT

### 1.0 Covenants and Responsibilities.

Without limiting any rights that ALH may have under the Operating Agreement or under any other agreement between ALH and any Management Person and/or any Management Person Affiliate (as defined in Section 5.2(b) hereof), the Management Persons, jointly and severally, hereby covenant and agree as follows:

(a) Management.

(i)    Day to Day Management.  Commencing on the execution hereof, the Management Persons shall cause Lamm to have the primary day to day managerial responsibilities of Manager and Lion Capital with respect to ALH and its Subsidiaries, it being understood and agreed that the Supervisory Board, in its sole discretion (with or without cause), may remove Lamm from such responsibilities at any time. Subject to the foregoing sentence, recognizing the importance of his personal involvement in conducting the business of Manager and Lion Capital, Manager and Lamm agree that Lamm shall be actively involved in the

management and leadership of Manager on behalf of ALH and its Subsidiaries and shall devote not less than a majority of his business time, and his highest attention and skill to such management and leadership. Notwithstanding anything to the contrary herein or otherwise, the obligations of Lamm to have the primary responsibility for the day to day management of Manager and Lion Capital with respect to ALH and its Subsidiaries as set forth in this Section 1.0(a) may not be delegated to any other Person. In connection with carrying out responsibilities for the day to day management of ALH, no Management Person, unless expressly approved thereto in advance in writing by the Supervisory Board, shall have check signing, wire transfer or any other similar authority with respect to the disbursement of funds of (or on behalf of) ALH and/or its Subsidiaries in excess of $10,000 in any single transaction or series of related transactions.

(ii)    Lamm Consulting Agreement. Notwithstanding the foregoing clause (i), commencing upon the execution hereof, Lamm hereby agrees that the Consulting Agreement between ALH and Lamm, dated September 1, 1998, as amended on March 15, 1999 (as amended, the "Lamm Consulting Agreement") is hereby terminated and of no force and effect and that no amounts are owing from ALH to Lamm or otherwise thereunder.

(b) Compensation to Manager and Management Persons. Except as expressly set forth in the Consulting Agreement of even date herewith between Lion Capital and ALH (the "Lion Capital Consulting Agreement"), commencing as of the date set forth above, no Management Person shall, or shall cause or permit any Management Person Affiliate to, be paid salary by or obtain employment or other benefits from ALH or any of its Subsidiaries without the express approval of the Supervisory Board. In addition, unless approved by the Supervisory Board, no Management Person shall, or shall cause or permit any Management Person Affiliate to, accept (or shall cause or permit ALH or its Subsidiaries to make) any payments from ALH or any of its Subsidiaries to such Management Person and/or any Management Person Affiliate pursuant to any agreement between ALH and/or any of its Subsidiaries and any Management Person and/or any Management Person Affiliate, which payment is made prior to the final date upon which such payment is due and payable or which payment has otherwise been accelerated under the terms of such agreement.

(c) Ownership of Manager. Until June 30, 2004, Lamm, Zich, Hourihan and Maureen Raimond shall be the sole holders of all of the voting and equity interests in Lion Capital (unless any of the foregoing shall cease to hold such interests as a result of his or her death or mental incapacity or disability) and (ii) Lion Capital shall be the sole holder of all of the voting and equity interests in Manager.

(d) ALH Corporate Opportunities. Each Management Person shall, and shall cause each Management Person Affiliate to, inform the Supervisory Board of, and grant ALH on behalf of itself and its Subsidiaries the first opportunity to undertake, any business opportunity of such Management Person or such Management Person's Affiliates if such opportunity is in any line of business of ALH and/or any of its Subsidiaries or any line of business similar thereto or in which, as of such date of determination, ALH and/or any of its Subsidiaries proposes be engaged.

2

(e) Certain Indebtedness.

(i)    Without limiting Manager's day to day responsibility for the management of ALH in accordance with the terms of the Operating Agreement, each Management Person agrees that, without the prior approval of the Supervisory Board, such Management Person shall not cause or permit after the date first set forth above:

(A) ALH or any of its Subsidiaries to incur or permit to exist, directly or indirectly, any indebtedness for borrowed money from, or to grant or permit to exist any lien, pledge, mortgage or security interest on any assets of ALH or any of its Subsidiaries to or for the benefit of, any Management Person or any Management Person Affiliate;

(B) ALH or any of its Subsidiaries to incur or permit to exist, directly or indirectly, any indebtedness for borrowed money (other than borrowings under a Credit Facility and, subject to Section 1(e)(ii)(A) below, the Tampa Loan (as defined in Section 1(e)(ii)(A) below)) from any Person or the granting or existence of any lien, pledge, mortgage or security interest on any assets of ALH or any of its Subsidiaries other than in the ordinary course of ALH's or such Subsidiary's business; or

(C) ALH or any of its Subsidiaries to make or permit to exist any loan(s) to (other than the Berkshire Loans (as defined in Section 2(g) below)), or guarantee(s) (other than, subject to Sections 1(e)(ii)(B) and (C) below, the Arlington Guarantee (as defined in Section 2(h) below) and the ALH II Guarantees (as defined in Section 2(k) below)) of any obligation(s) to any Person (including, without limitation, any Management Person or any Management Person Affiliate) or causing or permitting ALH or any of its Subsidiaries to become a surety, guarantor or accommodation party, other than guarantee(s) required under the Credit Facility or, subject to Sections (1)(e)(ii)(B) and (C) below, the Arlington Guarantee or the ALH II Guarantees.

(ii)    Subsequent to the execution hereof, each Management Person shall in good faith use its commercially reasonable efforts to:

(A) Cause the indebtedness incurred by American Landmark Homes of Florida, Inc. ("ALH Florida") in favor of New South Federal Savings in the aggregate outstanding amount (both principal and interest) of approximately $467,027.10 and the indebtedness incurred by Sedona at Avila Limited Partnership in favor of New South Federal Savings in the aggregate outstanding amount (both principal and interest) of approximately $239,289 (collectively, the "Tampa Loan"), and any and all obligations of any of ALH, its Subsidiaries and its Members (but expressly excluding each Management Person and any Management Person Affiliate) (collectively, the "ALH Persons") in connection with the Tampa Loan, to be fully released.

(B) Obtain the release of the Arlington Guarantee as that term is defined in Section 2.0(h) below, or, in the event that such release is not obtained, cause any Person that is not an ALH Person to pay for any amount demanded or

3

otherwise owing pursuant to the Arlington Guarantee, and cause any restrictions or limitations imposed upon the ability of ALH, BBC (as defined in Section 2(h) below) or any other ALH Person to obtain credit as a result of the Arlington Guarantee, whether such restrictions arise directly from the terms of the Arlington Guarantee or otherwise, to be cancelled and released (it being expressly understood and agreed that, as long as any amounts then due and owing from BBC under the Amended Rolling Option Agreement shall have been paid as of the date of any demand upon the Arlington Guarantee, the obligations of the Management Persons set forth in Section 7.1 hereof to indemnify and hold harmless the ALH Persons shall apply to any obligations, demands for payment, payments or other claims, restrictions or limitations arising in connection with the Arlington Guarantee).

(C) Obtain the release of the ALH II Guarantees (as that term is defined in Section 2(k) below) entered into in connection with the "Rolling Option Agreement" as that term is defined in Section 2.0(h) below, or, in the event that such release is not obtained, cause any Person that is not an ALH Person to pay for any amount demanded or otherwise owing pursuant to any ALH II Guarantee, and cause any restrictions or limitations imposed upon the ability of ALH II or any ALH Person to obtain credit as a result of the ALH II Guarantees, whether such restrictions arise directly from the terms of the ALH II Guarantee or otherwise, to be cancelled and released (it being expressly understood and agreed that, as long as any amounts then due and owing from BBC under the Amended Rolling Option Agreement shall have been paid as of the date of any demand upon the Arlington Guarantee, the obligations of the Management Persons set forth in Section 7.1 hereof to indemnify and hold harmless the ALH Persons shall apply to any obligations, demands for payment, payments or other claims, restrictions or limitations arising in connection with the ALH II Guarantees).

(D) Cause the Arbor Debt to be satisfied on behalf of ALH and its Subsidiaries without cost or liability to, or payment by, any ALH Person and provide evidence reasonably satisfactory to the Supervisory Board of the satisfaction of the Arbor Debt. In addition, in the event that subsequent to the execution and delivery hereof, (i) ALH or any of its Subsidiaries is obligated to make (and the Management Persons shall have otherwise failed to satisfy such obligation on behalf of ALH or any of its Subsidiaries), or a claim or demand is made upon ALH or any of its Subsidiaries to make, payment of any Interest Amount relating to the Arbor Debt, the Management Persons shall within no more than 5 business days make further contributions to ALH from time to time promptly following the occurrence of any such event in the amount of such Interest Amount and (ii) there shall exist any Discount Amount with respect to the Arbor Debt or any portion thereof that is being satisfied, the Management Persons shall within no more than 5 business days make further contributions to ALH in the amount of such Discount Amount as may be required.

(f) Other Agreements.    Each of the Parties agrees, in good faith, to seek to enter into, within 30 days of the date of the Closing (as defined below), such other documents as ALH may deem necessary or useful in order to effect the transactions contemplated by this Agreement.

4

(g) Subsidiary Board. The Management Persons acknowledge that the Class A Members have designated the individuals set forth on Schedule 1.0(g) attached hereto as directors of each Subsidiary set forth thereon, and each Management Person shall take such action as is necessary and within such Management Person's authority to ensure that at least one director of each Subsidiary Board shall be appointed by the Class A Members; provided that this Section 1.0(g) shall not be deemed to limit any rights of the Class A Members under the Operating Agreement. The Management Persons shall take all action within their authority to cause ALH and the Subsidiaries of ALH, as necessary, to adopt resolutions within 30 days of Closing, satisfactory to the Class A Representatives, to effectuate the foregoing. No Management Person shall directly or indirectly cause or permit (i) the board of directors of any Subsidiary to take any action which such board of directors is authorized or required to take unless a meeting of the board of directors is held or the board of directors acts by unanimous written consent or (ii) any meeting of the board of directors of any Subsidiary to be held without at least 48 hours prior written notice to each of the members of such board of directors.

(h) No Related Party Transactions. No Management Person shall, or shall cause or permit any Management Person Affiliate to, enter into any agreement with any ALH Person(s) without the express approval of the Supervisory Board.

(i) Financial Statements/Management Letter. Within no more than 30 days after the date of Closing (and, with respect to the financial statements of ALH, within no more than 60 days after the date of Closing), the Management Persons shall cause to be delivered to the Supervisory Board audited consolidated financial statements (including balance sheets, statements of income and retained earnings and cash flows) of each of ALH and ALH II, Inc. for the fiscal year of ALH and ALH II, as applicable, ending December 31, 2000, which financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied and certified without qualification (other than a going concern qualification arising solely as a result of default(s) on or prior to the date of Closing by ALH or ALH II under their existing credit agreements, which default(s) the Management Persons have informed ALH of on or prior to the date of Closing) by Ernst & Young or another independent certified public accounting firm of national standing acceptable to the Supervisory Board in its reasonable discretion and concurrent with the delivery of the financial statements for ALH and with the delivery of financial statements for ALH II, the Management Persons shall deliver to the Supervisory Board a letter (a "Management Letter") for the benefit of the Supervisory Board with respect to such financial statements containing joint and several representations and warranties by the Managing Persons that the financial statements are true, accurate and complete in all respects and do not omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and that no change has occurred which makes such documents or information inaccurate in any respect.

(j) Further Assurances. Each Management Person will diligently perform all acts, and execute and deliver all documents, necessary to effect all provisions of this Agreement, and the agreements and documents executed in connection herewith (including, without limitation, taking such actions required to cause any security interest granted by any

5

Management Person pursuant to Section 3.0(a) below any of the foregoing to remain fully perfected).

(k) Subsidiary Charter Documents. No Management Person shall directly or indirectly cause or permit the articles of incorporation, by-laws or other charter documents of any Subsidiary to be amended without the express written consent of the Supervisory Board.

(l) Resignation of Zich. Effective as of August 16, 2001, Zich will resign as a Class D Representative from the Supervisory Board of ALH. The Management Persons shall cause Zich to deliver to ALH a letter setting forth such resignation (the "Zich Resignation Letter") at Closing, and Manager shall deliver Class D Member resolutions at Closing satisfactory to the Class A Representatives (the "Class D Member Resolutions").

## 2.0 Acknowledgements.

Each of the Management Persons hereby acknowledges (without apportioning any liability among the Management Persons), and ALH has been advised based upon the representations of the Management Persons, that the following actions have heretofore occurred:

(a) The Management Persons caused ALH to make payments to Arbor National Commercial Mortgage LLC in the aggregate amount of $879,057 from the date such payments were made to the date of the execution hereof, in connection with the Lamm Consulting Agreement;

(b) The Subsidiaries employed Zich during the period from June 1, 1998 until June 30, 2001, during which period Zich received aggregate compensation from the Subsidiaries in the amount of $480,000;

(c) The Subsidiaries employed Hourihan during the period from June 1, 1998 until June 30, 2001, during which period Hourihan received aggregate compensation from the Subsidiaries in the amount of $593,400;

(d) Manager received a financing fee of $737,000 in connection with procuring a source of financing for the acquisition of Mulvaney Homes, Inc. by ALH II, Inc., a wholly-owned Subsidiary of ALH;

(e) The Management Persons directed ALH to make payments to and on behalf of ALH Florida in the aggregate amount of approximately $4,200,000 in connection with the operations and sale of ALH Florida's business in Tampa, Florida (the "Tampa Close-Down");

(f) ALH Florida and Sedona at Avila Limited Partnership incurred the Tampa Loan in connection with its operations and the Tampa Close-Down;

(g) Madaket Properties, Inc. ("Madaket") and Berkshire Homes, Inc. ("Berkshire") entered into agreements evidencing indebtedness in favor of ALH in the aggregate

6

principal amount of $489,000, of which the entire principal amount and accrued interest thereunder remains outstanding on the date hereof (the "Berkshire Loans");

(h) L&L Arlington, L.P. ("Arlington"), an Affiliate of Manager, has acquired 207 finished lots (the "Lots") in Memphis, Tennessee (the "Memphis Property") for subsequent resale to a Subsidiary, Bowden Building Corporation ("BBC"), and BBC has entered into an agreement with Arlington (the "Rolling Option Agreement") to purchase the Lots from Arlington on a rolling basis, and in connection therewith, BBC has guaranteed the obligations of Arlington for the purchase of the Memphis Property (the "Arlington Guarantee"), and BBC has (i) heretofore acquired Lots under the Rolling Option Agreement, (ii) has heretofore paid for such Lots in accordance with the terms of the Rolling Option Agreement, and (iii) is further obligated to purchase Lots under the Amended Rolling Option Agreement;

(i) ALH II, Inc. entered into that certain Employment Agreement, dated July 1, 2000, with John Laguardia;

(j) Annual audited consolidated financial statements of ALH for each fiscal period beginning on or after 1998 until the date hereof have not been prepared or delivered to the Supervisory Board;

(k) ALH II has guaranteed (the "ALH II Guarantees") the loans set forth on Schedule 2.0(k) to this Agreement; and

(l) A release of ALH's obligations with respect to the Arbor Debt (plus any Interest Amount thereon) has not heretofore been obtained.

**3.0 Management Persons' Deliveries.**

(a) Concurrent with or prior to the execution hereof, the Management Persons shall cause to be delivered to ALH (i) an original, fully executed, secured promissory note dated as of the date hereof (the "Note") in the principal amount of $1,400,000 in favor of ALH in the form annexed hereto as Exhibit 3.0(a)(i), (ii) an original, fully executed guarantee of Cousy, LLC for the benefit of ALH in the form annexed hereto as Exhibit 3.0(a)(ii) (the "Cousy Guarantee"), (iii) an original, fully executed pledge agreement between Cousy, LLC and ALH in the form annexed hereto as Exhibit 3.0(a)(iii) (the "Pledge Agreement"), pursuant to which Cousy, LLC is pledging its interest in QACC LLC, a Delaware limited liability company, (iv) original, executed affidavits of confession of judgment (collectively, the "Confession of Judgment") of each Management Person in the form annexed hereto as Exhibit 3.0(a)(iv), (v) an original, executed Consulting Agreement between Lion Capital and ALH (the "Lion Capital Consulting Agreement") in the form annexed hereto as Exhibit 3.0(a)(v), (vi) original, fully executed letter agreements between ALH and the Management Persons in form and substance satisfactory to ALH in its sole discretion (the "Letter Agreements"), (vii) an original, fully executed agreement in favor of ALH II, Inc. acknowledging that the aggregate amount of $236,000 is no longer a debt of ALH II, Inc. in form and substance satisfactory to ALH in its sole discretion (the "Acknowledgement"), and (viii) a payment in the amount of $264,000 (the "Payment") (which Payment shall be deemed satisfied upon receipt by ALH or ALH II of the escrow deposit of the Management Persons in the amount of $264,000 made in accordance with

the letter, dated July 6, 2001, from Clifford A. Brandeis on behalf of the Management Persons). The Note, Cousy Guarantee, Pledge Agreement, Confession of Judgment, Lion Capital Consulting Agreement, Letter Agreements, Acknowledgement and the Payment are hereinafter sometimes referred to as the "Management Persons' Deliveries."

(b)  The Note shall bear interest at the rate of 15% per annum, subject to the terms set forth therein, and shall be a joint and several, binding obligation of the Management Persons, enforceable in accordance with its terms, and shall not be due upon the sale of all of the Membership Interests or all or substantially all of the assets of ALH; provided, however, that in the event that ALH enters into a binding agreement on or before December 31, 2001 to effect the sale or disposition of all of its Membership Interests or all or substantially all of its assets (a "Sale Event") and such Sale Event is consummated on or before March 31, 2002, then the repayment of certain amounts outstanding under the Note shall be delayed until December 31, 2002, as set forth in, and subject to the terms of, the Note.

### 4.0  Representations and Warranties.

4.1  Representations and Warranties of Management Persons.  Each Management Person, jointly and severally, represents and warrants to ALH as follows:

(a)  Duly Organized, Validly Existing, Good Standing.  Each of Manager and Lion Capital is a duly formed and validly existing limited liability company in good standing under the laws of the State of Delaware and is qualified to do business and is in good standing as a foreign corporation in all jurisdictions where the nature of the property owned by it or leased by it, or the nature of the business conducted by it, makes such qualification necessary, except where the failure to qualify individually or in the aggregate will not have an adverse effect on ALH or a material adverse effect on the business of Manager or Lion Capital.  Each of Manager and Lion Capital has the requisite power and authority to transact the business in which it is engaged, and to perform its obligations under this Agreement, the Note, the Operating Agreement, each of the Management Persons' Deliveries and the other agreements executed in connection herewith and therewith.

(b)  Authority.

(i)  The execution, issuance, as applicable, and delivery by each of Manager and Lion Capital of this Agreement, the Note, each of the Management Persons' Deliveries and the other agreements executed in connection herewith, and the cancellation of the indebtedness owing by ALH II, Inc. set forth therein, have each been duly authorized and all necessary limited liability company action has been taken with respect thereto, and such issuances, deliveries and cancellation will not contravene or conflict with, or require any approval, authorization, permit of or filing with or pursuant to (A) the organizational documents of Manager or Lion Capital, as applicable, (B) any law, rule or regulation, or (C) any agreement to which Manager or Lion Capital, as applicable, is a party.  Subject to (x) applicable bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, or similar laws from time to time in effect affecting creditor's rights generally and (y) general principles of equity, whether such proceedings are considered in a proceeding at law or in equity, this Agreement, the Note, each of the Management Persons' Deliveries and the other agreements executed in connection herewith

and therewith have been duly executed and delivered by each of Manager and Lion Capital, as applicable, and constitute legal, valid and binding obligations of each of Manager and Lion Capital, as applicable, enforceable against each of Manager and Lion Capital, as applicable, in accordance with their terms.

(ii)     Each of Lamm, Zich and Hourihan has the legal capacity to execute and deliver, and to perform his obligations under, this Agreement, the Note and each of the Management Persons' Deliveries executed by such person, and this Agreement, the Note and each of the Management Persons' Deliveries executed by such person constitutes a legal, valid and binding obligation of each of Lamm, Zich and Hourihan enforceable in accordance with its terms.

(c) Equity Interests.

(i)     All of the outstanding voting and equity interests in the Manager are owned by, and the sole equity holder of the Manager is, Lion Capital, and the sole holders of equity interests in Lion Capital are Lamm, Zich, Hourihan and Maureen Raimond. There are no other outstanding voting or equity interests in or other securities, instruments, options or rights convertible into, exchangeable for, or providing the ability to acquire, any voting or equity interest in Manager or in Lion Capital, or any other arrangements or commitments obligating Manager or Lion Capital to issue any equity interest therein or obligating Lamm or any other member of Lion Capital to cause any other person or entity to issue, grant or transfer any voting or equity interest in Manager or Lion Capital.

(ii)     Schedule 4.1(c)(ii) accurately sets forth (i) each of the direct and indirect Subsidiaries and affiliates of ALH, (ii) each of the holders on a fully diluted basis of any equity interests in such Subsidiaries and affiliates (specifying the class of equity interests, number of shares and percentage interest of each such holder) and (iii) the directors and officers of each such Subsidiary and affiliate.

(d) Compliance With Laws.  Neither Lion Capital nor Manager is in conflict with, or in default or violation of, any law, rule or regulation applicable to Lion Capital or Manager or any of the Management Person Affiliates, by which any of their respective properties are bound or affected, by which the ability of Manager to act as "Manager" under and as defined in the Operating Agreement is affected or by which ALH or any other ALH Person is affected, whether as a result of Manager acting as "Manager" under the Operating Agreement or otherwise.

(e) Contracts.  Manager has not breached, is not in default under, or has not received written notice of any breach of or default under, any material agreement, contract or other instrument relative to the business of ALH and/or its Subsidiaries to which it is a party with another non-Party; to the knowledge of each Management Person, no other party to any such agreement, contract or other instrument has breached or is in default of any of its obligations thereunder; and each of such agreements, contracts and other instruments is in full force and effect.