## Gene Krieger

| | |
|---|---|
| **From:** | Gene Krieger |
| **Sent:** | Friday, September 06, 2002 4:11 PM |
| **To:** | 'Arenson Avie' |
| **Cc:** | George Buchler |
| **Subject:** | RE: ALH |

Dear Avie:

Best wishes to you and yours for a healthy, happy and safe New Year. Let's pray that the new year brings new hope for peace in Israel.

I am sorry to hear that progress on the buyout has slowed down. We understand that a meeting was held a few days ago in Miami with Landstar, so I assume they are the party you expect to respond by September 9th. Since you indicate that Shalom is important to this process, I am willing to hold off a while longer on addressing ALH's issues with him. What do you mean that "he is taking advantage of his personal relationship in an unconscionable fashion"? Do you think his role in helping facilitate a buyout is being used as a shield (or a delaying tactic) from facing the issues he has with ALH?

As you know, we are having a meeting with management in Memphis on the 10th. I don't think it would be practical to hook you in by phone, but we would be happy to bring you up to date after the meeting. Shalom will not be able to attend either. Since it has been so long since we have had any face to face contact with the management, and we don't get much information from Shalom, we wanted to get an informal update on the business operations. Had we been able to get everybody together for a Board meeting sooner than October 2nd, we wouldn't need this management meeting.

Things are moving ahead with Walter Industries. They have asked for a lot more information, and they are meeting today in Memphis to cover some of their final due diligence matters. We expect to hear something more definitive from them at the end of next week. Indications are that they remain very interested in Bowden, and I hope they will come forward with an acceptable offer.

We expect to hear from prospective buyers next week about their interest in Jacksonville. Assuming positive responses, we hope to move that process forward as quickly as possible.

Please keep us in the loop. I want to be respectful of the B's interest - both as a current partner and as a possible buyer of the A's interest, but we need to continue to move forward.

Regards,

Gene

-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Tuesday, September 03, 2002 3:16 AM
**To:** Gene Krieger
**Subject:** Re: ALH

Dear Gene:

11/1/2004

I have delayed answering because the situation continues to be very fluid. We seem to have an acceptable and interested third party to buy you out, but have no definite word from him to go ahead. This after a round with an earlier potential buyer who finally decided he wasn't interested. We expect to know whether he will go ahead or not by 09Sept. We have not eliminated the possibility that the 'B's among themselves take up your shares, but sentiment is definitely in favour of an third party who is from the industry. I am aware of the Walter timetable.

At this point I cannot tell you what Shalom's involvement in the ultimate management set-up would be, if at all. Obviously he is quite important, if not vital, to the sale process, so that this is not a good time for a major distraction.

I think that he is taking advantage of his personal relationship in an unconscionable fashion.

what do to about it and when, is a good question.

I would be happy to take part by speaker phone in your non-board meeting on 9th, if you think it is practical, to exchange thoughts and bring each other up to date, and look forward to the 2-Oct meeting in Jacksonville.

best wishes for the New Year

Avie Arenson


----- Original Message -----
**From:** Gene Krieger
**To:** Avie Arenson (E-mail)
**Cc:** George Buchler
**Sent:** Friday, August 30, 2002 1:21 AM
**Subject:** ALH


Dear Avie:

A month has now passed and we have heard nothing from you on the possible buyout by the Bs, nor have I gotten a response to my note below. While we have heard from Shalom that information regarding ALH has been furnished to parties assisting in this transaction, we have not gotten any meaningful feedback that this transaction is progressing.

The timing of this issue is becoming more important. Walter Industries is making progress on their due diligence of Bowden, and we expect that they will provide us an offer and draft documents in a week or so. We know of no issues that have arisen that might deter them from proceeding.

The "book" on ABI has been furnished to several prospective buyers, and we expect to get expressions of interest and valuation within the next two weeks.



Dear Avie:

Since we haven't had an ALH Board meeting for quite some time, and we have been preoccupied with matters related to financings, the sale process and management issues, I haven't had an opportunity to bring you up to date on an important matter that has been dragging on for quite a while.

I think you are aware that Shalom is in default on his obligations to ALH arising out of the settlement agreement reached with him about a year ago. Shalom has not made any payments against the two installments which were due in February and May, and these past due obligations now aggregate approximately $750,000. There is another (final) payment due in November. Shalom has requested that we modify the payment terms to accommodate his current financial condition, and we agreed to entertain such a request. Notwithstanding our offers to discuss this in good faith, Shalom has not put forth a proposal, has delayed this process unreasonably, has failed to meet promises and has created obstacles to our attempts to have meetings and discussions. Most recently, we were trying to arrange a meeting with Shalom for the end of July, when you raised the prospect of the B interests buying the A interests. Because of that development, and not knowing how Shalom fit into your plans, we held off any further attempt to address this issue with Shalom.

I believe it is important to protect ALH's interest, and I don't want this matter to drag on unnecessarily. However, if you tell me that we should hold off on this issue because of Shalom's involvement with you on a possible buyout, I would be willing to consider a further delay. On the other hand, if you do not object to renewing our attempts to reach an arrangement with Shalom, we will try to do that once again. We would do this with a view to bringing the issue to you and the Board by the next meeting. I would appreciate your thoughts on this matter.

It has now been over two weeks since you indicated that the Bs were seriously interested in a buyout of the A's interest in ALH, and you said the process would be one of weeks not months. I haven't heard anything further from you on this issue. Please let me know if the prospects of a transaction are real and the likely timetable.

Best personal regards.

Gene

11/1/2004

# EXHIBIT C

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

SHAMROCK HOLDINGS OF          )
CALIFORNIA, INC., SHAMROCK    )
CAPITAL ADVISORS, INC., EUGENE I.  )
KRIEGER, GEORGE J. BUCHLER and   )
BRUCE J. STEIN,               )
                              )     Civil Action No. _____
        Plaintiffs,           )
                              )
    v.                        )
                              )
AVIE ARENSON, SELK, LLC and   )
LAUREL EQUITY GROUP, LLC,     )
                              )
        Defendants.           )

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs Shamrock Holdings of California, Inc. ("Shamrock"), its affiliate, Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein"), by and through their attorneys, allege upon knowledge with respect to themselves and their own actions and upon information and belief with respect to other matters as follows:

## NATURE OF THE ACTION

1.      This action seeks declaratory relief, pursuant to 10 Del. C. §§ 6501 et seq., with respect to certain rights and obligations of the parties hereto.

2.      Defendants, directly and indirectly, invested in the equity of ALH Holdings, Inc. ("ALH"), a limited liability company organized under Delaware law in June 1998 to engage in the home-building business. Shamrock invested millions of dollars more in the equity of ALH than did any of the defendants. Due to no wrongdoing

1

by plaintiffs, ALH was ultimately unsuccessful, with the result that both Shamrock and defendants have lost most of what they invested in ALH. Defendants are now threatening to sue Shamrock, Krieger, Buchler and Stein, even though there is no basis for holding these plaintiffs liable for ALH's disappointing performance.

3. The plaintiffs' and defendants' financial interests in ALH have at all times been fully aligned. The only difference is that Shamrock's share of ALH's downside is necessarily larger than that of defendants, because Shamrock's investment in ALH is larger. No setback experienced by ALH could hurt defendants without hurting Shamrock more. As the single largest investor in ALH, Shamrock always sought to maximize value for all investors. All of plaintiffs' actions in connection with ALH were taken in good faith, in the reasonable exercise of plaintiffs' business judgment.

4. At most, defendants are claiming that they would have made certain business decisions differently than plaintiffs. In particular, defendants assert that they were opposed to the sale of ALH's operations and that the sale process should have been handled differently. Defendants object vehemently to ALH's separate sales of its regional operations, even though months of searching yielded no buyer for the company as a whole, and the company could not meet its liquidity and capital needs without selling at least some of its operations. In fact, through their Representative on ALH's Supervisory Board, defendants consented to the sale of ALH and approved the selection, retention and compensation of the financial and investment banking professionals who conducted the auction of ALH's operations.

5. Defendants seem to believe, in hindsight, that they should have taken some other approach to ALH, e.g., by asserting themselves more strongly in the

2

management of ALH or by presenting concrete alternative plans for meeting ALH's financial obligations and needs, as plaintiffs repeatedly invited defendants to do. Such a hindsight belief cannot support any legal claim against plaintiffs — let alone a claim for bad faith or gross negligence that would override the exculpation clause in § 6.2(f) of ALH's Operating Agreement.

      6.     This action presents a case or controversy suitable for declaratory judgment because defendants persist in asserting that plaintiffs breached their fiduciary duties, acted in self-interest and engaged in other wrongful conduct. Defendants have demanded millions of dollars from plaintiffs, insisting that plaintiffs must "make them whole" by paying them the entire amount they invested in the equity of ALH, plus additional damages. As set forth below, plaintiffs are entitled to judicial relief from these spurious accusations and injurious demands.

**PARTIES**

      7.     Plaintiff Shamrock invested more than $9.1 million in the equity of ALH, constituting approximately 38% of ALH's total equity. Shamrock is a Class A Member of ALH, holding approximately 62% of the Class A Membership Interest in ALH. · Shamrock and the other Class A Members of ALH invested a total of approximately $ 14.5 million in ALH (approximately 62% of ALH's total equity).

      8.     Plaintiffs Krieger, Buchler and Stein are employees of Shamrock who serve as Representatives on ALH's Supervisory Board. Krieger, Buchler and Stein all perform substantial services for plaintiff SCA.

      9.     Defendant Avie Arenson ("Arenson") serves on ALH's Supervisory Board as the Representative of ALH's Class B Members.

3

10.    Arenson controls A. Arenson Holdings, Ltd. ("Arenson Holdings") and D.A. Gardens, Ltd. ("D.A. Gardens"). Arenson Holdings and D.A. Gardens invested $1.4 million in the equity of ALH, constituting approximately 6% of ALH's total equity. Arenson Holdings and D.A. Gardens are both Class B Members of ALH; together they hold approximately 17% of the Class B Membership Interest in ALH.

11.    Arenson signed ALH's original June 12, 1998 Operating Agreement on behalf of Arenson Holdings and D.A. Gardens. Arenson also signed the March 15, 1999 Amendment to ALH's Operating Agreement on behalf of Arenson Holdings and D.A. Gardens. (Except as otherwise indicated, the term "Operating Agreement" as used herein refers to ALH's June 12, 1998 Operating Agreement as amended.)

12.    Pursuant to a loan agreement dated April 6, 2000, Arenson Holdings loaned $166,666 to ALH II, Inc. ("ALH II"), a Delaware corporation organized in December 1998. ALH II is a direct wholly-owned subsidiary of ALH. All of ALH's operating companies are subsidiaries of ALH and ALH II. The formation of ALH II was approved unanimously by all members of ALH's Supervisory Board, including Arenson. Shamrock loaned $1,633,000 to ALH II pursuant to the April 6, 2000 loan agreement, and other ALH Members also made loans to ALH II.

13.    The borrowings by ALH II pursuant to the April 6, 2000 loan agreement were approved unanimously by all members of ALH's Supervisory Board, including Arenson. Arenson signed the April 6, 2000 loan agreement on behalf of Arenson Holdings.

4

14.    Pursuant to a loan agreement dated May 7, 2002, D.A. Gardens loaned $312,500 to ALH II. The borrowings by ALH II pursuant to the May 7, 2002 loan agreement were approved unanimously by all members of ALH's Supervisory Board, including Arenson. Arenson signed the May 7, 2002 loan agreement on behalf of D.A. Gardens. Shamrock loaned $1,964,000 to ALH II pursuant to the May 7, 2002 loan agreement, and other ALH Members also made loans to ALH II.

15.    At the June 26, 2003 meeting of ALH'S Supervisory Board, Arenson suggested that the loans to ALH II pursuant to the April 6, 2000 and May 7, 2002 loan agreements — including the loans made by Arenson Holdings and D.A. Gardens, as well as loans made by other Class B Members and by Shamrock — should be repaid from the proceeds of the sale of ALH's operations in Jacksonville, Florida. All members of ALH's Supervisory Board, including Arenson, consented to these loan repayments.

16.    Defendant SELK, LLC ("SELK") invested approximately $2.9 million in the equity of ALH, constituting approximately 12% of ALH's total equity. SELK is a Class B Member of ALH, holding approximately 33% of the Class B Membership Interest in ALH. SELK is a limited liability company organized under Delaware law.

17.    Defendant Laurel Equity Group ("Laurel") also invested approximately $2.9 in the equity of ALH, constituting approximately 12% of ALH's total equity. Laurel is a Class B Member of ALH, holding approximately 33% of the Class B Membership Interest in ALH. Laurel is a limited liability company organized under Delaware law.

5

18.     Together, Arenson Holdings, D.A. Gardens, SELK and Laurel hold 83% of the Class B Membership Interest in ALH.

## JURISDICTION

19.     This Court has subject matter jurisdiction of this case pursuant to 6 Del. C. § 18-111.

20.     This Court has personal jurisdiction over the defendants pursuant to 6 Del. C. § 18-105, 6 Del. C. § 18-109 and 10 Del. C. § 3104.

## FACTS

### ALH's Supervisory Board

21.     Section 6.2(a) of the Operating Agreement provides that Major Decisions concerning ALH are to be made only by the Members of ALH, acting through ALH's Supervisory Board.  Section 6.2(c) of the Operating Agreement defines Major Decisions as including, among other things: the sale, disposition or other transfer of substantially all the assets, or any securities, of ALH or any subsidiary of which ALH holds more than 40% of the voting power (a "Subsidiary"); the acquisition by ALH or a Subsidiary of all or substantially all of the assets or ownership interests of any other person; any modification of the Operating Agreement; engaging in any business other than home building or land development; making loans to, or guaranteeing obligations of, any person (except for guarantees required under the existing credit facilities of ALH or any Subsidiary); the sale to any person of any interest in ALH, any Subsidiary, or any of their properties or businesses; any distribution by ALH or any Subsidiary other than in accordance with the Operating Agreement; establishing, amending or modifying any rules for the operation of the Supervisory Board or similar governing body of any

6

Subsidiary, including levels of authority for officers of ALH or any Subsidiary; any borrowing from any person (except under the existing credit facilities of ALH or any Subsidiary); any litigation settlement in excess of $500,000; the commencement of any litigation; approval of the annual budget or any amendment thereto by ALH or any Subsidiary; capital expenditures in excess of $50,000 outside the ordinary course of business; removal of any of the five most highly compensated employees; the execution of any agreement with any affiliate or Member of ALH; the execution of any agreement requiring aggregate payments in excess of $100,000; the execution of any agreement extending beyond June 12, 1999; and the taking of any action that is other than in the ordinary course of business or not in compliance with ALH's budget (except for immaterial deviations and certain capital expenditures otherwise permitted by the Operating Agreement).

22.    When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by ALH's Class A Members, one designated by ALH's Class B Members and two designated by ALH's Class D Members. From the outset, Buchler was a Class A Representative and Arenson was the Class B Representative.    In or around late 1999/early 2000, Krieger became a Class A Representative, replacing the Shamrock employee who previously held that position. The Representatives of the Class D Members were Shalom E. Lamm ("Lamm") and Jonathan Zich ("Zich"). Lamm is an investor in defendant SELK.

23.    ALH's Supervisory Board has always had five members. The Class B Members have never had more than one Representative on the Supervisory Board. Nothing in the Operating Agreement requires the consent of the Class B

7

Representative for any action or decision by the Supervisory Board. Nothing in the Operating Agreement requires the consent of the Class B Members for actions or decisions by ALH (except that Members must consent to amendments of the Operating Agreement that modify their limited liability, alter their interest in the profits, losses or distributions of ALH, or alter the number or voting rights of the Representatives). Actions and decisions by ALH are generally effective by majority vote of the five Representatives on the Supervisory Board. All Major Decisions require the consent of the Class A Representatives on the Supervisory Board.

24.     Pursuant to an agreement with ALH dated July 1, 2001 (the "July 2001 Agreement"), Zich resigned from ALH's Supervisory Board and was replaced by Stein. The July 2001 Agreement gave ALH's Class A Members the right to designate one of the two Class D Representatives on the Supervisory Board. Since July 2001, three of the five members of the Supervisory Board have been Shamrock employees. This change in the composition of ALH's Supervisory Board was approved unanimously by all members of the Board, including Arenson.

### The SCA Consulting Agreement

25.     Simultaneously with the July 2001 Agreement, ALH entered into an agreement (the "Consulting Agreement") for SCA to provide consulting services to ALH for a fee of $100,000 per year.

26.     Section 2 of the Consulting Agreement provides that ALH has no obligation to follow any of SCA's advice, and that SCA has no duty to provide any oversight or review of ALH's activities or plans. Section 2 further provides that (1) SCA shall devote such time as it deems necessary to perform the services to be rendered by it

8

under the Consulting Agreement, and (2) SCA is not required to devote any minimum amount of time to the performance of such services.

27.    Section 6 of the Consulting Agreement provides that SCA may terminate the agreement at any time, with or without cause.  Under § 6 of the Consulting Agreement, ALH could have terminated the agreement at any time, with or without cause, after December 31, 2002.  Neither the Class B Representative on ALH's Supervisory Board nor the Class B Members have ever requested that the Consulting Agreement be terminated.

28.    Exhibit A to the Consulting Agreement requires ALH to indemnify and hold harmless SCA, its affiliates, and the partners, officers, directors, employees and agents of the foregoing against all liabilities arising from or relating to the Consulting Agreement, except to the extent that it is finally judicially determined that such liabilities result primarily from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct.  Exhibit A further provides that SCA shall have no liability to ALH or any other person in connection with the services rendered pursuant to the Consulting Agreement, except to the extent that it is finally judicially determined that such liability results primarily from SCA's bad faith, gross negligence or willful misconduct.

29.    The Consulting Agreement was approved unanimously by all members of ALH's Supervisory Board, including Arenson.

### ALH's Acquisitions of ABI, BBC and MHI

30.    In 1998, ALH acquired home-building operations in Jacksonville, Florida that operated under the name Atlantic Builders, Inc. ("ABI").  This acquisition

9

was approved unanimously by all members of ALH's Supervisory Board, including Arenson.

31.    In 1999, ALH acquired home-building operations in Memphis, Tennessee that operated under the name Bowden Building Corporation ("BBC"). This acquisition was approved unanimously by all members of ALH's Supervisory Board, including Arenson.

32.    In 2000, ALH acquired home-building operations in Charlotte, North Carolina that operated under the name Mulvaney Homes, Inc. ("MHI"). This acquisition was approved unanimously by all members of ALH's Supervisory Board, including Arenson.

### ALH's Engagement of Jolson Merchant Partners

33.    In March 2002, ALH and its wholly-owned subsidiary ALH II (collectively the "Company") engaged Jolson Merchant Partners ("JMP") to provide financial advisory and investment banking services in connection with the possible sale of the Company.    ALH selected JMP, a firm with substantial qualifications and experience in the home-building industry, after seriously considering and interviewing four candidates for this engagement.

34.    The engagement of JMP was approved unanimously by all members of ALH's Supervisory Board, including Arenson.

35.    The March 20, 2002 engagement letter between the Company and JMP (the "JMP Engagement Letter") contemplated JMP's provision of a broad range of services, including: investigation and analysis with respect to the business and operations of the Company and of the industry and markets it serves; analysis of the various

strategic alternatives available to the Company; development, updating and ongoing review of a list of parties that might have a specific interest in acquiring the Company; marketing the Company to potential buyers; advising on the financial aspects of proposed transactions; participating in meetings of the Supervisory Board to consider potential transactions; structuring a sale transaction process, including developing and administering a confidential bidding process; counseling the Company with respect to strategy and tactics for negotiation of a transaction; participating with the Company and its counsel in the negotiation of a transaction; and rendering opinions as to the fairness of a transaction, from a financial point of view, to the Company's equity holders or advising the Supervisory Board that JMP is unable to render such an opinion.

36.    With the knowledge and consent of ALH's Supervisory Board, including Arenson, JMP spent more than six months seeking a buyer for the Company or substantially all of its assets. After these efforts to sell the Company in its entirety proved unsuccessful, JMP began seeking potential buyers of ABI (the Jacksonville, Florida operation).

37.    JMP was selected with reasonable care by or on behalf ALH to perform the services contemplated by the JMP Engagement Letter. Shamrock, Krieger, Buchler and Stein reasonably believed, based on JMP's substantial experience in the industry, that such services were within JMP's professional and expert competence, and they relied in good faith on JMP's advice. Therefore, as to all matters relating to the sale of the Company, Shamrock, Krieger, Buchler and Stein are fully protected by 6 Del. C. § 18-406.

11

### *ALH's Sale of ABI*

*May 14, 2003 Meeting of ALH's Supervisory Board*

      38.    At the meeting of ALH's Supervisory Board on May 14, 2003, JMP gave an overview of the efforts to sell ALH in its entirety and the subsequent efforts to sell ABI. JMP initially spoke to 20 builders who were potential buyers of ABI and then narrowed this list to six viable candidates. From these six, JMP obtained four written proposals and one verbal proposal. The most favorable proposal came from Mattamy Homes, Ltd. ("Mattamy"), which offered approximately $20 million for substantially all of the assets of ABI.

      39.    JMP advised the Board that the Mattamy proposal represented the best available transaction for the sale of ABI. John Laguardia ("Laguardia"), who was then the President and Chief Operating Officer of ALH II, presented his views of the home-building market in Jacksonville, Florida, and stated that the sale of ABI to Mattamy would be at the peak of the market.

      40.    William R. Lanius ("Lanius"), who was then Executive Vice President and Chief Financial Officer of ALH II, stated that ABI faced various liquidity issues with respect to the capital needed to honor its existing land contracts. Lanius explained that ABI did not have either the cash or credit available with existing lenders to finance upcoming purchases pursuant to the existing contracts. Buchler noted that ALH as a whole had serious liquidity issues resulting from, among other things, poor results at MHI, which were causing ALH's auditors to write down a minimum of $15 million in goodwill. Lanius pointed out that ALH did not have sufficient cash on hand to finance its

anticipated settlement of certain litigation in connection ALH's acquisition of BBC from the Bowden family (the "Bowden Litigation").

41.    At the time of the May 14, 2003 meeting, the Bowden Litigation was scheduled to go to trial the following month. In the Bowden Litigation, the Bowden family sought payment under a promissory note (the "Bowden Note") issued by ALH Tennessee Acquisition Corp. ("ALH Acquisition") — a wholly-owned subsidiary of ALH and ALH II and the parent company of BBC — in connection with the purchase of BBC. The principal amount of the Bowden Note was $2.25 million and the accrued interest was approximately $600,000. In addition, there was an earn-out provision with an estimated value of approximately $675,000, and the judge could require payment of attorneys' fees in the range of $200,000 to $600,000.

42.    Based on the foregoing, if the Bowden family were to prevail on its then-pending motion for partial summary judgment, the liability to the Bowden family could be approximately $4 million. In addition, the Bowden Litigation sought tens of millions of dollars in consequential and punitive damages on the grounds that, among other things, non-payment of the Bowden Note had caused the failure of three new businesses started by the Bowden family after they sold BBC to ALH.

43.    At a mediation held shortly before the May 14, 2003 meeting, ALH Acquisition had offered $5 million to settle the Bowden Litigation: $1 million to be paid up front and the balance to be paid later from the proceeds of the sale of ABI. The Bowden family had countered at $8 million, but it appeared that they might accept $5-6 million if payment were made promptly.

13

44.    The Bowden Note was guaranteed by ALH II, and ALH II was a named defendant in the Bowden Litigation. Consequently, the Bowden Note and related claims asserted in the Bowden Litigation could have been enforced against any or all of ALH's Subsidiaries and their assets.

*June 26, 2003 Meeting of ALH's Supervisory Board*

45.    At the next meeting of ALH's Supervisory Board, held on June 26, 2003, ALH's outside counsel described a proposed settlement of the Bowden Litigation under which the Bowden family would be paid $5 million plus $210,000 in attorneys' fees (the "Settlement"). The first $1 million would be due immediately upon execution of the settlement agreement and the balance would be payable on the earlier of August 31, 2003 or the consummation of the sale of ABI. The proposed Settlement included an option to extend the final payment date for an additional 90 days, for a fee of $250,000. ALH's outside counsel advised the Supervisory Board that the proposed Settlement was favorable to ALH, ALH II and other ALH Subsidiaries.

46.    At the June 26, 2003 meeting, there was a full discussion of the proposed Settlement.    Arenson, Lamm and Lanius commented that the proposed Settlement was favorable. Arenson asked how the final payment would be addressed if the proposed sale of ABI were not consummated. Buchler stated that, under such circumstances, it would be necessary to exercise the option to extend the final payment date and seek other purchasers for ABI. Following this discussion, ALH's Supervisory Board, including Arenson, unanimously approved the Settlement.

47.    ALH's outside counsel in the Bowden Litigation were selected with reasonable care by or on behalf ALH to perform such legal services. Shamrock,

14

Krieger, Buchler and Stein reasonably believed, based on counsel's substantial litigation experience, that these services were within such counsel's professional and expert competence, and they relied in good faith on counsel's advice. Accordingly, as to all matters relating to the Bowden Litigation, Shamrock, Krieger, Buchler and Stein are fully protected by 6 Del. C. § 18-406.

48.    At the June 26, 2003 meeting, JMP gave an overview of its efforts to find purchasers for ALH's various subsidiaries and assets. During the discussion that followed, JMP stated that it was an excellent time to sell BBC because of its strong performance in the first half of 2003. Lanius pointed out that BBC would achieve approximately $2.2 million in EBITDA (earnings before interest, taxes, depreciation and amortization), and appeared able to maintain comparable EBITDA for the second half of 2003. JMP stated that a purchase price at a multiple of five times EBITDA was possible, so assuming EBITDA of $4.4 million, the price for BBC could exceed $20 million.

49.    With respect to MHI, JMP advised that it was not yet the best time to sell. JMP recommended that ALH continue its efforts to expand MHI's business before pursuing sale opportunities, and that the Supervisory Board reconsider its opportunities for selling MHI in the second half of 2003.

50.    Buchler asked JMP to give its assessment of the proposed Purchase Agreement for the sale of ABI to Mattamy. JMP stated that based on, among other things, its review of comparable transactions, the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. In light of ABI's projected EBITDA of approximately $8 million for 2003, the proposed purchase price represented an EBITDA multiple that was well above the average for previous sales of homebuilders.

15

This price also compared favorably to comparable sale prices derived from multiples of book value or earnings. JMP concluded by stating that, based on its analysis and review, the proposed sale of ABI on the terms described in the Purchase Agreement was fair to ALH from a financial point of view.

51.    At the June 26, 2003 meeting, neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of ABI.

52.    Buchler asked Laguardia and Lanius for their views on the proposed sale of ABI. Laguardia stated that ALH would be selling ABI at the peak of the Jacksonville, Florida homebuilding market. Lanius concurred in this, noting that the proceeds of the sale of ABI could be used to pay for the settlement of the Bowden Litigation, which would enhance ALH's ability to sell BBC. Lanius explained that, to continue competing in its market, ABI would need substantially better capitalization, and that ABI did not have financial resources for the land purchases it would need to make in order to compete successfully. Lanius also stated that ABI's existing contracts to purchase building lots would place considerable strain on ALH's liquidity resources. Lanius concluded that, from a financing and liquidity perspective, it was the most opportune time to sell ABI.

53.    Following a presentation by ALH's outside counsel concerning the terms of the proposed Purchase Agreement, there was a discussion among the Board Representatives. Arenson questioned whether it would be better for ALH to raise additional equity rather than sell the assets of ABI. Arenson suggested that ALH's existing Members might consider investing more capital in ABI.

16

54.    Buchler pointed out that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of the Bowden Litigation to be concluded, and (3) no other proposals for funding or acquiring ABI, including proposals from the Class B Members or Arenson himself, had been made. Lanius added that Jacksonville, Florida was not an attractive market. He said he would not recommend that ALH invest more money in that market because it had reached its peak and, due to the entry of many new and powerful builders, he anticipated that ABI's business opportunities would deteriorate in the future.

55.    After further review and discussion, a majority of ALH's Supervisory Board voted in favor of the sale of ABI. Arenson voted against the sale and Lamm abstained.

56.    At Arenson's request, Buchler discussed the application of the net proceeds from the sale of ABI. Buchler explained that approximately $8.8 million would be left after payment of various transaction costs and funding the previously approved settlement of the Bowden Litigation.

57.    Arenson then suggested that the remaining $8.8 million be used to repay (to the extent permitted under ALH's other credit agreements) the loans made by certain of ALH's Members under the April 6, 2000 and May 7, 2002 loan agreements. The repayments suggested by Arenson would be made to his entities (Arenson Holdings and D.A. Gardens), SELK and another Class B Member, as well as to Shamrock and other Class A Members. Arenson suggested that any monies remaining after the repayment of the Member loans could be used for ALH's working capital needs or to repay ALH's bank debt.

17

58.    In accordance with Arenson's suggestion, the loans made by ALH's Members under the April 6, 2000 and May 7, 2002 loan agreements were repaid from the proceeds of the sale of ABI.

59.    At the June 26, 2003 meeting, the Supervisory Board discussed the fee to be paid to JMP for its work in connection with the ABI sale.  Under the JMP Engagement Letter, JMP was only entitled to a fee upon the sale of the whole Company. However, in light of JMP's efforts over the preceding 14 months, the Board unanimously authorized a fee to JMP for the sale of ABI alone.  The Board unanimously authorized Buchler and Krieger to negotiate the fee with JMP up to a total of $300,000 (the prorated portion of the fee that would have been payable to JMP upon a sale of the whole Company).

60.    The Supervisory Board discussed the payment of an exit bonus to Lanius upon the consummation of the ABI sale and his anticipated resignation as an employee of ALH. The Board agreed that Lanius should be treated fairly and generously. The Board unanimously authorized Buchler and Krieger to negotiate an appropriate exit bonus for Lanius.

61.    The Supervisory Board also discussed the payment of a fee to Shamrock in connection with its efforts to facilitate the ABI sale. Krieger, Buchler and Stein declined to participate in any discussion of such a fee, because of their relationship with Shamrock. Arenson and Lamm indicated that some payment to Shamrock would be appropriate in light of Shamrock's special services to ALH in connection with the sale of ABI. Arenson and Lamm were appointed as a special committee to evaluate the services performed by Shamrock and to determine the appropriateness and amount, if any, of a fee

18

to Shamrock for its services in facilitating the sale of substantially all the assets of ABI and negotiating the terms of the Purchase Agreement. Arenson and Lamm subsequently authorized a fee of $200,000 to Shamrock.

### *ALH's Sale of BBC*

*March 24, 2004 Meeting of ALH's Supervisory Board*

62.    At a meeting on March 24, 2004, ALH's Supervisory Board considered the proposed sale of 100% of the stock of BBC. Buchler gave an overview of the economic terms of the transaction and ALH's outside counsel made a presentation regarding the terms of the proposed purchase agreement.

63.    JMP gave an overview of its efforts to find purchasers for BBC during the preceding two years. JMP had contacted approximately 20 prospective buyers, constituting every entity identified by JMP as a potentially active participant or potential participant in the Memphis, Tennessee homebuilding market. Levitt Corporation ("Levitt") was the only entity that provided a serious bid for BBC. JMP noted that the Memphis area was flat in growth and that the homebuilding market there was not robust.

64.    In determining the merits of the BBC sale, JMP had reviewed comparable transactions in the Memphis area. JMP was aware of only two sales in the Memphis area in the preceding two years that were comparable to the BBC sale, and in both cases, the acquired entities performed poorly post-acquisition. JMP explained that Levitt's proposed purchase price for BBC approximated a multiple of five times BBC's 2003 EBITDA, which was well above the average EBITDA multiple for previous sales of

19

homebuilders. The price also compared favorably to comparable sale prices derived from a multiples of book value.

65.    JMP stated that Levitt's proposed purchase agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in comparable sales agreements. JMP concluded that Levitt's proposal represented the best potential transaction for the sale of BBC and a superior opportunity for ALH to realize value on its investment.

66.    At the March 24, 2004 meeting, neither Arenson nor Lamm asked any questions of JMP regarding the proposed sale of BBC.

67.    The Board then discussed the merits of the proposed BBC sale. Buchler pointed out that Jeffrey Sweeney ("Sweeney"), BBC's President and Chief Executive Officer, had indicated that he would not continue at BBC absent a sale to Levitt. Buchler stated his belief that Sweeney was integral to BBC's operations and was an important part of BBC's relationship with its lenders. Buchler noted that there was no successor to take over from Sweeney and that it would be difficult to identify and hire an adequate successor in a timely manner. Buchler also noted that the current absence of equity capital greatly impaired BBC's ability to significantly expand its business.

68.    Arenson stated that he opposed the sale of BBC for the same reasons he had opposed the sale of ABI. Arenson expressed a concern that the sale was not in the best interest of all of ALH's Members and that better value might be obtained by continuing to operate BBC. Arenson did not identify any proposal from himself, from any of the Class B Members or from any other source for obtaining additional capital for BBC, for improving BBC's financial or operational condition, for realizing better value

20

by continuing to operate BBC, or for finding a replacement for Sweeney. Buchler stated his belief that the sale of BBC to Levitt was the best option available under the current circumstances.

        69.    Arenson expressed a concern that there might be a possible conflict of interest on the part of ALH's outside counsel in the BBC transaction because this counsel also represented Shamrock. The outside counsel explained that his firm was representing ALH and the Supervisory Board in the transaction and not ALH's Members separately. He noted that ALH had waived any potential conflict of interest and that the waiver had been approved by the Board prior to his firm's representation of ALH. He invited the Board Representatives to call him or his Tennessee co-counsel directly with any concerns or questions.

        70.    Arenson did not identify any way in which the services performed by outside counsel for ALH might have been affected by such counsel's representation of Shamrock, or any way in which other Members of ALH might have been disadvantaged by such counsel's representation of Shamrock. Likewise, defendants have not articulated how the legal services rendered for ALH in the BBC transaction might have been affected by such counsel's representation of Shamrock, or how defendants or other Members of ALH might have been disadvantaged by such counsel's representation of Shamrock. To the contrary, Shamrock's interests and incentives were and remain fully aligned with those of the defendants.

        71.    Lamm stated that he opposed the sale of BBC for reasons similar to Arenson's.

72.    After further discussion, a majority of the Supervisory Board voted in favor of the proposed sale of BBC to Levitt. Arenson and Lamm both voted against the sale. The Supervisory Board expressly acknowledged the "extraordinary and valuable services" provided by JMP in connection with the sale of BBC, and unanimously authorized a fee of approximately $135,000 for such services. Arenson and Lamm formed a special committee to consider whether Shamrock should be paid a bonus for facilitating the BBC sale, but in light of their opposition to the sale itself, they subsequently decided against such a bonus.

### ALH's Proposed Sale of MHI

73.    ALH is now in the process of negotiating a possible sale of MHI (the last of ALH's homebuilding operations) to Levitt. MHI is currently operating under severe financial constraints. Absent a sale or a substantial infusion of capital, MHI will most likely be forced to shut down.

74.    Shamrock is not interested in investing additional capital in ALH. None of ALH's Class B Members, including any of the defendants, is interested in investing additional capital in ALH. Neither ALH's other Members nor any third parties have expressed any interest in investing additional capital in ALH. As set forth above, at the time of the ABI sale, Arenson expressly acknowledged ALH's need for additional capital. However, Arenson and the other defendants have been unwilling to reach into their own pockets to solve ALH's liquidity and capital issues. The sale of ALH's operations was thus inevitable.

75.    None of ALH's Members is under any obligation to invest any additional capital. Section 3.3 of the Operating Agreement expressly provides that no

22

Member shall have any personal liability to ALH, to any other Member of ALH, or to any other person for deciding not to make a further investment in ALH.

### *Defendants' Threats to Sue Plaintiffs*

76.    During the past two months, defendants have repeatedly threatened to sue plaintiffs — in a derivative action or otherwise — for breach of fiduciary duty. In particular, defendants are accusing plaintiffs of unilaterally deciding to sell ALH because ALH was taking up too much of plaintiffs' time. As set forth above, the decision to sell ALH was not unilaterally made by plaintiffs; it was unanimously made by ALH's Supervisory Board.    Plaintiffs have devoted thousands of hours to ALH and are continuing to try to ameliorate the outcome for all of ALH's Members.  In contrast, the Class B Members (including the defendants) are sitting at the sidelines, carping but not lifting a finger to help — not even proposing any alternative courses of action.

77.    The crux of defendants' position is that plaintiffs are obligated to expend indefinite amounts of time and energy on ALH, without regard to the likelihood of improving ALH's situation.  As set forth above, the Consulting Agreement, which was unanimously approved by the Supervisory Board (including Arenson), expressly provides that SCA is not required to devote any minimum amount of time to the performance of services for ALH.

78.    Shamrock has always had the same right as any Member of ALH (including defendants) to make a cost/benefit business judgment with respect to the future of ALH. Under § 4.1(b) of the Operating Agreement, the Class A and Class B Members of ALH are treated *pari passu*. Therefore, such a judgment by Shamrock cannot benefit or harm one group relative to the other.  To the extent that Shamrock has, at various

23

times, considered how much time and energy to put into ALH, such consideration has not been limited to the potential impact on Shamrock alone. Rather, it has necessarily encompassed the prospects of ALH as a whole.

79.    If defendants genuinely believed that it were worthwhile to put more effort into ALH, they presumably would have done so themselves. Instead, they have left the plaintiffs to shoulder the entire burden. By defendants' own account, their supposed efforts on behalf of ALH have taken two forms: (1) general criticisms of the ALH sale process, unaccompanied by any concrete proposals for alternatives; and (2) Arenson's suggestion, in late 2002/early 2003, that the Class B members might acquire Shamrock's Class A Membership Interest.

80.    The Class B members (including defendants) never made a formal written proposal to Shamrock. Instead, an email from Arenson's lawyer mentioned a possible price for the entire Class A Membership Interest and outstanding loans owed by ALH to all of the Class A Members: a price that would have yielded Shamrock less than the outstanding amount of its loans to ALH, thus valuing Shamrock's equity at a negative number. But even if the Class B Members had made a concrete offer at a reasonable price, Shamrock would have been free to reject it, and such a rejection could not support any sort of legal claim against any of the plaintiffs.

81.    Defendants have accused plaintiffs of benefiting at defendants' expense through ALH's repayment of the loans made by certain of ALH's Members. As set forth above, the repayments of the loans under the April 6, 2000 and May 7, 2002 agreements were made to both Class A and Class B Members, including Arenson. All of these lenders were repaid in full; none benefited at the expense of any other.

24

82.    It was Arenson himself who suggested that the loans be repaid from the proceeds of the sale of ABI. ALH's financial needs took a back seat to repaying Arenson and other ALH Members — Arenson's idea was that only monies remaining after repayment of the Member loans should be used for ALH's working capital needs or to repay its bank debt.

83.    Defendants have repeatedly accused plaintiffs of wrongfully seizing control of ALH. As set forth above, the July 2001 Agreement that gave the Class A Members the right to designate three of the five Representatives on ALH's Supervisory Board was unanimously approved by the Supervisory Board (including Arenson).

84.    Defendants have also accused plaintiffs of wrongfully causing ALH to make certain decisions — especially in connection with the sale of ALH — without defendants' consent. As set forth above, the Operating Agreement never gave the Class B Members more than one Representative on the five-member Supervisory Board. Decisions by the Supervisory Board have never required a unanimous vote. The Class B Members (including defendants) knowingly chose to invest in ALH on these terms, i.e., on terms that expressly gave ALH the right to act without the Class B Members' consent. Much of what defendants complain of was in fact consented to by Arenson as Class B Representative, but even if that were not so, defendants would not have a legal claim against plaintiffs based on the absence of defendants' consent.

85.    Defendants' threats to sue plaintiffs are focused primarily on the decision to sell ALH and the process by which the sale was implemented. It is undisputed that ALH originally sought a buyer for the entire company and that this decision was unanimously approved by the Supervisory Board. After many months of

25

effort by JMP (whose selection was unanimously approved by the Supervisory Board, including Arenson), no such buyer was found.

86.    Defendants assert that such a buyer could have been found, but for the supposed mishandling of the sale process by plaintiffs. As set forth above, the sale process was guided by JMP, on whom plaintiffs reasonably relied in good faith. In any event, defendants' contention that the sale process should have been handled differently is at most matter of business judgment that cannot give rise to a legal claim by defendants against plaintiffs.

### The Exculpation Provisions of the Operating Agreement

87.    Section 10.2 of the Operating Agreement provides as follows: "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

88.    6 Del. C. § 18-1101(c), as amended effective August 1, 2004, provides as follows: "To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided that a limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."

89.    6 Del. C. § 18-1101(d), as amended effective August 1, 2004, provides as follows: "Unless otherwise provided in a limited liability company

26

agreement, a member or manager or other person shall not be liable to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement for breach of fiduciary duty for the member's or manager's or other person's good faith reliance on the provisions of the limited liability company agreement."

90.    6 Del. C. § 18-1101(e), as amended effective August 1, 2004, provides as follows: "A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

91.    In keeping with the foregoing provisions of Delaware law, § 6.2(f) of the Operating Agreement provides as follows: "Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence."

27

92.    Krieger, Buchler and Stein have at all times acted in good faith within the scope of the authority conferred on them by the Operating Agreement, and have not committed any act of fraud, criminality, bad faith or gross negligence. Therefore, they are exculpated by § 6.2(f) of the Operating Agreement from any liability to defendants.

## COUNT I
### (Declaratory Judgment: No Breach of Fiduciary Duty)

93.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 92 as if fully set forth herein.

94.    A controversy has arisen between plaintiffs and defendants with respect to plaintiffs' fiduciary duties to defendants in connection with, among other things, the sale of ALH's operations.

95.    The parties are in need of a declaratory judgment declaring their rights and obligations under the governing Delaware law of fiduciary duty.

96.    Plaintiffs seek a judicial declaration that they have not breached any fiduciary duty to defendants.

## COUNT II
### (Declaratory Judgment: No Breach of Operating Agreement)

97.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 96 as if fully set forth herein.

98.    A controversy has arisen between plaintiffs and defendants with respect to their respective rights and obligations under the Operating Agreement.

99.    The parties are in need of a declaratory judgment declaring their rights and obligations under the Operating Agreement.

28

100.    Plaintiffs seek a judicial declaration that they have not breached any obligations to defendants, or violated any rights of defendants, under the Operating Agreement.

## COUNT III
### (Declaratory Judgment: No Liability Under Consulting Agreement)

101.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 100 as if fully set forth herein.

102.    A controversy has arisen between plaintiffs and defendants with respect to services provided by SCA to ALH pursuant to the Consulting Agreement.

103.    The parties are in need of a declaratory judgment declaring their rights and obligations under the Consulting Agreement.

104.    Plaintiffs seek a judicial declaration that (1) in rendering services pursuant to the Consulting Agreement, they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement.

## COUNT IV
### (Declaratory Judgment – Good Faith Reliance on Professionals and Experts)

105.    Plaintiffs repeat and reallege the allegations of ¶¶ 1 through 104 as if fully set forth herein.

106.    A controversy has arisen between plaintiffs and defendants with respect to plaintiffs' reliance on JMP and on ALH's outside counsel.

107.    The parties are in need of a declaratory judgment declaring whether plaintiffs relied in good faith on JMP and on ALH's outside counsel.

29

108.    Plaintiffs seek a judicial declaration that they relied in good faith on JMP and on ALH's outside counsel.

**WHEREFORE,** plaintiffs respectfully request that this Court enter an order:

A.    declaring that they have not breached any fiduciary duty to defendants;

B.    declaring that they have not breached any obligations to defendants, or violated any rights of defendants, under the Operating Agreement;

C.    declaring that (1) in rendering services pursuant to the Consulting Agreement, they did not commit bad faith, gross negligence or willful misconduct, and (2) they are protected from any liability to defendants by the Consulting Agreement;

D.    declaring that they relied in good faith on JMP and on ALH's outside counsel; and

E.    granting such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL

OF COUNSEL:

Gregory P. Joseph
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
(212) 407-1200

A. Gilchrist Sparks, III (#467)
S. Mark Hurd (#3297)
Samuel T. Hirzel, II (#4415)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
    Attorneys for Plaintiffs Shamrock Holdings
    of California, Inc., Shamrock Capital
    Advisors, Inc., Eugene I. Krieger, George J.
    Buchler and Bruce J. Stein

September 13, 2004
426874

30

# EXHIBIT CC

## Pamela Jarvis

| | |
|---|---|
| **From:** | Pamela Jarvis |
| **Sent:** | Thursday, August 05, 2004 12:16 PM |
| **To:** | 'Isaac M. Neuberger' |
| **Cc:** | Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com |

**Subject:** RE: ALH

Dear Isaac:

In response to your inquiries regarding a meeting,  you are correct in assuming that New York should be the location. Unfortunately, Monday and Tuesday of next week are not possible. With regard to meeting in Europe, we know of no reason why Mr. Arenson would only be able to meet there, and in any event Shamrock will not undertake to meet there.

In order to expedite communication without the burden of travel for anyone, we propose an initial conference call during the week of August 23. This would give us all an opportunity to gauge whether a face-to-face meeting in New York would be worthwhile. If you would like to have a conference call sooner than that, Shamrock is available tomorrow from 10:00-11:30 am and 1:30-4:30 pm Los Angeles time.

Regarding participants in conference calls or meetings, George Buchler and perhaps other Class A Representatives would attend. We assume that Mr. Arenson, as the sole Class B Representative, would also attend. Would other Class B Members attend?

It would be most helpful if you would provide us with a proposed agenda, so that we can be as fully prepared as possible.

If you would like to have a conference call tomorrow, please get back to me right away so that I can make the necessary arrangements.

Sincerely,

Pamela Jarvis

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Wednesday, August 04, 2004 5:02 PM
**To:** Pamela Jarvis
**Cc:** Thomas M. Wood; avie@arenson.co.il; bjj@jesselson.com; mgj@attglobal.net; konig@skynet.be; starjewelers@aol.com; mfrankel@iaac.com
**Subject:** RE: ALH

*PLEASE SEE MY RESPONSES IN CONTEXT*

**From:** Pamela Jarvis [mailto:pjarvis@josephnyc.com]
**Sent:** Tuesday, August 03, 2004 12:35 PM

**To:** Isaac M. Neuberger
**Cc:** Thomas M. Wood
**Subject:** RE: ALH

You seem to be intent on mischaracterizing the situation as one in which Shamrock is unwilling to meet with the Class B investors. As my letters have plainly stated, Shamrock is indeed willing to meet. This is why I asked you (*see* August 2, 2004 letter at 4) to let me know when Mr. Arenson will be in the United States. If, as you assert, your clients want to meet with Shamrock, I trust that you will provide this information at your earliest convenience.

*IMN- BY COPY OF THIS E-MAIL, I AM INQUIRING IF MR. ARENSON CAN MEET IN THE USA. I ASSUME THAT WE WILL MEET IN NYC. IS ATHAT CORRECT? WHO, FROM SHAMROCK, WILL ATTEND. IF MR. ARENSON IS ABLE, IS NEXT MONDAY OR TUESDAY POSSIBLE? IF MR. ARENSON CAN ONLY MEET IN EUROPE, IS SHAMROCK WILLING TO DO SO AND IF YES, WHEN?*

I do not comprehend your statement that "MHI is a Shamrock creation." It is my understanding that **(1)** Shalom Lamm introduced MHI to ALH, (2) ALH acquired MHI in January 2000, at a time when the Class A investors had only two of ALH's five board seats, and (3) ALH's acquisition of MHI was unanimously approved by the board, including by Mr. Arenson.

*IMN- THE DILEMMA OF MHI, AS A STAND ALONE IS THE RESULT OF SHAMROCK'S HAVING SOLD BOTH MEMPHIS AND JACKSONVILLE, IN A PIECE MEAL FASHION, OF HAVING DESTROYED THE MANAGEMENT STRUCTURE BY LETTING IT BE KNOWN THAT ALH WAS BEING LIQUIDATED, PIECE BY PIECE AND THEREBY ALLOWING ALH TO BE DISMEMBERED AS IT WAS. THE ORIGINAL ACQUISITION OF MHI IS IRRELEVANT AND THE INTRODUCTION OF SHALOM LAMM IS BUT ANOTHER RED HERRING.*

Your assertion that only a "little information [has been] occasionally dribbled out by Shamrock" is demonstrably untrue. Shamrock and others have routinely kept Mr. Arenson, as Class B representative, up-to-date on material developments concerning ALH. Mr. Arenson has received weekly reports, periodic financial statements and other materials. He has had unrestricted access to the company's management. In addition to board meetings, there have been numerous teleconferences and email exchanges between Shamrock and Mr. Arenson, and Shamrock has consistently made itself available to Mr. Arenson. (*See, e.g.,* June 1, 2004 email to Mr. Arenson, arranging teleconference with George Buchler and Eugene Krieger to update Mr. Arenson concerning, *inter alia*, MHI and "[a]nything else that you would like to know about.") Moreover, your clients have always had full access to information from Shalom Lamm, under Section 9.2 of the Operating Agreement. I am unaware of any instance in which your clients requested information but did not receive it. Whatever they wanted to know has been theirs for the asking -- if they did not ask, that is their responsibility, not Shamrock's.

*IMN- AS I TOLD YOU WHEN WE SPOKE, WHILE SHAMROCK ALLOWED ITS COUNSEL TO ATTEND BOARD MEETINGS AT WILL MESSRS KRIEGER ET. AL REFUSED TO ALLOW MR. ARENSON TO BRING ME TO A BOARD MEETING CHARLOTTE. IN ADDITION, AS TO THE ISSUES AT HAND, THE WRONGFUL AND IMPROPER LIQUIDATION OF ALH TO SATISFY A SHAMROCK OBJECTIVE, WAS DONE OVER THE OBJECTION AND PROTEST OF MR. ARENSON AND THE Bs.*

In particular, with regard to MHI, the current information concerning the Levitt offer is set forth in Mr. Buchler's July 1, 2004 email to Mr. Arenson and the letter of intent that was faxed to Mr. Arenson at that time. MHI's "dire straits" are described in the July 1 email, and have been discussed at length with Mr. Arenson, as reflected in, *inter alia*, paragraph 3 of the email. Your attempt to suggest that your clients do not grasp the "critical" nature of the MHI situation is disingenuous. I am confident that Mr. Arenson, as one of Israel's largest general contractors, fully understands the ramifications of MHI present dependence on short-term extensions of its construction lines of credit, in the absence of which MHI "would have had to shut down operations" (July 1 email paragraph 2). Indeed, Mr. Arenson must be especially sensitive to the inability of MHI's management to function without appropriate capital resources.

*IMN- MHI'S LACK OF CREDIBLE MANAGEMENT IS THE CORE ISSUE. SHAMROCK ALLOWED THAT CONDITION TO OCCUR, AS IT WAS PART OF THEIR CAMPAIGN TO "CLOSE" ALH AND RID*

8/8/2005

*THEMSELVES OF THEIR FIDUCIARY OBLIGATIONS, AT ANY COST. THEY HAD WRITTEN OFF THE EQUITY LONG AGO AND ONLY SOUGHT TO BE REPAID THEIR LOANS.*

The question Shamrock has repeatedly put to the Class B investors with respect to MHI is whether they are interested in making an alternative proposal. The answer to this can only come from the Class B investors -- it cannot come from Shamrock. As discussed above, if the Class B investors wanted any additional information concerning MHI in order to answer this question, they could seek it from Shamrock or other sources, but they have not done so.

*IMN- AS PART OF AN OVERALL RESOLUTION OF THIS "MESS" I AM SURE THAT MHI'S CURRENT POSITION CAN BE ADDRESSED, AS WELL. THE SOONER WE MEET, THE BETTER. WE ARE UNABLE TO REALLY CONSIDER ANY OTHER ALTERNATIVE OR APPROVE THE SHAMROCK SPONSORED DEAL WITH LEVITT UNTIL WE HAVE RESOLVED THE CURRENT SITUATION WITH SHAMROCK.*

I have already addressed your unfounded accusations regarding breach of fiduciary duty, so I will not repeat that discussion here.

I look forward to hearing from you concerning Mr. Arenson's availability to meet.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT D

**OPERATING AGREEMENT**

**OF**

**ALH HOLDINGS LLC**

**DATED AS OF JUNE 12, 1998**

DO NY/83845.17

## TABLE OF CONTENTS

Page

ARTICLE I      DEFINED TERMS ............................................. 1
    1.1      Definitions .................................................. 1

ARTICLE II     FORMATION AND NAME; OFFICE; PURPOSE; TERM ........ 12
    2.1      Organization .............................................. 12
    2.2      Name of the Company ...................................... 12
    2.3      Purpose .................................................. 12
    2.4      Term ..................................................... 12
    2.5      Principal Office .......................................... 12
    2.6      Resident Agent ........................................... 13

ARTICLE III    MEMBERS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS 13
    3.1      Capital Contributions ..................................... 13
    3.2      Additional Capital Contributions .......................... 14
    3.3      No Other Capital Contributions Required ................... 14
    3.4      No Interest on Capital Contributions ...................... 14
    3.5      Return of Capital Contributions ........................... 14
    3.6      Capital Account Maintenance .............................. 15

ARTICLE IV     DISTRIBUTIONS ........................................... 16
    4.1      Distributions ............................................. 16
    4.2      Limitation Upon Distributions ............................. 18

ARTICLE V      ALLOCATIONS ............................................ 18
    5.1      Allocation of Net Profit or Net Loss ....................... 18
    5.2      Tax Credits .............................................. 19
    5.3      Special Allocations ....................................... 19
    5.4      Curative Allocations ...................................... 21
    5.5      Allocations to Transferred Interests in the Company .......... 21
    5.6      Company Adjustments ..................................... 22

ARTICLE VI     MANAGEMENT OF THE COMPANY ........................ 22
    6.1      Manager ................................................. 22
    6.2      Supervisory Board ........................................ 23
    6.3      Subsidiary Boards of Directors ............................ 27
    6.4      Annual Budget. ........................................... 27
    6.5      Member Voting. ........................................... 28
    6.6      Limitation on Authority of Members. ....................... 29

**Page**

| | | |
|---|---|---|
| **ARTICLE VII** | **TRANSFERS OF INTERESTS** ............................ | 29 |
| 7.1 | Transfers ............................................... | 29 |
| | | |
| **ARTICLE VIII** | **DISSOLUTION; LIQUIDATION** ........................... | 31 |
| 8.1 | Dissolution ............................................ | 31 |
| 8.2 | Winding Up ........................................... | 31 |
| 8.3 | Liquidation ........................................... | 31 |
| 8.4 | No Obligation to Restore Adjusted Capital Account Deficits ........ | 32 |
| | | |
| **ARTICLE IX** | **BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS** ... | 32 |
| 9.1 | Bank Accounts ........................................ | 32 |
| 9.2 | Books and Records .................................... | 33 |
| 9.3 | Annual Accounting Period ............................. | 33 |
| 9.4 | Tax Returns .......................................... | 33 |
| 9.5 | Tax Matters Member .................................. | 34 |
| 9.6 | Miscellaneous ........................................ | 34 |
| | | |
| **ARTICLE X** | **GENERAL PROVISIONS** ................................ | 34 |
| 10.1 | Assurances ........................................... | 34 |
| 10.2 | Applicable Law ....................................... | 35 |
| 10.3 | Headings ............................................. | 35 |
| 10.4 | Binding Provisions .................................... | 35 |
| 10.5 | Separability of Provisions ............................. | 35 |
| 10.6 | Modification, Amendment, Waiver ..................... | 35 |
| 10.7 | Counterparts ......................................... | 35 |
| 10.8 | Waiver ............................................... | 35 |
| 10.9 | Additional Remedies .................................. | 36 |

## ALH HOLDINGS LLC
## OPERATING AGREEMENT

This Operating Agreement of ALH HOLDINGS LLC (the "Agreement") is entered into as of this 12th day of June, 1998, by and among LION ALH CAPITAL LLC, a Delaware limited liability company ("Lion LLC"), the Persons listed on Exhibit A hereto, the Persons listed on Exhibit B hereto and LANDMARK EQUITY INVESTORS LLC, a Delaware limited liability company ("Landmark Equity LLC"), and Shalom E. Lamm (collectively, the "Members").

### EXPLANATORY STATEMENT.

The parties hereto have agreed to organize and operate a limited liability company in accordance with the terms of, and subject to the conditions set forth in, this Agreement.

NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending legally to be bound, agree as follows:

### ARTICLE I
### DEFINED TERMS

1.1    Definitions. The following capitalized terms shall have the meanings ascribed to them in this Section 1.1. Other terms may be defined in the text of this Agreement and shall have the meanings ascribed to them herein.

"Act" means the Delaware Limited Liability Company Act, as codified at Title 6, §§18-101 et seq. of the Delaware Code, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    increase such Capital Account by any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, as hereinafter defined; and

DO NY/83645.17

(ii)     decrease such Capital Account by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" means with respect to any Person any other Person that: (a) directly or indirectly controls, or is controlled by, or is under common control with such Person; (b) directly or indirectly beneficially owns or holds five percent (5%) or more of the voting stock of such Person; or (c) five percent (5%) or more of the voting stock of which is directly or indirectly beneficially owned or held by such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Agreement, as amended from time to time.

"ALH" means American Landmark Homes Corporation, a Delaware corporation and a wholly-owned subsidiary of the Company.

"American Debt" means an aggregate amount of $7,600,000 owed by American Landmark Homes Corporation, a Delaware corporation and a wholly-owned subsidiary of the Company, to third parties as of the date hereof.

"Annual Budget" has the meaning ascribed to such term in Section 6.4.

"Arbor Debt" has the meaning ascribed to such term in Section 3.2.

"Ash" means William J. Ash.

"Ash Payment" means an amount equal to 5% of the Net Proceeds payable by the Company under certain circumstances to Ash pursuant to an agreement dated the date hereof between the Company and Ash.

"Available Funds" means, at any time, (i) the aggregate amount of Operating Revenues and reserves previously set aside from Operating Revenues which are no longer required as such reserves, in excess of (ii) the aggregate amount required for Operating Expenses, capital expenditures, debt service and reasonable reserves for working capital, Company liabilities and debt service (contingent or otherwise), in each

case as determined in good faith by the Manager and subject to any restrictions imposed by any loan document or instrument evidencing indebtedness of the Company.

"Bankruptcy" means the happening of any of the following: (i) the filing of an application by a Person for, or a consent to, the appointment of a trustee for all or substantially all such Person's assets, (ii) the filing by a Person of a voluntary petition in bankruptcy, or the filing of a pleading in any court of record admitting in writing such Person's inability to pay its debts as they come due, (iii) the making by a Person of a general assignment for the benefit of creditors, (i) the filing by a Person of an answer admitting the material allegations of, or such Person's consenting to, or default in answering, a bankruptcy petition, (v) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating a Person a bankrupt, or appointing a trustee of all or substantially all such Person's assets or (vi) the filing of an involuntary case or other proceeding against any Person seeking liquidation, reorganization or other relief under any bankruptcy, insolvency or other similar law, which case or proceeding shall not have been dismissed within sixty days after filing.

"Book Basis" means, with respect to any asset, the asset's adjusted basis for United States federal income tax purposes; provided, that (i) if property other than U.S. dollars is contributed to the Company, the initial Book Basis of such property shall equal its Fair Market Value on the date of contribution, and (ii) if the Capital Accounts of the Members are adjusted pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations to reflect the Fair Market Value of the Company's assets, the Book Basis of each such asset shall be adjusted to equal its Fair Market Value as of the time of such adjustment in accordance with such Regulation in accordance with Section 3.6(c) of this Agreement. The Book Basis of all assets shall be adjusted thereafter by depreciation and amortization as computed for book purposes as provided in Section 1.704-1(b)(2)(iv)(g) of the Regulations.

"Business Day" means any day other than a Saturday or Sunday on which banks are open for business in New York, New York.

"Capital Account" means, with respect to any Member, the account maintained for each Member on the books of accounts of the Company in accordance with Section 3.6 of this Agreement.

"Capital Contribution" means any contribution to the Company by a Member of cash or any other assets, determined by the amount of such cash or the Fair Market Value of such other assets, net of liabilities assumed or to which the assets are subject; and "Capital Contributions" means the aggregate amount of cash and the Fair Market Value of any other assets contributed to the Company by a Member, net of liabilities assumed or to which the assets are subject.

3

"Capital Event" has the meaning ascribed to such term in Section 6.2(c)(i) of this Agreement.

"Class" means any of the following, as applicable: the Class A Members collectively, the Class B Member, the Class C Member, the Class D Member or the Class E Member.

"Class A Capital Contribution" has the meaning ascribed to such term in Section 3.1(a) of this Agreement.

"Class B Capital Contribution" has the meaning ascribed to such term in Section 3.1(b) of this Agreement.

"Class C Amount" means, as of any date, an amount equal to the excess, if any, of (y) $3,289,185 (as adjusted for any capital contribution subsequently made by the Class C Member) over (z) the cumulative amount of any money and the Fair Market Value of any Company property previously distributed to the Class C Member under Section 4.1(b)(v) of this Agreement.

"Class C Capital Contribution" has the meaning ascribed to such term in Section 3.1(c) of this Agreement.

"Class D Capital Contribution" has the meaning ascribed to such term in Section 3.1(d) of this Agreement.

"Class E Capital Contribution" has the meaning ascribed to such term in Section 3.2 of this Agreement.

"Class A Members" mean the Persons listed on Exhibit A hereto and permitted transferees, if any.

"Class B Members" mean the Persons listed on Exhibit B hereto and permitted transferees, if any.

"Class C Member" means Landmark Equity LLC.

"Class D Member" means Lion LLC.

"Class E Member" means Shalom E. Lamm.

"Class A Membership Interest" means the Membership Interest received by the Class A Members pursuant to this Agreement.

"Class B Membership Interest" means the Membership Interest received by the Class B Members pursuant to this Agreement.

"Class C Membership Interest" means the Membership Interest received by Landmark Equity LLC pursuant to this Agreement.

"Class D Membership Interest" means the Membership Interest received by Lion LLC pursuant to this Agreement.

"Class E Membership Interest" means the Membership Interest received by Shalom E. Lamm pursuant to Section 3.2 of this Agreement.

"Class A Representatives" has the meaning ascribed to such term in Section 6.2(b)(i).

"Class B Representative" has the meaning ascribed to such term in Section 6.2(b)(ii).

"Class D Representatives" has the meaning ascribed to such term in Section 6.2(b)(iv).

"Class A Vote" means the vote or written consent of Class A Members which are record owners of a majority of the percentage interest in the Class A Membership Interest.

"Class B Vote" means the vote or written consent of Persons which are record owners of not less than 67% of the ownership interests in the Class B Membership Interest.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means the limited liability company organized in accordance with this Agreement and/or any successor entity to such company.

"Credit Facility" means that certain Amended And Restated Master Loan and Intercreditor Agreement dated October 31, 1997 by and among Atlantic Builders, Inc. and Atlantic Development Corporation of Jacksonville, as Borrowers, Spencer's Lake Joint Venture, Laurel Grove Ltd., Merrill Hills Joint Venture, Odom's Mill Two Joint Venture, Braywick Joint Venture, Pickwick Joint Venture, Greyfield Joint Venture, Sutton Lakes Joint Venture, Lake Parke Joint Venture, W.R. Howell Company and Waverly Place Joint Venture, as Joint Ventures, NationsBank, N.A. and First Union

National Bank, as Banks, and NationsBank, N.A. as Administrative Agent for the Banks and as Issuing Bank and the other credit agreements to which the Company or any Subsidiary is a party as of the date hereof which are identified on Exhibit E attached hereto.

"Deputy Representative" has the meaning ascribed to such term in Section 6.2(a).

"Discount Amount" means the sum of (a) the excess of $5,600,000 over the amount paid by the Class E Member to satisfy or otherwise acquire or extinguish the Arbor Debt on behalf of ALH and (b) the excess of $2,000,000 over the amount paid by the Class E Member to satisfy or otherwise acquire or extinguish the Elovic Debt on behalf of ALH.

"Draft Annual Budget" has the meaning ascribed to such term in Section 6.4.

"EBITDA" means earnings before capitalized construction interest for pre-sold homes, tax, depreciation and amortization.

"Elovic Debt" has the meaning ascribed to such term in Section 3.2.

"Fair Market Value" means, as to any property, the price at which a willing seller would sell and a willing buyer would buy such property in an arm's length transaction without time constraints, having reference to factors including but not limited to prices paid for comparable properties, cash flow, earnings, and prospects for future earnings and cash flow. Unless otherwise specifically provided for under the terms of this Agreement, any determination of the Fair Market Value of any property required to be made under this Agreement shall be made by the Manager in its sole, good-faith discretion.

"Fiscal Year" shall mean the Company's fiscal year, which shall be the calendar year.

"Initial Manager" has the meaning ascribed to such term in Section 6.1(a).

"Interest Amount" means the sum of (i) interest paid or accrued with respect to (a) the Arbor Debt on or after September 1, 1998 and (b) the Elovic Debt on or after the date of this Agreement and (ii) any and all premiums, prepayment penalties or charges, or other charges, exit fees or expenses paid by the Company, ALH or any of their Subsidiaries to redeem, retire, extinguish or acquire the Arbor Debt or the Elovic Debt.

"Major Decision" has the meaning ascribed to such term in Section 6.2(c).

"Manager" has the meaning ascribed to such term in Section 6.1(a).

"Member" means each Person signing this Agreement and any Person subsequently admitted as a Member of the Company.

"Member Nonrecourse Debt" means debt of the partnership within the meaning of Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Deductions" means any and all items of loss, deduction or expenditure (described in Code Section 705(a)(2)(B)) that, in accordance with the principles of Section 1.704-2(i)(2) of the Regulations, are attributable to Member Nonrecourse Debt.

"Membership Interest" means an ownership interest of a Member in the Company from time to time, including, without limitation, the right of such Member to any and all distributions (liquidating and otherwise) and allocations of the income, gains, losses, deductions and credits of the Company to which such Member is entitled with respect to such ownership interest, as provided in this Agreement and the Act, together with the management, voting and participation rights devolving on such Member with respect to such ownership interest by virtue of such Member's status as a Member under the Act and as specifically set forth in this Agreement, and the obligations of such Member with respect to such ownership interest to comply with the terms and provisions of this Agreement and the Act.

"Membership Minimum Gain" means that amount determined in accordance with Section 1.704-2(g) of the Regulations.

"Minimum Gain Attributable to Member Nonrecourse Debt" means that amount determined in accordance with the principles of Section 1.704-2(i)(3), (4) and (5) of the Regulations.

"Minimum Net Proceeds" means Net Proceeds in an amount of at least the sum of (i) the aggregate accrued but unpaid Preferred Return of the Class A Members and the Class B Member as of the anticipated closing date of the Capital Event and (ii) the Unrecovered Class A Capital and Unrecovered Class B Capital as of such date.

"Net Proceeds" means the aggregate proceeds received by the Company (or its Affiliates) in connection with a Capital Event, less costs, expenses and taxes paid or payable by the Company (or its Affiliates) in connection therewith.

"Net Profit" and "Net Loss" mean, for each Fiscal Year of the Company or portion thereof, an amount equal to the Company's taxable income or loss, determined in accordance with Code Section 703(a), with the following adjustments:

(i)    all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii)    any tax-exempt income of the Company, not otherwise taken into account in computing Net Profit or Net Loss, shall be included in computing taxable income or loss;

(iii)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as such pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account as an item of loss pursuant to this definition shall be subtracted from taxable income or loss;

(iv)    gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for United States federal income tax purposes shall be computed by reference to the Book Basis of the property disposed of, notwithstanding that the adjusted basis of the property for United States federal income tax purposes may differ from its Book Basis;

(v)    in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or portion thereof, computed in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations, if applicable;

(vi)    in the event the Book Basis of any Company asset is adjusted pursuant to Section 3.6(c) of this Agreement, the amount of such adjustment shall be taken into account as gain or loss for purposes of computing Net Loss and Net Profit;

(vii)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the

disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss; and

(viii)   notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.3 or Section 5.4 of this Agreement shall not be taken into account in computing Net Profit or Net Loss.

"Non-Selling Members" has the meaning ascribed to such term in Section 7.1(b)(i).

"Nonrecourse Deductions" has the meaning of such term set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" means any liability of the Company treated as a nonrecourse liability under Section 1.704-2(b)(3) of the Regulations.

"Offer" has the meaning ascribed to such term in Section 7.1(b).

"Offer Notice" has the meaning ascribed to such term in Section 7.1(b)(i).

"Operating Expenses" means all ordinary costs and expenses of operating the Company and its business, determined in accordance with generally accepted accounting principles (adjusted to exclude depreciation and amortization expenses).

"Operating Revenues" means the sum of (a) all operating revenues of the Company determined in accordance with generally accepted accounting principles, excluding Capital Contributions, and (b) the net proceeds of any insurance, other than title or fire and extended coverage.

"Operational Default" means (a) any failure of the Company to (i) generate consolidated EBITDA of not less than $2,100,000 for the twelve (12) month period commencing on June 1, 1998 and ending on May 31, 1999;  (ii) generate consolidated EBITDA of not less than $4,700,000 the twelve (12) month period commencing on June 1, 1999 and ending on May 31, 2000, (iii) enter into an agreement with respect to a Capital Event by June 1, 2000, which agreement provides for consideration in an amount of at least the Minimum Net Proceeds, (iv) consummate a Capital Event which results in the receipt of consideration in an amount of at least the Minimum Net Proceeds on or before October 1, 2000, (v) meet the conditions set forth in Section 6.4 or (b) the failure of Lion ALH Capital LLC or its assignee to contribute to the Company the Class E Capital Contribution pursuant to Section 3.2 or (c) any breach by the Company of its representations in the subscription agreement between the Company and the Class A Members.

"Permitted Transferee" has the meaning ascribed to such term in Section 7.1(a).

"Person" means and includes an individual, corporation, company, partnership, association, limited liability company, limited liability partnership, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Preferred Return" means, with respect to the Class A Members, Class B Members and Class C Member, respectively, an amount equal to twenty seven percent (27%) per annum (determined on the basis of a year of 365 days for the actual number of days in the period for which such Preferred Return is being determined, cumulative and compounded annually to the extent not distributed in any Fiscal Year pursuant to Section 4.1(c) of this Agreement) of the average daily balance of the Unrecovered Class A Capital, Unrecovered Class B Capital or Class C Amount, as the case may be, from time to time during the period to which the Preferred Return relates, calculated from the date of the respective Capital Contributions or, with respect to the Class C Amount, the date hereof.

"Provisional Budget" has the meaning ascribed to such term in Section 6.4.

"Public Sale" means any sale of (i) Membership Interests (or of securities or other interests representing ownership in any successor entity of the Company) or (ii) shares of common stock or other equity securities of any Subsidiary, in either case, to the public pursuant to an offering registered or required to be registered under the Securities Act or pursuant to the provisions of Rule 144A adopted under the Act.

"Regulations" means the regulations, including any temporary and proposed regulations, promulgated by the U.S. Treasury Department under the Code, as such regulations may be amended from time to time (including corresponding provisions of any succeeding regulations).

"Regulatory Allocations" has the meaning ascribed to such term in Section 5.4.

"Removal Notice" has the meaning ascribed to such term in Section 6.1(b).

"Representatives" has the meaning ascribed to such term in Section 6.2(a) of this Agreement.

"Securities Act" means the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder.

"Selling Member" has the meaning ascribed to such term in Section 7.1(b).

"Subsidiary" means any corporation, company, joint venture or other entity more than 40% of whose outstanding shares, securities or other equity interests representing the right to vote, exercise management authority or make decisions is owned, directly or indirectly, by the Company, including, without limitation, ALH, Landmark Homes of Florida, Inc., a Florida corporation, ALH Acquisition Corp., a Delaware corporation, Atlantic Builders, Inc., a Florida corporation, Atlantic Development of Jacksonville Corp., a Florida corporation, and Florida Lifestyle Homes, Inc., a Florida corporation.

"Subsidiary Board" has the meaning ascribed to such term in Section 6.3 of this Agreement.

"Supervisory Board" has the meaning ascribed to such term in Section 6.2(a) of this Agreement.

"Transfer", when used as a noun, means any sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means to sell, hypothecate, pledge, assign, attach or otherwise transfer.

"Tax Matters Member" has the meaning ascribed to such term in Section 9.5 of this Agreement.

"Unrecovered Capital" means (i) with respect to the Class A Members, as of any date, the Unrecovered Class A Capital, (ii) with respect to the Class B Members, as of any date, the Unrecovered Class B Capital and (iii) with respect to the Class E Member, as of any date, the Unrecovered Class E Capital.

"Unrecovered Class A Capital" means, as of any date, an amount equal to the excess, if any, of (y) $10,000,000 (as adjusted for any additional capital contribution made by a Class A Members) over (z) the cumulative amount of any money and the Fair Market Value of any Company property previously distributed to the Class A Members under Section 4.1)(b)(i) of this Agreement.

"Unrecovered Class B Capital" means, as of any date, an amount equal to the excess, if any, of (y) $6,000,000 (as adjusted for any additional capital contribution made by the Class B Members) over (z) the cumulative amount of any money and the Fair Market Value of any Company property previously distributed to the Class B Members under Section 4.1(b)(ii) of this Agreement.

"Unrecovered Class E Capital" means, as of any date after the Class E Capital Contribution has been contributed in full to the Company, an amount equal to the excess, if any, of (y) $7,600,000 (as adjusted for any additional capital contribution made by the Class E Member other than pursuant to Section 3.2 of this Agreement) over (z) the cumulative amount of any money and the Fair Market Value of any Company property previously distributed to the Class E Member under Sections 4.1(a), (c) or (d) of this Agreement.

## ARTICLE II
### FORMATION AND NAME; OFFICE; PURPOSE; TERM

2.1    Organization. The Company was formed as a limited liability company pursuant to the Act by the filing with the Secretary of the State of Delaware of a Certificate of Formation on June 3, 1998.

2.2    Name of the Company. The name of the Company shall be ALH Holdings LLC.

2.3    Purpose. The Company shall have all the powers provided for a limited liability company under the Act. The primary purpose of the Company shall be to act directly or indirectly as a holding company with respect to one or more operating companies engaged in the businesses of home building or land development and businesses ancillary thereto, including, without limitation, American Landmark Homes Corporation, Landmark Homes of Florida, Inc. and Atlantic Builders, Inc.

2.4    Term. The term of the Company began upon the effective date of the Certificate of Formation, and the Company shall continue in existence without interruption until December 31, 2020, unless sooner dissolved pursuant to the provisions of this Agreement or the Act.

2.5    Principal Office. The principal office of the Company shall be located at Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, or at such other place as the Manager may designate.

2.6    Resident Agent. The name and address of the Company's resident agent
in the State of Delaware for service of process shall be the Corporation Trust Company,
1209 Orange Street, Wilmington, Delaware 19801. Copies of process are to be sent to
the principal office of the Company as provided for in Section 2.5 of this Agreement.

## ARTICLE III
## MEMBERS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1    Capital Contributions.

(a)    Pursuant to the terms of those certain subscription agreements,
dated as of June 12, 1998, between each of the Class A Members and the Company, upon
execution of this Agreement each of the Class A Members shall contribute to the
Company the amount set forth opposite its name on Exhibit A, comprising $10,000,000
in the aggregate (the "Class A Capital Contribution") in exchange for the percentage
interest in the Class A Membership Interest set forth opposite such Class A Member's
name on Exhibit A.

(b)    Pursuant to the terms of those certain subscription agreements,
dated as of June 12, 1998, between each of the Class B Members and the Company, upon
execution of this Agreement each of the Class B Members shall contribute to the
Company the amount set forth opposite its name on Exhibit B (in cash unless otherwise
set forth on Exhibit B), comprising $6,000,000 in the aggregate (the "Class B Capital
Contribution") in exchange for the percentage interest in the Class B Membership Interest
set forth opposite such Class B Member's name on Exhibit B.

(c)    Pursuant to the terms of that certain subscription agreement, dated
as of June 12, 1998, between Landmark Equity LLC and the Company, upon execution of
this Agreement Landmark Equity LLC shall contribute the property set forth on Exhibit C
to the Company free and clear of all claims, mortgages, pledges, liens, charges, security
interests and encumbrances in exchange for a 100% Class C Membership Interest. The
Company, the Class A Members, the Class B Members, the Class C Member, the Class D
Member and the Class E Member agree that, for purposes of attributing a dollar amount
to such property for purposes of this Section 3.1, the value of such property on the date
contributed by the Class C Member to the Company is $1.00 (the "Class C Capital
Contribution").

(d)    Pursuant to the terms of that certain subscription agreement, dated
as of June 12, 1998, between Lion LLC and the Company, upon execution of this
Agreement Lion LLC shall contribute the property set forth on Exhibit C to the Company
free and clear of all claims, mortgages, pledges, liens, charges, security interests and

DO NY/83845.17                              13

encumbrances. The Company, the Class A Members, the Class B Members, the Class C Member, the Class D Member and the Class E Member agree that, for purposes of attributing a dollar amount to such property for purposes of this Section 3.1, the value of such property on the date contributed by the Class D Member to the Company is $1.00 (the "Class D Capital Contribution").

    3.2    Additional Capital Contributions. On or prior to September 1, 1998, pursuant to the terms of that certain subscription agreement, dated as of June 12, 1998, between Shalom E. Lamm and the Company, the Class E Member shall contribute to the Company in one or more installments (either in cash for the satisfaction of the American Debt or by direct satisfaction of the American Debt on behalf of ALH) an amount of $5,600,000, in payment of that portion of the American Debt owed to Arbor National Commercial Mortgage (the "Arbor Debt") and $2,000,000 in payment of that portion of the American Debt owed to Eugene Elovic (the "Elovic Debt") plus the Discount Amount, if any, plus the Interest Amount, if any (such amount, the "Class E Capital Contribution") in exchange for an aggregate 100% Class E Membership Interest. Upon the occurrence of an event that gives rise to an obligation of the Company to make payment of any Interest Amount on the Elovic Debt and/or the Arbor Debt, then the Class E Member shall make further contributions to the Company from time to time promptly following the occurrence of any such event in the amount of such Interest Amount. The Company, the Class A Members, the Class B Members, the Class C Member, the Class D Member and the Class E Member agree that, if the Class E Capital Contribution is made in cash, the Class E Capital Contribution (or such lessor amount as may be paid in full satisfaction of the American Debt) will be used to satisfy the American Debt on behalf of ALH.

    3.3    No Other Capital Contributions Required. Except as set forth in Section 3.2, no Member shall be required to contribute any additional capital to the Company and, except as set forth in the Act or as a result of the failure to make a contribution required pursuant to Section 3.2 of this Agreement, no Member shall have any personal liability to the Company, to any other Member of the Company, or to any other person with respect to any obligations of the Company.

    3.4    No Interest on Capital Contributions. Members shall not be paid interest on their Capital Contributions.

    3.5    Return of Capital Contributions. Except as otherwise expressly provided in this Agreement, no Member shall have the right to receive the return of any Capital Contribution.

3.6   Capital Account Maintenance.

(a)    Each Member shall have a Capital Account maintained in accordance with the capital account maintenance requirements of Section 1.704-1(b)(2)(iv) of the Regulations.

(b)    Without limiting the generality of the foregoing, each Member's Capital Account shall be increased by (i) the amount of any money contributed by such Member to the Company, (ii) the Fair Market Value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752), and allocations to such Member of Net Profit and any items in the nature of income, or gain which are specially allocated to such Member pursuant to Section 5.3 or Section 5.4 of this Agreement, and each Member's Capital Account shall be decreased by (x) the amount of any money distributed to such Member by the Company, (y) the Fair Market Value property distributed to such Member by the Company (net of liabilities secured by such distributed property that the distributee Member is considered to assume or take subject to under Code Section 752), and (z) allocations to such Member of Net Loss and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to Section 5.3 or Section 5.4 of this Agreement. The Capital Account of each Member shall be appropriately adjusted for income, gain, loss and deduction as required by Section 1.704-1(b)(2)(iv)(g) of the Regulations (relating to allocations and adjustments resulting from the reflection of property on the books of the Company at book value, or a revaluation thereof, rather than at such property's adjusted tax basis).

(c)    (i)    Consistent with the provisions of Treasury Regulations Section 1.704-l(b)(2)(iv)(f) of the Regulations, and as provided in Section 3.6(c)(ii) of this Agreement, the Book Basis of Company property, and correspondingly, the balances of the Capital Accounts of the Members, shall be adjusted upward or downward to reflect any unrealized income, gain, loss or deduction inherent in such Company property (that has not been previously reflected in the Capital Accounts of the Members), as of the times of the adjustments provided in Section 3.6(c)(ii) of this Agreement, as if such unrealized income, gain, loss or deduction had been recognized on an actual sale of each such property.

(ii)    Such adjustments shall be made as of the following times: (A) immediately prior to the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) immediately prior to the distribution by the Company to a Member of more than a de minimis amount of money or other Company property as consideration for an interest in the Company; and (C) immediately prior to the liquidation of the Company within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Regulation; provided, that adjustments

pursuant to clauses (A) and (B) above shall be made only if the Manager determines in its sole discretion that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(iii)  In determining unrealized income, gain, loss or deduction for purposes of this Section 3.6(c), the Fair Market Value of all Company assets shall be determined by the Manager using such reasonable method of valuation as it may adopt. The Manager shall allocate such aggregate value among the assets of the Company in such manner as it reasonably determines to arrive at a Fair Market Value for individual properties.

(d)  In the event that any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

(e)  The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Account, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or which are assumed by the Company or one or more of the Members), are computed in order to comply with such Regulations, the Manager may make such modification.  The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between a Member's Capital Account and the amount of Company capital of such Member reflected on the Company's balance sheet, as computed for book purposes in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations, and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.  Notwithstanding the preceding two sentences, the Manager may not make any modification pursuant to this Section 3.6(e) that would have a material adverse effect on any Member without the consent of such Member.

### ARTICLE IV
### DISTRIBUTIONS

4.1  Distributions.

(a)  Except as otherwise provided in this Section 4.1, the timing and amount of any distributions to the Members shall be determined by the Supervisory Board pursuant to Section 6.2.

DO NY/83645.17                    16

(b)     Upon the occurrence of a Capital Event, the Net Proceeds and other Available Funds shall be distributed to the Members as follows:

(i)     first, on a pari passu basis, to the Class A Members (in proportion to their respective percentage interests in the Class A Membership Interest) and the Class B Members, in an amount equal to their respective aggregate accrued but unpaid Preferred Return as of the date of the distribution;

(ii)     second, on a pari passu basis, to the Class A Members (in proportion to their respective percentage interest in the Class A Membership Interest) and the Class B Members in an amount equal to the Unrecovered Class A Capital and Unrecovered Class B Capital, respectively, as of the date of the distribution;

(iii)     third, to the Class E Member in an amount equal to the Unrecovered Class E Capital, as of the date of the distribution;

(iv)     fourth, after the Company has made the Ash Payment, to the Class C Member in an amount equal to its aggregate accrued but unpaid Preferred Return as of the date of the distribution;

(v)     fifth, to the Class C Member in an amount equal to the Class C Amount as of the date of the distribution;

(vi)     then, with respect to distributions in an aggregate amount up to and including $20,000,000:  (x) thirty-one and a quarter percent (31.25%) of such distributions to the Class A Members (in proportion to their respective percentage interests in the Class A Membership Interest), (y) eighteen and three quarters percent (18.75%) of such distributions to the Class B Members, and (z) fifty percent (50%) of such distributions to the Class D Member; and

(vii)     thereafter, with respect to any other distributions:  (x) twenty five percent (25%) of such distributions to the Class A Members (in proportion to their respective percentage interests in the Class A Membership Interest), (y) fifteen percent (15%) of such distributions to the Class B Member, and (z) sixty percent (60%) of such distributions to the Class D Member.

(c)     In the event that the Supervisory Board determines pursuant to Section 6.2 to make any distributions of Available Funds, such distributions shall be made to the Members in accordance with the provisions of Section 4.1(b), without regard to the Ash Payment.

4.2    Limitation Upon Distributions. Notwithstanding anything to the contrary contained or implied in this Agreement, no distribution shall be made to any Member if prohibited by Sections 18-601 through 18-607 of the Act.

# ARTICLE V
# ALLOCATIONS

5.1    Allocation of Net Profit or Net Loss.

(a)    If any Member has a negative Capital Account balance at the end of any Fiscal Year (or other period), Net Profit for such Fiscal Year (or other period) shall first be allocated among those Members (and credited to their capital accounts) with negative capital account balances in proportion to their respective negative capital account balances until such negative balances are reduced to zero. Net Profit (in excess of Net Profit allocated under the preceding sentence) or Net Loss for each Fiscal Year (or other period) shall be allocated among the Members (and credited or debited to their Capital Accounts) in such manner that were the Company to liquidate completely at the end of such Fiscal Year (or other period) and in connection with such liquidation (i) sell all of its assets and settle all of its liabilities at their then Book Values (i.e., without any Net Profit or Net Loss resulting therefrom), and (ii) distribute its remaining cash to the Members in accordance with their respective positive Capital Account balances (after crediting or debiting Capital Accounts for Net Profit or Net Loss for such Fiscal Year (or other period)) (the "Hypothetical Capital Account Distribution"), the resulting distribution would correspond as closely as possible to the distributions that would result if the liquidating distributions had instead been made in accordance with the provisions of Section 4.1 (the "Hypothetical Section 4.1 Distribution"). For purposes of maintaining the Capital Accounts, items of income, gain, loss, deduction, expense and credit shall be allocated to the Members in the same manner as are Net Profits and Net Losses, except where otherwise necessary to more closely conform the Hypothetical Capital Account Distribution with the Hypothetical Section 4.1 Distribution.

(b)    For tax purposes, all items of income, gain, loss, deduction, expense and credit, other than tax items corresponding to items allocated pursuant to Section 5.3 (which shall be allocated in the same manner as items allocated pursuant to that section), shall be allocated to the Members in the same manner as are Net Profits and Net Losses, provided, however, that in accordance with Section 704(c) of the Code, the Treasury Regulations promulgated thereunder and Treas. Reg. Section 1.704-1(b)(4)(i), items of income, gain, loss, deduction, expense and credit with respect to any property whose Book Value differs from its adjusted basis for tax purposes shall, solely for tax purposes, be allocated between the Members so as to take account of both the amount and character of such variation. Any elections or other decisions relating to such allocations

DO NY/83845.17                                18

(including, under Section 1.704-3 of the Regulations, whether to use the traditional method, the traditional method with curative allocations or the remedial method) shall be made by the Tax Matters Member (as hereafter defined) after consultation with the other Members in any manner that reasonably reflects the purpose and intention of this Agreement.

(c)    Notwithstanding any other provision of this Agreement, in no event shall Net Losses be allocated to a Member if such allocation would result in such Member having a negative capital account balance in excess of such Member's share of "minimum gain" and "partner minimum gain" (as defined below).

For purposes of applying this Section 5.1 a Member's Capital Account shall be increased by such Member's share of "minimum gain" and "partner minimum gain" (within the meaning of Treasury Regulations under Section 704(b) of the Code).

5.2    Tax Credits. Except to the extent otherwise provided in Section 1.704-1(b)(4)(ii) of the Regulations, (i) any tax credits for any Fiscal Year shall be allocated among the Members in accordance with, and in proportion to, each Member's allocable share of taxable net income in the Fiscal Year such tax credit arises, and (ii) any tax credit recapture for any Fiscal Year shall be allocated to those Members who received the tax credits to which such recapture relates.

5.3    Special Allocations. Notwithstanding any provision of Section 5.1, the following special allocations shall be made for each Fiscal Year (or portion thereof) in the following order:

(a)    Membership Minimum Gain. Except as otherwise provided in Section 1.704-2(f) of the Regulations, if there is a net decrease in Membership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in proportion to and to the extent of, an amount equal to the portion of such Member's share of the net decrease in Membership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations. This Section 5.3(a) is intended to comply with the chargeback of items of income and gain requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(b)    Minimum Gain Attributable to Member Nonrecourse Debt. Except as otherwise provided in Section 1.704-2(i) of the Regulations, if there is a net decrease in Minimum Gain Attributable to Member Nonrecourse Debt during any Fiscal Year of the Company, each Member with a share of Minimum Gain Attributable to Member Nonrecourse Debt shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in proportion to, and to the

extent of, an amount equal to the portion of such Member's share of the net decrease in the Minimum Gain Attributable to Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Regulations. This Section 5.3(b) is intended to comply with the chargeback of items of income and gain requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 5.3(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit (determined, without duplication, after the adjustments set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations and after adjusting such Member's Capital Account upward for any obligation to restore pursuant to Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations) after all other allocations provided for in this Article V have been tentatively made as if this Section 5.3(c) were not in this Agreement.

(d)    Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year which is in excess of the amount such Member is obligated to restore or is deemed to be obligated to restore pursuant to Sections 1.704-2(g) and 1.704-2(i)(5) of the Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 5.3(d) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit (determined, without duplication, after reducing such Member's Capital Account for the items set forth in Section 1.704-1(b)(2)(ii)(d) of the Regulations and after adjusting such Member's Capital Account upward for any amounts such Member is obligated to restore or is deemed obligated to restore pursuant to Sections 1.704-2(g) and 1.704-2(i)(5) of the Regulations) in excess of such amount after all other allocations provided for in this Article V have been tentatively made as if Section 5.3(c) of this Agreement and this Section 5.3(d) were not in this Agreement.

(e)    Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be allocated to the Members in the same ratio that Net Profit or Net Loss, as the case may be, is allocated for the Fiscal Year in accordance with Section 1.704-2(b)(1) of the Regulations. If the Manager determines in its good faith discretion that the Nonrecourse Deductions must be allocated in a different ratio to satisfy the safe harbor requirements of the Regulations promulgated under Section 704(b) of the Code, the

Manager is authorized, upon written notice to other Members, to revise the prescribed ratio to the numerically closest ratio that does satisfy such requirements.

(f)     Member Nonrecourse Deductions. Member Nonrecourse Deductions for any Fiscal Year shall be allocated 100% to the Member that bears the economic risk of loss (as defined in Section 1.704-2(b) of the Regulations with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i) of the Regulations). If more than one Member bears the economic risk of loss with respect to a Member Nonrecourse Debt, such Member Nonrecourse Deductions attributable thereto shall be allocated between or among such Members in accordance with the ratios in which they share such economic risk of loss.

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(c) is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations.

5.4     Curative Allocations. The allocations set forth in Sections 5.3(a) through (g) above (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2(b). Notwithstanding any other provisions of this Article V (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred. In determining the allocations under this Section 5.4 consideration shall be given to future allocations under Sections 5.3(a) and 5.3(b) that, although not yet made or required, are likely to offset other relevant allocations under this Article V.

5.5     Allocations to Transferred Interests in the Company. In the event of a transfer of any Membership Interest, regardless of whether the transferee becomes a Member, all items of income, gain, loss, deduction and credit for the Fiscal Year in which the transfer occurs shall be allocated for United States federal income tax purposes between the transferor and the transferee on a pro rata basis based upon the actual number of days during such Fiscal Year that each of the transferor and the transferee held that

Membership Interest, except to the extent otherwise required by Code Section 706(d). Distributions made on or after the effective date of transfer shall be made to the transferee, regardless of when such distributions accrued on the books of the Company. The effective date of the transfer shall be (a) in the case of a voluntary transfer, the date on which the Manager receives written notice of the transfer, or (b) in the case of an involuntary transfer, the date of the operative event.

5.6    Company Adjustments. Upon a transfer of a Membership Interest (within the meaning of "transfer of an interest in a partnership" in Code Section 743), or upon the death of a Member, the Company shall, if requested by any Member, elect in a timely manner pursuant to Code Section 754 and pursuant to corresponding provisions of applicable state and local tax laws, to adjust the basis of the assets of the Company pursuant to Code Sections 734 and 743.

## ARTICLE VI
## MANAGEMENT OF THE COMPANY AND SUBSIDIARIES

6.1    Manager.

(a)    Subject to the terms of this Agreement, the overall business, operations and affairs of the Company shall be managed by a manager designated pursuant to the terms of this Agreement (the "Manager") in the ordinary course of business, in compliance with applicable law and the terms of this Agreement. Subject to the terms of Section 6.1(b), the Manager of the Company shall be Lion LLC (the "Initial Manager"). The initial officers of the Company shall be the individuals as set forth on Exhibit D hereto, who shall hold the offices set forth opposite their respective names on Exhibit D until replaced as provided herein. No Member acting alone, other than the Manager acting as authorized pursuant to this Agreement, shall have any right, power or authority to bind the Company.

(b)    In the event of an Operational Default, then (i) the Class A Members acting by a Class A Vote (the "Removal Notice"), shall be entitled to (x) appoint a Manager to replace the Initial Manager; (y) remove and replace the Class D Representatives appointed pursuant to Section 6.2(b)(iii) and those directors appointed pursuant to Section 6.3(d); provided that a Removal Notice (1) shall be given to all other Members not less than five (5) business days, following such removal and appointment; (2) sets forth the names of individuals designated to replace such Class D Representatives and directors; and (3) is signed on behalf of the Class A Members and (z) remove and replace any or all officers of the Company.

DO NY/83645.17                                    22

6.2    Supervisory Board.

(a)    Except as provided elsewhere herein, Major Decisions (as defined herein) shall be decided upon only by the Members, acting through a Supervisory Board (the "Supervisory Board") as provided in Section 6.2(c). The Supervisory Board shall be comprised of five individual representatives (the "Representatives") appointed by the Members pursuant to Section 6.2(b). Any Representative on the Supervisory Board may be removed or replaced at any time, with or without cause, by the Class represented by such Representative, effective immediately upon notice to the Members of the other Classes. Each Representative shall be an officer, director of, or holder of a direct or indirect equity interest in, a Member or an officer or director of a corporation controlled by a Member. Each Representative may, from time to time, designate a deputy representative, by duly executed power of attorney (each, a "Deputy Representatives") and written notice to the Company and each of the Members, to attend and vote at Supervisory Board meetings in such Representative's absence. A reasonable number of Deputy Representatives or other assistants to the Representatives may also attend meetings of the Supervisory Board at which the applicable Representative is present.

(b)    Each Class shall (from time to time as necessary) vote such Class' Membership Interest to nominate and elect to the Supervisory Board (or remove therefrom as directed in writing by the Class nominating such director) the Representatives designated separately by Members (or classes thereof) to serve on the Supervisory Board as follows:

(i)    the Class A Members shall be entitled and required (acting by Class A Vote) to designate two Representatives to serve on the Supervisory Board (the "Class A Representatives");

(ii)    the Class B Members shall be entitled and required (acting by a Class B Vote) to designate one Representative to serve on the Supervisory Board (the "Class B Representative"); and

(iii)    until the occurrence of an Operational Default, the Class D Member shall be entitled and required to designate two Representatives to serve on the Supervisory Board (the "Class D Representatives") and after the occurrence of an Operational Default such Class D Representatives shall be designated by the Class A Members.

(c)    The following matters (each, a "Major Decision") may be decided only upon (and the Company or any Subsidiary, and the Manager and the officers of the Company or such Subsidiary on its behalf, shall not take any action relating to such matters without) the adoption of a resolution by (y) the Class A Representatives or their

23

Deputy Representatives present in person or by proxy at a meeting of the Supervisory Board or (z) the unanimous written consent of the Class A Representatives or their Deputy Representatives for action taken without a meeting:

        (i)      The consolidation, combination or merger of the Company or any Subsidiary with or into any other Person or the sale, disposition, assignment, transfer or lease of (y) all or substantially all the assets or (z) any securities of, or other ownership interest in, the Company or any Subsidiary to another Person (other than a pledge of assets as security for a loan) including, without limitation, a Public Sale (each such occurrence, a "Capital Event");

        (ii)     The acquisition by the Company or any Subsidiary of all or substantially all the assets of or securities or other ownership interest in any other Person;

        (iii)    Subject to Section 10.6, any modification of or amendment to this Agreement;

        (iv)    The engagement by the Company in any business other than the business described in this Agreement;

        (v)      The making of any loan(s) to, or guarantee(s) of any obligation(s) of, any Person, or causing the Company or any Subsidiary to become a surety, guarantor or accommodation party, other than any guarantee(s) required under the Credit Facility;

        (vi)    The issuance or sale (or the offer to issue or sell) to any Person of any Membership Interest or other interest or participation in the profits, losses, assets, properties, capital or business of the Company or any Subsidiary;

        (vii)   Any distribution of cash flow, capital proceeds or other assets or property by the Company or any Subsidiary to any Member other than in accordance with Sections 4.1 and 5.1 of this Agreement;

        (viii)  Any change of the Company's or any Subsidiary's Fiscal Year;

        (ix)    The establishment, amendment or modification of rules for the operation of the Supervisory Board or similar governing body of any Subsidiary, including, without limitation, levels of authority for the officers of the Company or any Subsidiary;

(x)    The incurrence of any indebtedness for borrowed money (other than borrowings under a Credit Facility) from any Person (including any Member) or the granting of any lien, pledge, mortgage or security interest on any assets of the Company or any Subsidiary other than in the ordinary course of the Company's or any Subsidiary's business;

(xi)    The taking of any action that would constitute a Bankruptcy of the Company or any Subsidiary;

(xii)    The assignment, transfer, pledge, compromise or release of any claim or debt due to the Company or any Subsidiary, which assignment, transfer, pledge, compromise or release is for an amount in excess of $500,000;

(xiii)    Any settlement of any claim, litigation or proceeding, which settlement would require payments by the Company or any Subsidiary aggregating in excess of $500,000, or the commencement of any litigation or proceeding against any Person;

(xiv)    The approval of the Annual Budget or any amendment thereto by the Company or any Subsidiary;

(xv)    The making of any capital expenditure by the Company or any Subsidiary (other than for the purchase of land for development or other purchases of equipment, in each case in the ordinary course of the Company's or any Subsidiary's business and as is consistent with the Annual Budget or provisional budget, as applicable) in excess of $50,000 or which exceeds any budgeted amount in any Annual Budget or Provisional Budget by more than twenty percent 20% of such budgeted amount;

(xvi)    The removal or replacement of any of the five (5) most highly compensated employees of the Company (including for this purpose, employees of any Subsidiary);

(xvii)    The execution by the Company or any Subsidiary of any contract or agreement (x) with any Affiliate of the Company or any Member, (y) which requires aggregate payments by the Company over the term thereof in excess of $100,000 or (z) the fixed term of which extends beyond the second anniversary of the date of this Agreement;

(xviii)    The contribution by the Company of any capital to Landmark Homes of Florida, Inc. (other than capital in an amount of up to

$3,250,000 to be contributed to Landmark Homes of Florida, Inc. out of the Capital Contributions being made to the Company on the date hereof;

(xix)  Any modification or amendment to any Credit Facility (other than any modification or amendment which does not increase the amount of any such Credit Facility);

(xx)  the taking of any action (A) other than in the ordinary course of business or (B) not in compliance with the Annual Budget or Provisional Budget (as the case may be), except as may be permitted pursuant to Section 6.2(c)(xv) above or as may otherwise constitute immaterial deviations from the Annual Budget or Provisional Budget; and

(xxi)  any increase in the Ash Payment or any acceleration of the time or priority of its payment or any granting of security for such payment.

(d)    Meetings of the Supervisory Board shall be held at the Company's principal place of business or such other place as the Supervisory Board may agree and at such regular times not less frequently than once each calendar month as may be specified by the Manager and, in addition, special meetings may be called by any Member by giving at least five (5) Business Days prior notice thereof to each of the Representatives. Notice of each meeting shall be in writing and shall state the date, time and place at which such meeting is to be held and the purposes for which such meeting is called. An annual meeting of the Supervisory Board shall be held no later than sixty (60) days prior to the beginning of each Fiscal Year or at such other time and place as the Representatives may mutually designate.

(e)    The attendance of a Representative (or his or her Deputy Representative) at a meeting shall constitute a waiver of notice of such meeting. Subject to Section 6.2(c), the presence at a meeting of at least four Representatives (or Deputy Representatives) shall constitute a quorum for the transaction of all business of the Supervisory Board. Any meeting of the Supervisory Board which is properly called and at which a quorum is present may be adjourned to a date which is no later than twenty-one (21) days from the date upon which the initial meeting was called. A Representative (or his or her Deputy Representative) may vote either in person or by written proxy signed by the Representative (or his or her Deputy Representative) or by his or her duly authorized attorney-in-fact. Each Representative (or his or her Deputy Representative) shall have one vote on all matters presented to the Supervisory Board for approval, and except with respect to a Major Decision, the vote of a majority of the Representatives at a meeting which is properly called and at which a quorum is present shall be binding on the Supervisory Board. Any action taken by the Representatives (or his or her Deputy Representatives) pursuant to this Agreement shall be binding on such

DO NY/83845.17                                              26

Member. Any action required or permitted to be taken at a meeting of the Supervisory Board may be taken (i) by means of a telephone conference in which all Persons participating in the meeting and constituting a quorum can hear and speak to each other or (ii) by means of unanimous written consent executed by all of the Representatives (or Deputy Representatives) representing all Representatives. All action taken pursuant to the immediately preceding sentence shall be deemed for all purposes to have been taken at a meeting of the Supervisory Board.

(f)    Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence. Nothing in this Section 6.2(f) shall be deemed to make the Manager or any Representative or Deputy Representative liable, responsible or accountable to any Person other than the Company or the Members.

6.3    Subsidiary Boards of Directors. Subject to the terms of Section 6.1(b), each Class shall (from time to time as necessary) vote such Class' Membership Interest to nominate and elect to the board of directors of ALH or any other Subsidiary, as the case may be (each a "Subsidiary Board") (or remove therefrom as directed in writing by the Class nominating such director) the directors designated separately by the Classes to serve on such Subsidiary Board as follows:

(a)    the Class A Members shall be entitled and required (acting by Class A Vote) to designate two directors to serve on a Subsidiary Board;

(b)    the Class B Members shall be entitled and required (acting by Class B Vote) to designate one director to serve on a Subsidiary Board;

(c)    the Class A Members and the Class B Member (acting by a Class A Vote and a Class B Vote, respectively) shall be entitled and required to jointly designate one director to serve on a Subsidiary Board; and

(d)    until the occurrence of an Operational Default the Class D Member shall be entitled and required to designate two directors to serve on a Subsidiary Board and thereafter the Class A Members shall have the right to designate such directors.

6.4    Annual Budget. Not later than sixty (60) days prior to the commencement of each Fiscal Year, the Manager shall prepare and submit to the Supervisory Board a draft of annual capital and operating budgets, business plan and cash flow projections for

such Fiscal Year of the Company (the "Draft Annual Budget"). Promptly following the submission of the Draft Annual Budget, and in any event not later than ten (10) days after such submission, the Supervisory Board shall review and consider the Draft Annual Budget, make such revisions or amendments thereto as the Supervisory Board shall deem appropriate and adopt the Draft Annual Budget as so revised or amended (such budget as adopted and as revised or amended by the Supervisory Board with, where applicable, the approval of the Class A Representatives, the "Annual Budget") and shall submit the Annual Budget to the Class A Representatives for approval. Promptly thereafter, the Class A Representatives shall review the Annual Budget and, subject to receipt of the Draft Annual Budget as provided above, not later than fifteen (15) days prior to the commencement of the Fiscal Year, shall notify the Supervisory Board and the Manager of its approval or disapproval of the Annual Budget and, in the case of its disapproval, shall provide in reasonable detail the reasons for its disapproval. If the Class A Representatives shall have disapproved the Annual Budget, the Manager and the Class A Representatives shall consult in good faith to agree on the Annual Budget. If, following such consultation, the Class A Representatives do not approve the Annual Budget on or before the commencement of any Fiscal Year, a provisional budget (calculated as provided below) (the "Provisional Budget") shall be used until such time as an Annual Budget is approved by the Class A Representatives, and all references to Annual Budget shall be to such Provisional Budget. The Provisional Budget shall be calculated as follows: for items constituting expenses, the Provisional Budget amount shall be equal to the greater of (i) 100% of the actual expenditures for such items in the immediately preceding Fiscal Year or (ii) the lesser of the amounts adopted by the Supervisory Board or proposed by the Class A Representatives, respectively, in their discussions of the Annual Budget for such Fiscal Year. For other items, the Provisional Budget amount shall be the amounts adopted by the Supervisory Board.

While the Provisional Budget is in effect, the Manager and the Class A Representatives shall consult in good faith to agree on an Annual Budget. Notwithstanding the foregoing, if an Annual Budget is not approved by the Class A Representatives, in the exercise of their reasonable judgment within three months after commencement of any Fiscal Year, then commencing on the first day of the fourth month of such Fiscal Year, an Operational Default shall be deemed to have occurred.

    6.5    Member Voting.

    (a)    In the event that pursuant to the Act or this Agreement, the Members are entitled or required or choose to vote on any matter, each Member shall have the number of votes set forth below:

| Member | Number of Votes |
|--------|-----------------|
| Class A Members | 10 |
| Class B Member | 6 |
| Class C Member | 1 |
| Class D Member | 1 |
| Class E Member | 1 |

(b)    In the case of any vote cast by the Class A Members or Class B Member, as the case may be, any such vote shall be by a Class A Vote or Class B Vote as applicable.

6.6    Limitation on Authority of Members.

(a)    No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

(b)    Any Member who takes any action or binds the Company in violation of this Article VI shall be solely responsible for any loss and expense incurred by the Company or any other Member as a result of the unauthorized action and shall indemnify and hold the Company and any such other Member harmless with respect to the loss or expense, including any reasonable attorney fees.

**ARTICLE VII**
**TRANSFERS OF INTERESTS**

7.1    Transfers.

(a)    Except as set forth herein, no Member may Transfer all or any portion of such Member's Membership Interest except with the prior written consent of each Member, which consent may be given or withheld in the sole discretion of such Member, or as provided in Section 7.1(b). The Transfer of any Membership Interest in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom a Membership Interest is attempted to be transferred in violation of this Section 7.1 shall not be entitled to vote on matters coming before the Supervisory Board or the Members, appoint Representatives (or Deputy Representatives) to serve on the Supervisory Board, participate in the management of the Company, receive distributions (liquidating or otherwise) from the

Company, or have any other rights in or with respect to such Membership Interest. Notwithstanding the above, subject to such transfer being permitted, as determined by the Manager in its reasonable judgment, under applicable securities laws, any Member may transfer such Member's Membership Interest, or a percentage interest therein, to one or more Permitted Transferees; provided that no such transfer shall be permitted if it would cause the Company to be an investment company required to be registered under the Investment Company Act of 1940, as amended; and provided further that no such transfer shall be effective until the Permitted Transferee becomes a party to this Agreement, and any applicable securities law requirements have been met to the Manager's reasonable satisfaction. For purposes of this Section 7.1 "Permitted Transferee" means any spouse, parent or child of any Member or any trust established for the benefit of any such spouse, parent or child, or, in the case of a Class A Member, any Affiliate of a Class A Member or any officer, director or employee of a Class A Member or any Affiliate thereof.

(b)    Right of First Refusal. In the event of the Bankruptcy, dissolution or liquidation of any Member, if such Member or its successor, trustee or other Person acting on its behalf (the "Selling Member") shall propose to sell all or any portion of its Membership Interest pursuant to a bona fide written offer (an "Offer"), then:

(i)    promptly following receipt of the Offer, the Selling Member shall deliver a written notice (the "Offer Notice") to each of the other Members (the "Non-Selling Members") specifying the identity of the proposed purchaser, the price at which the Selling Member's Membership Interest is proposed to be purchased, the closing date of the proposed purchase, and any other terms or conditions of the proposed purchase, and including a copy of the Offer;

(ii)    within 30 days of its receipt of the Offer Notice, each Non-Selling Member shall have the right (the "Right of First Refusal") to deliver a written notice to the Selling Member indicating that such Non-Selling Member elects to purchase the Selling Member's Membership Interest or, if more than one of the Non-Selling Members elect to exercise its Right of First Refusal, then its pro rata share (in the ratio that such Member's Capital Contribution bears to the aggregate Capital Contributions of all Members) of the Selling Member's Membership Interest, in each case on the same terms and conditions as set forth in the Offer;

(iii)    if one or more of the Non-Selling Members elects to exercise its Right of First Refusal, then each such Non-Selling Member shall purchase all or, if applicable, its pro rata share of, the Selling Member's Membership Interest on the terms and conditions (including, without limitation, at the price and on the closing date) set forth in the Offer; and

DO NY/83845.17

30

(iv)    if none of the Non-Selling Members elects to exercise its Right of First Refusal, then the Selling Member shall be entitled to sell its Membership Interest to the proposed purchaser in accordance with the terms and conditions (including, without limitation, at the price and on the closing date) set forth in the Offer. If such sale is not consummated on or prior to the proposed closing date or within 30 days thereafter, then the requirements of this Section 7.1(b) must be met prior to any proposed sale or transfer of a Member's Membership Interest.

## ARTICLE VIII
## DISSOLUTION; LIQUIDATION

8.1    <u>Dissolution</u>. The Company shall be dissolved and its affairs wound up in the event that:

(a)    The term of the Company as may be provided in this Agreement expires; or

(b)    Members holding not less than 50% of the votes as set forth in Section 6.5 agree, by vote or written consent, to dissolve the Company.

(c)    The death, retirement, withdrawal, resignation, expulsion, bankruptcy or dissolution of a Member, the sale or redemption of a Member's entire Membership Interest, or the occurrence of any other event which terminates the continued participation of a Member in the Company, unless the business of the Company is continued by the consent of all the remaining Members within 90 days following the occurrence of any such event.

8.2    <u>Winding Up</u>. Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall proceed to wind up the affairs of the Company as soon as is practicable.

8.3    <u>Liquidation</u>.

(a)    Upon any dissolution of the Company, the Company shall be liquidated and the proceeds of any dissolution shall be distributed in accordance with the following order of priority (to the extent that such order of priority is consistent with the laws of the State of Delaware):

DO NY/83845.17                                31

(i)    First, to the payment of the debts and liabilities of the Company and the expenses of dissolution and liquidation;

(ii)    Second, to the establishment of any reserves which the Manager shall deem reasonably necessary for payment of such other debts and liabilities of the Company (contingent or otherwise), as are specified by the Manager, and such reserves shall be held by a bank or trust company selected by the Manager, as escrow holder, to be disbursed as directed by the Manager in payment of any of the specified debts and liabilities or, at the expiration of such period as the Manager may deem advisable, to be distributed in the manner hereinafter provided; and

(iii)    Thereafter, to the Members in accordance with Section 4.1(b). Without affecting the amount that would otherwise be distributable to any Member, this Section 8.3(a) is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(b)(2) of the Regulations.

(b)    If any assets of the Company are to be distributed in kind, the net Fair Market Value of such assets as of the date of dissolution shall be determined by the Manager. In accordance with Section 3.6(c) of this Agreement, such assets shall be deemed to have been sold as of the date of dissolution for their Fair Market Value, and the Capital Accounts of the Members shall be adjusted to reflect such deemed sale prior to the distribution of the assets in liquidation.

8.4    No Obligation to Restore Adjusted Capital Account Deficits. If any Member has an Adjusted Capital Account Deficit (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the year during which dissolution of the Company occurs), such Member shall have no obligation, other than obligations pursuant to another provision of this Agreement, to make any contribution to the capital of the Company with respect to such Adjusted Capital Account Deficit, and the negative balance of any Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purposes whatsoever.

## ARTICLE IX
## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

9.1    Bank Accounts. All funds of the Company shall be deposited in a bank account opened in the Company's name. The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts,

and the Persons who will have authority with respect to the accounts and the funds therein.

    9.2    Books and Records. (a) The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The books and records shall be available at the Company's principal office for examination by a Member or the Member's duly authorized representative at any and all reasonable time during normal business hours.

        (b)    The Manager shall prepare or cause to be prepared and shall deliver to the Members (i) quarterly unaudited profit and loss statement and statement of cash flow, within thirty (30) days after the end of each quarter of the Company's Fiscal Year, (ii) annual audited consolidated financial statements of the Company including an annual balance sheet, profit and loss statement and statement of cash flow, within ninety (90) days after the end of each Fiscal Year of the Company and (iii) any other reports or forms (including IRS Forms K-1) as required by the Service or as may be necessary for a Member to file its federal or any required state or local income tax return.

    9.3    Annual Accounting Period. The annual accounting period of the Company shall be its Fiscal Year.

    9.4    Tax Returns.

        (a)    The Members intend that the Company shall be treated as a "partnership" for United States federal, state, local and foreign income and franchise tax purposes and agree to take all action, including the amendment of this Agreement and the execution of other documents, as the Manager may request to qualify for and receive such treatment.

        (b)    The United States federal, state, local, and foreign tax returns of the Company shall be prepared at the direction of the Manager. Copies of all tax returns of the Company shall be furnished for review by each Member, if requested, as early as possible prior to the statutory date for filing such returns, including any extensions thereof. The Manager shall duly consider all suggestions of the Members regarding positions taken and disclosures made on any such returns. In the case of disagreements, the Members shall attempt to resolve any differences in good faith.

        (c)    Company income and expenses shall be reported under the accrual method of accounting. The annual accounting period for the Company for tax purposes shall be the same as its Fiscal Year.

DO NY/83645.17                              33

9.5    Tax Matters Member.  So long as no Operational Default shall have occurred, the Class D Member shall be the tax matters partner pursuant to Code Section 6231(a)(7) (the "Tax Matters Member") and shall serve in a similar capacity under any applicable state, local or foreign law, and is authorized to take all necessary action to qualify as such.  Upon the occurrence of any Operational Default, the Class A Members, acting by Class A Vote, shall designate a Member as the Tax Matters Member.  The Tax Matters Member shall represent the Company on behalf of the Members in connection with all administrative and judicial proceedings with respect to Company affairs involving or resulting from examinations by any and all United States federal, state, local or foreign tax authorities (including, but not limited to, examinations by the Internal Revenue Service), and may expend Company funds for reasonable professional services and costs in connection therewith as it deems advisable and necessary; provided, that the Tax Matters Member may not agree to the disposition of or settle any such administrative or judicial proceeding where such disposition or settlement would have a material adverse effect on any Member without the consent of such Member; and provided, further, that except as otherwise provided in this Agreement or by law, the Tax Matters Member does not assume any obligations or responsibilities with respect to the foregoing.  The Company will reimburse the Tax Matters Member for all reasonable expenses it incurs in fulfilling its duties as such.

9.6    Miscellaneous.

(a)    All elections by the Company for federal, state, local and foreign income and franchise tax purposes (including, without limitation, any elections under Code Section 754) shall be determined by the Tax Matters Member.

(b)    Prompt notice shall be given to each Member upon receipt of advice that the Internal Revenue Service or any other government agency intends to examine any Company tax returns or any other notice.  In the event of an audit of the tax returns of the Company by the Internal Revenue Service or any other government agency, the Tax Matters Member shall supervise, participate in, and retain professionals to participate in, such audit and shall contest it, to the extent it, in its sole discretion, determines appropriate or advantageous, any assertions by such agency that may be adverse to the Members or the Company.

### ARTICLE X
### GENERAL PROVISIONS.

10.1    Assurances.  Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and