LION LAMM CAPITAL;          2128676303;          Apr-6-00  7:26PM;          Page 13/19

ATLANTIC BUILDERS INC., a Delaware
corporation

By: _____

Printed Name: _____
Title: _____

BOWDEN BUILDING CORPORATION, a
Tennessee corporation

By: _____

Printed Name: _____
Title: _____

MULVANEY HOMES, INC: a North
Carolina corporation

By: _____

Printed Name: _____
Title: _____

LENDER:

SHAMROCK HOLDINGS OF CALIFORNIA, INC.

By: _____

Printed Name: George Eichler

LION & LAMM CAPITAL, LLC

By: _____

Printed Name: Jonathan Zu

A. ARENSON HOLDINGS, INC.

By: _____

Printed Name: _____

11

## EXHIBIT A

| Name | Amount |
| --- | --- |
| Shamrock Holdings of California, Inc. | $1,633,334.00 |
| A. Arenson Holdings, Inc. | $166,666.00 |
| Lion & Lamm Capital, LLC | $200,000.00 |

6

## PROMISSORY NOTE

$1,633,334

April 6 , 2000
Jacksonville, Florida

FOR VALUE RECEIVED, the undersigned, ALH II, INC. a Delaware corporation having an office at 7800 Belfort Parkway, Suite 200, Jacksonville, Florida 32256 ("Borrower"), hereby promises to pay to the order of SHAMROCK HOLDINGS OF CALIFORNIA, INC., having its offices at 4444 West Lakeside Drive, Burbank, California 91510-7774 ("SHC"), and/or its successors and assigns ("Lender"), at SHC's office at 4444 West Lakeside Drive, Burbank, California 91510-7774, or such other addresses as Lender may from time to time designate in a written notice to Borrower, on the Maturity Date (as defined below) the principal sum of ONE MILLION SIX HUNDRED THIRTY THREE THOUSAND THREE HUNDRED THIRTY FOUR DOLLARS or so much thereof as may be outstanding hereunder, together with interest thereon as hereinafter set forth, such payment to be made in lawful money of the United States of America in immediately available funds.

    1.    **Definitions**. The following terms used in this Note shall have the following meanings:

| | |
|---|---|
| "Business Day" | Any day except a Saturday, Sunday or other day on which commercial banks are required or permitted by law to close in New York, New York. |
| "Default Rate" | Shall have the meaning ascribed to such term in Section 3 hereof. |
| "Event of Default" | Shall mean any default beyond applicable grace and notice periods in the performance of the obligations under this Note |
| "Lender" | Shall have the meaning ascribed to such term in the introductory paragraph hereof. |
| "Interest Rate" | Shall have the meaning ascribed to such term in Section 2 hereof. |
| "Loan" | The loan made by Lender to Borrower on the date hereof which is evidenced by this Note. |

1

| "Loan Documents" | Shall mean this Note and any and all other documents, evidencing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note. |
| "Borrower" | Shall have the meaning ascribed to such term in the initial paragraph hereof. The term "Borrower" shall include the respective successors and assigns of Borrower. |
| "Maturity Date" | December 31, 2000. |
| "Note" | This Promissory Note, together with all extensions, renewals, modifications, amendments and supplements hereof or hereto. |
| "Payment Date" | July 5, 2000, and the first day of each calendar quarter thereafter during the term of this Note. |

2.    Interest and Principal Payments.

(a)    Subject to the further provisions of this Note, including Section 3 below, the principal amount outstanding hereunder shall bear interest at a rate per annum (the "Interest Rate") equal to fifteen (15%) percent based on a 360 day period.

(b)    Prior to the Maturity Date (or the date on which the unpaid principal balance of this Note otherwise becomes due, whether by acceleration or otherwise), interest on the outstanding principal balance of this Note, calculated at the Interest Rate, shall be payable quarterly, in arrears, on each Payment Date, with respect to the preceding period. The entire unpaid principal balance of this Note, together with all accrued and unpaid interest and all other sums payable hereunder and under the other Loan Documents, if not sooner paid, shall be due and payable in full on the Maturity Date.

(c)    All sums payable to Lender hereunder shall be payable, without setoff, deduction or counterclaim, in immediately available funds. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, when any payment is due hereunder or under any of the other Loan Documents on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day.

3.    Default Interest. If any installment of interest or principal payable hereunder is not paid within five (5) days from the date when the same shall become due and payable or if all principal, interest and other amounts due hereunder and under the

2

other Loan Documents is not paid on the Maturity Date (or such earlier date as the same may become due, whether by acceleration or otherwise), or if any other sum payable hereunder or under any of the other Loan Documents is not paid when due, after applicable grace and/or notice periods, if any, then a late charge of four (4%) percent of the installment due may, at the sole option of the Lender, be assessed.

4.      Event of Default.    The entire outstanding principal balance of this Note, together with all accrued and unpaid interest thereon and all other sums due hereunder and/or under the Loan Agreement, shall become immediately due and payable, at the option of Lender, upon the occurrence or during the continuance of any Event of Default as described in the Loan Agreement, whereupon the same shall forthwith become immediately due and payable without presentment, demand, protest or other notice of any kind and Lender may proceed to exercise any rights and remedies available to Lender hereunder and under the Loan Agreement or which Lender may have at law, in equity or otherwise.

5.      Expenses.    Borrower hereby agrees to pay to Lender on demand any and costs and expenses incurred by Lender (including, without limitation, attorneys' fees and disbursements) in connection with the enforcement and collection of this Note, whether or not any suit is brought on this Note or any foreclosure or other proceeding is brought. The provisions of this Section 5 are not intended to limit in any manner Borrower's obligations to pay any other costs and expenses of Lender as may be elsewhere provided herein or in any of the other Loan Documents.

6.      Maximum Lawful Rate.    Notwithstanding any provision to the contrary contained in this Note or in the Loan Agreement, under no circumstances shall Borrower be charged more than the highest rate of interest which lawfully may be charged by the Lender hereof and paid by Borrower on all or any portion of the indebtedness evidenced by this Note. It is, therefore, agreed that if at any time interest on any portion of the indebtedness evidenced by this Note would otherwise exceed the highest lawful rate:

(a)      Borrower shall only be obligated to pay interest on the indebtedness evidenced by this Note at such highest lawful rate, the Interest Rate or any other applicable interest rate or rates shall be deemed to be reduced to such maximum lawful rate and this Note and the Loan Agreement shall be deemed to have been, and shall be, reformed and modified to reflect such reduction;

(b)      any amount paid by Borrower in excess of such highest lawful amount shall, at the option of Lender, be (i) applied as a credit against the then outstanding principal balance due under this Note or against any other sums then due and payable by Borrower hereunder or under the Loan Agreement, or both, (ii) refunded to Borrower or (iii) any combination of the foregoing; and

(c)      neither Borrower nor any of the other persons required to pay any amounts with respect to the Loan shall have any action or remedy against Lender for any damages whatsoever or any defense to enforcement of this Note or the Loan Agreement

3

arising out of the payment or collection of any interest which is in excess of such maximum lawful rate.

7. _Waiver._ Borrower expressly waives presentment for payment, demand, notice of demand and of dishonor and nonpayment of this Note, protest and notice of protest, diligence in collecting, and the bringing of suit against any other party.

8. _Governing Law._ THIS NOTE SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

9. _Modification._ This Note can be extended, modified or amended only in writing by an instrument executed by Lender and Borrower and none of the rights or benefits of Lender hereunder can be waived except in a written document executed by Lender.

10. _Binding Effect_ This Note shall be binding upon and inure to the benefit of Lender, Borrower and their respective successors and assigns.

11. _Interpretation._ The headings of sections and paragraphs in this Note are for convenience only and shall not be construed in any way to limit or define the content, scope, or intent of the provisions hereof. As used in this Note, the singular shall include the plural, and masculine, feminine, and neuter pronouns shall be fully interchangeable, where the context so requires. The parties hereto intend and believe that each provision in this Note comports with all applicable law. However, if any provision in this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of all parties to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of Borrower and Lender under the remainder of this Note shall continue in full force and effect, provided, however, that if any provision of this Note is found to be in violation of any applicable law concerning the imposition of interest hereunder, the rights, obligations and interests of Borrower and Lender with respect to the imposition of interest hereunder shall be governed and controlled by the provisions of Section 8 hereof. Time is of the essence in respect of each and every obligation of Borrower set forth in this Note.

12. _Waiver of Jury Trial._ BY THE EXECUTION HEREOF, BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREES THAT NEITHER BORROWER NOR ANY ASSIGNEE, SUCCESSOR, HEIR OR LEGAL REPRESENTATIVE OF BORROWER SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE ARISING FROM OR BASED UPON ANY LOAN DOCUMENT EVIDENCING, SECURING OR RELATING TO THE OBLIGATIONS EVIDENCED HEREBY OR TO THE DEALINGS OR RELATIONSHIP BETWEEN OR AMONG

4

THE PARTIES THERETO. NEITHER BORROWER NOR LENDER WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN OR CANNOT BE WAIVED.

IN WITNESS WHEREOF, the undersigned has duly executed this Note as of the day and year first above written.

BORROWER

ALH II. INC.

By: _____

5

# EXHIBIT VV

### Minutes of a Meeting of the
### Supervisory Board of ALH Holdings LLC
### Held on March 24, 2004

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH
Holdings LLC, a Delaware limited liability company (the "Company"), was held on March
24, 2004, pursuant to Section 6.2 of the Operating Agreement of the Company. In
attendance were the following members of the Board:

| | |
|---|---|
| Avie Arenson | Shalom E. Lamm |
| George Buchler | Bruce Stein |
| Eugene Krieger | |

David K. Robbins and Laura Long of Fried, Frank, Harris, Shriver & Jacobson, counsel to
the Company, also attended the meeting at the invitation of the Board. The meeting was
called to order at 8:00 AM PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to address Board approval of
the proposed sale of 100% of the issued and outstanding shares of Bowden Building
Corporation, a Tennessee corporation and an indirect, wholly-owned subsidiary of the
Company ("Bowden"), to Levitt Corporation, a Florida corporation traded on the New York
Stock Exchange ("Buyer").

## PROPOSED SALE OF BOWDEN

The Board considered the proposed sale of 100% of the issued and outstanding stock of
Bowden to Buyer on the terms described in the draft of the proposed Stock Purchase
Agreement (the "Purchase Agreement"), among Bowden, ALH II, Inc., a Delaware
corporation and a wholly-owned subsidiary of the Company ("ALH"), ALH Tennessee
Acquisition, Inc., a Delaware corporation and an indirect, wholly-owned subsidiary of the
Company ("ALH Tennessee" and, together with ALH, the "Seller Entities") and Buyer, the
latest draft of which had been circulated to the Board on March 23, 2004.

### *Overview of Economic Terms*

Mr. Buchler gave a summary of the economic terms of the sale, stating that the purchase
price was approximately $7.25 million, plus (i) $100,000 per month from September 30,
2003 through Closing, pro rated if the Closing occurs other than at the end of the month,
and (ii) the amount reserved for income taxes on Bowden's income (less $100,000 per
month, prorated for the month in which the Closing occurs) from September 30, 2003
through the Closing. In addition, Buyer will assume or pay off all of Bowden's existing
indebtedness for borrowed money.

Mr. Buchler explained that the Seller Entities will be obligated to pay, from the purchase
price, (i) $1.0 million to John Laguardia in connection with his employment contract, (ii)
$200,000 to Jeffrey Sweeney (who will receive an additional $100,000 directly from
Buyer), (iii) legal fees to Fried Frank and Tennessee co-counsel, (iv) a $135,000 success fee

**1**

88037

payable to the Company's investment advisor, JMP Securities, LLC ("JMP"), (v) the amount of any success fee to be paid to Class A Member Shamrock Holdings of California, Inc. in connection with its efforts regarding the Bowden Sale, to the extent approved by a special committee of non-interested directors to be established, and (vi) $4.0 million to the Company's lender, Wachovia Bank.

In addition, $650,000 of the purchase price will be placed in escrow at Closing in connection with the Seller Entities' general indemnity obligations under the Purchase Agreement and an additional $350,000 of the purchase price will be placed in escrow at Closing in connection with the Seller Entities' indemnification obligations with respect to litigation pending against Bowden at Closing (the "Pending Litigations"). To the extent that there remains any unresolved Pending Litigation after December 31, 2005, the Seller Entities are required to place an additional $1.15 million in escrow before making any payment to their affiliates.

Further, under the terms of the Purchase Agreement, the Seller Entities are required to pay an aggregate of $50,000 to Buyer in connection with the part-time use of Mr. Laguardia's services during the six-month transition period after Closing.

Mr. Buchler explained that the estimated Closing date was April 15th and that Buyer has required that the Seller Entities sign an exclusivity letter with Buyer that terminates on April 15th.

In response to a question from Mr. Arenson, Mr. Buchler confirmed that the two major changes in the draft of the Purchase Agreement circulated to the Board on March 23, 2004 from the previous most recent draft circulated to the Board were (i) an increase in the escrow by $350,000 and (ii) the requirement that the Seller Entities place $1.15 million in escrow after December 31, 2005 under certain circumstances.

*Counsel's Presentation regarding the Purchase Agreement*

Mr. Buchler requested Mr. Robbins to provide a brief overview of the draft of the Purchase Agreement that had been circulated to the Board. Mr. Robbins stated that he would address some of the more significant provisions contained in the latest draft of the Purchase Agreement as follows:

Transaction Structure and Purchase Price: The proposed transaction would be structured as a stock sale. The Purchase Price is $7.25 million, adjusted as previously described by Mr. Buchler. In addition, the Purchase Price may be decreased or increased due to adjustments for fees paid by Bowden on behalf of the Seller Entities and fees paid by the Seller Entities on behalf of Bowden, in each case between the date of the December 31, 2003 balance sheet and Closing.

Escrow Amount: At Closing, Buyer will place $1,000,000 of the purchase price in escrow as follows: (i) $650,000 of this escrow amount will be available for claims arising from the Seller Entities' general indemnification obligations under the Purchase Agreement and will be released, less the amount of any claims made pursuant to the indemnification

2

88037

provisions of the Purchase Agreement, to the Seller Entities on the eighteen month anniversary of the Closing and (ii) $350,000 of this escrow amount will be available solely for claims arising from the Seller Entities' indemnification obligations with respect to Pending Litigations. The Seller Entities must pay for counsel fees, settlements and judgments with respect to the Pending Litigations out of their own funds. When the final Pending Litigation is resolved, the remaining portion of the $350,000, if any, shall be released to the Seller Entities.

In addition, to the extent that there remains any unresolved Pending Litigation after December 31, 2005, the Seller Entities must place an additional $1.15 million in escrow before making any kind of payment to their affiliates. This $1.15 million will be available solely for claims arising from the Pending Litigations. After the $1.15 million has been placed into escrow, the Seller Entities may draw from the escrowed amount to pay for counsel fees, settlements and judgments with respect to the Pending Litigations.

Pending Litigation: There are two breach of contract cases pending against Bowden -- Etheridge and Quality Life. Tennessee litigation counsel is handling both cases and has informed the Seller Entities that they believe that Bowden has a good defense in both cases. However, Mr. Robbins cautioned the Board that litigation can be unpredictable, particularly in the case of Etheridge and Quality of Life, where much depends on the results of deposition testimony which has not yet been taken. In addition to the Etheridge and Quality Life cases, there are a handful of construction defect cases that are in the process of being settled or which have been settled in principle but where the settlement agreement has not yet been executed, and in each case Tennessee counsel has informed the Seller Entities that they believe such cases are covered by insurance and will be settled without material liability to Bowden. Mr. Robbins asked the Board to contact him or Stephen Alexander, a litigation partner at Fried Frank, if the Board has any additional questions with respect to the Pending Litigation.

Representations and Warranties: The representations and warranties that Buyer is requesting from the Seller Entities are highly detailed. In some instances, the representations and warranties are qualified by the "knowledge, after due inquiry" of John Laguardia and Jeffery Sweeney. As a condition to signing the Purchase Agreement, the Seller Entities have asked Messrs. Laguardia and Sweeney to sign letters certifying that the representations and warranties are true and correct. Messrs. Laguardia and Sweeney are currently reviewing the Purchase Agreement and related schedules in anticipation of delivering these certifications. Because of the amount of detail in the representations and warranties, Mr. Robbins advised that the schedules to the Purchase Agreement must be carefully prepared by the Seller Entities, and the Seller Entities must interview employees and carefully review their books and records to ensure the Seller Entities' compliance with these representations and warranties.

Timing: The Purchase Agreement provides for a simultaneous signing and Closing.

Indemnification: The indemnification procedures of the Purchase Agreement limit the Seller Entities' liability for breaches of representations and warranties to $3,625,000 (except for claims that arise from fraudulent or intentional misrepresentations). This

3

88037

indemnification amount is subject to a "basket" of $50,000. Liability for other indemnified matters (such as Pending Litigation) is not subject to a cap or basket. The indemnification period for claims for breaches of most representations and warranties expires on the eighteen month anniversary of the Closing.

Non-Compete: The Purchase Agreement provides that neither the Company nor any of its direct or indirect subsidiaries will (A) compete with Buyer in the Memphis area homebuilding market during the two-year period following the Closing or (B) solicit or hire any employees of Bowden or Buyer during the two-year period following the Closing.

Employment Agreements: Buyer is currently in negotiation with Messrs. Laguardia and Sweeney to enter into employment agreements. Buyer has indicated that execution of satisfactory employment agreements is a condition to Buyer's signing the Purchase Agreement.

Mr. Buchler asked if there were any additional questions for Mr. Robbins, and there were none.

*Evaluation by JMP*

Tony Avila with JMP was invited to join the meeting. Mr. Avila gave an overview of JMP's efforts to find purchasers for Bowden over the last two years, stating that JMP had contacted approximately 20 prospective buyers, constituting every entity JMP identified as a potentially active participant or potential participant in the Memphis homebuilding market. Mr. Avila noted that Buyer was the only entity that provided a serious bid for Bowden. Mr. Avila also noted that the Memphis area was flat in growth and that the homebuilding market in Memphis was not robust.

In determining the merits of the Bowden sale, Mr. Avila stated he had reviewed comparable transactions in the Memphis area. Mr. Avila was aware of only two sales in the Memphis area in the past two years which were comparable to the Bowden sale and, in both cases, the acquired entity performed poorly post-acquisition. Mr. Avila explained that the proposed purchase price for Bowden approximated a multiple of five times Bowden's 2003 EBITDA, which is well above the average EBITDA multiple for previous sales of homebuilders. The purchase price also compared favorably to comparable sales prices that are derived from a multiple of a company's book value.

Mr. Avila stated that the proposed Purchase Agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in comparable sales agreements.

Finally, Mr. Avila stated that he thought the proposed Purchase Agreement represented the best potential transaction for the sale of Bowden and a superior opportunity for the Company to realize value on its investment.

Mr. Buchler asked if there were any other questions for Mr. Avila pertaining to the proposed sale of Bowden. There were none, and Mr. Avila left the call at this time.

4

88037

### Board Discussion of Bowden Sale

A discussion ensued regarding the merits of the Bowden sale. Mr. Buchler pointed out that Mr. Sweeney's employment contract is set to expire shortly, and Mr. Sweeney has indicated that he will not renew his contract without a sale to Buyer. Mr. Buchler stated that he believes Mr. Sweeney is integral to the operations of Bowden and is an important part of Bowden's relationships with its lenders. Mr. Buchler also noted there is currently no successor to take over Mr. Sweeney's position should Mr. Sweeney leave Bowden and that he believes it will be difficult to identify and hire an adequate successor in a timely manner. Mr. Buchler also noted that the current absence of additional equity capital greatly impaired Bowden's ability to significantly expand its business.

Mr. Arenson stated that he opposed the Bowden sale for the same reasons he opposed the previous sale of the assets of the Company's indirect, wholly-owned subsidiary, Atlantic Builders, Inc. Mr. Arenson expressed a concern that the sale was not in the best interest of all stockholders and that better value might be obtained by continuing to operate Bowden. Mr. Arenson also expressed a concern that there might be a possible conflict of interest on the part of the Company's counsel, Fried Frank, because it also represents one of the Class A Members. Mr. Lamm noted that he, too, opposed the sale for reasons similar to Mr. Arenson's. Mr. Buchler stated that he believed the Bowden sale to Buyer was the best option available under current circumstances. Mr. Robbins explained that Fried Frank was representing the Company and the Supervisory Board in this matter and not the Company's members separately. Mr. Robbins noted that the Company has waived any potential conflicts with Fried Frank representing the Company and that the conflict waiver had been approved by the Board prior to Fried Frank's representation of the Company. Mr. Robbins invited the members of the Board to call him or Tennessee co-counsel directly with any concerns or questions.

### SHOC Fee

The Board next discussed the payment of a fee to Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC"), in connection with its efforts to facilitate the Bowden sale. The Board representatives who are affiliated with SHOC indicated that it would not be appropriate for them to participate in this decision, and Messrs. Buchler, Krieger and Stein agreed to abstain from any participation in these discussions. The Board decided that any payment of a fee to SHOC, and the amount of any such fee, would be left to Messrs. Arenson and Lamm, and the Board agreed to form a Special Compensation Committee consisting of Messrs. Arenson and Lamm to make such determination. Messrs. Arenson and Lamm expressed concern, given their opposition to the Bowden sale itself, about paying SHOC a fee in connection with the sale and agreed to discuss the matter separately as part of a Special Compensation Committee meeting.

After further discussion, upon motion duly made and seconded, the following resolutions were adopted by the Board, with Messrs. Buchler, Krieger and Stein voting in favor and Messrs. Arenson and Lamm voting against:

5

88037

## APPROVAL OF STOCK PURCHASE AGREEMENT

WHEREAS, the Supervisory Board of ALH Holdings LLC, a Delaware limited liability company (the "Company"), has determined it to be in the best interests of ALH II, Inc., a Delaware corporation and wholly owned subsidiary of the Company ("ALH II"), ALH Tennessee Acquisition, Inc., a Delaware corporation and an indirect, wholly owned subsidiary of the Company ("Tennessee Acquisition"), and Bowden Building Corporation, a Delaware corporation and a wholly owned subsidiary of Tennessee Acquisition ("Bowden" and, collectively, with ALH II and Tennessee Acquisition, the "ALH Entities"), to enter into a Stock Purchase Agreement (the "Purchase Agreement") among the ALH Entities and Levitt Corporation, a Florida corporation ("Levitt"), substantially in the form previously circulated to and reviewed by the Supervisory Board of the Company; and

WHEREAS, pursuant to the Purchase Agreement, Tennessee Acquisition agrees to sell to Levitt, and Levitt agrees to purchase from Tennessee Acquisition, 100% of the issued and outstanding capital stock of Bowden, for a purchase price of approximately $7,250,000 (plus the Interim Tax Amount and plus the Intercompany Differential, as each term is defined in the Purchase Agreement), on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, pursuant to the Purchase Agreement, ALH II agrees to, among other things, indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, on the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company and the ALH Entities for the ALH Entities to enter into the Purchase Agreement and for (i) Tennessee Acquisition to sell to Levitt 100% of the issued and outstanding capital stock of Bowden; and (ii) ALH II to agree to indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, each on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously circulated to and reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, including the (i) sale by Tennessee Acquisition to Levitt of 100% of the issued and outstanding capital stock of Bowden; and (ii) the agreement by ALH II to indemnify Levitt for breaches of Tennessee Acquisition's representations, warranties, covenants and agreements under the Purchase Agreement, each on the terms and subject to the conditions set

88037

forth in the Purchase Agreement, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company and the ALH Entities be and each of them hereby is authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications, certificates, documents, agreements, escrow agreements or instruments required or desired to be delivered by the ALH Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements, escrow agreements or instruments to be conclusive evidence of such due authorization by the Company.

## APPROVAL OF JMP FEE

WHEREAS, the Supervisory Board of the Company recognizes the extraordinary and valuable services JMP Securities, LLC ("JMP") has provided to the Company and the ALH Entities in connection with the sale of Bowden; and

WHEREAS, the Supervisory Board of the Company has determined that fee in the amount of approximately $135,000 should be paid to JMP (the "JMP Fee") for the extraordinary and valuable services rendered in connection with the sale of Bowden pursuant to the Purchase Agreement;

NOW, THEREFORE, BE IT RESOLVED, that the payment of the JMP Fee by the Company to JMP be, and it hereby is, approved, authorized, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered, for and on behalf of the Company, to take such actions as such officers may deem advisable, necessary or desirable to deliver the JMP Fee to JMP and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Company in connection with the payment by the Company of the JMP Fee, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization by the Company.

## FORMATION OF SPECIAL COMMITTEE

7

88037

WHEREAS, it has been proposed that the Company create a Special Compensation Committee (the "Special Committee"), comprised of the disinterested Representatives of the Class B Members of the Company serving on the Supervisory Board of the Company, to evaluate the services performed by Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC") in facilitating the sale of Bowden, and to determine the appropriateness and amount, if any, of the Company's payment of any bonus to SHOC in exchange such services in facilitating such sale.

NOW, THEREFORE, BE IT RESOLVED, that the Supervisory Board of the Company hereby adopts, ratifies and confirms the formation of the Special Committee.

RESOLVED, that the Supervisory Board of the Company hereby confirms that the current membership of the Special Committee, and the Chairmanship thereof, shall be as follows:

> Avie Arenson, Chairman
> Shalom E. Lamm

RESOLVED, that the Supervisory Board of the Company hereby delegates to the Special Committee the power and authority of the Supervisory Board of the Company to evaluate the services performed by SHOC in connection with the sale of 100% of the issued and outstanding shares of Bowden pursuant to the Purchase Agreement and to determine and the appropriateness and amount, if any, of the Company's payment of a bonus to SHOC in connection therewith and to authorize the payment of any such bonus to SHOC.

## OMNIBUS RESOLUTIONS

WHEREAS, in order to effectuate the transactions as contemplated by the Purchase Agreement, the Supervisory Board of the Company has determined it to be in the best interests of the Company, to authorize the officers of the Company's direct or indirect subsidiaries (the "Subsidiaries") to execute and deliver certain ancillary documents in connection with the Purchase Agreement, such ancillary documents including a (i) noncompetition agreement; and (ii) release (collectively, the "Ancillary Documents").

NOW THEREFORE, BE IT RESOLVED, that the officers of the following Subsidiaries of the Company be and they hereby are authorized and empowered, for and on behalf of each respective Subsidiary listed below, to negotiate the final form, terms and provisions of, and, to execute and deliver, the Ancillary Documents with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other applications,

8

88037

certificates, documents, agreements or instruments required or desired to be delivered by such Subsidiaries in connection with the Ancillary Documents, on such terms as such officers of each respective Subsidiary may deem advisable, necessary or desirable, the preparation, execution and delivery of such applications, certificates, documents, agreements or instruments to be conclusive evidence of such due authorization by the Company on behalf of each respective Subsidiary:

Mulvaney Homes, Inc.
Mulvaney Homes/ ALH, Inc.
ALH Acquisition Corp.
American Landmark Homes Corporation
American Landmark Homes of Florida, Inc.
American Landmark Homes, Inc.
ALH/ Jacksonville Builders, Inc.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of them hereby is, authorized, directed and empowered on behalf of the Company and in its name, to prepare, execute, deliver and/or file any applications, certificates, documents, agreements, or any other instruments, including the Ancillary Documents and/or releases or any amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such applications, certificates, documents, agreements or any other instruments, including the Ancillary Documents or any amendments or supplements thereto, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that all actions heretofore taken by any officer of the Company in connection with any of the foregoing be, and each of them hereby is, ratified, confirmed and approved.

Upon motion duly made and seconded and unanimously approved, the Board then agreed to hold its next meeting at 8 a.m. (PST) on Tuesday, April 13, 2004 to review the status of the Bowden sale transaction.

9

88037

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

_____
George Buchler
Chairman of the Meeting

88037

# EXHIBIT W

MAR. 21. 2002 12:30PM   PRINT FRANK B., INC.    Document 13-51    Filed 09/02/2005   Page 2 of 24
MAR 20 2002  14:45           904-394-2599



PERSONAL AND CONFIDENTIAL

March 20, 2002

ALH Holdings LLC
ALH II, Inc.
489 Fifth Avenue
28th Floor
New York, NY 10017
Attention: Mr. Shalom Lamm

Re:    ALH Engagement with Jolson Merchant Partners

Dear Shalom:

We are pleased to confirm the arrangements under which Jolson Merchant Partners ("we," "us" or "JMP") is engaged by ALH Holdings LLC and ALH II, Inc. (collectively, "you" or the "Company") as a financial advisor to the Company in connection with the Transaction described below, subject to the terms and conditions of this letter agreement (the "Agreement").

1.0    **Engagement**

1.1    Scope of Engagement

You have engaged us to advise you concerning a sale of the Company and matters related thereto. For purposes of this Agreement, a sale of the Company includes any transaction or related series of transactions whereby, directly or indirectly, control of the Company or of all or substantially all of the assets of the Company is acquired by a third party (but specifically excluding any current holder of equity interests in the Company or any affiliate of such holder) in a sale or exchange of stock, merger or consolidation, sale of assets or other similar transaction ("Transaction"). For purposes of this Agreement, "control" means the ownership of 50% or more of the equity interests in the Company.

We will render to you such financial advisory and investment banking services as are necessary or appropriate in connection with the Transaction or any potential Transaction. When and as necessary or appropriate we will (i) conduct an investigation and analysis with respect to the business and operations of the Company and its subsidiaries and of the industry and markets which it serves, (ii) perform an analysis of the various strategic alternatives available to the Company and

*One Embarcadero Center, Suite 2100    San Francisco, California 94111    T. (415) 835-8900    F. (415) 263-1337*



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 2

review such analysis with the management of the Company, (iii) develop (and update from time to
time) and review with you on an on-going basis a list of parties which might have a specific interest in
acquiring the Company with the understanding that we will contact only parties you approve, (iv)
market the Company to potential buyers expressly approved by the Company, (v) assist you in
preparing a descriptive memorandum concerning the Company that describes the operations and
financial condition of the Company and its subsidiaries and provides other appropriate information
furnished by the Company (the "Offering Memorandum"), (vi) advise and consult with you with
respect to the financial aspects of any transaction as described in the agreements effecting any
Transaction or potential Transaction, (vii) participate in meetings of the board of directors of the
Company at which such potential Transaction is to be considered, (viii) structure a sale transaction
process, including developing and administering a highly confidential "bidding" process, (ix) counsel
the Company as to strategy and tactics for negotiations in connection with any Transaction or
potential Transaction, (x) participate with the Company and its counsel in negotiations related to the
Transaction or any potential Transaction, (xi) assist the Company in the administration of the closing
of the Transaction or another form of transaction that may aid the Company in achieving its strategic
objectives, (xii) if requested by the Company, render an opinion (such opinion will be in writing if
requested by the Company) as to the fairness, from a financial point of view, to the Company's equity
holders of the consideration to be received by such equity holders or of the exchange ratio, as the case
may be, in any potential Transaction or advise the board of directors of the Company that we are
unable to render such an opinion and (xiii) render such other financial advisory and investment and/or
merchant banking services as may be agreed upon from time to time by us and the Company.  We will
promptly notify the Company of any communication concerning a potential Transaction.

        In connection with performing our services we will use publicly available information
and information which you provide to us, including information concerning the business, assets,
operations or financial condition of the Company ("Company Information"). We may rely upon the
accuracy and completeness in all material respects of such Company Information without independent
verification. JMP shall provide Company Information, Confidential Information (as defined in
Section 3.3 below) or the Offering Memorandum only to those potential buyers approved by the
Company, unless otherwise approved in writing by the Company.

        We will provide our financial advice, written or oral, exclusively for the information
of your board of directors and senior management, who, in their sole discretion, will make all
decisions regarding whether and how to pursue any opportunity or transaction. Your board of
directors and senior management may base their decisions on our advice as well as on the advice of
their legal, tax and other business advisors and other factors which they consider appropriate.
Accordingly, as an independent contractor, we will not assume the responsibilities of a fiduciary to
you or your shareholders in connection with the performance of our services in good faith on the
terms set forth herein. Notwithstanding anything to the contrary contained herein, the Company
shall have no obligation to consummate or pursue any potential Transaction, Qualified Equity
Placement or opportunity or other transaction proposed or identified by JMP or by any other person
or entity.

ALH Holding LLC
ALH II, Inc.
March 20, 2002
Page 3

This Agreement shall not give rise to any commitment by JMP to act as a principal in the Transaction, and JMP shall have no authority to bind the Company. With the prior written consent of the Company, JMP may retain other advisors or consultants to act on its behalf in connection with the Transaction in accordance with the terms of this Agreement (it being understood and agreed that, unless otherwise expressly agreed by the Company in writing, JMP hereby assumes all liability and agrees to be solely responsible for the actions and inactions of such other advisors and consultants).

### 1.2 Term of Engagement

The term of our engagement will begin on the date hereof and continue for one year or until earlier terminated by the final closing of the Transaction or our mutual written agreement. The Company may terminate this Agreement for any reason whatsoever upon 30 days prior written notice. Without limiting the foregoing, in the event that Tony Avila shall cease providing services under this Agreement, cease working for JMP or acting as lead investment banker, or being primarily responsible, for the services under this Agreement (an "Assistance Default"), JMP agrees to provide the Company written notice of any Assistance Default within 5 days of its occurrence and the Company (regardless of whether or not JMP shall have provided the foregoing notice with respect to such Assistance Default) may terminate this Agreement at any time after the occurrence of any Assistance Default immediately upon written notice to JMP. Subject to Section 2.1 below, any early termination of our engagement will not affect your obligation to pay our fees or reimburse our expenses owing hereunder to the extent that such fees are due and payable, and expenses have been incurred, prior to the date of such termination and JMP requests the payment of such properly documented fees and expenses within 60 days after the date of such termination; provided, however, that in the event that this Agreement is terminated because of an Assistance Default which Assistance Default has not been disclosed to the Company within 5 days of its occurrence, the Company shall not have any obligation to pay any of our fees or reimburse our expenses to the extent that such fees are due and payable, or expenses were incurred, from and after the date of such Assistance Default.

### 1.3 Compliance with Securities Laws.

JMP and the Company agree to conduct its respective activities in connection with the Transaction in a manner permitted by all applicable Federal and state securities laws.

### 2.0 Compensation; Expenses and Retainer

### 2.1 Retainer

As compensation for our services, you will pay us a cash retainer fee of $150,000, which shall be deemed earned upon execution of this Agreement. The retainer fee shall be payable in three installments of $50,000 each, the first of which shall be due upon the execution of this Agreement, the second of which shall be due upon the date which is 60 days after the execution of this Agreement, and the third of which shall be due upon the date which is 120 days after the execution of this Agreement (or, in each case, if such installment date is not a business day, on the next succeeding

ALH Holding LLC
ALH II, Inc.
March 20, 2002
Page 4

business day). The retainer fee, to the extent of payments made thereon pursuant to the preceding sentence, will be credited against any fees (except the fairness opinion fee) due to us under this Agreement when and as such fees are payable until such retainer fee has been applied in its entirety against all such fees. The retainer fee, to the extent of payments made thereon by the Company, will be credited against any success fee (including without limitation any Transaction Fee or incentive fee), any Break-Up Fee (as defined below) or any Equity Placement Fee (as defined below) paid pursuant to Subsection 2.2. Except as set forth in the immediately succeeding sentence, the retainer is non-refundable such that if the Transaction fails to close, the retainer shall be retained in full by JMP as a fee for services rendered, and shall be in addition to the expense reimbursement payable by the Company under Subsection 2.3. Notwithstanding the foregoing sentence, upon the occurrence of an Assistance Default, JMP agrees to immediately refund one-half of the retainer fee paid by the Company.

2.2    Fees

If a Transaction is consummated with a JMP Prospect (as defined below) during the term of this engagement or at any time prior to nine months following the expiration or earlier termination of this Agreement (or, in the event that this Agreement is terminated pursuant to any Assistance Default, at any time prior to the date which is 60 days after such termination), you will pay us a fee equal to 0.85% of the consideration (as defined below) paid to the Company or the Company's equity holders in such Transaction (the "Transaction Fee"), which Transaction Fee, less the retainer fee (to the extent of any payments made thereon by the Company) described in Section 2.1 above and less the fairness opinion fee, if paid, described in Section 2.5 below and less the Equity Placement Fee, if any, previously paid (such deductions referred to collectively as the "Offsets"), will be due and payable when and as any consideration is paid to the Company or its equity holders in connection with such Transaction and to the extent not prohibited by law, such Transaction Fee shall be in the form of such consideration received by the Company and its equity holders, as applicable, or, to the extent that payment of such Transaction Fee in the form of such consideration is prohibited by law, such Transaction Fee shall be paid in cash when the Company or its equity holders realize cash in connection with the sale or transfer of such consideration; provided, however, that upon the consummation of such Transaction (or if the Transaction results from a series of sub-transactions, upon the consummation of the final sub-transaction related to the Transaction), the Transaction Fee payable at such time, prior to giving effect to any and all Offsets, shall not be less than $700,000 in cash (the "Minimum Payment") (it being understood and agreed that, to the extent to which the Minimum Payment exceeds the Transaction Fee which would be otherwise due and payable at the consummation of the Transaction then the amount of such excess shall be applied against future payments of the Transaction Fee in the order that such future amounts become payable). Additionally, if a Transaction is consummated with a JMP Prospect during the term of this engagement or at any time prior to nine months following the expiration or earlier termination of this Agreement (or, in the event that this Agreement is terminated pursuant to any Assistance Default, at any time prior to the date which is 60 days after such termination), you will pay us an incentive fee of one and one half percent (1.50%) of any consideration in excess of $120 million paid to the Company or the Company's equity holders in such Transaction. The incentive fee shall also be due and payable when and as any consideration is paid to the Company or its equity holders in connection with such



ALH Holding LLC
ALH II, Inc.
March 20, 2002
Page 5

Transaction and to the extent not prohibited by law, such fee shall be in the form of such consideration received by the Company and its equity holders, as applicable, or, to the extent that payment of such fee in the form of such consideration is prohibited by law, such fee shall be paid in cash when the Company or its equity holders realize cash in connection with the sale or transfer of such consideration. For purposes of this Agreement, "JMP Prospect" shall mean any prospective third party purchaser identified by JMP and with whom JMP or the Company has substantive discussions regarding a Transaction prior to the earlier of the date of termination of this Agreement.

Our fee will not be reduced by any obligation that you may have to any other broker or finder. In addition, if a Transaction for which we would have been entitled to a fee is not consummated, you will pay us a fee equal to (x) the difference between the amount of any "termination," "break-up," "topping" or other cash fee that you receive as a result of the failure to consummate such Transaction less the amount of any and all costs, fees and expenses of any kind whatsoever paid or incurred by the Company pursuant to such Transaction, any other Transaction or potential Transaction or otherwise pursuant to or in connection with this Agreement (other than fees payable under this paragraph) *multiplied by* (y).25 (the "Break-Up Fee"), less the amount of any Offsets; provided, however, that the Break-Up Fee shall not exceed the amount of the Transaction Fee and any incentive fee which would have been payable to JMP upon the consummation of such Transaction.

Subject to the immediately succeeding paragraph, in the event of a Transaction or Qualified Equity Placement (as defined below), "consideration" means, without duplication, the sum of (i) the cash paid to the Company or its equity holders or any entity affiliated with the Company or its equity holders in connection with such Transaction or Qualified Equity Placement, (ii) the marketable equity securities or equity interests transferred, the unmarketable equity securities or equity interests transferred, and the debt instruments and convertible debt instruments or obligations issued (including any amounts paid into escrow) to the Company or its shareholders or any entity affiliated with the Company or its shareholders in connection with such Transaction or Qualified Equity Placement (or, upon the election of the Company, in its sole discretion, the fair market value of each of the foregoing as may be mutually agreed upon by the parties), (iii) the outstanding amount of indebtedness for borrowed money (excluding trade payables, short-term financing facilities secured by mortgage loans or mortgage loan derivatives and indebtedness payable pursuant to securitizations) of the Company assumed directly or indirectly by an acquiring party or any entity affiliated with an acquiring party in connection with such Transaction or Qualified Equity Placement, and (iv) the cash received from contingent future payment obligations (e.g., earn-outs) arising in connection with such Transaction or Qualified Equity Placement when and as such cash is received by the Company and its equity holders.

Notwithstanding anything to the contrary contained in this Agreement, (i) consideration shall be determined as at the time the Transaction or Qualified Equity Placement is consummated, unless the sale of the Company occurs as the result of a combination or series of sub-transactions, in which case the total consideration shall be an amount equal to the sum of the aggregate consideration paid on the closing date of each applicable sub-transaction, with the value of consideration for any sub-transaction to be determined as of the closing date such sub-transaction, and

MAR. 21. 2002 3:15PM-00062D FRANK Document 18-51     Filed 09/02/2005     Page 17 of 21
MAR 20 2002 14:49                    5004034342599

ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 6

(ii) In the event that any Transaction (including without limitation, any Transaction resulting from a series of sub-transactions described in clause (i) above) will result in the disposition of less than all of the equity interests, business or assets of the Company, the "consideration" for such Transaction shall be an amount equal to the consideration otherwise payable for such Transaction in connection with the immediately preceding paragraph (and, as applicable, clause (i) above) *multiplied* by the percentage of the Company acquired by any third party (but specifically excluding any current holder of equity interests in the Company or any affiliate of such holder).

If the sale by the Company to a JMP Prospect of equity interests in the Company in an amount equal to at least 20% (but less than 50%) of such interests then outstanding is consummated during this engagement or at any time prior to nine months following the expiration or earlier termination of this Agreement (or, in the event that this Agreement is terminated pursuant to any Assistance Default, at any time prior to the date which is 60 days after the occurrence of such Assistance Default) and such sale does not constitute a sub-transaction of any Transaction or is not otherwise made in connection with any Transaction (a "Qualified Equity Placement"), you will pay us a cash fee of 3.0% of the consideration received for such sale (the "Equity Placement Fee"), less the amount of any Offsets, subject to a maximum fee which shall be no greater than the amount of the Transaction Fee and any incentive fee which would be payable at the valuation of the Company applied in connection with such Qualified Equity Placement. Such Equity Placement Fee, less the amount of any Offsets, will be due and payable when, as and in the form of any consideration paid to the Company or its equity holders.

### 2.3    Expenses

Whether or not there is a closing of the Transaction, the Company will pay its own and its agents' expenses in connection with the Transaction and will reimburse JMP for its reasonable out-of-pocket expenses incurred in connection with the Transaction, including, without limitation, the reasonable fees and expenses of outside legal counsel, reasonable out-of-pocket costs related to preparing, printing and disseminating the Offering Memorandum and reasonable travel expenses; provided that such expenses shall not exceed $30,000 in the aggregate without the prior written consent of the Company. JMP agrees not to hire any third-parties for which the Company would be responsible for any fees and/or expenses without the prior written consent of the Company. The Company will reimburse JMP's reimbursable out-of-pocket expenses and such other expenses within thirty (30) days after receipt by the Company of an invoice submitted by JMP for the payment of such expenses and appropriate supporting documentation. JMP will deliver such an invoice from time to time.

### 2.4    Payment of Compensation, Fees and Expenses

All amounts under this section 2.0 shall be denominated in United States Dollars and payable by check or wire transfer of immediately available funds to JMP.



ALH Holding, LLC
ALH II, Inc.
March 20, 2002
Page 7

### 2.5   Rendering of Fairness Opinion

If requested by the Company, upon JMP rendering a written fairness opinion to the Company, a one-time fairness opinion fee of $100,000 shall be due and payable. In the event that the Company shall request any additional fairness opinions in connection with this Agreement, no fee shall be due or payable in connection with any such additional fairness opinions. Further, such fairness opinion fee shall be fully credited against any Transaction Fee, Incentive fee, Break-Up Fee, or Equity Placement Fee due hereunder in the order that such other fees become payable, and to the extent that the fairness opinion fee shall exceed the aggregate amount of the foregoing credits, the amount of such excess shall be credited against any amounts that the Company may in the future owe to JMP, whether pursuant to this Agreement or otherwise.

## 3.0   Miscellaneous

### 3.1   Reasonable Efforts

JMP shall commit such time and other resources as are necessary or appropriate to seek timely success of the Transaction and the Company shall commit such time and resources as are reasonably necessary to seek timely success of the Transaction.

### 3.2   Company Material

From and after the date of this Agreement, the Company shall provide to JMP such information as JMP shall reasonably request in connection with any Transaction or potential Transaction and shall promptly inform JMP of any events which, to the knowledge of the senior officers of the Company, would materially and adversely affect a Transaction or potential Transaction. To the knowledge of the senior officers of the Company, the written materials, taken as a whole, provided to JMP by the Company shall not contain an untrue statement of a material fact or omit to state a material fact necessary to make any such statements, in light of the circumstances under which they were made, not misleading.

### 3.3   Confidentiality of Company Material

JMP will keep confidential and not disclose to any third-party any confidential, proprietary or non-public information of the Company, whether oral, written, graphic, machine-readable or otherwise ("Confidential Information"), made available to JMP by the Company or the directors, officers, managers, members, affiliates, representatives, agents (including without limitation, its advisors, consultants, accountants and attorneys) or employees (collectively, "Representatives") of the Company, and will use the Confidential Information only in connection with the engagement hereunder; provided, however, such Confidential Information shall not include any information already in the possession of JMP prior to the date of its disclosure to JMP by the Company or its Representatives, any information generally available to the public (other than as a result of any disclosure by JMP or its Representatives), or any information which becomes available to JMP on a non-confidential basis from a third-party who is not bound by a confidentiality obligation; and provided, further, that such Confidential Information may be disclosed (i) to JMP's officers, members,



ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 8

employees, agents, advisors and representatives who need such Confidential Information in connection
with JMP's engagement hereunder and who shall be informed of the confidential nature of the
information, that such information is subject to a confidentiality agreement and of the terms of this
confidentiality provision; (ii) to any person with the prior written consent of the Company, including
to any prospective investors; or (iii) if, upon the advice of counsel, and only to the extent that, JMP is
compelled to disclose any Confidential Information pursuant to any order or requirement of a court,
administrative agency or other governmental body (it being agreed that JMP shall provide prompt
notice of such court order or requirement to the Company to enable the Company, at its own
expense, to seek a protective order or otherwise prevent or restrict such disclosure and JMP shall
reasonably cooperate with the Company with respect to the foregoing).

3.4    Indemnification

JMP and the Company hereby agree to the terms set forth in Exhibit A hereto.

3.5    Notices

All notices or communications hereunder will be in writing and will be mailed or
delivered as follows: If to the Company, at the name and address set forth on the first page of this
Agreement, facsimile number (212) 867-6303 with a copy to George Buchler, Shamrock Capital
Advisors, Inc., 4444 Lakeside Drive, Burbank, CA 91505, facsimile number (818) 556-6995, and if to
JMP, at One Embarcadero Center, Suite 2100, San Francisco, CA 94111, facsimile number (415) 263-
1337.

3.6    Survival; Governing Law; Entire Agreement; Successors and Assigns

The provisions of Subsection 1.3, Section 2.0, Subsections 3.2, 3.5 and 3.6 hereof shall
survive any termination of this Agreement. The provisions of Subsection 3.3 hereof (Confidentiality)
and Subsection 3.4 and Exhibit A hereof (Indemnity) shall survive the closing of the Transaction and
any termination of this Agreement for a period of two (2) years, and no longer, following the final
closing or the termination of this Agreement, as applicable.

This Agreement, including Exhibit A hereto, shall be governed by and construed in
accordance with the internal laws of the State of California without giving effect to any principles of
conflicts of law. Each of JMP and the Company (on its own behalf and, to the extent permitted by
law, on behalf of its shareholders) waives any right to trial by jury in any action, claim, suit or
proceeding with respect to this Agreement.

This Agreement, together with Exhibit A hereto, contains the entire agreement
between the Company and JMP concerning the Transaction and supersedes any prior understanding
or agreement whether written or oral with respect to the subject matter hereof. Any amendment
hereto or waiver of any right or obligation hereunder must be in writing signed by the party to be
charged. The rights and obligations you have or may have to us or any of our affiliates under any
other agreement are separate from your rights and obligations under this engagement agreement and
will not be affected by our performance or failure to perform hereunder.

MAR. 21. 2002 12:33PM    Case 3:05-cv-00285 FRANKLIN    Document 18-51    Filed 09/02/2005    NO. 803 10 of 41
MAR-20-2002  14:50                904*394*2599

ALH Holdings LLC
ALH II, Inc.
March 20, 2002
Page 9

     JMP may not assign its obligations hereunder. The benefits of this Agreement and the attached indemnity provisions shall inure to the respective successors and permitted assigns of the parties hereto and of the indemnified parties hereunder and their successors and permitted assigns, and the obligations and liabilities assumed in this Agreement and the attached indemnity provisions shall be binding upon their respective successors and assigns.

     This Agreement is effective as of the date first set forth above. Please confirm that the foregoing correctly and completely sets forth our understanding, by signing and returning to us the enclosed duplicate of this Agreement. We thank you for the opportunity to share in your business endeavors and are looking forward to a successful and mutually beneficial relationship.

             Very truly yours,

             JOLSON MERCHANT PARTNERS

             By: _____
                 Carter Mack
                 Managing Director

Agreed and accepted as of the date first written above:

ALH HOLDINGS LLC

By: _____
      Shalom Lamm
      Its Duly Authorized Signatory

ALH II, INC.

By: _____
      Shalom Lamm
      Its Duly Authorized Signatory

## EXHIBIT A

### INDEMNITY AGREEMENT

In connection with the engagement of Jolson Merchant Partners ("JMP") to advise and assist the undersigned (referred to herein as "we," "our," "us" or the "Company") with the matters set forth in the Agreement dated March 20, 2002 between us and JMP (the "Agreement"), we hereby agree to indemnify and hold harmless JMP, its affiliated companies, and each of JMP's and such affiliated companies' respective members, officers, directors, agents, employees and controlling persons (within the meaning of each of Section 20 of the Securities Exchange Act of 1934 and Section 15 of the Securities Act of 1933) (each of the foregoing, including JMP, being hereinafter referred to as an "Indemnified Person") to the fullest extent permitted by law from and against any and all losses, claims, damages, expenses (including reasonable fees, disbursements and other charges of counsel), actions (including actions brought by us or our equity holders or derivative actions brought by any person claiming through us or in our name), proceedings, arbitrations or investigations (whether formal or informal), or threats thereof (all of the foregoing being hereinafter referred to as "Liabilities"), based upon, relating to or arising out of such engagement or any Indemnified Person's role therein; provided, however, that we shall not be liable under this paragraph: (a) for any amount paid in settlement of claims without our consent, unless our consent is unreasonably withheld, or (b) to the extent that it is finally judicially determined, or expressly stated in an arbitration award, that such Liabilities resulted primarily from the willful misconduct or gross negligence of, breach of the Agreement by, or any violation of law by, the Indemnified Person seeking indemnification. We hereby also agree that neither JMP nor any other Indemnified Person shall have any liability to us (or anyone claiming through us or in our name) in connection with JMP's engagement by us except to the extent that such Indemnified Person has engaged in willful misconduct, or been grossly negligent or has otherwise materially violated the Agreement.

Promptly after JMP receives notice of the commencement of any action or other proceeding in respect of which indemnification or reimbursement may be sought hereunder, JMP will notify us thereof; but the omission so to notify us shall not relieve us from any obligation hereunder unless, and only to the extent that, such omission results in our forfeiture of substantive rights or defenses. If any such action or other proceeding shall be brought against any Indemnified Person, we shall, upon written notice given reasonably promptly following your notice to us of such action or proceeding, be entitled to assume the defense thereof at our expense with counsel chosen by us and reasonably satisfactory to such Indemnified Person; provided, however, that any Indemnified Person may at its own expense retain separate counsel to participate in such defense. Notwithstanding the foregoing, such Indemnified Person shall have the right to employ separate counsel at our expense and to control its own defense of such action or proceeding if, in the reasonable opinion of counsel to such Indemnified Person, (i) there are or may be legal defenses available to such Indemnified Person or to other Indemnified Persons that are different from or additional to those available to us, or (ii) a difference of position or potential difference of position exists between us and such Indemnified Person that would make such separate representation advisable; provided, however, that in no event shall we be required to pay fees and expenses under this indemnity for more than one firm of attorneys (in addition to local counsel) in any jurisdiction in any one legal action or group of related legal actions. We agree that we will not, without the prior written consent of JMP, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding relating to the matters

A-1

contemplated by JMP's engagement (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise or consent includes an unconditional release of JMP and each other Indemnified Person from all liability arising or that may arise out of such claim, action or proceeding.

If the indemnification of an Indemnified Person provided for hereunder is finally judicially determined by a court of competent jurisdiction to be unenforceable, then we agree, in lieu of indemnifying such Indemnified Person, to contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by us on the one hand and by JMP on the other from the transactions in connection with which JMP has been engaged. If the allocation provided in the preceding sentence is not permitted by applicable law, then we agree to contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities in such proportion as is appropriate to reflect not only the relative benefits referred to in such preceding sentence but also the relative fault of us and of such Indemnified Person. Notwithstanding the foregoing, in no event shall the aggregate amount required to be contributed by all Indemnified Persons taking into account our contributions as described above exceed the amount of fees actually received by JMP pursuant to such engagement. The relative benefits received or sought to be received by us on the one hand and by JMP on the other shall be deemed to be in the same proportion as (a) the total value of the transactions with respect to which JMP has been engaged bears to (b) the fees paid or payable to JMP with respect to such engagement.

The rights accorded to Indemnified Persons hereunder shall be in addition to any rights that any Indemnified Person may have at common law, by separate agreement or otherwise.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE. WE HEREBY CONSENT, SOLELY FOR THE PURPOSE OF ALLOWING AN INDEMNIFIED PERSON TO ENFORCE ITS RIGHTS HEREUNDER, TO PERSONAL JURISDICTION AND SERVICE AND VENUE IN ANY COURT IN WHICH ANY CLAIM FOR WHICH INDEMNIFICATION MAY BE SOUGHT HEREUNDER IS BROUGHT AGAINST JMP OR ANY OTHER INDEMNIFIED PERSON. We and JMP also hereby irrevocably waive any right we and JMP may have to a trial by jury in respect of any claim based upon or arising out of this agreement. This agreement may not be amended or otherwise modified except by an instrument signed by both JMP and us. If any provision hereof shall be determined to be invalid or unenforceable in any respect, such determination shall not affect such provision in any other respect or any other provision of this agreement, which shall remain in full force and effect. If there is more than one indemnitor hereunder, each indemnifying person agrees that its liabilities hereunder shall be joint and several. Each Indemnified Person is an intended beneficiary hereunder.

The officer signing below is duly authorized to execute this indemnification agreement on behalf of the Company and, upon his execution thereof, this indemnification agreement shall be binding against the Company and in full force and effect.

A-2

The foregoing indemnification agreement shall remain in effect indefinitely, notwithstanding any termination of JMP's engagement.

Very truly yours,

**ALH HOLDINGS LLC**

By: _____
Shalom Lamm
Its Duly Authorized Signatory

**ALH II, INC.**

By: _____
Shalom Lamm
Its Duly Authorized Signatory

Agreed and accepted as of the date first written above:

**JOLSON MERCHANT PARTNERS**

By: _____
Carter Mack
Managing Director

A-3

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written

Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the

same force and effect as if regularly adopted at a meeting of the Board of Directors held upon due

notice.

_____
Shalom E. Lamm

_____
Eugene Krieger

_____
George Buchler

76881

IN WITNESS WHEREOF, the undersigned have executed this
Unanimous Written Consent as of the date set forth above.

_____
Shalom E. Lamm

_____
Bruce Stein

_____
Avie Arenson

_____
Eugene Krieger

_____
George Buchler

76882

MAR-20-2002  14:45          904*394*2599 :                    10179   P.02

# UNANIMOUS WRITTEN CONSENT
## OF THE SUPERVISORY BOARD
## OF
## ALH HOLDINGS LLC
### (a Delaware limited liability company)

### March 15, 2002

Pursuant to the provisions contained in Title 6, Sections 18-106 and 18-302(d) of the Delaware Limited Liability Company Act (the "DLLCA") and the Operating Agreement (the "Operating Agreement") of ALH Holdings LLC, a Delaware limited liability company (the "Company"), dated as of June 12, 1998, as amended, the undersigned, being all of the Representatives designated to serve on the Supervisory Board of the Company hereby take the following action by unanimous written consent:

## APPROVAL OF ENGAGEMENT AGREEMENT

WHEREAS, the Supervisory Board has determined that it is in the best interests of the Company to enter into an Engagement Agreement (the "Engagement Agreement") among Jolson Merchant Partners ("JMP"), ALH II, Inc., a Delaware corporation and wholly owned subsidiary of the Company ("ALH II"), and the Company, substantially in the form previously circulated to and reviewed by the Supervisory Board, pursuant to the terms of which the Company and ALH II will engage JMP to act as a financial advisor to the Company and ALH II;

NOW, THEREFORE, BE IT RESOLVED, that the Engagement Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be and hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered for and on behalf of the Company, to negotiate the final terms and provisions of the Engagement Agreement, to execute and deliver the Engagement Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other documents, agreements or instruments required or desired to be delivered in connection with the Engagement

76482

MAR-20-2002  14:45        904*394*2599 :                              10179    P.03

Agreement, on such terms as such officers may deem advisable, necessary or
desirable, the preparation, execution and delivery of such documents, agreements
and instruments to be conclusive evidence of such due authorization by the
Company.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of
them hereby is, authorized and directed and empowered on behalf of the Company
and in its name to prepare, execute, deliver and/or file any applications,
certificates, agreements, or any other instruments or documents, or amendments or
supplements thereto, and to incur all fees and to pay all expenses which such
officers may deem necessary or appropriate to enable the Company to carry out
the obligations of the Company under, and to effect the transactions contemplated
by, the foregoing resolutions, or to do and to cause to be done any and all other
acts and things as such officers may in their discretion deem necessary or
appropriate to carry out the purposes of the foregoing resolutions, the preparation,
execution, delivery and/or filing of such documents, agreements and instruments,
or the doing or causing to be done of such other acts and things, to be conclusive
evidence of such due authorization by the Company.

RESOLVED, that any and all actions heretofore taken by any officer or the
Class A Representatives of the Company in connection with the foregoing be, and
each of them hereby is, ratified, confirmed and approved.



-2-

78982

MAR-20-2002  14:45                    904*394*2599 :                          10179   P.04

IN WITNESS WHEREOF, the undersigned have executed this

Unanimous Written Consent as of the date set forth above.

_____
Shalom E. Lamm

_____
Bruce Stein

_____
Avie Arenson

_____
Eugene Krieger

_____
George Buchler

**ACTION TAKEN BY**
**UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**ALH II, INC.**
(a Delaware corporation)

March 15, 2002

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, the undersigned, being all of the directors (the "Board of Directors") of ALH II, Inc., a Delaware corporation (the "Corporation"), hereby take the following action by unanimous written consent in lieu of a meeting:

<u>APPROVAL OF ENGAGEMENT AGREEMENT</u>

WHEREAS, the Board of Directors of the Corporation has determined it to be in the best interests of the Corporation to enter into an Engagement Agreement (the "Engagement Agreement"), among Jolson Merchant Partners ("JMP"), ALH Holdings, LLC, a Delaware limited liability company and holder of all outstanding equity interests of the Corporation ("ALH Holdings"), and the Corporation, substantially in the form previously circulated to and reviewed by the Board of Directors, pursuant to the terms of which the Corporation and ALH Holdings will engage JMP to act as a financial advisor to the Corporation and ALH II.

WHEREAS, the Board of Directors has further determined that it is in the best interests of the Corporation to authorize Shalom E. Lamm to execute the Engagement Agreement on behalf of the Corporation.

NOW, THEREFORE, BE IT RESOLVED, that the Engagement Agreement, substantially in the form previously circulated to the Board of Directors of the Corporation, be, and hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers and Shalom E. Lamm of the Corporation be, and each of them hereby is, authorized and empowered for and on behalf of the Corporation, to negotiate the final form, terms and provisions of, and to execute and deliver, the Engagement Agreement with such changes, modifications, and/or additions thereto as such officers and/or Shalom E. Lamm shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other documents, agreements or instruments required or desired to be delivered by the

76883



MAR-20-2002  14:46          904*394*2599  1                              10179   P.06

Corporation pursuant to the Engagement Agreement, on such terms as such officers and/or Shalom E. Lamm may deem advisable, necessary or desirable, the preparation, execution and delivery of such documents, agreements and instruments to be conclusive evidence of such due authorization by the Corporation.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Corporation and Shalom E. Lamm be, and each of them hereby is, authorized and directed and empowered on behalf of the Corporation and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers and/or Shalom E. Lamm may deem necessary or appropriate to enable the Corporation to carry out the obligations of the Corporation under, and to effect the transactions contemplated by, the forgoing resolutions, or to do and to cause to be done any and all other acts and things as such officers and/or Shalom E. Lamm may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such documents, agreements and instruments or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Corporation.

RESOLVED, that any and all actions heretofore taken by any officer or director of the Corporation in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

2

73115

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written Consent as of the date set forth above, thereby agreeing that the above resolutions shall be of the same force and effect as if regularly adopted at a meeting of the Board of Directors held upon due notice.

Shalom E. Lamm

Eugene Krieger

George Buchler

76883

# EXHIBIT WW

**Minutes of a Joint Meeting of the**
**Supervisory Board of ALH Holdings LLC**
**Board of Directors of ALH II, Inc.**
**Board of Directors of ALH Tennessee Acquisition, Inc.**
**And**
**Bowden Building Corporation**
**Held on April 13, 2004**

A duly scheduled telephonic meeting of the Supervisory Board of ALH Holdings LLC, a Delaware limited liability company (the "Company"), and the Boards of Directors of ALH II, Inc., a Delaware corporation, ALH Tennessee Acquisition, Inc., a Delaware corporation, and Bowden Building Corporation, a Tennessee corporation ("Bowden"), was held on April 13, 2004, pursuant to Section 6.2 of the Operating Agreement of the Company. In attendance were the following members of the Boards:

Avie Arenson
George Buchler
Eugene Krieger
Bruce Stein

David K. Robbins and Laura Long of Fried, Frank, Harris, Shriver & Jacobson LLP, counsel to the Company, and Robert J. Pinstein of Husch & Eppenberger LLC, counsel to the Company, also attended the meeting at the invitation of the Boards. The meeting was called to order at 8:00 AM PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called to update the Boards on the previously approved sale of 100% of the issued and outstanding shares of Bowden, to Levitt Corporation, a Florida corporation traded on the New York Stock Exchange ("Buyer").

## APPROVAL OF PRIOR MINUTES

Mr. Buchler referred the Boards to the previously circulated minutes (the "Minutes") of the Board meeting held on March 24, 2004. Upon motion duly made and seconded, the Minutes were unanimously approved.

## UPDATE ON PROPOSED SALE OF BOWDEN

Mr. Buchler explained that the proposed sale of Bowden was moving forward, and both sides expected the closing to take place shortly. He noted that one open issue was whether and when the Company would be permitted to draw down amounts out of escrow to settle outstanding third party litigation. He also noted that Buyer was negotiating with Messrs. Laguardia and Sweeney with respect to finalizing their employment agreements, and that the Company was negotiating with Messrs. Laguardia and Sweeney with respect to their certification of the representations and warranties in the Bowden Stock Purchase Agreement. A full discussion of the progress on the proposed sale ensued. Mr. Pinstein informed the Boards that he felt the disclosure schedules were in good shape. He stated that Tennessee counsel had held two sessions with Messrs. Laguardia and Sweeney for the

1

88239

purpose of reviewing the representations and warranties in the Purchase Agreement and had also had a number of other informal diligence discussions with Messrs. Laguardia and Sweeney.

## APPROVAL OF TERMINATION OF BOWDEN 401(K) PLAN

Mr. Buchler informed the Boards that Buyer has required as a condition to the sale of Bowden that the board of directors of Bowden terminate Bowden's 401(k) Plan, effective immediately prior to the closing of the Bowden sale. Upon motion duly made and seconded, the following resolutions were adopted by the Board of Directors of Bowden, with Messrs. Buchler and Krieger voting in favor and Mr. Lamm absent:

### APPROVAL OF 401(K) PROFITSHARING PLAN TERMINATION AGREEMENT

WHEREAS, Bowden Building Corporation (the "Corporation") desires to enter into a Stock Purchase Agreement (the "Purchase Agreement") among Levitt Corporation, a Florida corporation ("Levitt"), ALH Tennessee Acquisition, Inc., a Delaware corporation, the Corporation, and ALH II, Inc., a Delaware corporation, pursuant to which Levitt would purchase all of the outstanding shares of the Corporation, which Purchase Agreement has been reviewed and approved by the Board of Directors of the Corporation; and

WHEREAS, as a condition to entering into the Purchase Agreement, Levitt is requiring the Corporation to terminate the 401(k) Profitsharing Plan previously adopted by the Corporation (the "Plan"); and

WHEREAS, the Board of Directors of the Corporation has determined it to be in the best interests of the Corporation to enter into the Purchase Agreement; and

WHEREAS, in connection with the execution of the Purchase Agreement, the Board of Directors of the Corporation has determined it to be in the best interests of the Corporation to terminate the Plan.

NOW, THEREFORE, BE IT RESOLVED, that the Plan shall be terminated effective immediately prior to the closing of the transactions contemplated by the Purchase Agreement, and that such termination of the Plan, be, and it hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Corporation be and each of them hereby is authorized and empowered, for and on behalf of the Corporation, to negotiate, execute and deliver such applications, certificates, documents, agreements or instruments required or desired to be delivered by the Corporation in connection with the termination of the Plan, on such terms as such officers may deem advisable, necessary or desirable, the

2

88239

preparation, execution and delivery of such applications, certificates, documents, agreements or instruments to be conclusive evidence of such due authorization by the Corporation.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Corporation be and each of them hereby is authorized, directed and empowered on behalf of the Corporation and in its name, to prepare, execute, deliver and/or file any applications, certificates, documents, agreements, or any other instruments or any amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Corporation to carry out the obligations of the Corporation under, and to effect the transactions contemplated by, the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such applications, certificates, documents, agreements, or any other instruments or any amendments or supplements thereto, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Corporation.

RESOLVED, that all actions heretofore taken by any officer of the Corporation in connection with any of the foregoing be, and each of them hereby is, ratified, confirmed and approved.

## SPECIAL COMPENSATION COMMITTEE DETERMINATION

Mr. Buchler then noted that Shalom Lamm had reported to him, on behalf of the Special Compensation Committee established at the Boards' March 24, 2004 meeting, that the Committee had determined not to grant a fee to Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company, in connection with its efforts to facilitate the Bowden sale.

88239

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

George Buchler
Chairman of the Meeting

88239