Because Mattamy's proposal was the most favorable of the proposals received, the Company and Mattamy executed a non-binding term sheet on April 11, 2003. Mr. Avila stated his view that the deal described in the Mattamy term sheet represents the best transaction for the sale of the ABI.

Mr. Buchler reviewed the status of the discussions regarding the proposed sale of ABI to Mattamy. He reported that Mattamy finished its accounting due diligence and is close to finishing its legal due diligence. He reported that several issues remain to be resolved by the parties, including the ability of ABI to assign all of its land contracts to Mattamy, Mattamy's proposed assumption of ABI's bank debt, and the potential transfer of an ABI account receivable related to the Towers' litigation. Mr. Lanius mentioned that Don Walker, Mattamy's Chief Financial Officer, had indicated to him that these three issues were the only significant concerns that Mattamy currently had regarding the proposed sale of ABI.

With respect to the ability of ABI to assign its land contracts, Mr. Buchler mentioned that Baker & Hostetler, PC, the Company's Florida counsel, provided a memorandum indicating that ABI should be able to assign its rights under its contract to purchase lots from Oakleaf Plantation, LLC. However, Baker & Hostetler indicated that, with respect to ABI's lot purchase agreement with Bartram Lakes, LLC, the standards for assigning ABI's rights are more restrictive. Mr. Laguardia asked the Board if he should contact the Bartram Springs developer about the potential assignment of the contract. It was decided by the Board that the Company's Florida counsel would prepare a draft assignment of the Bartram Springs contract and that Mr. Buchler would have the authority, on behalf of the Board, to authorize Mr. Laguardia to contact the developer when, and if, Mr. Buchler determined that it would be advisable to do so.

### Market Status

Mr. Buchler then asked Messrs. Laguardia and Lanius to provide their views regarding the proposed sale of ABI. Mr. Laguardia stated that he thought Mattamy had made the strongest offer for the ABI business and that this was the peak of the Jacksonville, Florida real estate market. He noted that ABI was performing exceptionally well at this time and that ABI's margins have improved steadily with EBITDA increasing to 14% in the month of April and to 13% for the period of January through March, 2003. Mr. Laguardia cautioned, however, that he could not estimate how long this environment will continue. He mentioned that the Jacksonville market currently has a shortage of lots. As a result, developers are raising lot prices and asking for larger deposits and requiring takedowns of larger numbers of lots. Thus far, ABI has been able to pass these lot price increases on to its buyers, but he was concerned about ABI's ability to continue doing so. Mr. Laguardia stated that, based on these factors, his view is that the Company would be selling ABI at the peak of the market.

Mr. Avila also suggested that a sale presently would be at the market peak because 10,848 units were sold in the Jacksonville market in 2002, an unusually large number of units. Mr. Laguardia added that this number is significantly higher than the historical average of 7,500 units sold per year. Mssrs. Laguardia and Avila also indicated to the Board that

84417

2

competition in the Jacksonville market is intensifying with many national and regional homebuilders entering the Jacksonville market. For example, D.R. Horton, Inc. is planning to sell 1,000 homes per year in the Jacksonville market and KB Home is buying lots to build 1,000 homes per year in the Jacksonville market. These homes would represent 26.67% of the historical average of units sold each year. Also, they indicated that Toll Brothers, Inc. and Lennar Corporation appear to be looking to enter the Jacksonville market. The entrance of these larger homebuilders/developers into the Jacksonville market would likely have a negative impact on ABI's future performance.

Mr. Lamm stated his view that ABI is considered a real "player" in the Jacksonville homebuilding market again and has a reputation sufficient for dealing with major developers. Mr. Laguardia agreed that ABI is now on the "A" list with some developers, but he questioned ABI's ability to maintain this status in the future because ABI's size and financial resources preclude it from buying land for its own account and developing lots. He added that big developers did not approach ABI when lots were being sold in two recent deals. In one such deal, Rutherford sold 50% of its lots to another large developer, Ryland, and, in another deal, Rutherford sold 50% of its lots to a large homebuilder without contacting ABI.

### Liquidity Concerns

Mr. Lanius then explained that the Company faces various liquidity issues with respect to the capital required for ABI to honor its existing land contracts. He indicated that ABI is ramping up from selling 350 homes per year to 400 homes per year and that it needs more cash and increased credit facilities for its increased inventory. ABI has four major lot purchases upcoming pursuant to existing contracts:

(1)    Oakleaf Plantation – 130 lots at a cost of $4.4 million;
(2)    Bartram Springs – 86 lots at a cost of $4.0 million;
(3)    John's Creek – 80 lots at a cost of $4.2 million; and
(4)    Bentwater – 51 lots at a cost of $2.4 million.

These upcoming purchases of an aggregate of 347 lots at a total cost of $15 million equals the total number of homes that ABI typically can close and sell within any given year. Because these purchases will take place over a compressed period of time, ABI's financial resources are being placed under considerable strain. ABI does not presently have either the cash or credit available with existing lenders to finance these contemplated purchases, and Messrs. Laguardia and Lanius stated that ABI will need to find other financing to fund the required purchases under these contracts. Mr. Lanius stated that he will need to find financing solutions within the next two months.

In addition to ABI's liquidity concerns, Mr. Buchler stated that the Company also has serious liquidity issues. The poor results generated by Mulvaney Homes, Inc. ("Mulvaney") are causing the Company's auditors to write down a minimum of $15 million in goodwill and have impacted the Company's financial statements. Mr. Buchler also mentioned that the Company will need to write down certain other receivables, further negatively impacting its financial statements.

84417

Mr. Lanius said that over the next six months, the Company should have approximately $2.4 million in cash flow. In addition to the need to obtain financing for the ABI lot purchases, the Company is near the limit on its lines of credit at Mulvaney required to start an 18-unit development. He also added that the Company also does not have sufficient cash on hand to finance the projected settlement of the Bowden family litigation.

### Bowden Building Sale

Mr. Avila then updated the Board on the sale of Bowden Building Corporation ("Bowden Building"). He said that Walter Industries, Inc. shows continued interest in Bowden Building, but, in his view, purchase price issues will need to be considered in light of Bowden Building's improved performance.

Mr. Buchler asked if there were any other questions pertaining to the sale of ABI or the other two divisions. There were none, and Mr. Avila left the call at this time.

### Proceeds

Mr. Buchler next discussed the application of the net proceeds from the proposed sale of ABI. The proposed sale would provide the Company with approximately $17 million in cash (subject to a reduction for amounts required to be placed in escrow under the proposed sale documentation). After deducting expenses and other amounts payable, there would be net proceeds of approximately $16 million available to the Company (subject to the escrow amounts). The estimated cost of settling the litigation with the Bowden family is approximately $5 million. The remaining $11 million would be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the Loan Agreement, dated April 6, 2000, among ALH II and the Company's members who are a party thereto and the Loan Agreement, dated May 7, 2002, among ALH II and the Company's members who are a party thereto. Any remaining monies could then be used to pay down amounts owing under the Note Purchase Agreement, dated January 13, 2000, between the Company and Wachovia Bank, N.A., as amended to date (which is secured by a surety bond posted by Swiss Reinsurance America Corporation and Amwest Surety Insurance Company), and to support operations at the Company's other subsidiaries.

### The Bowden Family Litigation

Mr. Buchler reviewed the status of the litigation with the Bowden family. Steve Alexander, with Fried, Frank, Harris, Shriver & Jacobson, joined in the telephonic meeting at the invitation of the Board.

Mr. Alexander provided the Board with an update regarding the litigation, which is scheduled for trial on June 23, 2003. He explained that ALH Acquisition's local attorney intends to file a motion to postpone the trial, but he indicated that we do not know whether the judge will grant this motion.

4

84417

Mr. Alexander explained that there are two motions currently pending in the Bowden litigation: The first motion was brought by the Bowden family and seeks partial summary judgment with respect to amounts owing by ALH Acquisition under the Bowden Note. The second motion was brought by ALH Acquisition regarding consequential damages (lost profits) and seeks dismissal of those claims due to the speculative nature of the alleged damages.

He explained that the Bowden family's case revolves around two sets of claims. The first set alleges that ALH Acquisition failed to pay interest and other amounts owing on the Bowden Note when and as required in accordance with its terms. The Bowden family's motion for partial summary judgment raises this set of claims. Given the terms of the Bowden Note and ALH Acquisition's failure to pay amounts when due, Mr. Alexander did not think that ALH Acquisition had strong defenses to this claim.

He explained that the amounts potentially owing with respect to Bowden's motion for partial summary judgment for non-payment of the Bowden Note are as follows: The principal amount is $2.25 million, and accrued interest is approximately $600,000. There is also an earn-out provision with a minimum and a maximum calculation. The Company's estimate of the earn-out provision's value is approximately $675,000. In addition, the judge can require payment of attorney's fees that are estimated at between $200,000 and $600,000. Based on these amounts, if the Bowden family were to prevail on its motion, the total judgment could be approximately $4 million. If the Bowden family prevails on its motion and the Company wants to appeal the court's decision, ALH Acquisition would have to post a bond for the full amount of the judgment.

The second set of claims brought by the Bowden family is for consequential and punitive damages. These claims are more tenuous. After selling Bowden Building to ALH Acquisition, the Bowden family apparently started three new businesses. All three companies failed, and the Bowdens each claim losses of over $3 million for each business. Mr. Alexander stated that the failure of ALH Acquisition to make interest and earn-out payments does not appear to have significantly affected these other businesses. He said that, in fact, recently produced documents appear to show that the Bowden family was in severe financial straits prior to ALH Acquisition's failure to make interest and earn-out payments under the Bowden Note. The Bowden family had been asking for tens of millions of dollars under this second claim, and this demand appears to be driven by their need to repay their debt. At the most recent mediation, the Bowdens said they needed $13 million to repay this debt. However, it now appears that the Bowden family's real exposure with banks is for deficiencies valued at approximately $1.3 million. Mr. Alexander then indicated that the second claim has a value ranging from zero to unknown millions.

The court ordered mediation discussions between the parties were held on April 28, 2003. Mssrs. Buchler, Lanius and Alexander attended these discussions on behalf of ALH Acquisition. In these discussions, ALH Acquisition offered $5 million to settle the Bowden family lawsuit: $1 million to be paid upfront and $4 million to be paid later from the proceeds of the sale of ABI. The Bowden family, however, countered at $8 million (with such payment to be deferred for some time, but not subject to the closing of the sale of ABI, and with a guarantee of such payment by the Company) to settle. Mr. Alexander stated that

5

84417

he had told the Bowdens' attorney during these discussions that the most that the Company could offer is $5 million due to financial restrictions that the Company's lenders placed on the Company. While no settlement was reached, the mediator is continuing to work with the parties. Based on these discussions, it appears that Bowdens might accept $5-6 million if the Company had the cash in hand or the amount was guaranteed.

Mr. Buchler asked if there were any other questions pertaining to the Bowden litigation. There were none, and Mr. Alexander left the call at this time.

## Other Matters

Mr. Laguardia proposed to the Board that it accept his resignation as President of Mulvaney and replace him with Gary Shamp. He then proposed that he become a Vice President at Mulvaney and that the Company also promote Julie Walker to the position of Vice President of Mulvaney. After considering this proposal, a vote was taken and unanimously approved by the members of the Board. Mr. Lanius stated that he would draft a Unanimous Written Consent accepting Mr. Laguardia's resignation and authorizing the appointments of Mssrs. Shamp and Laguardia and Ms. Walker.

The Board members agreed that, unless necessary, they would postpone the next scheduled meeting on June 4th in light of Mr. Arenson's conflicting travel plans. The Board members agreed to delay the meeting until some time shortly thereafter so that the contract for the sale of ABI to Mattamy could be reviewed and considered.

Mr. Arenson inquired about Mr. Lanius' continued role at the Company and whether Mr. Lanius intended to work for Mattamy if the proposed ABI sale occurred. Mr. Lanius responded that he was still in discussions with Mattamy's management regarding his future employment status.

84417

6

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

George Buchler
Chairman of the Meeting

84417

# EXHIBIT U

## State of Delaware
## Office of the Secretary of State   PAGE 1

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "ALH II, INC.",
FILED IN THIS OFFICE ON THE NINTH DAY OF DECEMBER, A.D. 1998, AT
9 O'CLOCK A.M.



Edward J. Freel, Secretary of State

2976631   8100

991076752

AUTHENTICATION:   9600512

DATE:   02-26-99

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 12/09/1998
981473321 - 2976631

## CERTIFICATE OF INCORPORATION

### OF

### ALH II, INC.

FIRST.    The name of this corporation shall be:

### ALH II, INC.

SECOND.    Its registered office in the State of Delaware is to be located at 1013 Centre Road, in the City of Wilmington, County of New Castle and its registered agent at such address is CORPORATION SERVICE COMPANY.

THIRD.    The purpose or purposes of the corporation shall be:

To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH.    The total number of shares of stock which this corporation is authorized to issue is:

One Thousand Five Hundred (1,500) Shares With No Par Value

FIFTH.    The name and address of the incorporator is as follows:

Kimberly Wright
Corporation Service Company
1013 Centre Road
Wilmington, DE  19805

SIXTH.    The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH.  No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director.  Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.  No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

IN WITNESS WHEREOF, the undersigned, being the incorporator hereinbefore named, has executed, signed and acknowledged this certificate of incorporation this ninth day of December, A.D., 1998.

Kimberly Wright
Incorporator

# EXHIBIT UU

**Minutes of a Meeting of the**
**Supervisory Board of ALH Holdings LLC**
**Held on June 26, 2003**

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH
Holdings LLC, a Delaware limited liability company (the "Company"), was held on June
26, 2003, pursuant to Section 6.2 of the Operating Agreement of the Company. In
attendance were the following members of the Board:

| | |
|---|---|
| Avie Arenson | Shalom E. Lamm |
| George Buchler | Bruce Stein |
| Eugene Krieger | |

John Laguardia, President and Chief Executive Officer of the Company, William Lanius,
Treasurer and Chief Financial Officer of the Company, and David K. Robbins and Lino
Lauro of Fried, Frank, Harris, Shriver & Jacobson, counsel to the Company, also attended
the meeting at the invitation of the Board. The meeting was called to order at 9:00 AM
PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to address two issues:

    (1)    Board approval of the proposed settlement of the lawsuit brought by
Helen E. Bowden, Donald L. Bowden, Sr., Donald L. Bowden, Jr., and
Jere W. Bowden, as Plaintiffs (the "Bowden Plaintiffs"), against ALH II,
Inc., a Delaware corporation and wholly-owned subsidiary of the
Company ("ALH II"), ALH Tennessee Acquisition, Inc., a Delaware
corporation and an indirect, wholly-owned subsidiary of the Company
("Tennessee Acquisition"), Bowden Building Corporation, a Tennessee
corporation and an indirect, wholly-owned subsidiary of the Company
("BBC" and together with ALH II and Tennessee Acquisition, the "BBC
Entities"), Shalom Lamm, an individual, and Jon Zich, an individual, as
Defendants, in that certain matter No. Ct. 003524-01 filed in the Circuit
Court of Tennessee for the Thirtieth Judicial District at Memphis (the
"Bowden Family Litigation"); and

    (2)    Board approval of the proposed sale of substantially all of the assets of
Atlantic Builders, Inc., a Florida corporation and an indirect, wholly-
owned subsidiary of the Company ("ABI"), to an affiliate of Mattamy
Homes, Ltd., an Ontario corporation ("Mattamy").

## THE BOWDEN FAMILY LITIGATION

Stephen Alexander of Fried, Frank, Harris, Shriver & Jacobson joined the meeting at the
invitation of the Board. Mr. Alexander explained the terms of the proposed settlement of
the Bowden Family Litigation, as described in the letter from Allen S. Blair to Stephen
Alexander and John S. Golwen, dated June 25, 2003, and previously provided to the Board

1

84981

(the "Settlement"). Under the terms of the Settlement, the BBC Entities would be required to pay the Bowden Plaintiffs $5 million (the "Settlement Cost") and reimburse them for $210,000 for their attorneys' fees. The Settlement Cost would be payable as follows: $1 million would be due immediately upon the execution of the settlement agreement; and an additional $4 million (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would be payable upon the earlier to occur of August 31, 2003 or the consummation of the sale of ABI. In addition, the Settlement provides the BBC Entities the option to extend the final payment date for an additional 90 days for a fee of $250,000.

Mr. Alexander indicated that the sum of the Settlement Cost and the $210,000 for the attorneys' fees of the Bowden Plaintiffs is approximately $500,000 to $750,000 more than the aggregate amount that the BBC Entities would be obligated to pay under the terms of the promissory note owing to the Bowden Plaintiffs and under the earn-out provision contained in the Stock Purchase Agreement, dated as of January 20, 1999, as amended, with the Bowden Plaintiffs. He stated that, while the outcome of the Bowden Family Litigation cannot be predicted, the BBC Entities could easily be required to pay an amount in excess of the Settlement Cost if there were a judgment in favor of the Bowden Plaintiffs. Given that the court could (and likely would) rule against the BBC Entities in the pending action for partial summary judgment on the promissory note, Mr. Alexander stated that, in his view, if this settlement was rejected, the likelihood of a settlement later on terms as favorable as those of the Settlement were remote. Mr. Alexander stated that, given the potential alternatives, the proposed terms of the Settlement, including the Settlement Cost, were favorable to the Company and the BBC Entities.

Mr. Laguardia informed the Board that ALH II had already accrued a $5 million liability for the Bowden Family Litigation on its balance sheet, and payment of the Settlement Cost (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would result in only a $210,000 impact on ALH II's financial statements.

Mr. Lanius stated that ALH II could pay the first installment (of $1 million) of the Settlement Cost with funds currently held by its subsidiaries. Mr. Lanius commented that reaching a settlement was difficult and that he thought that the terms of the Settlement were favorable to the Company and the BBC Entities. Messrs. Arenson and Lamm commented that they also thought that the proposed terms of the Settlement were favorable to the Company and the BBC Entities.

Mr. Arenson asked the Board how the second installment (of $4,000,000) of the Settlement Cost (plus $210,000 for the attorneys' fees of the Bowden Plaintiffs) would be addressed if the proposed sale of ABI were not consummated. Mr. Buchler stated that, under such circumstances, the BBC Entities would need to exercise their option to extend the final payment date and seek other purchasers for ABI.

A full discussion ensued, after which Mr. Buchler asked if there were any other questions for Mr. Alexander pertaining to the Bowden Family Litigation or the Settlement. There were none, and Mr. Alexander left the call at this time.

84981

2

Upon motion duly made and seconded and unanimously approved, the Board adopted the following resolutions:

APPROVAL OF SETTLEMENT

WHEREAS, the Supervisory Board of the Company believes it is in the best interests of the BBC Entities to enter into the Settlement with the Bowden Plaintiffs substantially on the terms previously reviewed by the Board and attached hereto as Exhibit A; and

WHEREAS, the Supervisory Board of the Company has been advised by management and counsel as to the claims, risks and costs of the Bowden Family Litigation and the proposed terms of the Settlement and has determined it to be in the best interests of the Company for the Company and the BBC Entities to enter into a settlement agreement and settle the Bowden Family Litigation, on the terms and subject to the conditions set forth in the Settlement.

NOW, THEREFORE, BE IT RESOLVED, that the Settlement, substantially on the terms reviewed by the Supervisory Board of the Company and attached hereto as Exhibit A, be, and it hereby is, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of, and counsel to, the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the settlement agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the BBC Entities in connection with the Settlement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the BBC Entities that are its direct and indirect subsidiaries to, enter into the Settlement on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84981

3

## SALES EFFORTS

Tony Avila with Jolson Merchant Partners ("JMP") was invited to join the meeting. Mr. Avila gave an overview of JMP's efforts to find purchasers for the sale of the Company's various subsidiaries and/or assets.

### Status of Potential Bowden Building Sale

At the request of Mr. Arenson, Mr. Avila described the status of efforts to find purchasers for BBC. Mr. Avila stated that Walter Industries, which expressed interest in purchasing BBC's assets last year, might have renewed interest in pursuing the transaction after the settlement of the Bowden Family Litigation. In his view, it is an excellent time to sell BBC because of its strong performance in the first half of 2003.

Mr. Laguardia pointed out that BBC would achieve approximately $2.2 million in EBITDA for the first half of 2003 and appears able to maintain comparable EBITDA throughout the second half of 2003. Mr. Avila said that the Company might obtain a purchase price representing a multiple of five times its EBITDA for 2003 from a potential buyer and that, with EBITDA of $4.4 million, the purchase price for BBC could exceed $20 million.

### Status of Potential Mulvaney Homes Sale

Mr. Avila stated that, in his view, it was not yet the best time to sell Mulvaney Homes, Inc., a North Carolina corporation and an indirect, wholly-owned subsidiary of the Company ("Mulvaney"). He recommended that the Company continue its efforts to expand Mulvaney's business before pursuing sales opportunities. In his view, Mulvaney needs increased EBITDA to obtain a target sales price of $65 million. Presently, entry-level competition from other builders, combined with decreased demand for homes in the Charlotte real estate market (and significant, recent lay-offs by the employers of potential homebuyers in the area), may limit EBITDA in the short term. Mr. Avila recommended that the Board reconsider its opportunities with respect to the sale of Mulvaney in the second half of 2003.

## PROPOSED SALE OF ABI

The Board considered the proposed sale of substantially all of the assets of ABI to Mattamy (Jacksonville) Partnership, a Florida general partnership and an affiliate of Mattamy ("Buyer") on the terms described in the draft of the proposed Asset Purchase Agreement (the "Purchase Agreement"), among ABI, ALH Acquisition Corp., a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("Acquisition Corp.") and, together with ABI, the "Seller Entities") and Buyer, a draft of which had previously been circulated to the Board.

4

84981

### Evaluation by JMP

Mr. Buchler asked Mr. Avila to assess the terms of the proposed sale of ABI. Mr. Avila stated that he thought the proposed Purchase Agreement represented the best potential transaction for the sale of ABI. Mr. Avila indicated that in making this determination he had performed a review of comparable sales transactions. He also reviewed the proposed Purchase Agreement and compared it to documents for similar transactions. He stated that the proposed Purchase Agreement is "market" and has terms, conditions, covenants and other provisions consistent with those found in such comparable sales agreements.

Mr. Avila pointed out that the bid from Mattamy was the highest bid (by approximately $1.5 million to $2.0 million) that the Company had received for ABI. He explained that the combination of (i) the approximately $17 million purchase price (subject to adjustments described in the Purchase Agreement), (ii) ABI's ability to retain certain receivables with approximately $2.5 million in value and (iii) Buyer's assumption of substantially all of ABI's outstanding debt, results in a deal which yields an aggregate purchase price of approximately $40 million.

Mr. Avila explained that ABI's projected EBITDA for 2003 is approximately $8 million, and that the aggregate purchase price approximates a multiple of five times this projected EBITDA. Mr. Avila stated that the aggregate purchase price is based, therefore, upon an EBITDA multiple that is well above the average for previous sales of homebuilders and is at least as high as any recent transaction with which he is familiar. The aggregate purchase price also compares favorably to sales prices that are derived from a multiple of a company's book value or earnings.

Mr. Avila stated that, based upon his analysis and review, he believed that the proposed transaction for the sale of ABI on the terms described in the proposed Purchase Agreement was fair to the Company from a financial point of view.

Mr. Buchler asked if there were any other questions for Mr. Avila pertaining to the proposed sale of ABI or JMP's pursuit of possible transactions regarding Mulvaney or BBC. There were none, and Mr. Avila left the call at this time.

### Evaluation by the Company's Senior Officers

Mr. Buchler then asked Messrs. Laguardia and Lanius to provide their views regarding the proposed sale of ABI. Mr. Laguardia stated that he thought Mattamy had made its offer for the ABI business at the peak of the Jacksonville, Florida homebuilding market. Mr. Laguardia stated that other homebuilders, such as Lennar and Standard Pacific, were considering entry into the Jacksonville real estate market and that additional competition from large participants would make it more difficult for ABI to maintain its current profit levels. Mr. Laguardia stated that, based on these factors, he believed that the Company would be selling ABI at the peak of the market. In addition, Mr. Laguardia noted that the proceeds of the proposed ABI sale could be used to pay for the settlement of the Bowden Family Litigation, which would enhance the Company's ability to sell BBC.

84981

Mr. Lanius concurred with Mr. Laguardia's evaluation of the Jacksonville real estate market. In addition, Mr. Lanius stated that ABI needs substantially better capitalization in order to continue competing in the Jacksonville market. He explained that ABI's upcoming lot purchase obligations under its existing contracts (such as those regarding the Oakleaf Plantation and Bartram Springs developments) will require ABI to purchase large numbers of lots and will place considerable strain on the Company's liquidity resources. He also indicated that, to compete successfully in Jacksonville in the future, ABI must begin purchasing large numbers of lots in single transactions, a requirement that ABI does not have sufficient financial resources to meet. Mr. Lanius concluded that, from a financing and liquidity perspective, it is the most opportune time to sell ABI.

*Counsel's Presentation regarding the Purchase Agreement*

Mr. Buehler requested Mr. Robbins to provide a brief overview of the draft of the Purchase Agreement that had been circulated to the Board. Mr. Robbins stated that he would address some of the more significant provisions contained in the latest draft of the Purchase Agreement circulated by Mattamy's counsel, and he indicated that several issues remained open to further negotiation. Mr. Robbins explained that the draft circulated by Mattamy's counsel provides as follows:

Transaction Structure and Liabilities: The proposed transaction would be structured as an asset sale with ABI retaining certain liabilities, including all liabilities of ABI prior to closing (unless a reserve for such liabilities had been established on ABI's balance sheet as of December 31, 2002). ABI's retained liabilities would include, therefore, all environmental liabilities, whether or not caused by ABI, in existence prior to the closing, as well as claims with respect to pre-closing employment matters. In addition, he indicated that ABI would remain liable for warranties on homes built prior to closing, but that the draft Purchase Agreement provides for a "basket" of approximately $413,000 for these warranty claims, which must be exhausted before Mattamy is entitled to seek indemnification for warranty claims from ABI.

Retained Assets: ABI would retain an account receivable related to the Towers' litigation and pre-paid expenses related to insurance and indebtedness. Mr. Buehler informed the Board that these items are currently valued on ABI's balance sheet at approximately $437,000, $46,000 and $19,000, respectively.

Escrow Amount: At closing, Buyer will place $2,000,000 of the purchase price in escrow. $1,000,000 of this escrow amount, less the amount of any claims made pursuant to the indemnification provisions of the Purchase Agreement, shall be released to ABI on the first anniversary of the closing. The remaining portion of the escrow amount, less the amount of any claims made pursuant to the indemnification provisions of the Purchase Agreement, shall be released to ABI on the second anniversary of the closing.

Representations and Warranties: The representations and warranties that Buyer is requesting from the Seller Entities are highly detailed and the "knowledge" qualifier provided by the Buyer with respect to these representations and warranties requires the Seller Entities to make "due inquiry" into the veracity of many representations. Therefore,

6

84981

the schedules to the Purchase Agreement must be carefully prepared by the Seller Entities, and the Seller Entities must interview employees and carefully review their books and records to ensure the Seller Entities' compliance with these representations and warranties.

Interim Period Covenants: The covenants with respect to the operation of ABI during the period between signing and closing are typical for deals of this size and nature.

Closing Conditions: Buyer's obligation to purchase ABI's assets is subject to the Seller Entities' satisfaction of the following conditions, among others:

- The representations and warranties of the Seller Entities must be true and correct, except where such failure would not, individually or in the aggregate, be reasonably expected to cause a material adverse change in the assets or operations of ABI.
- Messrs. Lanius and Holt must enter into employment agreements with Mattamy.
- Buyer must hire at least 32 out of 39 of ABI's employees.
- ABI's net income for the period beginning January 1, 2003 until the closing must exceed $1.4 million. Mr. Buehler informed the Board that ABI is currently projecting to generate $2.134 million in net income for the first six months of 2003. The Purchase Agreement provides that the purchase price may be increased by ABI's net income over $1.5 million, and, based upon these projections, the purchase price would be increased by $634,000.
- ABI must obtain consents with respect to certain of its lot purchase and option contracts, including consents with respect to ABI's agreements with Bartram Springs ("Bartram"). Because the purchase of ABI is structured as an asset deal, it may be difficult to avoid obtaining a consent from Bartram, but Baker & Hostetler has proposed a structure which would not require Bartram's consent. This proposal is not without risk, and Bartram might challenge the proposed structure. Of course, ABI must first get the Buyer to cooperate with it to pursue such a structure, and ABI is attempting to do so.

Termination: The current draft of the Purchase Agreement allows either party to terminate the proposed transaction on or after July 25, 2003, and limits the damages that may be recovered from the terminating party to $300,000. Mr. Robbins noted that ABI has been trying to establish an earlier termination date but that, in light of ABI's difficulties in obtaining Bartram's consent, this might not be possible.

Indemnification: The indemnification procedures of the Purchase Agreement limit the Seller Entities' liability to $10,000,000 (for claims that do not arise from fraudulent, willful or intentional misrepresentations or claims arising from breaches of representations and warranties that ABI had knowledge of). This indemnification amount is subject to a "basket" of $200,000, and individual claims under $2,500 are not counted towards this indemnity basket. Similarly, Buyer's indemnification obligations are capped at $10,000,000. The indemnification period for many claims expires on the second anniversary of the closing, although claims for breaches of certain representations and warranties may be made until the fifth anniversary of the closing.

84981

Guaranty: Contemporaneously with the signing of the Purchase Agreement, Mattamy will execute a Guaranty with respect to Buyer's obligations to pay the purchase price and repay or assume ABI's existing indebtedness at closing.

Non-Compete: The Purchase Agreement provides that neither the Company nor any of its direct or indirect subsidiaries will (A) compete with Buyer in the Jacksonville area homebuilding market during the seven-year period following the closing or (B) solicit or hire any of Buyer's employees, contractors, customers or suppliers during the five-year period following the closing. Baker & Hostetler has advised ABI that the length of the non-compete provision may not be enforceable under Florida law, and ABI is attempting to clarify this issue with the Buyer.

Contractor's License. Buyer has not yet obtained a contractor's license with the Florida Construction Industry Licensing Board and must apply for one. ABI has been informed that the application process could take up to six weeks. Buyer has requested that ABI, for no more than three months following the closing, maintain its existing contractor's license for the benefit of Buyer until Buyer obtains a new license. ABI has requested that Buyer indemnify ABI with respect to these obligations, reimburse ABI for all of its fees and costs associated with its maintenance of this license and cause ABI to be named as an additional insured on Buyer's insurance policies.

Mr. Buchler noted that Buyer has also agreed to obtain title insurance with respect to the Owned Real Property at its sole cost and expense, resulting in ABI's saving approximately $200,000 in title expenses. Mr. Buchler then asked if there were any other questions for Mr. Robbins regarding the Purchase Agreement. There were none. Mr. Buchler then read resolutions (set forth below) with respect to the Purchase Agreement for consideration by the Board.

A discussion ensued. Mr. Arenson questioned whether it would be better for the Company to raise additional equity rather than sell the assets of ABI. Instead, Mr. Arenson suggested that the shareholders might consider investing more capital in ABI. Mr. Buchler noted that (i) ABI has pressing liquidity needs that it will not be able to meet in the near future, (ii) the Settlement with the Bowden Plaintiffs can be brought to a conclusion upon the consummation of the sale of ABI and (iii) no other proposals for funding or acquiring ABI, including proposals of the Class B Members or Mr. Arenson, have been proposed to the Company's Board for its consideration. Mr. Laguardia stated that Jacksonville is not an attractive market and that he would not recommend that the Company invest more money in the Jacksonville market because it had reached its peak and, with many new and powerful builders entering into this market, he anticipated that the business opportunities of ABI would deteriorate in the future.

Mr. Lamm then requested that the Board reconsider the proposed sale later in the day. Mr. Lamm stated that he had insufficient time to review the text of the proposed resolutions. In response to Mr. Lamm's request, the Board requested that Mr. Robbins discuss in greater detail the substance of the proposed resolutions with the Board. After such review and consideration of the merits of Mr. Lamm's proposal and the text of the proposed

8

84981

resolutions, the Board ultimately elected to proceed with a vote regarding the proposed sale of the assets of ABI.

After further discussion, upon motion duly made and seconded, the following resolutions were adopted by the Board, with Messrs. Buchler, Krieger and Stein voting in favor, Mr. Arenson voting against and Mr. Lamm abstaining:

APPROVAL OF ASSET PURCHASE AGREEMENT

WHEREAS, the Company desires to cause the Seller Entities to enter into the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, pursuant to which the Seller Entities will agree to sell substantially all of the assets of ABI and its subsidiaries to Buyer for a purchase price of approximately $17,000,000, subject to adjustment as provided in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company for the Seller Entities to enter into the Purchase Agreement and sell substantially all of the assets of ABI and its subsidiaries, on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Seller Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the Seller Entities to, enter into the Purchase Agreement and to consummate the transactions contemplated thereby on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84981

9

*Use of Proceeds*

Mr. Buchler requested that Messrs. Laguardia and Lanius leave the call.

At the request of Mr. Arenson, Mr. Buchler discussed the application of the net proceeds from the proposed sale of ABI. He stated that the proposed sale would provide the Company with proceeds of approximately $14 million (after taking into consideration the $2 million to be placed in escrow and deducting expenses and other amounts payable in connection with the Purchase Agreement). Upon subtracting the Settlement Cost (as well as $210,000 for the attorneys' fees of the Bowden Plaintiffs) for the Bowden Family Litigation, approximately $8.8 million would remain. Mr. Arenson suggested that the remaining $8.8 million could be applied to repay, to the extent permitted under the Company's other credit agreements, amounts owing under the Loan Agreement, dated April 6, 2000, of ALH II with certain of the Company's members and under the Loan Agreement, dated May 7, 2002, of ALH II with certain of the Company's members. He suggested that any remaining monies could then be used for the working capital needs of the Company or to repay amounts owing under the Note Purchase Agreement, dated January 13, 2000, between the Company and Wachovia Bank, N.A., as amended to date.

## OTHER MATTERS

*JMP Fee*

The Board next discussed a fee to be paid to JMP in connection with the ABI sale. Under the terms of the Engagement Letter, dated as of March 21, 2002, among JMP, the Company and ALH II, JMP was only entitled to a fee upon the sale of the whole Company. Mr. Avila and the Company had later agreed to negotiate a fee with JMP in good faith to be paid upon the sale of ABI within a certain timeframe. Pursuant to the terms of the Engagement Letter, JMP would have been entitled to a minimum fee of .85 basis points upon a sale of the whole Company. Mr. Avila had calculated the pro-rated fee for the ABI sale to be approximately $300,000. Upon motion duly made and seconded, the Board unanimously authorized Messrs. Buchler and Krieger on behalf of the Company to negotiate the fee for the ABI sale with JMP up to a maximum amount of $300,000.

*Exit Bonuses for Messrs. Holt and Lanius*

The Board next discussed the possibility of paying exit bonuses to Messrs. Lanius and Holt upon the consummation of the ABI sale and the termination of their employment. The Board agreed that Messrs. Lanius and Holt should both be treated fairly and generously and that Messrs. Buchler and Krieger could negotiate appropriate exit bonuses for each of them. Upon motion duly made and seconded and approved, the Board unanimously authorized Messrs. Buchler and Krieger to negotiate, approve and authorize appropriate exit bonuses for Messrs. Lanius and Holt.

*Adoption of Prior Meeting's Minutes*

84981

10

Mr. Buchler stated that the next order of business was the approval of minutes of the meeting of the Board held on May 14, 2003. Upon motion duly made and seconded, the Board unanimously approved minutes of the meeting of the Supervisory Board of the Company held on May 14, 2003.

*Corporate Record-Keeping*

Mr. Buchler informed the Board that he had been advised by counsel that the corporate minute books and other records of many of the Company's subsidiaries would need to be updated before signing the Purchase Agreement or entering into the Settlement. He asked Mr. Lauro to provide a brief overview of the types of modifications that needed to be made. Mr. Lauro explained that some ministerial actions, such as adopting name changes, should be reflected in the books and records of the Company's subsidiaries and that, under the terms of the Company's Operating Agreement, the Board must authorize its subsidiaries to undertake many such actions.

Upon motion duly made and seconded and unanimously approved, the following resolutions were adopted by the Board:

## RATIFICATION AND ADOPTION OF COMPANY ACTIONS

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company to cause the Company and its direct and indirect, wholly-owned subsidiaries (the "Subsidiaries") to take certain ministerial actions and measures as its counsel may advise ("Company Actions") and to adopt such resolutions as may be necessary or desirable to duly ratify, adopt or document the Company Actions of the Subsidiaries.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt, or document the Company Actions as such officers, upon the advice of counsel to the Company and the Subsidiaries, shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Subsidiaries on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt or document the Company Actions of the Subsidiaries.

*SHOC Fee*

84981

11

The Board next discussed the payment of a fee to Shamrock Holdings of California, Inc., a California corporation and Class A Member of the Company ("SHOC"), in connection with its efforts to facilitate the ABI sale. The Representatives who are affiliated with SHOC indicated that it would not be appropriate for them to participate in this decision, and Messrs. Buchler, Krieger and Stein agreed to abstain from any participation in these discussions. Messrs. Arenson and Lamm indicated that some payment to SHOC would be appropriate in consideration of SHOC's special services to the Company in connection with the Purchase Agreement, but Mr. Arenson suggested that he would like to consider this matter further. The Board decided that the payment of a fee to SHOC (if any), and the amount of any such fee, would be left to Messrs. Arenson and Lamm, and the Board agreed to form a Special Compensation Committee consisting of Messrs. Arenson and Lamm to make such determination.

Upon motion duly made and seconded and unanimously approved, the following resolutions were adopted by the Board:

FORMATION OF SPECIAL COMMITTEE

WHEREAS, it has been proposed that the Company create a Special Compensation Committee (the "Special Committee"), comprised of Messrs. Arenson and Lamm, to evaluate the services performed by SHOC and to determine the appropriateness and amount, if any, of the Company's payment of any bonus to SHOC (the "SHOC Bonus") in exchange for its services in facilitating the sale of substantially all of the assets of ABI and negotiating the terms of the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has decided to create the Special Committee to evaluate the services performed by SHOC and to determine the appropriateness and amount, if any, of the Company's payment of the SHOC Bonus.

NOW, THEREFORE, BE IT RESOLVED, that the Supervisory Board of the Company hereby adopts, ratifies and confirms the formation of the Special Committee.

RESOLVED, that the Supervisory Board of the Company hereby confirms that the current membership of the Special Committee, and the Chairmanship thereof, shall be as follows:

Avie Arenson, Chairman
Shalom E. Lamm

RESOLVED that the Supervisory Board of the Company hereby delegates to the Special Committee the power and authority of the Supervisory Board of the Company to evaluate the services performed by SHOC in connection with the sale of substantially all of the assets of ABI pursuant to the Purchase Agreement and to

12

84981

determine the appropriateness and amount, if any, of the Company's payment of the
SHOC Bonus.

84981

13

There being no further business to discuss, upon motion duly made and seconded and unanimously approved, the meeting was adjourned.

Respectfully submitted,

Bruce Stein
Secretary of the Meeting

APPROVED:

George Buchler
Chairman of the Meeting

84981

**PROPOSED RESOLUTIONS FOR A MEETING**
**OF THE SUPERVISORY BOARD**
**OF**
**ALH HOLDINGS LLC**
**(a Delaware limited liability company)**

**June 26, 2003**

84886

APPROVAL OF SETTLEMENT

      WHEREAS, the Supervisory Board of the Company believes it is the best interest of ALH II, Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("ALH II"), ALH Tennessee Acquisition, Inc., an indirect, wholly-owned subsidiary of the Company ("Tennessee Acquisition") and Bowden Building Corporation, a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("BBC" and, collectively, the "ALH Entities"), to enter into a settlement agreement with the Bowdens substantially on the terms set forth in the Letter from Allen S. Blair, dated June 25, 2003, and attached hereto as Exhibit A (the "Settlement"); and

      WHEREAS, the Supervisory Board of the Company has been advised by management and counsel as to the claims, risks and costs of the Bowden Litigation and the proposed terms of the Settlement and has determined it to be in the best interests of the Company for the Company and the ALH Entities to enter into a settlement agreement and settle the Bowden Litigation, on the terms and subject to the conditions set forth in the Settlement.

      NOW, THEREFORE, BE IT RESOLVED, that the Settlement, substantially on the terms reviewed by the Supervisory Board of the Company and attached hereto as Exhibit A, be, and it hereby is, approved, adopted, ratified and confirmed.

      RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of, and, if applicable, to execute and deliver, the settlement agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the ALH Entities in connection with the Settlement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

      RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the ALH Entities that are its direct and indirect subsidiaries to, enter into the Settlement on the terms described herein.

      RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

### APPROVAL OF ASSET PURCHASE AGREEMENT

WHEREAS, the Company desires to cause ALH Acquisition Corp., a Delaware corporation and an indirect, wholly-owned subsidiary of the Company ("Acquisition Corp."), and Atlantic Builders, Inc., a Florida corporation and an indirect, wholly-owned subsidiary of the Company ("ABI" and, together with Acquisition Corp., the "Seller Entities"), to enter into an Asset Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company (the "Purchase Agreement"), pursuant to which Seller Entities will agree to sell substantially all of the assets of ABI and its subsidiaries to Mattamy (Jacksonville) Partnership, a Florida general partnership and an affiliate of Mattamy Homes, Ltd., for a purchase price of approximately $17,000,000, subject to adjustment as provided in the Purchase Agreement; and

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company for the Seller Entities to enter into the Purchase Agreement and sell substantially all of the assets of ABI and its subsidiaries, on the terms and subject to the conditions set forth in the Purchase Agreement.

NOW, THEREFORE, BE IT RESOLVED, that the Purchase Agreement, substantially in the form previously reviewed by the Supervisory Board of the Company, and the transactions contemplated thereby, be, and they hereby are, approved, adopted, ratified and confirmed.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to negotiate the final form, terms and provisions of the Purchase Agreement with such changes, modifications and/or additions thereto as such officers shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Seller Entities in connection with the Purchase Agreement, on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to, and to take such action as is necessary or desirable to cause the Seller Entities to, enter into the Purchase Agreement and to consummate the transactions contemplated thereby on the terms described herein.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

## APPROVAL OF MINUTES

WHEREAS, the Supervisory Board of the Company has reviewed the Minutes of the Meeting of the Supervisory Board of the Company held on May 14, 2003, in the form attached hereto as Exhibit B.

NOW, THEREFORE, BE IT RESOLVED, that the Minutes of the Meeting of the Supervisory Board of the Company held on May 14, 2003, in the form attached hereto as Exhibit B, be, and they hereby are, approved, adopted, ratified and confirmed.

## APPOINTMENT OF OFFICERS

WHEREAS, pursuant to the Operating Agreement, the Supervisory Board of the Company desires, and deems it to be in the best interests of the Company, to authorize ALH II and its subsidiaries to take such actions as are necessary or desirable to cause ALH Acquisition Corp., Atlantic Builders, Inc., and Mulvaney Homes, Inc., which are each indirect, wholly-owned subsidiaries of the Company, to appoint certain individuals to positions as officers as set forth below:

## ALH Acquisition Corp.

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of ALH Acquisition Corp, a Delaware corporation, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
|------|--------|
| John Laguardia | Vice-President and Assistant Secretary |
| Eugene Krieger | Vice-President and Assistant Secretary |
| Bruce Stein | Vice-President and Assistant Secretary |

## Atlantic Builders, Inc.

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of Atlantic Builders, Inc., a Florida corporation, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
|------|--------|
| John Laguardia | Vice-President and Assistant Secretary |
| Eugene Krieger | Vice-President and Assistant Secretary |
| George Buchler | Vice-President and Assistant Secretary |
| Bruce Stein | Vice-President and Assistant Secretary |

84886

Mulvaney Homes, Inc.

RESOLVED, that the Company hereby accepts the resignation of John Laguardia as President of Mulvaney Homes, Inc., a North Carolina corporation ("Mulvaney").

RESOLVED, that the Company hereby authorizes ALH II and its subsidiaries to take such actions as are necessary or desirable to cause the following individuals to be appointed to serve as officers of Mulvaney, each to hold office until his or her successor has been duly elected and qualified:

| Name | Office |
|------|--------|
| Gary Shamp | President |
| John Laguardia | Vice-President |
| Julie Walker | Vice-President |

## RATIFICATION AND ADOPTION OF COMPANY ACTIONS

WHEREAS, the Supervisory Board of the Company has determined it to be in the best interests of the Company to cause the Company and the Subsidiaries to take certain ministerial actions and measures as its counsel may advise ("Company Actions") and to adopt such resolutions as may be necessary or desirable to duly ratify, adopt or document the Company Actions of the Subsidiaries.

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt, or document the Company Actions as such officers, upon the advice of counsel to the Company and the Subsidiaries, shall deem advisable, necessary or desirable, and to negotiate, execute and deliver such other certificates, documents, agreements or instruments required or desired to be delivered by the Subsidiaries on such terms as such officers may deem advisable, necessary or desirable, the preparation, execution and delivery of such certificates, documents, agreements and instruments to be conclusive evidence of such due authorization.

RESOLVED, that the Company hereby authorizes ALH II to take such action as is necessary or desirable to cause the Subsidiaries to duly ratify, adopt or document the Company Actions of the Subsidiaries.

## GENERAL RESOLUTIONS

RESOLVED, that each of the officers of the Company be, and each of them hereby is, authorized, directed and empowered on behalf of the Company

84886

and in its name to prepare, execute, deliver and/or file any applications, certificates, agreements, or any other instruments or documents, or amendments or supplements thereto, and to incur all fees and to pay all expenses which such officers may deem necessary or appropriate to enable the Company to carry out the obligations of the Company under, and to effect the transactions contemplated by the foregoing resolutions and to do and to cause to be done any and all other acts and things as such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions, the preparation, execution, delivery and/or filing of such certificates, documents, agreements and instruments, or the doing or causing to be done of such other acts and things, to be conclusive evidence of such due authorization by the Company.

RESOLVED, that any and all actions heretofore taken by any officer or Representative of the Company in connection with the foregoing be, and each of them hereby is, ratified, confirmed and approved.

84886

# EXHIBIT V

## LOAN AGREEMENT

### Dated as of April  6  2000

**Between**

**ALH II, INC.**
**a Delaware corporation**

**the "Borrower"**

**and**

**The Parties Described on Exhibit A,**

**the "Lender"**

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Loan Agreement") is made as of ~~April 6~~, 2000 by and between ALH II, INC., a Delaware corporation ("ALH") ("Borrower") and the Parties listed on Exhibit A hereto (collectively the "Lender").

## R E C I T A L S:

A.    The Borrower has requested a loan in the principal amount of Two Million Dollars ($2,000,000) as set forth herein (the "Loan") to finance certain operations of the Borrower.

B.    The Lender is willing to make the requested loan upon and subject to the terms and conditions set forth in this Agreement.

## A G R E E M E N T:

NOW, THEREFORE, in consideration of the covenants and conditions herein contained, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1.   Certain Defined Terms.  As used herein (including any Exhibits attached hereto), the following terms shall have the meanings set forth below (unless expressly stated to the contrary):

"ALH-Acquisition" shall mean ALH Acquisition Corporation, a Delaware corporation.

"ALH" shall mean ALH II, Inc., a Delaware corporation.

"ALH-Tennessee" shall mean ALH Tennessee Acquisition, Inc., a Delaware corporation.

"Atlantic Builders" shall mean Atlantic Builders, Inc., a Florida corporation.

"Borrower" shall mean ALH

"Bowden" shall mean Bowden Building Corporation, a Tennessee corporation,

"Business Day" shall mean any day except Saturday, Sunday or other day on which commercial banks are required or permitted by law to close in New York, New York.

"Event of Default" shall mean the occurrence, after any applicable grace period, of any of the events listed as Events of Default.

"GAAP" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession prevalent in the United States of America.

1

"Guarantors" shall mean the following entities: ALH Acquisition Corporation, a Delaware corporation ("ALH-Acquisition"), ALH Tennessee Acquisition Corporation, a Delaware corporation ("ALH-Tennessee"), Atlantic Builders Inc., a Delaware corporation ("Atlantic Builders"), Bowden Building Corporation, a Tennessee corporation ("Bowden"); Mulvaney Homes, Inc, a North Carolina corporation ("Mulvaney").

"Lender" shall mean the parties set forth on Exhibit A hereto and their successors and assigns.

"Material Adverse Change" shall mean any material and adverse change in, or a change which has a material adverse effect upon, any of:

(a)    the legal ability of the Borrower to perform its obligations under the Loan and to avoid any Event of Default; or

(b)    the legality, validity, binding effect or enforceability against the Borrower of the Loan Agreement.

"Maturity Date" shall mean December 31, 2000.

"Mulvaney" shall mean Mulvaney Homes, Inc., a North Carolina corporation

"Note" shall mean those certain Promissory Notes dated of even date herewith and executed by the Borrower, as maker, and made payable to the order of a Lender, as holder, in the aggregate amount of Two Million Dollars ($2,000,000) and maturing on the Maturity Date, to evidence the Loan, as such Promissory Notes may be amended or otherwise modified from time to time.

"Prepayment Price" shall mean an amount equal to (i) the principal amount of the Loan to be prepaid with no premium thereon, plus (ii) all accrued interest to the date of prepayment on the principal amount prepaid

## ARTICLE II
## THE LOAN

Section 2.1.    Agreement to Lend and Borrow; Evidence of Indebtedness and Maturity.

(a)    The Lender agrees, on the terms and conditions hereinafter set forth, to make the Loan to the Borrower for the purpose of providing financing for its operations. Each of the parties making up the Lender shall make a loan to Borrower only up to the amounts listed next to their name on Exhibit A.

(b)    Concurrent with the execution and delivery of this Loan Agreement, the Borrower shall execute and deliver to the Lender the Note, evidencing the indebtedness incurred by the Borrower pursuant to the terms of this Loan Agreement.

(c)    The outstanding principal balance of the Loan, together with accrued and unpaid interest thereon and all other amounts payable by the Borrower under the terms of the Loan Agreement, shall be due and payable on the Maturity Date.

Section 2.2.    Repayment of Principal. Principal of the Loan shall be due and payable on the Maturity Date

2

Section 2.3.    Interest.

(a)    The Loan shall bear interest from the date of disbursement hereunder on the unpaid principal at the per annum rate of fifteen (15%) percent. Throughout the term of the Loan, interest shall be calculated on the basis of a 360-day year consisting of twelve (12) thirty (30) day months.

(b)    On or before the fifth business day after the end of each calendar quarter, commencing with June 30, 2000, the Borrower shall pay the interest due for the previous quarter.

Section 2.4.    Prepayment of the Loan.  The Borrower shall have the right to prepay the Loan at any time, in full or in part at a price equal to the Prepayment Price.

Section 2.5.    Payments.  All computations of interest under the Loan Documents shall be made by the Lender on the basis of a year of 360 days, comprised of twelve (12) thirty (30) day months.  If any payment of interest or principal to be made by the Borrower shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing any interest with respect to such payment.

Section 2.6.    Applications of Payments: Late Charges

(a)    Payments received by the Lender pursuant to the terms hereof shall be applied in the following manner:

(1)    first, to any costs or expenses incurred by Lender in regard to the Loan.

(2)    second, to the payment of all interest accrued to the date of such payment; and

(3)    three, to the payment of principal.

(b)    If any installment of interest and/or the payment of principal is not received by the Lender within five (5) Business Days after the due date thereof, then the Lender may elect to assess a late charge of four percent (4%) of the amount of the installment due and unpaid, which such late charge will be added to the delinquent amount to compensate the Lender for the expense of handling the delinquency.  The Borrower and the Lender agree that such late charge represents a good faith and fair and reasonable estimate of the probable cost to the Lender of such delinquency.  Acceptance of such late charge shall not constitute a waiver of the default with respect to the overdue installment, and shall not prevent the Lender from exercising any of the other rights and remedies available hereunder.

Section 2.7.    Interest Rate Limitation.  The provisions of this Loan Agreement and the other Loan Documents are hereby expressly limited so that in no contingency or event whatsoever shall the amount paid or agreed to be paid to the Lender for the use, forbearance or detention of the sums evidenced by this Loan Agreement exceed the maximum amount permissible under applicable law.  If from any circumstance whatever the performance or fulfillment of any provision of this Loan Agreement or of any other Loan Document should involve or purport to require any payment in excess of the limit prescribed by law, then the obligation to be performed or fulfilled is hereby reduced to the limit of such validity, and if, from any circumstance whatever, the Lender should ever receive as interest an amount which would exceed the highest lawful rate under applicable law, then the amount which would be excessive interest shall be applied as an optional reduction of principal in accordance with the terms of Section 2.4 of this Loan Agreement (or, at the Lender's option, be paid over to the Borrower), and shall not be counted as interest.

Section 2.8    Guaranty.  Each of the Guarantors hereby expressly and unconditionally

3

guaranties the full and timely performance by the Borrower of its obligations hereunder. This guarantee shall remain in full force and effect until all of the Borrower's obligations hereunder have been fully and indefeasibly paid and satisfied. The guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment of all of Borrower's obligations hereunder without regard to any defense (other than the defense of payment), set-off or counterclaim which may at any time be available to or be asserted by the Guarantors against the Lenders. The Guarantors waive notice of or proof of reliance by the Lenders upon this guarantee or acceptance of this guarantee. All of Borrower's obligations hereunder, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this guarantee, and all dealings between Borrower or the Guarantors and the Lenders shall likewise be conclusively presumed to have been had or consummated in reliance upon this guarantee. The Guarantors unconditionally waive, to the extent permitted by applicable law, any and all rights the Guarantors may have or that at any time hereafter may be conferred upon them, by statute, regulation or otherwise, to terminate or cancel this guarantee.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1.    Consideration.  As an inducement to the Lender to execute this Loan Agreement, make the Loan and disburse the proceeds of the Loan, the Borrower represents and warrants to the Lender the truth and accuracy of the matters set forth in this Article III

Section 3.2.    Organization.  The Borrower and each Guarantor is duly organized, validly existing and in good standing as a corporation under the laws of the State of its respective incorporation, is duly qualified to do business and is in good standing in every jurisdiction where its business or properties require such qualification and has all requisite power and authority to own and operate its properties and to carry on its business as now conducted or proposed to be conducted.

Section 3.3.    Governmental Consents.  No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by any of the entities constituting the Borrower of the Loan Documents or any other document executed pursuant thereto or in connection therewith.

Section 3.4.    Validity.  The Loan Documents have been duly executed and delivered by and constitute the legal, valid and binding obligations of the Borrower, enforceable in accordance with their respective terms.

## ARTICLE IV
## COVENANTS OF BORROWER

Section 4.1.    Consideration.  As an inducement to the Lender to execute this Loan Agreement, make the Loan and make each disbursement of the Loan, the Borrower hereby covenants as set forth in this Article IV.

Section 4.2.    Affirmative Covenants  So long as any amount payable hereunder or under any other Loan Document shall remain unpaid or the Lender shall have any commitment to disburse the Loan hereunder, the Borrower shall, unless the Lender shall otherwise consent in writing:

(a)    Reporting Requirements.  Furnish or cause to be furnished to the Lender the following notices and reports:

(1)    *Quarterly Financial Reports.*  As soon as possible and in any event within forty five (45) days after the end of each fiscal quarter of the Borrower (other than the last quarter of any fiscal year), the unaudited financial statements of the

4

Borrower on a fully consolidated and consolidating basis, which financial statements shall include (A) a balance sheet as at the end of such fiscal quarter and (B) statements of income and cash flow for the period from the beginning of the then current fiscal year to the end of such fiscal quarter and setting forth in comparative form figures for the corresponding budget for such fiscal year, including income and expense statements for each division; all in reasonable detail and in accordance with GAAP consistently applied and certified by the Chief Financial Officer of ALH to fairly present the financial condition of the Borrower on a fully consolidated and consolidating basis as at the end of such fiscal quarter and the results of the operations of the Borrower on a fully consolidated and consolidating basis for the period ending on such date;

(2)    *Annual Financial Statements.* As soon as possible after the end of each fiscal year of the Borrower, audited financial statements of the Borrower on a fully consolidated and consolidating basis, which financial statements shall include a balance sheet of the Borrower as at the end of such fiscal year, statements of income, shareholders' equity and cash flow of the Borrower for such fiscal year, and setting forth in each case in comparative form figures for the preceding fiscal year, all in reasonable detail and in accordance with GAAP consistently applied accompanied by an opinion issued by an independent certified public accountant acceptable to the Lender.

(b)    Compliance with Laws, Etc.  Comply in all material respects, with all applicable laws, rules, regulations and orders of any governmental authority, the noncompliance with which might result in a Material Adverse Change.

(c)    Maintenance of Existence.  Maintain and preserve its existence and all rights, privileges, qualifications, permits, licenses, franchises and other rights material to its business.

(d)    Senior or Pari Pasu Debt.  Not enter into any new debt facility or other debt that would be senior or of equal priority with the Loan.

(e)    Further Assurances.  Execute and deliver at any time and from time to time any and all instruments, agreements and documents, and shall take such other action as the Lender reasonably requires.

## ARTICLE V
## EVENTS OF DEFAULT AND REMEDIES

Section 5.1.    Events of Default.  The occurrence and continuance of any of the following events shall constitute an "Event of Default" hereunder:

5

(a)    The Borrower shall fail to pay any installment of principal on the Loan when due, whether at stated maturity, as a result of a mandatory prepayment requirement, upon acceleration or otherwise, or pay when due any interest, fees or other amounts payable hereunder or under the other Loan Documents; or

(b)    The Borrower or any Guarantor shall assert the invalidity or unenforceability of the Loan Agreement or Note and the same be adjudicated to be invalid or unenforceable in any material respect; or

(c)    the dissolution or winding up of the Borrower; or

(d)    The Borrower defaults under the terms of any senior debt; or

(e)    Borrower has materially breached any representation or covenant contained herein.

Section 5.2.    Notices of Default.  The Borrower, immediately upon becoming aware of any circumstance that that is or would result in an Event of Default, shall so notify the Lender specifying the circumstances of such default.

### ARTICLE VI
### MISCELLANEOUS

Section 6.1.    Successors and Assigns; No Assignment by Borrower.  The provisions of this Loan Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that the Borrower may not assign or transfer any of its rights or obligations under this Loan Agreement or without the prior written consent of the Lender.

Section 6.2.    Notices.  All notices, requests and demands to be made hereunder to the parties hereto shall be in writing (at the addresses set forth below) and shall be given by any of the following means:

(a)    personal delivery;

(b)    reputable overnight courier service;

(c)    electronic communication, whether by telex, telegram or telecopying (if confirmed in writing sent by registered or certified, first class mail, return receipt requested); or

(d)    registered or certified, first class mail, return receipt requested.

Any notice, demand or request sent pursuant to the terms of this Loan Agreement shall be deemed received (i) if sent pursuant to subsection (a), upon such personal delivery, (ii) if sent pursuant to subsection (b), on the next Business Day following delivery to the courier service, (iii) if sent pursuant to subsection (c), upon dispatch if such dispatch occurs between the hours of 9:00 a.m. and 5:00 p.m. (recipient's time zone) on a Business Day, and if such dispatch occurs other than during such hours, on the next Business Day following dispatch and (iv) if sent pursuant to subsection (d), upon receipt.

The addresses for notices are as follows:

6

To Lender:    c/o Shamrock Capital Advisors
        4444 West Lakeside Drive
        Burbank, California 91505
        Attn: George J. Buehler
        Telephone No.: (818) 845-4444
        Telecopier No.: (818) 845-4675

With a copy to:   Fried Frank Harris Shriver & Jacobson
        350 South Grand Avenue
        32nd Floor
        Los Angeles, California 90071
        Telephone No.: (213) 473-2000
        Telecopier No.: (213) 473-2222

To the Borrower:  ALH II, Inc.
        c/o Atlantic Builders
        7800 Belfort Parkway
        Suite 200
        Jacksonville, Florida 32256
        Attention:  John LaGuardia, President
        Telephone No.: (904) 384-1900
        Telecopier No.: (904) 384-2599

With a copy to:   Jonathan Zich
        General Counsel
        c/o Lion & Lamm Capital, LLC
        489 Fifth Avenue
        New York, NY 10017
        Telephone No.: (212) 867-6363
        Telecopier No.: (212) 867-6303

Such addresses may be changed by notice to the other parties given in the same manner as provided above.

   Section 6.3. Changes, Waivers, Discharge and Modifications in Writing.  No provision of this Loan Agreement may be changed, waived, discharged or modified except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or modification is sought.

   Section 6.4. Indemnification.  The Borrower agrees to protect, indemnify, defend and hold harmless the Lender from and against any and all claims, damages, losses, liabilities, obligations, penalties, actions, judgments, suits, costs, disbursements and expenses (including, without limitation, reasonable fees and expenses of counsel and consultants and allocated costs of internal counsel) that may be incurred by or asserted against the Lender, in each case arising out of or in connection with or related to any of the following:

     (a)  the Loan, this Loan Agreement;

     (b)  the use of funds advanced under the Loan Documents;

   Section 6.5. Governing Law.  This Loan Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Section 6.6.   Titles and Headings.   The titles and headings of sections of this Loan Agreement are intended for convenience only and shall not in any way affect the meaning or construction of any provision of this Loan Agreement.

Section 6.7.    Counterparts.    This Loan Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page.

Section 6.8.    Lender's Rights With Respect to the Loan.    Notwithstanding any provision to the contrary contained in this Loan Agreement, the Lender may at any time sell, assign, grant or transfer to any person all or a portion of its interest in or rights with respect to the Loan.

Section 6.9.    Time is of the Essence.    Time is of the essence of this Loan Agreement.

Section 6.10.    No Third Parties Benefited    This Loan Agreement is made and entered into for the sole protection and legal benefit of the Borrower and the Lender and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with this Loan Agreement. The Lender shall not have any obligation to any Person not a party to this Loan Agreement.

Section 6.11.    Severability.    The illegality or unenforceability of any provision of this Loan Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Loan Agreement or any instrument or agreement required hereunder.

Section 6.12.    Jurisdiction.    Any legal action or proceeding with respect to this Loan Agreement or may be brought in the courts of the State of New York or of the United States for the Southern District of New York and by execution and delivery of this Loan Agreement, each of the Borrower, the Guarantors and the Lender consents to the jurisdiction of those courts.  Each of the Borrower, the Guarantors and the Lender irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect to this Loan Agreement or any document related hereto.  The Borrower, the Guarantors and the Lender each waive any personal service of any summons, complaint or other process, which may be made by any other means permitted by New York law.

Section 6.13.    Waiver of Jury Trial.    THE BORROWER, THE GUARANTORS AND THE LENDER WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OR ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS LOAN AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  THE BORROWER, THE GUARANTORS AND THE LENDER AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS LOAN.   THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LOAN AGREEMENT.

Section 6.13.    Interpretation.    This Loan Agreement shall not be construed against the Lender merely because of the Lender's involvement in the preparation of such documents and agreements.

9