# EXHIBIT M

## George Buchler

| | |
|---|---|
| From: | Arenson Avie [avie@arenson.co.il] |
| Sent: | Wednesday, December 18, 2002 12:08 AM |
| To: | Gene Krieger; George Buchler |
| Cc: | Michael G. Jesselson (E-mail); Michel Konig (E-mail); Isaac M. Neuberger |
| Subject: | ALHII |

Dear George and Gene:

Since our last conference call, (Gene, George, Isaac and me) the meeting with Swiss Re occurred and I know that you were gratified (as were we) to hear of the extension. Obviously, we now need to get Wachovia to accept the Swiss Re "bond" or find a different bank that will. There is real doubt on our part that Wachovia will not see this as an opportunity to force us out of the Bank. Wachovia is in fact First Union (in the merger, First Union bought Wachovia and changed their name) and they have shown NO interest in continuing their relationship with ALH.

In that connection and in connection with expanding the Ohio Savings Bank facilities, we remain gravely concerned that the sale of Bowden will seriously impair the viability of ALH, as while it might serve some short term end and may fund the Bowden litigation settlement, which we feel is not a "priority", it will hinder and cripple ALH going forward. The "auction" process is busted and it has made ALH look even weaker.

The Bs are prepared to fund needed working capital. We appreciate that the As have made a decision to exit and are NOT prepared to invest additional amounts. Since we fear that we have been placed in a liquidation mode, the Bs, in an effort to save their investment and seize an opportunity (that the As either do not believe is there or that they choose not to pursue) have been willing to offer the As a limited sum to exit and it is that amount that we need to agree upon.

What the Bs simply can not accept is to allow the As to liquidate ALH in a piecemeal fashion.

That said, we need to conclude a buy-out of the As on mutually acceptable terms or recommit ourselves to running ALH in a positive and forward looking manner and abandon, for the time being, the notion of a sale.

I look forward to hearing from you.

Avie

1

# EXHIBIT MM

## Gene Krieger

| | |
|---|---|
| **From:** | Gene Krieger |
| **Sent:** | Thursday, April 18, 2002 6:08 PM |
| **To:** | 'Arenson Avie' |
| **Cc:** | George Buchler; 'Shalom Lamm' |
| **Subject:** | RE: ALH Loan Agreement |

Dear Avie:

I tried to reach you on your mobile phone to discuss your email, but since we haven't connected, I thought I would respond by email.

I don't think we have any serious disagreements with the points your raise. However, I would like to give more background information and our viewpoint of this situation.

The current financial crisis came to our attention approximately 2 weeks ago when we were informed of Wachovia's decision to pull out of the expected Mulvaney facility. This news was a big surprise and an obvious blow to MHI's ability to reach its 2002 projections, which are critical to achieving a successful sale of the company. Early last week, we were told that the adverse impact to MHI's operating profit, per MHI, would be $4.5 million, but Shalom said the adverse impact would more likely be $3 million. The impact of such a fall-off in operating performance would erode our equity value very significantly. You can do the math. If we are hoping to sell the company at a 6x multiple of EBITDA, the impact would easily be $15 to $20 million - perhaps 1/2 of our expected exit proceeds.

Shalom indicated that MHI would need a line of $5 to $10 million to get back on track. But, he also indicated that with some time and effort, we might get by on less than $5 million. His suggestions included a $2 million guarantee by Shamrock (to grease the skids), and that it would be reasonable for ALH to pay a fee to Shamrock for such a guarantee. (Aside from questions of fairness and possible conflicts of interest in such an arrangement, Shamrock does not issue such guarantees and we are unwilling to share the very private financial information that would be necessary for such an arrangement.)

We quickly accepted the urgency of this matter and suggested that the need to protect the equity of all owners called for an "equity raise". Based on the unlikely possibility that we could get another lender to support ALH immediately, we thought this was the only realistic alternative. Also, in the midst of all this, ALH's auditors, Ernst & Young, advised Lanius that they were not going to issue an unqualified ("clean") opinion on ALH's financial statements. The absence of a clean opinion would preclude, or certainly significantly delay, any prospect of outside funding. Time was critical - Ted was canceling lot take-downs, and delaying construction, etc. Positive financial support was needed immediately.

Our suggestion was extremely fair. Without more capital, all Class A & B owners would suffer significantly. If all owners participate in a pro rata funding, the terms of the deal would be largely irrelevant. Any owner's pro rata loan would essentially be a loan to himself. On the other hand, if we all don't participate, the non participating investor gets a substantial benefit of riding on the capital of the contributing investors.

Shamrock and the other Class A members were not interested in loaning money to ALH. We didn't hear of any other ALH owners willing to step up and provide the capital. We do want to protect our equity as do all the other investors. So, we are not trying to disadvantage any investor - we want all investors to be treated the same.

11/1/2004

We proposed a fall-back position to Shalom. If all investors don't participate, we would support an equity round at the current risky valuation. Such a process would take longer and be much more cumbersome. Most importantly, however, it would result in substantial dilution to those investors who don't participate. That would be fair. That is the way the capital markets work.

Faced with the need to act quickly, Shamrock expressed a willingness to contribute our share of a $3 to $5 million pro rata loan, and we undertook to get the other Class A members committed on that basis. We promptly met with Kaufman and Bernstein (the representatives of the other Class A members), and quickly got their support for this approach. We asked Shalom to undertake a similar effort with the B investors. As I mentioned earlier, if this program was accepted, the loan terms are not important. I believe Shalom agreed to this approach, and expressed confidence that the Bs would participate. Since he obviously couldn't commit for all the Bs, we asked him to get the Bs to participate as a group, so we could get the total participation. As you know, Shalom attracted these investors to ALH -- we do not know them (except you), and we have never had any contact with them. With the possibility that there might be some non pro rata participation by the Bs, we suggested that Shalom advise us of an appropriate interest rate since it would only be relevant to the Bs. We indicated a rate of 16%, and on Friday, Shalom thought it might need to be slightly higher. Shalom never gave us a "rate", so we therefore put 18% in the draft loan document.

On Tuesday, we heard from Shalom that Laurel Equities (Frankel) would likely not participate. While it was good news that 87 1/2 % of the investors have stepped forward, it was also disappointing that we don't have full participation. We were willing to commit our funds and we got the commitment of the other As on the basis of 100% participation. Without 100% participation, there is an element of unfairness in the arrangement. If given the choice, we would also prefer to stand on the side lines, not fund, and let others take up the call -- even at a very high interest rate. I think you can appreciate the tremendous amount of time, expense and energy that Shamrock has unselfishly devoted to ALH, so we are upset to see some lack of support for this funding.

Now, let me respond more specifically to the issues in your email:

1. I agree that there is "no particular amount of money we 'must' have". However, we responded based on the input from management and Shalom. The approach we have taken so far is to fund $3 million immediately, and fund additional amounts if needed. We thought it imprudent to get a smaller commitment, and risk having to go back for more later. Certainly, if ALH doesn't need the funds, we would not request further advances under the proposed loan facility.

2. I do not know of, and have not been advised of, any "legitimate reasons" why others shouldn't fund. The fact that they are passive investors is not relevant as far as I'm concerned. They have money at stake as we and you do - all our money is treated the same.

3. Your suggestion of 12% interest and a 15% fee is not much different than the current draft, which has an 18% interest rate with a one year minimum. (12% for 6 months = 6%, plus 15% fee = 21%. 18% for one year with a 3% fee would make the total cost the same.)   Regardless of the approach to the rate and terms, we are in the same ballpark. The difference is that we based this on 100% participation.

4. I am aware of the risks of conflicts; however, they are all eliminated if we have 100%.

I apologize for such a lengthy response, but I want to be sure you are in the loop and up-to-date. I will be in my office tomorrow morning (our time), and I would be happy to discuss this further. My direct dial phone number is +1-818-973-4295.

11/1/2004

Best personal regards.

Gene

-----Original Message-----
**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Thursday, April 18, 2002 7:58 AM
**To:** gkrieger@shamrock.com
**Cc:** George Buchler; Shalom Lamm
**Subject:** ALH Loan Agreement

Hello Gene:

I got back from the Independence Day break and have looked over the e-mails I have been copied on. I am aware that I don't have all the correspondence, or all the mass of on-going details that have to be considered in making any decision, but I am going to hazard putting forward my thoughts.

A and B shareholders have basically the same risks and benefits with regard getting back equity or moneys lent. There is no particular amount of money we 'must' have. The company can manage on 4 or 5 million or even considerably less. We don't have an axe to grind with any of the other investors who basically let us do what we thought best in the company. I could think of any number of legitimate
reasons why any of the other more passive investors would not or could not come up with their share on such short notice. I think that at a suitable interest rate or one time placement fee to the A and B shareholders who do make funds available, we would benefit the company and ourselves, without letting anybody have a free ride. Instead of 16% per annum, I thought that 12% per annum plus a one time 15% placement fee would insure that those participating would be amply rewarded, and the company would have a sufficient motivation not to ask for unnecessary
funds and would make every effort to repay it quickly.

Another point I am sure we are all sensitive to is the possibility of the appearance of conflict of interest in our dealings with the company in our various capacities and in our legal council.

I am not sure that my writing skills (?) are up to the challenge of this important question. If not, I would be very happy to expand on it together with any or all of you at your convenience by telephone. At any time in the next 4 or 5 hours.

best regards

Avie

11/1/2004

# EXHIBIT N

RE: ALHII                                                                                    Page 1 of 4

## Gene Krieger

**From:**     Gene Krieger
**Sent:**     Friday, December 27, 2002 2:50 PM
**To:**       'Isaac M. Neuberger'
**Cc:**       'Michael G. Jesselson (E-mail)'; 'Michel Konig (E-mail)'; 'Arenson Avie'; George Buchler
**Subject:**  RE: ALHII

1. Bill Lanius has already met with Wachovia, and the meeting went well. While there was no expectation that they could approve the extension at the meeting, they gave no indication that they would not go forward. They asked for some additional information, and they are updating their underwriting. (Our relationship with Wachovia on the secured lending side is very good. We have significant lines with them for Memphis and Charlotte, and those loans are working out fine for Wachovia.) Lanius is in continual contact with Wachovia, and we hope to get the extension shortly after the new year.

2. We understand your views about BBC and the Bowden litigation.

3. We are not allowing ALH to "flounder", and such comments are a disservice to the management who is working very hard on our behalf with our support.

4. If the Bs want to buy out the A's interest, they need to put forth a realistic offer. We made it clear in our last conversation that $3 million is woefully inadequate.

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Sunday, December 22, 2002 1:00 PM
**To:** George Buchler; Gene Krieger
**Cc:** Michael G. Jesselson (E-mail); Michel Konig (E-mail); Arenson Avie
**Subject:** RE: ALHII

*Gentlemen:*
*The e-mail below was typed on Thursday December 19. Unfortunately, it got "lost" in the cyber world of "Outbox" and somehow was not sent when intended.It had something to do with the wireless protocol. That said, I am sorry.*
*I appreciate that this is a Holiday week, but to the extent that Shamrock is available, we would like to continue a dialogue as soon as possible to see if there can be a meeting of the minds.*

When we met with Messrs. Lanius and LaGuardia in NYC, several weeks ago, they together with Messrs. Zich and Lamm recounted the difficulties that the First Union people (now called Wachovia) had with ALH and in fact they (the new people who took over the "old" Wachovia relationship) refused to extend the construction financing lines and hence the urgent need for Ohio Savings.
At that meeting we discussed openly the possibility that even if Swiss Re extended (which we felt that had no choice about) that the real challenge would be Wachovia. I guess that you should discuss this with Lanius and LaGuardia.

With respect to the sale of Bowden; we feel that we should ALL recognize that we have a busted auction; that we should declare that ALH is NO longer for sale and that we need to extend both internally and externally that ALH is here to stay (at least for now) as we think that a great deal of momentum has been lost in this process.The longer we continue to project a "sale mode" the more ALH will be viewed as "shop worn" and make financing, which is its life blood, all the more difficult to achieve, at competitive rates.

11/1/2004

RE: ALHII                                                                                                        Page 2 of 4

With respect to the Bowden litigation, as I explained on our phone call, management needs to consider options available. The Bowden plaintiffs are unsecured and should be treated as such.

With regard to the a purchase of the A interests, I had thought that Avie had made the B position very clear. We had no concern about Swiss Re, as we knew full well, and we assume that you too realized, that Swiss Re had no choice, since they hardly have need for control of a homebuilding operation.On a liquidation scenario, the equity is worthless, as are the investor loans. Even absent the Bowden litigation, ALH needs working capital to survive and to clean up its balance sheet, which we suspect as part of the '02 audit, might well be imposed, which will, as a consequence of the new accounting rules on "asset impairment" result in a wipe-out of the balance sheet retained earnings, making operating financing even more difficult.The As who control, have indicated that they do NOT want to make further investment and.in fact, want to exit. Hence, the Bs, are faced with only two choices. Take a write off, as a result of decisions made by others OR step to the plate and invest "more" and to do so alone.In our phone conference, your pricing was based on an a "go forward" scenario rather than a liquidation one. Our suggestion of a $3 Million payment to the As, while a very significant loss against the investment, is a very significant premium from what a liquidation will produce.Your pricing concept is simply inappropriate to our current circumstances.

Regardless, we need to meet to hopefully forge a consensus on either a "go forward" or "buy out", but to allow ALH to continue to "flounder" in this failed attempt to sell it will only lead to a self fulfilling liquidation.

I still think that we need to meet as soon as possible.

-----Original Message-----
From: Gene Krieger [mailto:gkrieger@shamrock.com]
Sent: Thursday, December 19, 2002 12:26 AM
To: 'Arenson Avie'
Cc: Michael G. Jesselson (E-mail); Michel Konig (E-mail); Isaac M. Neuberger; George Buchler
Subject: RE: ALHII

Dear Avie:

We are, of course, very pleased that Swiss Re has agreed to the extension, and they have already signed a document to that effect. I am a bit puzzled by your comment regarding Wachovia. Bill Lanius has been our focal point on the Wachovia relationship, and we understand that the relationship is fine and we fully expect that they will extend the loan now that the Swiss Re surety bond has been extended. First Union was involved in last year's extension, and although it made things a little cumbersome, everything worked out fine. If you have some information regarding our Wachovia relationship, please share it with us as soon as possible.

I understand your view on the sale of Bowden (BBC). Since we have been unable to reach a settlement with the Bowdens, the sale process of BBC to Walter Industries is on hold. If the B investors want to buy out the As and retain BBC as part of ALH, that option is currently available. But, time is of the essence. We are still trying to reach a settlement with the Bowdens that would allow us to sell BBC.

In our last conversation on this subject about two weeks ago, you said you would get back to us with a counter-offer. Now that the Swiss Re situation has improved considerably and we haven't yet sold BBC, I hope you and your A partners will see this as an opportunity to move this along more quickly.

Best regards.

Gene

RE: ALHII

-----Original Message-----
From: Arenson Avie [mailto:avie@arenson.co.il]
Sent: Wednesday, December 18, 2002 12:08 AM
To: Gene Krieger, George Buchler
Cc: Michael G. Jesselson (E-mail); Michel Konig (E-mail); Isaac M.
Neuberger
Subject: ALHII

Dear George and Gene:
Since our last conference call, (Gene, George, Isaac and me) the meeting
with Swiss Re occurred and I know that you were gratified (as were we) to
hear of the extension. Obviously, we now need to get Wachovia to accept the
Swiss Re "bond" or find a different bank that will. There is real doubt on
our part that Wachovia will not see this as an opportunity to force us out
of the Bank. Wachovia is in fact First Union (in the merger, First Union
bought Wachovia and changed their name) and they have shown NO interest in
continuing their relationship with ALH.

In that connection and in connection with expanding the Ohio Savings Bank
facilities, we remain gravely concerned that the sale of Bowden will
seriously impair the viability of ALH, as while it might serve some short
term end and may fund the Bowden litigation settlement, which we feel is not
a "priority", it will hinder and cripple ALH going forward. The "auction"
process is busted and it has made  ALH look even weaker.

The Bs are prepared to fund needed working capital. We appreciate that the
As have made a decision to exit and are NOT prepared to invest additional
amounts. Since we fear that we have been placed in a liquidation mode,  the
Bs, in an effort to save their investment and seize an opportunity (that
the As either do not believe is there or that they choose not to pursue)
have been willing to offer the As a limited sum to exit and it is that
amount that we need to agree upon.

What the Bs simply can not accept is to allow the As to liquidate ALH in a
piecemeal fashion.

That said, we need to conclude a buy-out of the As on mutually acceptable
terms or recommit ourselves to running ALH in a positive and forward looking
manner and abandon, for the time being, the notion of a sale.

I look forward to hearing from you.

Avie

****************************************
CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a
communication protected by the attorney-client privilege. If you are not the intended recipient or a person

RE: ALHII                                                                    Page 4 of 4

responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
**********************************

11/1/2004

# EXHIBIT NN



CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2005 DEC 20  PM 3:53

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SHAMROCK HOLDINGS OF )
CALIFORNIA, INC., SHAMROCK )
CAPITAL ADVISORS, INC., EUGENE I. )
KRIEGER, GEORGE J. BUCHLER and )
BRUCE J. STEIN, )
                                )     Civil Action No.: 04-1339 - SLR
         Plaintiffs, )
                     )
        v. )
                     )
AVIE ARENSON, SELK, LLC and )
LAUREL EQUITY GROUP, LLC, )
                     )
        Defendants. )

## REPLY DECLARATION OF PAMELA JARVIS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND

PAMELA JARVIS declares pursuant to 28 U.S.C. § 1746 that:

    1.     I am a partner in the law firm of GREGORY P. JOSEPH LAW OFFICES LLC, counsel to Plaintiffs in the above-captioned action. I submit this declaration in support of the motion of Plaintiffs Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, Bruce J. Stein and George J. Buchler for an order pursuant to 28 U.S.C. §1447(c): (1) remanding this action to the Court of Chancery of the State of Delaware (the "Court of Chancery"), and (2) awarding the just costs and actual expenses, including attorney fees, incurred by Plaintiffs as a result of Defendants' removal of this action. Unless otherwise indicated, I have personal knowledge of the matters set forth in this Declaration, and as to such other matters, I believe that the statements herein are true.

1

2.     Annexed as Exhibit A hereto is a true and accurate copy of the following documents obtained by independent consultants retained by me from the public records of the Commonwealth of the Bahamas: the Certificate of Incorporation, Register of Directors and Officers and Memorandum of Association and Articles of Association of Sallervale Company Inc. On information and belief, these are the governing documents of Sallervale Company, which Defendants assert is a member of Defendant Laurel Equity Group, LLC.

3.     Annexed as Exhibit B hereto is a true and accurate copy of the following documents obtained by independent consultants retained by me from the public records of the Territory of the British Virgin Islands: the Certificate of Incorporation and Memorandum of Association and Articles of Association of NACA Holding Inc. On information and belief, these are the governing documents of NACA Holdings Inc., which Defendants assert is a member of Defendant SELK, LLC.

4.     Before commencing this action, Plaintiffs' counsel tried but were unable to determine the state of organization of "J12ALH, Associates LLC." These efforts included, but were not limited to, making inquiries to the Delaware Secretary of State's Office seeking records under the name "J12ALH Associates, LLC" and a number of variations on that name.

5.     On December 6, 2004, I received Defendants' answering papers in opposition to Plaintiffs' remand motion. Defendants' papers included a sworn declaration of Ruth L. Mirvis stating on "personal knowledge" that "J12ALH Associates, LLC is a Delaware limited liability company." Mirvis Dec. ¶2. Thereafter, Plaintiffs'

2

counsel made further inquiries to the Delaware Secretary of State's Office regarding J12ALH Associates, LLC" and a number of variations on that name. The Delaware Secretary of State's Office again advised Plaintiff's counsel that they had no record of the existence of any such entity.

6.    Attached hereto as Exhibit C is a true and correct copy of an exchange of emails between counsel to the parties on December 14-15, 2004 concerning the nature and existence of the entity referred to by Defendants as "J12ALH Associates, LLC." The December 15, 2004 email from Defendants' counsel states that "J12ALH Associates" is not a Delaware LLC, but is in fact a New York general partnership.

7.    Defendants' assertions in their Answering Brief (at 7-8) that the parties were engaged in a "race to the courthouse" and that Plaintiffs "filed this lawsuit in order to 'forum shop'" are untrue. It is also untrue that Defendants "informed plaintiffs that they intended to file [a lawsuit against Plaintiffs] in North Carolina." *Id.* at 7.

8.    For months prior to the filing of the Complaint in this action, Defendants (through their counsel, Neuberger) had been threatening baseless claims against Plaintiffs. In the hope of reaching an expeditious resolution of the matter at a relatively reasonable cost, Plaintiffs suggested that the parties try mediating their differences in the Court of Chancery, pursuant to that court's voluntary mediation program. Plaintiffs believed that this would bring a neutral, experienced perspective to bear on the matter.

9.    After more than two weeks of waiting for Defendants to agree to mediation, Plaintiffs filed their Complaint in the Court of Chancery. Defendants' assertion

3

that, at the time Plaintiffs filed the Complaint, the parties were "engaged in ongoing settlement discussions" (Answering Brief at 8) is untrue. To the contrary: Plaintiffs had hoped that Defendants would agree to participate in the proposed mediation, and that this might lead to a resolution of the matter, but Defendants did not agree to mediate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 17, 2004.

PAMELA JARVIS

/560869

4

# EXHIBIT O

## Gene Krieger

| | |
|---|---|
| **From:** | Gene Krieger |
| **Sent:** | Tuesday, August 06, 2002 3:09 PM |
| **To:** | 'Isaac M. Neuberger' |
| **Cc:** | George Buchler; 'Avie Arenson (E-mail)' |
| **Subject:** | RE: ALH |

Thank you for your email regarding the Class B members' interest in ALH. We appreciate and respect the views expressed in your message, and we would be pleased to work with the Class B members on the sale of the A's interest.

As you may know, and as we have explained to Avie, we have been in discussions with Walter Industries for some time and have reached a critical stage in these discussions. We had agreed to enter into an exclusivity arrangement with Walter for the purchase of the Memphis subsidiary (Bowden) when Avie asked us to entertain an offer by the Bs to purchase the A's interest. We agreed to postpone entering into the exclusivity arrangement with Walter until Tuesday, July 30th, on the understanding that Avie would provide us with an offer immediately following the Meeting in London on July 29th. George made it clear to Avie 1) that the timing of this process was very critical, and 2) the elements that were needed to allow us to abandon the discussions with Walter in favor of a deal with the Bs. When we heard from Avie in an email on July 30th, his message indicated an interest in exploring a buyout of the A's interest. In subsequent phone conversations, this message was repeated, but we have received no tangible offer or other evidence that a deal is forthcoming. By Wednesday and Thursday of last week, it became clear to us that any further delay with Walter would eliminate them as a potential buyer for Bowden (and as a possible buyer for Mulvaney). In order to preserve ALH's position, we have entered into the exclusivity arrangement with Walter. This arrangement does not preclude the Bs from pursuing an acquisition of the A's interest, and we encourage them to do so in an expedited manner.

We are happy to meet with the Bs in a face-to-face meeting; however, in order to make any such meeting productive, we would need, in advance, a clear indication of the proposed arrangement. If you have any questions, or would like to discuss this further, please do not hesitate call me or George at 818-973-4295 or 818-973-4222, respectively.

-----Original Message-----
**From:** Isaac M. Neuberger [mailto:IMN@NQGRG.com]
**Sent:** Tuesday, August 06, 2002 11:24 AM
**To:** George J. Buchler (E-mail); Eugene Krieger (E-mail)
**Cc:** Avie Arenson (E-mail); Michael G. Jesselson (E-mail); Michel Konig (E-mail); Mark Frankel (E-mail)
**Subject:** ALH


> As you might remember from prior communications, I represent SELK LLC,
> one of the Class B Members of ALH II. As I know Avie Arenson has
> advised you, all of the Class B Members met together in London last
> week and have had a number of telephonic conferences both before and
> after the London meetings.
>
> The Class Bs have discussed among themselves and have consulted with

> experts of note in the homebuilding industry the future prospects of ALH, as a going concern; the advisability of selling Memphis alone NOW; the impact that such a sale will have on both ALH's continuing operations and whether it will reduce the aggregate sales value of ALH as a going concern. We also have discussed with these same knowledgeable people whether there are in fact others who might be interested in Memphis as a stand alone, assuming that Walter Industries would not agree to a delay in the entry of the LOI, as proposed. Lastly we feel it essential that we explore gaining a further extension of the Swiss Re-Wachovia facility now. All of these discussions and consideration take into account and recognize Shamrock's decision to exit this particular investment and the need .for the Bs to move quickly to

>
> We understand that in large part your desire to exit this investment is driven by the management demands made on you by other investments and what appears to be a concern that with Swiss Re-Wachovia facility can NOT be extended. Obviously the Bs feel that the "control" of ALH owes them a duty to try and maximize their return, not to speak of the loss that the current situation portends.
>
> As Avie has advised you, it is the considered opinion of the Bs, that
> if you proceed NOW with the exit that you are directing that Shamrock
> and each of the Bs will face a significant loss that we think can be
> avoided and that the business as a going concern could at the right
> time provide a significant return.
>
> The Bs have been exploring forming a Joint Venture with several
> extremely knowledgeable tract home building experts to acquire the A
> position in ALH. We would intend to explore the other issues
> identified above at the very same time. We think that this can be
> accomplished in weeks. We feel that a sale of Memphis would cause
> irreversible injury and doom ALH to a nearly complete loss. If this
> could be avoided, it would serve everyone's interest and allow
> Shamrock an exit with any further involvement with ALH.
>
> The geographical locations of the Bs coupled with August vacation
> schedules make this task all the more difficult. However we are ALL committed to see this through.
>
> If Shamrock is willing we would like to propose a face to face meeting
> (where some of the Bs might have to participate by phone) to explore
> the parameters of an arrangement. Please let me know if Shamrock is
> willing to meet with the Bs and their counsel.
>
>
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: This e-mail message from Neuberger, Quinn, Gielen, Rubin & Gibber, P.A. contains CONFIDENTIAL INFORMATION for the use ONLY of the intended recipient and may constitute a communication protected by the attorney-client privilege. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any use, distribution, or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (410) 332-8550.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT OO

**Isaac M. Neuberger**

| | |
|---|---|
| **From:** | Pamela Jarvis [pjarvis@josephnyc.com] |
| **Sent:** | Friday, August 27, 2004 11:49 AM |
| **To:** | Isaac M. Neuberger |
| **Cc:** | Thomas M. Wood |
| **Subject:** | Applicability of Delaware Law |

It occurred to me that you might not be aware that Section 10.2 of the ALH Holdings
LLC Operating Agreement provides that "All questions concerning the construction,
validity and interpretation of this Agreement and the performance of the obligations
imposed by this Agreement shall be governed by the internal law, not the law of
conflicts, of the State of Delaware."

Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Tel: 212-407-1250
Fax: 212-407-1278
pjarvis@josephnyc.com
www.josephnyc.com

# EXHIBIT P

# PARTNERSHIP AGREEMENT

## OF

## J12ALH ASSOCIATES

Dated: June _2_ , 1998

GOLENBOCK, EISEMAN, ASSOR & BELL
437 MADISON AVENUE
NEW YORK, NY 10022-7302

## J12ALH ASSOCIATES
### PARTNERSHIP AGREEMENT

AGREEMENT made as of the 2nd day of June, 1998, by and between Erica Jesselson and Jays Twelve LLC, both having an address for purposes of this Agreement at 1301 Avenue of the Americas, New York, New York.

The Partners agree as follows:

1.    Creation of Partnership.  The partners hereby agree to create a general partnership to be known as J12ALH ASSOCIATES (the "Partnership") under the laws of the State of New York and, except as provided in this Agreement, the rights and obligations of the Partners shall be governed by the New York Partnership Law.

2.    The Partners.  The partners are as follows:

| | |
|---|---|
| Erica Jesselson | Class "A" Partner |
| Erica Jesselson | Class "B" Partner |
| Jays Twelve LLC | Class "B" Partner |

3.    Purpose.  The purposes of the Partnership are (a) acquiring, owning, managing, investing in, or disposing of an interest in ALH Holdings LLC, and other investment opportunities and activities relating to enterprises of all kinds, and (b) carrying on such other business activities whether in connection with the foregoing or not as the Partners may determine.

87552.1

4.    <u>Nature of Interest</u>.    A Partner's interest in the Partnership shall constitute personal property for all purposes. All property of the partnership shall be held in the name of the Partnership (or in the name of a nominee for the Partnership) and deemed owned by the Partnership as an entity, and no Partner, individually, shall have any ownership interest in any property owned by the Partnership.

5.    <u>Principal Place of Business</u>.    The principal place of business of the Partnership shall be 1301 Avenue of the Americas, New York, New York, or at such other place within or without the State of New York as may from time to time be designated by the Partners.

6.    <u>Term</u>.    The Partnership shall commence on the date hereof and shall continue until the close of business on December 31, 2047, unless sooner terminated as hereinafter provided.

7.    <u>Capital Contributions</u>.

(a)    The Partners shall contribute the following amounts to the capital of the Partnership:

| Erica Jesselson | — | $888,889 for her Class "A" partnership interest |
| Erica Jesselson | — | $11,111 for her Class "B" partnership interest |
| Jays Twelve LLC | — | $100,000 for its Class "B" partnership interest |

(b)    No Partner shall be entitled to withdraw any part of his capital contribution to the Partnership, or to receive any

distribution from the Partnership, except as expressly provided in this Agreement. No Partner shall receive any interest on his capital contribution.

8.    Capital Accounts.    The Partnership shall maintain a capital account for each Partner in accordance with Section 704(b) of the Internal Revenue Code of 1986 and the regulations thereunder, which shall be (a) credited with the amount of his capital contribution to the Partnership, (b) credited or charged, as the case may be, with his distributive share of Partnership income or loss, and (c) charged with the amounts of any distributions to him.

9.    Distributions; Allocation of Income and Loss.

(a)  Definitions.    As used in this Agreement, the following terms shall have the following meanings:

(i)  "Cash Flow" shall mean, for each Partnership fiscal year, all of the unreserved cash of the Partnership as of the last day of such fiscal year. The Partners shall from time to time determine the amount of cash that shall be reserved for such fiscal year. In determining the amount of cash to be reserved, the Partners shall reserve funds which they shall deem necessary or appropriate to meet the reasonable business needs of the Partnership, including the payment or making provision for the payment, when due, of obligations of the Partnership, reserves against possible losses, and reserves for intended capital expenditures or for future investment or reinvestment.

87552.1                                    3

Sent By: JESSELSON CAPITAL CORP;    2127513377;    Dec-14-04  6:23PM;    Page 6

(ii) "Percentage Interest" shall mean the following percentage interests of the Partners:

| Partner | Percentage Interest |
|---|---|
| Erica Jesselson, as Class "A" Partner | -0- |
| Erica Jesselson, as Class "B" Partner | 10% |
| Jays Twelve LLC, as Class "B" Partner | 90% |

(iii) "Priority Return" for a Partnership fiscal year shall mean an amount equal to seven (7%) percent of the average Unrecouped Capital Contribution during such fiscal year (based upon the amount of Unrecouped Capital Contribution outstanding on each day during such fiscal year).

(iv) "Profits" and "Losses" shall mean, for each Partnership fiscal year, the net income or loss of the Partnership for such fiscal year as determined in accordance with principles applied in determining income, gains, expenses, deductions or losses, as the case may be, reported by the Partnership for Federal income tax purposes on its federal partnership information return. Profits and Losses shall include net gain from capital transactions and shall be reduced by any net loss from capital transactions.

(v) "Unrecouped Capital Contribution" shall mean the excess of (A) the value of the total aggregate capital contribution of the Class "A" Partner as provided in paragraph "7" hereof, over (B) the aggregate amount of all distributions, other

87552.1                          4

Sent By: JESSELSON CAPITAL CORP;        2127513377;        Dec-14-04  6:23PM;        Page 7

than distributions of Priority Return, made by the Partnership to the Class "A" Partner.

    (b)  **Distributions.**

        (i)  **Distributions of Cash Flow.**  Cash Flow for each fiscal year shall be distributed to the Partners in the following order of priority:

           (A)  First, to the Class "A" Partner in an amount equal to the unpaid Priority Return for previous fiscal years, and the Priority Return for the current fiscal year.

           (B)  Second, to the Class "A" Partner up to an amount equal to her then Unrecouped Capital Contribution.

           (C)  Third, any balance thereof shall be distributed to the Partners in accordance with their respective Percentage Interests.

        (ii)  **Timing of Annual Distributions.**  Distributions of Cash Flow shall be made within seventy-five (75) days after the close of each fiscal year.

        (iii)  **Deferral of Priority Return.**  In the event the Cash Flow shall be insufficient to pay the Priority Return due to the Class "A" Partner for any fiscal year of the Partnership, such payment shall be made during the four (4) year period beginning at the end of the fiscal year for which such payment was due.

873521

 

 

(c) <u>Allocation of Profits and Losses</u>.  Subject to any special allocations required by the Internal Revenue Code or the regulations thereunder, Profits and Losses for each fiscal year shall be allocated among the Partners, as follows:

(i)  Profits shall be allocated as follows:

(A)  First, to the Class "A" Partner: all of such profits up to the sum of (x) the Priority Return for the current fiscal year; and (y) that portion of the aggregate Priority Return for all prior fiscal years which exceeds the aggregate amount of Profits allocated to the Class "A" Partner (with respect to the Priority Return) for all such prior fiscal years.

(B)  Second, to the Class "A" Partner to the extent any losses shall have been allocated to her in prior fiscal years (but only to the extent profits shall not have been previously allocated pursuant to this subparagraph "(c)(i)(B)").

(C)  The balance of any Profits shall be allocated to the Class "B" Partners in accordance with their respective Percentage Interests.

(ii) Losses shall first be allocated to the Class "B" Partners in accordance with their respective Percentage Interests so long as a Partner shall have a positive balance in his capital account; then losses shall be allocated to the Class "A" Partner so long as she shall have a positive balance in her capital account; and then losses shall be allocated to the Class "B" Partners in accordance with their respective Percentage Interests.

87552.1                                          6

Sent By: JESSELSON CAPITAL CORP;           2127513377;          Dec-14-04  6:23PM;        Page 9/14

10.  Tax Elections.  An election under Internal Revenue Code Section 754 shall be made by the Partnership at the request of any Partner.

11.  Rights and Powers of Partners.

(a)  The Partnership shall keep complete and accurate books and financial records with respect to the Partnership business in accordance with sound business practices.

(b)  Within seventy-five (75) days after the end of each fiscal year, the Partnership's accountants shall prepare and send to each Partner an information return showing the amount of Cash Flow, taxable income or loss, capital gain and capital loss, if any, distributed or allocated to such Partner during such fiscal year, and an annual report which shall include a balance sheet and a statement of the receipts, disbursements, Cash Flow and taxable income or tax loss of the Partnership and such other information as the accountants may deem appropriate in order fairly to set forth the condition of the Partnership.

(c)  The books of account and all other records of the Partnership shall be maintained at the principal office of the Partnership.    All   Partners   and   their   duly   authorized representatives shall have the right to examine the books of the Partnership at all reasonable times.

(d)  All receipts, funds and income of the Partnership shall be deposited in the name of the Partnership in such bank or banks  as  the  Partners  from  time  to  time  shall  determine.

87552.1                          7

Sent By: JESSELSON CAPITAL CORP;        2127513377;        Dec-14-04  6:24PM;        Page 10/14

Withdrawals from such bank or banks shall be made on signatures of such person or persons as the Partners shall determine.

(e)   Each Partner acting alone is specifically authorized for and on behalf of the Partnership to enter into and execute on behalf of the Partnership any and all subscription agreements, other contracts, documents, notices and instruments, as he may deem appropriate to carry out the intents and purposes of this Agreement.

12.   Dissolution.

(a)   The Partnership shall dissolve upon, but not before, the first to occur of:

(i)   the expiration of the term of the Partnership;

(ii) the written consent of all of the Partners.

(b)   Upon the dissolution of the Partnership, the Partners shall proceed diligently to wind up the affairs of the Partnership and distribute its assets in accordance with the provisions of this paragraph "12".

(c)   Upon the termination of the Partnership, any Partner having a deficit balance in his capital account (after allocations of profits and losses) shall be required to restore the amount of such deficit balance to the Partnership, and the assets of the Partnership shall then be distributed in the following order of priority:

87352.1                        8

Sent By: JESSELSON CAPITAL CORP;        2127513377;        Dec-14-04  6:24PM;        Page 11/14

(i) First, to the payment of any debts and liabilities of the Partnership, other than to Partners, which then shall be due and payable.

(ii) Second, to the establishment of any reserve which the Partners deem necessary to provide for any contingent or unforeseen liabilities or obligations of the Partnership.

(iii) Third, to any Partner who has made loans to the Partnership, an amount equal to the unpaid accrued interest on, and the unpaid principal balance of, such loans.

(iv) Fourth, to the Class "A" Partner up to an amount equal to the sum of any unpaid Priority Return plus the then balance of her Unrecouped Capital Contribution.

(v) Fifth, to the Partners in accordance with the balances of their respective capital accounts (after adjusting such capital accounts for all distributions required to be made pursuant to the previous provisions of this paragraph "12").

(vi) Sixth, the balance, if any, to all the Partners in proportion to their Percentage Interests.

(d) Distributions of Partnership property to Partners pursuant to this paragraph "12" may be made in kind. The amount by which the fair market value of any Partnership property to be distributed in kind exceeds or is less than the basis of such property for federal income tax purposes shall, to the extent not otherwise recognized by the partnership, be taken into account in

875521                              9

Sent By: JESSELSON CAPITAL CORP;    2127513377;    Dec-14-04  6:24PM;    Page 12/14

computing gain or loss for purposes of crediting or charging the capital accounts of, and distributing proceeds to, the Partners pursuant to this Agreement.

13. Assignment of Partnership Interests.

(a) Except as otherwise specifically permitted in this Agreement, no Partner shall have the right at any time to assign, sell, transfer, hypothecate, pledge or otherwise dispose of all or any part of his interest in the Partnership.

(b) With the prior written consent of all of the Partners, any Partner shall have the right to transfer and dispose of all or any part of his interest in the Partnership.

14. Death or Incapacity. Upon the death, or adjudication of incompetency of any individual Partner, the partnership shall not be dissolved, the business of the Partnership shall continue under and pursuant to the provisions of this Agreement, and such Partner's interest shall descend to and vest in the legal representatives, heirs, legatees, trustees, committee or other successors of such Partner.

15. Notices. All notices, demands, consents, offers and other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made if mailed by certified or registered mail, return receipt requested, postage prepaid, addressed to the respective address of such party set forth at the beginning of this Agreement.

67332.1                                    10

Case 1:06-cv-00062-SLR    Document 22-31    Filed 01/31/2006    Page 34 of 85
☑015/016
12/16/2004 17:48 FAX 410 332 4503        NQGRG    Case 3:05-cv-00256    Document 13-37    Filed 09/02/2005    Page 13 of 14

Sent By: JESSELSON CAPITAL CORP;        2127513377;        Dec-14-04  6:25PM;        Page 13/14

16. **Binding Effect.**  This Agreement shall inure to the benefit of and be binding upon the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto.

17. **Agreement in Counterparts.**  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

18. **Rules of Construction.**  Each paragraph and section of this Agreement shall be considered severable, and if for any reason any paragraph, paragraphs, section or sections herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or affect the portions of this Agreement which are valid.

19. **Governing Law.**  The validity, interpretation and construction of this Agreement shall be determined and governed in all respects by the laws of the State of New York.

20. **Captions.**  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this agreement or the intent of any provision hereof.

21. **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership.

22.  Entire Agreement.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.  No covenant, representation or condition not expressed in this Agreement shall effect or be effective to interpret, change or restrict the express provisions of this Agreement.

23.  Pronouns.  All pronouns and any variation thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
Erica Jesselson

JAYS TWELVE LLC

By: _____

573S2.7

12

# EXHIBIT PP

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. Box 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 Fax

S. MARK HURD
302 575 7354
302 498 6202 Fax
shurd@mnat.com

September 13, 2004

## By Fax and Federal Express

Isaac M. Neuberger, Esquire
Thomas M. Wood, IV, Esquire
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, Maryland 21202

> Re:    Shamrock Holdings of California, Inc., et al.
> v. Avie Arenson, et al.; Civil Action No. 692-N

Dear Messrs. Neuberger and Wood:

Enclosed please find a copy of the complaint in the above-referenced action, which was filed today in the Delaware Chancery Court. My firm is co-counsel for the plaintiffs.

Because Ms. Jarvis is at present out of the country, she asked that I convey the following to you.

1.    The commencement of this action reflects no diminution in plaintiffs' desire to engage in the previously discussed mediation with your clients. However, it has been more than two weeks since plaintiffs first proposed the mediation, and you have yet to agree to it. Consequently, plaintiffs thought it prudent to pursue the mediation in the context of a pending action.

2.    Plaintiffs recognize that the upcoming holidays will affect your and your clients' availability over the next month or so, and we are of course prepared to accommodate your needs in terms of time to respond to the complaint.

3.    Please let us know as soon as possible whether you will accept service of the complaint on behalf of your clients. We will be happy to prepare a stipulation addressing service as well as additional time for your responding papers.

Isaac M. Neuberger, Esquire
Thomas M. Wood, IV, Esquire
September 13, 2004
Page 2


        Ms. Jarvis will be back in her office on Wednesday, September 15, but in the
meantime, please feel free to contact me.

                        Very truly yours,

                        S. Mark Hurd

SMH/dmd
Enclosure

# EXHIBIT Q



**PAGE 1**

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "JAYS TWELVE LLC", FILED IN THIS OFFICE ON THE TWELFTH DAY OF JANUARY, A.D. 1998, AT 9 O'CLOCK A.M.



2844899  8100

050247317

Harriet Smith Windsor, Secretary of State
**AUTHENTICATION: 3769067**

**DATE: 03-28-05**

### CERTIFICATE OF FORMATION

#### OF

#### JAYS TWELVE LLC

This Certificate of Formation of Jays Twelve LLC (the "LLC") is being duly executed and filed by Thomas J. Wilson, Esq., an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act.

FIRST: The name of the limited liability company formed hereby is: Jays Twelve LLC

SECOND: The address of the registered office of the LLC in the State of Delaware is 1013 Centre Road, Wilmington, New Castle County, Delaware, 19805. The LLC's registered agent for service of process at that address is Corporate Service Company.

IN WITNESS WHEREOF, the undersigned has caused this Certificate of Formation to be duly executed as of January 9, 1998.

_____
Thomas J. Wilson, Organizer

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 01/12/1998
981011763 - 2844899

# EXHIBIT QQ

LAW OFFICES

## NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

27th FLOOR
ONE SOUTH STREET
BALTIMORE, MARYLAND 21202-3282
www.nqgrg.com
(410) 332-8550

ISAAC M. NEUBERGER
(410) 332-8510

FAX No.
(410) 332-8511
E-MAIL ADDRESS:
IMN@NQGRG.COM

July 12, 2004

**VIA E-MAIL: sgold@shamrock.com**
**AND FEDERAL EXPRESS**

Mr. Stanley P. Gold
Shamrock Holdings of California, Inc.
4444 Lakeside Drive
2nd Floor
Burbank, California 91505

**VIA E-MAIL: gbuchler@shamrock.com**
**AND FEDERAL EXPRESS**

Mr. George J. Buchler
Shamrock Holdings of California, Inc.
4444 Lakeside Drive
2nd Floor
Burbank, California 91505

**VIA E-MAIL: gkrieger@shamrock.com**
**AND FEDERAL EXPRESS**

Mr. Eugene Krieger
Shamrock Holdings of California, Inc.
4444 Lakeside Drive
2nd Floor
Burbank, California 91505

Dear Mr. Gold, Mr. Buchler and Mr. Krieger:

Avie Arenson has forwarded to the other Class B shareholders (and to me, as their counsel) a copy of George Buchler's e-mail of July 1, regarding a Levitt Homes proposal to purchase MHI.

Obviously, the entire ALH situation is now a disaster. Unfortunately it does not come as a surprise. When Avie and I met with you in North Carolina, after it was clear that ALH faced a "busted auction" of itself, as a going concern, we warned you that your efforts to dismantle ALH, piecemeal, could only lead to calamity.

Then and again, at the sale of Jacksonville, we sounded the alarm. Shamrock and the individual directors of ALH in a single minded effort to extricate Shamrock from what it felt was a time consuming involvement in an investment that Shamrock had lost interest in, went about trying to shed themselves of their obligations, freely assumed by their own acts, by destroying any shareholder value that ALH may have had, to a point that Shamrock now presents a picture of ALH as reflected in Levitt's offer.

NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

Mr. Stanley P. Gold
Mr. Eugene Krieger
Mr. George J. Buchler
July 12, 2004
Page 2

This is nothing more than an egregious breach by Shamrock and the individuals appointed by Shamrock and their A allies, as directors of ALH, of their collective fiduciary obligations to the Class B "minority" shareholders.

To be sure, it is clear that Shamrock's course of conduct to date has been driven by a stated intention to rid itself of ALH and at the same time to attempt to protect the repayment of its loans to ALH from being disgorged as voidable preferences. It is our view, however, that unlike the Class B loans, whose repayment might too have been preferences, but for the passage of time, that Shamrock's loans are recoverable even after the one year period, as they are equitably subordinated to the claims of ALH's Class B shareholders (and possibly others, as well) as a result of a series of predicate acts and patterns of misconduct, intentional breaches of fiduciary duty and wanton disregard of duties and obligations. In addition to the recovery from Shamrock of the loan repayments, we are exploring the rights of the Class B shareholders to seek recovery of their equity and damages, as well.

In addition to the gross and wanton behavior and attitudes to which the Class B shareholders have been treated, we advise you that Fried Frank's involvement is under scrutiny as well. It is ridiculous for the entrenched control, who have conflicts with ALH and its shareholders to believe that they can willy nilly waive conflicts of interest between a law firm engaged by ALH and themselves and even more absurd that Fried Frank did not appreciate the untenable position that they were in and continued to act for both Shamrock, their principal client and ALH, at the same time, knowing full well that an actual, unwaiveable conflict existed. The waivers that the Class B shareholders executed are only evidence of the problem and are of no legal force or effect.

We all understand and anticipate the indignation and anger that Shamrock and the individual ALH directors appointed by Shamrock will express upon receipt of this communication. Shamrock and its principals have made a very loud effort at Disney about the "high road" in corporate governance. Fried Frank has been a part of that game plan too. Please spare us. I suggest that if and when it becomes known how Shamrock has treated the Class B shareholders in ALH, that at least Michael Eisner will be the only one smiling. Certainly not the Class B investors. This is all a tragedy from their perspective.

We all know and appreciate the history and circumstances. Once Shamrock decided that it wanted to control ALH, it assumed a myriad of obligations to the Class B shareholders.

Shamrock allowed the Memphis situation to arise, where, if the sale had not occurred, the then management would have driven Memphis further into the ground. Now, Shamrock is proposing that we cast our lot with the very same group, all in an effort to neatly "bury" ALH and Shamrock's exposures.

## NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

Mr. Stanley P. Gold
Mr. Eugene Krieger
Mr. George J. Buchler
July 12, 2004
Page 3

The Class B shareholders (with counsel) are prepared to meet with Shamrock and their counsel (provided it is other than Fried Frank) to seek some acceptable resolution of the current situation.

I must advise you that any communications from Shamrock or the individual directors with Fried Frank on these matters, following receipt of this communication, are NOT protected and may constitute further actionable acts that may be raised if further formal action is necessary.

I have also been asked by Avie and the other Class B investors to request that all communications regarding this matter be directed through me and that you not attempt to communicate directly.

This is a very serious situation and one in which millions of dollars may have been lost by what we feel is actionable behavior.

Very truly yours,

Isaac M. Neuberger

IMN/tem
cc:     DA Gardens, LTD.
        The Erica Jesselson 1984 CLAT
        SELK, LLC

# EXHIBIT R

*State of Delaware*

## Office of the Secretary of State    PAGE 1

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED LIABILITY COMPANY OF "ALH HOLDINGS LLC", FILED IN THIS OFFICE ON THE THIRD DAY OF JUNE, A.D. 1998, AT 1 O'CLOCK P.M.



Edward J. Freel, Secretary of State

2903934   8100

981394463

AUTHENTICATION:   9351237

DATE:   10-13-98

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 01:00 PM 06/03/1998*
*981213185 – 2903934*

# CERTIFICATE OF FORMATION

## OF

## ALH HOLDINGS LLC

This Certificate of Formation of ALH Holdings LLC (the "LLC"), dated June 3, 1998, is being duly executed and filed by Jeeun P. Kahng, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq).

### I.

The name of the limited liability company formed hereby is ALH Holdings LLC.

### II.

The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

### III.

The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Jeeun P. Kahng
Authorized Person

DO NY-120580.1

6-11-1998  4:19PM    FROM HOTEL TWIN DOLPHIN 111 58196+                          P. 2

06/11/98  16:06    310 277 1849            K + B INC.                           004

# CERTIFICATE

The undersigned, an authorized officer of Kaufman + Bernstein, INC hereby certifies that he has caused to be delivered to each member listed on Schedule A, except Shamrock Holdings of California, Inc., a copy of the Operating Agreement of ALH Holdings, LLC and the Class A subscription agreement sent to me under cover of a memorandum dated June 9, 1998 in connection with their subscription of Class A membership interest in ALH Holdings, LLC.

Date:  June 11, 1998

by _____

Name: HOWARD BERNSTEIN

Title: SECRETARY

# EXHIBIT RR

(M)

Fried, Frank, Harris, Shriver & Jacobson
350 South Grand Avenue, 32nd Floor
Los Angeles, CA 90071
Tel: 213.473.2000
Fax: 213.473.2222
www.ffhsj.com

Direct Phone: 213.473.2005
robbida@ffhsj.com

December 17, 2001

ALH Holdings LLC
489 Fifth Avenue
New York, NY 10017
Attention: Shalom E. Lamm

Shamrock Holdings of California, Inc.
4444 Lakeside Drive, 2nd Floor
Burbank, CA 91505
Attention: George J. Buchler

FRIED
FRANK
HARRIS
SHRIVER
JACOBSON

Re:    **ALH Holdings LLC**

Gentlemen:

This letter will confirm that ALH Holdings LLC ("ALH") has asked Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") to advise it regarding the possible sale of ALH II, Inc., a Delaware corporation ("ALH II"), or all or substantially all of the assets of ALH II and its subsidiaries (the "ALH Representation").

As you are aware, Fried Frank (i) has been retained by ALH as previously described in our August 10, 2001 letter and also only for the limited purpose of the ALH Representation, (ii) represented Shamrock Holdings of California, Inc. and its affiliates (collectively, "Shamrock") in connection with Shamrock's investment in the Class A Membership Interests (as defined in the Operating Agreement) of ALH and (iii) may in the future represent Shamrock in various other matters, including, without limitation, in connection with Shamrock's investment in ALH and other matters which may be adverse to ALH.

You have previously acknowledged and agreed that the interests of ALH with respect to the ALH Representation are consistent with the interests of Shamrock and do not give rise to any conflict of interest. In accordance with California Rules of Professional Conduct Rule 3-310 (copy attached), we are requesting the written consent of ALH and Shamrock in order to act for ALH in this matter.

A Partnership
Including
Professional
Corporations

New York
Washington
Los Angeles
London
Paris

75379

Fried, Frank, Harris, Shriver & Jacobson

ALH Holdings LLC
December 17, 2001
Page 2

It is agreed and understood that Fried Frank can continue to represent and act for Shamrock as set forth above.

If you have any questions concerning this matter please feel free to call me. In deciding whether to consent to the representation and waive any conflict you should not hesitate to consult separate counsel.

If you determine to consent, please confirm your agreement to do so by signing and returning the enclosed copy of this letter.

Very truly yours,

David K. Robbins

Agreed and consented to by:

ALH HOLDINGS LLC

By:    LION ALH CAPITAL, LLC, its Manager

By:
Shalom E. Lamm, its duly
authorized signatory

SHAMROCK HOLDINGS OF CALIFORNIA, INC.

By:
George J. Buchler, Vice President and
Assistant Secretary

73161

# Rule 3-310. Avoiding the Representation of Adverse Interests

(A) For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) "Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

(a) such nondisclosure is otherwise authorized by law; or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

73136

# EXHIBIT S

**GUARANTEE AGREEMENT**

**BY AND BETWEEN**

**ALH HOLDINGS LLC**

**AND**

**SELK, LLC**

### GUARANTEE AGREEMENT

All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Subscription Agreement dated as of June 12, 1998 by and between ALH Holdings LLC, a Delaware limited liability company (the "Company") and Shalom E. Lamm, a Delaware limited liability company (the "Purchaser"), as amended (the "Subscription Agreement").

Pursuant to this Guarantee Agreement (the "Guarantee") between the Company and SELK, LLC ("the Guarantor"), to induce the Company to consent to the Amendment, dated as of March 15, 1999, to the Subscription Agreement, and in consideration thereof, the Guarantor hereby unconditionally and irrevocably guarantees to the Company, the prompt and complete payment when due, including any Interest Amount or Discount Amount thereon, of the Second and Third Capital Contributions (the "Guaranteed Obligations"), which guaranteed amount the Guarantor acknowledges is equal to a principal amount of $4,700,000. The Guarantor further agrees to pay any and all expenses which may be paid or incurred by the Company, in enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee.

This Guarantee shall remain in full force and effect until the Guaranteed Obligations have been fully and indefeasibly paid and satisfied. The Guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment of the Guaranteed Obligations without regard to any defense (other than the defense of payment), set-off or counterclaim which may at any time be available to or be asserted by the Guarantor against the Company. The Guarantor waives notice of or proof of reliance by the Company upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Purchaser or the Guarantor and the Company shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. The Guarantor unconditionally waives, to the extent permitted by applicable law, any and all rights the Guarantor may have or that at any time hereafter may be conferred upon him, by statute, regulation or otherwise, to terminate or cancel this Guarantee.

   IN WITNESS WHEREOF, the undersigned has caused this Guarantee to be duly executed and delivered on this 15 day of March, 1999.

                    GUARANTOR

                    SELK, LLC

                    By: _____
                        Name: Sheldon S) Lumm
                        Title: Manny Most


Agreed to and Acknowledged by:

ALH HOLDINGS LLC

By: _____
    Name: Sheldon Zion
    Title: Member for ALH Capital LLC

2

# EXHIBIT SS

Fried, Frank, Harris, Shriver & Jacobson
350 South Grand Avenue, 32nd Floor
Los Angeles, CA 90071
Tel: 213.473.2000
Fax: 213.473.2222
www.ffhsj.com

Direct Phone: 213.473.2005
robbida@ffhsj.com

January 28, 2002

ALH Holdings LLC
489 Fifth Avenue
New York, NY 10017
Attention: Shalom E. Lamm

Shamrock Holdings of California, Inc.
4444 Lakeside Drive, 2nd Floor
Burbank, CA 91505
Attention: George J. Buchler



Gentlemen:

This letter confirms that ALH Holdings LLC and its subsidiaries and affiliates (collectively, "ALH") has asked Fried, Frank, Harris, Shriver & Jacobson (the "Firm", "we", "our" or "us") to serve as counsel in connection with certain general corporate matters, as well as in connection with the possible sale of ALH II, Inc. or all or substantially all of the assets of ALH (the "Corporate Matters"). As you know, the Firm represents ALH Holdings LLC as described in our letters dated August 10, 2001 and December 17, 2001.

As you also know, the Firm represented Shamrock Holdings of California, Inc. and its affiliates (collectively, "Shamrock") in connection with Shamrock's investment in the Class A Membership Interests (as defined in the Operating Agreement) of ALH Holdings LLC. The Firm also represents Shamrock in a variety of other matters and expects to continue to do so, including in connection with Shamrock's relationship with ALH. You acknowledge and agree that the interests of ALH with respect to the Corporate Matters are consistent with the interests of Shamrock and do not give rise to any conflict of interest. In accordance with California Rules of Professional Conduct Rule 3-310 (copy attached), we are requesting the written consent of ALH and Shamrock in order to act for ALH in the Corporate Matters.

It is understood and agreed that we will remain free, notwithstanding the Firm's representation of ALH in the Corporate Matters or in other matters and whether or not during the course of the Firm's representation of ALH, to represent any present or future client of the Firm, including Shamrock, with interests adverse to ALH in any

A Partnership
Including
Professional
Corporations

New York
Washington
Los Angeles
London
Paris

Fried, Frank, Harris, Shriver & Jacobson

matter (including representation in litigation, arbitration or mediation in which ALH and such other client may be adverse parties), so long as such matter is not substantially related to the matters in which we are representing ALH, and does not require us to utilize confidential information that we have learned from ALH while working on ALH's behalf.

It is understood and agreed that the Firm may share with Shamrock any and all confidences, secrets, or other privileged or confidential communications that ALH conveys to us in connection with our representation of ALH in the Corporate Matters.

If the foregoing accurately reflects our understandings, please sign one of the two originals enclosed and return it to me.

Sincerely,

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON

By:
David K. Robbins

Agreed and consented to by:

ALH HOLDINGS LLC

By:     LION ALH CAPITAL, LLC, its Manager

By:
Shalom E. Lamm, its duly authorized signatory

SHAMROCK HOLDINGS OF CALIFORNIA, INC.

By:
George J. Buchler, Vice President and
Assistant Secretary

75775_4.DOC

JAN. 28. 2002  3:12PM    FRIED FRANK ET. AL.                    NO. 7218    P. 3

Fried, Frank, Harris, Shriver & Jacobson

matter (including representation in litigation, arbitration or mediation in which ALH
and such other client may be adverse parties), so long as such matter is not
substantially related to the matters in which we are representing ALH, and does not
require us to utilize confidential information that we have learned from ALH while
working on ALH's behalf.

        It is understood and agreed that the Firm may share with Shamrock any and all
confidences, secrets, or other privileged or confidential communications that ALH
conveys to us in connection with our representation of ALH in the Corporate Matters.

        If the foregoing accurately reflects our understandings, please sign one of the
two originals enclosed and return it to me.

Sincerely,

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON

By:
        David K. Robbins


Agreed and consented to by:

ALH HOLDINGS LLC

By:    LION ALH CAPITAL, LLC, its Manager

By:
Shalom E. Lamm, its duly authorized signatory


SHAMROCK HOLDINGS OF CALIFORNIA, INC.


By:
George J. Buchler, Vice President and
Assistant Secretary


75775_4.DOC

matter (including representation in litigation, arbitration or mediation in which ALH and such other client may be adverse parties), so long as such matter is not substantially related to the matters in which we are representing ALH, and does not require us to utilize confidential information that we have learned from ALH while working on ALH's behalf.

It is understood and agreed that the Firm may share with Shamrock any and all confidences, secrets, or other privileged or confidential communications that ALH conveys to us in connection with our representation of ALH in the Corporate Matters.

If the foregoing accurately reflects our understandings, please sign one of the two originals enclosed and return it to me.

Sincerely,

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

By: _____
        David K. Robbins

Agreed and consented to by:

ALH HOLDINGS LLC

By:    LION ALH CAPITAL, LLC, its Manager

By: _____
Shalom E. Lamm, its duly authorized signatory


SHAMROCK HOLDINGS OF CALIFORNIA, INC.

By: _____
George J. Buchler, Vice President and
Assistant Secretary


75775_4.DOC

# Rule 3-310. Avoiding the Representation of Adverse Interests

(A) For purposes of this rule:

(1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

(2) "Informed written consent" means the client's or former client's written agreement to the representation following written disclosure;

(3) "Written" means any writing as defined in Evidence Code section 250.

(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2) The member knows or reasonably should know that:

(a) the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

(b) the previous relationship would substantially affect the member's representation; or

(3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter; or

(4) The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C) A member shall not, without the informed written consent of each client:

(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

(D) A member who represents two or more clients shall not enter into an aggregate settlement of the claims of or against the clients without the informed written consent of each client.

(E) A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

(F) A member shall not accept compensation for representing a client from one other than the client unless:

(1) There is no interference with the member's independence of professional judgment or with the client-lawyer relationship; and

(2) Information relating to representation of the client is protected as required by Business and Professions Code section 6068, subdivision (e); and

(3) The member obtains the client's informed written consent, provided that no disclosure or consent is required if:

(a) such nondisclosure is otherwise authorized by law; or

(b) the member is rendering legal services on behalf of any public agency which provides legal services to other public agencies or the public.

73136

# EXHIBIT T

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. Box 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 Fax

S. MARK HURD
302 575 7354
302 498 6202 Fax
shurd@mnat.com

January 14, 2005

## BY FAX AND FIRST CLASS MAIL

Sean J. Bellew, Esq.
David A. Felice, Esq.
Cozen O'Connor
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

Thomas M. Wood, IV, Esq.
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, MD 21202-3201

Re:    *Shamrock Holdings of California, Inc. v. Arenson*
       C.A. No. 04-1399-SLR

Gentlemen:

It has come to our attention that, by means of a Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR"), Shalom E. Lamm ("Lamm"), on behalf of himself and his heirs, successors, assigns, subsidiaries, affiliates (including Lion ALH Capital LLC and Lion & Lamm Capital, LLC), agents, attorneys, employees, officers, directors, shareholders and managers (collectively the "Lamm Affiliates"), has released ALH Holdings, LLC, ALH II, Inc., and Mulvaney Homes, Inc. and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors and assigns (collectively the "ALH Affiliates"), from "any and all claims, demands, debts, duties, bonds, damages, liabilities, actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contacts and promises" (collectively "Claims") of Lamm or the Lamm Affiliates that "relate[] to or aris[e] out of [any] past transactions between or amongst them." *See* SAMR §2 (copy enclosed).

01/14/2005 Case 3:05-cv-00256 NICHOLS ARSHT AND TUNNELled 09/02/2005 2124071278 of 18 · 165   0003

Sean J. Bellew, Esq.
David A. Felice, Esq.
Thomas M. Wood, IV, Esq.
January 14, 2005
Page 2


        The sworn Declaration filed by Lamm on behalf of SELK, LLC ("SELK"), on or
about December 6, 2004, in opposition to plaintiffs' motion to remand the above-captioned
action (the "Action"), states among other things that Lamm (1) is "the managing member" of
SELK, (2) holds a 30% membership interest in SELK, and (3) on behalf of SELK, authorized the
removal of the Action from the Court of Chancery of the State of Delaware to the United States
District Court for the District of Delaware (the "District Court"). See Lamm Declaration ¶¶2, 5
and 7. Consequently, SELK is a Lamm Affiliate which has released any Claims it may have
against the ALH Affiliates, including but not limited to the threatened claims which referenced
in the Action.
        We therefore propose that the parties to the Action file a stipulation under Fed. R.
Civ. P. 41 (a)(1)(ii) dismissing with prejudice any claims that have been or could be asserted by
SELK against plaintiffs or by plaintiffs against SELK. A stipulation to this effect, signed by us,
is enclosed. Please sign it and return it to us; we will take care of filing with the Court.

                            Very truly yours,

                            S. Mark Hurd

SMH/dmd
Enclosures

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release ("Agreement") is made and entered into as of December 17, 2004 by and among ALH Holdings, LLC, a Delaware limited liability company ("ALH"), ALH II, Inc. a Delaware corporation ("ALH II"), and Mulvaney Homes, Inc., a North Carolina corporation ("Mulvaney"), on the one hand, and Shalom E. Lamm, an individual resident in New York ("Lamm") on the other hand, with reference to the following facts:

A.    Lamm is obligated to ALH in the amount of US$ 1,400,000, plus accrued interest, under that certain Promissory Note, dated July 1, 2001, (the "Note Obligation").

B.    On May 27, 2004, judgment in favor of ALH Holdings, LLC against Lamm and others in the sum of $3,550,807.16 was entered based on Lamm's Affidavit of Confession of Judgment in an action entitled <u>ALH Holdings LLC v. Shalom E. Lamm</u> in New York County Supreme Court, index 108088/04 (the "Judgment").

C.    Lamm is currently an officer and director of Mulvaney and its wholly owned subsidiary Mulvaney Homes/ALH, Inc., a North Carolina corporation ("ALH/Mulvaney").

D.    ALH II has agreed to sell, and Mattamy (US) Acquisition Corporation has agreed to purchase, all of the capital stock of Mulvaney (the "Mulvaney Sale").

E.    To permit the Mulvaney Sale to close, ALH, ALH II and Mulvaney have requested Lamm to execute a resignation as an officer of Mulvaney and ALH/Mulvaney and a release in favor of such companies effective as of the closing, which Lamm is willing to do in exchange for the releases set forth herein.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Upon execution and delivery of this Agreement by both parties, Lamm shall promptly execute and deliver to ALH a Resignation and Release in form and substance similar to that attached hereto as <u>Exhibit A</u>.

2.    Lamm, for himself and for his heirs, successors, assigns, subsidiaries, affiliates (including Lion ALH Capital LLC and Lion & Lamm Capital, LLC), agents, attorneys, employees, officers, directors, shareholders, managers, members, and each of them (collectively, the "Lamm Affiliates"), does hereby, in perpetuity, release,

01/14/2005  Case 5:05-cv-00256  NICHOLS ARSHT FND RUNNEL  Filed 09/02/2005  212 4271 2784  NO. 165  P005

remise and discharge ALH, ALH II and Mulvaney, and their respective subsidiaries, affiliates, agents, attorneys, employees, officers, directors, shareholders, managers, members, successors, assigns, and each of them (collectively, the "ALH Affiliates") from any and all claims, demands, debts, duties, bonds, damages, liabilities, actions, causes of action, suits, other sums of money, accounts, covenants, agreements, contracts and promises (referred to herein as "Claims"), in law or in equity, which Lamm or the Lamm Affiliates now have, have had or at any time may have against ALH, ALH II, Mulvaney, and/or the ALH Affiliates, whether or not they have been subject to dispute and whether or not known or unknown or suspected or unsuspected or liquidated or unliquidated, by reason of any matter, cause or thing whatsoever related to or arising out of the Note Obligation or any other past transactions between or amongst them.

3.      ALH, ALH II, and Mulvaney, for themselves and the ALH Affiliates do hereby, in perpetuity, release, remise and discharge Lamm and the Lamm Affiliates from any and all Claims, in law or in equity, which ALH, ALH II, Mulvaney, or the ALH Affiliates now have, have had or at any time may have against them, whether or not they have been subject to dispute and whether or not known or unknown or suspected or unsuspected or liquidated or unliquidated, by reason of any matter, cause or thing whatsoever, related to or arising out of the Note Obligation or any other past transactions between or amongst them.

4.      Upon execution hereof by the parties hereto, ALH Holdings LLC shall, at its sole cost and expense, including satisfaction of any and all Sheriff and Marshall fees, (a) provide Lamm with a Satisfaction of Judgment in the form annexed hereto as Exhibit B; (b) promptly discontinue with prejudice the supplementary proceeding entitled, ALH Holdings LLC v. Chase Manhattan Bank and Tina S. Lamm pending in New York County Supreme Court and provide Lamm with a Stipulation of Discontinuance with prejudice in substantially the form annexed hereto as Exhibit C; (c) promptly release all restraints and/or levies issued against Lamm and/or his wife, Tina S. Lamm, including but not limited to, the Chase account which is the subject of the supplementary proceeding; and (d) promptly withdraw all subpoenas, restraining notices, levies, income or property executions and all other judgment enforcement devices as against Lamm and/or Tina S. Lamm and provide Lamm with copies of all documents withdrawing such documents and notify all credit reporting agencies of the satisfaction of the Judgment. It is the intention of the parties that all collection efforts by ALH Holdings LLC or its attorneys against Lamm or the Lamm Affiliates shall be promptly withdrawn.

5.      Each party hereto expressly represents that such party has carefully read this Agreement; knows the contents thereof; has had the advice of counsel of such party's choosing in connection with the subject matter hereof, the resolution thereof reflected herein, and the releases, warranties, representations, conditions and agreements contained herein; has signed this Agreement freely and voluntarily; and has not been influenced to any extent whatsoever in doing so by any party hereto or

2

by any other person or entity, except for those representations, statements and promises expressly set forth herein.

6.    It is the intention of the parties hereto that this Agreement shall be effective as a full and final accord and satisfaction and release of each party hereto. It is expressly understood by the parties that Section 1542 of the Civil Code of the State of California provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The parties hereto acknowledge that they are aware that they may hereafter discover facts in addition to and/or different from those which they now know or believe to be true with respect to the subject matter of this Agreement, but that, notwithstanding that fact, it is their intention hereby to fully, finally, and forever release all claims, actions, obligations and matters released herein and settle all disputes and differences related to the subject matter hereof, except as otherwise expressly provided in this Agreement, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, which now exist, or may in the future exist or heretofore have existed between each of them, and such releases herein shall be and remain in effect as full and complete releases, notwithstanding the discovery or existence of any such additional or different facts.

7.    Each of ALH, ALH II, Mulvaney and Lamm represents and warrants that it/he has neither assigned nor transferred, and will not hereafter assign or transfer, any of the Claims released herein.

8.    This Agreement shall be deemed to have been entered into in the State of California and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of California applicable to contracts entered in and performed entirely within the State of California, without regard to any conflict of laws principles.

9.    Each and every provision of this Agreement is severable from each and all of the other provisions of this Agreement. In the event that any provision or provisions of this Agreement are for any reason unenforceable, the balance of said provisions shall nonetheless remain in full force and effect.

10.    This Agreement may be modified only by written agreement executed by the parties in interest at the time of the modification.

11.    This Agreement represents the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous

3

01/14/2005  Case 3:05-cv-00256  NICHOL ARSHT AND JUNNE led 09/02/2005 212 407 1279  19.165   ©007

oral or written communications, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereof.

12.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, representatives, successors and assigns. Each party hereto represents and warrants that (a) it is authorized to execute, deliver and perform this Agreement; and (b) this Agreement constitutes a legal, valid and binding obligation of such party enforceable against such party in accordance with its terms.

13.  Except as expressly set forth above with respect to the ALH Affiliates and the Lamm Affiliates, nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third parties to any party hereto, nor of any party hereto to any third parties.

14.  Any notice or communication required or permitted under this Agreement shall be effective when personally delivered in writing; or on the date when the notice, service or communication is transmitted by electronic facsimile (with a confirmation copy to be sent by mail) or the day after the notice, service or communication is sent by overnight air courier service (e.g., FedEx Courier); or five (5) days after the date of mailing. All notices shall be sent to the parties at the notice addresses listed below or to such other persons and notice addresses as may be designated in writing by the parties to each other.

To ALH, ALH II, or Mulvaney:

> ALH Holdings, LLC
> 444 Lakeside Drive, Second Floor
> Burbank, CA 91505
> ATTN: George J. Buchler
> Facsimile: (818) 556-6995

To Lamm:

> Shalom E. Lamm
> 330 Elm Street
> West Hempstead, NY 11552
> Facsimile: (877) 869-6465

15.  Nothing contained in this Agreement shall constitute a release of any party hereto from liability for failure of such party to perform as required by the terms of this Agreement. In the event of any litigation or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and expenses incurred in connection

4

with settling or resolving such dispute. The attorneys' fees which the prevailing party is entitled to recover shall include fees for prosecuting or defending any appeal and shall be awarded for any supplemental proceedings until final judgments is satisfied in full. In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or arbitration based on this Agreement shall be entitled to its reasonable attorneys' fees incurred in any post-judgment proceedings to collect or enforce the judgment. This attorneys' fees provision is separate and several and shall survive the merger of this Agreement into any judgment.

16.    This Agreement may be executed in one or more counterparts, and taken together shall constitute one and the same instrument. Facsimile signatures (sent via facsimile machine or e-mail) shall be equally valid and binding as original signatures.

[signature page follows]

5

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement and Mutual Release to be duly executed as of the date first above written.

**"ALH"**
ALH HOLDINGS, LLC

By: _George Buchler (signature)_ _____

Name: _George Buchler_ _____

Title: _Vice President_ _____

**"ALH II"**
ALH II, INC.

By: _George Buchler (signature)_ _____

Name: _George Buchler_ _____

Title: _Vice President_ _____

**"Mulvaney"**
MULVANEY HOMES, INC.

By: _George Buchler (signature)_ _____

Name: _George Buchler_ _____

Title: _Vice President_ _____

**"Lamm"**

_____

SHALOM E. LAMM

6

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement and Mutual Release to be duly executed as of the date first above written.

"ALH"
ALH HOLDINGS, LLC

By:_____
Name:_____
Title:_____

"ALH II"
ALH II, INC.

By:_____
Name:_____
Title:_____

"Mulvaney"
MULVANEY HOMES, INC.

By:_____
Name:_____
Title:_____

"Lamm"

_____
SHALOM E. LAMM

6

## EXHIBIT A

## RESIGNATION AND RELEASE

Effective as of the closing of the transactions contemplated by the Stock Purchase Agreement dated as of the 17th day of December 2004, by and among Mattamy Homes Corporation, a Delaware corporation, ALH II, Inc., a Delaware corporation, and Mulvaney Homes, Inc., a North Carolina corporation, I, Shalom Lamm, hereby resign from the following positions:

Director and Secretary of Mulvaney Homes, Inc.; and

Secretary of Mulvaney Homes/ALH, Inc., a North Carolina corporation.

Mulvaney Homes, Inc. and Mulvaney Homes/ALH, Inc. are referred to herein collectively as the "Mulvaney Companies".

I hereby remise, release and forever discharge each of the Mulvaney Companies of and from all actions, causes of action, suits, proceedings, debts, duties, accounts, bonds, covenants, contracts, claims and demands whatsoever which I, as a director, officer or employee of the Mulvaney Companies or otherwise, had, now have or hereafter shall or may have arising out of any cause, matter or thing whatsoever existing up to the present time, whether pursuant to statute, contract, common law or otherwise, and, in particular, without in any way limiting the generality of the foregoing, claims, demands or proceedings arising out of the following: my office, directorship, status, rights, interests or employment or the termination, cessation or loss thereof; and any moneys advanced, notice, pay in lieu of notice, severance pay, bonuses, benefits, perquisites, expenses, director's fees, participation in profits or earnings or other remuneration, whether authorized, pursuant to or provided for by by-law, resolution, statute, contract, common law or otherwise.

The provisions hereof shall inure to the benefit of the successors and assigns of each of the Mulvaney Companies and shall be binding upon my heirs, executors, administrators and legal personal representatives.

Dated: December ___, 2004

_____
Shalom Lamm

# 2463118_v2

**EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK _____ X

ALH HOLDINGS LLC,

                              Plaintiff,

          - against -

LION ALH CAPITAL LLC, LION & LAMM CAPITAL,
LLC, JOHN D. HOURIHAN, SHALOM E. LAMM, and
JONATHAN ZICH,
_____ Defendants.____ X

SATISFACTION OF JUDGMENT FOR
LION ALH CAPITAL LLC, LION & LAMM
CAPITAL,LLC ,and SHALOM E. LAMM ONLY

INDEX#: 108088 /04

A Judgment was duly entered in the above-entitled action in favor of Plaintiff, ALH Holdings LLC, and against Defendants, Lion ALH Capital LLC, at 489 Fifth Avenue, New York, NY, Lion & Lamm Capital, LLC, at 489 Fifth Avenue, New York, NY, John D. Hourihan, at 15 East Green Cay, Christianstead, St. Croix, USVI, Shalom E. Lamm, at 330 Elm Street, West Hempstead, NY and Jonathan Zich at 180 Riverside Drive, New York, NY in the Supreme Court, County of New York on, *May 27, 2004* under index 108088/04.

Transcripts of the aforesaid Judgment have been duly filed with the offices of the Clerk of the County of Nassau County on October 7, 2004; Clerk of the County of Queens County on October 8, 2004; and Clerk of the County of Suffolk County on October 8, 2004.

The aforesaid Judgment entered for $3,550,807.16, plus post judgment interest accruing at the legal rate of 9% from May 27, 2004 minus a payment of $2,032.17 made on September 13, 2004 leaving a balance due on the Judgment of $ 3,726,341.19 minus a payment of $100.00 made on December 16, 2004, leaving a balance due on the Judgment of $ 3,726,241.19 as of December 16, 2004 with post judgment interest continuing to accrue at the legal rate of 9%.

Plaintiff will promptly notify the Sheriff/Marshall to withdraw any outstanding executions with respect to Shalom E. Lamm, Lion ALH Capital LLC and Lion and Lamm Capital LLC.

Thus, said Judgment against Defendants, Lion ALH Capital LLC, Lion & Lamm Capital, LLC, and, Shalom E. Lamm, only is acknowledged to be satisfied and the Clerk of the Courts are directed and authorized to satisfy said Judgment, or transcripts thereof, of record on the dockets thereof, and to make an entry thereof. The Judgment remains in effect on other Defendants, JOHN D. HOURIHAN and JONATHAN ZICH.

Dated:                                    ALH HOLDINGS LLC

                                          BY: _____

                                          TITLE: _____

**COUNTY OF FAIRFAX**
**COMMONWEALTH OF VIRGINIA**

On _____, before me the undersigned personally appeared, _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the statement, the individual or the person on behalf of which the individual acted, executed the instrument.

                    **NOTARY PUBLIC**

**EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------X

ALH HOLDINGS LLC,

              Petitioner,

  - against -

CHASE MANHATTAN BANK and TINA S. LAMM,

              Respondents,

  - and -

LION ALH CAPITAL LLC, LION & LAMM CAPITAL,
LLC, JOHN D. HOURIHAN, SHALOM E. LAMM
and JONATHAN ZICH,

              Judgment Debtors.
-----------------------------------------------X

**STIPULATION OF
DISCONTINUANCE
WITH PREJUDICE**

Index No. 04-114207

      IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, the attorneys of record for all the parties, that whereas no party hereto is an infant, incompetent person for whom a committee has been appointed or conservatee and no person not a party has an interest in the subject matter of the action, the above entitled action can be, and the same hereby is discontinued with prejudice, and without costs to either party as against the other; and

      IT IS FURTHER STIPULATED THAT plaintiff's counsel shall advise the court that it is withdrawing its petition currently returnable on January 6, 2005; and

      IT IS FURTHER STIPULATED that the discontinuance of this action has no effect on the companion action commenced in the Supreme Court of New York County under Index # 108088/04 which shall continue only as it pertains to John A. Hourihan and Jonathan Zich; and

1

IT IS FURTHER STIPULATED that facsimile signatures, shall be deemed an original.

Dated:                                Dated:

ALH HOLDINGS LLC

By: _____     By: _____
   Title: _____        Joseph Capobianco/Craig M. Johnson
                          REISMAN, PEIREZ & REISMAN
                          L.L.P. Attorneys for Defendants Lion
                          ALH Capital LLC, Lion & Lamm
                          Capital, LLC, and, Shalom E. Lamm
                          1350 Frankling Avenue
                          Garden City, NY 11530

# 2474619_v1

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 04-1339-SLR |
| v. | ) ) ) | |
| AVIE ARENSON, SELF, LLC AND LAUREL EQUITY GROUP, LLC, | ) ) ) | |
| Defendants. | ) | |

## STIPULATION AND ORDER OF DISMISSAL WITH PREJUDICE

WHEREAS, this action was originally commenced on September 13, 2004 in the Court of Chancery of the State of Delaware (the "Chancery Court") and was removed by defendants to this Court on October 6, 2004; and

WHEREAS, on November 5, 2004, plaintiffs moved to remand this action back to the Chancery Court, and such motion is now *sub judice*; and

WHEREAS, by means of that certain Settlement Agreement and Mutual Release dated December 17, 2004 (the "SAMR"), defendant SELK LLC ("SELK") has released any and all claims it has asserted or could assert against plaintiffs in this action (whether in this Court or the Chancery Court); and

WHEREAS, by means of the SAMR, plaintiffs have released any and all claims they have asserted or could assert against defendant SELK in this action (whether in this Court or the Chancery Court);

IT IS HEREBY STIPULATED AND ORDERED, pursuant to Rule 41 of the

Federal Rules of Civil Procedure, that:

    1.    SELK dismisses with prejudice any and all claims it has asserted or could

assert against plaintiffs in this action (whether in this Court or the Chancery Court); and

    2.    Plaintiffs dismiss with prejudice any and all claims they have asserted or

could assert against SELK in this action (whether in this Court or the Chancery Court).

MORRIS NICHOLS ARSHT & TUNNELL        COZEN O'CONNOR


A. Gilchrist Sparks, III (#247)               Sean J. Bellew (#4072)
S. Mark Hurd (#3297)                      David A. Felice (#4090)
Samuel T. Hirzel (#4415)                 1201 N. Market Street
1201 N. Market Street                    Wilmington, DE 19899
Wilmington, DE 19899                   302-295-2000
302-658-9200                           Attorneys for Abraham Arenson, SELK,
    Attorneys for Plaintiffs Shamrock Holdings of      LLC, Laurel Equity Group, LLC
    California, Inc., Shamrock Capital Advisors,
    Inc., Eugene I. Krieger, George J. Buchler, and
    Bruce J. Stein

OF COUNSEL:                          OF COUNSEL

Gregory P. Joseph Law Offices LLC        Neuberger, Quinn, Gielen, Rubin &
Gregory P. Joseph                     Gibber, P.A.
Pamela Jarvis                            Thomas M. Wood, IV
805 Third Avenue, 31st Floor             One South Street, 27th Floor
New York, NY 10022                   Baltimore, MD 21202
(212) 407-1200                          (410) 332-8550

         IT IS HEREBY ORDERED this ___ day of January, 2005.


                    United States District Judge

Case 1:06-cv-00062-SLR    Document 22-31    Filed 01/31/2006    Page 80 of 85
⑫002/003
01/19/2005 10:35 FAX  410 332 4503          NQGRG
Case 3:05-cv-00256    Document 13-45    Filed 09/02/2005    Page 17 of 18

LAW OFFICES

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

27TH FLOOR
ONE SOUTH STREET
BALTIMORE, MARYLAND 21202-3282
www.nqgrg.com
(410) 332-8550

THOMAS M. WOOD, IV.
(410) 332-8523

FAX NO.
(410) 332-8564
E-MAIL ADDRESS:
TMW@NQGRG.COM

January 19, 2005

VIA FACSIMILE: 302-498-6202
AND REGULAR MAIL

S. Mark Hurd, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

      RE:   *Shamrock Holdings of California, Inc. v. Arenson*
            C.A. No: 04-1399-SLR

Dear Mr. Hurd:

      I am in receipt of your letter dated January 14, 2005 proposing that SELK, LLC ("SELK") enter into a stipulation dismissing any claims that it has asserted or could have asserted against Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., George J. Buchler, Eugene I. Krieger and Bruce J. Stein ("Shamrock"), in the above-captioned matter. Your proposal is absurd, disingenuous and so far beyond the pale that it hardly merits a response. Obviously, SELK will not enter into any such stipulation.

      Your position that SELK released any claims it has against Shamrock in the above-captioned matter or in any other matter is ridiculous. The Settlement Agreement and Mutual Release ("SAMR") entered into by Shalom Lamm did not release any claims that SELK has against Shamrock. The SAMR makes clear that its purpose was to release Lamm in connection with the Note Obligation and a confessed judgment entered in New York in return for Lamm's resignation as an officer of Mulvaney Homes, Inc. ("MHI") and Mulvaney Homes/ALH, Inc. so that ALH II could sell the stock of MHI to Mattamy.

      Your contention that SELK is an affiliate of Lamm and that the words in the SAMR that "Lamm, for himself and his heirs, successors, assigns, subsidiaries, affiliates (including Lion ALH Capital, LLC and Lion & Lamm Capital, LLC"), agents, attorneys, employees, officers,

# NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER, P.A.

S. Mark Hurd, Esquire
January 19, 2005
Page 2 of 2

directors, shareholders and managers (collectively the "Lamm Affiliates"), release any of SELK's claims against Shamrock is ludicrous. SELK is not an affiliate of Lamm nor is affiliate defined anywhere in the SAMR.

Undoubtedly, the Court will not look upon your letter or your position with favor. Any further assertion of this position will result in a request for sanctions with the Court.

Very truly yours,

Thomas M. Wood, IV

TMW/tem

215408.3/1060.3

# EXHIBIT TT

### Minutes of a Meeting of the
### Supervisory Board of ALH Holdings LLC
### Held on May 14, 2003

A duly scheduled telephonic meeting of the Supervisory Board (the "Board") of ALH Holdings LLC, a Delaware limited liability company (the "Company"), was held on May 14, 2003, pursuant to Section 6.2 of the Operating Agreement of the Company. In attendance were the following members of the Board:

Avie Arenson                      Shalom E. Lamm
George Buchler                    Bruce Stein
Eugene Krieger

Also in attendance, at the invitation of the Board, were John Laguardia, President and Chief Executive Officer of ALH II, Inc., a wholly-owned subsidiary of ALH II, and William Lanius, Treasurer and Chief Financial Officer of ALH II. The meeting was called to order at 8:00 AM PST. Mr. Stein was asked to serve as secretary for the meeting.

Mr. Buchler explained that the meeting was called primarily to discuss two issues affecting the Company: (1) the potential sale of Atlantic Builders, Inc., an indirect wholly-owned subsidiary of the Company ("ABI"), directly or indirectly to Mattamy Homes ("Mattamy") and (2) a lawsuit brought by the Bowden family with respect to the Note, dated March 19, 1999, in the principal amount of $2,250,000 (the "Bowden Note") issued by ALH Tennessee Acquisition, Inc., an indirect, wholly-owned subsidiary of the Company ("ALH Acquisition"), to Donald L. Bowden, Sr. and Helen E. Bowden.

#### The Proposed Sale of ABI

*ABI Sale Status*

Tony Avila, with Jolson Merchant Partners, was invited to join the telephonic meeting by the Board. Mr. Avila gave an overview of the efforts to sell the Company in its entirety and the subsequent efforts to sell ABI. He explained that he began his search for potential buyers of ABI after an unsuccessful search for a purchaser of the Company or substantially all of its assets by speaking with twenty builders and then narrowed this list to six viable buyer candidates. From these six candidates, Mr. Avila had obtained four written proposals (one of which was subsequently withdrawn) and one verbal proposal for the purchase of ABI. The purchase prices offered by the bidders that made written proposals were as follows:

| | |
|---|---|
| Mattamy | $20 million (this figure reflects a $17-17.5 million offer plus a "gross-up" of approximately $2.5 million to make it comparable to the other proposals, all of which would require an adjustment downward to account for intercompany receivables of approximately $2.5 million) |
| MDC Holdings | $18.5 million |
| Toll Brothers | $14 million plus a $4 million earn-out |

84417

Because Mattamy's proposal was the most favorable of the proposals received, the Company and Mattamy executed a non-binding term sheet on April 11, 2003. Mr. Avila stated his view that the deal described in the Mattamy term sheet represents the best transaction for the sale of the ABI.

Mr. Buchler reviewed the status of the discussions regarding the proposed sale of ABI to Mattamy. He reported that Mattamy finished its accounting due diligence and is close to finishing its legal due diligence. He reported that several issues remain to be resolved by the parties, including the ability of ABI to assign all of its land contracts to Mattamy, Mattamy's proposed assumption of ABI's bank debt, and the potential transfer of an ABI account receivable related to the Towers' litigation. Mr. Lanius mentioned that Don Walker, Mattamy's Chief Financial Officer, had indicated to him that these three issues were the only significant concerns that Mattamy currently had regarding the proposed sale of ABI.

With respect to the ability of ABI to assign its land contracts, Mr. Buchler mentioned that Baker & Hostetler, PC, the Company's Florida counsel, provided a memorandum indicating that ABI should be able to assign its rights under its contract to purchase lots from Oakleaf Plantation, LLC. However, Baker & Hostetler indicated that, with respect to ABI's lot purchase agreement with Bartram Lakes, LLC, the standards for assigning ABI's rights are more restrictive. Mr. Laguardia asked the Board if he should contact the Bartram Springs developer about the potential assignment of the contract. It was decided by the Board that the Company's Florida counsel would prepare a draft assignment of the Bartram Springs contract and that Mr. Buchler would have the authority, on behalf of the Board, to authorize Mr. Laguardia to contact the developer when, and if, Mr. Buchler determined that it would be advisable to do so.

### Market Status

Mr. Buchler then asked Messrs. Laguardia and Lanius to provide their views regarding the proposed sale of ABI. Mr. Laguardia stated that he thought Mattamy had made the strongest offer for the ABI business and that this was the peak of the Jacksonville, Florida real estate market. He noted that ABI was performing exceptionally well at this time and that ABI's margins have improved steadily with EBITDA increasing to 14% in the month of April and to 13% for the period of January through March, 2003. Mr. Laguardia cautioned, however, that he could not estimate how long this environment will continue. He mentioned that the Jacksonville market currently has a shortage of lots. As a result, developers are raising lot prices and asking for larger deposits and requiring takedowns of larger numbers of lots. Thus far, ABI has been able to pass these lot price increases on to its buyers, but he was concerned about ABI's ability to continue doing so. Mr. Laguardia stated that, based on these factors, his view is that the Company would be selling ABI at the peak of the market.

Mr. Avila also suggested that a sale presently would be at the market peak because 10,848 units were sold in the Jacksonville market in 2002, an unusually large number of units. Mr. Laguardia added that this number is significantly higher than the historical average of 7,500 units sold per year. Mssrs. Laguardia and Avila also indicated to the Board that

84417

2

competition in the Jacksonville market is intensifying with many national and regional homebuilders entering the Jacksonville market. For example, D.R. Horton, Inc. is planning to sell 1,000 homes per year in the Jacksonville market and KB Home is buying lots to build 1,000 homes per year in the Jacksonville market. These homes would represent 26.67% of the historical average of units sold each year. Also, they indicated that Toll Brothers, Inc. and Lennar Corporation appear to be looking to enter the Jacksonville market. The entrance of these larger homebuilders/developers into the Jacksonville market would likely have a negative impact on ABI's future performance.

Mr. Lamm stated his view that ABI is considered a real "player" in the Jacksonville homebuilding market again and has a reputation sufficient for dealing with major developers. Mr. Laguardia agreed that ABI is now on the "A" list with some developers, but he questioned ABI's ability to maintain this status in the future because ABI's size and financial resources preclude it from buying land for its own account and developing lots. He added that big developers did not approach ABI when lots were being sold in two recent deals. In one such deal, Rutherford sold 50% of its lots to another large developer, Ryland, and, in another deal, Rutherford sold 50% of its lots to a large homebuilder without contacting ABI.

### Liquidity Concerns

Mr. Lanius then explained that the Company faces various liquidity issues with respect to the capital required for ABI to honor its existing land contracts. He indicated that ABI is ramping up from selling 350 homes per year to 400 homes per year and that it needs more cash and increased credit facilities for its increased inventory. ABI has four major lot purchases upcoming pursuant to existing contracts:

(1)   Oakleaf Plantation – 130 lots at a cost of $4.4 million;
(2)   Bartram Springs – 86 lots at a cost of $4.0 million;
(3)   John's Creek – 80 lots at a cost of $4.2 million; and
(4)   Bentwater – 51 lots at a cost of $2.4 million.

These upcoming purchases of an aggregate of 347 lots at a total cost of $15 million equals the total number of homes that ABI typically can close and sell within any given year. Because these purchases will take place over a compressed period of time, ABI's financial resources are being placed under considerable strain. ABI does not presently have either the cash or credit available with existing lenders to finance these contemplated purchases, and Messrs. Laguardia and Lanius stated that ABI will need to find other financing to fund the required purchases under these contracts. Mr. Lanius stated that he will need to find financing solutions within the next two months.

In addition to ABI's liquidity concerns, Mr. Buchler stated that the Company also has serious liquidity issues. The poor results generated by Mulvaney Homes, Inc. ("Mulvaney") are causing the Company's auditors to write down a minimum of $15 million in goodwill and have impacted the Company's financial statements. Mr. Buchler also mentioned that the Company will need to write down certain other receivables, further negatively impacting its financial statements.

84417

3