IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
No. 3:05-CV-256-H

| | | |
|---|---|---|
| A. ARENSON HOLDINGS, LTD., D.A. GARDENS, LTD., J12ALH ASSOCIATES, SELK, LLC and LAUREL EQUITY GROUP, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR TRANSFER** |
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) ) | |
| Defendants. | ) | |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

ARGUMENT ........................................................................................................ 14

    I.    The Case Should Be Dismissed or Transferred on Grounds of
Improper Venue ........................................................................................ 14

        A.  Under 28 U.S.C. § 1391(a), This Case Should Be Dismissed ...................... 24

        B.  Alternatively, Under the First to File Rule, This Case
Should Be Transferred ............................................................................... 19

    II.    The Case Should Be Dismissed For Lack of Subject Matter Jurisdiction ........ 28

        A.  The Claims Assert Injury to ALH and Are Therefore Derivative ................. 28

        B.  The Complaint Does Not Plead Facts Establishing Plaintiffs' Standing ....... 31

        C.  If the Derivative Claims Were Properly Pled, There Would Be No
Diversity ................................................................................................... 33

    III.    This Court Lacks Personal Jurisdiction Over Defendants ............................... 36

        A.  This Court Lacks Jurisdiction Over Any Defendants .................................... 36

        B.  This Court Lacks Jurisdiction Over SCA ..................................................... 37

            1.   This Court Lacks General Jurisdiction Over SCA ................................... 37

            2.   This Court Lacks Specific Jurisdiction Over SCA .................................. 38

    IV.    The Complaint Fails to State Any Claim On Which Relief Can
Be Granted ................................................................................................ 40

        A.  Delaware's Business Judgment Rule Presumption ....................................... 42

        B.  Plaintiffs Have Not Stated a Claim for Breach of the Duty of Loyalty ........ 43

        C.  Plaintiffs Have Not Stated a Claim for Bad Faith ........................................ 45

D.  Plaintiffs Have Not Stated a Claim for Gross Negligence ............................. 46

E.  Plaintiffs Have Not Stated Any Breach of Contract Claim ........................... 47

F.  Plaintiffs Have Not Stated an *Ultra Vires* Claim ............................................ 49

G. Plaintiffs Have Not Stated a Civil Conspiracy Claim ..................................... 49

H.  Plaintiffs' Claims Are Time-Barred ............................................................... 51

CONCLUSION .......................................................................................................... 55

## PRELIMINARY STATEMENT

Defendants Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein") ("Defendants") respectfully submit this brief in support of their motion to dismiss, or in the alternative to transfer, the Complaint filed by Plaintiffs A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12"), SELK, LLC ("SELK") and Laurel Equity Group, LLC ("Laurel") ("Plaintiffs"). (The Complaint is Exhibit A to the accompanying Declaration of Pamela Jarvis.) Defendants move to dismiss on, *inter alia*, the following grounds:

- Improper Venue. Venue is improper under 28 U.S.C. § 1391(a) because, *inter alia*: (1) the Complaint mirrors pending claims brought by Defendants against Plaintiffs more than eight months earlier in federal court in Delaware (the "DE Action"), (2) Defendants do not reside in this District, (3) Plaintiffs' claims could and should have been brought as counterclaims in the DE Action, and (4) the Complaint does not and cannot allege that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. The case should be dismissed or transferred to Delaware under 28 U.S.C. § 1406(a), or transferred to Delaware under 28 U.S.C. § 1404(a).

- Lack of Subject Matter Jurisdiction: Entire Complaint. The Complaint asserts only derivative claims on behalf of ALH Holdings, LLC ("ALH"). By contending that Defendants "depressed [the] value of ALH" and "destroyed all [investor] equity" in ALH (Complaint ¶12), Plaintiffs make classic derivative claims that they have no standing to bring directly. Plaintiffs could not properly plead these claims without, *inter alia*, joining ALH as a party, but that would preclude diversity jurisdiction here, because all parties are members of ALH and ALH's citizenship cannot be diverse from that of its members.

- Lack of Subject Matter Jurisdiction: Count III. Count III alleges that SCA breached a July 2001 consulting agreement with ALH ("Consulting Agreement"). Plaintiffs are not parties to this agreement and thus lack standing to sue for its breach.

- Lack of Personal Jurisdiction Over All Defendants. An essential statutory prerequisite to the exercise of long-arm jurisdiction under N.C. Gen. Stat. § 1-75.4 does not exist, namely, subject matter jurisdiction over Plaintiffs' claims.

- Lack of Personal Jurisdiction Over SCA. The Complaint alleges no jurisdictionally significant contacts between SCA and North Carolina and no claim against SCA that arises from contact with North Carolina.

- <u>Failure to State a Claim for Relief: Individual Counts of the Complaint</u>:

  - All Counts claim breach of fiduciary duty. These claims are barred by ALH's Operating Agreement and the Consulting Agreement, which preclude liability absent fraud, criminal action, bad faith, gross negligence or willful misconduct. The Complaint does not allege fraud or criminal action. Its allegations of bad faith, gross negligence and willful misconduct are wholly conclusory, unsupported by any facts or inferences that could reasonably be drawn.

  - Count II and III allege that Defendants breached ALH's Operating and Consulting Agreements and the implied contractual covenant of good faith and fair dealing, but they identify no express or implied contractual obligation that has been breached. The only breach of contract they allege is breach of fiduciary duty.

  - Count V alleges that the sale of ALH's operations was *ultra vires*. This claim fails because, *inter alia*, such sale was not beyond ALH's powers.

  - Count VI pleads civil conspiracy, but fails to state any independent cause of action for civil conspiracy.

- <u>Failure to State Claim for Relief: Entire Complaint</u>. The Complaint is time-barred. It alleges a scheme by Defendants, beginning in early 2001, to breach fiduciary and other obligations relating to ALH, but was not served until June 2005, after the end of the three-year limitation period. Certain alleged events occurred after June 2002, but at most such events are only aggravation of the original alleged injury.

Accordingly, there are ample grounds for dismissing the Complaint or transferring the case (with all pending motions) to the Delaware federal court.[1]

## STATEMENT OF FACTS

### I.    Defendants' DE Action

On September 13, 2004, Defendants commenced the DE Action by filing their original complaint in the Court of Chancery of the State of Delaware ("Chancery Court"). Jarvis Dec. Ex. C. The DE Action arises from the formation, funding and management of ALH, a Delaware

---

[1]    Plaintiffs' claims are governed by Delaware law because (1) ALH is a limited liability company ("LLC") formed under Delaware law, so under N.C. Gen. Stat. § 57C-7-01, Delaware law governs, *inter alia*, its internal affairs and the liability of its members and managers, and (2) ALH's Operating Agreement (Jarvis Dec. Ex. D at § 10.2) provides that "[a]ll questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

LLC.  (Defendants' current complaint, cited as "DE Complaint ¶ __," is Jarvis Dec. Ex. B.)
Shamrock, as a holder of Class A equity in ALH ("Class A Member"), is the single largest
investor in ALH, having invested over $9 million.  DE Complaint ¶¶ 2, 7.  The five Plaintiffs
herein (Arenson Holdings, D.A. Gardens, J12, SELK and Laurel) are the five Class B equity
investors in ALH ("Class B Members").  *Id.* at ¶¶ 9-18, 52, 57- 59; Jarvis Dec. Ex. D at Ex. B).[2]

Plaintiffs invested in the equity of ALH, which was formed in June 1998 to engage in the
home-building business.  DE Complaint ¶ 2.  Shamrock invested millions of dollars more in
ALH than did any of the Plaintiffs.  *Id.*  Due to no wrongdoing by any of the Defendants, ALH
was ultimately unsuccessful, with the result that both Shamrock and Plaintiffs lost most of what
they invested in ALH.  *Id.*

Under ALH's June 12, 1998 Operating Agreement, as amended (the "Operating
Agreement"), the economic rights of the Class A and Class B Members are *pari passu*.  Jarvis
Dec. Ex. D at §§ 4.1(b), 8.3(a) (iii), Ex. E at ¶ 20, Ex. MM at 3; DE Complaint ¶¶ 3, 134.[3]  The
Class A Members have no financial priority or preference over the Class B Members.  *Id.*  The
only difference is that Shamrock's share of ALH's losses is necessarily larger than that of the
Plaintiffs, because Shamrock's investment in ALH is larger.  DE Complaint ¶ 3.  No setback
experienced by ALH could hurt Plaintiffs without hurting Shamrock more.  *Id.*  Although there
was no basis for holding any of the Defendants liable for ALH's disappointing performance,
Plaintiffs made spurious accusations and repeatedly threatened to sue.  *Id.* ¶¶ 2-6.

---

[2]     Avie Arenson ("Arenson") is a defendant in the DE Action but not a Plaintiff herein.  He owns
and controls two of the Plaintiffs herein: Arenson Holdings and D.A. Gardens.  *See* DE Complaint ¶ 11;
Jarvis Dec. ¶ 67.  Arenson is also a member of ALH's Supervisory Board, on which he serves as the Class
Representative of the Class B Members.  DE Complaint ¶ 10; *see* accompanying Declaration of George J.
Buchler at ¶ 2.  Together, Arenson and the Class B Members are the defendants in the DE Action.

[3]     The Operating Agreement (Jarvis Dec. Ex. D) and other documents referred to in the Complaint
may be considered on a Fed. R. Civ. P. Rule 12(b) motion without converting it into a summary judgment
motion.  *See, e.g., Iconbazaar, LLC v. America Online, Inc.*, 308 F. Supp. 2d 630 (M.D.N.C. 2004).

The DE Complaint seeks a declaratory judgment that: (1) Defendants did not breach any fiduciary duty in connection with ALH, particularly the sale of ALH's operations (Count I); (2) they have no liability under the Operating or Consulting Agreements (Counts II & III); (3) they relied in good faith on ALH's outside advisors (Count IV); (4) they are entitled to indemnification (Count V); (5), SELK has released its claims against them (Count VI); (6) SELK's equity interest in ALH should be reduced or eliminated (Count VII); and (7), they have not violated Arenson's rights as Class B Representative (Count VIII).

On October 6, 2004, the original defendants in the DE Action (SELK, Laurel and Arenson) removed the original complaint (Jarvis Dec. Ex. C) to the Delaware federal court. *Id.* at ¶ 64. On October 14, 2004, they moved to dismiss the DE Action, but <u>did not move to dismiss on grounds of improper venue and did not move to transfer the action to North Carolina</u>. *Id.*[4]

On April 22, 2005, Defendants filed the DE Complaint in the Delaware federal court. Among other things, the DE Complaint added Arenson Holdings, D.A. Gardens and J12 as defendants. DE Complaint ¶¶ 11, 58-62. On June 3, 2005, in the DE Action, Plaintiffs and Arenson made various motions to dismiss, but they <u>did not move to dismiss on grounds of improper venue and did not move to transfer the action to North Carolina</u>. Jarvis Dec. ¶ 66.

## II.    Plaintiffs' "Mirror Image" Action in this Court

On June 2, 2005, the Class B Members filed their Complaint, which is essentially a mirror image of the DE Complaint (except that Arenson is not a party to this action and this action does not address the Defendants' claims for such relief as indemnification). The Complaint purports to state claims against Defendants for: (1) alleged breach of fiduciary duty in

---

[4]     On November 5, 2004, Defendants moved to remand the DE Action on the grounds that the defendants therein had failed to carry their burden of establishing diversity jurisdiction. Jarvis Dec. ¶ 65. The defendants therein provided discovery concerning Plaintiffs' ownership, controlling persons and business activities and made supplemental factual submissions. *Id.* On March 22, 2005, the Delaware federal court denied the motion to remand. *Id.*

connection with ALH, particularly the sale of ALH's operations (Count I); (2) alleged breach of

the Operating and Consulting Agreements (Counts II & III); (3) alleged gross negligence in

connection with the sale of ALH's operations and hiring of advisors (Count IV); (4) alleged self-

dealing/*ultra vires* action in connection with the sale of ALH's operations (Count V); and (5)

alleged civil conspiracy in connection with the sale of ALH's operations (Count VI).

This action and the DE Action concern the same alleged breaches of fiduciary duty by the

Defendants herein in connection with ALH, the same sales of ALH's operations, the same

Supervisory Board decisions, the same Operating and Consulting Agreements, and the same

advisors.  *Compare* Jarvis Dec. Ex. A *with* Jarvis Dec. Ex. B.  The claims in this action are

compulsory counterclaims in the DE action because they unquestionably arise out of the same

transactions and occurrences that are the subject matter of the DE Action.  FED. R. CIV. P. 13(a).

### III.    The Exculpation Provisions of the Operating and Consulting Agreements

Section  6.2(f) of the Operating Agreement (Jarvis Dec. Ex. D) provides that:

> Neither the Manager nor any Representative or Deputy Representative shall be
> liable, responsible, or accountable in damages or otherwise to the Company or
> any of the Members for any failure to take any action or the taking of any action
> within the scope of authority conferred on it, him or her by this Agreement made
> in good faith, except that the Manager, Representatives and Deputy
> Representatives shall be liable, responsible and accountable for their own fraud,
> criminal action, bad faith or gross negligence.

The Consulting Agreement provides that SCA shall have no liability to ALH or any other person

in connection with the services rendered pursuant to the Consulting Agreement, except to the

extent that it is finally judicially determined that such liability results primarily from SCA's bad

faith, gross negligence or willful misconduct.  Jarvis Dec. Ex. J at Ex. A. p. 2.  By means of

conclusory assertions of "bad faith," "gross negligence," "willful misconduct," "malice," "ill

will" and the like, the Complaint attempts — unsuccessfully — to override these exculpation provisions.

The crux of the Complaint is that Defendants conspired to seize control of ALH and then used that control to achieve their "goal to sell off ALH at a loss." Complaint ¶ 37; *see also* ¶¶ 8, 33, 35, 39, 46, 71. Since the financial interests of Shamrock and Plaintiffs in ALH were at all times fully aligned, there is no conceivable reason why Shamrock would have wanted to "sell off the operating units of ALH [at] depressed values." *Id.* ¶ 8. Not surprisingly, Plaintiffs plead no facts that support these conclusory and patently illogical claims.

*Allegations Concerning Loan Repayments*. Plaintiffs attempt to explain their position by contending that Defendants' alleged wrongdoing resulted from a desire to receive and retain repayment of loans made to ALH in April 2000 and May 2002, but this contention is based on wholly unreasonable inferences that the Court need not credit, even on a motion to dismiss under Rule 12(b)(6). With regard to these loans, the interests of Shamrock and Plaintiffs were the same: they both made loans to ALH and they both were repaid at the same time. *Id.* ¶¶ 41-43. The repayments discharged lawful debts of ALH and allowed it to continue to operate. *See id.* ¶¶ 10, 55. Even assuming *arguendo* that Defendants caused the sale of ALH's operations at "'fire sale' prices in order to use the proceeds to repay the loans" (*id.* ¶ 11), any supposed advantage — or disadvantage — from this would be the same for both Shamrock and Plaintiffs.[5]

Plaintiffs do not allege that they <u>objected to the repayment of the loans</u> or <u>sought to return their repayments to ALH</u>. Nor do Plaintiffs allege that, had the loans not been repaid, ALH would have had sufficient funds to continue and grow its operations. Given that Plaintiffs and Shamrock received and retained their loan repayments under exactly the same circumstances,

---

[5]    Plaintiffs speculate that, <u>if</u> ALH had declared bankruptcy within one year of the repayment of the loans, the repayments would have had to be disgorged as preferential. *Id.* ¶ 44. None of this ever happened, but if it had, Plaintiffs would presumably have had to disgorge their repayments as well.

Plaintiffs do not appear to claim that such repayments (including their own) are wrongful as such.  Rather, Plaintiffs seem to contend that repayment of the loans was the <u>motive</u> for Defendants' alleged scheme.  Even if this were Defendants' motive, it would in no way conflict with their interest in maximizing value, and it would not support Plaintiffs' conclusory assertions of self-interest and bad faith.

*Allegations Concerning Management Responsibilities.*  The Complaint contends that Defendants sold off ALH's operations at inadequate prices in order to rid themselves of management responsibility for ALH.  *See, e.g.*, Complaint ¶¶ 6, 8-9, 11, 45, 57-58, 60, 68, 73.  The Complaint pleads no facts that substantiate this contention or from which reasonable inferences substantiating this contention could be drawn.  Indeed, the Complaint refers to (but fails to attach for the Court's review) two documents that refute this contention: (1) the July 2001 agreement that Plaintiffs refer to as the "Management Agreement" (the "Lion LLC Settlement Agreement"); and (2) the Consulting Agreement. *Id.* ¶¶ 33, 37.  (The Lion LLC Settlement Agreement and the Consulting Agreement, respectively, are Jarvis Dec. Exs. F and J.)[6]  These two documents demonstrate that the Defendants <u>could at any time have relinquished any management responsibilities</u> they may have assumed.  Plaintiffs' premise that Defendants had to sell off ALH in order to avoid spending time on ALH is thus disproved by the Complaint itself.

The Lion LLC Settlement Agreement addressed Defendants' involvement with ALH in three ways: (1) it approved the Class A Members' right to designate an additional Class Representative on ALH's Supervisory Board, but it did not require the Class A Members to exercise this right in any particular manner or for any specified period (Jarvis Dec. Exs. H-I); (2)

---

[6]     Under the Lion LLC Settlement Agreement, the Class A Members were enabled to designate an additional Class Representative on ALH's Supervisory Board, such that the Class A Members could designate three of the five Class Representatives instead of two.  Jarvis Dec. Ex. D at § 6.2(b)(i) & Exs. H-I.  All of ALH's Members — including Plaintiffs, acting thorough Arenson as Class B Representative — approved the Lion LLC Settlement Agreement. *See, e.g.*, Jarvis Dec. Exs. F-L.

Buchler was added to the boards of ALH's subsidiaries, but was not required to continue for any specified period (*id.* at Ex. K); (3) ALH and SCA entered into the Consulting Agreement, but SCA could terminate that agreement at any time. *Id.* at Ex. J § 6; Complaint ¶ 37.[7]

Assuming *arguendo* that Defendants were involved in ALH's management as alleged in the Complaint, the Complaint does not allege (nor can it) that anything prevented the Defendants from ceasing that involvement at any time. According to the Complaint itself, Defendants could have chosen at will to spend less time on the management of ALH, or none at all. They did not need any "scheme" — let alone a "scheme" that would injure Shamrock more than any other investor in ALH by "depress[ing]" ALH's value. Complaint ¶ 8.

In short, the Complaint fails to plead claims permitted by the exculpation provisions of the Operating and Consulting Agreements or rebut the business judgment rule presumption.

## IV.    Plaintiffs Seek to Thwart the First to File Rule

On June 3, 2005 — the day after filing this action — Plaintiffs moved in the Delaware federal court to dismiss or stay the DE Action in favor of this action (the "Forum Motion").[8] In support of their Forum Motion, Plaintiffs argue that, contrary to the well-established "first to file" rule of this Court and the Delaware federal court, the Defendants' choice of Delaware as the forum for this litigation should be disregarded. We expect that, in responding to Defendants'

---

[7]    The Complaint (¶ 33) characterizes the Lion LLC Settlement Agreement as a "management agreement" as if to suggest that it gave Defendants management responsibility for ALH. In fact, it is an agreement between (1) ALH and (2) an entity called Lion ALH Capital, LLC ("Lion LLC") and certain affiliates of Lion LLC (the "Management Persons"). In substance, the Lion LLC Settlement Agreement regulates the conduct of the Managements Persons (who are unrelated to Defendants) in connection with ALH. It requires, *inter alia*, that the Management Persons: (1) ensure ALH's right to corporate opportunities; (2) obtain approval from ALH's Supervisory Board before causing or permitting ALH to enter into certain kinds of transactions, including related-party transactions; (3) acknowledge the receipt of certain payments from ALH; and (4) make certain payments to ALH and sign confessions of judgment in favor of ALH in the aggregate amount of $1.9 million. Jarvis Dec. Ex. F at §§ 1(d), 1(e), 1(h), 2.0, 3.0; *see id.* at Ex. G. *See also* Buchler Dec. ¶ 4.

[8]    Defendants have filed their papers in opposition to the Forum Motion and Plaintiffs' other motions in the DE Action. Plaintiffs' reply papers are due September 9, 2005.

present motion to dismiss this action for lack of venue, Plaintiffs will take the same position they have taken made in support of their Forum Motion in Delaware.

Plaintiffs' sole argument in support of the Forum Motion is that even though the DE Action was filed in September 2004 — more than eight months before this action — Defendants' choice of a Delaware forum is not protected by the first to file rule because the DE Action was filed solely to deprive Plaintiffs of their choice of forum. This argument relies on two false factual premises. Contrary to Plaintiffs' unsupported contentions: (1) there were <u>no ongoing settlement negotiations</u> between the parties when the DE Action was filed, and (2) Defendants were <u>not informed of an imminent lawsuit</u> in North Carolina before the DE Action was filed.

Plaintiffs' first false premise is that Defendants filed the DE Action while the parties were engaged in ongoing settlement negotiations. From mid-July through late August 2004, Plaintiffs and Defendants conducted a nearly daily exchange of correspondence to try to set up a meeting at which the parties might discuss and attempt to resolve their differences. Jarvis Dec. at ¶¶ 56-57. It proved to be impossible to get agreement on a face-to-face meeting. *Id*. at ¶ 57. Even arranging the date and time for a conference call was difficult. *Id.* & Exs. CC, DD, EE.

There was sharp disagreement concerning what might be discussed during the possible conference call. *Id*. at ¶ 58 & Ex. GG. Plaintiffs sought to discuss the compensation they wanted from the Defendants for ALH's disappointing performance. *See Id*. Defendants maintained that Plaintiffs had no right to any such compensation, but Defendants were willing to discuss the possibility of a business transaction that would address the future of ALH. *See id*. at ¶ 58 & Exs. DD, FF, GG. In any event, the call would give the parties an opportunity to assess whether a face-to-face meeting would be worthwhile. *See, e.g., id*. at Ex. CC.

Finally, on August 26, 2004, the parties and their counsel held a conference call. *See*
Buchler Dec. at ¶ 13. The parties agreed in advance that the call (in contrast to the parties'
correspondence) "will be in the nature of settlement discussions and will be without prejudice
and 'off the record' and not useable in any context." Jarvis Dec. Exs. HH, II. Following the
conference call, Defendants concluded that there was no common ground between the parties
that might serve as a starting point for settlement discussions. Buchler Dec. at ¶ 13. Plaintiffs
seem to have reached the same conclusion: the day after the conference call, Plaintiffs sent
Defendants an email stating that, *inter alia*, "it appears that Shamrock is unwilling to see its way
clear towards an acceptable resolution." Jarvis Dec. Ex. KK at 3. At no time after the
conference call did either party attempt to schedule any further discussions. *Id*. at ¶ 59.

Despite the failure of the August 26, 2004 conference call to set in motion any
negotiations between the parties, it occurred to Defendants that a respected mediator experienced
in the applicable principles of Delaware law might be able to help Plaintiffs see that they had no
basis for their claims against Defendants. Buchler Dec. at ¶ 14. Defendants suggested that
Plaintiffs consider mediation in the Delaware Chancery Court under Del. Code Ann. tit. 10, § 347,
but Plaintiffs did not agree. *See* Jarvis Dec. Exs. JJ, KK, LL, NN at ¶¶ 8-9, E at ¶ 23.

Thus, as of September 13, 2004, when the DE Action was filed, there were no ongoing
settlement negotiations between the parties. Indeed, given that Plaintiffs had not agreed to
mediation, there was not even a prospect of such negotiations. As of September 13, 2004,
Plaintiffs had not explicitly refused to mediate, but neither had they agreed to it. Jarvis Dec. Exs.
JJ, KK & LL. It appeared that Plaintiffs were not serious about mediating, but were instead
hoping to obtain information that they might at some point try to use in a lawsuit. Buchler Dec.

¶ 14.  In any event, Plaintiffs' noncommittal response to the possibility of mediation can hardly be characterized as ongoing settlement negotiations.

Plaintiffs' second false premise is that the Defendants rushed to file the DE Action as a preemptive measure against an imminent tort action that Plaintiffs had informed Defendants they intended to file in North Carolina.  In fact, Plaintiffs did not inform Defendants of anything concerning litigation, let alone that they were about to file suit in North Carolina or elsewhere.

On August 27, 2004, while Defendants still hoped that Plaintiffs might agree to mediation in Delaware, Defendants' counsel emailed Plaintiffs' counsel, stating that: "

> It occurred to me that you might not be aware that Section 10.2 of the ALH Holdings LLC Operating Agreement provides that "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware."

Jarvis Dec. at Ex. OO.  Plaintiffs responded the same day, asking whether § 10.2 of the Operating Agreement had the effect of a forum selection clause precluding litigation outside Delaware: "We are aware of this provision . . . it does NOT prevent the filing of a suit in North Carolina, does it?"  *Id*. at Ex. KK at 3 (ellipsis in original).  This single line in Plaintiffs' August 27, 2004 email is the only thing cited by Plaintiffs in support of their assertion in the Forum Motion that they informed Defendants of their intention to file suit in this Court  Plaintiffs' August 27, 2004 email also asked a second question: whether mediation in Delaware would afford the same discovery "that we would be entitled *[sic]* if we proceed in a different forum."  *Id*.; emphasis added.

By email dated August 30, 2004, Defendants responded to Plaintiffs' August 27 email.  *Id*. Ex. KK at 2.  Defendants stated that: "In addition to confirming that Delaware law governs, Section 10.2 of the Operating Agreement would weigh in favor of Delaware as the appropriate

forum."  In addition, Defendants stated that: "The Delaware mediation process . . . does not

provide for formal discovery, but the parties could of course agree to exchange whatever

information they want to."  *Id*.  "Also, participation in the mediation would not affect the parties'

ability to obtain discovery in <u>future litigation, if any</u>" (emphasis added).  *Id*.

Defendants did not understand Plaintiffs' August 27, 2004 email to be a notification of

imminent intent to sue in North Carolina or anywhere else.  Even assuming that one or both of

the questions in' August 27, 2004 email were rhetorical in nature, at most they express Plaintiffs'

view that the Delaware choice of law provision in Section 10.2 of the Operating Agreement did

not prevent Plaintiffs from suing in North Carolina or "in a different forum."  Id. at Ex. KK at 3.[9]

This could not objectively be understood as notification of an imminent intention to sue.

Plaintiffs did not imminently sue.  Between August 27, 2004, when Plaintiffs posed their

questions, and September 13, 2004, when Defendants filed the DE Action, more than two weeks

elapsed, during which Plaintiffs <u>did not sue or threaten to sue</u>.  *Id*. at ¶ 60.  During the <u>eight</u>

<u>months after</u> Defendants filed the DE Action, Plaintiffs <u>did not sue or threaten to sue</u>.  *Id*.

By email dated September 5, 2004, Plaintiffs stated that, before agreeing to a mediation

in Delaware, "we will require that Shamrock . . . agree to the same level of discovery that we

think we could achieve <u>if</u> we were to file a lawsuit.  I have asked Sam Wood [a partner in

Plaintiffs' counsel's law firm] to scope that out and to provide you with the <u>outline [of] a lawsuit</u>

<u>that would be the basis of the mediation</u>" (emphasis added).  *Id*. at Ex. LL.  Mr. Wood never

provided the "outline of a lawsuit," whether as a basis for mediation or for any other purpose.

---

[9]     Several weeks before the August 26 conference call, Plaintiffs' counsel put the following
question to Defendants' counsel: "IF THIS CASE IS BROUGHT IN DELWARE, NORTH CAROLINA
OR ELSEWHERE OTHER THAN NYC, WILL YOU PARTICIPATE?"  Jarvis Dec. Ex. GG at 5 (upper
case in original).  This suggested, as had other communications from Plaintiffs, that they were
contemplating the possibility of litigation, but it was hardly a notification of imminent intent to sue.  In
addition, to the extent it indicates any specificity of thought regarding a possible lawsuit, it suggests that
<u>Plaintiffs themselves considered Delaware an appropriate forum in which to sue Defendants</u>.

*Id.* at ¶ 61.  Nor did he provide any other information regarding the discovery that Plaintiffs

supposedly wanted as a condition of agreeing to mediation.  *Id.*

On September 8, 2004, Plaintiffs sent a further more email asking about "the extent of the

discovery that [Shamrock] would consider if we were to agree to the Mediation."  Id. at Ex. LL.

That same day, Defendants responded by asking for the information from Mr. Wood that was

promised on September 5.  *Id.*  Defendants provided nothing.  *Id.* at ¶ 62.  By this point, it

appeared to Defendants that Plaintiffs might merely be toying with the idea of mediation, in the

hope of getting extra-judicial discovery to use as the basis for a lawsuit.  Buchler Dec. at ¶ 14.

*See, e.g.*, Jarvis Dec. Ex. JJ (request that Shamrock provide discovery information to show it is

sincere in seeking resolution through mediation).

By letter dated September 13, 2004, enclosing a courtesy copy of the original complaint

in the DE Action, Defendants advised Plaintiffs that:

> The commencement of this action reflects no diminution in plaintiffs' desire to
> engage in the previously discussed mediation with your clients.  However, it has
> been more than two weeks since plaintiffs first proposed the mediation, and you
> have yet to agree to it.  Consequently, plaintiffs thought it prudent to pursue the
> mediation in the context of a pending action.

*Id.* at  Ex. PP.  Since then, Plaintiffs have not expressed the slightest interest in pursuing

mediation or settlement discussions.  *Id.* at ¶ 63.[10]

By the time Defendants filed the DE Action, Plaintiffs had intermittently been

threatening litigation for months.  For example, in a July 12, 2004 letter to Shamrock, Krieger

and Buchler, Plaintiffs stated that "we are exploring the rights of the Class B shareholders to

seek recovery of their equity and damages, as well," and that "millions of dollars may have been

---

[10]    After the parties' August 26, 2004 conference call proved useless and Plaintiffs did not agree to
mediation, Defendants filed their original complaint in the Chancery Court in the hope of obtaining a
prompt resolution of the parties' dispute.  *Id.* Ex. E at ¶ 23.  As reflected in Defendants' September 13,
2004 letter, Defendants also believed that a pending action in the Chancery Court might be conducive to
getting Plaintiffs involved in the mediation process in that court.  *Id.* at Ex. PP.

lost by what we feel is actionable behavior." *Id*. Ex. QQ at 2-3.  In this letter, Plaintiffs also
threatened to try to harm Shamrock's reputation by publicizing their accusations. *Id*. at 2.  For
even longer, Plaintiffs had been accusing Defendants of breaches of fiduciary duty.  *See, e.g.*,
April 1, 2004 email from Arenson to Buchler, stating that Plaintiffs "FEEL VERY STRONGLY
THAT SHAMROCK USED ITS CONTROLLING POSITION TO FURTHER SHAMROCK'S
ENDS, WITHOUT REGARD TO THE IMPACT ON THE OTHER ALH SHAREHOLDERS."
Jarvis Dec. at Ex. BB (upper case in original).  Especially in this context, Plaintiffs' August 27,
2004 email asking whether Section 10.2 of the Operating Agreement prevented the filing of a
lawsuit in North Carolina is patently inadequate to support Plaintiffs' assertion that they had
informed Defendants of their imminent intention to sue in North Carolina.

## ARGUMENT

**I.   The Case Should Be Dismissed or Transferred on Grounds of Improper Venue**

**A.   Under 28 U.S.C. § 1391(a), This Case Should Be Dismissed**

Defendants move under Fed. R. Civ. P. Rule 12(b)(3) to dismiss the Complaint on
grounds of improper venue.  The Complaint (¶ 25) asserts that venue is proper in this District
because "Defendants conducted substantial business within this District, and because a
substantial part of the events or omissions giving rise to the claim occurred in this District."
Since Plaintiffs assert jurisdiction solely on the basis of diversity of citizenship (Complaint ¶ 24),
venue is governed by 28 U.S.C. § 1391(a), which states that venue is proper only in:

> (1) a judicial district where any defendant resides, if all defendants reside in the
> same State, (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property that is
> the subject of the action is situated, or (3) a judicial district in which any
> defendant is subject to personal jurisdiction at the time the action is commenced,
> if there is no district in which the action may otherwise be brought.

Here, venue is not proper under 28 U.S.C. § 1391(a)(1) because Defendants do not all reside in North Carolina. For venue purposes, an individual defendant resides in the state where he or she is domiciled. *See, e.g., Nowotny v. Turner*, 203 F. Supp. 802, 803-04 (M.D.N.C. 1962); *Manley v. Engram*, 755 F.2d 1463, 1466 (11th Cir. 1985); *Finger v. Masterson*, 152 F. Supp. 224, 225 (W.D.S.C. 1957). Krieger, Buchler and Stein are citizens and domiciliaries of California. Complaint ¶¶ 21-23; Buchler Dec. ¶ 16. Shamrock and SCA, as corporations, are deemed to reside in any judicial district where they are subject to personal jurisdiction when the action is commenced. 28 U.S.C. § 1391(c). Krieger, Buchler and Stein do not reside here, so even if Shamrock and SCA were subject to personal jurisdiction in this District, 28 U.S.C. § 1391(a)(1) does not apply. *See, e.g., Hart v. Skadden, Arps, Slate, Meagher & Flom*, Case No. 1:90CV00437, 1991 U.S. Dist. Lexis 18053, at *7 (M.D.N.C., Aug. 5, 1991) (unpublished); *Loeb v. Bank of Am.*, 254 F. Supp. 2d 581, 586 (E.D. Pa. 2003).[11]

Venue is also not proper under 28 U.S.C. § 1391(a)(3), because it is not the case that "there is no district in which the action may otherwise be brought." Plaintiffs could have brought their claims in this action as counterclaims in the DE Action. *See* FED. R. CIV. P. 13; *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 935; *A.J. Indus., Inc. v. U.S. Dist. Ct.*, 503 F.2d 384, 387 (9th Cir. 1974); *Leesona Corp. v. Duplan Corp.*, 317 F. Supp. 290, 295 (D. R.I. 1970). *See also* Point II.C *infra*. Indeed, Plaintiffs do not assert that their claims could only have been brought in this District. Therefore, 28 U.S.C. § 1391(a)(3) does not apply.

This leaves only one theoretically possible basis for venue: the occurrence in this District of a "substantial part of the events or omissions giving rise to the claim." 28 U.S.C.

---

[11]    The Complaint (¶ 25) asserts that venue is proper because "Defendants conducted substantial business within this District." The Complaint alleges no facts to support this conclusory assertion, and even if it were true, it is not one of the three bases for venue under 28 U.S.C. § 1391(a).

§ 1391(a)(2).  However, notwithstanding Plaintiffs' conclusory allegation in ¶ 25 of the

Complaint, there are no facts to support venue on this basis.

In determining whether 28 U.S.C. § 1391(a)(2) applies, the Court must review "'the

entire sequence of events underlying the claims.'"  *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th

Cir. 2004) (citation omitted); *Ciena Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000) (venue

was proper where "many of the events and facts central to this case" occurred); *Precept Med.*

*Prods., Inc. v. Klus*, 282 F. Supp. 2d. 381, 387-88 (venue proper where "many acts very closely

related to the . . . action" occurred).  Plaintiffs do not — and cannot — allege <u>facts</u> showing that

a substantial part of the events or omissions on which Plaintiffs base their claims occurred here.

Plaintiffs' claims are, at most, incidentally related to North Carolina.  Mulvaney Homes,

Inc. ("MHI"), which operated in North Carolina, was the last of ALH's operations to be sold.

*See* Complaint ¶¶ 26, 56, 69.  Arenson — who owns and controls two of the Plaintiffs (Arenson

Holdings and D.A. Gardens) and represents all Plaintiffs as Class B Representative of ALH's

Supervisory Board — deemed the sale of MHI to be of no importance.  Drafts of the MHI

transaction documents were sent to Arenson for his review and comment, but he did not respond.

Buchler Dec. ¶ 15.  He <u>did not even bother to attend the Supervisory Board meeting at which the</u>

<u>proposed sale of MHI was considered</u>.  Jarvis Dec. Ex. Z.  He explained this by stating that "any

further participation [in ALH's affairs] would be a waste of my time."  *Id*. at 1.[12]  Moreover,

although the Complaint (¶¶ 56-69) purports to describe various events in the course of the sale of

MHI, it <u>does not allege that any of these supposed events occurred here</u>.

The Complaint (¶¶ 45-46) alleges only one specific event in North Carolina: a meeting in

February 2003 at which "some of the Plaintiffs and their counsel met with Shamrock (Messrs.

---

[12]      In contrast, the Complaint (¶¶ 48, 52) alleges that Arenson attended the Supervisory Board
meetings at which the sale of ALH's Florida and Tennessee operations — Atlantic Builders, Inc. ("ABI")
and Bowden Building Corporation ("BBC") — were sold.

Krieger and Buchler) in Charlotte."  The Complaint (¶ 45) asserts that "[t]he purpose of the meeting was to discuss the problems then-currently facing ALH and the future problems that could arise if a change of course was not effected."  Allegedly, Defendants said that "ALH was consuming too much management time" and that they "wanted to rid themselves of the hassle of dealing with ALH."  *Id*.  Assuming *arguendo* that this statement was made, it was nothing new or different: the Complaint (¶ 6) asserts that "Defendants <u>first expressed a desire to exit their investment and management of ALH" in early 2001</u>.

The Complaint (¶ 46) further alleges that, at the February 2003 meeting, Plaintiffs "warned Defendants that a piecemeal sale of [ALH's] operating units would be disastrous" and proposed buying out Shamrock's position in ALH.  It also alleges that Plaintiffs "concerns and proposals [were] ignored."  *Id.*  This was nothing new or different either: since at least as far back as July 2002, Plaintiffs had argued against the sale of ALH's operations.  See, e.g., Jarvis Dec. Ex. ZZ.  Also, in July 2002, Plaintiffs met with each other in England to discuss making a proposal to buy out ALH's Class A equity, including Shamrock's position.  *Id*.  From time to time thereafter, Plaintiffs communicated with Shamrock concerning their interest in making such a proposal, but this never even resulted in a written proposal.  *Id*. at Exs. O, ZZ, AAA, BBB; Buchler Dec. ¶ 12.  In any event, the Complaint does not assert (nor could it) that anything related to Plaintiffs' abortive buy-out idea gave rise to any of the claims in this action.

Even if these allegations in the Complaint concerning MHI and the February 2003 meeting were true, this would not mean that "a substantial part of the events or omissions giving rise to [Plaintiffs' claims] occurred" in this District.  28 U.S.C. § 1391(a)(2).  As set forth above, the Plaintiffs themselves have treated the sale of MHI as an irrelevancy.  No decisions were

made or actions taken at the February 2003 meeting; nothing new or different was said or done. By February 2003, Defendants' alleged scheme was two years old. *See, e.g.*, Complaint ¶ 6.

The Fourth Circuit mandates a review of "'the entire sequence of events underlying the claims.'" This sequence of events includes a host of occurrences (and alleged occurrences) that did not occur in this District — and, to the extent they are addressed in the Complaint, are not alleged to have occurred in this District.

These encompass, *inter alia*, the original creation of ALH as a Delaware LLC in 1998, years before ALH acquired MHI, including the parties' entry into the Operating Agreement that governs their relationship under Delaware law (*see* Jarvis Dec. Exs. D, R, Complaint ¶ 30, DE Complaint ¶¶ 19-21, 68 (a)-(c)); Defendants' alleged formation, in or before early 2001, of a desire and scheme to exit their investment and management of ALH (Complaint ¶ 6); Defendants' alleged efforts in 2001 to force a sale of ALH "under any circumstances" (*id.*); Defendants' alleged seizure of control of ALH in the summer of 2001 and ALH's alleged entry into the so-called "Management Agreement" (*id.* ¶ 33); the July 2001 Lion LLC Settlement Agreement and the related changes in the composition of ALH's Supervisory Board (*id.* ¶ 33-35, Jarvis Dec. Exs. F-L, DE Complaint ¶¶ 36-41, 68(g), 72, 139); the July 2001 Consulting Agreement between ALH and SCA (Complaint ¶¶ 4, 37, DE Complaint ¶¶ 39, 68(l), 74-78); ALH's December 2001 retention of California outside counsel, Fried Frank, in connection with the possible sale of ALH, and Fried Frank's allegedly unwaivable conflicts (Complaint ¶¶ 39-40, Jarvis Dec. Exs. RR, SS, DE Complaint ¶¶ 119-20); the efforts, beginning in March 2002, to sell ALH as a going concern, and defendants' alleged mishandling of that process "from the start" (Complaint ¶ 7); ALH's March 2002 engagement of Jolson Merchant Partners ("JMP"), a California investment banker and financial advisor, in connection with the possible sale of some

or all of ALH's operations, which was approved by Arenson as Class Representative (Jarvis Dec. Ex. W, DE Complaint ¶¶ 44, 82-86); the April 2000 and May 2002 Member loans to ALH (Complaint ¶¶ 41-42, Jarvis Dec. Exs. V, X, DE Complaint ¶¶ 32-35, 44-48); the repayment of the loans from the proceeds of the sale of ABI (ALH's Florida operation) in 2003, which repayment was suggested and consented to by Arenson as Class B Representative (Complaint ¶ 43, Jarvis Dec. Ex. UU at 10 , DE Complaint ¶ 138); Arenson's June 2003 approval, as Class B Representative, of a litigation settlement for which the proceeds of the sale of ABI were needed (Jarvis Dec. Ex. UU at 2-3, DE Complaint ¶ 96); Arenson's July 2003 approval, as Class B Representative, of a $200,000 bonus payment to Shamrock for services provided in connection with the sale, as an expression of thanks on behalf of all the Class B Members, even though Arenson voted against the sale (Jarvis Dec. Exs. XX and. YY, DE Complaint ¶¶ 68(i), 75, 111); and the Supervisory Board meetings on May 14, 2003, June 26, 2003, March 24, 2004 and April 3, 2004, at which, among other things, ALH's financial and operational condition, liquidity needs, and sale efforts were discussed, and Arenson represented Plaintiffs and purportedly expressed their views concerning the sale of ALH's operations and alternatives thereto (Complaint ¶¶ 47-54, Jarvis Dec. Exs. TT, UU, VV, WW, DE Complaint ¶¶ 12-13, 15, 73, 112-31).

In the context of this "entire sequence of events," it is beyond question that "a substantial part of the events or omissions giving rise" to Plaintiffs' claims did not occur in this District.

**B.      Alternatively, Under the First to File Rule, This Case Should Be Transferred**

Because 28 U.S.C. § 1391(a) provides no basis for venue in this District, the Court has the option of either dismissing the case or transferring it to Delaware, where the DE Action has been pending since last September.  28 U.S.C. § 1406(a).  This Court may, "if it be in the interest

of justice," transfer the case to any district "in which it could have been brought." *Id.*  As set forth in Point I.A, *supra*, there is no question the Plaintiffs could have brought their claims as counterclaims in the DE Action.  Under the first to file rule, if this case is not dismissed, the interest of justice compels its transfer to Delaware.

The Fourth Circuit "honor[s] the principle that a plaintiff may ordinarily select his forum unless there are factors of convenience sufficiently important to the parties and the court to occasion denying him that choice."  *Ellicott Mach. Corp. v. Modern Welding Co.*, 502 F.2d 178, 180  (4th Cir. 1974).  Under the first to file rule, "as a principle of sound judicial administration, the first suit should have priority, absent the showing of balance of convenience in favor of the second action."  *Id.* (citations and internal quotation marks omitted).  The case law under the first to file rule demonstrates and underscores the various ways in which the rule promotes the interest of justice, including judicial efficiency, comity, enforcement of the compulsory counterclaim rule (FED. R. CIV. P. 13(a)), avoidance of forum shopping, and plaintiff's presumptive right to select his forum.  The courts have consistently rejected attempts by litigants like Plaintiffs here to delay bringing suit and then — after they have been sued and decide they would prefer a different forum — bring a mirror image suit to try to thwart the first to file rule.

For example, in *Learning Network, Inc.  v. Discovery Comms., Inc.*, No. 01-1202, 2001 U.S. App. LEXIS 11881 (4th Cir. June 7, 2001) (unpublished), the plaintiff-appellee ("Network") sued the defendant-appellant ("Discovery") in federal court in Maryland, seeking a declaratory judgment validating Network's use of a particular trademark.  Less than two weeks before the Maryland action was filed, Discovery had sent Network a "cease and desist letter" alleging trademark violations, expressing a desire "'to reach a quick and amicable resolution,'" and requesting Network's "'urgent attention.'"  *Id*. at *3-4.  Network responded with a letter

20

stating that it was "'looking into'" Discovery's allegations and that it would "'promptly'" respond to Discovery.  *Id*. at *4.  Five days later, Network commenced the Maryland action.

The parties entered into an agreement not to file or serve further pleadings pending the outcome of their settlement negotiations.  *Id*.  Eventually, the settlement negotiations broke off.  Discovery obtained an extension of its time to answer the Maryland complaint, having given assurances that "it was not intending to 'sandbag' Network."  *Id*. at *5.  Two weeks later, Discovery sued Network in federal court in New York, alleging trademark violations.

Network obtained an order in Maryland enjoining Discovery from proceeding in New York.  Discovery appealed to the Fourth Circuit, arguing that there were "special circumstances" warranting departure from the first to file rule, in that the Maryland action "was an improper anticipatory filing because it was made under the threat of imminent litigation."  *Id*. at *8-9.  The Fourth Circuit "ha[d] not stated explicitly that special circumstances may warrant an exception to the first-filed rule," but without reaching this question, the Court held that the district court did not abuse its discretion in finding no special circumstances."  *Id*. at *8 n.2.[13]

The Court was mindful of the need to discourage forum shopping and races to the courthouse, stating that:

> It has long been established that courts look with disfavor upon races to the courthouse and forum shopping. Such procedural fencing is a factor that counsels against exercising jurisdiction over a declaratory judgment action . . . .  However, <u>there can be no race to the courthouse when only one party is running</u>.

---

[13]    The Court pointed out that "[d]eclaratory judgment actions are proper when there is a potential lawsuit," explaining that such an action "'allows the uncertain party to gain relief from the insecurity of a potential lawsuit waiting in the wings.'"  *Id*. at *9 (citation omitted).  On the other hand, the Court recognized that "[i]n some cases, there may come a point after which the potential lawsuit . . . has become so certain or imminent, that the declaratory judgment action is merely an improper act of forum shopping, or a race to the courthouse."  *Id*. at *9-10.  The Court explained that "'[a]n improper anticipatory filing is one made under the apparent threat of a presumed adversary filing the mirror image of that suit in another court.'"  *Id*. at *10 (citations omitted).

*Id.* at *10-11 (citations omitted) (emphasis added).[14]  The Court emphasized that "Discovery's own actions belie its argument that its potential suit against Network was imminent."  *Id.* at *11.

Discovery's cease and desist letter had "neither overtly threatened litigation nor threatened to take particular action if Network failed to respond to the letter by a certain date." *Id.*  The Court carefully analyzed the timing of the two actions, noting that even after negotiations had broken off and Discovery was formally was served in the Maryland action, Discovery waited an additional four to six weeks before filing its allegedly imminent New York action.  Therefore, the district court had not abused its discretion in finding that the Maryland action "was not an act of procedural fencing, so as to merit an exception to the first-filed rule." *Id.* at *11-12 (emphasis added).

The Court's analysis in *Learning Network* is both instructive and dispositive here. Plaintiffs' supposed threat of litigation — in the form of a question about whether the Operating Agreement would prevent a suit in North Carolina — was far vaguer than Discovery's cease and desist letter.  At the time Defendants filed the DE Action, they did not (unlike Network) claim to be looking into Plaintiffs' allegations, and they had not undertaken to respond to Plaintiffs in any way.  In fact, the status of the communications as of September 13, 2004, when the DE Action was filed, was that Plaintiffs were delinquent in responding to Defendants concerning the possibility of mediation and the discovery Plaintiffs claimed to want.  Most importantly, Plaintiffs' delayed for over eight months in bringing their supposedly imminent lawsuit: many times longer than Discovery's delay in the *Learning Network* case.  Even if the Fourth Circuit recognized a special circumstances exception to the first to file rule — a question that has yet to be decided — there are plainly no such circumstances here.  *See also Ramsey Group, Inc. v. EGS*

---

[14]    Here, given Defendants' extensive but ultimately unsuccessful efforts to engage Plaintiffs in a constructive dialogue, it cannot fairly be said that even one party was "running."  But even if Defendants had been "running," Plaintiffs certainly were not.

22

*Int'l, Inc.*, 208 F.R.D. 559, 564 (W.D.N.C. 2002) (although plaintiff filed suit a week after receiving a cease and desist letter threatening litigation, its suit was treated as first-filed).

Similarly, in *SAS Inst., Inc. v. PracticingSmarter, Inc.*, 353 F. Supp. 2d 614 (M.D.N.C. 2005), the defendant ("PSI") sent the plaintiff ("SAS") a letter threatening to sue in 30 days if SAS did not agree to mediate or if the mediation was unsuccessful.  The letter enclosed copies of PSI's proposed lawsuit.  Two days before the end of the 30-day period, SAS brought a declaratory judgment action against PSI.  PSI sued in state court on the 30th day and SAS removed the complaint, with the result that both actions were pending in the same federal court.

PSI argued that SAS's suit was an improper anticipatory filing — a "pre-emptive strike" by SAS because it was about to be sued and preferred the procedural posture of being a defendant.  *Id.* at 617.  PSI also argued that treating SAS's suit as first-filed would discourage the pursuit of alternative dispute resolution.  SAS responded that that its declaratory judgment action was "justified in order to 'affirmatively and proactively protect' its intellectual property rights and to stop [PSI] from falsely claiming ownership of these copyrights."  *Id.* at 618.  SAS argued that PSI's claims were compulsory counterclaims under Fed. R. Civ. P. Rule 13, because they arose out of the same transaction or occurrence as SAS's claims.

The Court agreed with SAS on the compulsory counterclaim point, noting that "[t]he penalty for failing to follow Rule 13(a), such as by filing a new lawsuit with the same claims as the earlier-filed case, is a dismissal or a stay of the later-filed case."  *Id.* (citing 6 C WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1418 (2d ed. 1990).)  The court also observed that "[t]he fact that one suit is for a declaratory judgment <u>does not change the general rule that the first-filed case should go forward</u>."  *Id.* at 617 (emphasis added).  The court concluded that there was no reason to deviate from the first to file rule, even though SAS had

unquestionably filed in the face of an explicit threat by PSI (including copies of the lawsuit) to sue within a specified period of time.

The promotion of the interest of justice by the first to file rule is further underscored by *R.J. Reynolds Tobacco Co. v. Star Scientific, Inc.*, 169 F. Supp. 2d 452 (M.D.N.C. 2001). There, the defendant ("Star") sued the plaintiff ("RJR") for infringement in federal court in Maryland. Approximately three weeks later, RJR sued Star for declaratory judgment in federal court in North Carolina. RJR argued that its second-filed action in North Carolina should be treated as first-filed because the Maryland action was jurisdictionally defective.

In rejecting this argument, the court explained that "[t]he 'first-filed' rule respects the choice of forum made by the first plaintiff to file, while also acknowledging 'considerations of judicial and litigant economy, and the just and effective disposition of disputes.'" *Id*. at 455 (citation omitted). An important purpose of this rule is to "prevent a court from 'trenching on the authority of its sister court,'" and also to avoid "duplicative litigation [that] sap[s] judicial resources." *Id*. at 455-56 (citation omitted). Because the jurisdictional issue raised by RJR was also before the Maryland court, the court stayed RJR's North Carolina action "pending the course of proceedings" in Maryland. *Id*. at 456.

In *Walker Group, Inc. v. First Layer Comms., Inc*., 333 F. Supp. 2d 456 (M.D.N.C. 2004), the defendant ("Knutson") sued the plaintiff ("Walker") for declaratory judgment in Colorado. Just over a month later, Walker sued Knutson in North Carolina. Each party sought to have the dispute resolved in its preferred forum, so each moved to stay, dismiss or transfer. Thus, both courts were asked to determine in which court the case should proceed. Relying on the first to file rule, the Colorado court denied Walker's motion to dismiss or transfer. Noting that "this district also follows the "first-to-file rule," the North Carolina court, *sua sponte*,

transferred the North Carolina action to Colorado, stating that transferring case, including all pending motions, to the court that had the first-filed case was "the preferred action." *Id*. at 460.

The importance of enforcing the compulsory counterclaim rule was highlighted in *Laughlin v. Edwards Bus. Machs., Inc*., 155 F.R.D. 543 (W.D. Va. 1994). There, under 28 U.S.C § 1404, the court transferred three later-filed suits to federal court in Pennsylvania, where an earlier-filed suit was pending. The court emphasized that the claims asserted by the plaintiffs in the three later suits were compulsory counterclaims in the earlier one:

> When a party violates Rule 13(a) by bringing a second action rather than filing a compulsory counterclaim in the first action, "normally, the first suit should have priority, absent a showing of a balance of convenience in favor of the second action." . . . Consolidation and transfer in this situation is appropriate and serves the interests of justice. "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to wastefulness of time, energy and money that § 1404(a) was designed to prevent."

Id. at 545 (citations omitted).

As the foregoing cases demonstrate, transferring this action to Delaware under the first to file rule would amply satisfy the "interest of justice" component of 28 U.S.C. § 1406(a). But even if the Court found a basis for venue in this District and declined to transfer under 28 U.S.C. § 1406(a), the case should be transferred under 28 U.S.C. § 1404(a), which provides that:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Transfer pursuant to § 1404(a) is appropriate if the transferring court has subject matter jurisdiction and personal jurisdiction, and if venue in the transferring court is proper, but if there are procedural impediments such as a lack of personal jurisdiction or improper venue, then transfer should be effected pursuant to § 1406(a). *Zellinger v. Control Servs., Inc.*, No. 1:01CV003, 2002 U.S. Dist. LEXIS 24935, at *2 (M.D.N.C., Dec. 27, 2002) (unpublished). *See*

*Porter v. Groat*, 840 F.2d 255, 258 (4th Cir. 1988) (§ 1406(a) allows a court to transfer a case for any reason which constitutes an impediment to a decision on the merits in the transferor district, but would not be an impediment in the transferee district).

Under 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a), the analysis of whether a transfer is in the interest of justice is the same. *Landers v. Dawson Constr. Plant, Ltd.*, No. 98-2709, 1999 U.S. App. LEXIS 28474, at *4 (4th Cir. Nov. 2, 1999) (unpublished). As the Fourth Circuit stated in *Landers*, district courts faced with motions to transfer "must engage in an analysis of convenience and fairness, weighing a number of case-specific factors." *Id*. at *5. Factors that are "commonly considered in ruling on a motion to transfer" are:

> (1) the ease of access to the sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of the witnesses; (4) the availability of compulsory process; (5) the possibility of a view by the jury; (6) the interest in having local controversies decided at home; and (7) the interests of justice.

*Id*. In diversity cases, an additional factor is the "the court's familiarity with applicable law." *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F. Supp. 582, 592 (E.D. Va. 1992).

The plaintiff's choice of forum "is accorded substantial weight," but "the deference given to plaintiff's choice is proportionate to the relation between the forum and the cause of action." *Parham v. Weave Corp.*, 323 F. Supp. 2d 670, 673-74 (M.D.N.C. 2004). In *Parham*, North Carolina was deemed to have little relation to the parties' dispute, because the contract at issue was performed and terminated in New Jersey and was governed by New Jersey law, and defendant's records and witnesses were in New Jersey. Plaintiff resided in North Carolina, and defendant had sufficient contacts with North Carolina to support long-arm jurisdiction, but the court nonetheless transferred the case to New Jersey.[15]

---

[15]    In an ordinary case, where there are not two parallel actions, the weight given to the plaintiff's choice of forum would have to be overcome by the defendant moving to transfer. Here, however,

The factors considered under § 1404(a) are essentially the same as those considered in determining whether to dismiss an action under the common law doctrine of forum non conveniens, except that "§ 1404 vests courts with broader discretion 'to grant transfers upon a lesser showing on inconvenience' than is required to obtain dismissal under the doctrine of forum non conveniens." *Verosol*, 806 F. Supp. at 592 (citation omitted).  As this Court stated in *Datasouth Computer Corp. v. Three Dimensional Techs., Inc.*, 719 F. Supp. 446, 450 (W.D.N.C. 1989), "'the transfer calculus is qualitative, not quantitative'" (citation omitted).

The § 1404(a) factors overwhelmingly favor Delaware as the forum for this case.  The Complaint does not allege that any of the Plaintiffs or Defendants is a citizen or resident of North Carolina.  None of the Plaintiffs claim that they or Defendants conduct any ongoing business in North Carolina or have any presence of any kind there.  The primary witnesses in the case will be the parties themselves.  For these witnesses, in terms of mileage and ease of transportation, the Delaware federal court, in Wilmington,  is more accessible than this Court.  *See* Jarvis Dec. ¶¶ 68-76.  The same is true for the expected non-party witnesses.  *Id*.

Parties on both sides of the case are Delaware entities: SELK and Laurel are Delaware LLCs, SCA is a Delaware corporation and one of J12's general partners is a Delaware LLC. Complaint ¶¶ 16-20; DE Complaint ¶¶ 52, 57, 60, 68(l).  Plaintiffs' claims arise from the creation and management of a Delaware LLC and are governed by Delaware law.  The expertise of the Delaware courts in the well-developed body of Delaware law concerning fiduciary duty and derivative claims is of particular value in this case.  *See* Points II and IV, *infra.*

---

Defendants are the plaintiffs in the first-filed DE Action, so the weight is given to Defendants' choice of the Delaware forum, even though Defendants are the moving party here.  This is why, in cases applying the first to file rule, the forum chosen by the plaintiff in the first-filed action prevails <u>unless</u> sufficiently important convenience factors favor the forum chosen by the plaintiff in the later-filed action.  *See, e.g., Ellicott*, 502 F.2d at 180.  The burden thus falls on Plaintiffs to show that important convenience factors favor this Court over the Delaware federal court.

The DE Action has been litigated in Delaware for nearly a year. It includes a party (Arenson) who is not named in this action. All of Plaintiffs' claims in this action are encompassed by the DE Action, but there are claims in the DE Action that are not within this action. Plaintiffs have made various motions to dismiss the DE Action. If this case is transferred to the Delaware, most of those motions would be moot because all Class B Members would be before the Delaware court. Plaintiffs' lead counsel is in Baltimore and Defendants' lead counsel is in New York. Both parties have extremely able Delaware counsel.

In making their Forum Motion, Plaintiffs did not attempt to set forth any reasons why Delaware is an inappropriate or inconvenient forum or why North Carolina would be a more appropriate or convenient forum. This is not surprising. Other than to needlessly increase Defendants' litigation expenses, Plaintiffs appear to have no reason for bringing this action in this Court. If Plaintiffs had a legitimate interest in proceeding in North Carolina, they could have sought to transfer the DE Action here. Instead they opened a whole second litigation front, such that Defendants have been forced simultaneously to defend multiple motions in the DE Action while protecting their rights by making the present motions in this action.

## II.    The Case Should Be Dismissed For Lack of Subject Matter Jurisdiction

### A.    The Claims Assert Injury to ALH and Are Therefore Derivative

Throughout the Complaint, Plaintiffs claim that Defendants destroyed the value of ALH and therefore the value of Plaintiffs' interests in ALH. *See, e.g.*, Complaint "Background" at 1 (apparently intended as ¶ 1) ("[a]s a result of Defendants' improper conduct as set forth herein, the value of Plaintiffs' interests in ALH are worthless, their investments have been lost, and ALH is now insolvent); ¶ 12 (Defendants "depressed the value of ALH and destroyed all member equity," and "wiped out all member equity"); ¶ 44 (Defendants' alleged scheme

"ultimately stripped ALH of any value and wiped out Plaintiffs' equity"); ¶ 67 (Defendants'
conduct "resulted in the severely depressed financial condition of ALH"); ¶ 110 (Defendants
"conspired with each other to strip ALH of its value"); and ¶ 112 ( Defendants have "financially
injured all Plaintiffs by reducing the value of their interests in ALH to virtually nothing").  These
are classic derivative claims.

 As the Delaware Supreme Court has explained, "[t]he derivative suit is a corporate
concept grafted onto the limited liability company form."  *Elf Atochem N. Am., Inc. v. Jaffari*,
727 A.2d 286, 293 (Del. 1999).[16]  Under Delaware law, the determination of whether a claim is
derivative or direct

> must turn *solely* on the following questions:  (1) who suffered the alleged harm
> (the corporation or the suing stockholders, individually); and (2) who would
> receive the benefit of any recovery or other remedy (the corporation or the
> stockholders, individually)?

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del. 2004) (emphasis in
original).

 In considering these questions, Delaware law instructs that the court

> should look to the nature of the wrong and to whom the relief should go.
> The stockholder's claimed direct injury must be independent of any
> alleged injury to the corporation.  The stockholder must demonstrate that
> the duty breached was owed to the stockholders and that he or she can
> prevail *without showing an injury to the corporation.*

*Id.* at 1039 (emphasis added).  Here, in contrast, Plaintiffs have only pled injury to themselves as
a by-product of injury to ALH.  <u>Only by showing injury to ALH</u> could Plaintiffs prevail in their
claims.

 Moreover, the Complaint repeatedly asserts breaches of duty to ALH as well as to
Plaintiffs.  *See, e.g.*, Complaint ¶ 13 (Defendants' "schemes" were "not  . . . in the best interests

---

[16] As noted above, Plaintiffs' breach of fiduciary duty claims are governed by Delaware law.  *See*
N.C. Gen. Stat. § 57C-7-01 and ALH Operating Agreement § 10.2 (Jarvis Dec. Ex. D).

of the Class B members <u>and ALH</u>") (emphasis added); ¶ 36 (Defendants "have continually made

hiring decisions not in the best interests of the Class B members <u>or ALH as a whole</u>") (emphasis

added).  Plaintiffs even attempt to sue for breach of the Consulting Agreement, to which ALH is

a party but Plaintiffs most definitely are not.  Complaint Count III (¶¶ 88-94); Jarvis Dec. Ex. J

(no mention of Plaintiffs in Consulting Agreement).

     The derivative nature of Plaintiffs' claims is confirmed by the recent decision in *Metro

Comm. Corp. BVI v. Advanced Mobilecomm Techs., Inc.,* 854 A.2d 121 (Del. Ch. 2004).  There,

plaintiff sued other members of Fidelity Ventures Brazil, LLC for breach of fiduciary duty and

other claims premised upon their alleged awareness of or active participation in a bribery scandal

which, once revealed, caused the LLC to abandon its plans for a public offering.  Plaintiff argued

that it was bringing a direct claim, not a claim that was derivative of harm to the LLC.  The court

disagreed, concluding that the claim was derivative because any harm plaintiff suffered was

"entirely contingent on <u>harm suffered by Fidelity Brazil as a whole as a result of alleged

mismanagement</u>."  *Id.* at 167-68 (emphasis added).

     Here, as in *Metro Comm.*, the Complaint repeatedly alleges that Defendants depressed the

value of ALH as a whole by, *inter alia*, mismanaging the sale of ALH and making inappropriate

hiring decisions.  Complaint ¶¶ 12, 36, 39-40, 75-77, 112.  Without a doubt, these are derivative

claims.  *See also Weber v. King,* 110 F. Supp. 2d 124, 129 (E.D.N.Y. 2000) (although plaintiffs

claimed that defendants' conduct was intended to cause plaintiffs to default on promissory notes,

court held that "the harm alleged is nevertheless principally to the Company and only indirectly

to the Plaintiffs."); *Delgado Oil Co. v. Torres*, 785 F.2d 857, 860 (10th Cir. 1986) (claims that

director breached fiduciary duties by causing corporation to make preferential payments for

director's benefit are derivative claims); *Weinberger v. Lorenzo*, C.A. No. 10692, 1990 WL

156529, at *3 (Del. Ch. Oct. 12, 1990) (unpublished) (claim that officers and directors stripped corporation of its assets and impaired ability of plaintiffs to receive value of their preferred stock was derivative).[17]

Under this well-established body of Delaware law, Plaintiffs' claims are unquestionably derivative. The Complaint alleges that ALH has been harmed by the manner in which the sale process was conducted. It further alleges that Defendants breached duties owed "to ALH" and depressed the "value of ALH," thereby supposedly lowering the value of "all member equity." *See, e.g.,* Complaint ¶¶ 12-13. Thus, by their own allegations, Plaintiffs acknowledge that they cannot prevail on their claims without showing injury to ALH. *See Tooley*, 845 A.2d at 1031. Therefore, the claims in the Complaint are not direct or individual claims of the Plaintiffs, but are derivative claims of ALH. Since, as set forth below, the Complaint have not been properly pled as derivative claims, it must be dismissed.

### B. The Complaint Does Not Plead Facts Establishing Plaintiffs' Standing

Delaware's Limited Liability Company Act expressly permits derivative suits, stating that a member may sue "to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action or if an effort to cause those managers or members to bring the action is not likely to succeed." Del. Code Ann. tit. 6, § 18-1001. Where derivative claims are asserted on behalf of an LLC, Delaware law requires that "the complaint set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a

---

[17]    As noted above, Plaintiffs contend that Defendants deliberately mishandled the ALH sale process so that certain loans to ALH and others could be repaid. In addition to the fact that this contention defies common sense, it is insufficient to make Plaintiffs' claims direct. The putative flaws in the sale process would have directly harmed ALH; any harm to Plaintiffs would be indirect, so the claims are derivative, regardless of whether, as Plaintiffs contend, repayment of the loans was the motivation for the sale process.

manager or member or the reasons for not making the effort."[18]  *Id.* § 18-1003; *cf.* FED. R. CIV. P.
23.1.  "Under Delaware law, an individual plaintiff can only bring a derivative claim against an
LLC without first making a demand of the board if such demand would have been futile."  *VGS,
Inc. v. Castiel,* No. C.A. 17995, 2003 WL 723285, at * 11 (Del. Ch., Mar. 10. 2003
(unpublished).

If a complaint omits the necessary averments stating either that an effort was made to
secure initiation of the action by a manager or member, or the reasons for not making such effort,
dismissal under Fed. R. Civ. P. Rule 12(b)(1) (lack of subject matter jurisdiction) or 12(b)(6)
(failure to state a claim for relief) is appropriate.  *See, e.g., Strickland v. Flue-Cured Tobacco
Co-op. Stabilization Corp.*, 643 F. Supp. 310, 316 (D.S.C. 1986) (where plaintiffs had not
complied with the requirements for a derivative action, they lacked standing, so the court
dismissed the suit under Rule 12(b)(1)); *Banks v. Whyte*, No. Civ. A. 94-CV-0711, 1994 WL
418997, at *2 (E.D. Pa. Aug. 9, 1994) (unpublished) (noting that Rule 12(b)(6) dismissal is
appropriate and citing 7C WRIGHT, MILLER AND KANE, FEDERAL PRACTICE AND PROCEDURE,
§ 1836 at 162-63 (1986)); *Agostino v. Hicks*, 845 A.2d 1110, 1122-23 (Del. Ch. 2004) (where
plaintiffs alleged that defendants' breaches of fiduciary duty reduced assets and prevented
plaintiffs from recovering on their investments, the claims were dismissed because they were
derivative and belonged to the corporation).

Here, the Complaint contains no allegation that Plaintiffs made a demand on ALH's
Supervisory Board to consider the claims Plaintiffs are attempting to assert in this case.  Nor are
there specific allegations in the Complaint explaining why such a demand should be excused as

---

[18]    "In a diversity case, [the court] must consult state law to determine the nature of the litigant's
rights and whether he is entitled to assert the claims he makes."  *General Tech. Applications, Inc. v. Exro
Ltda.,* 388 F.3d 114, 118 (4th Cir. 2004) (applying Virginia law to determine standing to bring derivative
action on behalf of Virginia LLC).

futile.  Accordingly, Plaintiffs are without standing to assert their derivative claims and the Complaint should be dismissed.

### C.    If the Derivative Claims Were Properly Pled, There Would Be No Diversity

If Plaintiffs were permitted to amend the Complaint to plead facts sufficient to establish standing to assert their derivative claims, the Complaint would still be subject to dismissal because ALH is a necessary party and the Court would therefore lack subject matter jurisdiction.

It is "axiomatic" that the corporation is a necessary party in a derivative suit so that "it can receive the fruit of any recovery."  *Sternberg v. O'Neil,* 532 A.2d 993, 998-99 (Del. Ch. 1987), *aff'd in part, rev'd in part,* 550 A.2d 1105 (Del. 1998); *Striker v. Chesler,* 161 A.2d 576, 577 (Del. Ch. 1960) ("it is horn-book law that a corporation for whose benefit and in whose right a derivative action is brought is clearly a necessary party to such action"); *Ross v. Bernhard,* 396 U.S. 531, 538 (1970).  When an LLC member attempts to assert derivative claims the LLC is likewise an indispensable party.  *See, e.g., Trident-Allied Assocs., LLC v. Cypress Creek Assocs., LLC,* 317 F. Supp. 2d 752, 756 (E.D. Mich. 2004); *Weber v. King,* 110 F. Supp. 2d 124, 133 (E.D.N.Y. 2000) (LLC was indispensable party even though all members of the LLC were before the court); *Trademark Retail, Inc. v. Apple Glen Investors, LP,* 196 F.R.D. 535, 542 (N.D. Ind. 2000) (LLC was necessary and indispensable party).

Because ALH would be a necessary party to Plaintiffs' derivative claims in this Court, its effect on this Court's diversity jurisdiction would inevitably have to be considered.  It is well-settled that "the citizenship of a limited liability company for diversity purposes is determined by the citizenship of each and all of its members."  *Triad Motorsports, LLC v. Pharbco Mktg Group, Inc.*, 104 F. Supp. 2d 590, 594 (M.D.N.C. 2000); *see also General Tech. Applications, Inc. v. Exro Ltda.,* 388 F.3d 114 (4th Cir. 2004).

In *General Tech.*, Exro and GTA had created and were the two members of an LLC called EXG. Exro sued GTA and others (who were citizens of Virginia), asserting both derivative and direct claims premised violations of Exro's right to certain litigation proceeds GTA had recovered. Jurisdiction over Exro's derivative claims had been premised on diversity of citizenship. The Fourth Circuit observed that EXG had the citizenship of each of its members: Columbia (where Exro was incorporated and did business) and Virginia (where GTA was incorporated and had its principal place of business). Noting that the entity on whose behalf the suit is initiated is typically aligned as a defendant, but may under certain circumstances be aligned as a plaintiff, the Fourth Circuit held that the alignment made no difference because:

> In either case diversity jurisdiction does not exist. If we align EXG as a defendant, then Exro (Columbia) is suing EXG (Columbia and Virginia) and the other defendants (Virginia). The alien citizenship on both sides of the controversy destroys diversity. If we align EXG as a plaintiff, then Exro (Columbia) and EXG (Columbia and Virginia) are suing the various defendants (Virginia). Virginia's presence on both sides of the controversy destroys diversity.

*Id.* at 120. Accordingly, the Fourth Circuit concluded the district court had been without subject matter jurisdiction, vacated its judgment and remanded.

Here, the Complaint alleges that Plaintiffs are citizens of Israel, Panama, New York, the British Virgin Islands, New Jersey, the Bahamas and Switzerland. Complaint. ¶¶ 14-18. Defendants are alleged to be citizens of California and Delaware. *Id.* at ¶¶ 19-23. ALH has the citizenship of each of its members, including but not limited to Plaintiffs and Shamrock. If ALH were aligned as a defendant, alien parties (Israel, Panama, the British Virgin Islands, the Bahamas and Switzerland) would be both plaintiffs and defendants, so there would be no diversity. If ALH were aligned as a plaintiff, then citizens of California would be both as plaintiffs and defendants, likewise precluding diversity. Therefore, even if Plaintiffs re-pled the

Complaint to remedy the fatal defect in standing that now exists because of the derivative nature

of the claims, Plaintiffs would also have to join ALH as a party.  This would preclude the

complete diversity required by 28 U.S.C. § 1332, so this Court would not still have subject

matter jurisdiction.  *See Weber,* 110 F. Supp. 2d at 133 (concluding LLC was indispensable party

and that joinder would destroy diversity, and dismissing for lack of subject matter jurisdiction);

*Trademark Retail,* 196 F.R.D. at 542 (same).

It should be noted that the foregoing obstacle to this Court's jurisdiction over Plaintiffs'

derivative claims would not prevent the Delaware federal court from exercising jurisdiction over

those claims if they were brought — as they should have been — as counterclaims in the DE

Action.  This is because the Delaware federal court would have supplemental jurisdiction over

such claims pursuant to 28 U.S.C. § 1367.

As the Fourth Circuit explained in *United Capitol Ins. Co. v. Kapiloff,* 155 F.3d 488 (4th

Cir. 1998):

> Despite the requirement of complete diversity for jurisdiction under 28 U.S.C. §
> 1332, 28 U.S.C. § 1367(a) confers supplemental jurisdiction over "all other
> claims that are so related to claims in the action within . . . original jurisdiction
> that they form part of the same case or controversy. . . ."  Section 1367(a) states
> that "[s]uch supplemental jurisdiction shall include claims that involve the joinder
> or intervention of additional parties."

*Id.* at 492.  In *United Capitol,* plaintiff sued the Kapiloffs for a declaratory judgment that it was

not obligated to pay claims they had submitted under an insurance policy issued by plaintiff.

The Kapiloffs filed a counterclaim for breach of contract and also joined their insurance brokers,

who were nondiverse parties, as counterclaim defendants.  *Id.* at 490.  The Fourth Circuit first

considered whether the district court had subject matter jurisdiction, given the Kapiloffs' joinder

of nondiverse parties as counterclaim defendants.  Noting that 28 U.S.C. § 1367(a) conferred

supplemental jurisdiction over the Kapiloffs' related counterclaims, the Fourth Circuit also

considered subsection (b) of § 1367, holding that it "applies only to <u>plaintiffs</u>' efforts to join nondiverse parties." *Id.* at 492 (emphasis in original). It was not the plaintiff, United Capitol, that sought to join nondiverse parties — it was the declaratory judgment defendants who sought to do so. Therefore, the district court had subject matter jurisdiction. *Id.* at 493.[19]

Here, the Plaintiffs in this action are all named defendants in the DE Action. Those defendants (i.e., Plaintiffs here) cannot bring the derivative claims they have asserted in this Court because the presence of ALH would preclude diversity. However, they can, as the defendants in DE Action, bring those same claims, and join ALH, in their counterclaims in the Delaware federal court pursuant to 28 U.S.C. § 1367, without affecting that court's subject matter jurisdiction.[20]

## III. This Court Lacks Personal Jurisdiction Over Defendants

### A. This Court Lacks Jurisdiction Over Any Defendants

North Carolina's long-arm statute defines the statutory prerequisites for obtaining personal jurisdiction over an out-of-state defendant. N.C. Gen. Stat. § 1-75.4. Under the plain language of the statute, a prerequisite for personal jurisdiction over such a defendant is that the

---

[19]    The law is the same in the Third Circuit. *See, e.g., HB General Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1197 (3d Cir. 1996), citing *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 15 F.3d 1230, 1238 (3d Cir.), *cert. denied sub nom. Texas Eastern Corp. v. Fidelity Cas. Ins. Co.*, 53 U.S. 915 (1994) ("We hold that the additional non-diverse counterclaim defendants do not destroy diversity in [this] action because there is complete diversity of citizenship between the originally named parties."). *See also* 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, CIVIL 2D SECTION 1436 (1990), 2005 SUPPLEMENT (Uncertainty concerning the ability of courts to assert ancillary jurisdiction over Rule 13(h) parties joined to a compulsory counterclaim was laid to rest by the enactment of the supplemental jurisdiction statute in 1990. Such jurisdiction is available for all related claims that form part of the same case or controversy as the original claims, and it includes claims that involve the joinder or intervention of additional parties.)

[20]    The Court also lacks subject matter jurisdiction over Count III. Plaintiffs are not parties to the Consulting Agreement; they are not even mentioned in the Consulting Agreement. Accordingly, Plaintiffs lack standing to bring a claim for breach of the Consulting Agreement. *See Mitchell v. Mitchell's Formal Wear, Inc.*, __ N.C. App. __,606 S.E.2d 704, 707-08 (2005); *see also Boudreau v. Baughman*, 322 N.C. 331, 348, 368 S.E.2d 849, 861 (1988) (determining privity under the substantive law of Florida, not North Carolina).

court must have subject matter jurisdiction over the action. *Id.* ("A court of this State having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to Rule 4(j), Rule 4(j1), or Rule 4(j3) of the Rules of Civil Procedure under any of the following circumstances . . ."; emphasis added). As set forth in Point II above, this Court lacks subject matter jurisdiction over the Complaint.

Therefore, the statutory component of the two-part test for exercise of long-arm jurisdiction has not been satisfied. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396 (4th Cir. 2003) (exercise of jurisdiction must be authorized by North Carolina's long-arm statute <u>and</u> such exercise of jurisdiction must satisfy due process requirements of Fourteenth Amendment). Accordingly, Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P Rule 12(b)(2) should be granted.

### B.     This Court Lacks Jurisdiction Over SCA

The Complaint fails to allege facts sufficient to establish personal jurisdiction over SCA. It is Plaintiffs' burden to produce competent evidence to sustain jurisdiction. *See, e.g., Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993); *In re Celotex Corp.,* 124 F.3d 619, 628 (4th Cir. 1997). Here, Plaintiffs have not even made sufficient allegations to support personal jurisdiction over SCA.

#### 1.     This Court Lacks General Jurisdiction Over SCA

A federal court's exercise of personal jurisdiction may be based on either general or specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). If defendant's contacts with the forum state form the basis for plaintiff's claims, these contacts may establish specific jurisdiction. *Carefirst*, 334 F.3d at 397. In contrast, where defendant's contacts with the forum state do not provide the basis for the claims, "jurisdiction

over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state." *Id.* General jurisdiction only exists when defendant's activities in the forum state have been "continuous and systematic." *Id.* The requirement that the defendant have "continuous and systematic contacts" with the forum state mandates a showing "significantly higher" than that necessary for specific jurisdiction. *See ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).

The Complaint contains no allegations that SCA has the continuous and systematic contacts or activities in North Carolina required for general jurisdiction. The Complaint (¶ 20) alleges that SCA is a Delaware corporation "engaged in business as a merchant bank" with its principal place of business in Burbank, California. The Complaint does not assert that SCA has any ongoing business relationships with any residents of North Carolina, that it solicits business in North Carolina, that it has any employees or clients in North Carolina, or that it owns property in North Carolina. Even under the most imaginative of arguments, there are no allegations of "continuous and systematic" activities in North Carolina by SCA.

2.    This Court Lacks Specific Jurisdiction Over SCA

In determining whether the exercise of specific jurisdiction is appropriate, the Fourth Circuit examines: (1) whether and to what extent the defendant "purposely availed" itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiffs' claims arise out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Nolan*, 259 F.3d at 215-16 (citing *Helicopteros*, 466 U.S. at 414-16,; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

The only connection alleged between SCA and North Carolina is that Defendants Buchler, Stein, and Krieger have "conducted business on behalf of Shamrock and SCA in North Carolina." Complaint ¶¶ 21-23. None of the allegations concerning actions by SCA — *i.e.*, entry into the Consulting Agreement (¶¶ 4, 37), consulting services in connection with Shamrock's alleged dismantling of ALH (¶ 36), assisting Shamrock in its alleged "goal to sell off ALH at a loss" (¶ 37), and alleged breaches of fiduciary duty (¶ 89) — mentions any connection with North Carolina.

The sole allegation specifically placing any of the Defendants in North Carolina is that "[i]n February, 2003 some of Plaintiffs and their counsel met with Shamrock (Messrs. Krieger and Buchler) in Charlotte." Complaint ¶ 45. Thus, Plaintiffs only asserts that <u>Shamrock</u>, through defendants Krieger and Buchler, met with Plaintiffs in North Carolina — not SCA. Moreover, as set forth in the Statement of Facts above, nothing of significance occurred at the February 2003 meeting. The Complaint does not allege that any decisions were made or any actions taken; it simply alleges that Defendants <u>repeated things they had said before</u>, and <u>did not do anything differently</u> as a result of the meeting. Complaint ¶¶ 45-46.[21]

Moreover, the only claim specifically directed against SCA is that SCA breached its Consulting Agreement with ALH. But there is no allegation that the negotiation or execution of that agreement occurred in North Carolina, or that the agreement was either performed or breached in North Carolina. There is no allegation that SCA took any actions that were directed

---

[21]    Even assuming *arguendo* that this visit to North Carolina by Krieger and Buchler on behalf of Shamrock could be attributed to SCA, the Fourth Circuit has held that isolated visits by a company's employees to the forum state are insufficient to establish a "relationship among the defendant, the forum, and the litigation." *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 508-09 (4th Cir. 1956); *see also Le Bleu Corp. v. Standard Capital Group,* No. 00-2392, 11 Fed. App. 377, 2001 WL 672066, at *2 (4th Cir. 2001) (unpublished).

at North Carolina or caused harm to North Carolina resident.[22]  Perhaps most importantly, there

is no allegation that Plaintiffs' claims against SCA arise from any contacts between SCA and

North Carolina.

Finally, the exercise of personal jurisdiction over SCA would be constitutionally

unreasonable.  In determining whether the exercise of personal jurisdiction is constitutionally

reasonable, courts evaluate: (1) the burden on defendant; (2) the forum State's interest in

adjudicating the dispute; (3) the plaintiff's interest in convenient and effective relief; (4) efficient

resolution of controversies; and (5) the shared interest of States in furthering fundamental

substantive social policies.  *Nolan*, 259 F.3d at 217 (citing *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 477 (1985)); *see also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113,

(1987).  For all the same reasons that this case (if it is not dismissed) should be transferred to

Delaware, the exercise of personal jurisdiction over SCA is not constitutionally reasonable.

## IV.    The Complaint Fails to State Any Claim On Which Relief Can Be Granted

The Complaint should also be dismissed for failure to state a claim on which relief can be

granted.[23]  As set forth in the Statement of Facts above, the Operating Agreement and the

Consulting Agreement preclude liability absent fraud, criminal action, bad faith, gross

negligence or willful misconduct.  The Complaint does not allege fraud or criminal action, and

its allegations of bad faith, gross negligence and willful misconduct are wholly conclusory,

unsupported by any facts or inferences that could reasonably be drawn from the facts as pled.

---

[22]    MHI was a North Carolina corporation, but the harm alleged by Plaintiffs is harm to themselves as equity holders of ALH.  Even as a derivative action, this case would concerns alleged harm to ALH. Plaintiffs have alleged no basis — and we know of none — for piercing through MHI's parent companies to attribute harm to MHI as a North Carolina resident.

[23]    For purposes of this Rule 12(b)(6) motion, Defendants rely only on the Complaint and documents referred to therein, so as not to convert this to a summary judgment motion.  *See, e.g., Iconbazaar, LLC v. America Online, Inc.*, 308 F. Supp. 2d 630, 636 n.7 (M.D.N.C. 2004).

Indeed, the Complaint contains no allegations sufficient to rebut the presumption that
Defendants' actions are protected by the business judgment rule.

In <u>Count I</u>, Plaintiffs assert that Defendants "knowing[ly] and willful[ly]" breached their
fiduciary duties by failing to maximize the value of ALH in the sale process. *See* Complaint ¶
79. But the Complaint contains no factual allegation to support the profoundly illogical notion
that Shamrock, as the single largest investor in ALH, would intentionally do anything other than
seeks to maximize value — if only for its own sake.[24] In particular, Plaintiffs' contentions
concerning the repayment of loans from Members (including Plaintiffs) and Defendants'
supposed desire to reduce or end their management responsibilities provide no basis for any
inference of wrongdoing.

<u>Counts II and III</u> assert that Defendants' alleged breaches of fiduciary duty are also
actionable as breaches of the Operating Agreement and the Consulting Agreement. *Id*. ¶¶ 82, 89.
But the Complaint does not identify a single provision of either agreement that Defendants
supposedly breached, and as set forth above, Plaintiffs were not parties to the Consulting
Agreement, so they have no standing to assert its breach.

<u>Count IV</u>, which purports to plead "gross negligence," reiterates Plaintiffs' assertions
regarding the sale of ALH and refers generally to Defendants' "hiring and directions to both

---

[24]     The Complaint acknowledges that Defendants invested substantially more than Plaintiffs in ALH,
such that Defendants had a proportionately larger interest in maximizing the proceeds of the sale process.
*See* Complaint ¶¶ 14-18 and amounts invested, as set forth in Operating Agreement incorporated in
Complaint by reference (Jarvis Dec. Ex. D). "Delaware law is clear that substantial stockholdings in a
company by directors create powerful incentives to get the best deal in the sale of that company."
*McGowan v. Ferro,* 859 A.2d 1012, 1030 (Del. Ch. 2004) (on summary judgment, court rejected claim
that defendants engaged in wrongdoing in connection with sale of riverboat casinos, where record
established that defendants had proportionately larger interest in sale proceeds than plaintiff).

Fried Frank and SCA."  *Id.* ¶ 96.  But the Complaint does not identify any way in which

Defendants acted on an uninformed basis, so this claim must fail.[25]

    Count V, which purports to plead "self-dealing," [26] asserts that the three Class

Representatives designated by the Class A Members voted in favor of resolutions concerning the

sale of ALH's operations that Plaintiffs allegedly disagreed with, and contends that these

resolutions were *ultra vires*.  In addition to the fact that any claim based on Defendants' alleged

seizure of control of ALH is time-barred (*see* Point IV.A, *infra*), these resolutions cannot be *ultra

vires* because ALH unquestionably has the power to sell its operations.

    Count VI purports to state a claim for conspiracy to breach fiduciary duties, but this claim

fails for all the same reasons that Plaintiffs' breach of fiduciary duty claims otherwise fail.

Moreover, there is no independent cause of action for civil conspiracy under North Carolina or

Delaware law, and affiliates such as Defendants cannot conspire with themselves.

### A.    Delaware's Business Judgment Rule Presumption

    Under the bedrock principle of Delaware corporate law — *i.e.*, the "business judgment

rule" — the business and affairs of ALH are governed by its managers and Supervisory Board,

whose decisions are presumed to have been made in good faith and in the belief that they are in

the best interests of ALH and its members.  Delaware's business judgment rule

> is a presumption that in making a business decision the directors of a corporation
> acted on an informed basis, in good faith and in the honest belief that the action
> taken was in the best interests of the company . . . .  The burden is on the party
> challenging the decision to establish facts rebutting the presumption.

---

[25]    The Complaint asserts that Fried Frank had a conflict of interest, but it does not identify any way in which this affected the course of events at ALH, let alone causing any harm to ALH or its Members. None of the supposed "directions" to Fried Frank and SCA are identified anywhere in the Complaint.

[26]    "Self-Dealing" is simply a species of breach of the fiduciary duty of loyalty; it does not give rise to a separate cause of action.  Likewise, self-dealing is not an independent cause of action under North Carolina law; redress for self-dealing is usually sought via a breach of fiduciary duty claim.  *See, e.g., State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 596-97, 513 S.E.2d 812, 819 (1999); *Matthews v. Watkins*, 91 N.C. App. 640, 656, 373 S.E.2d 133, 142 (1988), *aff'd*, 324 N.C. 541, 379 S.E.2d 857 (1989).

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (emphasis added).  The business judgment rule presumption is rebutted <u>only by facts</u> showing that the fiduciary had a <u>personal financial interest</u> in the transaction, or <u>did not act in good faith or on an informed basis</u>.  *Id.*  Accordingly, "to survive a Rule 12(b)(6) motion, a plaintiff must allege well-pleaded facts to overcome the presumption."  *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995).

### B. Plaintiffs Have Not Stated a Claim for Breach of the Duty of Loyalty

To rebut the "powerful presumption" of the business judgment rule, a complaint asserting breach of the duty of loyalty must plead facts to establish "that the defendants were materially interested in the transaction or failed to act independently on behalf of the corporation."  *In re Encore Computer Corp. S'holders Litig.*, Consol. C.A. No. 16044, 2000 WL 823373, at *5 (Del. Ch. June 16, 2000) (unpublished) (dismissing amended complaint for failure to state a claim where it "failed to allege facts sufficient to establish that the Encore directors either had a material self-interest in, or failed to act independently with respect to, the challenged transactions.").

Here, Plaintiffs predicate their claim that Defendants mishandled the ALH sale process on the assertion that Defendants were concerned about having loans to ALH repaid.  As set forth in the Statement of facts above, there neither is nor could be any allegation that Plaintiffs and Defendants were treated disparately, either with respect to the repayment of loans they made to ALH or with respect to any allocation of proceeds from the sale of ALH.  For example, in *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 721 (Del. 1971), although a dividend resulted in "great sums of money" being transferred to defendant, the Delaware Supreme Court reversed the lower court's ruling that plaintiff had rebutted the presumption of the business judgment rule. This is because there was no disparate treatment: "a proportionate share of this money was

received by the minority shareholders," such that defendant received nothing "to the exclusion of its minority stockholders." *Id.* at 721-22. *See also Watchmark Corp. v. Argo Global Capital, LLC,* No. Civ. A. 711-N, 2004 WL 2694894, at *5 (Del. Ch., Nov. 4, 2004) (unpublished) (rejecting breach of fiduciary duty claim and noting that any disparate treatment was solely the result of a choice not to participate in transaction).

There is no allegation in the Complaint that any Plaintiff who wanted to lend money to ALH was prevented from doing do. There is no allegation that the loans were not paid back in full, at the same time, to all who chose to lend. The Complaint does not allege that any of the Plaintiffs objected to the loans or the loan repayments. It does not allege that any of the Plaintiffs offered to return their own repayments to ALH or asked anyone else to do so. Even assuming *arguendo* that Defendants' decisions with respect to the sale of ALH were motivated by a desire to see the loans repaid, the result was equal treatment for the lenders, the continued viability and operation of ALH (*see* Complaint ¶¶ 10, 55) and ALH's discharge of concededly lawful debts.

Similarly, assuming *arguendo* that Defendants decisions with respect to the sale of ALH were motivated by a desire to use their time for activities other than the management of ALH, this would signify nothing more than a business decision concerning the potential future upside versus downside of ALH as an enterprise. Shamrock had made a substantial investment of both money and time in ALH. Like the Plaintiffs, they were free to decide whether and to what extent to make any further investment. *See* Jarvis Dec. Ex. D at §3.3 (Operating Agreement expressly provides that no Member can be held liable for deciding not to make a further investment in ALH). As discussed above, under § 4.1(b) of the Operating Agreement, the Class A and Class B Members of ALH are treated economically *pari passu*. Consequently, Shamrock's judgment

concerning how much money or time to expend on ALH <u>could not benefit or harm one group relative to the other</u>.

In short, no fact has been alleged that would support an inference of personal financial interest or lack of independence on Defendants' part.  Thus, the presumption of the business judgment rule remains untouched by the Complaint.

### C.     Plaintiffs Have Not Stated a Claim for Bad Faith

The mere incantation of such conclusory phrases as "bad faith" and "willful misconduct" do not satisfy Plaintiffs' obligation to plead specific facts establishing breach of fiduciary duty claim.  Nor can it transform a difference of opinion between investors — *i.e.*, a matter of business judgment — into a breach of fiduciary duty by the investors whose judgment prevails because they have a majority of the votes on the company's governing body.[27]

For example, the Complaint (¶ 48) alleges that, at the Supervisory Board meeting to consider the sale of ALH's ABI operations, Arenson "recommended" that existing Members infuse additional capital into ALH, but there is no allegation that any of the Members — including any of the Plaintiffs — were willing to do so.  The Complaint (¶ 49) asserts that Buchler responded to this "recommend[ation]" by pointing out ABI's pressing liquidity needs, ALH's need to fund the settlement of certain litigation, and the absence of any alternative funding or acquisition proposals.  The Complaint characterizes Buchler's statements as having been made "in bad faith," <u>but it does not allege that any of Buchler's statements were in any way untrue</u>: Plaintiffs do not (and cannot) aver that ABI did <u>not</u> have pressing liquidity needs, that funds for the settlement of the litigation were <u>not</u> needed, or that <u>there were</u> alternative funding or acquisition proposals.

---

[27]     As set forth above, documents incorporated by reference into the Complaint show that Plaintiffs approved the July 2001 Lion LLC Settlement Agreement that gave the Class A members three seats on ALH's Supervisory Board.  Moreover, any attack by Plaintiffs on that agreement is time-barred..

In assessing claims like those in the Complaint, courts look past the rhetoric to the specific factual allegations, and where they are found wanting, the claims will be dismissed.  *See, e.g., McMillan v. Intercargo Corp.,* 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing complaint that contained only a conclusory allegation that directors breached their fiduciary duties "in a bad faith and knowing manner"); *White v. Panic,* 793 A.2d 356, 368 (Del. Ch. 2000) ("plaintiff's conclusory allegation that the Director Defendants were improperly motivated as part of a 'conscious scheme' to protect [the company's CEO/Chairman] . . . does not provide a sufficient basis to infer bad faith conduct").

### D.    Plaintiffs Have Not Stated a Claim for Gross Negligence

Under Delaware law, gross negligence provides the standard for the fiduciary duty of due care.[28]  Delaware law defines gross negligence as "reckless indifference" or a "gross abuse of discretion."  *See, e.g., Solash v. Telex Corp.*, C.A. Nos. 9518, 9525 & 9528, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988).  Here, the Complaint alleges no facts suggesting that Defendants' "actions relating to the sale of ALH and subsequent sale of its operating units" or the "hiring and directions to both Fried Frank and SCA" were uninformed.  Complaint ¶ 96.  Indeed, the Complaint says nothing about the information Defendants utilized in taking these actions.  Nor is there any allegation that Arenson, as Class B Representative, was not informed about the matters as to which Plaintiffs assert gross negligence by Defendants.  To the contrary, the Complaint (*e.g.*, ¶ 46) avers that Plaintiffs held and expressed strong views on these matters.

Plaintiffs allege that their opinions and recommendations concerning ALH were not followed (*see, e.g., id*. ¶¶ 46, 48-49, 52-53), but this is simply another manifestation of the parties' differing business judgments.  In fact, these allegations show that Defendants <u>were</u>

---

[28]    Consequently, the "gross negligence" claim in Count IV of the Complaint is legally duplicative of the breach of fiduciary duty claims in Count I.  *See Aronson*, 473 A.2d at 812.  The Complaint alleges no basis for a claim of gross negligence independent of a claim for breach of the fiduciary duty of due care.

informed of Plaintiffs' views. If a plaintiff could state a claim for gross negligence anytime a defendant did not follow plaintiff's advice, every disagreement could become a breach of fiduciary duty litigation. There would be nothing left of Delaware's business judgment rule.

The Complaint asserts only legal conclusions of gross negligence. Such conclusory assertions do not support a claim that Krieger, Buchler and Stein, as members of the Supervisory Board, acted with "reckless indifference." Accordingly, the Complaint does not state a claim for breach of the duty of care under Delaware law. *See Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 39 (Del. 1996) (affirming Rule 12(b)(6) dismissal of duty of care claim where complaint alleged defendants did not negotiate a sufficient tender offer price and elected not to dispute foreclosure). *Cf. Smith v. Van Gorkom*, 488 A.2d 858, 871-742 (breach of duty of due care where, *inter alia*, CEO negotiated merger without consulting with board, price was determined by random suggestion, merger was approved after two hour board meeting and signed at social event that evening, and no directors read merger agreement before it was signed).

### E.  Plaintiffs Have Not Stated Any Breach of Contract Claim

In Counts II and III, respectively, Plaintiffs assert that Defendants' alleged breaches of fiduciary duty also breached the Operating Agreement and the Consulting Agreement. Complaint ¶¶ 82, 89. Because, as set forth above, the Complaint fails to state a claim for breach of fiduciary duty, Counts II and III likewise fail to state a claim on which relief can be granted. Furthermore, as noted above, the Complaint does not identify a single provision of either agreement that was supposedly breached by Defendants.

Plaintiffs' contention that Defendants violated an implied contractual covenant of good faith and fair dealing in both agreements is equally defective. Delaware law recognizes an

implied covenant but will not permit it to "be used to forge a new agreement beyond the scope of the written contract." *Kelly v. McKesson HBOC, Inc.*, No. Civ. A. 99 C-09-265WCC, 2002 WL 88939, at *10 (Del. Super. 2002) (unpublished). "To state a claim for breach of an implied covenant of good faith and fair dealing, the plaintiffs must identify a specific implied contractual obligation." *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *8 (Del. Ch.) (unpublished) (dismissing claim for violation of implied covenant when that claim was inconsistent with contractual language). *See also Chamison v. HealthTrust, Inc. - The Hospital Co.*, 735 A.2d 912, 921 (Del. Ch. 1999) (implied covenant cannot contravene parties' express agreement and cannot expand agreement beyond scope of written contract), *aff'd*, 748 A.2d 407 (Del. 2000) (TABLE); *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1234 (Del. Ch. 2000) ("[C]ases invoking the implied covenant of good faith and fair dealing should be rare and fact-intensive. Only where issues of compelling fairness arise will this Court embrace good faith and fair dealing and imply terms in an agreement."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1259 (Del. 2004) (exchange offer and merger did not violate implied covenant where. "[b]y their plain terms, the Warrants gave the plaintiffs no right to participate in the Exchange Agreement").

The implied covenant is only breached where the defendant has engaged in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Wilgus v. Salt Pond Inv. Co.,* 498 A.2d 151, 159 (Del. Ch. 1985). Here, decisions were made by a majority of the Class Representatives on ALH Supervisory Board, according to the express terms of ALH's Operating Agreement. See Jarvis Dec. Ex. D at § 6.2(e). Arenson, as Class B Representative, was outvoted on the sales of ALH's operations. The Class B Members did not have a blocking right, and this Court should not

rewrite ALH's Operating Agreement to provide them with one after the fact.  Having failed to identify any express provision of the Operating or Consulting Agreements that Defendants supposedly violated, Plaintiffs cannot rely on an "implied covenant" to fill the gap, so Counts II and III should be dismissed.

### F.    Plaintiffs Have Not Stated an *Ultra Vires* Claim

Plaintiffs' claim that the actions they challenge were *ultra vires* (Complaint ¶ 108) ignores the fact that the "now largely abolished" *ultra vires* doctrine applies only to a narrow class of actions that are beyond the entity's power because they are illegal or not authorized under its organizational documents.  *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 896 (Del. Ch. 1999).  An *ultra vires* act is a legal nullity incapable of cure.  *Apple Comp., Inc. v. Exponential Tech., Inc*., No. 16315, 1999 WL 39547, at *6 (Del. Ch., Jan. 21, 1999) (unpublished).  The majority vote of ALH's Supervisory Board to sell ALH's operations was not prohibited by the Operating Agreement — to the contrary, it was a possibility contemplated by and consistent with that agreement.  *See* Jarvis Dec. Ex. D at § 6.2(e).

### G.    Plaintiffs Have Not Stated a Civil Conspiracy Claim

In Count VI. the Complaint alleges a civil conspiracy by Defendants to breach their fiduciary duties.  Thus, the viability of Count VI depends on the viability of the underlying breach of fiduciary duty claims.  If they are dismissed (as we respectfully submit they should be), Count VI should likewise be dismissed.

Under Delaware law, the effect of a conspiracy is that "a conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987).  Where, as here, all of the alleged conspirators are also alleged joint tortfeasors, the conspiracy claim is redundant.  *See, e.g.,*

*Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *15 (Del. Ch., Apr. 15, 2004) (unpublished) (declining to award separate or enhanced relief based on conspiracy claim)  Moreover, because Count I is pled against <u>all</u> Defendants, there is no alleged <u>non</u>-fiduciary participant in the supposed wrongs, so Plaintiffs fail to state a claim for a civil conspiracy to breach fiduciary duties.  *See Carlton Investments v. TLC Beatrice Intern. Holdings, Inc.*, Civ. A. No. 13950, 1995 WL 694397, at *15 (Del.Ch., Nov. 21, 1995) (unpublished) (to establish civil conspiracy or aiding and abetting claim, plaintiff must plead facts showing, *inter alia*, knowing participation in the breach by a <u>non-fiduciary defendant</u>).

> To the extent Plaintiffs assert that a civil conspiracy occurred in North Carolina and should be governed by North Carolina law, Count VI must nonetheless be dismissed because North Carolina does not recognize civil conspiracy as an independent cause of action.  *See Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002).  A civil conspiracy "action" is for damages resulting from acts committed by the conspiracy.  *Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 774 (1966).  A civil conspiracy charge "does nothing more than associate the defendants together [for damages purposes] and perhaps liberalizes the rules of evidence to the extent that under proper circumstances the acts and conduct of one [defendant] might be admissible against all."  *Id.*; *see also Jones v. City of Greensboro*, 51 N.C. App. 571, 583, 277 S.E.2d 562, 571 (1981), *overruled on other grounds by Fowler v. Valencourt*, 334 N.C. 345, 435 S.E.2d 530 (1993).[29]

---

[29]     A claim of civil conspiracy between the corporate and individual Defendants is also barred by the intracorporate immunity doctrine, under which a corporation cannot conspire with its officers and directors because at least two persons must be present to form a conspiracy, and the acts of the agent are the acts of the corporation.  *Buschi v. Kirven,* 775 F.2d 1240, 1252 (4th Cir. 1985); *Garlock v. Hilliard*, 2000 WL 33914616, at *5 (N.C. Bus. Ct. 2000) (unpublished). *See also Mobile Oil v. Advanced Envtl. Recycling Techs., Inc.,* 833 F. Supp. 437, 445 (D. Del. 1993). (intra-enterprise actors cannot conspire with each other for purposes of federal antitrust liability).

### H.    Plaintiffs' Claims Are Time-Barred

The alleged breaches of the Operating and Consulting Agreements are governed by the

three-year statute of limitation in N.C. Gen. Stat. § 1-52(1), which requires "an action . . . [u]pon

a contract, obligation or liability arising out of a contract, express or implied," to be brought

within three years of the time that the cause of action accrues.[30]  A three-year statute of limitation

also governs Plaintiffs' negligence claim.  *See* N.C. Gen. Stat. § 1-52(5); *see also White v.*

*Consol. Planning, Inc.*, 166 N.C. App. 283, 308, 603 S.E.2d 147, 164 (2004) (negligence claims

falls within § 1-52(5), which sets three-year limitation period for "any other injury to the person

or rights of another, not arising on contract and not hereafter enumerated").  Plaintiffs' breach of

fiduciary duty and self-dealing claims are subject to the three-year statute of limitation, because a

"breach of fiduciary duty is a species of negligence or professional malpractice." *Carlisle v.*

*Keith*, 614 S.E.2d 542, 548, __ N.C. App. __ (2005) (citation omitted) (attorney allegedly

breached fiduciary duty by committing malpractice).

Here, Plaintiffs' breach of fiduciary duty claims are more akin to negligence than

professional malpractice, because there was no professional relationship between Defendants and

Plaintiffs for the provision of professional services.  Therefore, the three-year limitation period

applicable to negligence actions also governs the breach of fiduciary duty claims.  *See Tierney v.*

*Garrard*, 124 N.C. App. 415, 417, 477 S.E.2d 73, 75 (1996), aff'd by, 347 N.C. 258, 490 S.E. 2d

237 (1997) (three-year period applied to plaintiffs' claim for breach of fiduciary duty where

plaintiffs alleged that defendant misapplied corporate funds for personal gain, as part of scheme

---

[30]     In diversity cases, federal courts apply the forum state's rules governing choice of law.  *Stokes v.*
*Southeast Hotel Props., Ltd.,* 877 F. Supp. 986, 993 (W.D.N.C. 1994) (citing *Klaxon Co. v. Stentor Elec.*
*Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).   North Carolina courts consistently characterize statutes of
limitation as procedural; therefore, federal courts sitting in North Carolina apply North Carolina statutes
of limitation in diversity cases.  *Id*. at 996; *see also Wener v. Perrone & Cramer Realty, Inc.*, 137 N.C.
App. 362, 365, 528 S.E.2d 65, 67 (2000).

to defraud subscribers to proposed bank). Likewise, self-dealing, which is a type of breach of fiduciary duty, is governed by the three-year statute of limitation. *See Compton v. Kirby*, 157 N.C. App. 1, 15, 577 S.E.2d 905, 914 (2003) (self-dealing constitutes a breach of fiduciary duty). The three-year statute of limitation also applies to Plaintiffs' civil conspiracy claim. *Carlisle*, 614 S.E.2d at 549, __ N.C. App. at __ (three-year period in N.C. Gen Stat. § 1-52(5) barred civil conspiracy claim).

Defendants' assertion of the statute of limitation as an affirmative defense is properly brought before the Court on a motion to dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(6). *See Pinehurst Airlines v. Resort Air Servs., Inc.*, 476 F. Supp. 543 (1979) (when it appears on face of complaint that limitation period has run, defendant may properly assert this defense in a Rule 12(b)(6) motion. "[T]he burden rests on the plaintiff to prove that his claims were timely filed." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 305, 603 S.E.2d 147, 162 (2004).

A statute of limitation generally begins to run when the plaintiff's right to maintain an action accrues. *Davis v. Wrenn*, 121 N.C. App. 156, 158, 464 S.E.2d 708, 710 (1995). The cause of action accrues when "the injured party becomes aware or should reasonably have become aware of the existence of the injury." *Pembee Mfg. Corp. v. Cape Fear Constr. Co., Inc.*, 313 N.C. 488, 493, 329 S.E.2d 350, 354 (1985). It is irrelevant that "further damage could occur; such further damage is only aggravation of the original injury." *Id. But cf. Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003) (recognizing continuing violation doctrine as exception to general rule that cause of action accrues when right to maintain suit arises); *Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 811-12 (1977) (in federal antitrust actions alleging continuing conspiracy, plaintiffs' cause of action accrues from day to day).

Plaintiffs filed their Complaint on June 2, 2005.  In order for the claims not to be time-barred, they must have accrued on or after June 2, 2002.  Taking Plaintiffs' well-pled allegations as true, all of the claims accrued before June 2, 2002.  In essence, the Complaint alleges that, beginning at least as early as 2001, Defendants embarked on a scheme to take control of ALH's Supervisory Board and use that control to sell off ALH's operations in a piecemeal fashion for Defendants' sole benefit.  *See* Complaint ¶¶ 8, 33, 35, 39, 46, 71.  Although the sales of ALH's operations did not occur until 2003-2003, Plaintiffs' claims arose well before then.

Specifically, Plaintiffs allege that Defendants scheme to "entrench the power of Shamrock" began in the summer of 2001, when ALH entered into a so-called "Management Agreement" that gave ALH's Class A Members the right to designate one of the two Class D Representatives on ALH's Supervisory Board.  Complaint ¶ 33.  Plaintiffs further allege that in "early 2001, Defendants first expressed a desire to exit their investment and management of ALH.  Over the next year, Defendants attempted to use their majority position to force a sale under any circumstances."  Complaint ¶ 6 (emphasis added).  Thus, from early 2001 to early 2002, Plaintiffs say they were aware that Defendants had wrongfully seized control of ALH and were seeking force its sale under any circumstances.  The Complaint (¶ 7) also alleges that "[i]n March 2002, Defendants attempted to sell ALH as a going concern but the sale was mishandled from the start" (emphasis added).

In addition, Plaintiffs allege that "Defendants have continually made hiring decisions not in the best interests of the Class B members or ALH as a whole."  Complaint ¶ 36.  However, the Complaint points to only two hiring decisions—both of which were made prior to June 2002—to support this allegation.  First, Plaintiffs assert that, "[i]n July 2001," ALH entered into the Consulting Agreement with SCA.  Complaint ¶ 37; *see also* ¶ 4.)  The Complaint (¶ 37) further

alleges that "SCA assisted, aided and abetted Shamrock in its goal to sell off ALH at a loss." Thus, according to the Complaint, the Consulting Agreement was executed before June 2002 and the alleged actions from which Plaintiffs' claims arise were also under way.

Second, Plaintiffs allege that Fried Frank was hired by Shamrock to represent ALH, and that Fried Frank had a conflict of interest. Complaint ¶ 39. Like SCA, Fried Frank was also hired before June 2002. *See* Jarvis Dec. Exs. RR, SS (conflict waiver letters expressly referenced in ¶ 39 of Complaint). Plaintiffs' assertion that they protested the hiring of Fried Frank (Complaint ¶ 39) shows that, instead of than bringing an action to stop the alleged wrongdoing and injury, they opted to sit on their putative rights.

Plaintiffs' only allegations involving alleged misconduct occurring after June 2002 are the sales of ALH's three operating units.[31] *See* Complaint ¶¶ 50, 54-55, 65-69. However, before June 2002, Plaintiffs were well aware that buyers were being sought. Indeed, Plaintiffs allege that SCA and Fried Frank had been hired in 2001 for just that purpose. *See* Complaint ¶¶ 4, 39.

Based on their own allegations, taken as true, Plaintiffs were aware that they had been injured before June 2002. But Plaintiffs did not sue at that time. Instead, they opted to wait while Defendants supposedly dismantled ALH in a manner that Plaintiffs assert was detrimental. This is impermissible. Plaintiffs may not sit idly by, allowing their alleged injury to increase, and then march into court years later. Any injury claimed by Plaintiffs after June 2002 is simply an aggravation of the original injury: Defendants' alleged scheme to sell ALH's operating units was well underway and known to Plaintiffs before June 2002. Because Plaintiffs did nothing for more than three years after discovering this supposed conspiracy, they are barred from bringing their claims now.

---

[31]    As discussed above, Plaintiffs do not claim that the loan repayments in 2003 were wrongful (the loans themselves were made in April 2000 and May 2002; *see* Complaint ¶¶ 41-42). Rather, Plaintiffs contend that repayment of the loans was the motivation for the sale of ALH's operations.

## CONCLUSION

By reason of the foregoing, Defendants respectfully request that this Court grant their

motion to dismiss, or alternatively transfer, the Complaint.


This the 2nd day of September, 2005


<u>/s/ J. Donald Cowan, Jr.</u>
J. Donald Cowan, Jr.
North Carolina State Bar No. 0968
Elizabeth Brooks Scherer
North Carolina State Bar No. 27526

OF COUNSEL:
SMITH MOORE LLP
Post Office Box 21927
300 N. Greene Street, Suite 1400
Greensboro, North Carolina 27401
Telephone:  (336) 378-5200
Facsimile:  (336) 378-5400


OF COUNSEL:
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, New York 10022
Telephone:  (212) 407-1200
Facsimile:  (212) 407-1299

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been served by United States mail, first-class, postage prepaid, to the following counsel of record:

Russ A. Brinson
Cozen O'Connor
One Wachovia Center, Suite 2100
301 South College Street
Charlotte, North Carolina 28302

Thomas M. Wood, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, Maryland 21202-3282

This the 2nd day of September, 2005.

/s/ J. Donald Cowan, Jr.
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Elizabeth Brooks Scherer
N.C. State Bar No. 27526

OF COUNSEL:
SMITH MOORE LLP
Post Office Box 21927
300 N. Greene Street, Suite 1400
Greensboro, North Carolina 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400

OF COUNSEL:
Pamela Jarvis
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200
Facsimile: (212) 407-1299

*Attorneys for Defendants Shamrock Holdings
of California, Inc., Shamrock Capital Advisors,
Inc., Eugene I. Krieger, George J. Buchler,
and Bruce J. Stein*