IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 3:05-CV-256-H

| | | |
|---|---|---|
| A. ARENSON HOLDINGS, LTD., D.A. GARDENS, LTD., J12ALH ASSOCIATES, SELK, LLC and LAUREL EQUITY GROUP, LLC | ) ) ) ) ) | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR TRANSFER |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN | ) ) ) ) ) | |
| Defendants | ) ) ) | |

# Table of Contents

INTRODUCTION ........................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................... 1

FACTS ......................................................................................................................... 2

    A.  The Dismantling of ALH ................................................................................. 6
    B.  The Present Action .......................................................................................... 7
    C.  The Delaware Action ....................................................................................... 8

ARGUMENT ............................................................................................................... 9

I.  Defendants' Motion to Dismiss For Improper Venue Should Be Denied. ................... 9

    A.  Standard of Review .......................................................................................... 9
    B.  Venue Is Proper Under 28 U.S.C. § 1391(a)(2). ............................................ 10

II.  Defendants' Motion to Transfer Should Be Denied. ............................................... 14

    A.  This Case Could Not Have Been Brought In Delaware. ................................. 14
    B.  Transfer Under 28 U.S.C. § 1406 Is Not Appropriate. ................................... 18
    C.  This Case Should Not Be Transferred to Delaware. ....................................... 19
        1.  Special Circumstances Warrant Departure From the First-Filed Rule. ............ 19
        2.  The Factors Under § 1404 Weigh Against Transfer to Delaware. .................... 30

III.  Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Should Be Denied. .... 33

IV.  This Court Has  Personal Jurisdiction Over All Defendants. .................................. 37

    A.  This Court Has Both Subject Matter and Personal Jurisdiction Over Defendants. ............... 37
    B.  This Court Has Personal Jurisdiction Over SCA. .......................................... 37
    C.  Limited Discovery Is Warranted. ................................................................... 41

V.  Plaintiffs State a Claim on All Counts in the Complaint. ........................................ 42

    A.  Standard of Review ........................................................................................ 42
    B.  By Filing the Delaware Action, Defendants Concede Plaintiffs' Claims Are Viable. ............... 42
    C.  This Court Should Not Rely On The Business Judgment Rule to Dismiss Plaintiffs' Claims. 43
    D.  The Complaint States a Claim for Breach of Fiduciary Duty. ...................... 46
    E.  The Complaint States a Claim for Breach of the Operating Agreement and the Consulting
        Agreement. ...................................................................................................... 48
    F.  The Complaint States A Claim for Gross Negligence. ................................... 51
    G.  The Complaint States A Claim for Self-Dealing. .......................................... 52
    H.  The Statute of Limitations Does Not Bar Plaintiffs' Claims. ........................ 53

CONCLUSION .......................................................................................................... 55

Plaintiffs, A. Arenson Holdings, Ltd. ("**Arenson Holdings**"), D.A. Gardens, Ltd. ("**D.A. Gardens**"), J12ALH Associates ("**J12ALH**"), Selk, LLC ("**Selk**") and Laurel Equity Group LLC ("**Laurel**") (collectively "**Plaintiffs**"), by their undersigned counsel, file this Opposition to the Motion to Dismiss Or Transfer ("**Defendants' motion**"),[1] filed by Defendants, Shamrock Holdings of California, Inc. ("**Shamrock**"), Shamrock Capital Advisors, Inc. ("**SCA**"), Eugene I. Krieger ("**Krieger**"), George J. Buchler ("**Buchler**"), and Bruce J. Stein ("**Stein**") (hereinafter collectively "**Defendants**").

## INTRODUCTION

Plaintiffs are the Class B members of ALH Holdings LLC ("**ALH**"), a Delaware limited liability company. Defendants control ALH through Shamrock's majority control of the Class A members, its majority representation on the Supervisory Board by Krieger, Buchler and Stein and the consulting services provided to ALH by its affiliate SCA.[2] This dispute involves Defendants' decision to sell the operating units of ALH in a piecemeal fashion at fire sale prices over the well-reasoned objections of Plaintiffs. Defendants' actions have not been in the best interests of Plaintiffs or ALH and constitute a breach of Defendants' fiduciary duties owed to Plaintiffs as Class B members of ALH. The sole purpose of the dismantling of ALH was to relieve Defendants of their duty to manage ALH which Defendants themselves admitted was too time consuming. Plaintiffs offered to purchase the Class A's interests in ALH but Defendants demanded an unreasonable price and rather than hand over control to Plaintiffs and allow them to strengthen ALH, Defendants acted in bad faith and in a grossly negligent manner by selling ALH's operations in a piecemeal fashion rather than as a whole, which resulted in a depressed value.

## PROCEDURAL HISTORY

This dispute involves two lawsuits, the present action filed on June 2, 2005 and a preemptive, anticipatory declaratory judgment action filed on September 13, 2004 by Shamrock, SCA, Krieger, Buchler and Stein (collectively referred to in this section as "**Shamrock**").

---

[1] Defendants' Memorandum in Support of Motion to Dismiss or Transfer is docket item 15 and hereinafter shall be cited as "**D.I. 15**".

[2] All of the services provided by SCA to ALH were performed by Krieger, Buchler and Stein. *See* Declaration of Shalom Lamm attached hereto as Exhibit E.

While the parties were involved in settlement negotiations, Shamrock filed a declaratory judgment action in the Delaware Court of Chancery against Abraham (Avie) Arenson ("**Arenson**"), Selk and Laurel (collectively referred to in this section as "**Delaware Defendants**").  Thereafter, Delaware Defendants removed the case to the United States District Court for the District of Delaware (the "**Delaware Court**").[3]  Arenson filed a motion to dismiss challenging the Delaware Court's exercise of personal jurisdiction over him and Selk and Laurel filed a motion to dismiss for failure to join necessary parties since the remaining Class B members were not named as parties.  At Shamrock's request, Delaware Defendants agreed to stay briefing on both motions until Shamrock filed and obtained a ruling on a motion to remand the case back to the Delaware Court of Chancery.  On March 22, 2005, the Delaware Court denied Shamrock's motion to remand.  Shamrock again requested that Delaware Defendants agree to an extension to give Shamrock time to respond to the pending motions and Delaware Defendants agreed.  On April 22, 2005, instead of responding to the pending motions, Shamrock filed an amended complaint joining as defendants the necessary parties, Arenson Holdings, D.A. Gardens and J12ALH.[4]  In response to Shamrock's amended complaint, Delaware Defendants filed several motions to dismiss, which have been fully briefed by the parties and are awaiting decision by the Delaware Court.

On June 2, 2005, Plaintiffs filed a Complaint in this Court seeking affirmative relief for Defendants' wrongful conduct (the "**Complaint**").[5]

## FACTS

ALH, a Delaware limited liability company, and ALH II, Inc. ("**ALH II**"), a Delaware corporation and wholly-owned subsidiary of ALH, are both Delaware entities but neither has ever conducted business activities in Delaware.  (D.I. at 1-2).  ALH was in the homebuilding business in North Carolina, Florida and Tennessee and ALH II was formed as a vehicle to obtain debt financing for ALH's operations and acquisitions.

---

[3] The Delaware Action is civil action number 04-1339-SLR.  Arenson is not a party to this action.
[4] The Complaint in this action is docket item 1 and hereinafter shall be cited as "**D.I. 1**".
[5] The Amended Complaint filed in the Delaware Action and attached as Exhibit B to Defendants' Motion will hereinafter be referred to as "**DE Comp.**".

As provided in the ALH Operating Agreement (the "**Operating Agreement**"), the overall business, operations and affairs of ALH are controlled by a designated manager. (D.I. 15, Exh. D). Lion LLC ("**Lion**") was originally designated as the manager. *Id.* The Operating Agreement also created a Supervisory Board (the "**Board**"), comprised of five members—2 Class A representatives, 1 Class B representative and 2 Class D representatives. At all relevant times, Krieger and Buchler, employees of Shamrock and SCA, were the Class A Representatives and Arenson was the Class B representative. (D.I. 1 ¶ 31). Until July 2001, Shalom Lamm and Jonathan Zich were the Class D Representatives, but in July 2001, when Lion was stripped of its authority, the Class A members designated one of the two Class D representatives and they replaced Jonathan Zich with Stein. (D.I. 1 ¶¶ 31-32).

Shortly after its formation, ALH acquired home-building operations in Jacksonville, Florida that operated under the name Atlantic Builders, Inc. ("**ABI**"). (D.I. 1 ¶ 27). In December 1998, ALH II, Inc. ("**ALH II**") was formed to act as the parent company for ALH's operating subsidiaries and to provide a vehicle for obtaining debt financing for ALH's operations and acquisitions. In 1999, ALH acquired home-building operations in Memphis, Tennessee that operated under the name Bowden Building Corporation ("**BBC**"). (D.I. 1 ¶ 28). In 2000, ALH acquired home-building operations in Charlotte, North Carolina, that operated under the name Mulvaney Homes, Inc. ("**MHI**"). (D.I. 1 ¶ 29).

In addition to obtaining financing from outside lenders, several members of ALH loaned funds to the company with the approval of the Board. On April 6, 2000, several members of ALH loaned $2 million to ALH II to finance certain operations of ALH II.[6] (D.I. 1 ¶ 41). In May 2002, it became apparent that ALH needed additional funding. After considering various alternatives, the Board approved a second loan from certain members of ALH. On May 7, 2002, ALH II entered into a loan agreement with certain members for a $4.4 million loan to ALH II to provide working capital.[7]

In 2001, as a result of a dispute regarding Lion's performance, ALH entered into a settlement agreement with Lion wherein its authority was limited by, *inter alia*, requiring the consent of the Board—

---

[6] Shamrock loaned ALH II $1,633,334. Arenson Holdings loaned ALH II $166,666. Lion & Lamm Capital LLC loaned ALH II $200,000.

[7] D.A. Gardens loaned $312,500 to ALH II and Shamrock loaned $1,964,000, to ALH II.

then controlled by Defendants—before Lion could make certain decisions.  DE Comp. at 37-39.  Further entrenching Defendants' control of ALH, Defendant SCA, an affiliate of Shamrock, entered into an agreement with ALH to take over the consulting services for ALH formerly performed by Lamm.  (D.I. 1 ¶ 47).  Thereafter, ALH was effectively controlled solely by Defendants because they controlled three of the five representatives on the Board; they had the power to remove the nominal manager, Lion; they controlled the outside consultant; and they had the sole power under the Agreement to make major decisions for ALH.

In 2001, the Board decided it was a good time to sell the entire company.  Defendants had begun expressing a desire to exit their investment in ALH as their management responsibilities were too time consuming.  (D.I. 1 ¶ 6).  ALH retained Jolson Merchant Partners to provide financial advice and investment banking services in connection with the sale of the entire company.  (DE Compl. ¶ 82).  Defendants attempted to sell ALH as a going concern but the sale was mishandled because Defendants insisted on selling ALH's balance sheet, which contained an enormous amount of goodwill, rather than selling ALH as a multiple of cash flow and land option inventory.  (D.I. 1 ¶ 7).

By the summer of 2002, Defendants were unable to sell ALH as a whole so they decided to sell off the operating units of ALH piecemeal rather than continue to look for a buyer for the entire entity.  Plaintiffs objected to this and warned Defendants that such a sale would be disastrous.  Defendants, however, exploited their control over ALH and began marketing the operating units and negotiating with a buyer for the sale of BBC.

On July 30, 2002, Arenson informed Defendants that the Class B members had met and unanimously agreed that the sale of BBC was ill advised and would weaken ALH and make the sale of the remaining operating units more difficult.  (D.I. 15, Exh. ZZ)  Further, Arenson advised that while the Class B members would like to continue to operate ALH with Defendants, if Defendants were unwilling to continue then the Class B members would consider buying out the Class A's interests in ALH.  *Id.*  Defendants expressed an interest in selling  the Class A's interests to the Class B members but still continued to pursue a buyer for BBC and ABI. *Id.*

Discussions between the parties regarding the Class B members buy out of the Class A equity ensued, but an agreement was not reached. Defendants demanded $12 million for their interest and the Class B members offered $5 million. *See* Exh. A attached hereto. On December 18, 2002, Arenson sent an email to Defendants stating:

> [The Class B members] remain gravely concerned that the sale of [BBC] will seriously impair the viability of ALH, as while it might serve some short term end and may fund the Bowden litigation settlement, which we feel is not a "priority", it will hinder and cripple ALH going forward. The "auction" process is busted and it has made ALH look even weaker. The Bs are prepared to fund needed working capital. We appreciate that the As have made a decision to exit and are NOT prepared to invest additional amounts. Since we fear that we have been placed in a liquidation mode, the Bs, in an effort to save their investment and seize an opportunity (that the As either do not believe is there or that they choose not to pursue) have been willing to offer the As a limited sum to exit and it is that amount that we need to agree upon. What the Bs simply can not accept is to allow the As to liquidate ALH in a piecemeal fashion. That said, we need to conclude a buy-out of the As on mutually acceptable terms or recommit ourselves to running ALH in a positive and forward looking manner and abandon, for the time being, the notion of a sale.

(Attached hereto as Exh. C). Defendants rejected Plaintiffs' buy-out offer, continued pursuing buyers for the separate divisions and disregarded the reasoned advice to focus on strengthening ALH for the time being and stop trying to sell it. Defendants' goal was clear—sell off ALH regardless of the consequences.

In February 2003, the parties agreed to meet in Charlotte, North Carolina to discuss ALH's then current problems, the future problems that would arise if a change of course was not effected and a possible buy-out by the Class B members of the Class A's interests in ALH. (D.I. 1 ¶ 45). At the meeting, Defendants indicated that ALH was consuming too much management time and that they wanted to rid themselves of the time consuming demands of dealing with ALH. *Id.*. Defendants refused to negotiate a reasonable price for the sale of the Class A's interests in ALH to give Plaintiffs the capability to restructure and strengthen ALH. Instead, Defendants acted in their own self-interest and continued to market the operating units of ALH in furtherance of their efforts to liquidate ALH. Plaintiffs warned Defendants that such action would adversely affect ALH and the members by, *inter alia*, impairing ALH's ability to obtain necessary financing. With total disregard for the best interests of ALH and its members, Defendants ignored the warnings and vigorously pursued the piecemeal liquidation of ALH.

### A. The Dismantling of ALH

Defendants hired Fried, Frank, Harris, Shriver & Jacobson, LLB ("**Fried Frank**") to represent ALH in the sale of its various operating units. (D.I. 1 ¶ 39). Fried Frank has a longstanding relationship with Shamrock and also represents SCA. Arenson raised the issue that this was a clear conflict of interest and likely to be detrimental to the Class B members. *Id.* Despite the non-waivable conflict, Fried Frank continued to attend the Board meetings on behalf of ALH and Shamrock throughout the sale of the operating units, maintaining that any potential conflict had been waived by ALH in a signed conflict letter. (D.I. 1 ¶¶ 39-40).

On June 26, 2003, a Board meeting was held and Defendants proposed the sale of ABI. (D.I. 1 ¶ 48). Buchler explained that the sale was necessary because of pressing liquidity needs and the need to settle pending litigation. (D.I. 1 ¶ 49). Since Defendants controlled ALH, Arenson could not stop them from selling ABI but he recommended that it would be better for ALH if the members financed another infusion of capital to assist ALH as was previously done with success in 2000 and 2002. (D.I. 1 ¶ 48). After further discussion, and with Defendants firmly in control of the Board, Defendants voted in favor of the sale of ABI despite Arenson's reasoned recommendation to the contrary. It was apparent to Arenson that Defendants intended to act in their own self-interest to liquidate ALH regardless of the consequences to others. Arenson, therefore, suggested that the proceeds from the sale of ABI be used to repay the 2000 and 2002 loans from the members. The proceeds from the sale of ABI were used to repay those loans and to provide working capital for ALH. (D.I. 1 ¶ 43).

On March 24, 2004, a Board meeting was held and Defendants presented a proposal for the sale of 100% of the stock of BBC.[8] (D.I. 1 ¶ 51). Arenson again expressed concern that the sale was not in the best interests of ALH and that ALH might obtain a better offer if BBC continued to operate. (D.I. 1 ¶

---

[8] John LaGuardia was the president of Levitt Homes at the time of the letter of intent. (D.I. 1 ¶ 60). LaGuardia used his insider knowledge about Defendants' mismanagement of ALH and their lack of commitment to ALH to leverage an advantageous deal for the purchase of BBC by Levitt to the disadvantage of ALH. *Id.*

52). Further, Arenson challenged the conflict of interest of Fried Frank, counsel for ALH, SCA and Shamrock. (D.I. 1 ¶ 53). Fried Frank claimed that ALH had waived any potential conflict. After further discussion, Defendants voted in favor of the sale of BBC despite Arenson's reasoned objections.

Finally, in the summer of 2004, ALH entered into a letter of intent with Levitt Homes for the sale of MHI. (D.I. 1 ¶ 60). On behalf of ALH, William Lanius ("Lanius"), the former CFO of ALH, handled the negotiations with Levitt and negotiated numerous financial matters in connection with the Levitt offer.[9] However, on October 6, 2004, Levitt informed ALH that it was no longer interested in purchasing MHI. (D.I. 1 ¶ 63). The circumstances surrounding this rescission are unclear but suspicious, since in the same email notifying Plaintiffs of Levitt's rescission, Buchler informed Plaintiffs that Lanius, on behalf of Mattamy homes, was interested in purchasing MHI on terms and conditions less favorable to ALH than the Levitt deal. (D.I. 1 ¶¶ 63, 66). Since Lanius was intimately familiar with the finances of ALH, he was able to exploit insider information to obtain MHI at a depressed price. (D.I. 1 ¶ 60). Defendants did not attempt to solicit other offers from third parties but voted to accept the Mattamy offer. (D.I. 1 ¶ 66)

It was apparent that Defendants were determined to sell off the remaining unit of ALH regardless of the best interests of ALH or their fiduciary duties to the Class B members. Arenson did not travel from Israel to the United States to attend the perfunctory Board meeting where Defendants voted to sell off the final asset of ALH. (D.I. 15 at 16). Defendants attempt to misconstrue Arenson's decision not to attend the meeting as an admission that the sale of MHI was not important. Such an insinuation is ridiculous since all previous attempts by Arenson to prevent Defendants from liquidating ALH had gone unheeded and Defendants had filed suit against Arenson, individually, thereby confirming his belief that any attempt to dissuade Defendants from their final act of dismantling ALH was futile.

**B. The Present Action**

---

[9] After the sale of ABI, Lanius, the CFO of ALH, became the president of Mattamy Homes, the entity that acquired ABI. (D.I. 1 ¶ 58). Thereafter, Defendants chose to retain Lanius as a consultant to advise Defendants on the management and financial aspects of ALH and to assist in the sales of ALH's remaining operating units BBC and MHI. *Id.*

On June 2, 2005, Plaintiffs filed this action against Defendants alleging claims for breach of fiduciary duty in connection with the sale of ALH's operating units, breach of the operating agreement, breach of the consulting agreement, gross negligence, self-dealing and civil conspiracy in connection with Defendants' mismanagement of ALH and the piecemeal sale of its operating units.

### C. The Delaware Action

On September 13, 2004, before the sale of MHI, Shamrock, SCA, Krieger, Buchler and Stein (collectively referred to in this section as '**Shamrock**") filed a preemptive declaratory judgment action against Arenson, Selk and Laurel (collectively referred to in this section as '**Delaware Defendants**"). After lulling Delaware Defendants into believing that Shamrock was willing to discuss a settlement in good faith, Shamrock filed an anticipatory declaratory judgment action seeking, *inter alia*, a declaration of non-liability for their mismanagement in connection with the piecemeal sale of ALH. Delaware Defendants removed the action to the federal district court and Arenson moved to dismiss the claims against him under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Selk and Laurel moved to dismiss the claims against them under Rule 12(b)(7) for failure to join necessary parties. On April 22, 2005, Shamrock filed an amended complaint joining as defendants Arenson Holdings, D.A. Gardens and J12ALH and requested the following declarations:

> (1) that they have not breached any fiduciary duty to defendants; (2) that they have not breached any obligations to defendants, or violated any rights of defendants, under the Operating Agreement; (3) that (a) in rendering services pursuant to the Consulting Agreement, they did not commit bad faith, gross negligence or willful misconduct, and (b) they are protected from any liability to defendants by the Consulting Agreement; (4) that they relied in good faith on JMP and on ALH's outside counsel; (5) that they are entitled to indemnification, including advancement of legal fees and other expenses; (6) the extent to which Selk's equity interest is reduced or eliminated due to a shortfall in the Class E Capital Contribution; and (7) declaring whether plaintiffs have violated Arenson's rights as Class B Representative.

(DE Comp. ¶¶ 156, 160, 164, 168, 176, 179 and 183).

On June 3, 2005, Delaware Defendants filed the following motions and supporting memoranda: (1) Motion to Dismiss or in the alternative For Stay of Proceedings under the Declaratory Judgment Act filed by Defendants, Arenson Holdings, D.A. Gardens, J12ALH, Selk and Laurel; (2) Motion to Dismiss

for lack of personal jurisdiction filed by Defendants, Arenson, Arenson Holdings, D.A. Gardens and J12ALH and for failure to join necessary parties filed by Selk and Laurel; and (3) Motion to Dismiss under 12(b)(6) filed by Defendant Arenson.

Delaware Defendants Arenson Holdings, D.A. Gardens and J12ALH claim that the Delaware Court lacks personal jurisdiction over them since they have no contacts with Delaware other than their passive ownership of an interest in a Delaware LLC that does not conduct business in Delaware.  Arenson claims that the Delaware Court lacks personal jurisdiction over him and that Shamrock has failed to state a claim against him since he has no direct interest in the declaratory relief requested.  All Delaware Defendants, except Arenson, moved to dismiss or stay the declaratory judgment action asking that the Delaware Court decline to exercise its jurisdiction since the Delaware Complaint was filed while settlement negotiations were ongoing and in anticipation of a coercive action by Delaware Defendants and, as such, constitutes an inappropriate use of the declaratory judgment procedure and an exception to the first-filed rule.  Those motions have been fully briefed and are currently awaiting decision by the Delaware Court.

### ARGUMENT

## I. Defendants' Motion to Dismiss For Improper Venue Should Be Denied

### A.  Standard of Review

Defendants have moved for dismissal of this action under Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. § 1406(a) for improper venue.  "Where an action is filed in the wrong venue, the district court shall, pursuant to 28 U.S.C. § 1406(a), 'dismiss [such action], or if it be in the interest of justice, transfer such case to any district ... in which it could have been brought.'"  *AC Controls Co., Inc. v. Pomeroy Computer Res., Inc.*, 284 F. Supp. 2d 357, 359 (W.D.N.C. 2003)(quoting 28 U.S.C. § 1406).  Section 1406 "permits courts to dismiss an action if venue is improper, but 'in most cases of improper venue ... courts conclude that it is in the interest of justice to transfer to a proper forum rather than to dismiss." *Hackos v. Sparks*, 378 F. Supp. 2d 632, 634 (M.D.N.C. 2005).

"[W]here a motion to dismiss is filed pursuant to Section 1406(a) and Fed.R.Civ.P. 12(b)(3) the Court must look to 28 U.S.C. § 1391 . . . '[t]he rationale for this rule appears to be that dismissal for improper venue under Rule 12(b)(3) depends on whether the requirements of venue as set out in Section 1391 are met[.]"  *AC Controls,* 284 F. Supp. 2d at 359.  In order to "survive a motion to dismiss for improper venue when no evidentiary hearing is held, plaintiff need only make a prima facie showing of venue[.]"  *Production Group Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 798 (E.D. Va. 2004)(citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)).  The prima facie requirement may be satisfied if the plaintiff can show that further discovery will reveal that the chosen forum lies in the district in which a substantial part of the events giving rise to the claim occurred.  *See TBV v. Schey*, 2002 WL 1733649, *1 (S.D.N.Y. Jul. 26, 2002).  For the reasons that follow, Plaintiffs have done so.

**B. Venue Is Proper Under 28 U.S.C. § 1391(a)(2).**

Contrary to Defendants' assertions, venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391(a)(2).  Under 28 U.S.C. § 1391(a)(2), a civil action founded on diversity of citizenship may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  Therefore, this Court must determine whether a substantial part of the events or omissions giving rise to this claim occurred in the Western District of North Carolina.  In making that determination, "a court should not focus only on those matters that are in dispute or that directly led to the filing of the action. Rather, it should review '**the entire sequence of events underlying the claim**.'" *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (emphasis added); *see also Ciena Corp. v. Jarrard,* 203 F.3d 312, 315-16 (4th Cir. 2000)(holding that enough closely related business contacts had occurred in a district for venue to be proper there, even though the specific acts giving rise to the suit did not occur in that district).

The First Circuit applied the "entire sequence of events" test in *Uffner v. Reunion Francaise, S.A.*, 244 F.3d 38 (1st Cir. 2001) *cited in Mitrano*, 377 F.3d at 405-06.  *Uffner* involved a contract dispute over an insurance policy on a yacht that sank off the coast of Puerto Rico.  The district court held that venue was not proper in Puerto Rico since the claim sounded in contract and the triggering event was the denial

of the insurance claim, "the occurrence of a fire in Puerto Rican waters was a 'tenuous connection at best.'" *Id.* at 41. On appeal, the First Circuit reversed. In reaching its decision, the court outlined the following sequence of events leading to the claim: (1) a resident of the Virgin Islands obtained an insurance policy for his yacht; (2) the yacht caught fire and sank in Puerto Rican waters; (3) a claim was filed through the yacht owner's insurance broker; and (4) the claim was denied because it was allegedly not covered by the policy. *Id.* at 42. The court held that "the sinking of [the yacht] was one part of the historical predicate for the instant suit" and "although the sinking of [the yacht] is itself *not in dispute*, the event is connected to the claim inasmuch as Uffner's requested damages include recovery for the loss." *Id.* at 42-43 (emphasis added). The court further explained that "an event need not be a point of dispute between the parties in order to constitute a substantial event giving rise to the claim." *Id.* at 43. Finally, the court noted that allowing venue in Puerto Rico does not "thwart the general purpose of statutorily specified venue, which is 'to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial'" because the defendant did not allege that Puerto Rico would "confer a tactical advantage" to the plaintiffs or "prejudice" the defendants own case. *Id.* at 43.

In this case, the allegations in the Complaint defeat Defendants' attempt to minimize the activities in North Carolina. Looking at "the entire sequence of events", a substantial part of the events giving rise to this claim occurred in North Carolina.[10] First, the Complaint alleges that Defendants acted in gross negligence in selling MHI—a North Carolina corporation that conducted substantial business in North Carolina—at a fire sale price to a North Carolina company. Second, the Complaint alleges that an important Board of Directors meeting occurred in North Carolina where the parties discussed, *inter alia*, the sale of ALH's operating units and the Class B members' proposal to purchase the Class A's interests to prevent the piecemeal sale of ALH's operating units.

---

[10] Defendants suggest that the sale of MHI was not important because Arenson, the Class B Representative, did not attend the Board meeting to vote on the sale. Arenson's subjective view on the importance of the sale of MHI has no legal relevance to a determination of whether the sale of MHI is a substantial part of the events or omissions on which Plaintiffs base their claim.

Defendants' sale of MHI is more related to this action than the sinking of the yacht in *Uffner*. The essence of this action is that Defendants wrongfully sold off ALH—including MHI, a North Carolina company—in a piecemeal fashion in order to further their own self-interests and in doing so violated their fiduciary duties to Plaintiffs. Just as the sinking of the yacht in *Uffner* was substantial because the requested damages included recovery for that loss, here Plaintiffs' claims include damages resulting from the sale of MHI to the detriment of the Class B members. In this case, the events are even more substantial because, unlike in *Uffner* where the sinking of the yacht was not in dispute, the activities in North Carolina—the sale of MHI—is in dispute. Finally, as in *Uffner*, Defendants here have failed to allege why North Carolina confers a tactical advantage to Plaintiffs or causes prejudice to Defendants. Therefore, as in *Uffner*, venue is proper in North Carolina because the sale of MHI is one part of the historical predicate to the instant suit.

In addition to the sale of MHI, a meeting occurred in Charlotte that is a substantial event giving rise to the claims. In *Roncaicoli v. Investec Ernst & Co.*, 2003 WL 22244936, *3 (D.Conn. Sept. 26, 2003), the court held that venue was proper in Connecticut where a series of meetings and communications regarding the parties' investment relationship took place because the "meetings and communications constituted a 'substantial part' of the events that gave rise to the dispute and the subsequent arbitration proceedings[.]" *Id.* The court further held that "[t]he 'substantial part' standard set forth in section 1391(a)(2) is liberal and 'may be satisfied by a communication to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action." *Roncaicoli*, 2003 WL 22244936, *3 (quoting *TBV Holdings Ltd. V. Schey*, 2002 WL 1733649, *4 (S.D.N.Y Jul. 26, 2002))*; see also Sacody Technologies, Inc. v. Avant, Inc.*, 862 F. Supp. 1152, 1157 (S.D.N.Y. 1994)(holding "[t]he standard set forth in § 1391(a)(2) may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action."); *Gruntal & Co., Inc. v. Kauachi*, 1993 WL 33345, at *2 (S.D.N.Y. Feb. 5, 1993) (finding venue proper in diversity common-law fraud action

based on telephone calls during which allegedly fraudulent representations were made, where one party to

calls was within district during calls).

In February 2003, Plaintiffs along with their counsel met with Shamrock in Charlotte, North

Carolina to discuss the problems ALH was currently facing, the future problems that would arise if a

change of course was not effected and a possible buy-out by the Class B members of the Class A's

interests in ALH.  (D.I. 1 ¶ 45).  Plaintiffs discussed the potential harm of selling ALH in a piecemeal

fashion and Defendants responded by stating that ALH was consuming too much time and that they were

ready to dispose of the assets of ALH.  *Id.*  Further, Defendants continued to demand an unreasonable

amount for a buy-out instead insisting that a piecemeal sale of the operating units was the best

resolution.[11]

Defendants claim that the sequence of events includes "a host of occurrences (and alleged

occurrences) that did not occur in this District—and, to the extent they are addressed in the Complaint,

are not alleged to have occurred in this District."  (D.I. 15 at 18).  This has no bearing on whether

substantial events giving rise to the claim occurred in North Carolina because venue may be proper in

more than one judicial district.  *Mitrano*, 377 F.3d at 405.  Therefore, even if none of the actions  or

omissions that damaged Plaintiffs occurred in North Carolina, venue is still proper in North Carolina

because events closely related to the legal action occurred there.  *See Brown v. Flowers*, 297 F. Supp. 2d

846, 849 (M.D.N.C. 2003)(holding that "[v]enue in a district may be proper where acts or omissions

closely related to the legal action occurred, even if none of those acts or omissions were the act or

omission that allegedly caused the injury.").

Plaintiffs have made a prima facie showing of venue based on the sale of MHI and the February

2003 meetings in Charlotte, both of which are substantial events giving rise to Plaintiffs' claims. If,

however, the Court determines that further information is needed, Plaintiffs request that a determination

on the issue of venue await further discovery since the information is almost exclusively within

---

[11] Defendants would have been better off if they had accepted a reasonable offer from the Class B members.  In the
end, Defendants received a lower return on their investment and their grossly negligent decision to retain control for
the purpose of liquidating the business resulted in a total loss to the Class B members.

Defendants' knowledge and control.  Nevertheless, Defendants' motion to dismiss under Rule 12(b)(3) and § 1406(a) for improper venue should be denied.

## II.  Defendants' Motion to Transfer Should Be Denied.

In the alternative, Defendants contend that this action should be transferred under 28 U.S.C. § 1406 or § 1404.[12]  The Court should deny Defendants' motion to transfer this case to Delaware.  A transfer is impermissible because Delaware is not a district in which this action could have been brought because Delaware is an improper venue.  However, even if Delaware were a district in which this action could have been brought, the first to file rule does not apply and therefore, Defendants have failed to establish that a transfer is necessary for the convenience of the parties and in the interests of justice.

### A.  This Case Could Not Have Been Brought In Delaware.

Contrary to Defendants' contention, this case should not be transferred to Delaware under either 28 U.S.C. § 1406(a) or § 1404(a), because Delaware is not a forum where this action might have been brought.[13]  (D.I. 15 at 19).  "The first step in addressing a motion to transfer under Section 1404(a) is a determination of whether the proposed transferee court is one in which the action originally 'might have been brought.'"  *Cable-La, Inc. v. Williams Communications, Inc.*, 104 F. Supp. 2d 569, 574 (M.D.N.C. 1999).  "The phrase 'where it might have been brought' in section 1404(a) refers to a forum where venue originally would have been proper for the claim and where a defendant originally would have been subject to personal jurisdiction."[14]  *Kotsonis v. Superior Motor Exp.*, 539 F. Supp. 642, 645 (D.C.N.C. 1982).

This Court may not transfer the case to Delaware because it is not a proper venue under 28 U.S.C. § 1391(a), which provides:

---

[12] Section 1404(a) provides "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

[13] "Whether section 1404(a) or section 1406(a) governs is dependent upon whether there was proper venue in the district in which the plaintiff originally brought the action. When venue exists in the district in which the case was originally filed, section 1404(a) applies; when venue never existed in the district where the suit was filed, section 1406(a) governs." *FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp. 2d 442, 449 (D. Del. 1999); *see also Zellinger v. Control Services, Inc.*, 2002 WL 31914695 , *1 (M.D.N.C. Dec. 27, 2002).

[14] The meaning of "in which it could have been brought" under § 1406(a) is the same as the meaning attributed to the phrase "might have been brought" in § 1404(a)). *FS Photo, Inc.*, 48 F. Supp. 2d at 449-50.

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

Since all Defendants do not reside in Delaware, § 1391(a)(1) is not applicable. Further, since a substantial part of the events giving rise to the claim occurred in North Carolina,[15] a proper venue exists under § 1391(a)(2), therefore § 1391(a)(3) does not apply. *See FS Photo*, 48 F. Supp. 2d 442 (holding that § 1391(b)(3) is only applicable if (b)(1) and (b)(2) do not apply).

Finally, venue does not exist in Delaware under § 1391(a)(2) because Delaware is not a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred because none of the events giving rise to the claim occurred in Delaware.[16] Defendants attempt to misconstrue this issue by arguing that the claims arise from the formation, funding and management of ALH, a Delaware LLC. A cursory review of the facts refutes this argument. While the formation of ALH occurred in Delaware in 1998, the Complaint does not allege any claims relating to the formation of ALH. *See FS Photo*, 48 F. Supp. 2d 442 (ruling that Delaware was not a district where a substantial part of the events giving rise to the suit occurred where the defendant corporation was incorporated in Delaware and had its principal place of business in Virginia); *Friedman v. Revenue Mgmt. of New York*, 839 F. Supp. 203 (S.D.N.Y. 1993)(holding that New York was not a proper venue even though defendant corporation was incorporated in that state). Although ALH II was formed in Delaware in 1999 as a vehicle to obtain debt financing for ALH's operations and acquisitions, the Complaint does not allege any claim relating to the funding or financing of ALH. At issue is the grossly negligent management of ALH by Defendants and the grossly negligent manner in which Defendants sold the operating units of ALH. There are no allegations that any mismanagement occurred directly or even indirectly in Delaware. Accordingly,

---

[15] *See supra* § I. for discussion on propriety of venue in North Carolina.

[16] In the Delaware Action, Plaintiffs decision not to raise improper venue should not be misconstrued as an admission that venue in Delaware is proper. Rather than challenge venue, Plaintiffs chose instead to assert other strong arguments that would result in dismissal of the Delaware Action and relieve Plaintiffs from the burden of litigating their affirmative claims in the awkward procedural position of defendants.

venue does not exist under § 1391(a)(2) because Delaware is not a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

Moreover, Defendants cannot consent to venue in Delaware. "[T]he power of a District Court under § 1404(a) to transfer an action to another district is made to depend not upon the wish or waiver of the defendant but, rather, upon whether the transferee district was one in which the action 'might have been brought' by the plaintiff." *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960). For purposes of transfer, personal jurisdiction and venue must be established independent of the consent of Defendants. Accordingly, in this case, transfer under § 1404 or § 1406 is not permissible because venue is not proper in Delaware.

Defendants do not maintain that venue and personal jurisdiction are proper in Delaware but contend that "there is no question the Plaintiffs could have brought their claims as counterclaims in the DE Action." (D.I. 15 at 20). Defendants cite no legal authority in support of this contention.[17] Defendants' contention is based on several contingencies—that the Delaware Court has personal jurisdiction over Plaintiffs and that it will not decline to exercise subject matter jurisdiction over Defendants' anticipatory declaratory judgment action or over Plaintiffs'.

The hypothetical ability to file a counterclaim does not satisfy the requirement under § 1404 for a district where a suit might have been brought. *Foster Wheeler Corp. v. Aqua-Chem, Inc.*, 277 F. Supp. 382, 384 (D.C. Pa. 1967). In *Foster Wheeler*, the plaintiff filed suit against Aqua-Chem in the Eastern District of Pennsylvania, concerning the validity of a patent that was the subject of a pending suit in the Eastern District of Louisiana involving infringement of the same patent. The court denied the motion to dismiss holding that "[c]ontrary to defendant's contention, the hypothetical ability of Foster Wheeler to file a counterclaim in the Louisiana suit previously instituted by Aqua-Chem against Gulf Oil in no way qualifies that district under § 1404(a) as one to which suit may properly be transferred." *Id.*

---

[17] Courts that have permitted a counterclaim to satisfy the requirements of § 1404, have done so only in cases where the defendants in the first-filed action had already filed an answer and did not challenge the court's exercise of jurisdiction. *See e.g. A.J. Indus., Inc. v. U.S. Dist. Ct.*, 503 F.2d 384 (9th Cir. 1974); *Leesona Corp. v. Duplan Corp.*, 317 F. Supp. 290 (D.R.I. 1970).

Similarly, in the present case, the hypothetical ability of Plaintiffs to file a counterclaim in the Delaware Action does not qualify that district under § 1404(a) as a district in which this action could have been brought. At the time this action was commenced, the Delaware Court lacked personal jurisdiction over Arenson Holdings, D.A. Gardens and J12ALH. Further, currently pending before the Delaware Court is Plaintiffs' motion to dismiss under 12(b) asking the court to decline to exercise subject matter jurisdiction since Defendants' declaratory judgment action is contrary to the policies of the Declaratory Judgment Act. Therefore, Defendants' contention that the action could have been brought as a counterclaim in Delaware is based upon the presumption that the Delaware Court has personal jurisdiction over Arenson Holdings, D.A. Gardens and J12ALH. Accordingly, since Plaintiffs may never file a responsive pleading including a counterclaim in the Delaware Action because the Delaware Court lacks personal jurisdiction over Arenson Holdings, D.A. Gardens and J12ALH, who are also necessary parties, Plaintiffs' ability to file a counterclaim was hypothetical at the time this action was filed and therefore does not satisfy the requirements of § 1404.

Moreover, until the Delaware Court determines that it has personal jurisdiction over all Plaintiffs, Delaware is not a district where the case might have been brought. *See Cessna Aircraft Co. v. Brown*, 348 F.2d 689 (10th Cir. 1965). In *Cessna,* the plaintiffs filed two actions in two separate federal courts. The plaintiffs commenced six actions against Cessna in the Western District of Louisiana but Cessna challenged the Louisiana court's exercise of personal jurisdiction. When that motion was pending, the plaintiffs filed the same six actions in the District of Kansas, where Cessna was subject to personal jurisdiction, as a precaution to protect against limitations. The Louisiana court held that it had personal jurisdiction over Cessna and denied Cessna's motion to transfer venue to Kansas. Subsequently, the Kansas court granted the plaintiffs' motion to transfer venue to Louisiana.

Cessna filed an application for mandamus with the Tenth Circuit to set aside the Kansas court's transfer order arguing that Louisiana lacked personal jurisdiction over it and was therefore not a district where the case might have been brought. *Cessna, 348* F.2d at 692. The plaintiffs argued that the Louisiana court's decision upholding jurisdiction over Cessna was determinative and satisfied the "where

it might have been brought" requirement of § 1404. *Id.* The Tenth Circuit issued the writ of mandamus

prohibiting, *inter alia*, the transfer. In reaching its decision, the court explained:

> It would have been unseemly for the federal district court in Kansas, and it is unseemly for us, to review the decision of the Western District of Louisiana upholding its jurisdiction. The remedy for Cessna lies in the Court of Appeals for the Fifth Circuit. At the same time we are aware of the vigorous contention [of] Cessna that the Louisiana jurisdiction may not be sustained. The transfer of the Kansas cases to the Western District will add nothing to the jurisdiction of that district. If the cases are transferred and the Court of Appeals for the Fifth Circuit ultimately holds that the Western District does not have jurisdiction over Cessna, the knot of procedural complications will have to be untied in some manner. We see no reason why such complications may not be avoided at this time.

*Cessna,* 348 F.2d at 692. Further, the court issued a stay in Kansas pending a final decision on

jurisdiction in Louisiana.

In the present case, as in *Cessna,* a transfer to Delaware before the Delaware Court determines

whether it has personal jurisdiction over Plaintiffs would produce procedural complications and does not

satisfy the requirement of § 1404. If, as Plaintiffs maintain, the Delaware Court lacks personal

jurisdiction over Arenson Holdings, D.A. Gardens and J12ALH then it will dismiss the claims against

them and no counterclaim could be filed. Therefore, until the pending motions in Delaware are resolved,

Defendants' motion to transfer must be denied because Delaware is not a forum where the action could

have been brought as required under § 1404.

### B. Transfer Under 28 U.S.C. § 1406 Is Not Appropriate.

Even if Delaware is a district in which this action could have been brought, Defendants cannot

establish that a transfer under 28 U.S.C. § 1406 is warranted. Section 1406(a) has been interpreted to

authorize transfers in cases where venue is proper but personal jurisdiction is lacking or there exists some

other impediment that would prevent the action from going forward in that district. *See Porter v. Groat*,

840 F.2d 255, 258 (4th Cir. 1988)("[W]e adopt as the rule in this circuit the reading of § 1406(a) that

authorizes the transfer of a case to any district, which would have had venue if the case were originally

brought there, for any reason which constitutes an impediment to a decision on the merits in the transferor

district but would not be an impediment in the transferee district.").

Here, Defendants claim that under § 1406 this action should be transferred because venue is improper here under 28 U.S.C. § 1391(a). For the reasons set forth in detail *infra* § I., venue is proper in the Western District of North Carolina because the sale of MHI and the February 2003 meetings in Charlotte are substantial events giving rise to Plaintiffs' claims against Defendants. Transfer under § 1406 is therefore, not permitted. In addition, Defendants have not established that transfer should be permitted under 28 U.S.C. § 1404(a).

### C. This Case Should Not Be Transferred to Delaware.

#### 1. Special Circumstances Warrant Departure From the First-Filed Rule.

Defendants contend that pursuant to § 1404 and under the first-filed rule this case should be transferred to Delaware. The first-filed rule does not apply in this case because special circumstances exist. Despite clear evidence that the parties were then still engaged in ongoing settlement discussions, Defendants filed the Delaware Action to prevent Plaintiffs from selecting the forum in which to litigate their claims against Defendants. Any doubts this Court may have regarding Defendants' motives for filing the Delaware Action are resolved by the chronology of events that preceded Defendants' filing of the Delaware Action. Moreover, Defendants' declaratory judgment action is contrary to the policies of the Declaratory Judgment Act because it was filed to guarantee their choice of forum and to obtain a declaration of non-liability.[18]

In *Nutrition & Fitness, Inc. v. Blue Stuff, Inc.*, 264 F. Supp. 2d 357 (W.D.N.C. 2003), this Court explained the standard for determining whether the first-filed rule is applicable:

> The determination of whether to apply the first-filed rule is not entirely ungoverned, however; courts have recognized three factors to be considered in determining whether to apply the first-filed rule: 1) the chronology of the filings, 2) the similarity of the parties involved, and 3) the similarity of the issues at stake. Furthermore, even if a court finds

---

[18] *See Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937)(stating the granting of declaratory relief is within this court's discretion, and should be denied when it is invoked to try issues or determine the validity of defenses in a pending action at law); *BASF Corp. v. Symington*, 50 F.3d 555, 559 (8th Cir. 1995)(holding "where a declaratory plaintiff raises chiefly an affirmative defense, and it appears that granting relief could effectively deny an allegedly injured party its otherwise legitimate choice of the forum and time for suit, no declaratory judgment should issue."); *Sun Oil Co. v. Transcon. Gas Pipe Line Corp.*, 108 F. Supp. 280 (E.D. Pa. 1952), aff'd, 203 F.2d 957 (3rd Cir. 1953)(holding that it is not one of the purposes of the Declaratory Judgment Act to enable a prospective defendant to obtain a declaration of non-liability).

the first-filed rule applicable, it may still make the discretionary determination that the rule should be ignored as a result of "special circumstances," such as forum shopping, anticipatory filing, or bad faith filing.  If a court determines that the suit first filed with it should be disregarded in favor of the later-filed suit, the court may stay its proceedings, dismiss the case entirely, or transfer the case to its sister court.

*Id.* at 360 (internal citations omitted).

In this case, the first-filed rule should be ignored because special circumstances exist. Specifically, Defendants filed this action in anticipation of Defendants' suit in North Carolina and in bad faith, knowing that Defendants were attempting to negotiate a settlement.  "[C]ircumstances under which an exception to the first-to-file rule will be made include bad faith and anticipatory suit filed for the purpose of forum shopping."  *Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 270 (C.D. Cal. 1998); *see also McJunkin Corp. v. Cardinal Systems, Inc.*, 190 F. Supp. 2d 874, 879 (S.D. W. Va. 2002)("Procedural fencing may provide an exception to the first-filed rule, such that [the declaratory judgment plaintiff's] choice of forum is not accorded deference when considering the appropriate venue."); *Moore Corp. Ltd. v. Wallace Computer Services, Inc.,* 898 F. Supp. 1089, 1099 (D. Del. 1995); *Williams Gas Supply Co. v. Apache Corp.*, 594 A.2d 34, 36 (Del. Ch. 1991) (first-filed Delaware action properly dismissed where it was "commenced in anticipation of [the] second filed action in Colorado").

An exception to the first-filed rule exists where the declaratory judgment action is filed in bad faith by prospective defendants when the would-be plaintiffs are attempting settlement talks in good faith. *See Columbia Pictures Indus., Inc. v. Schneider*, 435 F. Supp. 742, 747-48 (S.D.N.Y. 1977).  Courts have held that "[p]otential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before the plaintiff files a complaint." C*apitol Records, Inc. v. Optical Recording Corp*, 810 F. Supp. 1350, 1354 (S.D.N.Y.1992) (citation omitted).  In *Ontel Prod. Inc. v. Project Strategies Corp*., 899 F. Supp. 1144 (S.D.N.Y. 1995), the court stated: "[w]here a party is prepared to file a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary

used the resulting delay in filing to proceed with the mirror image of the anticipated suit." *Id.* at 1150. In short, the anticipatory suit exception encourages would-be plaintiffs to attempt settlement talks in good faith, even at a stage in the conflict where the complaint has already been drafted, without fear that the settlement efforts will be punished by the filing of an anticipatory suit. *See Columbia Pictures*, 435 F. Supp. at 747-48; *see also Riviera Trading Corp. v. Oakley, Inc.*, 944 F. Supp. 1150, 1158-59 (S.D.N.Y. 1996)(transferring first-filed action to district of second-filed action, where plaintiff in second-filed action had been engaged in good faith settlement effort and first-filed action was motivated in part by forum shopping).

In this case, Defendants claim that the kind of special circumstances that warrant departure from the first-filed rule are not present because: "(1) there were no ongoing settlement negotiations between the parties when the DE Action was filed, and (2) Defendants were not informed of an imminent lawsuit in North Carolina before the DE Action was filed." (D.I. 15 at 9)(emphasis in original). Defendants' claims that there were no ongoing settlement negotiations between the parties when this action was filed and that they were not informed of an imminent lawsuit is refuted by conversations and correspondence between counsel for the parties. In support of their baseless claims, Defendants have mischaracterized the facts and thus, a review of the events in chronological order demonstrates how disingenuous Defendants' claims are:

On Thursday, August 26, 2004, a conference call was held between the parties and their counsel. During this call the parties and counsel raised settlement, mediation and litigation against Plaintiffs.

On Friday, August 27, 2004, counsel for Defendants, Pamela Jarvis ("Jarvis") responded via email[19] to counsel for Plaintiffs, Isaac Neuberger's ("Neuberger") threat of litigation in the previous days conference call: "It occurred to me that you might not be aware that Section 10.2 of the ALH Holdings LLC Operating Agreement provides that "All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware." (Exh. B, at p. 1).

On August 27, 2004, in an email to Jarvis, Neuberger responds "We are aware of this provision. . . it does NOT prevent the filing of a suit in North Carolina, does it? . . . Since it appears that Shamrock is unwilling to see its way clear towards an acceptable resolution, I suspect that much of this will be the subject of discovery. As we consider the alternatives, if we were to agree to the

---

[19] All email exhibits are a true and correct copy of the original and are attached hereto as Exhibit B.

Delaware Mediation that you proposed, would we be afforded the same discovery if we proceed in a different forum. (Exh. B, at p. 2).

On Monday, August 30, 2004, in an email to Neuberger, Jarvis responds "In addition to confirming that Delaware law governs, Section 10.2 would weigh in favor of Delaware as the appropriate forum. . . . The Delaware Mediation process (like all other mediation processes I am aware of) does not provide for formal discovery, but the parties could of course agree to exchange whatever information they want to. Also, participation in the mediation would not affect the parties' ability to obtain discovery in future litigation, if any. (Exh. B, at p. 3).

On Monday, August 30, 2004, in an email to Jarvis, Neuberger responds "I fully appreciate Shamrock's desire to use a Delaware Mediation process. Please consider it from the B's perspective. . . . Hence, the issue for a trier of fact, to determine, is whether what happened here was a breach of the fiduciary duty that the individual directors and Shamrock owed to the B's or not. Discovery is critical to this type of factual based determination, hence, we need to know the extent of discovery that Shamrock and the individual directors will agree to." (Exh. B, at p. 4).

On Thursday, September 2, 2004, in an email to Neuberger, Jarvis responds "As you know, Shamrock totally disagrees with your assertions regarding self-interest and the circumstances leading to the sale of ALH's operations, but that is what we would hope to resolve in mediation. Shamrock is certainly open to the idea of discovery in connection with the mediation. As you may know, Delaware Chancery Court Rule 94(d) provides that "The Mediator may request parties to exchange or provide to the Mediator documents or other material necessary to understand the dispute or facilitate settlement. The parties may agree to exchange any document or other materials in the possession of the other that may facilitate a settlement." What specifically did you have in mind? I look forward to hearing from you. (Exh. B, at p. 5).

On Friday, September 3, 2004, in an email to Jarvis, Neuberger responded: "This is progress . . . . I will be back to you next week. ." (Exh. B, at p. 8).

On Sunday, September 5, 2004, in an email to Jarvis, Neuberger states: "In considering your suggestion that we agree to a Delaware mediation process, as you know, we will require that Shamrock, in advance of the Mediation, agree to the same level of discovery that we think we could achieve if we were to file a lawsuit. I have asked Sam Wood[20] to scope that out and to provide you with the outline [sic] a lawsuit that would be the basis of the mediation. In the meantime, we would like to know ASAP how Shamrock valued ALH on its books, from time to time, and how it described this investment in its reports to its investors. When did Shamrock write off its investment (if it did)? We believe that these reports would be discoverable. The answer to this inquiry will reflect how sincere Shamrock is in seeking a resolution through mediation and is willing to provide relevant discovery. (Exh. B, at p. 9).

On Wednesday, September 8, 2004, in an email to Neuberger, Jarvis responds "Shamrock is checking for the financial information you have requested. I look forward to receiving Sam's outline." (Exh. B, at p. 10).

On Wednesday, September 8, 2004, in an email to Jarvis, Neuberger asks "Has Shamrock decided on the extent of the discovery that it would consider if we were to agree to the Mediation?" (Exh. B, at p. 11).

On Thursday, September 9, 2004, in an email to Neuberger, Jarvis responds "As I indicated in my September 2 email to you, Shamrock will consider whatever discovery would be likely to facilitate the mediation and make it more productive. Once we have received from Sam the

[20] Thomas "Sam" M. Wood, IV ("Wood"), is a principal at Neuberger, Quinn, Gielen, Rubin & Gibber, attorneys for Plaintiffs, and counsel in this matter.

specifics of what you have in mind, we will be able to respond specifically. I would not expect there to be a disagreement about the relevant areas." (Exh. B, at p. 11).

On Monday, September 13, 2004, in a letter to Neuberger and Wood, S. Mark Hurd, Defendants' Delaware counsel, states "Enclosed please find a copy of the complaint in the above-referenced action, which was filed today . . . Because Ms. Jarvis is at present out of the country, she asked that I convey the following to you. []The commencement of this action reflects no diminution in plaintiffs' desire to engage in the previously discussed mediation with your clients. However, it has been more than two weeks since plaintiffs first proposed the mediation, and you have yet to agree to it. Consequently, plaintiffs thought it prudent to pursue the mediation in the context of a pending action." (Exh. B, at p. 12 ).

(hereinafter the "**chronology of events**").

Regardless of how Defendants spin the events that occurred prior to the filing of their preemptive declaratory judgment action, the chronology of events demonstrates that in fact there were ongoing settlement discussions and Defendants' lawsuit was imminent.  Plaintiffs offer the following justification for filing suit:

On September 8, 2004, Plaintiffs sent a further email asking about "the extent of the discovery that [Shamrock] would consider if we were to agree to the Mediation."  That same day,[21] Defendants responded by asking for the information from Mr. Wood that was promised on September 5. Defendants provided nothing. By this point, it appeared to Plaintiffs that Defendants might merely be toying with the idea of mediation, in the hope of getting extra-judicial discovery to use as the basis for a lawsuit.

(D.I. 15 at 13 (internal citations omitted))  This justification is based upon factual inaccuracies.  First, Ms. Jarvis did not ask for Mr. Wood's information, the information was not promised on September 5 and the information was not provided because there was no time to do so considering that the last email with Ms. Jarvis was on a Thursday and the Delaware Action was filed on Monday.  Defendants can hardly argue that such a delay is unreasonable especially since Defendants delayed the initial conference call to discuss settlement for nearly six weeks.  *See* Exh. D attached hereto.

Second, to say that it was filed because Plaintiffs were merely "toying" with the idea of mediation is fallacious since Ms. Jarvis' last communication gave no such indication but, to the contrary, showed a willingness to work out the details of discovery.  Specifically, Ms. Jarvis noted that after she received the information from Plaintiffs' counsel she would respond specifically as to what Shamrock would agree to

---

[21] Ms. Jarvis' response was not on the same day but was actually the next day, Friday, September 9, 2004.  (Exh. B at p.1)

produce but she did "not expect there to be a disagreement about the relevant areas" of discovery for mediation—the only potential issue Plaintiffs raised before agreeing to mediation. (Exh. B at p.11)

Even assuming *arguendo*, that Defendants had requested the discovery information and Plaintiffs had not provided it—which did not occur—a delay of four days over a weekend in providing information to facilitate mediation is not sufficient to warrant an inference that settlement discussions had terminated. It is, however, sufficient to support an inference that Plaintiffs were lulled into believing that Defendants were negotiating in good faith a possible method of settlement—mediation—when in fact, Defendants were drafting a lawsuit to ensure they secured the forum of their choosing.

Moreover, an exception to the first-filed rule exists because the Delaware Action is an anticipatory suit filed for the purpose of forum shopping.[22] "A suit is 'anticipatory' for the purposes of being an exception to the first-to-file rule if the plaintiff in the first-filed action filed suit on receipt of specific, concrete indications that a suit by the defendant was imminent." *Guthy-Renker Fitness*, 179 F.R.D. at 270. "Such anticipatory suits are disfavored because they are examples of forum shopping." *Id.* Here, Defendants filed the Delaware Action to control the forum and they did so after being told that Plaintiffs' suit in North Carolina was imminent. Any doubt this Court may have regarding Plaintiffs' motive here is resolved by the chronology of events.

Defendants' contention that they were not informed of an imminent lawsuit in North Carolina is without merit. Defendants' statement that "Plaintiffs did not 'inform' Defendants of anything concerning the litigation, let alone that they were about to file suit in North Carolina or elsewhere", (D.I. 15 at 11),

---

[22] In *Remington Arms Co., Inc. v. Alliant Techsystems, Inc.*, 2004 WL 444574, *3 (M.D.N.C. Feb. 25, 2004), the court held that "an improper anticipatory filing is one of the "special circumstances" that may indicate [that] a departure from the first-filed rule is appropriate." *Id.* In reaching its decision, the court noted that "[o]ther courts that have considered exceptions to the first-filed rule have, for example, refused to apply the first-filed rule when the party that files first does so with notice that the other party is about to file. *Id.* (citing *Anheuser-Busch, Inc. v. Supreme Int'l Corp.,* 167 F.3d 417, 419 (8th Cir.1999)); *Touchstone Research Lab., Ltd. v. Anchor Equip. Sales, Inc.,* 294 F. Supp. 2d 823, 828 (N.D.W. Va. 2003); *Nutrition & Fitness,* 264 F.Supp.2d at 360; *Citigroup Inc. v. City Holding Co.,* 97 F. Supp. 2d 549, 557 (S.D.N.Y. 2000)(defining an improper anticipatory filing as "one made under the apparent threat of a presumed adversary filing the mirror image of that suit"); *Myles Lumber Co. v. CNA Fin. Corp.,* 233 F.3d 821, 824 (4th Cir. 2000)(noting that one factor for determining when to decline to assert jurisdiction in a declaratory judgment action is "whether the declaratory judgment action is being used merely as a device for 'procedural fencing.'"").

conflicts with the chronology wherein Mr. Neuberger informed Ms. Jarvis that Mr. Wood would prepare

an "outline [of] a lawsuit that would be the basis of the mediation."  (Exh. B at 9)  Moreover, Defendants

do not deny that, by the time they "filed the Delaware Action, Plaintiffs had intermittently been

threatening litigation for months."  (D.I. 15 at 13)  Further, that the North Carolina Action was not filed

until June provides little support for Defendants as to Plaintiffs Arenson Holdings, D.A. Gardens and

J12ALH, who had only been joined as defendants in the Delaware Action six weeks earlier when the

Delaware Amended Complaint was filed.  As for any delay by Selk and Laurel in filing suit, at the request

of Defendants, Plaintiffs agreed to a stay of all issues while the parties addressed the remand issues in the

Delaware Action.

Moreover, Defendants' argument that they were not informed of an imminent lawsuit is contrary

to the allegations in the Delaware Amended Complaint and undermines their very right to maintain a

declaratory judgment action.  Defendants are not entitled to declaratory relief unless they can allege that

the probability that defendants would sue them was "of sufficient immediacy and reality to warrant the

issuance of a declaratory judgment."  *Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*, 898 F. Supp.

1089, 1095 (D. Del. 1995).  In order for a case or controversy to exist for the purposes of a declaratory

judgment, a plaintiff must demonstrate that the claim is ripe.  *Id.*  In the Delaware Amended Complaint,

Defendants alleged:

> This action presents a case or controversy suitable for declaratory judgment because,
> among other things, defendants persist in asserting that plaintiffs breached their fiduciary
> duties, acted in self-interests and engaged in other wrongful conduct.  Defendants have
> repeatedly stated their intention to sue plaintiffs for millions of dollars insisting that
> plaintiffs must 'make them whole' by paying them the entire amount they claim to have
> invested in ALH, plus additional damages.  Thus, plaintiffs face a real and substantial
> probability of being sued by defendants, and are entitled to judicial relief from injury
> caused by these spurious accusations.

(DE Compl. ¶ 6).  Defendants did not allege a present injury but claimed that present harms would flow

from the threat of future actions.  In some cases, however, "where a plaintiff can demonstrate that present

harm will flow from the threat of future actions, plaintiff has met his burden of establishing adversity.

Plaintiff must, in those cases, demonstrate that the probability of that future event occurring is 'of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Moore*, 898 F. Supp. at 1095(quoting *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990))(internal citations omitted). Therefore, to overcome any challenge to ripeness in the Delaware Action, Defendants had to allege that the threat that Plaintiffs would sue them was "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment", [23] which they did. In short, Defendants cannot have it both ways—they cannot allege in the Delaware Amended Complaint that a ripe controversy exists because the threat was imminent while simultaneously arguing that the Delaware Action is not an anticipatory filing because they did not know that a lawsuit was imminent. Defendants knew Plaintiffs intended to file a lawsuit and had only delayed in doing so as a result of ongoing settlement negotiations.

Defendants' motion to transfer should be denied because the Delaware Action is an improper anticipatory suit filed while the parties were engaged in ongoing settlement negotiations. In *Touchstone Research Laboratory, Ltd. v. Anchor Equipment Sales, Inc.*, 294 F. Supp. 2d 823 (N.D.W. Va. 2003), the court denied a motion to dismiss or transfer a second filed action where it appeared that the first-filed action may have been an improper anticipatory filing. In *Touchstone*, the plaintiff claimed that equipment it purchased from the defendant was defective. The plaintiff sent a letter to the defendant demanding that it provide adequate assurances that the defect would be remedied within thirty days or the plaintiff would immediately proceed to file a lawsuit. *Id.* at 826. The defendant sent an engineer to look at the equipment and discussions ensued between the parties. Unbeknownst to the plaintiff, three days after receiving the demand letter, the defendant filed a declaratory judgment action in Texas and waited a month to serve the plaintiff. Thereafter, the plaintiff filed an action in West Virginia seeking affirmative relief and moved to enjoin the defendant's first-filed action in Texas. The defendant moved to dismiss or transfer the second filed action to Texas.

The court denied the plaintiff's motion to enjoin the first-filed action and denied the defendant's motion to dismiss or transfer the second filed action and set forth the following standard:

---

[23] Such an analysis does not make all declaratory judgments preemptive filings because plaintiffs could demonstrate a legitimate basis—i.e. prevent additional damages, to refute the claim of forum shopping.

> The well-established rule is that in cases of [federal] concurrent jurisdiction, "the first court in which jurisdiction attaches has priority to consider the case." "This is not a rigid rule, however, and should be applied 'in the absence of compelling circumstances.'" Bad faith and forum shopping are sufficient reasons to depart from the first-filed rule, and the rule may also be rejected "when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum." "The letter and spirit of the first-filed rule, therefore, are grounded on equitable principles." The Fourth Circuit has stated that the first filed case should have priority absent a showing of a balance of convenience in favor of the second filed action.
>
> *          *          *
>
> "[I]t is the court in which the first-filed action was brought that should decide whether an exception to the first-filed rule applies." "'Absent such a rule, there exists the possibility of inconsistent rulings on discretionary matters as well as duplication of judicial effort.'"

*Touchstone.,* 294 F. Supp. 2d at 826-28 (internal citations omitted).

The court found that the following factors indicated that the defendant's suit was filed in bad faith merely to preempt a suit by the proper plaintiff: (1) that the plaintiff's letter put the defendant on notice that the plaintiff planned to file suit; (2) that the timing of the defendant's suit, only three days after receiving the letter, was significant; and (3) that the defendant's suit sought primarily declaratory relief that its equipment fulfilled the obligations of the parties' contract. *Id.* at 828. The court, however, held that "[b]ecause the first suit was filed in Texas, this Court defers to that court to decide the issue of whether or not that case constitutes an improper anticipatory lawsuit that should be enjoined." *Id.* Further, the court denied the defendant's motion to dismiss or transfer holding "because the circumstances of the procedural posture of this case suggest that defendant's first-filed suit may have been anticipatory, it would not be proper to dismiss this case, lest plaintiff should be punished 'for its efforts to settle this matter out of court' prior to filing suit." *Id.* at 829 (quoting *Johnson Bros. Corp. v. Int'l Bhd. of Painters*, 861 F. Supp 28, 29-30 (M.D.La. 1994)).

Similarly, in the present case, the facts strongly suggest that Defendants filed the Delaware Action in bad faith to preempt a suit by the proper plaintiffs and thus, Defendants should not benefit from the presumption of priority for first-filed cases. Consistent with this position, Plaintiffs have moved the Delaware Court to dismiss the suit on the grounds that it is an improper declaratory judgment action because it is contrary to the policies of the Declaratory Judgment Act. As in *Touchstone Research,*

Defendants' motion to transfer should be denied because the circumstances of the procedural posture of this case suggest that Defendants' first-filed suit was anticipatory and Plaintiffs should not be punished for their efforts to settle this matter out of court prior to filing suit.

Defendants rely on several cases that are inapposite to the present case because they involve determinations made by the court in the first-filed action. For example, in *Learning Network, Inc. v. Discovery Comms., Inc.*, 11 Fed. Appx. 297, 2001 WL 627618 (4th Cir. Jun. 07, 2001)(unpublished), the Fourth Circuit held that the District Court of Maryland did not abuse its discretion in applying the first-filed rule in favor of the first-filed declaratory judgment action filed in Maryland by enjoining the defendant from proceeding in the second-filed New York action for trademark infringement. In that case, the court held that the plaintiffs' declaratory judgment action was filed first; that the facts did not support a departure from the first-filed rule; and that the defendants should be enjoined from proceeding in California.

Further, in *Ramsey Group, Inc. v. EGS Int'l, Inc.*, 208 F.R.D. 559 (W.D.N.C. 2002), this Court denied the plaintiffs' motion to enjoin the defendants from proceeding in the second-filed action in California. The defendants did not claim that special circumstances warranted departure from the first-filed rule, but instead argued that the California action filed on June 25, 2002, was actually the first filed action due to their non-assertion statement filed in North Carolina on May 28, 2002.[24] Prior to addressing the first-filed issue, the court granted plaintiffs leave to amend their complaint and held that the amended complaint related back to the original complaint filed on March 26, 2002. Further, the court rejected the defendant's argument that the California action was filed first. The court, however, declined to enjoin the defendants from proceeding in California stating:

> The undersigned therefore concludes that, under the circumstances of this case, the first filed rule should be followed. Nonetheless, this determination presents a procedural quandary. While the Fourth Circuit in *The Learning Network, Inc.* affirmed a district court which enjoined a party from proceeding with an action in New York, the

---

[24] The court noted that "[t]he Federal Circuit has held that 'a patentee defending against an action for a declaratory judgment of invalidity can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer.'" *Ramsey Group*, 208 F.R.D. at 560, n.1 (quoting *Super Sack Mfg. Corp. v. Chase Packaging Corp*, 57 F.3d 1054, 1058 (Fed. Cir. 1995)).

undersigned remains loathe to tread on the jurisdiction of the United States District Court for the Central District of California. Moreover, Plaintiff has not addressed the factors supporting the granting of a preliminary injunction. *Id.* at 299-300. It may well be that the California Court will decline to exercise its jurisdiction based on this Court's ruling as to the "first filed" action. In that event, a motion for a transfer of venue would be unnecessary. However, the undersigned is not at this juncture prepared to enjoin the Defendants from proceeding in that action

*Ramsey Group*, 208 F.R.D. at 565.

The present case is distinguishable from both cases. In those cases, the first-filed case was in North Carolina and that court was the proper forum to determine if special circumstances existed. Moreover, Plaintiffs are not asking this Court to enjoin the Delaware Action. Plaintiffs are asking this Court to deny Defendants' motion to transfer because the facts in this case establish that exceptions to the first-filed rule exist. Plaintiffs believe that the Delaware Court will find that exceptions to the first-filed rule exist and decline to exercise jurisdiction to hear the Delaware declaratory judgment action. In the alternative, Plaintiffs request that this Court defer ruling on Defendants' motion to transfer until the Delaware Court has ruled on the first-filed issue and determined whether it has personal jurisdiction over Arenson Holdings, D.A. Gardens and J12ALH. *See Touchstone*, 294 F. Supp. 2d at 28 ("[I]t is the court in which the first-filed action was brought that should decide whether an exception to the first-filed rule applies." "'Absent such a rule, there exists the possibility of inconsistent rulings on discretionary matters as well as duplication of judicial effort.' "); *R.J. Reynolds Tobacco Co. v. Star Scientific, Inc.*, 169 F. Supp. 2d 452 (M.D.N.C. 2001)(denying motion to dismiss or transfer second filed declaratory judgment action, the court instead granted a motion to stay the second filed action until the first-filed court ruled on the jurisdictional issues pending before it); *Walker Group, Inc. v. First Layer Comms., Inc.*, 333 F. Supp. 2d 456 (M.D.N.C. 2004)(transferring , *sua sponte*, the second-filed action to Colorado where the first-filed action was pending, after the Colorado Court ruled that the first-filed rule applied).

Defendants' reliance on *SAS Inst., Inc. v. PracticingSmarter, Inc.*, 353 F. Supp. 2d 614 (M.D.N.C. 2005), is misplaced. *SAS* involved parallel claims in the same court—the Middle District of North Carolina. The first-filed action was a declaratory judgment for non-infringement of a copyright and the second-file action was for, *inter alia*, copyright infringement. The court dismissed the second-filed

action with leave to re-file its claims as compulsory counterclaims in the first-filed action.  In reaching its

decision, the court held that departure from the first-filed rule was not warranted because even if the first-

filed action was an anticipatory filing, the plaintiff had not filed its declaratory judgment action to prevent

the defendant from selecting a venue of its choosing since both cases were filed in the same court.

The present case is readily distinguishable from SAS because both actions are pending in

different courts; there is strong evidence that the Delaware Action was filed to prevent Plaintiffs from

selecting the venue of their choosing; and the Delaware Court lacks personal jurisdiction over Arenson

Holdings, D.A. Gardens and J12 ALH, all of whom are necessary parties.

**2.  The Factors Under § 1404 Weigh Against Transfer to Delaware.**

Defendants provide little support for their conclusory assertion that "[t]he § 1404(a) factors

overwhelmingly favor Delaware as the forum for this case."  (D.I. 15 at 27).  "The Fourth Circuit has

recognized that a change of venue requires a weighing of factors and that 'unless the balance is strongly

in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'"  *Tools USA and*

*Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 841 F. Supp. 719, 721 (M.D.N.C. 1993) (internal

citation omitted).   When considering a motion to transfer, courts consider, among other things,  the

following eleven factors:

> 1) the plaintiff's choice of forum, 2) the residence of the parties, 3) access to evidence, 4)
> the availability of compulsory process for witnesses and the costs of transporting and
> obtaining those witnesses, 5) the possibility of a view by the jury, 6) the enforceability of
> a judgment, 7) the relative advantages and obstacles to a fair trial, 8) practical issues
> affecting trial expediency and efficiency, 9) the relative court congestion between the
> districts, 10)  the interest of resolving localized controversies at home and the
> appropriateness of having the trial of a diversity case in a forum that is at home with the
> state law that must govern the action, and 11) the avoidance of conflict of laws.

*Nutrition & Fitness*, 264 F. Supp. 2d at 362.  "When weighing these factors, the court must keep in mind

that a party seeking transfer pursuant to Section 1404(a) has the burden of persuasion and must show (1)

'more than a bare balance of convenience in his favor' and (2) 'that a transfer does more than merely shift

the inconvenience.'"  *Datasouth Computer Corp. v. Three Dimensional Techs., Inc.*, 719 F. Supp. 446,

451(W.D.N.C. 1989)(quoting *DMP Corp. v. Fruehauf Corp.*, 617 F. Supp. 76, 77 (W.D.N.C.1985)).  In the present case, Defendants cannot establish that the factors weigh in favor of transfer to Delaware.[25]

Because the first-filed rule is not applicable here, Plaintiffs' choice to file suit in North Carolina weighs heavily against transfer because "[t]his Court has long accorded the plaintiff's choice of forum great weight."  *D.P. Riggins & Associates, Inc. v. American Bd. Companies, Inc.*,  796 F. Supp. 205, 211 (W.D.N.C. 1992); *see also Nutrition & Fitness,* 264 F. Supp. 2d at 362 (holding plaintiff's choice of forum weighed in favor of transfer to second filed action where court found that first-filed action was improper anticipatory filing for purposes of forum shopping).  Accordingly, Plaintiffs' choice of forum weighs against transfer.

The residence of the parties does not weigh in favor of transfer.  None of the parties reside in North Carolina or Delaware.  Plaintiffs reside throughout the world.  Defendants reside in California.  Therefore, the parties will be required to travel to either district.  Access to evidence weighs in favor of North Carolina because the sale of MHI—which is at issue in this case—took place in North Carolina.  Defendants claim that "[t]he primary witnesses in the case will be the partie s themselves."  (D.I. 15 at 27).  It is, however, too early in the case to make such a limiting statement especially considering one of ALH's three operating units was based in North Carolina.  In contrast, there is no question that no witnesses or evidence will be in Delaware since the only connection to Delaware is that ALH, SCA, Selk and Laurel are Delaware entities but they do not conduct any business in Delaware.

The practical issues affecting trial expediency and efficiency weigh against transfer.  Defendants claim that "in terms of mileage and ease of transportation, the Delaware federal court, in Wilmington, is more accessible than this Court" and "Plaintiffs' lead counsel is in Baltimore and Defendants lead counsel

---

[25] *See generally Tools USA*, 841 F. Supp. 719 (denying a motion to transfer where defendant, a California Corporation, availed itself to suit in North Carolina by virtue of doing business there); *D.P. Riggins & Associates,* 796 F. Supp. at 214 (denying a motion to transfer filed by a New York Corporation because a choice of laws clause in the contract dictating New York law was applicable does not "offset the strong interest [p]laintiff has in maintaining this action in its forum of choice"); *Uniprop Mfd . Hous. Cmtys. Income Fund II v. Home Owners Funding Corp. of America*, 753 F. Supp. 1315 (W.D.N.C. 1990)(denying a transfer where a transfer would merely shift the inconvenience from the defendant to the plaintiff).

is in New York. Both parties have extremely able Delaware counsel." (D.I. 15 at 27-28). This argument is without merit.[26] "Section 1404(a) was not intended to create a bias toward transferring trials to districts encompassing commercial airline hub airports." *Hanover Ins. Co. v. Paint City Contractors, Inc.*, 299 F. Supp. 2d 554, 558 (E.D. Va. 2004)(rejecting argument that transfer may be warranted because Norfolk is more difficult to access than cities near major airport hubs); *see also Intranexus, Inc. v. Siemens Med. Solutions Health Servs. Corp.*, 227 F. Supp. 2d 581, 584-85 (2002)(rejecting argument that venue should be transferred to Eastern District of Pennsylvania based on greater availability of flights into Philadelphia). Moreover, Delaware may be a closer forum for counsel but it is no closer for the Defendants who will be traveling from California. In fact, Defendants Krieger, Buchler and Stein readily traveled to North Carolina when conducting business on behalf of ALH, Shamrock and SCA. Further, both parties have able counsel in North Carolina. Accordingly, this factor weighs against transfer.

The home forum interests weigh against transfer. Many of the issues giving rise to this litigation took place in North Carolina, therefore, this state has an interest in governing businesses which do business within its borders. *See Tools USA.*, 841 F. Supp. at 722 (declining to transfer to the state where defendant is incorporated, in part, because the company did business in North Carolina). Further, although Delaware law applies in this case, this does not weigh heavily in favor of transfer because a North Carolina court "has the capability to ascertain and apply the law of [Delaware]." *D.P. Riggin*, 796 F. Supp. at 214 (determining that transfer from North Carolina to New York was not warranted even though the parties agreed that a choice of laws clause dictated the case would be decided pursuant to New York law). Accordingly, this factor does not weigh in favor of transfer.

The relative court congestion weighs against transfer. In weighing this factor, courts consider statistics including cases filed per judge, median time from filing to disposition, and the number of trials completed per judge. *See id.* at 213; *Datasouth Computer*, 719 F. Supp. at 453. This factor favors denying transfer and keeping the case in North Carolina. In the twelve month period ending September

---

[26] There are no commercial airports in Delaware. (Delaware Tourism Office, http://www.visitdelaware.net/gettinghere.html). In contrast, Charlotte, North Carolina has a major commercial international airport.

30, 2004, in Delaware there were 414 civil cases filed per judge whereas in the Western District of North Carolina there were 223 civil cases filed per judge. (Federal Court Management Statistics, 2004, http://www.uscourts.gov/cgi-bin/cmsd2004.pl.). In the same period, the median time from filing to disposition in civil cases in Delaware was fourteen months versus ten months in this Court. *Id.* Moreover, there were nineteen trials completed per judge in Delaware versus thirteen trials per judge in this Court. *Id.* Based on these statistics, this factor weighs against transfer.

The enforceability of a judgment weighs against transfer. Since the parties are not residents of either North Carolina or Delaware, the same difficulties in enforcing judgments would be encountered by either party regardless of whether the case is transferred.

The remaining factors are not relevant. There is no argument that the jury will need to view anything. There is no argument that trial in either district would be unfair or somehow biased. The avoidance of conflict of laws is not relevant since the parties agree that Delaware law applies. Therefore, these factors do not weigh for or against transfer.

Since the first-filed rule does not apply to Defendants' declaratory judgment action in Delaware and the § 1404 factors weigh against transfer, Defendants' motion to transfer should be denied.

## III. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Should Be Denied.

Defendants' argument that Plaintiffs' claims assert injury to ALH and are therefore derivative is not only wrong but contrary to their position in the Delaware Action. Defendants commenced the Delaware Action directly against Defendants alleging that an actual case or controversy exists because they faced a real and substantial probability of being sued by Plaintiffs. (DE Compl. ¶ 6). Defendants did not make ALH a party to the Delaware Action. For Defendants to now claim that Plaintiffs cannot maintain an action against them because the alleged injuries were suffered only by ALH and that Plaintiffs lack standing to assert their claims is inconsistent with the stance taken in the Delaware Action. Nevertheless, this case is a direct action not a derivative action because the unjust enrichment exception

applies. Moreover, a derivative suit is not necessary or practical here because ALH is in liquidation. Accordingly, this Court has subject matter jurisdiction over this action.[27]

This action is a direct action and not derivative because the "unjust enrichment exception" to a derivative claim applies. *See Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004)(recognizing the "unjust enrichment exception"); Richard Montgomery Donaldson, *Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389, 407-08 (2005) (discussing the "unjust enrichment" exception). Under this exception, "the potential inclusion of culpable parties in the class due relief may affect the distinction between the derivative and direct claims." *In re Cencom Cable Income Partners*, 2000 WL 130629, *5 (Del. Ch. Jan. 27, 2000).

In *Cencom*, the court found that the claims of passive investors against the persons controlling the affairs of an entity were direct, not derivative in nature even though the alleged injury devalued the entities' assets. The court noted that "[m]echanistically applying the corporate common law rules surrounding derivative claims can sometimes defeat efficient resolution of claims." *Cencom*, 2000 WL 130629, *2. Accordingly, the court recognized "the need for flexibility" when applying corporate derivative doctrines to alternative business entities. *Id*. The court found that where defendants would recover for injuries resulting from their own actions, a derivative action would **not** be appropriate. *Id*. Specifically, the court explained "it is an elementary principle of equity that defendants found liable for breaches of either fiduciary duties or contractual arrangements should not benefit from any remedy for these breaches. The practical effect of this is to exclude the defendant from the group of those that may potentially recover." *Id*. at *4.

Furthermore, in *Fischer v. Fischer*, 1999 WL 1032768 (Del. Ch. Nov. 4, 1999), the court looked to the potential recovery of culpable parties in analyzing whether claims should be characterized as direct or derivative. The court held that "[a]s equity will not suffer a wrong without a remedy, I must permit

---

[27] Defendants' contentions that the Plaintiffs lack standing and that if the claims were properly pled as derivative claims, there would be no diversity are not ripe for adjudication since the Complaint does not contain derivative claims. Accordingly, Plaintiffs have not addressed those issues. If the Court determines that the actions are derivative, Plaintiffs request leave to re-file in state court.

plaintiff's individual claims to proceed." *Fischer*, 1999 WL 1032768, *4.  In reaching its decision, the court reasoned "[I]f I were to dismiss plaintiff's individual claims, I would place plaintiffs in the awkward position of continuing a purely derivative action with any relevant relief benefiting Fischer Enterprises alone.  An eventual victory for plaintiff, therefore, would achieve little since the individual defendants own an overwhelming interest in Fischer Enterprises." *Id*.

Moreover, the Delaware Court of Chancery has applied a similar analysis in determining whether a shareholder case involving defensive tactics should proceed as a direct class action or as a derivative suit.  *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71 (Del. Ch. 1999).  In analyzing whether the suit was derivative in nature the *Gaylord* court explained:

> [S]hould the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders?  If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not the corporation.

*Id*. at 80.

Applying these principles in the present case results in a determination that Plaintiffs' claims are direct.  If this action is derivative then Defendants, as the majority members of ALH, will unjustly benefit from any recovery in this case.  As in *Fischer*, Defendants here own an overwhelming interest in ALH and equity does not permit them to recover for damages suffered as a result of their own wrongdoing.  As alleged in the Complaint, in 2001, Defendants obtained total control of ALH when they obtained a majority control of the Board, retained SCA, an affiliate, as financial consultants for ALH, and continued to have sole authority to make all major decisions.  Without regard for the consequences to ALH or Plaintiffs, Defendants embarked on a course of conduct that achieved their goal of selling off ALH but at the peril of its members.  When it became apparent that a quick sale of ALH as a whole was not possible, Defendants refused to either postpone a sale to allow ALH time to strengthen its balance sheet or sell the Class A's interests to Plaintiffs for a reasonable amount and allow them to restructure ALH.  Instead, Defendants acted in their own interest by selling off ALH in a piecemeal fashion at below market prices in order to rid themselves of the burden of managing the company and, as a result, caused harm to

Plaintiffs. Because Defendants' actions as managers caused the harm to ALH and its members, equity does not permit Defendants to recover, as majority members of ALH, for the damages they themselves caused. Accordingly, Plaintiffs' claims should be characterized as direct actions.

Moreover, a derivative suit is not necessary or practical here because Defendants are liquidating ALH and it is not an ongoing entity. *See Cencom*, 2000 WL 130629. Defendants admit that ALH is no longer operating and its assets have been liquidated. (*See* Del. D.I. 51 at 34 ("Although ALH no longer has any operations, it still exists and will eventually have to wind up its affairs"); Del. D.I. 50 at 19 ("A declaratory judgment would . . . permit the Plaintiffs to wind down ALH . . .")). In *Cencom* the court stated:

> Once the enterprise is terminated and the fiduciaries have acted to wind up the finances of the enterprise, the demand rule's purposes become irrelevant. To now classify these claims as derivative, purely as a matter of form, and to institute 'demand analysis' only serves to impede efficient and final resolution of the remaining claims against those fiduciaries.

*Cencom*, 2000 WL 130629, *5. Similarly, here, Defendants have sold off the assets of ALH and have admitted they are planning to liquidate and wind down the entity. Therefore, ALH "is simply an artifice representing the relationship between two legally juxtaposed parties and is no longer relevant as a distinct legal creature for the purposes of resolving the final claims between these parties." *Id*. at *6. In summary, the Court should not classify this case as a derivative action because "superimposing derivative pleading requirements upon claims needlessly delays ultimate substantive resolution and serves no useful or meaningful public policy purpose." *Id*. at *3.

In short, Plaintiffs should be permitted to proceed with a direct action against Defendants. Equity does not permit Defendants, who have a majority interest in ALH, to profit from their own wrongdoing. Further, as a result of Defendants wrongdoing, ALH is no longer active and is in the process of winding up, therefore, classifying this action as derivative would serve no useful purpose since the Court can

fashion appropriate relief. Finally, by filing a direct rather than derivative action in Delaware, Defendants concede that appropriate relief can be fashioned among the parties present.[28]

## IV. This Court Has Personal Jurisdiction Over All Defendants.

### A. This Court Has Both Subject Matter Jurisdiction and Personal Jurisdiction Over Defendants.

Defendants contend that this Court lacks personal jurisdiction over all Defendants because it lacks subject matter jurisdiction. (D.I. 15 at 37). For the reasons set forth *infra* section III., this Court has subject matter jurisdiction because Plaintiffs' claims are direct not derivative. Therefore, Defendants' argument is without merit.

### B. This Court Has Personal Jurisdiction Over SCA.

Defendant SCA's motion to dismiss for lack of personal jurisdiction should be denied because North Carolina's long-arm statute authorizes jurisdiction over SCA and the exercise of jurisdiction is consistent with due process. When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff must "make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *In re The Celotex Corp.*, 124 F.3d 619, 629 (4th Cir. 1997). Plaintiffs "need not present evidence in making a prima facie case to oppose a motion to dismiss. Mere allegations are sufficient[.]" *Dowless v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305, 1307 (4th Cir. 1986). Moreover, "[t]he 'pleadings need not be verified and no lack of credibility will be implied by the absence of a verification of plaintiff's complaint.'" *Id.* (quoting *Bush v. BASF Wyandotte Corp.*, 306 S.E.2d 562, 565 (N.C. App. 1983)). The pleadings and the inferences drawn from them are to be construed in favor of the plaintiff. *Id.*

To determine whether a defendant is subject to personal jurisdiction, the Court must determine whether the following two requirements are met: first, whether North Carolina's long-arm statute authorizes jurisdiction over SCA; and second, whether the exercise of jurisdiction is consistent with due

---

[28] Defendants' claim that these are derivative actions is a veiled attempt to control the forum. If Plaintiffs' claims are derivative and the unjust enrichment exception does not apply, Defendants should have joined ALH as a party in the Delaware Action, which they did not.

process. *B.E.E. International, Ltd. v. Hawes*, 267 F. Supp. 2d 477, 481 (M.D.N.C. 2003). "North Carolina's long-arm statute is interpreted liberally in favor of finding jurisdiction. Following the lead of North Carolina state courts, federal courts consistently have construed the statute as extending jurisdiction to the full extent permitted by the Fourteenth Amendment. Thus, the statutory inquiry merges with the constitutional inquiry into whether the court's assertion of jurisdiction comports with due process." *Id.*

North Carolina's long-arm statute, N.C.G.S.A. § 1-75.4., authorizes jurisdiction over SCA. Specifically, jurisdiction is authorized under the following provisions of North Carolina's long-arm statute:

> A court of this State having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to Rule 4(j), Rule 4(j1), or Rule 4(j3) of the Rules of Civil Procedure under any of the following circumstances:
>
> (1) Local Presence or Status.--In any action, whether the claim arises within or without this State, in which a claim is asserted against a party who when service of process is made upon such party:
>
>           \*       \*       \*
>
> > d. Is engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise.
> >
> >           \*       \*       \*
>
> (3) Local Act or Omission.--In any action claiming injury to person or property or for wrongful death within or without this State arising out of an act or omission within this State by the defendant.
>
>           \*       \*       \*
>
> (5) Local Services, Goods or Contracts.--In any action which:
> > a. Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to perform services within this State or to pay for services to be performed in this State by the plaintiff;

N.C.G.S.A. § 1-75.4; (D.I. 1 ¶ 24).

Moreover, the exercise of personal jurisdiction over SCA comports with due process. To satisfy due process, the defendant does not need to be present in the state but must have certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The defendant's activity must be connected to the forum state in such a way that the defendant could

reasonably anticipate being brought into court there. *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286 (1980).

SCA, through the acts of its employees and agents, Krieger, Buchler and Stein, has sufficient continuous and systematic contacts with North Carolina to support the Court's exercise of general personal jurisdiction.[29] In *Sparrow v. Goodman*, 376 F. Supp. 1268, 1271 (D.C.N.C. 1974), the court held that "[f]oreign corporations have been held subject to 'long-arm jurisdiction' for acts of their agents under N.C.G.S. § 1-75.4[.]" *Id.* at 1271 *citing Federal Ins. Co. v. Piper Aircraft Corp.*, 341 F. Supp. 855 (W.D.N.C. 1972), *aff'd*, 473 F.2d 909 (4th Cir. 1973). "To establish general jurisdiction over the defendant, the defendant's activities in the State must have been "continuous and systematic," a more demanding standard than is necessary for establishing specific jurisdiction." *ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)(quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984)).

SCA, through the acts of its employees and agents Krieger, Buchler and Stein, has continuous and systematic business contacts with North Carolina. In 2001, SCA entered into a consulting agreement with ALH to provide financial consulting services to it for $100,000 per year (the "**Consulting Agreement**"). (D.I. 1 ¶ 37). SCA entered into the Consulting Agreement with ALH knowing it would be conducting business in North Carolina because one of ALH's operating units—MHI—was located in Charlotte, North Carolina. (Exh. E ¶ 8). MHI, a North Carolina corporation, engaged in homebuilding operations in North Carolina.

Krieger, Buchler and Stein, as employees and agents for SCA, provided consulting services to ALH. (D.I. 1 ¶ 38). In an affidavit attached to Defendants' motion, Buchler states: "Substantial services were provided to ALH under the Consulting Agreement. Krieger, Stein and I spent thousands of hours on ALH matters, including but not limited to negotiations and renegotiations of loans and other financial arrangements." (D.I. 15, Buchler Affidavit ¶ 6). In connection with the services provided by Krieger,

---

[29] SCA is one of the leading private national and international merchant banks and does business both domestically and internationally. (Exh . E ¶ 3). Krieger is vice chairman and chief financial officer of Shamrock. (Exh. E ¶ 4). Buchler is a managing director of SCA. *Id.* Stein is the vice president of SCA. *Id.*

Buchler and Stein, they exchanged numerous telephone calls and written communications with MHI, attended meetings in North Carolina and were substantially involved in negotiating loans and making other financial arrangements on behalf of ALH II for the benefit of MHI. (Exh. E ¶¶ 8-10). Further, Krieger, Buchler and Stein, as employees and agents for SCA, were responsible for the sale of MHI. In short, Krieger, Buchler and Stein were intimately involved in the management of MHI, which involved, *inter alia*, financing, employment issues and ultimately, the sale of MHI. In addition, SCA has other activities in North Carolina. Based on its continuous and systematic activities in North Carolina, SCA should reasonably anticipate being haled into court in North Carolina. Accordingly, this Court can exercise general personal jurisdiction over SCA.

In the alternative, this Court can exercise specific personal jurisdiction over SCA because Plaintiffs' claims arise from SCA's tortious activities in North Carolina. Specific jurisdiction exists when "the plaintiff's claims arise out of or relate to the defendant's activities within, or in some way directed at, the forum state,[.]" *Furbush,* 914 F. Supp. at 1277. In determining whether specific jurisdiction exists, the court considers the following factors: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *ALS Scan*, 293 F.3d at 712 (citation omitted). Although contacts that are "isolated" or "sporadic" may support specific jurisdiction if they create a "substantial connection" with the forum, the contacts must be more than random, fortuitous, or attenuated. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-75 (1985). Furthermore, it is not required that a defendant be physically present within the forum, provided its efforts are purposefully directed toward forum residents. *Id.* at 476.

SCA purposefully availed itself of the privilege of conducting activities in North Carolina through the substantial management services performed at MHI for ALH. (Exh. E ¶¶ 8-10). Moreover, Plaintiffs' claims arise out of those activities in that Krieger, Buchler and Stein, as employees and agents for SCA, breached their fiduciary duty to Plaintiffs, as members of ALH, by acting in their own self-interest and selling MHI in a grossly negligent manner. SCA negotiated, contracted for and facilitated the

completion of the sale of MHI, a North Carolina entity, in North Carolina. Plaintiffs have alleged claims against SCA for breach of fiduciary duty, breach of the Consulting Agreement, gross negligence, self-dealing and civil conspiracy, arising, in part, from the services performed by SCA at MHI and the sale of MHI. The exercise of specific personal jurisdiction over SCA is, therefore, constitutionally reasonable.

Accordingly, Plaintiffs have established a prima facie case of personal jurisdiction over SCA. North Carolina's long-arm statute provides jurisdiction over SCA under each of these provisions. Jurisdiction is proper under subsection (1) of North Carolina's long-arm statute because SCA engages in substantial business activity within North Carolina in connection with the consulting services provided to MHI. Jurisdiction is proper under subsection (3) of North Carolina's long-arm statute because Plaintiffs' claims, in part, arise out of SCA's tortious conduct in connection with the sale of MHI. Finally, jurisdiction is proper under subsection (5) of North Carolina's long-arm statute because Plaintiffs' claims against SCA arise, in part, out of the services performed by SCA in North Carolina under the Consulting Agreement between SCA and ALH for the benefit of ALH's members, including Plaintiffs. Moreover, the exercise of personal jurisdiction over SCA comports with the requirements of due process.

### C. Limited Discovery Is Warranted.

If, however, the Court finds there are insufficient facts at the present time to establish personal jurisdiction over SCA, Plaintiffs request that the Court defer ruling on the motion until Plaintiffs have had sufficient time to conduct discovery on the issue. The timing of discovery is a matter committed to the sound discretion of the court. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir.1993). "Limited discovery may be warranted to explore jurisdictional facts in some circumstances." *Crown Cork & Seal Co., Inc. v. Dockery*, 886 F. Supp. 1253, 1260 (M.D.N.C. 1995). Plaintiffs have not conducted any discovery on the issue of SCA's contacts in North Carolina. Moreover, in Defendant Buchler's affidavit, he admits that he, Krieger and Stein, on behalf of SCA, spent "thousands of hours" on ALH matters. At a minimum, this should entitle Plaintiffs to conduct discovery on the issue of SCA's contacts with North Carolina.

**V. Plaintiffs State a Claim on All Counts in the Complaint.**

Plaintiffs have alleged sufficient facts to state a claim on all counts.[30]

**A. Standard of Review**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "is to test the legal sufficiency of the complaint and not the facts that support it." *Phillips v. Mabe*, 367 F. Supp. 2d 861, 867 (M.D.N.C. 2005). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Id*. (citing *Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989)). In determining whether a 12(b)(6) motion should be granted, the Court "must accept as true all well-pleaded allegations and must construe the factual allegations in the light most favorable to the plaintiff." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). Therefore, "'a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Phillips*, 367 F. Supp. 2d at 867 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)); *see also Randall*, 30 F.3d at 522 (citing *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993))("a motion to dismiss should not be granted unless the plaintiff can prove no set of facts to support the claim and entitle the plaintiff to relief."). Accordingly, "dismissals [under 12(b)(6)] are allowed 'only in very limited circumstances.'" *Phillips*, 367 F. Supp. 2d at 867 (citing *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989)). Plaintiffs have alleged facts sufficient to defeat Defendants' 12(b)(6) motion on all counts.

**B. By Filing the Delaware Action, Defendants Concede Plaintiffs' Claims Are Viable.**

By filing a mirror image declaratory judgment action in Delaware, Defendants concede that Plaintiffs' claims are viable. (D.I. 15 at 5)("This action and the DE Action concern the same alleged breaches of fiduciary duty by the Defendants herein in connection with ALH, the same sales of ALH's

---

[30] Plaintiffs have stated a claim for breach of fiduciary duty, gross negligence and self-dealing and therefore, have stated a claim for civil conspiracy. To the extent that Delaware law requires the participation of a non-fiduciary to establish civil conspiracy, Plaintiffs' civil conspiracy count is viable if the court finds that any Defendant is not a fiduciary.

operations, the same Supervisory Board decisions, the same Operating and Consulting Agreements, and the same advisors."). Essentially, Defendants take the irreconcilable position that these issues are viable for a declaratory judgment action in Delaware, but are not cognizable claims here. Defendants cannot have it both ways. If, as Defendants contend, Plaintiffs can prove no set of facts to support their claims in this action then no controversy exists between the parties and Defendants cannot state a claim for declaratory relief against Plaintiffs in the Delaware Action. *Hanes Dye & Finishing Co. v. Caisson Corp.*, 309 F. Supp. 237, 240 (D.C.N.C. 1970)("The adjudicated cases leave little doubt that before an action for a declaratory judgment may stand, it must involve an actual controversy, a genuine dichotomy of contention upon which specific relief may be granted."). Defendants, however, alleged in the Delaware Action that an actual controversy exists and therefore, have implicitly conceded that the claims here are viable and ripe. (DE Compl. ¶ 6). Accordingly, Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be denied.

**C. This Court Should Not Rely On The Business Judgment Rule to Dismiss Plaintiffs' Claims.**

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs are not required to rebut the presumption of the business judgment rule. Defendants contend that dismissal is required because "the Complaint contains no allegations sufficient to rebut the presumption that Defendants' actions are protected by the business judgment rule." (D.I. 15 at 41). In support, Defendants erroneously rely on cases from Delaware courts that require pleading facts with specificity, which is not the federal notice pleading standard. *In re Tower Air, Inc.*, 416 F.3d 229, 236 (3d Cir. 2005)(holding that Delaware's notice pleading cases are **not** interchangeable with federal notice pleading cases). Moreover, the Third Circuit recently held that courts generally "will not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(6)." *Id.* at 238.

In *Tower Air*, the district court held that the plaintiff's complaint failed to allege well-pleaded facts, not conclusory allegations, to rebut Delaware's presumption that corporate fiduciaries acted within the bounds of the business judgment rule. *Tower Air*, 416 F.3d at 232, 235. On appeal, the Third Circuit reversed in part holding that the district court erred by imposing a heightened pleading standard not

required by Fed. R. Civ. Pro. 8. *Id.* at 237. Further, the court explained the appropriate pleading standard: Rule 8(a) merely requires "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), that provides the defendant fair notice of the plaintiff's claim and the "grounds upon which it rests." *Id.* at 237 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This means that a plaintiff need plead only "basic facts," and "'[i]f more facts are necessary to resolve or clarify the disputed issues, the parties may avail themselves of the civil discovery mechanisms under the Federal Rules.'" *Id.* (quoting *Alston v. Parker*, 363 F.3d 229, 233, n.6 (3d Cir. 2004)). In addition, the *Tower Air* court required the plaintiff to plead around the business judgment rule because the amended complaint expressly alleged that the business judgment rule did not vitiate his claims. The court explained that it would "not rely on an affirmative defense such as the business judgment rule to trigger dismissal of a complaint under Rule 12(b)(3)" unless "an unanswered affirmative defense appears on its face[.]" *Tower Air,* 416 F.3d at 238.

The Fourth Circuit also holds that a "motion to dismiss tests only the legal adequacy of the complaint, not the merits of an affirmative defense[,]" *Alston v. North Carolina A & T State Univ.,* 304 F.Supp.2d 774, 780, n.5 (M.D.N.C. 2004), unless "'the face of the complaint clearly reveals the existence of a meritorious affirmative defense.'" *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000)(citing *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996))(stating that a Rule 12(b)(6) motion does not generally invite an analysis of potential defenses to the claims asserted in the complaint).

Here, in contrast to *Tower Air* where the amended complaint alleged "that the business judgment rule does not vitiate any of [plaintiff's] claims", the Complaint contains no such allegation. *Tower Air*, 416 F.3d at 238. Plaintiffs, therefore, are not required to plead allegations to overcome the business judgment rule. *Id.* In addition, "the fact-based Business Judgment Rule defense should not be considered on this motion to dismiss." *In re Southeast Banking Corp.*, 827 F. Supp. 742, 754-55 (S.D.Fla.1993), *rev'd in part on other grounds*, 69 F.3d 1539 (11th Cir.1995); *see also Gilbert v. Bagley*, 492 F. Supp. 714, 738 (M.D.N.C. 1980)(holding "[a]pplication of the business judgment rule defense necessarily depends upon the facts as developed at trial and is thus an inappropriate ground for dismissal[.]"); *In re*

*Luxottica Group S.P.A., Securities Litig.*, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003)(holding "that any purported exercise of business judgment by Director Defendants is 'a question of fact that should not be considered in a motion to dismiss.'").  Accordingly, Plaintiffs are not required to plead facts to overcome the business judgment rule.

Nevertheless, even if Plaintiffs were required to plead facts to overcome the business judgment rule—which they are not—Plaintiffs have done so.  "[T]o rebut the presumption of the business judgment rule . . . plaintiff must effectively provide evidence that the defendant board of directors, in reaching its challenged decision, breached any one of its 'triad of fiduciary duties, loyalty, good faith or due care.'" *McMullin v. Beran*, 765 A.2d 910, 920 (Del. 2000) (emphasis in original); *see also In re Encore Computer Corp. S'holders Litig.*, 2000 WL 823373, *5 (Del. Ch. June 16, 2000)(stating, "To rebut that presumption, the plaintiffs may allege facts . . . that the defendants were materially interested in the transaction or failed to act independently on behalf of the corporation").  Under the federal notice pleading standards, to rebut the presumption of the business judgment rule, the plaintiff must plead sufficient facts to give the defendants notice of the claims against them and dismissal is not appropriate "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims[s] which would entitle him to relief.'"  *Tower Air*, 416 F.3d at 239(quoting *Conley*, 355 U.S. at, 45-46.

Here, Plaintiffs successfully rebut the business judgment rule by pleading facts which allege Defendants breached their duties of loyalty and good faith.  Plaintiffs allege facts showing that the Defendants breached those duties when they sold off ALH in a piecemeal fashion in order to further their own self-interest.  The Complaint states facts which allege that Defendants acted in their own self-interest, and not in the best interest of ALH, in order to rid themselves of the burden of managing ALH. (D.I. 1 ¶ 8)("Defendants concluded that ALH required too much of Shamrock's time, and embarked on their scheme to rid themselves of their management responsibilities and duties, by trying to sell off the operating units of ALH in a piecemeal fashion which they knew would result in depressed values for each of the units.").  Since the Complaint does not on its face raise the affirmative defense of the business judgment rule, Plaintiffs are not required to plead facts to rebut the rule to defeat a motion to dismiss.

Nevertheless the Complaint contains sufficient allegations to provide Defendants with notice of Plaintiffs' claims and to establish that Plaintiffs can prove a set of facts in support their claims which entitle them to relief.

**D. The Complaint States a Claim for Breach of Fiduciary Duty.**

Under Delaware law, to state a claim for breach of fiduciary duty, Plaintiffs must allege facts which show, "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *York Lingings v. Roach*, 1999 WL 608850, *2 (Del. Ch. Jul. 28, 1999); *see also Heller v. Kiernan*, 2002 WL 385545 (Del. Ch. Feb. 27, 2002)(discussing the elements of breach of fiduciary duty.) "It is well established that directors of a Delaware corporation owe fiduciary duties to the corporation." *Id.* Where an LLC's operating agreement contains an exculpatory provision authorized by 18 Del. C. § 11101(c)(2),[31] that immunizes the directors for liability for monetary damages as a result of a breach of their duty of care, the complaint must allege "facts that, if true, would buttress a conclusion that the defendant directors breached their duty of loyalty or otherwise engaged in conduct not immunized by the exculpatory charter provision."[32] *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 (Del.Ch. 2000). In *In re Walt Disney Co. Derivative Litigation*, 2005 WL 2056651 (Del.Ch.,2005), the court described the duty of loyalty:

> The fiduciary duty of loyalty was described in the seminal case of *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939), in these strict and unyielding terms:
>> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.

*Walt Disney*, 2005 WL 2056651, *33. When, however, the board of directors authorizes a sale of the company, the duty of the board changes from preservation of the company as a corporate entity to the

---

[31] 18 <u>Del.</u> <u>C.</u> § 11-101(c)(2) provides that a manager's 'duties and liabilities may be expanded or restricted by provisions in the limited liability company agreement."
[32] Section 6.2(f) of the ALH Agreement contains an exculpatory provision.

maximization of the company's value at a sale for the stockholders' benefit.  *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986).  "The directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company."  *Id.*

In *Blackmore Partners, L.P. v. Link Energy LLC*, 864 A.2d 80 (Del. Ch. 2004), the Delaware Court of Chancery held that "a complaint that does not contain specific allegations that a majority of the directors were either interested in the transaction or lacked independence may nevertheless survive a motion to dismiss on the basis of a permissible inference that the action of the directors amounted to a breach of the duty of loyalty."  *Id.* at 81.  The court denied a motion to dismiss a breach of fiduciary duty claim filed by the company and its directors despite a limited liability company agreement containing an exculpatory clause protecting the company's directors from a breach of the duty of care.  The court held that the former equity unit holders alleged sufficient facts in the complaint to support a claim for disloyal conduct, which was enough to survive the motion to dismiss.  The complaint alleged that the directors approved a transaction that disadvantaged the equity unit holders at a time when the LLC was neither insolvent nor on the verge of re-entering bankruptcy, "[y]et as a result of the transaction at issue, those units were rendered valueless."  *Id.* at 85-86.   In reaching its decision, the court explained:

> Once a board of directors determines to sell the corporation in a change of control transaction, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders.  This obligation is a contextually-specific application of the directors' duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its duties.  Rather, the board's actions must be evaluated in light of the relevant circumstances to determine whether they were undertaken with due diligence and in good faith.  If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.

*Blackmore Partners*, 864 A.2d at 85 (internal citations omitted).  The court held that the approval of "a sale of substantially all of [the LLC's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct."  *Id.* at 86.  The court, however, noted that "while on a more complete record, it may appear that the Director Defendants took no such action or were justified in acting as they did, this court cannot now conclude that

the complaint does not state a claim for breach of the duty of loyalty or other misconduct not protected by

the exculpatory provision in Link's operating agreement."  *Id.*

Similarly, in the present case, Plaintiffs have alleged that under *Revlon*, Defendants violated their

duty of loyalty by failing to maximize Plaintiffs' value in the sale of ALH's operating units.  Specifically,

the Complaint contains the following allegations:

> 73.  Rather than continue to spend the time required to properly manage ALH,
> Defendants schemed to relieve themselves of their fiduciary duties to run the company,
> but at the same time, have their loans repaid without running the risk of having to
> disgorge the payments as preferences.
> 74.  First, in attempting to sell ALH as a whole, Defendants owed a fiduciary
> duty to the Class B members to obtain the best possible price for Plaintiffs and to
> maximize value for the Class B members
> 75.  Defendants' failure to sell ALH in a manner that would maximize its value
> i.e., selling it as a multiple of cash flow and land option inventory, was a breach of their
> fiduciary duties to Plaintiffs.
> 76.  Second, Defendants' failure to actively solicit offers for ALH and their
> failure to work with Class B members was a breach of their fiduciary duties to Plaintiffs.
> 77.  Third, when Defendants embarked on their plan to sell the operating units
> piecemeal, Defendants breached their fiduciary duties by stifling competitive bids by
> selling the assets at "fire sale" prices.  Defendants' actions were knowing, intentional,
> willful, grossly negligent, and in bad faith.
> 78.  Defendants owe fiduciary duties to Plaintiffs and the Class B members.
> Defendants breached such duties by, *inter alia*, insuring that the sale of ALH would fail,
> scheming to sell operating units so that the proceeds could be used to prop up the
> liquidity of ALH so that ALH would not have to declare bankruptcy and the repayment
> of the loans would not be preferences, and hiring Fried Frank as counsel for ALH.
> 79.  As a result of Defendants' knowing and willful failure to comply with their
> fiduciary duties, Plaintiffs have lost the value of their investment and their equity is
> virtually worthless.

(D.I. 1 ¶¶ 73-79).  Under the federal notice pleading standards, Plaintiffs have alleged sufficient facts to

establish a claim for disloyalty or intentional misconduct.  Accordingly, this Court should deny

Defendants' motion to dismiss Count I – Breach of Fiduciary Duty.

### E.  The Complaint States a Claim for Breach of the Operating Agreement and the Consulting Agreement.

Plaintiffs state a claim for breach of the Operating Agreement and the Consulting Agreement by

alleging that Defendants breached their fiduciary duties and failed to act in good faith.  Defendants

breached the express terms of the Operating Agreement by acting in bad faith and in a grossly negligent

manner.  "LLC members' rights begin with and typically end with the Operating Agreement[.]"  *Walker*

*v. Resource Dev., L.L.C.*, 791 A.2d 799, 813 (Del. Ch. 2000). The Complaint alleges that Defendants

breached § 6.2(f) of the Operating Agreement, which provides:

> (f) Neither the Manager nor any Representative or Deputy Representative shall be liable, responsible, or accountable in damages or otherwise to the Company or any of the Members for any failure to take any action or the taking of any action within the scope of authority conferred on it, him or her by this Agreement made in good faith, except that the Manager, Representatives and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence. Nothing in this Section 6.2(f) shall be deemed to make the Manager or any Representative or Deputy Representative liable, responsible or accountable to any Person other than the Company or the Members.

(D.I. 1 ¶ 83). This provision eliminates Defendants' liability for breach of the duty of care but not for

breach of the duty of loyalty or for actions that constitute fraud, criminal acts, bad faith or gross

negligence. *See McMillan,* 768 A.2d at 501. Here, Plaintiffs have alleged that Defendants breached this

provision by breaching their duty of loyalty, acting in bad faith and with gross negligence.

In *McMillan*, the Delaware Court of Chancery noted that "conduct not in good faith, intentional

misconduct, and knowing violations of the law--quintessential examples of disloyalty, i.e., faithless,

conduct" are examples of breaches of the duty of loyalty. *McMillan*, 768 A.2d at 501. As discussed

above in section V.D., Plaintiffs have alleged facts that show Defendants breached their duty of loyalty to

Plaintiffs when they sold off ALH in a piecemeal fashion to the detriment of Plaintiffs. Therefore,

Plaintiffs have alleged sufficient facts to establish that by acting in bad faith, Defendants breached the

Operating Agreement.

The Complaint alleges that Defendant SCA violated the following provision in the Consulting

Agreement: "[T]he Company [ALH] shall not be responsible for any claims, liabilities, expenses, losses

and damages to the extent that it is finally judicially determined that they result primarily from actions

taken or omitted to be taken by SCA in bad faith or due to SCA' gross negligence or willful misconduct."

(D.I. 1 ¶ 90). The Complaint alleges that SCA breached its fiduciary duty of loyalty to Plaintiffs and

acted in the best interests of Shamrock at the expense of ALH. Accordingly, Plaintiffs have alleged

sufficient facts to establish a breach of contract claim against SCA.

In addition, Plaintiffs state a claim for breach of the Operating Agreement and the Consulting Agreement by alleging that Defendants failed to act in good faith.  Under Delaware law "an implied covenant of good faith and fair dealing is engrafted upon every contract."  *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985).  The Delaware Court of Chancery has described this doctrine as follows:

> The implied covenant of good faith "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." This doctrine emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." The parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct.

*Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1234  (Del.Ch. 2000)(internal citations omitted).   "Violating the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct."  *Id.*

Plaintiffs have alleged facts to establish that Defendants breached the implied covenant of good faith in the Operating Agreement.  Defendants contend that "[h]ere, decisions were made by a majority of the Class Representatives on ALH's Supervisory Board, according to the express terms of ALH's Operating Agreement."  (D.I. 15 at 48).  In support, Defendants cite *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151 (Del. Ch. 1985), stating "[t]he implied covenant is only breached where the defendants have engaged in 'arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract.'"  (D.I. 15  at 48 (quoting *Wilgus*, 498 A.2d at 159)).  To say that Defendants' conduct was not arbitrary and unreasonable because it was made by a majority on the Supervisory Board belies the fact that Defendants are a majority of the Board and control all major decisions.  Further, the ability to control the Board does not eliminate Defendants' obligation to do so in good faith.  The Complaint alleges that Defendants acted in their own self-interest, thereby breaching the Operating Agreement.

Plaintiffs have alleged sufficient facts to establish that Defendant SCA breached the implied covenant of good faith in the Consulting Agreement.  SCA was responsible to act in the best interests of

ALH and Plaintiffs without regard for Shamrock's agenda. SCA breached the implied covenant of good faith and fair dealing by acting in the best interests of Shamrock to the detriment of ALH and Plaintiffs. Accordingly, Plaintiffs have alleged sufficient facts to establish a claim for breach of the implied covenant of good faith against SCA.

Determining whether the implied covenant of good faith has been breached is a fact-intensive analysis. *Continental*, 750 A.2d at 1234. Defendants attempt to conduct a fact-intensive analysis in their Motion to Dismiss, however, the sufficiency of the facts are not an issue at this point. To survive a motion to dismiss, Plaintiffs need only allege facts to establish that they are entitled to offer evidence to support their claims **not** that they will ultimately prevail. *Phillip*, 367 F. Supp. 2d at 867. Accordingly, Plaintiffs have sufficiently alleged facts to state a claim for breach of the Operating Agreement and the Consulting Agreement.

**F. The Complaint States A Claim for Gross Negligence.**

Contrary to Defendants' contention, Plaintiffs have stated an independent claim for gross negligence apart from the breach of fiduciary duty claim. In *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607 (Del.Ch. Aug. 26, 2005), the Delaware Court of Chancery explained:

> Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason."

*Albert,* 2005 WL 2130607, *4 (internal citations omitted).

Plaintiffs have alleged facts which show that Defendants' decision to sell ALH was outside the bounds of reason. When it became apparent that Defendants were going to liquidate ALH regardless of the best interests of ALH or its members, Plaintiffs attempted to purchase the Class A's equity interests in ALH so they could restructure and strengthen ALH and preserve their equity interest. Defendants, however, demanded an unreasonable price for their interest and continued to liquidate ALH's operating units at depressed values rendering Plaintiffs' interest in ALH worthless. In addition, Defendants hired

Fried Frank, a law firm that had an unwaivable conflict of interest, to advise ALH in the sale process of ALH's operating units.  In short, Plaintiffs have alleged facts that establish Defendants' actions were reckless and outside the bounds of reason.  Under the federal notice pleading standards, Plaintiffs have alleged sufficient facts to establish a claim for disloyalty or intentional misconduct.  Accordingly, this Court should deny Defendants' motion to dismiss Count IV – Gross Negligence.

### G.  The Complaint States A Claim for Self-Dealing.

Plaintiffs have stated a claim for self-dealing against Defendants.  Under Delaware law, self-dealing describes the situation "when a director deals directly with the corporation, or has a stake in or is an officer or director of a firm that deals with the corporation [or] when a corporate fiduciary is on both sides of a transaction.'"  *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995) (quoting, *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. Super. Ct. 1971)).  The Delaware Supreme Court has "generally defined a director as being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations."  *Cede & Co. v. Tech., Inc.*, 634 A.2d 345, 362 (Del. 1993).  "There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person."  *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) *overruled on other grounds* by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Plaintiffs have alleged facts that show Defendants did not make decisions based entirely on the corporate merits but instead based decisions on Shamrock's desire to sell ALH regardless of the best interests of ALH or Plaintiffs.  Shamrock controls ALH.  SCA is an affiliate of Shamrock.  Defendants Krieger, Buchler and Stein are employees of Shamrock and SCA and therefore, are beholden to them.  Specifically, Plaintiffs alleged "Krieger, Buchler, and Stein . . . are highly placed officers in Shamrock, which wholly-owns SCA . . . [and] owe fiduciary duties to Plaintiffs, Defendants, ALH, and the companies hired by ALH[SCA]."  (D.I. 1 ¶ 38).  Defendants told Plaintiffs that ALH was taking too much of their time.  Accordingly, Plaintiffs have alleged sufficient facts to establish that Defendants' decisions

were not independent and based solely on the best interests of ALH and Plaintiffs but were based on personal and extraneous considerations, namely Shamrock's best interest.

### H. The Statute of Limitations Does Not Bar Plaintiffs' Claims.

Plaintiffs claims are not barred by the three year statute of limitations in N.C. Gen. Stat. § 1-52.[33] The defendant "carries the burden of proof in a motion to dismiss for failure to state a claim."[34] *I R Const. Products Co., Inc. v. D.R. Allen & Son, Inc.*, 737 F. Supp. 895, 896 (W.D.N.C. 1990). "In order for a defendant to succeed on a 12(b)(6) motion to dismiss based on the statute of limitations, he must show that the plaintiff's complaint on its face discloses that the action is time-barred." *Dawn v. Dawn*, 470 S.E.2d 341, 342-43 (N.C. App. 1996). If, however, the defect does not appear on the face of the complaint, "the motion to dismiss must be denied unless affidavits or other material is presented to the Court." *McKenzie v. E.E.O.C.*, 749 F. Supp. 115, 117 (W.D.N.C. 1990). If affidavits and other materials are considered, "the motion should be treated as a motion for summary judgment . . . [and] [i]f a question of fact exists as to the defense, the issue cannot be determined on affidavits." *Id.* Here, Defendants expressly state that "For purposes of this Rule 12(b)(6) motion, Defendants rely only on the Complaint and documents referred to therein, so as not to convert this to a summary judgment motion." (D.I. 15 at 40, n.23).

Contrary to the assertions of Defendants, Plaintiffs' claims did not accrue before June 2, 2002, therefore this case is not time barred. The Complaint on its face does not establish that Plaintiffs' claims are time barred because the claims did not accrue until Plaintiffs were injured by Defendants' liquidation of ALH's operating units which occurred after June 2, 2002.[35] "The period of the statute of limitations

---

[33]Plaintiffs do not dispute that a three year statute of limitations applies to their claims.

[34] Contrary to Defendants' contention, only after the defendant has properly pleaded the statute of limitations does the burden shift to plaintiff "to offer a forecast of evidence showing that the action was instituted within the permissible period after the accrual of the cause of action." *Pembee Mfg. Corp. v. Cape Fear Const. Co., Inc.*, 329 S.E.2d 350, 353 (N.C. 1985).

[35] Nevertheless, even if Plaintiffs' claims accrued before June 2, 2002—which they did not—the continuing violation doctrine applies here and the claims are not time barred. North Carolina law recognizes the "'continuing wrong' or 'continuing violation' doctrine as an exception to the general [statute of limitations] rule." *Williams v. Blue Cross Blue Shield of North Carolina*, 581 S.E.2d 415, 423 (N.C. 2003). "When this doctrine applies, a statute of limitations does not begin to run until the violative act ceases." *Id.* Moreover, "'[a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation.'" *Id.* Finally, "'if the

begins to run when the plaintiff's right to maintain an action for the wrong alleged accrues. The cause of action accrues when the wrong is complete, even though the injured party did not then know the wrong had been committed." *Davis v. Wrenn*, 464 S.E. 2d 708, 710 (N.C. App. 1995) (citing *Wilson v. Development Co.,* 171 S.E.2d 873, 884 (1970)).  In the present case, Defendants' breaches of their fiduciary duties did not "accrue" until June 2003, March 2004, and December 2004, when Defendants sold off ALH's operating units at depressed values thereby rendering Plaintiffs' equity in ALH worthless. (D.I. 1 ¶¶ 48, 51 and 69).

Although Defendants contend that the claim accrued in 2001, they fail to demonstrate what allegations in the Complaint establish that an injury occurred in 2001.  First, contrary to the assertions of Defendants, Plaintiffs do not allege that "Defendants had wrongfully seized control of ALH."  (D.I. 15 at 53).  Therefore, the Management Agreement entered into in 2001 did not trigger the statute of limitations for the present action.  Next, Defendants' expression of a "desire to exit their investment and management of ALH," did not commence the statute of limitations.  *Id.*  It is only after Defendants acted on that desire in contravention of their duties to ALH and Plaintiffs that the statute of limitations commenced.  Similarly, Defendants' attempts at selling off ALH as a whole did not cause the statute of limitations to begin running.  At most, such actions by Defendants can be viewed as an anticipatory breach or an anticipatory repudiation which does not trigger the statute of limitations.  *See Ramey v. District 141, Int'l Assoc. of Machinists and Aerospace Workers*, 378 F.3d 269, 279 (2nd Cir. 2004) (finding where an anticipatory repudiation exists, "the statute of limitations ordinarily does not begin to run, and the cause of action does not accrue, until the date of the actual breach."); *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002) (in the case of an anticipatory repudiation, "the time of accrual depends on whether the injured party chooses to treat the repudiation as a present breach").

---

same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation.'"  *Id*. In the present case, Defendants continued to breach their fiduciary duties, the Operating Agreement, and the Consulting Agreement by acting in their own self-interest and selling off ALH in a piecemeal fashion. Therefore, even if the Court finds that a cause of action accrued in 2001, which is unlikely since the Complaint does not allege that an injury occurred in 2001, this action is not barred because Defendants continued their unlawful acts by selling off ABI, BBC, and MHI in 2003 and 2004.

In short, Plaintiffs' claims did not accrue until they were injured and Plaintiffs' injuries did not occur until Defendants sold the operating units, which occurred after June 2, 2002. In an attempt to meet their heavy burden under Rule 12(b)(6), Defendants mischaracterize Plaintiffs' claims by taking the allegations out of context and cherry-picking other allegations rather than considering the Complaint as a whole. Accordingly, Defendants cannot establish, as a matter of law construing all allegations in the light most favorable to Plaintiffs, that that on the face of the Complaint Plaintiffs' claims are barred by limitations. Therefore, Defendants' motion to dismiss should be denied.

## CONCLUSION

Defendants' Motion to Dismiss or Transfer for improper venue and Motion to Dismiss for lack of personal jurisdiction should be denied. If, however, the Court finds there are insufficient facts at the present time to establish venue and personal jurisdiction, Plaintiffs request that the Court defer ruling on the motion until Plaintiffs have had sufficient time to conduct discovery on those issues. Defendants' Motion to Dismiss for lack of subject matter jurisdiction should be denied. If the Court finds that Plaintiffs' claims are derivative, Plaintiffs request leave to re-file in state court. Finally, Plaintiffs have stated a claim on all counts in the Complaint, but if the Court finds that any claims are insufficient, Plaintiffs request leave to file an Amended Complaint.

DATED:  October 13, 2005

Respectfully submitted,

__s/ Tracy L. Eggleston_____

Tracy L. Eggleston
N.C. State Bar No. 18471
Russ A. Brinson
N.C. State Bar No. 26070
Cozen O'Connor
301 South College Street, Suite 2100
Charlotte, North Carolina 28302
Telephone: (704) 348-3456
Facsimile:  (704) 334-3351

OF COUNSEL:
Thomas M. Wood, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, Maryland 21202-3282
Telephone: (410) 332-8523
Facsimile: (410) 332- 8564

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of October, 2005, a copy of Defendants

Opposition to Plaintiffs' Motion to Dismiss or Transfer was served by mail, first-class, postage prepaid

to:

> J. Donald Cowan, Jr.
> Smith More LLP
> P.O. Box 21927
> 300 N. Greene Street, Suite 1400
> Greensboro, North Carolina 27401
> Telephone: (336) 378-5200
> Facsimile: (336) 378-5400
> Email: Don.Cowan@smithmoorelaw.com
>
> Attorneys for Defendants Shamrock Holdings of California, Inc.,
> Shamrock Capital Advisors, Inc., Eugene I. Krieger,
> George J. Buchler, and Bruce J. Stein
>
>
> Pamela Jarvis
> Gregory P. Joseph Law Offices LLC
> 805 Third Avenue, 31st Floor
> New York, NY 10022
> Telephone: (212) 407-1200
> Facsimile: (212) 407-1299
> Email: pjarvis@josephnyc.com
>
> Of Counsel.

                                        __s/ Tracy L. Eggleston_____
                                        Tracy L. Eggleston
                                        N.C. State Bar No. 18471
                                        Russ A. Brinson
                                        N.C. State Bar No. 26070

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit A | December 18, 2002 Email from Avie Arenson to Eugene I. Kreiger, George J. Buchler, Michael G. Jesselson, Michel Konig and Isaac Neuberger. |
| Exhibit B | Emails in Chronology of Events |
| Exhibit C | March 27, 2003 Email from Avie Arenson to George Buchler |
| Exhibit D | July 26, 2004 Letter from Pamela Jarvis to Isaac M. Neuberger |
| Exhibit E | Declaration of Shalom E. Lamm in Opposition to Defendants' Motion to Dismiss or Transfer |
| Exhibit F | Copies of Unpublished Cases Cited in Plaintiffs' Opposition Brief |