IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
No. 3:05-CV-256-H

| | | |
|---|---|---|
| A. ARENSON HOLDINGS, LTD., D.A. GARDENS, LTD., J12ALH ASSOCIATES, SELK, LLC and LAUREL EQUITY GROUP, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR TRANSFER** |
| v. | ) ) | |
| SHAMROCK HOLDINGS OF CALIFORNIA, INC., SHAMROCK CAPITAL ADVISORS, INC., EUGENE I. KRIEGER, GEORGE J. BUCHLER and BRUCE J. STEIN, | ) ) ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................... 1

ARGUMENT ......................................................... 6

   I.   Plaintiffs Cannot Show that Venue in North Carolina is Proper ....................... 6

   II.  This Case Could Have Been Brought in Delaware ........................................... 11

   III. No Exception to the First-To-File Rule Applies Here ..................................... 14

   IV. Plaintiffs Cannot Show Subject Matter Jurisdiction ........................................ 21

   V.  Plaintiffs Cannot Show Personal Jurisdiction ................................................. 23

   VI. Plaintiffs Cannot Show that Their Allegations State Claims .......................... 24

CONCLUSION ...................................................... 28

## INTRODUCTION

Defendants Shamrock Holdings of California, Inc. ("Shamrock"), Shamrock Capital Advisors, Inc. ("SCA"), Eugene I. Krieger ("Krieger"), George J. Buchler ("Buchler") and Bruce J. Stein ("Stein") ("Defendants") respectfully submit this Reply Brief in further support of their motion to dismiss, or in the alternative to transfer, the Complaint filed by Plaintiffs A. Arenson Holdings, Ltd. ("Arenson Holdings"), D.A. Gardens, Ltd. ("D.A. Gardens"), J12ALH Associates ("J12"), SELK, LLC ("SELK"), and Laurel Equity Group, LLC ("Laurel") ("Plaintiffs").

Plaintiffs' Brief in Opposition to Defendants' Motion ("Opposition" or "Opp.") reinforces what is already manifest in the Complaint: that this is a dispute between parties from a number of jurisdictions, prominently <u>including Delaware</u> and, most notably, <u>excluding North Carolina</u>. The dispute turns solely on the application of <u>Delaware</u> law to the affairs of ALH Holdings, LLC ("ALH"), a <u>Delaware</u> limited liability company.

This dispute is — and was for more than eight months before Plaintiffs commenced the present action (the "NC Action") — the subject of a pre-existing action in Delaware (the "DE Action") encompassing all the same issues and parties. Plaintiffs' 50-plus page Opposition brief (plus exhibits) offers no reason why this dispute should be replicated in North Carolina or why it should not remain in Delaware. Instead, Plaintiffs present a smokescreen of distortions and untruths that are conspicuously <u>unsupported by verification of the Complaint, by any sworn statement or by any other competent evidence</u> that could contradict Defendants' sworn statements.

In this Reply Brief, Defendants will not attempt to enumerate all of Plaintiffs' unsubstantiated factual assertions or address all of the gaps and defects in Plaintiffs' legal

arguments.  However, the following crucial deficiencies in Plaintiffs' Opposition papers must be emphasized:

► Nothing in the Opposition supports Plaintiffs' contention that venue is proper in North Carolina or improper in Delaware (*see* Sections I and II *infra*):

- Plaintiffs' argument that a substantial part of the events giving rise to their claims occurred in North Carolina is premised on the notion that the claims do not arise from the management, financing and formation of ALH (Opp. at 15).  Yet throughout the Complaint and Opposition, Plaintiffs attack Defendants for allegedly mismanaging ALH's affairs, including its financial situation, the sale of its operations and its governance under the Operating Agreement.

- Plaintiffs' are legally wrong that the claims in the Complaint could not have been brought as counterclaims in the DE action (Opp. at 16).  Plaintiffs' contention (*id.*) that Defendants have cited no authority in support of their position on this issue is untrue. (*See* Defendants' Opening Brief ("Opening") at 15.)

- Plaintiffs assert (Opp. at 12) that Defendants "have failed to allege why North Carolina confers a tactical advantage to Plaintiffs or causes prejudice to Defendants."  However, as Defendants' Opening (at 28) points out, the NC Action "needlessly increase[s] Defendants' litigation expenses" and "open[s] a whole second litigation front," forcing Defendants "simultaneously to defend multiple motions in the DE Action while protecting their rights by making the present motion[]."  Defendants explain why North Carolina is a less convenient forum (Opening at 26-28), but Plaintiffs remain silent on why North Carolina would be more convenient.  As to tactical advantage, Plaintiffs admit (Opp. at 15 n.16) that they seek to "relieve [themselves] from the burden of litigating their affirmative claims in the awkward procedural position of defendants."

- Plaintiffs disingenuously try to explain away the failure of their Board Representative, Arenson, to attend the December 2004 meeting to consider the proposed sale of ALH's North Carolina subsidiary, Mulvaney Homes, Inc. ("MHI").  Plaintiffs suggest that Arenson's attendance at the meeting would have involved traveling from Israel to the U.S., but in fact he attended most ALH Board meetings by telephone and had confirmed that he would attend this meeting by the same means.[1]  Arenson's December 2004 statement (*see* Opening at 16) that it would be a "waste of [his] time" to consider the proposed sale of MHI belies Plaintiffs' attempt to inflate this transaction —which occurred at the tail end of Defendants' allegedly wrongful scheme — into a "substantial event."

---

[1]  *See* November 14, 2005 Reply Declaration of George J. Buchler in Support of Motion to Dismiss or Transfer ("Buchler Reply Dec.") at ¶ 11.

- As a last resort, Plaintiffs claim to have made a prima face showing in support of their venue allegations and that this entitles them to discovery (Opp. at 13-14). Plaintiffs have cited no authority for why the Court should assume the truth of their venue allegations — especially given that Defendants have presented substantial evidence to the contrary. Plaintiffs' continued reliance on bare, unsupported allegations does not justify burdening Defendants with discovery. Plaintiffs claim that "the information is almost exclusively within Defendants' knowledge and control" (*id.*), but they do not point to a single issue on which they lack access to relevant information that Defendants would have.

► Nothing in the Opposition supports Plaintiffs' contention that any exception to the first-

to- file rule applies here (*see* Section III, *infra*):

- Plaintiffs' innumerable reiterations of the phrase "ongoing settlement negotiations" are unsupported and insupportable (*see, e.g.,* Opp. at 2, 9, 19-21, 23, 26). Plaintiffs' first-to-file argument is premised on the notion that settlement negotiations began during the parties' August 26, 2004 conference call, but this is untrue.[2] Settlement negotiations never began, so no such negotiations could have been "ongoing" when the DE Action was commenced.

- Plaintiffs attempt to blur their general threats to sue with the kind of specific notice of imminent litigation that the courts rely on in the rare cases where they override the first-to-file rule. Plaintiffs are much like the proverbial "boy who cried 'Wolf!'" In September 2004, there was no more reason for Defendants to believe that Plaintiffs were about to sue than there had been at any of the times in the preceding months when Plaintiffs hurled accusations at Defendants and demanded large sums of money (*see, e.g.,* Opening at 3, 13-14).

- Until now, Defendants refrained from describing the substance of the parties' August 26, 2004 conference call. But given that Plaintiffs have breached the parties' confidentiality agreement and proffered an inaccurate and misleading description of the call, the Jarvis Reply Declaration seeks to set the record straight. *See* Jarvis Reply Dec. ¶ 3. During the August 26, 2004 conference call, Plaintiffs alluded to the possibility of litigation in Delaware or North Carolina (as they had before the call; *see, e.g.*, Opening at 12 n.9). In addition, however, Plaintiffs <u>stated that the "proper situs" for litigation was "probably Delaware.</u>" Jarvis Reply Dec. at ¶ 7. Thus, even assuming *arguendo* that Plaintiffs were threatening an imminent suit during the call, it would have been a suit in Delaware, not North Carolina.

- Plaintiffs claim (Opp. at 8, 24) that they were "lulled" by Defendants into not filing their supposedly imminent North Carolina lawsuit. Not surprisingly, none of the Plaintiffs has been willing to sign a sworn statement to this effect. As set forth in Defendants' Opening (at 12, 22), there was no imminent lawsuit. Nor were Plaintiffs deprived of any

---

[2] *See* November 14, 2005 Reply Declaration of Pamela Jarvis in Support of Motion to Dismiss or Transfer ("Jarvis Reply Dec.") at ¶¶ 4-6.

opportunity to pursue settlement, through mediation or otherwise, had they wanted to do so (*see, e.g.,* Opening at 13).

- Although Defendants' Opening (at 5, 15, 20, 23, 25) specifically raises the applicability of the compulsory counterclaim rule, Fed. R. Civ. P. 13(a), Plaintiffs do not even mention this issue, let alone attempt to explain their violation of it.

► Nothing in the Opposition supports Plaintiffs' assertion of subject matter jurisdiction (*see*

Section IV, *infra*):

- Plaintiffs' contention (Opp. at 33) that their claims are not derivative because the DE Action is not derivative is meritless. Plaintiffs purport to seek relief based on alleged injuries to ALH. Any recovery would, in the first instance, flow to ALH. These are the hallmarks of a derivative case. In contrast, the DE Action seeks no such relief and no recovery would flow to ALH.

- Plaintiffs' unjust enrichment argument (Opp. at 34-36) is based on Delaware case law that has been repudiated by the Delaware Supreme Court. Plaintiffs' only other argument (Opp. at 36) — that their claims are not derivative because ALH "is in the process of winding up" — is unsupported by any evidence and is untrue. Buchler Reply Dec. at ¶ 12.

► Nothing in the Opposition supports Plaintiffs' assertion of personal jurisdiction (*see*

Section V, *infra*):

- Plaintiffs concede (Opp. at 37) that unless they prevail in the feeble argument that their claims are not derivative, this Court lacks personal jurisdiction over any of the Defendants.

- Plaintiffs' assertion of general jurisdiction over SCA ignores the fact that such jurisdiction must be based on present, ongoing contacts with this state. Even if Plaintiffs' assertions regarding SCA's contacts with North Carolina were true, they all relate to a past relationship that has been over since December 2004, when ALH sold MHI. *See* Complaint at ¶¶ 21-23, 26, 29; Opp. at 32, 37-41. Plaintiffs' only assertions regarding SCA's present activities have nothing to do with North Carolina (*see* Opp. Exh. E at ¶ 3, stating that SCA is a "national" company).

- Plaintiffs' assertion of specific jurisdiction over SCA ignores the requirement that the claims arise from contacts with this state. Even if Plaintiffs' assertions regarding SCA's contacts with North Carolina were true, the Complaint does not allege that Plaintiffs' claims arose from such contacts. The existence of MHI's operations in North Carolina is not alleged to have resulted from any act or omission by SCA. The Complaint does not allege that Plaintiffs' claims arose from the location of MHI's operations (the claims would be the same regardless of MHI's location). As to the February 2003 meeting in

Charlotte, the Complaint (at ¶ 45) specifically alleges that this was a meeting with "Shamrock," not SCA.

- Implicitly conceding the weakness of their assertion of personal jurisdiction over SCA, Plaintiffs try to stave off the inevitable by claiming a right to discovery (Opp. at 41). Defendants have specifically itemized the defects in Plaintiffs' position (*see, e.g.*, Opening at 37-40), but Plaintiffs have made no evidentiary showing to remedy these defects. Instead, Plaintiffs continue to rely on the bare, unsupported and facially insufficient allegations of their Complaint, together with equally unsupported and insufficient assertions in their Opposition. Under these circumstances, discovery would simply advance Plaintiffs' strategy of burdening Defendants with costly, unnecessary litigation activities.

► Nothing in the Opposition supports Plaintiffs' assertion that the Complaint states a claim

for relief under Rule 12(b)(6) (*see* Section VI, *infra*):

- The DE Action seeks to establish, *inter alia*, that Plaintiffs have no viable claim against Defendants. Plaintiffs contend that if the DE Action states a claim, then the Complaint necessarily states a claim. This is, at best, a total *non sequitur*. Plaintiffs' assertion of meritless claims against Defendants can only bolster Defendants' entitlement to declaratory relief, not detract from it.

- Throughout their Opposition papers, Plaintiffs acknowledge that this entire case arises from what was, at most, a difference of opinion regarding how best to manage ALH and the sale of its operations.[3]

- The Opposition (*see, e.g.*, 1, 5, 13, 35, 51) seems to suggest that that Plaintiffs had the right to purchase the Class A equity in ALH for a "reasonable" price, even though the parties disagreed as to what a reasonable price might be (and Defendants did not own all of the Class A equity). The Complaint does not appear to plead such a claim and the Opposition cites no authority for one. This is not surprising. One expects a would-be

---

[3] For example, Plaintiffs' contend that Defendants acted despite Plaintiffs' "well-reasoned objections" (Opp. at 1), "disregarded [Plaintiffs'] reasoned advice" (Opp. at 5) and should have followed "Arenson's reasoned recommendation" (Opp. at 6). Plaintiffs concede (Opp. at 4) that in 2001, "the Board decided it was a good time to sell the entire company," but they contend that the sale process was "mishandled" because of the manner in which ALH's financial situation was presented. Plaintiffs further concede that "a quick sale of ALH as a whole was not possible" and suggest that it would have been better to postpone a sale. (Opp. at 35.) However, Plaintiffs do not — and cannot — claim that they or anyone else was willing to contribute the capital necessary to operate ALH in the meantime. Indeed, by contending that "it would have been better for ALH if the members financed another infusion of capital," Plaintiffs concede that ALH's members — including Plaintiffs — were unwilling to do so. (Opp. at 6.) Plaintiffs also acknowledge that ALH's future could not be predicted with certainty, *e.g.*, Arenson asserted that ALH "might" obtain a better offer if BBC continued to operate rather than being sold. (*Id.*) What all of this adds up to is a case in which Plaintiffs claim to have made different business judgments than Defendants made, albeit that Plaintiffs never "put their money where their mouths were."

buyer to characterize its offered price as reasonable.  If the owner's decision not to sell gave rise to a claim, courts would be flooded with cases asking them to evaluate prices, with a view to forcing such prices on the owners of whatever the plaintiffs wanted to buy.

- Plaintiffs struggle, to no avail, to find an excuse for their inability to plead the elements of a breach of fiduciary duty claim.  As set forth in Defendants' Opening papers (at 5-8 and 40-47), the Complaint is devoid of any factual allegation that could support Plaintiffs' profoundly illogical notion that Shamrock, as the single largest investor in ALH, would intentionally do anything other than seek to maximize ALH's value, if only for Shamrock's own sake.  This is not a mere technical pleading issue — it goes to the heart of whether Plaintiffs' well-pleaded allegations contain the necessary elements of a cause of action that Defendants must then incur the expense to litigate.

- Plaintiffs' claims for breach of the Operating Agreement and the Consulting Agreement rely solely on the exculpation provisions of those agreements (Opp. at 48-51).  They do not cite any provision of either agreement that is itself capable of being breached.  Plaintiffs ignore the fact that they are not parties to the Consulting Agreement (Opening at 1, 41) and thus lack standing to assert its breach.  In a vain attempt to avoid their statute of limitations problem, Plaintiffs' Opposition (at 54) now tries to deny that the Complaint alleges that Defendants wrongfully seized control of ALH in 2001 and have repeatedly abused that control ever since.  (*See, e.g.,* Complaint ¶¶ 4-8, 33-40).

- Plaintiffs refer in passing to their supposed civil conspiracy claim (Opp. at 42 n.30), but fail address the absence of authority for such a claim.  (*See* Opening at 49-50.)  As to the *ultra vires* claim (Opening at 49), Plaintiffs do not refer to it at all, and thus seem to have abandoned it entirely.

Accordingly, and as set forth in greater detail below, nothing in Plaintiffs' Opposition supports denying Defendants' Motion to Dismiss or Transfer.

## ARGUMENT

### I.  Plaintiffs Cannot Show that Venue in North Carolina is Proper

Plaintiffs' Opposition to Defendants' Motion to Dismiss for lack of venue is founded exclusively on Plaintiffs' assertion (Opp. at 10-13) that "a substantial part of the events or omissions giving rise to the claim occurred" in North Carolina, in that a single meeting between some of the parties occurred in Charlotte and certain assets of an ALH subsidiary, MHI, were located in North Carolina.

The parties agree that, in making a determination under 28 U.S.C. § 1391(a)(2), the Court should "review 'the entire sequence of events underlying the claim.'" *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). That history, even as related by Plaintiffs in the Complaint, is one of disagreement between parties who are not from North Carolina, including Delaware entities on both sides, concerning compliance with fiduciary and other duties prescribed by Delaware law in the context of the management, financing and formation of a Delaware limited liability company. (*See, e.g*, Complaint ¶¶ 2, 16-18, 20.)

Many of the communications and actions relevant to this dispute took place in cyberspace, as residents of Delaware, Israel, California, and New York (among other places) conferred, disputed and performed by way of telephone, email and other long-distance media — to and from numerous locations other than North Carolina. The salient facts are that these activities concerned the management of a Delaware entity with operations in various places, and are alleged to have been mishandled by Delaware entities, among others, under Delaware law.

The sale of ALH's last remaining subsidiary, MHI — which occurred at the tail end of the Defendants' alleged multi-year scheme — was approved by ALH at a December 2004 Supervisory Board meeting that Plaintiffs' Representative, Arenson, did not bother to attend. Jarvis September 2, 2005 Opening Dec. Exh. Z; Buchler September 2, 2005 Opening Dec. at ¶ 15. Arenson explained his failure to attend by stating that "any further participation [in ALH's affairs] would be a waste of my time." Jarvis Dec. Exh. Z at 1. Although the Complaint (¶¶ 56-69) purports to describe various events in the course of the sale of MHI, it does not allege that any of these supposed events occurred in North Carolina.[4] In short, nothing in Plaintiffs'

---

[4]   As set forth in Defendants' Opening (at 16-17), the Complaint (¶¶ 45-46) alleges only one specific event in North Carolina: a meeting in February 2003 at which "some of the Plaintiffs and their counsel met with Shamrock (Messrs. Krieger and Buchler) in Charlotte." The Complaint (at ¶ 45) asserts that "[t]he purpose of the meeting was to discuss the problems then-currently facing ALH and the future

Complaint or Opposition casts doubt on the facts, as set forth in Defendants' Opening (at 16-19), showing that Plaintiffs' claims are, at most, tangentially related to North Carolina.

　　None of the cases cited by Plaintiffs supports the proposition that a single meeting in Charlotte and the sale of a North Carolina subsidiary would constitute a substantial part of the events giving rise to Plaintiffs' claims.  In *Uffner v. L.A. Reunion Francaise, S.A.*, 244 F.3d 38 (1st Cir. 2001), the parties disputed an insurance claim for losses that occurred entirely within the district court's purview — in contrast to the case at bar, where none of the alleged multiple acts of mismanagement, over a multi-year period, occurred in North Carolina.  The *Uffner* court's consideration of whether the requested venue would "confer a tactical advantage" or "prejudice" the opponent "in any way," *id.* at 43, is particularly apt here, where Plaintiffs belatedly invoked the jurisdiction of this Court so as to harass Defendants and unnecessarily increasing their litigation costs, presumably in the hope of extracting some payment from Defendants for their spurious claims.[5]

---

problems that could arise if a change of course was not effected."  Defendants allegedly stated that "ALH was consuming too much management time" and that they "wanted to rid themselves of the hassle of dealing with ALH."  (*Id.*)  Assuming *arguendo* that this statement was made, it was simply a reiteration of previous alleged statements, *e.g.,* that "Defendants first expressed a desire to exit their investment and management of ALH" in early 2001.  (Complaint ¶ 6.)  The Complaint (¶ 46) further alleges that Plaintiffs "warned Defendants that a piecemeal sale of [ALH's] operating units would be disastrous" and proposed buying out Shamrock's position in ALH.  It also alleges that Plaintiffs "concerns and proposals [were] ignored."  (*Id.*)  These too were reiterations of previous alleged statements.  Since at least as far back as July 2002, Plaintiffs had argued against the sale of ALH's operations.  (*See, e.g.,* Jarvis Opening Dec. Exh. ZZ.)  Also, in July 2002, Plaintiffs met with each other in England to discuss making a proposal to buy out ALH's Class A equity, including Shamrock's position.  (*Id.*)  From time to time thereafter, Plaintiffs communicated with Shamrock concerning their interest in making such a proposal, but this never even resulted in a written proposal.  (*Id.* at Exhs. O, ZZ, AAA, BBB; Buchler Opening Dec. ¶ 12.)  The Complaint does not assert (nor could it) that anything related to Plaintiffs' abortive buy-out idea gave rise to any of the claims in this action.

[5]  Nowhere in their Opposition papers do Plaintiffs identify any other reason —not even convenience to themselves — for bringing their claims in a duplicative action here, rather than the pre-existing DE Action.  Nor do Plaintiffs offer any coherent explanation for their failure to challenge venue in the DE Action or seek to transfer the DE Action to this Court.  (*See* Opp. at 15 n.16.)  If Plaintiffs genuinely believed that North Carolina was the proper forum, they would not have waived their venue objection in

In each of the other cases cited by Plaintiffs, adversaries from two different districts sought venue in their own districts for a dispute over a contract or transaction that was negotiated, performed, and allegedly breached or mishandled between the two districts. In none of these cases was venue found proper in a district where neither of the parties resided, and where only a single meeting or communication in the course of a larger sequence of events occurred:

- In *Ciena Corp. v. Jarrard*, 203 F.3d 312, 317 (4th Cir. 2000) (Opp. at 10), a corporation located in Maryland executed a non-competition agreement there, trained defendant and disclosed its trade secrets to her there, and was injured there when defendant (who performed her job "on the move" throughout the country) accepted employment with a competitor located in Massachusetts.

- In *Roncaicoli v. Investec Ernst & Co*., No. Civ. 3:02 cv 2113 (SRU), 2003 WL 22244936 (D. Conn. Sept. 26, 2003) (Opp. at 12), Connecticut investors in a dispute over investment losses developed their relationship with defendants and entered into agreements with them in a series of meetings in Connecticut. The plaintiff investors then transmitted funds to defendants from Connecticut and received statements and communications from defendants there. This is hardly analogous to a single meeting in North Carolina that Plaintiffs' Board Representative did not bother to attend because it would be a "waste of [his] time." (*See* Jarvis Opening Dec. Exh. Z at 1.)

- In *TBV Holdings Ltd. v. Schey*, No. 02 CIV. 1122 (BSJ), 2002 WL 1733649 (S.D.N.Y. July 26, 2002) (Opp. at 10, 12), the single contract at issue was negotiated over the telephone by plaintiff in New York, drafted in and mailed from New York, and performed by the transmission of funds from and receipt of work product in New York.

- In *Sacody Techs., Inc. v. Avant, Inc*., 862 F. Supp. 1152 (S.D.N.Y. 1994) (Opp. at 12), a New York plaintiff alleged breach of a confidentiality agreement and unfair competition relating to a device invented and manufactured in New York and demonstrated to the Massachusetts defendant there, and the communications at issue, which occurred in New York, constituted negotiation and execution of the confidentiality agreement.

---

the DE Action, regardless of how much confidence they claim to have in their motions in that case. Plaintiffs "alternative" request (Opp. at 29) that this Court defer ruling on Defendants' Motion to Dismiss or Transfer illustrates Plaintiffs' desire to maximize the litigation burden on Defendants. Plaintiffs could, immediately upon filing this action, have sought a stay from this Court pending rulings on their motions in the DE Action, but apparently Plaintiffs had no interest in relieving Defendants from additional cost of making and briefing the present motion.

- *Gruntal & Co. v. Kauachi*, No. 92 Civ. 2840 (JFK), 1993 WL 33345 (S.D.N.Y. Feb. 5, 1993) (Opp. at 12-13) was a securities fraud action arising entirely from misstatements made by a Texas defendant in the course of telephone calls placed by plaintiffs representatives in New York, where venue was laid.

- In *Brown v. Flowers*, 297 F. Supp. 2d 846 (M.D.N.C. 2003) (Opp. at 13), North Carolina residents entered into and performed an oral agreement in North Carolina. The lawsuit alleged breach of that agreement with respect to music recorded in North Carolina, even though the breach — distribution of that music — occurred elsewhere.

Plaintiffs assert (Opp. at 10) that they need only make a "prima facie showing" of venue. Nowhere do Plaintiffs define what such a showing entails. To the extent that the cases cited by Plaintiffs can be read as defining what constitutes a prima facie showing of venue, those cases require far more than what Plaintiffs here have shown.[6] Plaintiffs further contend that "the prima facie requirement" can be "satisfied" by a showing that further discovery will reveal that a substantial part of the events giving rise to the claim occurred in this District. But the case Plaintiffs cite for this at best amorphous proposition found that venue had been demonstrated without any need for discovery, so the language Plaintiffs quote is dictum. Moreover, the case does not address the criteria for discovery in connection with a venue motion. In any event, Plaintiffs have not identified or described the information it would seek in discovery, let alone made a "showing" that such discovery would support Plaintiffs' position on venue.

---

[6] Although Defendants have presented substantial evidence to support their position on venue, Plaintiffs' supposed prima facie case consists only of the bare allegations of the Complaint. In the absence of some meaningful evidentiary basis for Plaintiffs' position, Defendants respectfully submit that it would be unfair and unreasonable to subject Defendants to discovery. *Cf. McLaughlin v. McPhail*, 707 F.2d 800, 806-07 (4th Cir. 1983) ("Against the defendants' affidavits stating that they had not engaged in any of the act enumerated in [the long-arm statue], McLaughlin offered 'nothing beyond his bare allegations' that the defendants had had significant contacts with the state. . . . On these facts, the district court did not abuse its discretion in concluding that, although limited depositions may be warranted to explore jurisdictional facts in some cases, this was not such a case.") (Internal citations omitted.)

## II.     This Case Could Have Been Brought in Delaware

Plaintiffs contend (Opp. at 14-19) that relief should be denied under both 28 U.S.C.

§ 1406(a) and § 1404(a) because Plaintiffs could not have brought their case in Delaware.  This

contention has no merit.  As set forth in the Opening (at 1, 5, 15, 20, 35, 36), Plaintiffs' claims

could and should have been brought as counterclaims in the DE Action.  (As noted above, the

Opposition simply ignores Plaintiffs' breach of the compulsory counterclaim rule, Fed. R. Civ.

P. 13(a).)

Plaintiffs rely primarily on *Foster Wheeler Corp. v. Aqua-Chem, Inc*., 277 F. Supp. 382

(E.D. Pa. 1967) (Opp. at 16-17), a decision rejected by the court in *A.J. Indus., Inc. v. U.S. Dist.

Ct*., 503 F.2d 384, 387 (9th Cir. 1974) ("the ability to raise the subject matter of a suit in the

transferor district by counterclaim in the transferee district will, as a general proposition, satisfy

the 'where it might have been brought' requirement of 28 U.S.C. § 1404(a)").  *See also Leesona

Corp. v. Duplan Corp.,* 317 F. Supp. 290, 293 (D.R.I. 1970) (also rejecting *Foster-Wheeler*: "the

right to bring a counterclaim against a defendant in the proposed transferee forum, if that right

existed at the time the action which is proposed to be transferred was instituted, qualifies that

forum as one in which suit 'might have been brought.'").

*A.J. Industries* represents the overwhelming weight of authority, which favors permitting

a potential counterclaim to satisfy the requirement under the venue statutes that the case "could

have been brought" or "might have been brought" in the transferee district.  *See Am. Tel. & Tel.

Co. v. Milgo Elec. Corp*., 428 F. Supp. 50, 54-55 (S.D.N.Y. 1977) ("plaintiff's ability at the time

he instituted an action to have raised the subject matter of that action by counterclaim in an

action pending in the transferee district qualifies that district as one in which 'it might have been

brought' under 28 U.S.C. § 1404(a)"); *Wellington Transp., Inc. v. Granite State Packing Co.,*

No. 84-2098-MA, 1984 U.S. Dist. LEXIS 21102, at *4-5 (D. Mass. Dec. 19, 1984) ("even if an action could not be brought independently in a transferee district, if an action could have been raised as a counterclaim in another action already pending in the transferee district, the transferee district is an appropriate forum"); *Martin v. South Carolina Bank*, 811 F. Supp. 679, 681-87 (D. Ga. 1992) (same); *Jumpit, AS v. Why ASAP, L.L.C.,* No. 04-1079 (PLF), 2005 U.S. Dist. LEXIS 4247, at *1-9 (D.D.C. Mar. 16, 2005) (same).  *Cf. U.S. Ship Mgmt. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 935 (D. Va. 2005) ("it may be that this claim 'could have been brought' by USSM in the District of Columbia at the time it was filed despite the lack of an independent basis for personal jurisdiction, because USSM could have joined the claim against MLL under Rule 18, Fed. R. Civ. P. . . . it is unnecessary to reach or decide this alternative argument").[7]

Plaintiffs assert that "[c]ourts that have permitted a counterclaim to satisfy the requirements of §1404 have done so only in cases where the defendants in the first-filed action had already filed an answer and did not challenge the court's exercise of jurisdiction."  (Opp. at 16 n.17.)  This assertion is demonstrably false.

In *Martin*, the plaintiff asserted that her claims could not have been asserted as counterclaims in the proposed transferee venue because the "lawsuit in Alabama [the proposed transferee venue] is an improper use of a declaratory judgment action."  811 F. Supp. at 684. This argument is identical to Plaintiffs' argument here (Opp. at 17) that the potential to bring their claims as counterclaims in the DE Action is insufficient because Plaintiffs have a pending motion to dismiss the DE Action, which motion asks the court to decline to exercise subject

---

[7]  *See also* 17 Moore's Federal Practice § 111.12 (Matthew Bender 3d ed.):  "[A]ction 'might have been brought' in the transferee district notwithstanding a lack of personal jurisdiction over the defendant because the plaintiff (who is the defendant in the action in the transferee district) had the right to raise the subject matter of its action as a counterclaim in the pending action in the transferee district.  Transfer of cases to a district in which a related action is pending is favored because it conserves judicial resources and avoids inconsistent results."

12

matter jurisdiction on the grounds that Defendants' declaratory judgment action is contrary to the policies of the Declaratory Judgment Act. The *Martin* court rejected this argument, as should this Court:

> The Secretary further argues that the principle set forth in *[A.J.] Industries* should not be extended to SCNB's application for transfer because SCNB filed the declaratory judgment in an attempt to control the forum for litigation. For the reasons stated in the second half of this order, the Court declines to hold that the principle set forth in *[A.J.] Industries* does not extend to SCNB's motion to transfer. <u>[T]he Alabama court, not this Court, is the court with the discretion to consider whether it will entertain the declaratory judgment action on its merits.</u>

811 F. Supp. at 685 (emphasis added).

Equally without merit is Plaintiffs' argument (Opp. at 17) that a potential counterclaim in the DE Action is insufficient to satisfy the venue statutes because some of the Plaintiffs have contested personal jurisdiction in Delaware. In *Jumpit, AS,* plaintiff Jumpit had not only contested personal jurisdiction in the proposed transferee court, <u>it had won</u>. Defendant Why ASAP had filed a declaratory judgment action against Jumpit in New Jersey in December 2003. Jumpit filed its suit in the District of Columbia in June 2004. Several months later, in October 2004, the New Jersey action was dismissed for lack of personal jurisdiction over Jumpit.

Nonetheless, the District of Columbia court granted a motion to transfer to New Jersey because the time to consider whether an action "might have been brought" as a counterclaim was the date the action was filed, regardless of later developments in the case:

> Plaintiff argues that this case may not be transferred because defendant could not have filed its counterclaim in the United States District Court for the District of New Jersey. That court would lack personal jurisdiction over Jumpit in a suit brought by Why ASAP, the defendant here, as evidenced by its dismissal of defendant's prior declaratory judgment case on exactly those grounds. The Supreme Court, however, has made clear that the appropriate inquiry under Section 1404(a) is where a case might have been brought considering the situation as it existed <u>when the case was originally filed</u>.

2005 U.S. Dist. LEXIS 4247, at *4 (internal citation omitted, emphasis in original). The *Jumpit* court's ruling applies *a fortiori* here, where any dismissal of the Delaware action for lack of personal jurisdiction is, at this juncture, purely hypothetical. It also undermines Plaintiffs' claim that courts have followed *A.J. Industries* only where there has been no challenge to the jurisdiction of the transferee court.

In support of their argument that this case may not be transferred until the Delaware court has decided all pending challenges to jurisdiction (Opp. at 17-18), Plaintiffs place considerable emphasis on *Cessna Aircraft v. Brown*, 348 F.2d 689 (10th Cir. 1965). There, tort plaintiffs filed the same case in Louisiana and in Kansas to ensure compliance with potential statutes of limitations. After the Louisiana court determined that it had jurisdiction, the Kansas court granted a motion to transfer. On appeal, the 10th Circuit prohibited the transfer and stayed the case pending appeal of the Louisiana' court's decision to the 5th Circuit, because it would be "unseemly" for the 10th Circuit to review a decision appealable to the 5th Circuit. *Cessna*, has no relevance here, where the issue is simply whether an action in which Plaintiffs' claims could be brought as counterclaims was pending on the date the NC Action was filed. Were the Delaware court to decide later that it had no jurisdiction over Plaintiffs *qua* Delaware defendants, that would have no bearing on whether they could be Delaware plaintiffs.

## III.   No Exception to the First-To-File Rule Applies Here

Plaintiffs' purported "chronology of events" (Opp. at 21-23) does not show any special circumstances that would warrant disregarding the "first-to-file" rule here. If anything, Plaintiffs' "chronology" confirms the facts as set forth in Defendants' Opening at 8-14. Plaintiffs do not claim (nor could they) that the parties were engaged in any settlement negotiations before the August 26, 2004 conference call. There were no such negotiations during

the call.  (*See* Jarvis Reply Dec. ¶¶ 4-6.[8])  Plaintiffs' first-to-file argument is premised on the

notion that settlement negotiations began during the conference call, but since they did not, no

such negotiations could have been "ongoing" when the DE Action was commenced.

Nor can Plaintiffs' transform their general threats into the kind of specific notice of

imminent litigation that the courts rely on in the rare cases where they override the first-to-file

rule.  Plaintiffs persist in arguing (Opp. at 26) that they delayed filing their supposedly imminent

North Carolina lawsuit because of the alleged "ongoing settlement negotiations."  Even if this

had some basis in fact (which it does not), it could hardly explain the eight-plus month delay

between the filing of the DE Action and the filing of the present action.  In both the DE Action

and this action, Plaintiffs have had ample opportunity to explain this delay, but they have not

explained and presumably cannot explain it — except by admitting that this action was an

afterthought and exercise in forum shopping by Plaintiffs themselves.

None of the cases cited by Plaintiffs would support the Court, on these facts, in

disregarding the first-to-file rule.  Not all of Plaintiffs' cases found a first-filed lawsuit to be

improperly anticipatory, but in those that did, the threat of litigation was explicit and/or

settlement negotiations unmistakable, moreover, the "race to the courthouse" was close by a

matter of days.

In *Guthy-Renker Fitness L.L.C. v. Icon Health & Fitness,* 179 F.R.D. 264, 271 (C.D. Cal.

1998) (Opp. at 20) a "notice-of-suit" letter provided "a detailed description of the substantial

---

[8]  As noted above, given that Plaintiffs have breached the parties' confidentiality agreement and proffered an inaccurate and misleading description of the call, Defendants have the right to set the record straight. *See, e.g., .Snap-On, Inc. v. Ortiz*, No. 96 C 2138, 1999 U.S. Dist. LEXIS 12104, at *41-43 (N.D. Ill. 1999) ("A material breach of contract justifies non-performance by the other party. . . .  Here, where the contract contained only two terms, each given in consideration for the other, the breach of one would clearly constitute a material breach, releasing the other party. …[E]ach party now argues that the other has not performed its part. It would undermine principles of fairness to hold one party to the contract while the other breaches it at will.").

experience" defendant had "in litigating its patents." Defendant's president stated that the letter was intended to "encourag[e] further dialog to avoid the sale of infringing products necessitating legal action." *Id.* This letter was far more explicit than any of Plaintiffs' statements to Defendants. But even so, it did not give the court a basis to disregard the first-to-file rule, because the letter "at best amount[ed] to veiled threats of legal action" and did not "provide Plaintiff with a specific, concrete indication of imminent suit." *Id.*

Plaintiffs cite *McJunkin Corp. v. Cardinal Sys.*, 190 F. Supp. 2d 874 (W.D. Va. 2002) (Opp. 20) for the proposition that "procedural fencing" may be a basis to disregard the first-to-file rule. There, the plaintiffs had filed an action seeking declaratory judgment but refrained from serving it on defendants until after the defendants filed their own action in a different jurisdiction. Consequently, "[t]he declaratory judgment action appear[ed] to have been filed silently, while the parties' negotiations continued, and held in Plaintiffs' hip pocket to preempt Defendants' potential breach of contract action." *Id.* at 879. This type of "procedural fencing" does not remotely exist in this case, where Defendants served the Delaware complaint as soon as it was filed and Plaintiffs' present action did not follow until more than eight months later.

Similarly, in *Touchstone Research Lab., Ltd. v. Anchor Equip. Sales, Inc.*, 294 F. Supp. 2d 823 (N.D. W. Va. 2003) (Opp at 24 n.22, 26-27, 29), defendant Anchor filed its complaint in Texas shortly after receiving unmistakable notice of plaintiff's intention to sue if negotiations failed, but did not serve the complaint until after plaintiff sued in Virginia. These maneuvers, like the "procedural fencing" in *McJunkin,* demonstrated the improper anticipatory nature of Anchor's first-filed suit. Yet the Virginia court refrained from deciding the issue in deference to the Texas court where the first complaint was filed. There is plainly no resemblance to the case at bar:

16

On October 8, 2002, Touchstone, by counsel, sent a letter to Anchor requesting that it provide adequate assurances that "all deficiencies in the autoclave will be remedied within thirty days from the date of this letter." Touchstone informed Anchor in that letter that if such assurances were not provided in thirty days, it would "immediately proceed to file a lawsuit seeking all damages, declaratory and/or equitable relief to which Touchstone is entitled as a result of Anchor's complete and utter failure to date to comply with the requirements of its contract with Touchstone." In response to the letter, Anchor sent an engineer to the Touchstone facility and discussions ensued between the two companies. On November 13, 2002, Touchstone was served with a complaint filed by Anchor against it in the state court of Harris County, Texas. Anchor filed that suit on October 11, 2002 seeking declaratory relief to relieve itself from the duties owed under its contract with Touchstone.

294 F. Supp. 2d at 826 (internal citations omitted).

In *Moore Corp. v. Wallace Computer Servs.*, 898 F. Supp. 1089 (D. Del. 1995) (Opp. at 20), Moore, a bidder in a tender offer, sued Wallace, the target company, in Delaware to prevent the target from blocking the tender offer. The target filed suit in New York two weeks later, alleging that the tender offer violated anti-trust and securities laws. Wallace sought to dismiss Moore's first-filed action on grounds, *inter alia*, that Moore had engaged in forum shopping to avoid Second Circuit precedent that favored Wallace. The court denied the motion, stating that "only where forum shopping is the sole factor motivating a choice of forum might dismissal be proper," and finding that an inference of forum shopping was overcome by the fact that, as here, "the issues raised involve Delaware law, a Delaware corporation, and a Delaware Board of Directors". 898 F. Supp. at 1099-1100. Indeed, it is Plaintiffs' choice of North Carolina (with which none of the parties has any relationship) that is inexplicable – a tell-tale sign of forum shopping. *See GT Plus, Ltd. v. Ja-Ru, Inc.*, 41 F. Supp. 2d 421, 425 (S.D.N.Y. 1998) ("Forum shopping occurs when a litigant selects a forum with only a slight connection to the factual circumstances of his action …").

Strangely, Plaintiffs cite *Moore* for the proposition that Defendants must have filed their Delaware suit knowing that litigation was imminent, because they could not otherwise have

alleged that the controversy was ripe for declaratory relief.  (Opp. at 25).  The distinction

between "ripeness" and threat of imminent suit is self-evident, and in fact, the *Moore* court held

both that the suit was ripe and that there was no basis for disregarding the "first-to-file" rule.

Plaintiffs omit salient facts of *Columbia Pictures Indus., Inc. v. Schneider*, 435 F. Supp.

742 (S.D.N.Y. 1977) (Opp. at 20), in citing it for the proposition that an exception to the first-to-

file rule exists "when the would-be plaintiffs are attempting settlement talks in good faith."

There, the would-be plaintiffs provided their adversaries with a draft of a complaint and a

deadline for commencing negotiations.  When, after a month of negotiations, the parties had

failed to come to an agreement, the adversaries raced to the courthouse to file in New York,

beating the would-be plaintiffs by a mere six days.  In dismissing the New York suit, the court

explicitly sought to encourage the practice of presenting a complaint to an adversary prior to

filing and prevent potential defendants from taking advantage of that practice:  "Potential

plaintiffs should be encouraged to attempt settlement discussions (in good faith and with

dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take

advantage of the opportunity to institute litigation in a district of its own choosing before

plaintiff files an <u>already drafted</u> complaint."  435 F. Supp. at 747-48 (emphasis added).

Tellingly, Plaintiffs attribute the above-quoted language to *Capitol Records, Inc. v.

Optical Recording Corp.,* 810 F. Supp. 1350, 1351-55 (S.D.N.Y. 1992) (Opp. at 20), which

purported to quote the *Columbia* decision but omitted the crucial phrase "already drafted."

Plaintiffs also omit to note the brevity of the gap (six days) between the *Columbia* parties'

competing filings.  Here, Plaintiffs did not provide Defendants with a draft complaint or any

other specific notice of intention to sue in a particular time frame; they did not proceed in good

faith with any settlement negotiations (as set forth above, there were no settlement negotiations);

and eight months after the DE Action was filed, they certainly were not a close second place in arriving at the North Carolina courthouse.

Nor does the decision in *Capitol Records* support Plaintiffs' position here. In that case, the defendant (who was plaintiff in the second-filed suit) had written a letter proposing "discussions to negotiate a settlement and avoid litigation." 810 F. Supp. at 1354. Instead of negotiating, "Capitol filed this action the day it received the letter." *Id.* Nothing of the kind occurred in the case at bar, where the parties tried for months — albeit in vain — to commence settlement negotiations before any suit was filed. Based on the facts before it, the court in *Capitol Records* ruled that "[a]llowing Capitol to proceed in the forum of its choosing based solely on the first-filed rule would undermine the policy of promoting good faith efforts to achieve a settlement." *Id.* Moreover, the court noted another reason for its decision that is decidedly not present here: the short time that elapsed before the second suit was filed. As the court explained, "the date of filing is less important when the competing actions are filed within a short period of time." *Id.* at 1355.

*Ontel Prods. Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144 (S.D.N.Y. 1995), is yet another decision that supports Defendants, notwithstanding the *dictum* Plaintiffs cite at Opp. 20-21. The *Ontel* court ultimately ruled that the first-to-file rule was inapplicable because the competing lawsuits were filed on the same day. 899 F. Supp. at 1153. Nonetheless, the defendants (who sued in New Jersey) charged that the simultaneous New York declaratory judgment suit was an improper anticipatory filing and sought to transfer it to New Jersey. The court addressed the issue of mirror image filings, explaining that declaratory judgment actions may be proper even if they anticipate that an adversary will file litigation elsewhere, and that a

delay in the adversary's filing undermines any inference that it was improperly deprived of its chosen forum. *Id.* at 1150.

The court ruled that "[i]n the instant case, although the available evidence supports the proposition that Ontel filed this action in the Southern District of New York in anticipation of P.S.C. bringing suit elsewhere, it also indicates that Ontel's filing was not 'improper.'" *Id.* The court explained that:

- "[T]he mere fact that an action is brought as one for a declaratory judgment 'does not necessarily [mean that it] constitute[s] an anticipatory filing for purposes of an exception to the first filed rule.'" *Id.*

- "A filing in this context is improper where it attempts to exploit the first-filed rule by securing a venue that differs from the one that the filer's adversary would be expected to choose. <u>This is not to say that whichever party first expresses its desire to resolve an alleged claim outside of the courtroom should always benefit from the first-filed rule; that would simply change the proverbial 'race to the courthouse' into the race to the post office,</u> facsimile machine, or telephone, in which parties would, at the first sign of conflict, communicate their desire to resolve the conflict without involving the courts." *Id.* at 1150-51 (internal citation omitted; emphasis added).

- Furthermore, if, after settlement discussions have proven fruitless, the party that initially refrained from filing does not proceed to file suit promptly, its adversary could be justified in filing first. This justification would exist where a party "created a controversy by making . . . charges, but by withholding suit, . . . prevented the other party from conclusively refuting them." *Id.* at 1151.

Here, where Plaintiffs delayed for more than eight months before filing their mirror image suit, *Ontel* counsels strongly that they are not entitled to relief from the first-to-file rule.[9]

---

[9] Plaintiffs' other authorities are also unavailing. *See Williams Gas Supply Co. v. Apache Corp.*, 594 A.2d 34, 36 (Del. 1991) (Opp. at 20) (court upheld dismissal of first-filed action on grounds that action was filed "when the parties were involved in settlement negotiations," but provided no description of the facts whatsoever, let alone any indication that the circumstances of that case were anything like the facts here); *Riviera Trading Corp. v. Oakley, Inc.*, 944 F. Supp. 1150 (S.D.N.Y. 1996) (Opp. at 21) (plaintiff filed lawsuit instead of responding to defendant's cease-and-desist letter, which contained a draft settlement agreement; settlement negotiations there were partially successful and defendants promptly filed suit in the forum of their choice).

Surprisingly, Plaintiffs devote a lengthy footnote (Opp. at 24 n.22) to a string cite of cases that underscore the fatal defects in Plaintiffs' position. For example, in *Remington Arms Co., Inc. v. Alliant Techsystems, Inc.,* No. 1:03 cv 1051, 2004 WL 444574 (M.D.N.C. Feb. 25, 2004), defendants had sent plaintiffs a

## IV.   **Plaintiffs Cannot Show Subject Matter Jurisdiction**

Plaintiffs argue that their Complaint embodies a direct rather than derivative action because the Defendants, through their equity interests in ALH, would be "unjust[ly] enriched" if there were a derivative recovery by ALH.  (Opp. at 33-37.)  Plaintiffs are wrong as a matter of fact and law.

As a factual matter, Shamrock is the only Defendant that is an equity holder in ALH. Defendants Krieger, Buchler and Stein are Shamrock's appointees to ALH's Supervisory Board; as such, they would have no right to share in any recovery by ALH.  Likewise, SCA, as consultant to ALH, would have no share in any derivative recovery.

As to the law, the Delaware Supreme Court, in 2004, repudiated the "special injury" analysis from which the so-called "unjust enrichment" exception derives, overruling all of the authority on which Plaintiffs purport to rely.  In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) — a decision Plaintiffs omit to cite — the Delaware Supreme Court revisited the derivative/direct distinction and held that the issue of whether a claim is derivative or direct "must turn <u>solely</u> on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Id.* at 1033 (emphasis in original).[10]

The *Tooley* court explicitly rejected the "special injury" test as a means of distinguishing between direct and derivative claims:

---

"cease and desist" letter with a seven-day deadline and explicit threat of suit.  Plaintiffs filed their suit one day before the deadline expired.  The remaining cases cited in that footnote are equally inapt.

[10]  Plaintiffs cite Donaldson, *Mapping Delaware's Elusive Divide*, 30 Del. J. Corp. L. 389, 391 (2005) (Opp. at 34), which analyzes the *Tooley* and *Agostino* decisions and states that "these decisions lay to rest the 'special injury' test."

> In our view, the concept of "special injury" that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.

845 A.2d at 1035. All of the authorities relied on by Plaintiffs (Opp. at 33-37) apply this now-overruled test.[11] Moreover, it is far from clear that the special injury test, even before it was overruled, would have permitted Plaintiffs' claims as direct claims. *Agostino v. Hicks*, 845 A.2d 1110 (Del. Ch. 2004), is a pre-*Tooley* case that, according to Plaintiffs, "recognize[ed] the 'unjust enrichment exception.'" (Opp. at 34.) Yet *Agostino* explicitly rejected the application of such an exception in the context of claims identical in nature to Plaintiffs' claims here:

> [The] series of events as described would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence. . . . In my opinion, the nature of this claim is nothing more than a claim of mismanagement that, "if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders." As such, "the wrong alleged is entirely derivative in nature."

845 A.2d at 1123 (internal citation omitted).

Plaintiffs also argue (Opp. at 36) that their suit is direct rather than derivative because "ALH is in the process of winding up." They offer no record support for this supposed fact nor could they, because it is not true. (*See* Buchler Reply Dec. at ¶ 12.)

---

[11] *See Fischer v Fischer*, No. C.A. 16864, 1999 WL 1032768, at *1 (Del. Ch. Nov. 4, 1999) (Opp. at 34-35) (holding that plaintiff "can bring her claims individually because she alleges she suffered special injury distinct from that suffered by the other shareholders"); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 75 (Del. Ch. 1999) (Opp. at 35) ("To make this decision, I must determine whether the complaint pleads a 'special injury' to the Proposed Class."); *In re Cencom Cable Income Partners*, No. C.A. 14634, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000) (Opp. at 34) ("It is the limited partners alone that allegedly suffer injury here based upon the general partner's alleged failure to confer the economic benefit to which the limited partners are entitled by contractual right under §7.3 of the Partnership Agreement.").

## V.      **Plaintiffs Cannot Show Personal Jurisdiction**

Plaintiffs' argument that SCA is subject to general personal jurisdiction in North Carolina (Opp. at 39) is wholly undermined by the language of North Carolina's long-arm statute, N.C.G.S.A. § 1-75.4 (which Plaintiffs quote), and by the allegations of their own Complaint. The statute provides for general personal jurisdiction over "a party <u>who when service of process is made</u> upon such party … <u>is engaged</u> in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise."  N.C.G.S.A. § 1-75.4 (1)(d) (emphasis added).  Notably, this provision is phrased in the present tense.

Plaintiffs' theory of general jurisdiction is that "SCA entered into the Consulting Agreement with ALH knowing it would be conducting business in North Carolina because one of ALH's operating units – MHI – was located in Charlotte," and that SCA in fact had a variety of contacts with North Carolina, all in the context of the management and sale of MHI.  (Opp. at 39-40.)  Leaving aside the fact that this theory springs entirely from argument in Plaintiffs' brief and is not to be found in the allegations of the Complaint, these alleged contacts cannot, as a matter of law, support general jurisdiction.  As Plaintiffs allege in the Complaint and emphasize throughout their Opposition papers, MHI was sold long before "service of process was made" upon SCA.  *See* Complaint ¶ 29 ("MHI was sold to Mattamy Homes Corporation ('Mattamy') in December, 2004"); ¶¶ 56-71 ("Shamrock sells off MHI"); Opp. at 40 ("Krieger, Buchler and Stein were intimately involved in the management of MHI, which involved, inter alia, financing, employment issues and ultimately, the sale of MHI.")  Whatever MHI-related activities SCA

may have conducted in the past, SCA was not (and is not alleged to have been) engaging in them when the Complaint was served in June 2004.[12]

Nor can Plaintiffs demonstrate specific personal jurisdiction over SCA by including in their brief a few conclusory and wholly unsubstantiated sentences to the effect that their claims arise out of the "substantial management services performed at MHI for ALH." (Opp. at 40-41.) In making this argument, Plaintiffs do not describe a single specific meeting, communication, other act in North Carolina, and do not refer to any allegations in their Complaint. This is presumably because the Complaint's only allegation of an activity in North Carolina from which Plaintiffs' claims supposedly arise concerns the single February 2003 meeting in Charlotte, which Plaintiffs expressly allege was with <u>Shamrock, not SCA</u>. (*See* Complaint ¶ 45.)

Nor, given the length of time the parties have been litigating and the paucity of Plaintiffs' jurisdictional allegations, should they be granted even limited discovery on jurisdictional issues. *See Crown Cork & Seal Co. v. Dockery*, 886 F. Supp. 1253, 1260 (M.D.N.C. 1995) ("Where a party has had ample time and opportunity to take discovery and the pleadings contain no specific facts that could establish jurisdiction, a court need not permit even limited discovery.").

## VI. <u>Plaintiffs Cannot Show that Their Allegations State Claims</u>

Plaintiffs argue that they need not plead facts sufficient to counter the presumption of the business judgment rule, contending that under *Stanziale v. Nachtomi* (*In re Tower Air, Inc.*), 416 F.3d 229 (3d Cir. 2005), they are not required "to plead around the business judgment rule" because they have not "expressly alleged that the business judgment rule did not vitiate [their] claims." (Opp. at 44.) This argument fails for three reasons.

---

[12] Plaintiffs do state in their brief that "SCA has other activities in North Carolina." (Opp. at 40.) This sentence, unadorned by any specificity and unsupported by any allegation or evidence, cannot possibly support personal jurisdiction.

First, under *Hanna v. Plumer*, 380 U.S. 460 (1965), a federal court sitting in diversity will apply federal procedural rules, but cannot vitiate a substantive requirement of state law. Even Plaintiffs characterize the *Tower Air* decision as "holding that Delaware's notice pleading cases are not interchangeable with federal notice pleading cases." (Opp. at 43.) Under Delaware law, allegations sufficient to overcome the presumption established by the business judgment rule are a substantive element of a fiduciary duty claim, not simply the procedural by-product of Delaware rules of pleading. The business judgment rule "operates as both a procedural guide for litigants and a substantive rule of law." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989). Accordingly, "a shareholder plaintiff challenging a board decision has the burden <u>at the outset</u> to rebut the rule's presumption." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added).

Second, even the *Tower Air* decision held that a plaintiff, to satisfy federal notice pleading standards, must plead more than legal conclusions: "[S]upporting facts should be alleged. . . . A plaintiff should plead basic facts, such as they are, for those are 'the grounds' upon which the plaintiff's claim rests. Even at the pleading stage, a defendant deserves fair notice of the general factual background for the plaintiff's claims." 416 F.3d at 237. Acknowledging this, Plaintiffs argue that "the Complaint contains sufficient allegations to provide Defendants with notice of Plaintiffs' claims and to establish that Plaintiffs can prove a set of facts in support [of] their claims which entitle them to relief" (Opp. at 46), because the Complaint alleges that "Defendants acted in their own self-interest, and not in the best interest of ALH, in order to rid themselves of the burden of managing ALH." (Opp. at 45.)

These allegations, however, are flatly contradicted by the Lion LLC Settlement Agreement and Consulting Agreement, which are incorporated into the Complaint and show that

Defendants could at any time, for any reason, exit any management responsibilities with respect to ALH.  (*See* Jarvis Opening Dec. Exhs. F and J.)  Moreover, the Operating Agreement, also incorporated into the Complaint, shows that the economic rights of Plaintiffs and Defendants are *pari passu*, and that consequently, all the actions and transactions of which Plaintiffs complain operated to the equal detriment or benefit of the parties.  (*See* Jarvis Opening Dec. Exh. D at §§ 4.1(b), 8.3(a)(iii), Exh. E at ¶ 20, Exh. MM at 3.)  Plaintiffs do not even attempt in their brief to explain how any finder of fact could infer from these allegations that Defendants' actions were culpably self-interested.

In *Tower Air*, the court acknowledged that where — as here — the complaint itself contradicts the claimed breach of fiduciary duty, that claim is subject to dismissal for failure to state a claim:

> We earlier stressed that we will not dismiss a complaint for lack of detailed facts. The problem here, though, is not the facts that are not pleaded, but the facts that are. It seems to us that a complaint is self-defeating when it states an ostensibly legitimate business purpose for an allegedly egregious decision.  Given his concession, it appears to us that Stanziale can prove no set of facts consistent with his claim . . . that would entitle him to relief.

416 F.3d at 239 (internal citations omitted).

Third, even assuming, *arguendo*, that rebuttal of the business judgment rule is otherwise outside the scope of notice pleading as set forth in *Tower Air*, Plaintiffs themselves point out that *Tower Air*, as well as decisions from this jurisdiction, do require a "plaintiff to plead around the business judgment rule" if "an unanswered affirmative defense appears on [the Complaint's] face".  (Opp. at 44.)  *See Tower Air*, 416 F.3d at 238; *Alston v. North Carolina A&T State Univ.*, 304 F. Supp. 2d 774, 780 (M.D.N.C. 2004) ("motion to dismiss tests . . . the merits of an affirmative defense . . . if the defense appears on the face of the Complaint").

Since the Complaint's allegations of self-interest are negated by agreements that the Complaint incorporates by reference, these allegations cannot be deemed "well-pleaded" for purposes of Rule 12(b)(6), and no inferences favorable to Plaintiffs should be drawn from them. What thus remains of the Complaint is nothing more than allegations that Plaintiffs disagreed with Defendants' business judgment. *See, e.g.,* Complaint ¶ 36 (hiring decisions), ¶ 46 ("concerns and proposals raised by the Class B members were ignored"), ¶¶ 48-49 (Defendants argued and voted against Plaintiffs' recommendation of a capital infusion), ¶¶ 51-52 (Defendants voted to sell BBC notwithstanding Plaintiffs' expressed concerns). The question, then, is whether the Complaint pleads any facts rebutting the presumption that those judgments were reasonable. As set forth above and in Defendants' Opening papers (at 40-51), it does not.

## CONCLUSION

By reason of the foregoing, and for the reasons set forth in all of Defendants' moving papers, Defendants respectfully request that this Court grant their motion to dismiss, or alternatively transfer, the Complaint.

This the 14th day of November, 2005

/s/ J. Donald Cowan, Jr.
J. Donald Cowan, Jr.
North Carolina State Bar No. 0968
Don.Cowan@smithmoorelaw.com

Elizabeth Brooks Scherer
North Carolina State Bar No. 27526
Beth.Scherer@smithmoorelaw.com

OF COUNSEL:
SMITH MOORE LLP
Post Office Box 21927
300 N. Greene Street, Suite 1400
Greensboro, North Carolina 27401
Telephone: (336) 378-5200
Facsimile: (336) 378-5400

OF COUNSEL:
Pamela Jarvis
Sandra M. Lipsman
Gregory P. Joseph Law Offices LLC
805 Third Avenue, 31st Floor
New York, NY 10022
Telephone: (212) 407-1200
Facsimile: (212) 407-1299

*Attorneys for Defendants Shamrock*
*Holdings of California, Inc., Shamrock*
*Capital Advisors, Inc., Eugene I. Krieger,*
*George J. Buchler, and Bruce J. Stein*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Defendants' Reply Memorandum In Support of Motion to Dismiss or Transfer has been served by United States mail, first-class, postage prepaid, to the following counsel of record:


Russ A. Brinson
Tracy L. Eggleston
Cozen O'Connor
One Wachovia Center, Suite 2100
301 South College Street
Charlotte, North Carolina 28302

Thomas M. Wood, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, Maryland 21202-3282


This the 14th day of November, 2005.


/s/ J. Donald Cowan, Jr.             _____
J. Donald Cowan, Jr.