CaSeale3B05cv00602BLR DoDocumentet123 FiFéléd06/02/20/20/806 PaPegbeof 8636

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

**FILED**
CHARLOTTE, N. C.

JUN  2 2005

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| A. ARENSON HOLDINGS, LTD.<br>5 Hashita Street<br>Caesera, Israel, | )<br>)<br>) |
| | ) |
| D.A. GARDENS, LTD.<br>31ˢᵗ Street 1-109<br>P.O.B. 6831<br>Panama 5, Panama, | )<br>)<br>)<br>) |
| | ) |
| J12ALH ASSOCIATES<br>1301 Avenue of the Americas<br>Suite 4101<br>New York, New York  10019, | )<br>)<br>)<br>) |
| | ) |
| SELK, LLC<br>One South Street, 27ᵗʰ Floor<br>Baltimore, Maryland 21202, | )<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| LAUREL EQUITY GROUP, LLC<br>4583 Route 9 North<br>Howell, New Jersey  07731 | )<br>)<br>) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| SHAMROCK HOLDINGS OF<br> CALIFORNIA, INC.<br>4444 Lakeside Drive<br>Burbank, California  91505, | )<br>)<br>)<br>) |
| | ) |
| SHAMROCK CAPITAL<br> ADVISORS, INC.<br>4444 Lakeside Drive<br>Burbank, California  91505, | )<br>)<br>)<br>) |
| | ) |
| EUGENE I. KRIEGER<br>4444 Lakeside Drive<br>Burbank, California  91505, | )<br>)<br>) |

Civil Action No.

3:05CV256-H

|                                          |     |
|------------------------------------------|-----|
| **GEORGE J. BUCHLER**                    | )   |
| **4444 Lakeside Drive**                  | )   |
| **Burbank, California 91505,**           | )   |
|                                          | )   |
| **and**                                  | )   |
|                                          | )   |
| **BRUCE J. STEIN**                       | )   |
| **4444 Lakeside Drive**                  | )   |
| **Burbank, California 91505**            | )   |
|                                          | )   |
| **Defendants.**                          | )   |
|                                          | )   |

## <u>COMPLAINT</u>
## (JURY TRIAL DEMANDED)

Plaintiffs, A. Arenson Holdings, Ltd., D.A. Gardens, Ltd., J12ALH Associates, SELK, LLC, and Laurel Equity Group, LLC, by and through their undersigned counsel, sue Defendants, Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler, and Bruce J. Stein and allege as follows:

## BACKGROUND

1.      Plaintiffs are the Class B Members of ALH Holdings, LLC ("ALH"), a Delaware limited liability company.   Although ALH was registered in Delaware, none of its daily business activities have ever been conducted in Delaware. ALH was in the home-building business and had until recently its only operating business in the Charlotte, Greensboro and Winston-Salem, North Carolina areas.   As a result of Defendants' improper conduct as set forth herein, the value of Plaintiffs' interests in ALH are worthless, their investments have been lost, and ALH is now insolvent.

2.    ALH II, Inc. ("ALH II") is a Delaware corporation and is a wholly-owned subsidiary of ALH. It is the operating subsidiary of ALH that has conducted business in Florida, Tennessee and North Carolina. ALH II has never conducted any of its daily business in Delaware.

3.    Defendant, Shamrock Holdings of California, Inc., ("Shamrock"), is a Class A Member of ALH and holds approximately 62% of the Class A membership interests in ALH.

4.    Defendant, Shamrock Capital Advisors, Inc. ("SCA"), has no membership interest in ALH. SCA is controlled by Shamrock. In July 2001, at Shamrock's insistence, without any change to the ALH Operating Agreement and without any consent of the Class B members, SCA entered into a consulting agreement with ALH to provide consulting services to ALH in connection with the sale of ALH's operating units and/or assets.

5.    Defendants, Eugene I. Krieger ("Krieger"), George J. Buehler ("Buehler"), and Bruce J. Stein ("Stein"), are employees of Shamrock and of SCA, and were nominated and elected by Shamrock in their individual capacities to serve as representatives on ALH's Supervisory Board. All three have served together as Supervisory Board Representatives of the Class A Members since at least July 2001. All three simultaneously owe conflicting loyalties to ALH on the one hand and Shamrock and SCA on the other.

6.    In early 2001, Defendants first expressed a desire to exit their investment and management of ALH. Over the next year, Defendants attempted to use their majority position to force a sale under any circumstances.

7. In March 2002. Defendants attempted to sell ALH as a going concern but the sale was mishandled from the start because Defendants insisted on selling ALH's balance sheet which contained an enormous amount of goodwill rather than sell ALH as a multiple of cash flow and land option inventory.

8. After the sale of ALH as a going concern was unsuccessful. Defendants concluded that ALH required too much of Shamrock's time, and embarked on their scheme to rid themselves of their management responsibilities and duties, by trying to sell off the operating units of ALH in a piecemeal fashion which they knew would result in depressed values for each of the units.

9. At the time Defendants announced that the management of ALH was too time consuming and began to sell off the company piecemeal, the loans that the Class A members had made to ALH through ALH II were still outstanding. Before Defendants completely walked away, they decided to get their loans repaid.

10. In order for the repayment of the loans not to be treated as preferences, since by this time ALH was insolvent. Shamrock realized that it had to keep ALH viable until the preference period elapsed.

11. In order to accomplish these goals of relieving themselves of their management responsibilities and safeguarding the repayment of the loans, Defendants began to sell off pieces of ALH at "fire sale" prices in order to use the proceeds to repay the loans.

12. The sale of ALH's operations in piecemeal fashion resulted in a depressed value of ALH and destroyed all member equity. That Defendants wiped out all member equity was reflected in the price obtained for its last asset, Mulvaney Homes,

Inc. ("MHI"). The sales also advanced Defendants towards their stated goal of ridding themselves of their responsibilities to ALH and its members.

13. The schemes, as detailed above, perpetrated by Defendants have not been in the best interests of the Class B members and ALH and amount to intentional breaches of fiduciary duties owed to Plaintiffs, gross negligence, bad faith, and self-dealing.

## PARTIES

14. Plaintiff, A. Arenson Holdings, Ltd. ("Arenson Holdings") is an Israeli Corporation. Arenson Holdings is a Class B member of ALH and owns approximately 8% of the Class B membership interest in ALH. Its principal place of business is in Israel. Arenson Holdings has not conducted any business in Delaware.

15. Plaintiff, D.A. Gardens, Ltd. ("D.A. Gardens"), is a Panamanian Corporation. D.A. Gardens is a Class B member of ALH and owns approximately 8.77% of the Class B membership interest in ALH. Its principal place of business is in Panama. D.A. Gardens has not conducted any business in Delaware.

16. Plaintiff, J12ALH Associates ("J12"), is a New York general partnership. The partners are Erica Jesselson and Jays Twelve, LLC, a Delaware LLC. Erica Jesselson is a citizen of New York. The members of Jays Twelve are twelve New York trusts. The trustees are all New York citizens. J12 is a Class B member of ALH and owns approximately 16.7% of the Class B membership interest in ALH. J12 ALH has not conducted any business in Delaware.

17.     Plaintiff, SELK, LLC ("SELK"), is a limited liability company registered in the state of Delaware. SELK's members are Shalom Lamm and NACA Holding Inc. Shalom Lamm is a citizen of New York and NACA Holding Inc. ("NACA") was incorporated in the British Virgin Islands. It does not have one principal place of business. It engages in business activities throughout Europe and Israel and occasionally the United States. All day to day activities, including investment decisions, as well as corporate decisions, are made in Europe, Israel and occasionally in New York by the Trust that owns NACA. No business is conducted in Delaware. SELK is a Class B member of ALH and owns approximately 33.3% of the Class B membership interests in ALH.

18.     Plaintiff, Laurel Equity Group, LLC ("Laurel Equity"), is a limited liability company registered in the state of Delaware. Laurel Equity's members are Mark Frankel, Chesky Frankel and Sallervale Company. Mark Frank and Chesky Frankel are New Jersey and New York citizens, respectively. Sallervale Company is a Bahamian corporation. Sallervale's principal place of business is in Geneva, Switzerland, where all corporate business decisions are made. No business is conducted in Delaware. Laurel Equity is a Class B member of ALH and owns approximately 33.3% of the Class B membership interests in ALH.

19.     Defendant, Shamrock, is a California corporation engaged in business as a diversified investment company wholly-owned by the Roy E. Disney Family with its principal place of business at 4444 Lakeside Drive, Burbank, California.

20.     Defendant, SCA, is a Delaware closed corporation engaged in business as a merchant bank with its principal place of business located at 4444 Lakeside Drive, Burbank, California. SCA is also the investment adviser affiliate of Shamrock.

21.     Defendant, Krieger is Vice-Chairman and Chief Operating Officer of Shamrock. Krieger also performs substantial services for SCA. Krieger also serves as a representative on ALH's Supervisory Board. Krieger is a citizen of the state of California. Krieger has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Krieger was a director of MHI.

22.     Defendant, Buehler is President and Chief Executive of the Shamrock Real Estate Division and was also Vice President and Chief Financial Officer of Shamrock. Buehler performs substantial services for SCA. Buehler also serves as a representative on ALH's Supervisory Board. Buehler is a citizen of the state of California. Buehler has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Buehler was a director of MHI.

23.     Defendant, Stein, is the Director of Real Estate for Shamrock. Stein performs substantial services for SCA. Stein also serves as a representative on ALH's Supervisory Board. Stein is a citizen of the state of California. Stein has conducted business on behalf of Shamrock and SCA in North Carolina. On information and belief, Stein was a director of MHI.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different states and

citizens of different states and foreign countries. This Court has personal jurisdiction over the defendants pursuant to N.C. Gen. Stat. § 1-75.4, N.C. Gen. Stat. § 1-75.6 and N.C. Rules Civ. Proc. § 1A-1, Rule 4 and principles of common law.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants conducted substantial business within this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE BUSINESS OF ALH

26.     ALH primarily built entry-level homes in the Southeastern United States. For example, in the Charlotte, North Carolina area, ALH, through one of its subsidiary operating units, MHI, closed 675 house sales in the year 2000 alone.

27.     In 1998, ALH acquired home-building operations in Jacksonville, Florida, that operated under the name Atlantic Builders, Inc. ("ABI"). This acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants.

28.     In 1999, ALH acquired home-building operations in Memphis, Tennessee that operated under the name Bowden Building Corporation ("BBC"). This acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants.

29.     In 2000, ALH acquired home-building operations in Charlotte, North Carolina, that operated under the name MHI. This acquisition was approved by ALH's Supervisory Board, which in all respects was controlled by Defendants. MHI expanded into western North Carolina and operated in the Charlotte, Greensboro and

- 8 -

Winston-Salem metropolitan areas. MHI was sold to Mattamy Homes Corporation ("Mattamy") in December, 2004.

## ALH'S SUPERVISORY BOARD

30.     When ALH was first formed in June 1998, its Supervisory Board consisted of five members: two designated by ALH's Class A members, one designated by ALH's Class B members and two designated by ALH's Class D members. ALH's Board has always consisted of five members, but the Class B members have consistently been limited to one Representative. Major decisions require the unanimous consent of the Class A Representatives on the Board. All other decisions and actions by ALH are effective by majority vote of the Board.

31.     From the outset, Buehler was one of two Class A Representatives and Arenson was the Class B Representative. The Representatives of the Class D members were Shalom E. Lamm ("Lamm") and Jonathan Zieh ("Zieh").

32.     In or around late 1999/early 2000, Krieger became a Class A Representative, replacing another Shamrock employee who previously held that position.

33.     In a move designed to further entrench the power of Shamrock, ALH entered into a management agreement in the summer of 2001 (the "Management Agreement"). The Management Agreement stripped one of the two seats from the Class D members on the Board and gave the Class A Members the right to designate the person to fill the Class D seat on the Board.

34.     Zieh was removed as the Class D member of the Supervisory Board, and Shamrock added Stein to the Supervisory Board.

35. Ever since the creation of the Management Agreement, three of the five members of the Supervisory Board (a majority) have been Shamrock employees.

## HIRING DECISIONS BY ALH

36. Defendants have continually made hiring decisions not in the best interests of the Class B members or ALH as a whole. At Shamrock's insistence, ALH hired a Shamrock-subsidiary, SCA, as a "consultant" when Shamrock embarked on its course to dismantle ALH. Shamrock also hired its own attorneys as the attorneys for ALH in connection with the sales of its assets and operating units. Shamrock used its consultant to justify the sales of operating units and its own clearly conflicted law firm to represent ALH in the sales.

### *Hiring a Subsidiary to be a Consultant*

37. In July 2001, ALH entered into an agreement with SCA (the "SCA Agreement") to provide consulting services to ALH for $100,000 per year. The SCA Agreement: (1) does not require SCA to provide any minimum amount of time in order to receive its yearly payoff; (2) allows SCA to determine how much time, if any, it will allocate to its duties; (3) allows SCA to terminate the agreement at will; (4) includes indemnification clauses to protect SCA from its mistakes; and (5) attempts to shield SCA from all liability to ALH for the mistakes it makes. SCA assisted, aided and abetted Shamrock in its goal to sell off ALH at a loss.

38. Krieger, Buehler, and Stein, the Class A Representatives on the Supervisory Board, have all done substantial work for SCA. The three Representatives are

highly placed officers in Shamrock, which wholly-owns SCA. The three representatives owe fiduciary duties to Plaintiffs, Defendants, ALH, and the companies hired by ALH.

### Shamrock hires conflicted counsel

39.     The law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP ("Fried Frank") represents Shamrock (largest Class A member) and SCA (the consultant hired by Shamrock for ALH). Fried Frank was hired by Shamrock to represent ALH in the sale of its various operating units and assets. Despite protests raised with Fried Frank, Shamrock, ALH, and the Supervisory Board regarding this clear conflict of interest and likely detriment to the Class B members of ALH, Fried Frank continued to represent ALH in the sales even though its duty of loyalty was to its longtime client Shamrock. Fried Frank's recognition of its conflict is evidenced by a conflict letter it insisted that ALH sign despite the fact that the conflict could not be waived. Fried Frank has assisted in the destruction of the Class B members' equity and the dismantling of ALH.

40.     Fried Frank continued to attend the Supervisory Board meetings on behalf of ALH and Shamrock and continued throughout the sale of ABI, BBC and MHI, to represent both ALH and Shamrock despite the unwaivable conflict. Any attempt by the Class B members to bring counsel to Supervisory Board meetings has been blocked by Shamrock without explanation.

### THE LOANS

41.     Pursuant to a loan agreement, dated April 6, 2000, various ALH members made loans to ALH II. The loans were guaranteed by various ALH II subsidiaries. Arenson Holdings loaned over $150,000 to ALH II and Shamrock loaned over $1,500,000,

42.     Pursuant to another loan agreement, dated May 7, 2002, various ALH members made loans to ALH II.  D.A. Gardens loaned over $300,000, J12ALH loaned over $300,000, SELK loaned over $600,000, and Shamrock loaned almost $2,000,000.

43.     These loans were eventually repaid from the proceeds of the sale of the assets of ALH's operating entity, ABI.

44.     At the time the loans were repaid, ALH was insolvent.  If ALH had declared bankruptcy at any time within one year from the date of the repayment of the loans, the repayments would have to be disgorged as preferential.  Therefore, rather than declare bankruptcy, Defendants continued to sell off ALH's assets so that ALH could continue to operate.  This scheme ultimately stripped ALH of any value and wiped out Plaintiffs' equity.

### *The Charlotte Meeting*

45.     In February, 2003 some of Plaintiffs and their counsel met with Shamrock (Messrs. Krieger and Buchler) in Charlotte.  The purpose of the meeting was to discuss the problems then-currently facing ALH and the future problems that could arise if a change of course was not effected.  Defendants' reply to Plaintiffs' counsel was that ALH was consuming too much management time and that Defendants wanted to rid themselves of the hassle of dealing with ALH.

46.     At this meeting, Plaintiffs warned Defendants that a piecemeal sale of the operating units would be disastrous.  The Class B members even proposed buying out the Shamrock position in ALH.  All of the concerns and proposals raised by the Class B members were ignored and continued to be ignored, and because of Defendants' gross

negligence and self-dealing, ALH is in the dire straits that was predicted at the Charlotte meeting.

## THE DISMEMBERING OF ALH

47. At the meeting of ALH's Supervisory Board on May 14, 2003, the failure to sell ALH in its entirety as a going concern and the subsequent efforts to sell ALH piece-by-piece, starting with ABI, were discussed.

### *Shamrock sells off ABI*

48. At a subsequent June 26, 2003, Supervisory Board meeting, an overview was presented regarding ALH's efforts to find purchasers for its various operating units and assets. Fried Frank (counsel to ALH, Shamrock, and SCA) then presented the terms of a proposed sale of ABI to the Supervisory Board. During the discussion that followed, Arenson recommended that existing members finance another infusion of capital to assist ALH compete more effectively in the home buying market as had been done in 2000 and 2002, rather than sell off the assets piecemeal.

49. Buchler argued in bad faith, despite Arenson's previous proposal, that (1) ABI had pressing liquidity needs it would be unable to meet in the near future, (2) the consummation of the sale of ABI would permit the settlement of pending litigation (that involved the initial purchase of BBC) to be concluded, and (3) no other proposals for funding or acquiring ABI had been made.

50. After further review and discussion, and with Shamrock firmly in control of the Supervisory Board, it voted in favor of the sale of ABI. Arenson voted against the sale. The proceeds of the sale were used, in part, to pay off the loans.

### *Shamrock sells off BBC*

51. Less than a year later, at a Supervisory Board meeting on March 24, 2004, ALH considered the proposed sale of 100% of the stock of BBC. Buehler gave an overview of the economic terms of the transaction and Fried Frank (counsel to ALH, Shamrock, and SCA) made a presentation regarding the terms of the proposed purchase agreement.

52. The Board then discussed the merits of the proposed BBC sale. Arenson stated that he opposed the sale of BBC for the same reasons he had expressed in connection with the sale of ABI. Arenson expressed a concern that the sale was not in the best interests of all of ALH's members and that better value might be obtained by continuing to operate BBC.

53. Arenson expressed concern that there was a conflict of interest on the part of Fried Frank in the BBC transaction because Fried Frank also represented Shamrock (and SCA). Fried Frank explained that it was representing ALH and the Supervisory Board in the transaction and not ALH's members separately. Fried Frank also took the position that, regardless of whether there was a potential conflict, ALH had waived any potential conflict of interest. These conflicts, however, could not be waived.

54.    After further discussion, and with Shamrock in control of the Supervisory Board, it voted in favor of the proposed sale of BBC over the protests of Arenson and another member of the Board.

55.    Again, the proceeds of the BBC sale were used to infuse cash into ALH so that it could continue to operate until such time as the repayment of the loans would not be considered preferential.

### Shamrock sells off MHI

56.    After the sales of ABI and BBC, ALH was left with only one operating home building unit, MHI.

57.    In furtherance of their scheme to rid themselves of any further management responsibilities with respect to ALH and, at the same time, tread water until the preference period expired, Defendants attempted to sell MHI at a depressed value.

58.    At the time of the sale of ABI in 2003, William Lanius ("Lanius") was the CFO for ALH. After the sale of ABI, Lanius became the President of ABI's acquirer, Mattamy. Despite his new position, he was hired by Defendants as a consultant to advise Defendants on the management and financial aspects of ALH and assist in the further sales of ALH's operating units BBC and MHI.

59.    In his capacity as consultant for ALH, Lanius was responsible for negotiating with potential buyers and negotiating with ALH's lenders, Wachovia and Swiss Re, in connection with the sales of BBC and MHI.

60.    In the summer of 2004, ALH and Levitt Homes ("Levitt") entered into a letter of intent for the sale of MHI. At that time, the President of Levitt was John LaGuardia ("LaGuardia"), the former President of ALH. LaGuardia had previously used

knowledge gained about the mismanagement by Defendants of ALH, in his former position with ALH to his advantage and to the disadvantage of ALH in the BBC sale. Despite the manner in which LaGuardia used Defendants' mismanagement of ALH (the lack of commitment and weakness of the management team) to leverage the purchase of BBC to the advantage of BBC and to the disadvantage of ALH, Defendants, nevertheless, attempted to sell MHI to Levitt.

61.     In connection with the sale of MHI to Levitt, Lanius, as the consultant for ALH, evaluated the offer from Levitt, negotiated with Levitt, negotiated with ALH's lenders, Wachovia and Swiss Re, negotiated the Wachovia Forbearance Agreement so that the MHI sale to Levitt could go forward and obtained an agreement from Swiss Re that the ALH shareholders would receive a payment of $1 million if the Levitt transaction closed. A copy of a memo from Defendant, Buehler, attached as Exhibit A, demonstrates Lanius' intimate role in the Levitt transaction.

62.     The $1 million payment negotiated by Lanius on behalf of the ALH shareholders was too little too late. Plaintiffs had invested over $8.5 million in ALH and a payment of $1 million was woefully inadequate, although not surprising, considering Defendants' mismanagement.

63.     On October 6, 2004, Levitt informed ALH that it no longer was interested in purchasing MHI. The reasons for Levitt's sudden lack of interest are unclear. Attached as Exhibit B is a copy of Defendant Buehler's e-mail regarding Levitt's refusal to go forward with its purchase of MHI.

64.     Although Buehler's e-mail conveyed Levitt's intent to withdraw, coincidentally, it indicated that Lanius, as President of Mattamy, was interested in

purchasing MHI. Buchler's e-mail makes crystal clear that as of October 6, 2004, Lanius was representing both ALH as a consultant and Mattamy as its President.

65.     On October 22, 2004 Mattamy submitted a proposal through Lanius, offering to purchase MHI on even less favorable terms than the Levitt deal. A copy of the Mattamy proposal is attached as Exhibit C.

66.     Between October 6 and October 22, 2004, Defendants made no efforts to solicit other buyers to purchase MHI. During this time, Defendants made no efforts to shop MHI on the open market but instead, entered into discussions with its own consultant, Lanius, who was intimately familiar with the financial weaknesses of ALH.

67.     Mattamy's depressed offer was not surprising. In his capacity as consultant, Lanius negotiated on behalf of ALH with the various lenders and was intimately familiar with the financial condition of ALH as well as Defendants' conduct which resulted in the severely depressed financial condition of ALH and MHI.

68.     The Mattamy offer was put together by Lanius and he undoubtedly used the insider information he gained while CFO and consultant to ALH to make such a depressed offer. ALH found itself in a position of having received this depressed offer from Mattamy as a result of the decisions and breaches of fiduciary duty made by Defendants in order to rid themselves of their management responsibilities and to recoup their loans to ALH without any preference issues.

69.     In December, 2004, Mattamy and ALH II entered into a Stock Purchase Agreement to sell MHI to Mattamy. This new offer still only gave One Million Dollars ($1,000,000) to Plaintiffs who had invested over $8.5 million in ALH.

70. Because of Defendants' past conduct in dismantling ALH, ALH now found itself in a position of having only one buyer who was intimately familiar with all of its weaknesses, was familiar with Defendants' desire to rid themselves of their investment and was able to exploit these weaknesses to the disadvantage of ALH, Plaintiffs, and to the advantage of Mattany.

71. It is apparent that Defendants, for their own purposes, wrote off the equity in ALH. By selling divisions of ALH in piecemeal fashion, they allowed ALH to avoid bankruptcy and have their loans paid back in a manner that would prevent the payments from being treated as "preferential" payments to "insiders" under 11 U.S.C. § 547 of the Bankruptcy Code.

## COUNT ONE - BREACH OF FIDUCIARY DUTY

72. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

73. Rather than continue to spend the time required to properly manage ALH, Defendants schemed to relieve themselves of their fiduciary duties to run the company, but at the same time, have their loans repaid without running the risk of having to disgorge the payments as preferences.

74. First, in attempting to sell ALH as a whole, Defendants owed a fiduciary duty to the Class B members to obtain the best possible price for Plaintiffs and to maximize value for the Class B members

75. Defendants' failure to sell ALH in a manner that would maximize its value i.e., selling it as a multiple of cash flow and land option inventory, was a breach of their fiduciary duties to Plaintiffs.

76. Second, Defendants' failure to actively solicit offers for ALH and their failure to work with Class B members was a breach of their fiduciary duties to Plaintiffs.

77. Third, when Defendants embarked on their plan to sell the operating units piecemeal, Defendants breached their fiduciary duties by stifling competitive bids by selling the assets at "fire sale" prices. Defendants' actions were knowing, intentional, willful, grossly negligent, and in bad faith.

78. Defendants owe fiduciary duties to Plaintiffs and the Class B members. Defendants breached such duties by, *inter alia*, insuring that the sale of ALH would fail, scheming to sell operating units so that the proceeds could be used to prop up the liquidity of ALH so that ALH would not have to declare bankruptcy and the repayment of the loans would not be preferences, and hiring Fried Frank as counsel for ALH.

79. As a result of Defendants' knowing and willful failure to comply with their fiduciary duties, Plaintiffs have lost the value of their investment and their equity is virtually worthless.

80. Thus, as a result of Defendants' breaches of their fiduciary duties alleged above, including their duty to maximize member value, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT TWO - BREACH OF OPERATING AGREEMENT

81. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

82. Defendants' breaches of fiduciary duties as alleged above are in violation of the ALH operating agreement.

83.     Section 6.2(f) of the ALH operating agreement states:

the Manager, Representatives, and Deputy Representatives shall be liable, responsible and accountable for their own fraud, criminal action, bad faith or gross negligence. Nothing in this Section 6.2(f) shall be deemed to make the Manager or any Representative or any Deputy Representative liable, responsible or accountable to any Person other than the Company or the Members.

84.     Defendants' actions, as described above, were done in bad faith and in a grossly negligent manner and constitute a violation of the operating agreement.

85.     Defendants' actions, as described above further violate Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

(c)     To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement **may not eliminate the implied contractual covenant of good faith and fair dealing**.

(e)     A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement **may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.**

86.     By engaging in the acts described above, Defendants have also violated the implied contractual covenant of good faith and fair dealing.

87.     As a result of Defendants' breaches, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT THREE – BREACH OF CONSULTING AGREEMENT

88. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

89. SCA's breaches of fiduciary duties as alleged above are in violation of the consulting agreement between SCA and ALH.

90. Schedule A of the consulting agreement [emphasis added] states:

> the Company [**ALH**] **shall not be responsible** for any claims, liabilities, expenses, losses, and damages to the extent that it is finally judicially determined that they result primarily **from actions taken or omitted to be taken by SCA in bad faith or due to SCA's gross negligence or willful misconduct.**

91. SCA's actions, as described above, were done in bad faith, in a grossly negligent manner, and with willful misconduct and constitute a violation of the consulting agreement.

92. SCA's actions, as described above further violate Delaware's Limited Liability Company Act, 6 Del.C. § 18-1101 [emphasis added], which provides:

> (c) To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement **may not eliminate the implied contractual covenant of good faith and fair dealing.**

> (e) A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement **may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.**

93. By engaging in the acts described above, SCA has also violated the implied contractual covenant of good faith and fair dealing.

94. As a result of SCA's breaches, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT FOUR - GROSS NEGLIGENCE

95. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

96. Defendants' conduct as alleged above and its actions relating to the sale of ALH and the subsequent sale of its operating units amounts to gross negligence. Further its hiring and directions to both Fried Frank and SCA were grossly negligent.

97. Defendants scheme to sell ALH in a piecemeal fashion was for the sole benefit of the Class A members.

98. Defendants hiring of Fried Frank and forcing ALH to waive any conflicts was grossly negligent and was in bad faith and was for the sole benefit of the Class A members.

99. Defendants owed a duty to Plaintiffs to act in their best interests and to protect the value of their interests in ALH.

100. Defendants further owed a duty to Plaintiffs to refrain from breaching the operating agreement.

101. Defendants have breached their duties as alleged above.

102. As a result of Defendants' grossly negligent actions, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT FIVE - SELF-DEALING

103. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

104. Defendants schemed to sell ALH in a piecemeal fashion. This plan of action was for the sole benefit of the Class A members.

105. Defendants, through their control of the Supervisory Board, directed that ABI, BBC, and MHI be sold as separate operating units.

106. Each time a vote was held to sell an operating entity of ALH, the bare minimum required (three votes) to approve the sale was achieved. Each time, the three votes were from insiders —all three were employees of Class A member Shamrock and worked for SCA.

107. The controlled votes allowed ALH to sell off ABI, BBC, and MHI for the sole benefit of the Class A members and to the detriment of the Class B members.

108. The actions approved by the Shamrock portion of the Board are *ultra vires* in nature and, as a result of Defendants' self-dealing, Plaintiffs have suffered injury and damage in excess of $8,000,000, the exact amount to be determined at trial.

## COUNT SIX - CIVIL CONSPIRACY

109. Plaintiffs reallege the previous paragraphs as if fully set forth herein.

110. Defendants have conspired with each other to strip ALH of its value, to breach their fiduciary duties to Plaintiffs, to hire consultants and lawyers who did not protect the interests of Plaintiffs, and other acts as alleged herein so that Defendants would no longer have to manage ALH and so that their loans would be repaid.

111.    In furtherance of their conspiracy, Defendants committed the breaches of fiduciary duty described herein and have conspired with each other for the sole benefit of themselves and the other Class A members.

112.    Defendants conspired against the Class B members with actual malice, ill will, and in bad faith and with an intent to financially injure them. Defendants' plan to sell off ALH in a piecemeal fashion has financially injured all Plaintiffs by reducing the value of their interests in ALH to virtually nothing.

WHEREFORE, Plaintiffs demand judgment against Defendants in excess of $8,000,000, the exact amount to be determined at trial.

PLAINTIFFS DEMAND A JURY TRIAL.

Respectfully submitted this the 2nd day of June, 2005.

RUSS A. BRINSON NC Bar No. 26070
Cozen O'Connor
One Wachovia Center, Suite 2100
301 South College Street
Charlotte, North Carolina  28202
(704) 376-3400
Fax:  704-334-3351
RBrinson@cozen.com

Of Counsel:

THOMAS M. WOOD, IV
Neuberger, Quinn, Gielen, Rubin & Gibber
One South Street, 27th Floor
Baltimore, MD  21202-3282
(410) 332-8523
tmw@nqgrg.com

Attorneys for Plaintiffs

**Subject:** FW: Wachovia Forbearance Agreement - Draft

----- Original Message -----
**From:** George Buchler
**To:** 'Shalom Lamm' ; Avie Arenson (avie@arenson.co.il) ; Gene Krieger ; Bruce Stein
**Sent:** Tuesday, August 24, 2004 2:17 AM
**Subject:** FW: Wachovia Forbearance Agreement - Draft

Please note the following information supplied by Bill Lanius regarding Wachovia's MHI loan.

-----Original Message-----
**From:** William R. Lanius [mailto:wrlanius@bellsouth.net]
**Sent:** Sunday, August 22, 2004 11:27 AM
**To:** 'George J. Buchler'
**Subject:** Wachovia Forbearance Agreement - Draft

George..... FYI, I have attached a copy of Wachovia's proposed forbearance agreement which provides for the continuity of construction financing thru the end of the year. However, Wachovia has also inserted some considerable hurdles, costs, restrictions and other legal provisions. I have summarized some of them below:

1. Forbearance Timetable
   a. 9/15/04 - Executed LOI w/ Levitt (done? If so, can I please have an executed copy?)
   b. 10/29/04 - Executed SPA/APA w/ Levitt
   c. 12/29/04 - Close MHI sale w/ Levitt
2. Non-refundable forbearance fee of $100k payable immediately
3. Interest rate increase of 50 bps to Prime – 1%
4. New financial covenants:

   a. Minimum liquid assets of $2.9 million
   b. Spec ratio of 35%
4. Cross-default w/ all other loans/lenders
5. Releases Wachovia completely with covenant not to sue

I have forwarded this document to counsel in NC for legal review but would also like to discuss the foregoing provisions w/ you. FYI, for the most part, I will be in meetings, etc. thru this Wednesday and may not be immediately reachable. Thx...... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556

Case 3:05-cv-00082BLR Document 123 Filed 02/22/2006 Page 27 of 8636

**Subject:** FW: Wachovia Forbearance Agreement - Draft

---

----- Original Message -----
**From:** George Buchler
**To:** Gene Krieger ; Bruce Stein ; Avie Arenson (avie@arenson.co.il) ; 'Shalom Lamm'
**Sent:** Tuesday, August 24, 2004 2:20 AM
**Subject:** FW: Wachovia Forbearance Agreement - Draft

Further update from Bill Lanius.

-----Original Message-----
**From:** William R. Lanius [mailto:wrlanius@bellsouth.net]
**Sent:** Monday, August 23, 2004 7:52 AM
**To:** 'George J. Buchler'
**Subject:** RE: Wachovia Forbearance Agreement - Draft

George .... I neglected to mention one other significant item below: the substitution collateral provision. Thx.... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556

> -----Original Message-----
> **From:** William R. Lanius [mailto:wrlanius@bellsouth.net]
> **Sent:** Sunday, August 22, 2004 2:27 PM
> **To:** 'George J. Buchler (gbuchler@shamrock.com)'
> **Subject:** Wachovia Forbearance Agreement - Draft

George..... FYI, I have attached a copy of Wachovia's proposed forbearance agreement which provides for the continuity of construction financing thru the end of the year. However, Wachovia has also inserted some considerable hurdles, costs, restrictions and other legal provisions. I have summarized some of them below:

1. Forbearance Timetable
   a. 9/15/04 - Executed LOI w/ Levitt (done? If so, can I please have an executed copy?)
   b. 10/29/04 - Executed SPA/APA w/ Levitt
   c. 12/29/04 - Close MHI sale w/ Levitt
2. Non-refundable forbearance fee of $100k payable immediately
3. Interest rate increase of 50 bps to Prime + 1%
4. New financial covenants:
   a. Minimum liquid assets of $2.9 million
   b. Spec ratio of 35%
5. Cross-default w/ all other loans/lenders
6. Releases Wachovia completely with covenant not to sue

I have forwarded this document to counsel in NC for legal review but would also like to discuss

Case 3:05-cv-00002-HLR Document 23 Filed 02/02/2006 Page 28 of 36

the foregoing provisions w/ you. FYI, for the most part, I will be in meetings, etc. thru this Wednesday and may not be immediately reachable. Thx...... WRL

Bill Lanius
e-mail: wrlanius@bellsouth.net
phone: 904-219-8460
fax: 904-279-9556

**From:** Arenson Avie [mailto:avie@arenson.co.il]
**Sent:** Sunday, October 10, 2004 2:19 AM
**To:** Isaac M. Neuberger; Michael G. Jesselson (E-mail); benjamin jesselson; Michel Konig (E-mail); Hesky
**Subject:** Fw: Mulvaney Homes (MHI)

----- Original Message -----
**From:** George Buchler
**To:** Avie Arenson (avie@arenson.co.il) ; Shalom Lamm (slamm@lionlamm.com) ; Gene Krieger ; Bruce Stein
**Cc:** 'Francis W. Costello (fcostell@hklaw.com)'
**Sent:** Wednesday, October 06, 2004 7:21 PM
**Subject:** Mulvaney Homes (MHI)

I have just been notified by Levitt that they will not proceed with their acquisition of MHI. Their stated reason for not moving forward is that they feel that MHI would need to reposition itself into the "move-up" home market and Levitt is uncertain whether this strategy would be a success. The starter home market is apparently overcrowded with many national firms in this category.

Mattamy, the purchaser of Atlantic Builders, has now surfaced as a potential buyer of the company. As you know, Bill Lanius, who has continued to assist ALH in a variety of ways, works for Mattamy. Bill has quickly reviewed the MHI potential acquisition with his boss, and there is sufficient interest to proceed. Bill will go to Charlotte early next week with the idea of doing enough due diligence to demonstrate the potential of acquiring MHI. If indications are then positive, depending on what Mattamy will pay for MHI, consent would then be needed from Swiss Re and the lenders to consummate the transaction. Undoubtedly, Swiss Re, as was the case with the aborted Levitt transaction, will need to in some way provide funding under their surety instrument. Swiss Re wants to be done with ALH and take their loss as required.

The MHI situation continues to be very fragile. We have been told of several employees leaving MHI for what they perceive as better employment opportunities elsewhere. Time is of the essence to complete a transaction.

If I can answer anything further regarding the situation, please let me know.

# Mattamy U.S. Group

7500 Belfort Parkway, Suite 200
Jacksonville, FL 32256

Phone: (904) 219-8460
Fax: (904) 279-9556

October 22, 2004

ALH II, Inc.
4444 Lakeside Drive
Second Floor
Burbank, California 91505
Attn: George J. Buchler
Director

Dear George:

The purpose of this letter is to confirm the interest of Mattamy Homes Corporation, or an affiliate thereof ("Mattamy") in acquiring all of the equity interests of Mulvaney Homes, Inc. and its subsidiaries (collectively, the "Company"). The proposed transaction, which is described below, will hereinafter be referred to as the "Acquisition." Mattamy and any affiliate or affiliates through which the Acquisition may be effected may hereinafter be referred to as the "Purchaser." The beneficial holder of all the equity interests in the Company is assumed to be ALH II, Inc. and will hereinafter be referred to as the "Interest Holder."

## NON-BINDING ACQUISITION PROPOSAL

1.  Acquisition. Based on the information currently known to Mattamy, it is proposed that the terms of the Acquisition would include the following:

    (a)  Purchase of Stock. At the closing for the Acquisition (the "Closing"), Purchaser would purchase from the Interest Holder all of the issued and outstanding shares of stock of the Company (the "Stock"). At the Closing, the assets of the Company would include those assets reflected on the September 30, 2004 balance sheet of the Company previously delivered to Mattamy, as the same may have changed only in the usual and ordinary course of the Company's business (the "Assets"). The Assets would include all assets currently used in the Company's homebuilding, land development and related businesses and necessary to continue the Company's business as a going concern.

    (b)  Purchase Price. The purchase price for the Stock (the "Purchase Price") would be $6,500,000, payable entirely in cash. The Purchase Price assumes that any debt of the Company or other amounts owed by the Company to related parties, including, but not limited to the Interest Holder, would be converted to equity in the Company prior to the Closing and that from September 30, 2004 through the Closing, no distributions would be made from the Company to the Interest Holder or any other related party.

---

(c)    Non-Compete/Non-Solicitation.  The Interest Holder would enter into non-compete/non-solicitation agreements with Purchaser prohibiting them and their affiliates from: (i) engaging, either directly or indirectly, in the construction, sale and/or leasing of single-family or multi-family homes, the development of real property for use as lots for residential or commercial construction, the provision of mortgage financing or title insurance/settlement services anywhere within 100 miles of any county in which the Purchaser operates, for a period of five (5) years after the Closing, and (ii) soliciting to employ or employing any employee of Purchaser, or an affiliate of Purchaser while such individual is employed by Purchaser or such affiliate, in each case for such five (5) year period.

(d)    Employment Arrangements.  Purchaser would obtain mutually satisfactory employment arrangements with key personnel of the Company, as identified by Mattamy.

(e)    Material Adverse Change.  From September 30, 2004 through the Closing, there would not have been any material adverse change, or occurrence of an event likely to result in any material adverse change, in the assets, liabilities, business, financial condition, results of operations, personnel or prospects of the Company.

2.    Definitive Agreement.    Mattamy would promptly prepare for consideration and negotiation by the parties, a draft of an agreement with the Interest Holders that would contain and describe with greater specificity the terms and conditions set forth herein and other usual and customary representations, warranties, indemnities, covenants and conditions for a transaction of the type contemplated herein.   In this regard, the Interest Holder's representations and warranties would relate to such matters as accuracy of financial statements, absence of unrecorded liabilities, payment of taxes, state of title to the Assets, compliance with applicable laws and absence of current or expected adverse events. As a condition of closing, the Interest Holder also would obtain any material consents of third parties required to permit the transfer of the Stock to Purchaser.   The Closing would occur by December 31, 2004.   The indemnification obligations of the Interest Holder would be funded solely out of the funds currently being held pursuant to that certain Escrow Agreement dated July 10, 2003 by and between Mattamy (Jacksonville) Partnership, Atlantic Builders, Inc. (an affiliate of the Interest Holder) and RBC Centura Bank, the terms of which would be amended accordingly and extended for a period of two years after the Closing.

The obligations of Purchaser and Interest Holder to consummate the Acquisition would be subject to the negotiation and execution of the definitive form of such agreement, containing mutually acceptable provisions, (the "Definitive Agreement") and to the following additional conditions, which are not intended to be exhaustive:

(a)    The results of Mattamy's diligence investigation are satisfactory to Mattamy in its sole discretion; and

    (b)     On or before Closing, all regulatory and material third party consents, approvals and clearances are received, on terms satisfactory to Mattamy in its sole discretion.

    (c)     On or before Closing, the "Term Loan" from Wachovia Bank to Interest Holder will be satisfied in full and no liens or encumbrances upon the capital stock of the Company will exist as of the Closing date. We understand that the current principal balance of the Term Loan is approximately $22 million and that Swiss Reinsurance America Corporation is a surety for such loan.

## BINDING PROVISIONS

3.     Diligence Investigation. Immediately upon the execution of this letter, the Company shall provide Mattamy's authorized employees, agents, consultants, legal counsel, accountants and other representatives with full access, upon reasonable prior notice, to the Company, its assets, properties, contracts, books and records and all other information and data concerning the Company, including without limitation working papers of the Company's public accountants. The Company and its officers and employees shall cooperate fully with, and the Company shall request its public accountants and outside legal counsel to cooperate fully with, those individuals engaged in Mattamy's investigation, and to make a full and complete disclosure to Mattamy of all material facts regarding the assets, liabilities, business, results of operations, financial condition, tax position and prospects of the Company. The examination shall include such environmental reviews as Mattamy may deem appropriate.

4.     Expenses. Purchaser and Interest Holder shall each bear their own accounting and legal fees and other costs and expenses with respect to the negotiation and preparation of the Definitive Agreement and the consummation of the Acquisition. The Interest Holder shall pay its share of such costs and expenses, including any broker fees for the Acquisition, from the Purchase Price and not the Assets of the Company.

5.     Confidentiality; Publicity. Without the prior written consent of the other parties hereto, no party shall, and each party shall cause its respective Representatives not to, make any release to the press or other disclosure with respect to either the fact that discussions or negotiations are taking place concerning Purchaser's possible acquisition of the Stock or the existence or contents of this letter, except for (a) such public disclosure as a party hereto reasonably believes may, after due consultation with counsel for such party, be necessary, in order for such party not to be in violation of or default under any applicable law, regulation, governmental order or rule of any securities market and (b) such other disclosure, on a confidential basis, as may be reasonably required to seek or obtain any consents of third parties to permit the transfer of the Stock to Purchaser. For purposes hereof, "Representatives" means officers, directors, managers, partners, members, employees, agents, counsel, accountants, financial advisors, consultants and other representatives.

6.  **Exclusivity.** For the period (the "Exclusivity Period") from the date of the Interest Holder's execution hereof until the earliest of (the "Termination Date") (a) December 31, 2004, or (b) the execution and delivery of the Definitive Agreement, Interest Holder shall not, and shall not permit any of its Representatives to, and shall direct its respective Representatives not to, directly or indirectly, enter into any discussions, negotiations or agreements with, or provide information to, any person, entity or group other than Mattamy relating to any proposal or offer for or inquiry about any merger or other business combination involving the Company, any acquisition of any equity ownership in the Company or any acquisition of a substantial portion of the Assets, whether directly or indirectly (a "Business Combination"). In addition, on the date of the Interest Holder's execution hereof, the Interest Holder and its Representatives shall cease any discussions, negotiations and the provision of information to any person, entity or group other than Mattamy with which it or its Representatives have had contact prior to such date regarding a Business Combination.

7.  **Conduct of Business.** From the date hereof through the date of Closing, the Company shall conduct its business in the ordinary course consistent with past practice.

8.  **Letter of Intent Not Binding; Survival.** This letter is intended to be a confirmation of Mattamy's interest with respect to the Acquisition and it is expressly understood that (a) this letter is not intended to, and does not, constitute an agreement to consummate the Acquisition or to enter into a definitive acquisition agreement and (b) the parties hereto will have no rights or obligations of any kind whatsoever relating to the Acquisition by virtue of this letter or any other written or oral expression by their respective Representatives or any past or future action, inaction or course of conduct or dealing unless and until a Definitive Agreement is executed and delivered; provided that the respective obligations of the Interest Holder and Mattamy contained in Sections 3, 4, 5, 6, 7 and this Section 8 (the "Binding Provisions") will constitute the binding agreements of the Interest Holder and Mattamy, as the case may be, when the Interest Holder has signed and returned a copy of this letter to Mattamy in the manner provided below, and will survive the Termination Date. The Binding Provisions, together with the Confidentiality Agreement, constitute the entire agreement among the parties and supersede all prior oral or written agreements, understandings, representations or other statements with respect to the subject matter hereof. The Binding Provisions shall be governed by and construed under the laws of the State of North Carolina without regard to conflicts of laws principles that would apply any other law.

Please indicate your acceptance of the foregoing by countersigning this letter and returning it to the undersigned at the address set forth on the first page hereof. Mattamy's proposal shall expire if a fully executed original (or facsimile copy followed by hard copy) has not been received by Mattamy by 5:00 p.m. Eastern Time on October 27, 2004.

Very truly yours,

MATTAMY HOMES CORPORATION

By: _____
William R. Lanius, President

AGREED AND ACCEPTED THIS
DAY OF OCTOBER _____, 2004

ALH II, INC., in its capacity as sole shareholder of MULVANEY HOMES, INC.

By: _____

Name: _____

Title: _____

# CIVIL COVER SHEET

3:05CV256-H

JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

A. Avesro Holdings, LTD., D.A. Gardens, Ltd., J12ALH Associates, Selk, LLC, Laurel Equity Group, LLC

**(b)** County of Residence of First Listed Plaintiff   Caesarea, Israel
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Cozen O'Connor, 301 S. College St., Charlotte, NC 28202
(704) 376-3400

## DEFENDANTS

Shamrock Holdings of California, Inc., Shamrock Capital Advisors, Inc., Eugene I. Krieger, George J. Buchler, Bruce J. Stein

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☒ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Stockholder's Suit

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE
06/02/2005

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____